ALTSHULER BERZON LLP
EVE CERVANTEZ
ecervantez@altshulerberzon.com
JONATHAN WEISSGLASS
jweissglass@altshulerberzon.com
DANIELLE LEONARD
dleonard@altshulerberzon.com
MEREDITH JOHNSON
mjohnson@altshulerberzon.com
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

COHEN MILSTEIN SELLERS & TOLL PLLC
ANDREW N. FRIEDMAN
afriedman@cohenmilstein.com
GEOFFREY GRABER
ggraber@cohenmilstein.com
SALLY M. HANDMAKER
shandmaker@cohenmilstein.com
ERIC KAFKA
ekafka@cohenmilstein.com
1100 New York Ave. NW Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

*Lead Plaintiffs' Counsel*

*Additional counsel appear on signature page*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN RE ANTHEM, INC. DATA BREACH LITIGATION** | Misc. No.<br><br>**Notice of Motion, and Motion to Compel Compliance with *Subpoena Duces Tecum***<br><br>Hearing:     To Be Set<br>Time:        To Be Set |

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ............................................................................... 2

II.   PROCEDURAL HISTORY .................................................................................... 7

   A.   Proceedings in the MDL ............................................................................... 7

   B.   Proceedings Specific to Discovery Sought From the OPM .................................... 9

III.  STATEMENT OF FACTS.................................................................................... 12

   A.   Documents that Formed the Factual Basis of Statements in the 2013 Audit Report......... 13

   B.   The Facts Obtained from OIG Auditor Interviews ............................................. 17

   C.   OPM's 2015 Draft Audit Report and 2015 Final Audit Report....................................... 19

   D.   Security of Personal Information Stored on Anthem's Computer System ....................... 20

   E.   OPM's Audit Access to Anthem/WellPoint's Computer System................................... 20

IV.   LEGAL STANDARDS ........................................................................................ 23

   A.   Burden of Proof for the Assertion of Any Privilege........................................... 23

   B.   Law Enforcement Privilege ........................................................................ 24

   C.   Deliberative Process Privilege .................................................................... 26

V.    ARGUMENT...................................................................................................... 28

   1.   The requested documents do not relate to an ongoing criminal investigation.............. 28

   2.   OPM has failed to satisfy its burden of proof on its claims of law enforcement privilege. 29

   B.   Deliberative Process Privilege Does Not Protect the Requested Documents.................... 29

   1.   The requested documents were not "pre-decisional."...................................... 30

   2.   The requested documents were not "deliberative" for purposes of the deliberative process privilege. ........................................................................................... 34

   3.   OPM must document that it made reasonable efforts to segregate factual material....... 36

   C.   If the Qualified Deliberative Process Privilege is Applicable at All, it is Overcome here by Plaintiffs' Need for the Information and the Extremely Low Level of Potential Harm Posed by Production of the Documents................................................................... 38

   1.   Information obtained during OPM's IT security audits is relevant. ............................ 38

   2.   OPM is the only source of IT security audit backup....................................... 39

   3.   The litigation is serious. ........................................................................ 40

i

4.   OPM's IT security audits were undertaken to benefit federal employees. .................... 40

5.   Possibility of future timidity of the government is minimal. ........................................ 40

6.   The level of potential for harm, if any, is minimal. ...................................................... 41

# TABLE OF AUTHORITIES

**Cases**

*A.N.S.W.E.R. Coal. v. Jewell*, 292 F.R.D. 44 (D.D.C. 2013)............................................ 24, 25, 28

*Bernat v. City of Cal. City*, No. 1:10-cv-00305 OWW JLT, 2010 U.S. Dist.
LEXIS 111538 (E.D. Cal. Oct. 12, 2010)............................................................. 34

*Blanks v. Lockheed Martin Corp.*, No. 4:05cv137 LR, 2006 U.S. Dist. LEXIS
46770, 2006 WL 1892512 (S.D. Miss. July 10, 2006)...................................... 37

*Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318 (D.D.C.1966), aff'd,
384 F.2d 979, 128 U.S. App. D.C. 10 (D.C.Cir.), *cert. denied*, 389 U.S.
952, 88 S. Ct. 334, 19 L. Ed. 2d 361 (1967)...................................................... 27

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 199 U.S. App. D.C.
272 (D.C. Cir. 1980). ......................................................................................... 30

*Coleman v. Schwarzenegger*, No. Civ. S-90-0520-LKK JFM P, 2008 U.S. Dist.
LEXIS 111653 (N.D. Cal. Sept. 10, 2008) .................................................. 24, 27

*Ctr. for Biological Diversity v. OMB*, No. C 07-4997 MHP, 2008 U.S. Dist.
LEXIS 98387 (N.D. Cal. Nov. 25, 2008) ..................................................... 27, 36

*Deseret Mgmt. Corp. v. United States*, 76 Fed. Cl. 88 (2007).......................................... 23, 24, 29

*Dobyns v. United States*, 123 Fed. Cl. 481 (2015).......................................................... 31, 32, 36

*Dole v. Milonas*, 889 F.2d 885 (9th Cir. 1989)................................................................. 23

*E.B. v. N.Y. City Bd. of Educ.*, 233 F.R.D. 289 (E.D.N.Y. 2005) .................................. 32

*EEOC v. FAPS, Inc.*, 2012 U.S. Dist. LEXIS 65591 (D.N.J. May 10, 2012) .............................. 38

*EPA v. Mink*, 410 U.S. 73, 93 S. Ct. 827, 35 L. Ed. 2d 119 (1973)............................... 36

*Eureka Fin. Corp. v. Hartford Accident and Indem. Co.*, 136 F.R.D. 179
(E.D.Cal.1991) ................................................................................................... 23

*Fox News Network, LLC v. United States Dep't of the Treasury*, 911 F. Supp. 2d
261 (S.D.N.Y. 2012)............................................................................................ 31

*Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336 (D.C. Cir. 1984)................. 38, 41

*FTC v. Liberty Supply Co.*, No. 4:15-CV-829, 2016 U.S. Dist. LEXIS 107784
(E.D. Tex. Aug. 15, 2016) ............................................................................. 25, 28

*FTC v. Warner Commc'ns Inc.,* 742 F.2d 1156 (9th Cir. 1984) ................................. 26

*Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473 (2d Cir. 1999) ............................... 31

*Heathmen v. United States Dist. Ct. for Cent. Dist. of Cal.*, 503 F.2d 1032 (9th
    Cir. 1974) ............................................................................................ 23

*Hopkins v. United States Dep't of Housing & Urban Dev.*, 929 F.2d 81 (2d Cir.
    1991) ............................................................................................ 26, 29

*In re Dep't of Investigation,* 856 F.2d 481 (2d Cir. 1988) .................................... 25, 28

*In re Franklin National Bank Securities Litigation*, 478 F.Supp. 577
    (E.D.N.Y.1979) ........................................................................................ 27

*In re Sealed Case*, 326 U.S. App. D.C. 276, 121 F.3d 729 (D.C. Cir. 1997) ................. 27, 36, 38

*In re U.S. Dep't of Homeland Sec.*, 459 F.3d 565 (5th Cir. 2006) ........................... 25, 28

*In re United States*, 277 U.S. App. D.C. 37, 872 F.2d 472(1989) ............................ 24

*Kaufman v. City of New York*, No. 98 Civ. 2648 (MJL) (KNF), 1999 U.S. Dist.
    LEXIS 5779 (S.D.N.Y. Apr. 22, 1999) .................................................... 23

*L.H. v. Schwarzenegger,* 2007 U.S. Dist. LEXIS 52060, 2007 WL 2009807 (E.D.
    Cal. July 6, 2007) .................................................................................. 24

*Micillo v. Liddle & Robinson LLP*, No. 15-CV-6141 (JMF), 2016 U.S. Dist.
    LEXIS 67247 (S.D.N.Y. May 23, 2016) .................................................... 25

*National Sec. Archive Fund v. CIA,* 402 F. Supp. 2d 211 (D.D.C. 2005) ................. 37

*Nat'l Wildlife Fed'n v. U.S. Forest Svc.*, 861 F.2d 1114, 1117 (9th 1988) ................. 26

*Nev. Partners Fund, LLC v. United States*, No. 3:06cv379-HTW-MTP, 2008 U.S.
    Dist. LEXIS 47853 (S.D. Miss May 12, 2008) ........................................... 37

*NLRB v. Robbins Tire and Rubber Co.*, 437 U.S. 214, 98 S. Ct. 2311, 57 L. Ed. 2d
    159 (1978) ............................................................................................ 36

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975) .......................................... 29

*North Pacifica, LLC v. City of Pacifica*, 274 F.Supp.2d 1118 (N.D. Cal. 2003) ......... 24

*Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 389 U.S. App. D.C. 356 (D.C. Cir.
    2010) ............................................................................................ 27

*Qamhiyah v. Iowa State Univ. of Sci. & Tech.*, 245 F.R.D. 393 (S.D. Iowa 2007) ......... 35

*S.E.C. v. Cuban*, No. 3:08-CV-2050-D, 2013 U.S. Dist. LEXIS 37167, 2013 WL
1091233 (N.D. Tex. Mar. 15, 2013) .................................................................. 25, 28, 37

*SEC v. Reserve Mgmt. Co. (In re Reserve Fund Sec. & Derivative Litig.)*, No. 09
Civ. 4346, 2010 U.S. Dist. LEXIS 146620 (S.D.N.Y. Nov. 29, 2010) .......................... 24

*Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. United States
Dep't of Justice*, 823 F.2d 574, 262 U.S. App. D.C. 166 (D.C. Cir. 1987)..................... 31

*Tigue v. United States DOJ*, 312 F.3d 70 (2d Cir. 2002)................................................. 32

*Tuite v. Henry*, 181 F.R.D. 175 (D.D.C. 1998)............................................................. 24

*United States of Am. v. Hardrives, Inc.*, No. CIV 90-1656 PHX RGS (MM), 1991
U.S. Dist. LEXIS 22094 (D. Ariz. Feb. 4, 1991)................................................. 23, 25, 26

*United States v. American Telephone and Telegraph Co.*, 524 F.Supp. 1381
(D.D.C.1981) ..................................................................................................... 27, 40

*United States v. Davis*, 131 F.R.D. 391 (S.D.N.Y. 1990)............................................. 23

*United States v. Leggett & Platt, Inc.*, 542 F.2d 655 (6th Cir.1976) ........................... 27

*United States v. Martin*, 278 F.3d 988 (9th Cir. 2002) ............................................... 23

*United States v. Pac. Gas & Elec. Co.*, No. 14-cr-00175-TEH-1, 2016 U.S. Dist.
LEXIS 77311 (N.D. Cal. June 14, 2016)............................................................. 23, 26, 29

*Velez v. City of New York*, No. CV 2004-1775, 2010 U.S. Dist. LEXIS 54237,
2010 WL 2265443 (June 2, 2010) ...................................................................... 32, 34, 35

*Waters v. United States Capitol Police Bd.*, 216 F.R.D. 153 (D.D.C. 2003) ............... 33

*Weil v. Investment/Indicators, Research and Management, Inc.*, 647 F.2d 18 (9th
Cir.1981) .......................................................................................................... 23

**Statutes**

28 U.S.C. § 1407.......................................................................................................... 7

FOIA Improvement Act of 2016.................................................................................. 29

**Rules**

Federal Rule of Civil Procedure 45 .............................................................................. 9

**Treatises**

2 J. Weinstein & M. Berger, Weinstein's Evidence P 509 (1982)................................ 27

**Regulations**

5 C.F.R. §295.203 ......................................................................................................................... 9

NOTICE is hereby given of the filing of this motion pursuant to Federal Rule of Civil Procedure 45(c)(2)(B) by Lead Plaintiffs ("Plaintiffs"), through their counsel.  This motion seeks to compel the Respondent, U.S. Office of Personnel Management ("OPM"), to comply with the *subpoena duces tecum* ("Subpoena")[1] that Plaintiffs' counsel has issued to it and to produce and permit for inspection and copying the materials specified in that Subpoena that have been withheld due to OPM's assertions of qualified privilege.  Pursuant to Local Civil Rule 7(m), the undersigned counsel for Plaintiffs represents that he has conferred with counsel for OPM with respect to this motion, but that, after conferring, OPM has chosen to refuse to produce the withheld documents responsive to the Subpoena.  In support of this motion, Plaintiffs' counsel is also filing the Declaration of Andrew N. Friedman, with exhibits attached.

This motion seeks an order from this Court directing OPM to produce documents it has withheld on asserted grounds of deliberative process privilege and law enforcement privilege. As described in detail below, these are not applicable in this situation and the withheld documents are highly relevant  to and will likely be very useful to Plaintiffs in the prosecution of their claims against Anthem, Inc. ("Anthem")[2] and other defendants[3] (collectively, the

---

[1]  A copy of the Subpoena is attached as Exhibit A to the Declaration of Andrew N. Friedman in Support of Motion to Compel Compliance with *Subpoena Duces Tecum* ("Decl.").

[2] The entity now known as Anthem was formed when Anthem, Inc., merged with WellPoint Health Networks Inc. in 2004.  From 2004 to December 2014, the company was known as WellPoint, Inc.  *See* https://www.antheminc.com/aboutantheminc/companyhistory/index.htm (last visited Sept. 27, 2016).

[3] Defendant Anthem is the parent company of and served its medical members through its health benefits and insurance subsidiaries and affiliates (the "Anthem Affiliates").  Third Consolidated and Amended Class Action Complaint ¶123.  Anthem also coordinated with other independent Blue Cross Blue Shield licensee insurance and health benefit companies ("non-Anthem BCBS") to create the BlueCard program (a national program that enables members of one Blue Cross and Blue Shield (BCBS) Plan to obtain healthcare services while traveling or living in another Blue Cross and Blue Shield Plan's service area). *Id*. at ¶250 The Anthem Affiliates and non-Anthem BCBS companies also named as defendants are listed at ¶¶124-166.  *Id.* Defendant Blue Cross Blue Shield Association ("BCBSA") is a national federation of 38 independent, community-

1

"Defendants") in the matter captioned *In re: Anthem, Inc. Data Breach Litigation*, 15-MD-02617-LHK, pending in the United States District Court for the Northern District of California (San Jose Division) before The Honorable Lucy H. Koh.

## I.   PRELIMINARY STATEMENT

In 2014 and 2015, Anthem experienced one of the largest data security breaches in history (the "Data Breach").  *See* Decl. Ex. B, Third Consolidated and Amended Class Action Complaint ("TAC") ¶1 (Redacted).  Hackers stole the Personally Identifiable Information ("PII") and Protected Health Information ("PHI") (collectively, "Personal Information") of approximately 80 million Americans ("Affected Individuals") that Anthem had collected and recklessly stored on one centralized database (the "Anthem Database") on Anthem's computer system.  *See* TAC ¶3.  Anthem used its Anthem Database to store the types of information that federal and state law requires companies to take security measures to protect: names, dates of birth, Social Security numbers, health care ID numbers, home addresses, email addresses, employment information, income data, and confidential medical data.  Defendants agreed and represented to the Affected Individuals that they would safeguard their members' Personal Information consistent with industry standards and the law.  We now know, they did not.  TAC ¶¶3-8.

Despite the fact that Anthem was storing massive amounts of unencrypted sensitive Personal Information that it knew was valuable to, and vulnerable to, hackers, Anthem failed to take even the most basic security precautions that could have protected Affected Individuals' data.  TAC ¶¶352-374.  Instead, Anthem used grossly inadequate computer systems and data security practices that allowed the hackers to easily gain access to and steal 80 million Affected

---

based and locally operated Blue Cross and Blue Shield companies and owns and manages the Blue Cross and Blue Shield trademarks and names.  *Id.* ¶307.

Individuals' Personal Information.  *Id.*  Such a massive hacking operation took time, and there were numerous opportunities along the way when any company following standard IT security practices would have foiled the Anthem hackers.  But Anthem failed to take these basic precautions.

On February 4, 2015, Anthem publicly announced that "[c]yber attackers executed a very sophisticated attack to gain unauthorized access to one of our parent company's IT systems and have obtained personal information relating to consumers . . . who are currently covered, or who have received coverage in the past.  The information accessed includes names, birthdays, social security numbers, street addresses, email addresses and employment information, including income data.  *See* TAC ¶347; Decl. Ex. C, Statement regarding cyber attack against Anthem; and http://www.nbcnews.com/news/us-news/anthem-major-health-insurer-suffers-hack-attack-n300511 (last visited Oct. 17, 2016).

Among the 80 million Affected Individuals were federal employees enrolled in health insurance offered by Anthem Affiliates through the Federal Employee Health Benefit Program ("FEHBP") administered by OPM.  The contracts between OPM and the companies that provide insurance under FEHBP grant OPM the right to conduct information technology ("IT") security audits of the providers' computer systems.  In 2013, OPM's Office of Inspector General ("OIG") conducted an IT security audit of the computer system at Anthem (then known as "WellPoint"), the same system from which the Personal Information of 80 million Anthem customers was stolen in 2014 and 2015.

OPM's Final Report, Audit Of Information Systems General And Application Controls at WellPoint, Inc. (the "2013 Audit Report")[4] identified a number of security flaws in WellPoint's IT systems that are highly relevant to Plaintiffs' current claims against Anthem, for example:

- "WellPoint has not implemented technical controls to prevent rogue devices (laptops, workstations, or routers not issued by or approved by the company) from connecting to its network";

- "WellPoint has created Technical Configuration Standards (TCS) that outline approved configuration settings for server and mainframe security software . . . However, we found several mainframe security settings that were not in compliance with the TCS."

- "[D]uring our review we discovered that several specific servers containing Federal data are not subject to routine vulnerability scanning, and we could not obtain evidence indicating that these servers have ever been subject to a vulnerability scan . . . Failure to perform full scope vulnerability scanning increases the risk that WellPoint's systems are compromised and sensitive data stolen or destroyed."

Further, OPM reported that WellPoint *willfully prevented OPM from conducting critical tests* to evaluate the security of the configuration of WellPoint's computer servers and, further, failed to provide evidence that WellPoint itself adequately monitored the configuration of its own servers.  As a result, OPM stated in its 2013 Audit Report: "There was one element of our audit in which WellPoint applied external interference with the application of audit process" and, consequently, OPM was "unable to independently attest that WellPoint's computer servers maintain a secure configuration."  *See* Decl. Ex. D (2013 Audit Report at 2).

Shortly after the Anthem Data Breach was announced, OPM notified Anthem of its intent to conduct a limited IT security audit (the "2015 Follow-on Audit") of Anthem's IT systems to evaluate the security of Anthem's server configuration – *i.e.*, the testing that WellPoint had prevented OPM from conducting during the 2013 Audit.  *See* Decl. Ex. E (OIG email

---

[4] *See* Decl. Ex D.

correspondence with Information Security Media Group).  The 2015 Follow-on Audit resulted in a draft audit report (the "2015 Draft Audit Report"), which OPM provided to Anthem in April 2016 and a 2015 Final Audit Report also provided by OPM to Anthem.  Neither Anthem nor OPM has yet produced these documents to Plaintiffs.

Thus, OPM, in the course of two separate IT security audits, independently and contemporaneously observed and documented not only the security flaws in WellPoint/Anthem's IT systems housing the Personal Information at the heart of Plaintiffs' lawsuit against Anthem, but also Anthem's knowledge of those flaws, its failure to cure them and even acts that kept OPM from testing and uncovering additional security flaws and vulnerabilities.

This motion seeks an order compelling OPM to produce a small number of documents that OPM has identified as relating to the 2013 Audit and/or the 2015 Follow-on Audit and responsive to requests for documents in the Subpoena.  These documents likely contain highly probative information bearing on, among other things: (a) the state of IT security at WellPoint/Anthem at the time of the 2013 Audit and 2015 Follow-on Audit; (b) WellPoint/Anthem's knowledge of IT security vulnerabilities; (c) WellPoint/Anthem's failure to undertake measures needed to appropriately monitor and secure the Personal Information of FEHBP participants and tens of millions of other Affected Persons stored on the Anthem Database; and (d) acts and representations by WellPoint/Anthem to frustrate OPM's efforts to conduct IT security audits.  Such information will assist the Plaintiffs in proving their claims against Anthem and other Defendants.

OPM's privilege claims are for the most part unfounded, as evidenced by the boilerplate nature of the explanations in its privilege log.  Moreover, even if some of the documents are held

to contain privileged material, OPM has failed to make a diligent attempt to segregate and produce the non-privileged portions of the documents.

Finally, both of the privileges on which OPM relies are "qualified privileges."  Plaintiffs' need for the documents and the compelling interest of millions of Federal Employee Class members and 80 million Affected Persons is sufficient to overcome the minimal, if any, potential for harm to OPM in light of the protections already in place for the handling and use of such documents.  Much of this information is unavailable to Plaintiffs, or would require enormous expenditures of time and effort by both Plaintiffs and Anthem personnel to attempt to replicate the factual investigation already performed and contemporaneously documented by OPM.  To the extent OPM has a legitimate interest in preventing public disclosure of the information requested, the protective order in effect in the litigation would assure confidentiality.

The very purpose of OPM's IT security audits was and is to protect the Federal Employee Class members from unauthorized disclosure of their Personal Information and to ensure they are getting state-of-the-art IT security of their Personal Information, the benefit of the bargain to which they are entitled.  Where those audits revealed security flaws that if timely corrected may have thwarted the massive Anthem Data Breach, it would be a perversion of the system to deny the victims of the Data Breach access to work done by OPM on their behalf.  OPM should be compelled to produce the requested documents.  In the alternative, OPM should be ordered to make a diligent effort to segregate and produce the factual information in any of the requested documents gathered during, or related to, the IT security audits.  If OPM continues to claim segregation is not possible, OPM should submit the documents to the Court for *in camera* review.

## II.     PROCEDURAL HISTORY

### A.  Proceedings in the MDL

A number of lawsuits were filed against Defendants in the wake of the Anthem Data

Breach.  In general, these lawsuits bring putative class action claims alleging (1) failure to

adequately protect Anthem's data systems, (2) failure to disclose to customers that Anthem did

not have adequate security practices, and (3) failure to timely notify customers of the Data

Breach.

In Spring 2015, plaintiffs in several lawsuits moved pursuant to 28 U.S.C. § 1407 to

centralize pretrial proceedings in a single judicial district.  On June 12, 2015, the Judicial Panel

on Multidistrict Litigation transferred all cases to the Northern District of California and

assigned the actions arising out of the Anthem Data Breach to Judge Lucy H. Koh for

coordinated or consolidated pretrial proceedings in the multidistrict litigation ("MDL"). *See*

Decl. Ex. F (Transfer Order at 1–3).

On September 21, 2015, the Court entered a Stipulated Protective Order For In Re

Anthem, Inc. Data Breach Litigation Involving Highly Sensitive Confidential Information

And/Or Trade Secrets ("Protective Order").  *See* Decl. Ex. G.

On October 19, 2015, pursuant to Judge Koh's request, Plaintiffs filed a Consolidated

Amended Class Action Complaint ("CAC"),  which organized Plaintiffs' causes of action into

thirteen different counts, with claims asserted pursuant to various state and federal laws under

each count.  *See* ECF No. 334-6[5] (Redacted).

Significantly, Count VI of the CAC (¶¶331-342) asserted a third-party beneficiary claim

for breach of contract under federal law on behalf of a Federal Employee Class, of all enrollees

---

[5] "ECF No. __" references in this memorandum refer to docket entries in *In re: Anthem, Inc. Data Breach Litigation*, 15-MD-02617-LHK (N.D. Cal).

in the Federal Employee Health Benefits Plan whose Personal Information was maintained on

the Anthem Database and was compromised in the Data Breach.  CAC ¶272.  The BCBSA,

Anthem, and other defendants contracted to protect the Personal Information of Federal

Employee Class members who enrolled in the Blue Cross Blue Shield Service Benefit Plan

("Federal BCBSA Plan"), which is governed by Contract No. CS 1039 ("Federal BCBSA

Contract") between OPM and BCBSA, acting on behalf of Anthem, and other defendants who

each promised to protect the Personal Information of the individuals insured under the Federal

BCBSA Plan.  CAC ¶¶172-174.  Anthem also promised in the Federal BCBSA Contract to

permit OPM to conduct IT security audits of Anthem's computer systems, including

vulnerability scans.

On November 23, 2015, Defendants filed their first round motions to dismiss and, after

briefing and argument, on February 14, 2016, the Court granted in part and denied in part the

first round motions to dismiss. ("First MTD Order.").  *See* Decl. Ex. H.  Significantly, the Court

denied the motion as to the third-party beneficiary claim for breach of contract on behalf of the

Federal Employee Class.

In accordance with the Court's First MTD Order, on March 11, 2016, Plaintiffs filed a

Second Consolidated Amended Class Action Complaint.  *See* ECF No. 473-4 (Redacted).  On

April 5, 2016, Defendants filed their second round motions to dismiss and, after briefing and

argument, on May 27, 2016, the Court granted in part and denied in part the second round

motions to dismiss ("Second MTD Order.").  *See* Decl. Ex. I.  On July 11, 2016, Plaintiffs filed

their TAC.  *See* Decl. Ex. B.  On August 4, 2016, Defendants filed their Answers to the TAC.

*See* Decl. Ex. J.

On July 22, 2016, the Court issued a Case Management Order that, among other things set December 1, 2016 as the close of fact discovery.  *See* Decl. Ex. K (Case Management Order at 2).

### B.  Proceedings Specific to Discovery Sought From the OPM

On May 13, 2016, Plaintiffs served the OPM with a letter request for records and information pursuant to 5 C.F.R. §295.203 ("Touhy Request") seeking seventeen categories of documents related to the 2013 Audit and 2015 Follow-on Audit and the Anthem Data Breach publicly announced in February 2015.  *See* Decl. Ex. L.

Also on May 13, 2013, Plaintiffs served the OPM with a Subpoena in the *In Re Anthem, Inc. Data Breach Litigation,* requesting production within this district, at the offices of Cohen Milstein Sellers & Toll PLLC, in Washington, D.C., of the same seventeen categories of documents requested in the Touhy Request.  *See* Decl. Ex. A and L.

By letter dated May 27, 2016, on behalf of the OPM, the U.S. Department of Justice ("DOJ") objected to the Subpoena pursuant to Federal Rule of Civil Procedure 45(d)(2)(B).  *See* Decl. Ex. M.

On June 3, 2016, counsel for the Plaintiffs conferred with Joseph Borson of the U.S. Department of Justice, Civil Division, Federal Programs Branch ("DOJ") on the scope, relevance and time period of documents sought and by letter dated June 6, 2016, counsel for Plaintiffs supplemented the Touhy Request on those issues.  *See* Decl. Ex. N.  Among other things, Plaintiffs' counsel provided copies of the First MTD Order and Second MTD Order and explained that OPM documents sought were relevant not only to the third-party beneficiary claim asserted on behalf of the Federal Employee Class, but the claims of all Affected Individuals.  Because of the IT security audit work OPM

conducted at WellPoint/Anthem, OPM was in a unique position to independently observe and document facts and conditions related to the security of Anthem's computer systems in 2013 (prior to the Data Breach) and in 2015 (after the Data Breach). Those facts are relevant to all 80 million Affected Individuals. Plaintiffs allege that Anthem's grossly inadequate data security caused injury to *all* class members. Evidence of Anthem's inadequate data security documented by OPM while conducting the 2013 Audit or 2015 Follow-on Audit is not only relevant, but likely compelling direct evidence that would tend to prove all claims in the TAC.

The withheld documents have added relevance to the Federal Employee Class members in connection with their third-party beneficiary claim. The TAC alleges that the Federal BCBSA Contract was intended to directly benefit and create enforceable rights for Federal Employee Class members. TAC ¶ 518. OPM paid money to Anthem and provided Anthem with Federal Employee Class members' Personal Information. TAC ¶ 519. In exchange, Anthem promised to provide health benefit services and to take reasonable measures to protect the security and confidentiality of Federal Employee Class members' Personal Information. TAC ¶ 519. The terms of the Federal BCBSA Contract that concern the protection of Federal Employee Class members' Personal Information were material terms. TAC ¶ 522. Federal Employee Class members are clearly intended third-party beneficiaries of the data security provisions in the Federal BCBSA Contract and are entitled to directly enforce its terms. TAC ¶ 527.

OPM did not receive the full benefit of its bargain, and instead Federal Employee Class members received services that were less valuable than what OPM had bargained for. TAC ¶ 528. Anthem did not implement the security measures required by the Federal BCBSA Contract

10

(TAC ¶ 528) and moreover, WellPoint/Anthem took steps to frustrate OPM's efforts to conduct IT security audits that OPM was entitled to conduct under the Federal BCBSA Contract by imposing scope limitations and refusing OPM access to its computer system to perform standard vulnerability scans. TAC ¶¶ 340-41. The Federal Employee Class members have been injured as a result of Anthem's breach of contract and are entitled to damages and/or restitution.  TAC ¶ 531.

The withheld documents that relate to the external interference or "difficulties" encountered during the 2013 Audit related to access to WellPoint's IT system, discussions about contract revisions and potential contract revisions necessitated by WellPoint/Anthem's refusal to cooperate with OPM's attempts to perform standard audit testing will likely be very useful in proving breach of the Federal BCBSA Contract and in seeking injunctive relief to stave off future breaches.

By letter dated June 16, 2016, the DOJ provided a request-by-request identification of what responsive information OPM and OIG had located at that time in its ongoing search for responsive documents.  *See* Decl. Ex. O.

On July 5, 2016, counsel for Plaintiffs and the DOJ again conferred on the scope of information sought which resulted in narrowing of certain requests and the OPM clarifying and supplementing information about the documents in its possession.  Plaintiffs agreed to conditionally limit their requests to exclude documents Plaintiffs could obtain from Anthem.  But if such documents could not be obtained from Anthem, OPM would consider producing them.

On July 15, 2016, the OPM made its final response to Plaintiffs' Touhy Request ("Touhy Response").  *See* Decl. Ex. P.  OPM produced approximately 150 pages of non-confidential responsive documents identified in its Touhy Response to Plaintiffs.

11

On July 20, 2016, counsel for Plaintiffs and the DOJ again conferred to clarify certain information in the Touhy Response and to confirm that OPM's production of information pursuant the Touhy Request was complete, and that OPM was withholding documents for which it asserted privilege and not merely because documents contained confidential information.

On August 9, 2016, OPM responded with clarifying information and stated that it had completed its search and did not expect to produce additional documents.  *See* Decl. Ex. Q.

On August 12, 2016, counsel for Plaintiffs and DOJ conferred about proceeding with the Subpoena and requesting a privilege log from the OPM for specific categories of documents responsive to the Subpoena that OPM had withheld from production due to the assertion of privilege.  On August 15, 2016, counsel for Plaintiffs provided the DOJ with a list of document categories for which Plaintiff's sought OPM's privilege log.  *See* Decl. Ex. R.  On September 9, 2016, the OPM produced its privilege log to Plaintiffs' counsel.  *See* Decl. Ex. S.

On October 19, 2016, counsel for Plaintiffs and DOJ met-and-conferred regarding the documents OPM has withheld from production.  The DOJ, on behalf of the OPM, stated while the OPM did not object on grounds of burden, it would not produce the documents Plaintiffs seek with this motion, and that the OPM would continue to assert the deliberative process privilege and/or law enforcement privilege.

III.    **STATEMENT OF FACTS**

The OPM's OIG Office of Audits conducts comprehensive and independent IT security audits at health insurance carriers such as Anthem/WellPoint that participate in the FEHBP. Anthem and its affiliates contracted with OPM to offer federal employees and other qualified persons health benefit plans through the FEHBP.  TAC ¶¶ 307-320.  In 2013, the OIG conducted an IT security audit of Anthem/WellPoint (TAC ¶¶ 418, 532) and issued the 2013 Audit Report

detailing numerous flaws and vulnerabilities in WellPoint's IT systems as well as WellPoint's refusal to allow OPM to conduct tests to evaluate the security of the configuration of a sample of WellPoint's computer servers.  The scope of the 2013 Audit centered on the IT systems used by WellPoint to process medical insurance claims for FEHBP members.[6]

Grossly inadequate IT security data at Anthem enabled hackers to take possession of sensitive Personal Information of 80 million Affected Persons which Anthem had stored on the Anthem Database causing injury to all class members.  Evidence of inadequate data security documented by OPM pertaining to IT security audits is, therefore, directly relevant to all claims in the TAC.

With this motion, Plaintiffs seek to compel production of five general categories of documents described in subsections A-E below:

### A. Documents that Formed the Factual Basis of Statements in the 2013 Audit Report

Plaintiffs seek to compel production by OPM of "documents that formed the basis" of ten specific statements in OPM's 2013 Audit Report ("Audit Report Statements").  OPM has identified between twelve and twenty-two documents responsive to 9 of these 10 specific statements (depending on the number of identified documents that are responsive to multiple requests).  To date, OPM identified no withheld documents for statement 1.  OPM has withheld all of the identified documents claiming the deliberative process privilege and law enforcement privilege.

---

[6] In the TAC, the third-party beneficiary claim for breach of contract under federal law against Anthem and others on behalf of a Federal Employee Class is set forth at ¶¶517-532.

The following chart lists the Audit Report Statements, the total number of responsive

documents identified by OPM for each statement, and document descriptions provided by OPM

in its privilege log:

| Statement in OPM 2013 Audit of Information Systems at WellPoint Inc. | # of responsive documents | "Withholding Description" provided by OPM |
|---|---|---|
| 1) "There was one element of our audit in which WellPoint applied external interference with the application of audit procedures, resulting in our inability to fully comply with GAS requirement of independence." | 0 | Auditor Statement: "There is no supporting documentation for this statement, it was the auditors' conclusion/professional opinion based on work performed during the audit. The "interference" was the whole issue about them not allowing us to perform scans." |
| 2) "when we requested to conduct this test at WellPoint [using automated tools to evaluate the configuration of a sample of computer servers], we were informed that a corporate policy prohibited external entities from connecting to the WellPoint network." | 4 | "Configuration Management Meeting Write Up" and three related scheduling and attendance documents. |
| 3) "we attempted to obtain additional information from WellPoint, but the Plan was unable to provide satisfactory evidence that it has ever had a program in place to routinely monitor the configuration of its servers" | 4 | "Configuration Management Meeting Write Up" and three related scheduling and attendance documents. |

| | | |
|---|---|---|
| 4)  "WellPoint has configured its servers to record the activity of privileged users (i.e., system administrators).  However, the event logs generated by these servers are only reviewed retroactively if a problem has been reported or detected . . . Failure to routinely review elevated user activity increases the risk that malicious activity could go undetected and sensitive information could be compromised" | 2 | Auditor Statement: "The portion of the statement that begins "Failure to routinely review..." does not have supporting documentation. It is based on the auditor's professional opinion of the effect of not having specific controls in place." Documents: "Network Security Meeting Write Up" and one related attendance document. |
| 5)  WellPoint has not implemented technical controls to prevent rogue devices (laptops, workstations, or routers not issued by or approved by the company) from connecting to its network" | 2 | "Network Security Meeting Write Up" and one related attendance document. |
| 6)  "during our review we discovered that several specific servers containing Federal data are not subject to routine vulnerability scanning, and we could not obtain evidence indicating that these servers have ever been subject to a vulnerability scan . . . Failure to perform full scope vulnerability scanning increases the risk that WellPoint's systems are compromised and sensitive data stolen or destroyed." | 2 | Auditor Statement: "The statement that begins "Failure to perform..." does not have supporting documentation. It is based on the auditor's professional opinion of the effect of not having specific controls in place." Documents: email from Anthem representative to OIG auditor stating that Anthem policy would not allow vulnerability scans. Vulnerability scanning workpaper describing Anthem's vulnerability scan practices. |

15

| | | |
|---|---|---|
| 7) "In order to evaluate an FEHBP carrier's configuration compliance auditing program, we typically use automated tools to document the actual configuration of a sample of servers.  We then compare the results to the company's approved baseline configuration . . . When we requested to conduct this test at WellPoint, we were informed that a corporate policy prohibited external entities from connecting to the WellPoint network." | 1 | Auditor Statement: "The portion of the statement that begins "In order to..." is the auditor's summarization of the testing performed to accomplish the audit step. There is no supporting documentation." Documents: email from Anthem representative to OIG auditor stating that Anthem policy would not allow vulnerability scans. |
| 8) "In an effort to meet our audit objective, we attempted to obtain additional information about WellPoint's configuration compliance auditing program.  We were initially provided a description of what appeared to be a thorough configuration compliance auditing program at WellPoint.  However, when we requested documentation to support this description, WellPoint was unable to provide any evidence that a configuration compliance auditing program had ever been in place at the company . . . Failure to implement a thorough configuration compliance auditing program increases the risk that insecurely configured servers remain undetected, creating a potential gateway for malicious virus and hacking activity that could lead to data breaches." | 1 | Auditor Statement: "The portion of the statement that begins "Failure to implement..." does not have supporting documentation. It is based on the auditor's professional opinion of the effect of not having specific controls in place." Documents: "Configuration Management Meeting Write Up" and three related scheduling and attendance documents. |
| 9) "During the fieldwork phase of the audit, WellPoint provided us with conflicting statements regarding its plans to transition to Tivoli Endpoint Manager.  These conflicting statements along with WellPoint's inability to provide evidence that it performs configuration compliance scans ultimately led to us documenting a formal scope limitation." | 2 | Documents: "Configuration Management Meeting Write Up" and one related attendance document. |

| | | |
|---|---|---|
| 10) "WellPoint has created Technical Configuration Standards (TCS) that outline approved configuration settings for server and mainframe security software . . . However, we found several mainframe security settings that were not in compliance with the TCS." | 1 | Documents: Workpaper describing auditor review of and conclusions about TCS settings for mainframe. |

## B.  The Facts Obtained from OIG Auditor Interviews

Plaintiffs seek to compel production by OPM of its documentation of interviews of

WellPoint personnel related to the 2013 Audit.  In planning its 2013 Audit, OPM first assessed

WellPoint's internal controls to determine the extent of compliance testing and other IT security

auditing procedures necessary to verify that internal controls were properly designed, placed in

operation, and effective.  *See* Decl. Ex. D (2013 Audit Report at 1-2).  OPM obtained that

understanding of WellPoint's internal controls through interviews and observations, as well as

inspection of various documents, including IT and other related WellPoint organizational

policies and procedures.  *Id*.  OPM identified 12 such interview summaries responsive to the

Subpoena that OPM has withheld from production on grounds of deliberative process privilege

and law enforcement privilege.  *See* Decl. Ex. S.

The following chart identifies 7 of the 12 interview summary documents and the

document descriptions provided by OPM in its privilege log for which Plaintiffs' counsel are

seeking the Court to compel OPM to produce:

| 2013 Audit IT Security Audit Planning | # of responsive documents | "Withholding Description" provided by OPM |
|---|---|---|
| Auditor interview summary | 1 | (4) Configuration Management Meeting Write Up. |
| Auditor interview summary | 1 | (6) Enterprise security Meeting Write Up. |

| Auditor interview summary | 1 | (8) Logical Access Meeting Write Up. |
|---|---|---|
| Auditor interview summary | 1 | (9)Network Security Meeting Write Up. |
| Auditor interview summary | 1 | (10) Physical access Meeting Write Up. |
| Auditor interview summary | 1 | (11) Risk Assessment Meeting Write Up. |
| Auditor interview summary | 1 | (12) Special Investigations and Fraud. |

OPM's privilege log includes the following boilerplate language as a Withholding

Description for each of the 2013 Audit Report Statements documents and Interview Summaries

being withheld:

> The OIG conducts audits as part of its unique oversight and enforcement role. The purpose of the IT audit is to ensure the audited entity's compliance with applicable laws, rules, regulations, standards, contract provisions, and other requirements. Factual information gathered during the audit is inextricably intertwined within documents that expose the audit process and reveal the deliberations of auditors as they reach the conclusions ultimately published in the Final Audit Report. Exposure of the audit process would have a chilling effect on the OIG's ability to obtain critical information for its oversight activities and enable audited entities to circumvent OIG's enforcement efforts. Revelation of the pre-decisional thoughts and impressions contained in the workpapers would cloud the Final Audit Report in confusion and contravene the Generally Accepted Government Auditing Standards. Any factual information contained in the workpapers would be available from the audited entity itself and could be obtained without the myriad harmful effects of compelling the government to waive its privileges. Audit workpapers are pre-decisional, deliberative documents, prepared during the course of an audit by individual auditors. Findings and Recommendations in the Final Audit Report are derived from the synthesis of deliberative information in the audit workpapers. Workpapers are designed to inform the conclusions and recommendations contained in the Final Audit Report and reflect the thoughts and impressions of each auditor as they gather information for consideration during the report drafting process.

In addition, where OPM identified a "Meeting Write-Up" as a responsive document (*see*

2013 Audit Report Statements 2, 3, 4, 5, 8 and 9 and Interview Summaries above), OPM's

"Withholding Description" includes the following:

18

"Meeting Write-Ups" are a form of workpaper documenting conversations or interviews between auditors and representatives of the audited entity, and reveal the mental process of the auditor on possible conclusions to draw from information that is shared during the meeting. The auditor's questions during the meeting reflect not only the auditor's judgment in response to the direction of the audit, but also protected investigative techniques, the revelation of which would undermine the OIG's ability to obtain complete and accurate information from other audited entities.

### C.  OPM's 2015 Draft Audit Report and 2015 Final Audit Report

Plaintiffs seek to compel production by OPM of a copy of its 2015 Final Audit Report. Shortly after Anthem announced the Data Breach in February 2015, OPM attempted to schedule a 2015 Follow-on Audit - a limited IT security audit comprised of the standard vulnerability scans and other tests WellPoint prohibited OPM from conducting during the 2013 Audit.  But as of March 2015, Anthem again informed OPM that it would not permit OPM to perform those standard vulnerability scans and configuration compliance tests citing "corporate policy." Despite OPM having conducted vulnerability scans and configuration compliance tests at numerous health insurance carriers without incident, Anthem again refused access.

Plaintiffs' counsel have been informed by the DOJ that OPM did conduct a 2015 Follow-on Audit and that a 2015 Draft Audit Report was provided by OPM to Anthem in the Spring 2016. The 2015 Draft Audit Report is *not* privileged and Plaintiffs' counsel are currently seeking production of the 2015 Draft Audit Report from Anthem.

On October 6, 2016, the DOJ informed Plaintiffs' counsel that OPM is currently administratively reviewing the 2015 Final Audit Report  to redact any confidential *business* information provided to OPM by Anthem and that it will be publicly releasing a redacted 2015 Final Audit Report "shortly."  A 2015 Final Audit Report has not been produced in the litigation by Anthem.

OPM has withheld the 2015 Final Audit Report on grounds that it contains information

confidential to Anthem and that, at some point in the future, the 2015 Final Audit Report can

presumably be obtained from Anthem.

### D.  Security of Personal Information Stored on Anthem's Computer System

Plaintiffs seek to compel production of internal OPM emails and inter-agency

memoranda that relate to the security and/or confidentiality of FEHBP enrollees' Personal

Information on WellPoint/Anthem's networks.  The OPM has identified 3 such documents

responsive to the Subpoena that it has withheld only on asserted grounds of deliberative process

privilege.  The 3 withheld documents are emails between OPM's OIG Information Systems

Audit Group ("ISAG") and Audit Resolution Branch that discuss how to close out OPM's IT

security recommendations to WellPoint stemming from the 2013 Audit.

The following chart identifies the 3 emails and document descriptions provided by OPM

in its privilege log for which Plaintiffs' counsel are seeking the court to compel OPM to produce:

| Security and/or the confidentiality of Enrollee's Personal Information | # of responsive documents | "Withholding Description" provided by OPM |
|---|---|---|
| Internal emails and inter-agency memoranda that relate to security and/or the confidentiality of enrollees' PII or PHI on Anthem's networks. | 3 | Emails between ISAG and Audit Resolution Branch re closing |

### E.  OPM's Audit Access to Anthem/WellPoint's Computer System

Plaintiffs seek to compel production of OPM's internal emails and memoranda regarding

OPM's access to Anthem/WellPoint's IT System for purposes of conducting IT security audits.

OPM has withheld this category of documents from production solely on asserted grounds of

deliberative process privilege.

OPM has identified 13 emails responsive to requests in the Subpoena that discuss OPM's

effort to modify the 2014 Federal BCBSA Contract following the "difficulties" during the 2013

Audit (WellPoint's refusal to provide OPM access to its computer system to perform standard vulnerability scans and configuration compliance tests), to modify the 2014 FEHB carrier contracts in a way that provided better IT audit access.  In these emails, OPM employees discuss issues raised during the Federal BCBSA Contracting process.  The OPM has also identified 26 emails between OPM's OIG and the Federal Employee Insurance Operations group (the "FEIO") regarding 2014 Federal BCBSA Contract language pertaining to OPM's IT security audit access in which OPM employees discuss issues raised during the same contracting process.

The OPM has identified 3 emails responsive to requests in the Subpoena between OIG, OPM and "carrier representatives" regarding the 2014 Federal BCBSA Contract Amendment pertaining to IT audit access.  According to OPM's privilege log, these emails discuss potential contractual modifications.

Finally, OPM has identified 4 emails responsive to requests in the Subpoena between OIG and OPM regarding 2015 (post Data Breach) discussions about potential contractual modification necessitated by Anthem's conduct and the Anthem Data Breach.   In these emails OPM employees discuss issues raised during the contracting process.

These audit access documents relate to difficulties OPM encountered with WellPoint thwarting its attempts to conduct a proper IT security audit in 2013 and discuss issues arising from contracting for access and will provide Plaintiffs information likely to be useful in proving WellPoint/Anthem's breach of the Federal BCBSA Contract and WellPoint/Anthem's willful conduct in its breach of that contract.  Contract language documents pertaining to Anthem's thwarting and interfering with OPM's IT security audit access will likely provide useful information about, among other things, interpretation of contract language including custom, usage and meaning that will assist Federal Employee Plaintiffs in proving breaches of contract as

well as obtaining effective injunctive relief to prevent future breaches such as refusing OPM

access to conduct proper IT security audits.

The following chart identifies the emails and document descriptions related to IT security

audit access provided by OPM in its privilege log for which Plaintiffs' counsel are seeking the

Court to compel OPM to produce:

| IT Security Audit Access | # of responsive documents | "Withholding Description" provided by OPM |
|---|---|---|
| Emails between OIG and FEIO discussing carrier comments on 2014 FEHB Contract Amendment | 13 | These emails pertain to OPM's effort, following the difficulties with the 2013 Anthem audit, to modify the 2014 FEHB carrier contracts in a way that provided better OIG IT audit access.  In these emails, OPM employees discuss issues raised during the contracting process. |
| Emails between OIG and FEIO re 2014 FEHB Contract Amendment language for OIG IT Audit Access | 26 | These emails pertain to OPM's effort, following the difficulties with the 2013 Anthem audit, to modify the 2014 FEHB carrier contracts in a way that provided better OIG IT audit access. In these emails, OPM employees discuss issues raised during the contracting process. |
| Emails between OIG and OPM regarding 2015 contract modifications (post Anthem breach) | 4 | These emails pertain to OPM discussion about potential contractual modification potentially necessitated after the Anthem breach. In these emails, OPM employees discuss issues raised during the contracting process. |
| Emails between OIG, OPM, and Carrier representatives re 2014 FEHB Contract Amendment for IT Audit Access | 3 | These emails discuss potential contractual modifications. |

In summary, it is believed that each of the above categories of withheld documents contains important information that will bear directly on, or will tend to show, among other things: (a) vulnerabilities of the security of computer systems at WellPoint/Anthem and the PII and PHI stored on those computer systems; (b) that management at WellPoint/Anthem was on notice of the vulnerabilities of the security of computers systems and the personal data stored thereon; and (c) that Wellpoint/Anthem, in violation of its obligations to provide access to OPM, interfered with OPM's efforts to conduct an IT systems audit at WellPoint/Anthem.

## IV.     LEGAL STANDARDS

### A.  Burden of Proof for the Assertion of Any Privilege

"The burden is on the party asserting the privilege to establish all the elements of the privilege." *United States v. Pac. Gas & Elec. Co.,* No. 14-cr-00175-TEH-1, 2016 U.S. Dist. LEXIS 77311, at *6 (N.D. Cal. June 14, 2016), quoting, *United States v. Martin*, 278 F.3d 988, 999-1000 (9th Cir. 2002). "The burden of justifying the application of the governmental deliberative process privilege rests with the party seeking to invoke it." *Deseret Mgmt. Corp. v. United States*, 76 Fed. Cl. 88, 95 (2007), quoting, *Kaufman v. City of New York*, No. 98 Civ. 2648 (MJL) (KNF), 1999 U.S. Dist. LEXIS 5779, at *10-11 (S.D.N.Y. Apr. 22, 1999).

"A party relying on privileges to protect materials from discovery has the burden of establishing the existence and applicability of each of the privileges asserted in all respects. *Dole v. Milonas*, 889 F.2d 885, 889 (9th Cir. 1989); *Heathmen v. United States Dist. Ct. for Cent. Dist. of Cal.*, 503 F.2d 1032, 1033 (9th Cir. 1974); *United States v. Davis*, 131 F.R.D. 391, 398 (S.D.N.Y. 1990)." *United States of Am. v. Hardrives, Inc.*, No. CIV 90-1656 PHX RGS (MM), 1991 U.S. Dist. LEXIS 22094, at *4 (D. Ariz. Feb. 4, 1991) (referring to work product privilege and law enforcement privilege).  "In examining the applicability of each of these privileges, the

23

court should be mindful of the fundamental tenet of the federal discovery rules which is to provide liberal pretrial discovery." *Id.*

"As with privileges generally, the deliberative process privilege should be narrowly construed because confidentiality may impede full and fair discovery of the truth. *See Eureka Fin. Corp. v. Hartford Accident and Indem. Co.*, 136 F.R.D. 179, 183 (E.D. Cal. 1991) (citing *Weil v. Investment/Indicators, Research and Management, Inc.*, 647 F.2d 18, 24 (9th Cir.1981)); *see also North Pacifica, LLC v. City of Pacifica*, 274 F.Supp.2d 1118, 1122 (N.D. Cal. 2003) (deliberative process privilege is "strictly confined within the narrowest possible limits consistent with the logic of its principles."). *Coleman v. Schwarzenegger*, No. Civ. S-90-0520-LKK JFM P, 2008 U.S. Dist. LEXIS 111653, at *20 (N.D. Cal. Sept. 10, 2008), quoting, *L.H. v. Schwarzenegger*, 2007 U.S. Dist. LEXIS 52060, *9, 2007 WL 2009807 (E.D. Cal. July 6, 2007). *See also In re United States*, 277 U.S. App. D.C. 37, 872 F.2d 472, 478-79 (1989) ("Because evidentiary privileges by their very nature hinder the ascertainment of the truth, and may even torpedo it entirely, their exercise should in every instance be limited to their narrowest purpose."); *Deseret Mgmt. Corp.*, 76 Fed. Cl. at 95 ("The [deliberative process] privilege, as it is in derogation of the search for truth, is not to be expansively construed."); *SEC v. Reserve Mgmt. Co. (In re Reserve Fund Sec. & Derivative Litig.)*, No. 09 Civ. 4346, 2010 U.S. Dist. LEXIS 146620, at *39-40 (S.D.N.Y. Nov. 29, 2010) ("While the deliberative process privilege protects important government interests, it still must be construed narrowly, as sustaining any privilege prevents a party from obtaining access to otherwise relevant information.").

## B. Law Enforcement Privilege

"The federal law enforcement privilege is a qualified privilege that allows for the nondisclosure of information that would be contrary to the public interest in the effective functioning of law enforcement." *Tuite v. Henry*, 181 F.R.D. 175, 176 (D.D.C. 1998). It "serves

to preserve the integrity of law enforcement techniques and confidential sources, protects witnesses and law enforcement personnel, safeguards the privacy of individuals under investigation, and prevents interference with investigations." *Id*. at 176-77. *See A.N.S.W.E.R. Coal. v. Jewell*, 292 F.R.D. 44, 50 (D.D.C. 2013). The privilege is designed "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witnesses and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *In re Dep't of Investigation,* 856 F.2d 481 (2d Cir. 1988).

The law enforcement privilege protects only "government documents relating to an ongoing criminal investigation." *S.E.C. v. Cuban*, No. 3:08-CV-2050-D, 2013 U.S. Dist. LEXIS 37167, 2013 WL 1091233, at *8 (N.D. Tex. Mar. 15, 2013) (quoting, *In re U.S. Dep't of Homeland Sec.*, 459 F.3d 565, 569-70 n.2 (5th Cir. 2006). The privilege is intended to protect "information pertaining to 'law enforcement techniques and procedures,' information that would undermine 'the confidentiality of sources,' information that would endanger 'witness and law enforcement personnel [or] the privacy of individuals involved in an investigation,' and information that would 'otherwise . . . interfere[] with an investigation.'" *Micillo v. Liddle & Robinson LLP*, No. 15-CV-6141 (JMF), 2016 U.S. Dist. LEXIS 67247, at *13 (S.D.N.Y. May 23, 2016).

Where a party fails to show that the requested documents relate to an ongoing criminal investigation, "the law enforcement privilege [] does not attach." *Hardrives*, 1991 U.S. Dist. LEXIS 22094, at *20. *Accord*, *FTC v. Liberty Supply Co.*, No. 4:15-CV-829, 2016 U.S. Dist. LEXIS 107784, at *14-15 (E.D. Tex. Aug. 15, 2016) ("The FTC has not demonstrated that the

Consumer Sentinel Complaints or the CIDs would fall within the law enforcement privilege as this is not a criminal investigation, but a civil investigation.").

"[B]ecause the privilege is a qualified one, the 'public interest in nondisclosure must be balanced against the need of a particular litigant for access to the privileged information.'" *A.N.S.W.E.R.*, 292 F.R.D. at 50, quoting *Tuite,* 98 F.3d at 1418 (D.C. Cir. 1996).  Application of the privilege must be "balanced against the defendants' substantial need for the information and their inability to obtain, without undue hardship, the substantial equivalent of the materials by other means." *Hardrives*, 1991 U.S. Dist. LEXIS 22094, at *4-5 (citations omitted). In examining the applicability of the privilege, courts "should be mindful of the fundamental tenet of the federal discovery rules which is to provide liberal pretrial discovery." *Id.*

### C.  Deliberative Process Privilege

The deliberative process privilege "permits the government to withhold documents that reflect advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated." *Pac. Gas & Elec.*, 2016 U.S. Dist. LEXIS 77311, at *6-8, quoting, *FTC v. Warner Commc'ns Inc.,* 742 F.2d 1156, 1161 (9th Cir. 1984).  To be protected by the deliberative process privilege, a document must be both "predecisional" and "deliberative." *Id.*

Documents are "predecisional" if they are "prepared in order to assist an agency decisionmaker in arriving at his decision." *Powell v. N.Y. City Health & Hosps. Corp.*, No. 03 Civ. 3264 (LTS) (DF), 2003 U.S. Dist. LEXIS 21739, at *2 (S.D.N.Y. Nov. 26, 2003) quoting, *Hopkins v. United States Dep't of Housing & Urban Dev.*, 929 F.2d 81, 84 (2d Cir. 1991).

"Deliberative" means that the document "must actually be related to the process by which policies are formulated." *Nat'l Wildlife Fed'n v. U.S. Forest Svc.*, 861 F.2d 1114, 1117 (9th 1988).  Because the deliberative process is "so dependent upon the individual document and the

26

role it plays in the administrative process," the agency must "establish what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Elec. Frontier Found. v. CIA*, No. C 09-3351 SBA, 2013 U.S. Dist. LEXIS 142146, 2013 WL 5443048, at *12 (N.D. Cal. Sept. 30, 2013) (internal quotation marks and citations omitted).  *Id.* at *39.  Documents qualify for protection under the deliberative process privilege "only if they 'reflect[] advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated, [or] the personal opinions of the writer prior to the agency's adoption of a policy.'" *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 875, 389 U.S. App. D.C. 356 (D.C. Cir. 2010) (citation omitted).

"The deliberative process privilege is a qualified one. A litigant may obtain deliberative materials if his or her need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure.  *See United States v. Leggett & Platt, Inc.*, 542 F.2d 655, 658 (6th Cir.1976), *cert. denied*, 430 U.S. 945, 97 S. Ct. 1579, 51 L. Ed. 2d 792 (1977); *United States v. American Telephone and Telegraph Co.*, 524 F.Supp. 1381, 1386 n.14 (D.D.C.1981)." *Coleman*, 2008 U.S. Dist. LEXIS 111653, at *23-24.  The validity of a privilege claim depends upon "a balance of the public interest in nondisclosure with the need for the information as evidence." *American Telephone*, 524 F. Supp. at 1386, n.14.  Among the factors to be considered in making this determination are: (1) the relevance of the evidence; (2) the availability of other evidence; (3) the government's role in the litigation; and (4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions.  *See*, *e.g.*, *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 327-329 (D.D.C.1966), *aff'd*, 384 F.2d 979, 128 U.S. App. D.C. 10 (D.C.Cir.), *cert. denied*, 389 U.S. 952, 88 S. Ct. 334, 19 L.

27

Ed. 2d 361 (1967); *In re Franklin National Bank Securities Litigation*, 478 F.Supp. 577, 583

(E.D.N.Y. 1979); 2 J. Weinstein & M. Berger, Weinstein's Evidence P 509 at 46-47 (1982)." *Id*.

Factual material is not protected under the deliberative process privilege "unless the

material is so inextricably intertwined with the deliberative sections of documents that its

disclosure would inevitably reveal the government's deliberations." *Ctr. for Biological Diversity*

*v. OMB*, No. C 07-4997 MHP, 2008 U.S. Dist. LEXIS 98387, at *25 (N.D. Cal. Nov. 25, 2008,

quoting *In re Sealed Case*, 326 U.S. App. D.C. 276, 121 F.3d 729, 737 (D.C. Cir. 1997)

(Agencies must disclose those portions of predecisional and deliberative documents that contain

factual information that does not "inevitably reveal the government's deliberations.").

The deliberative process privilege "does not extend to facts such as who conducted

investigations and whom they interviewed, the actions taken by the [governmental agency]

during the investigations, and communications between the [governmental agency] and

witnesses." *Cuban*, 2013 U.S. Dist. LEXIS 37167, at *26-29.

V.    **ARGUMENT**

   A.  **Law Enforcement Privilege Does Not Shield the Requested Documents from
       Disclosure**

          1.    **The requested documents do not relate to an ongoing criminal
                investigation.**

OPM invokes the law enforcement privilege in response to documents that formed the

factual basis of the 2013 Audit Report, Section III (A), *supra*; the facts obtained from OIG

auditor interviews,  Section III (B), *supra*; and OPM's  2015 Draft Audit Report, Section III (C),

*supra*; yet OPM offers not a shred of evidence in support of the privilege claim.  As set forth

*supra* at Section IV (B), the law enforcement privilege protects only government documents

relating to an ongoing criminal investigation.  *See Homeland Sec.,* 459 F.3d at 569, n.2; *Dep't of*

*Investigation*, 856 F.2d at 483-84 (2d Cir. 1988); *Liberty Supply,* 2016 U.S. Dist. LEXIS 107784,

at *14-15; *A.N.S.W.E.R.*, 292 F.R.D. at 50. The OPM's IT security audits are clearly not criminal investigations.  Its assertions of law enforcement privilege should be rejected out of hand on this basis alone.

>    **2.      OPM has failed to satisfy its burden of proof on its claims of law enforcement privilege.**

Even if the law enforcement privilege were somehow found to be applicable in this situation, OPM has failed by a wide margin to meet its burden of proof on the issue, as it makes no attempt in its privilege log to explain how disclosure of the documents would interfere with a criminal investigation, or undermine the confidentiality of sources, or endanger law enforcement personnel or the privacy of individuals involved in an investigation.  Thus, OPM has failed to establish all elements of the privilege, as it is required to do.  *See Pac. Gas & Elec.*, 2016 U.S. Dist. LEXIS 77311, at *6; *Deseret*, 76 Fed. Cl. at 95.

>    **B.  Deliberative Process Privilege Does Not Protect the Requested Documents**

On June 30, 2016, President Obama signed into law the FOIA Improvement Act of 2016.[7] One of the primary purposes of the legislation was to rein in, even in the FOIA context, the government's propensity for overuse of the exemptions provided in Section 5, including the deliberative process privilege, which both houses of Congress have acknowledged as a concern.[8]

---

[7] Exemption 5 of FOIA protects from disclosure documents that are "normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  Thus, while this motion is not brought under FOIA, an agency's overuse of the privilege in that context is instructive as to its view of the breadth of the privilege in a litigation setting.

[8] House Report 114-391stated: "Exemption five has been singled out as a particularly problematic exemption. Some have taken to calling it the `withhold it because you want to'' exemption…The deliberative process privilege is the most used privilege and the source of the most concern regarding overuse."  Senate Report 213-187 stated: "[T]there are concerns that some agencies are overusing FOIA exemptions that allow, but do not require, information to be withheld from disclosure. …There is a growing and troubling trend towards relying on these exemptions to withhold large swaths of Government information, even though no harm would result from disclosure. For example, according to the OpenTheGovernment.org 2013 Secrecy

The OPM's assertion of the privilege in this case, governed by the Federal Rules of Civil Procedure, not FOIA, is a perfect example of that overuse.

### 1.     The requested documents were not "pre-decisional."

To be protected by the deliberative process privilege, a document must be both "predecisional" and "deliberative."   *See supra* at Sec. IV(C).  Documents are "predecisional" if they are "prepared in order to assist an agency decisionmaker in arriving at his decision." *Hopkins*., 929 F.2d at 84.  OPM's own documents reveal that the documents at issue here were not used by any agency decisionmaker in the process of making a decision and, thus, are not covered by the privilege.

According to the 2013 Audit Report, the purpose of the Audit was to evaluate WellPoint's IT systems, not to contribute to an agency decisionmaking process.  The 2013 Audit Report states: "The objectives of this audit were to evaluate controls over the confidentiality, integrity, and availability of FEHBP data processed and maintained in WellPoint's IT environment."  *See* Decl. Ex. D (2013 Audit Report at 1).  There is no reference anywhere in the 2013 Audit Report to any decisionmaker to whom the Audit will be submitted, or any decision in which the Audit will be considered.

Further, the Recommendations in the 2013 Audit Report are directed to WellPoint, not to an agency decisionmaker (*Id*. at 1-18 stating "We recommend that WellPoint….).  There is no recommendation in the Audit directed to a decisionmaker and no recommendation regarding a decision to be made by the Agency.

---

Report, Federal agencies used Exemption 5, which permits nondisclosure of information covered by litigation privileges such as the attorney-client privilege, the attorney work product doctrine, and the deliberative process privilege, more than 79,000 times in 2012--a 41 percent increase from the previous year."

The boilerplate "Withholding Description" in OPM's privilege log confirms that the Audit was not part of a decisionmaking process, stating: "The OIG conducts audits as part of its unique oversight and enforcement role.  The purpose of the IT audit is to ensure the audited entity's compliance with applicable laws, rules, regulations, standards, contract provisions, and other requirements."

The D.C. Circuit has held: "In deciding whether a document should be protected by the privilege we look to whether the document is 'predecisional' whether it was generated before the adoption of an agency policy and whether the document is 'deliberative' whether it reflects the give-and-take of the consultative process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866, 199 U.S. App. D.C. 272 (D.C. Cir. 1980).  "To be pre-decisional, the document must have been prepared to assist an agency decision-maker in arriving at his decision. *Dobyns v. United States*, 123 Fed. Cl. 481, 487 (2015), citing *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999).  "Indeed, the court should be able 'to pinpoint an agency decision or policy to which the document contributed.'" *Id.*, quoting *Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. United States Dep't of Justice*, 823 F.2d 574, 585, 262 U.S. App. D.C. 166 (D.C. Cir. 1987).[9]

In *Dobyns*, the former Magistrate Judge John Facciola, acting as Special Master, rejected a Department of Justice claim that that documents relating to an investigation into possible misconduct by DOJ lawyers were shielded from disclosure by the deliberative process privilege,

---

[9] In the context of Freedom of Information Act claims, some courts have held that "[a]lthough an agency need not pinpoint an exact decision made in reliance on the document, it must show, *ex ante*, that the document related to a specific decision facing the agency.  This test is designed to distinguish predecisional documents from those that are merely part of a routine and ongoing process of agency self-evaluation." *Fox News Network, LLC v. United States Dep't of the Treasury*, 911 F. Supp. 2d 261 (S.D.N.Y. 2012).  Regardless of which standard is applied here, OPM cannot meet it.  The documents relating to Anthem's information security systems did not pertain to a specific decision facing the agency.

because they were "not documents produced during the consideration and adoption of a policy

by an agency of the United States."  Instead, they were produced or created during the

investigation of a particular matter—the alleged improper behavior of DOJ lawyers.  The

deliberative process privilege does not apply to such documents. *Id*. at 486.  The court further

explained:

> A document is predecisional when it is prepared in order to assist an agency
> decisionmaker in arriving at his decision. The document must have been created to assist
> the agency in the formulation of a specific decision on policy rather than part of a routine
> and ongoing process of agency self-evaluation.  By contrast, *measuring compliance with
> existing procedures is not* predecisional, and thus is not privileged.

*Id*. at 490 (emphasis added).  The court noted that "while there are drafts and e-mails by lawyers

… which are necessarily antecedent to the reaching of a final conclusion, they are certainly not

recommendations or analyses which speak to the adoption or rejection of a policy" and were,

therefore, not privileged.  *See Id*. at 488.

Other courts have also clearly stated that where a document "measure[s] compliance with

existing procedures, it is not privileged." *E.B. v. N.Y. City Bd. of Educ.,* 233 F.R.D. 289

(E.D.N.Y. 2005).  In *E.B.*, the court considered documents "generated as a result of on-site

reviews to evaluate the DOE's [Department of Education's] performance at various DOE

facilities."  The documents primarily contained "factual observations of the reviewers and the

results of their interviews with DOE personnel.  The documents also include[d]

recommendations from either the reviewers or the DOE personnel that were interviewed

regarding staffing, supplies, facilities and procedures."  The court held that the deliberative

process privilege did not apply because the "documents were not intended to assist the agency in

the formulation of a specific decision on policy, but were 'part of a routine and ongoing process

of agency self-evaluation.'"  *Id*. at 292, quoting, *Tigue v. United States DOJ*, 312 F.3d 70 (2d

Cir. 2002). *Accord*, *Velez v. City of New York*, No. CV 2004-1775, 2010 U.S. Dist. LEXIS

54237, 2010 WL 2265443 (June 2, 2010).

Similarly, in *Powell*, 2003 U.S. Dist. LEXIS 21739, the court held that a consultant's

report prepared for the Board of Corrections, evaluating the circumstances of an inmate's death,

was not predecisional because it was "created in order to measure compliance with existing

procedures in the specific instance of [plaintiff's death]" and did not relate to any particular

decision. "The consultant's review at issue is not protected from disclosure under the

'deliberative process privilege,' as Defendants have not shown the document was created as part

of a process to aid the government in reaching some type of decision." *Id*. at 2.

In *Waters v. United States Capitol Police Bd*., 216 F.R.D. 153 (D.D.C. 2003), the court

rejected a privilege claim concerning a memorandum from an inferior to a superior, containing

"evaluative comments about an earlier report" relevant to the investigation, because there was

policy under consideration. The court noted the absence of evidence that:

> [the recipient] was considering any policy and sought [the author's] views as to the
> wisdom of its adoption or that [the author], without [the recipient's] direction, was
> proposing a policy for [the recipient] to adopt. Instead, [the author] was speaking to a
> particular case *and the deliberative process privilege to this point in its history speaks to
> the adoption of a policy that pertains to all cases of a particular type.*

*Id*. at 162-163 (emphasis added).

In the present case, OPM has not claimed that the requested documents were relevant to a

policy decision under consideration at the time they were prepared, and there is no evidence that

the 2013 Audit Report was used by any agency decisionmaker in rendering any decision at all,

let alone a decision pertaining to all cases of a particular type. As in *Dobyns*, "the investigation

conducted here relates to the collection of facts pertaining to a singular occurrence. The analysis

of those facts by [the investigating agency] cannot possibly lead to the adoption or rejection of a policy. The deliberative process privilege, therefore, does not apply."

<div align="center">

**2.      The requested documents were not "deliberative" for purposes of the deliberative process privilege.**

</div>

To satisfy the "deliberative" prong of the deliberative process privilege, documents "must be related to the process by which policies are formulated.  There must therefore have been a process of decision-making in which the information at issue played a role." *Dobyns* at 488, citing *Grand Cen. P'ship*. "Among the factors that may be considered in this regard are whether the document forms an essential link in a specific consultative process, whether it reflects the personal opinion of the writer rather than the policy of the agency, and whether, if released, it would inaccurately reflect or prematurely disclose the views of the agency." *Id*.

The court in *Dobyns* held the documents pertaining to the investigation of lawyer misconduct were not "deliberative" because the agency was not engaged in "adopting a policy." The investigating offices:

> were not, for example, in the process of creating a policy pertaining to under what circumstances DOJ lawyers were or were not to report events to a court. They were conducting an investigation, upon referral by the judge in this case, into why the lawyers who may have been aware of the [threats against a witness] did not report it to the court…. Furthermore, the facts collected during the [] investigation cannot possibly be said to reveal in themselves a deliberative process or to be so "inextricably intertwined" in the process that the disclosure of the facts would disclose the process. That is impossible; there was no process occurring that looked towards the adoption or rejection of a policy now in existence.

*Id*. at 488-89.  By the same reasoning, the documents Plaintiffs seek from OPM are not deliberative and not privileged.

Documents are not deliberative if they relate to a lower order decision that does not involve agency policy.  The privilege protects only "predecisional materials developed for the purposes of assisting an agency decision maker to deliberate and decide high-level policy

<div align="center">

34

</div>

questions." *Bernat v. City of Cal. City*, No. 1:10-cv-00305 OWW JLT, 2010 U.S. Dist. LEXIS

111538, at *13 (E.D. Cal. Oct. 12, 2010).  In *Bernat*, records pertaining to the "City's decision in

hiring the officers and/or its decision regarding discipline of the officers for the incident

involving Plaintiff or for other incidents" were held not privileged.  "These decisions are not

high-level policy questions consideration of which the deliberative process privilege was

designed to protect." *Id*. at *13.  Similarly, the OPM documents pertaining to Anthem, if they

relate to any decision at all, do not implicate high-level policy questions.

It has been held, for example, that "recommendations concerning disciplinary review of a

discrete incident do not involve the policy formulations protected under the deliberative process

privilege."  *Velez*, 2010 U.S. Dist. LEXIS 54237.  The documents in *Velez* pertained to an

investigation into two police officers' interactions with a confidential informant. The City of

New York claimed that the documents "contain[ed] pre-decisional analysis and

recommendations made by a supervisor to the Internal Affairs investigator assigned to the case."

2010 U.S. Dist. LEXIS 54237, at *7.  The court rejected the privilege claim, holding that the

documents were not related to a process that would culminate in the adoption or rejection of a

policy:

> A document is deliberative when it is actually . . . related to the process by
> which policies are formulated.... These documents do not contain discussions
> underlying policy oriented judgments that the deliberative process privilege is
> designed to protect. The final decision the City refers to is whether
> disciplinary action was warranted against the defendant officers based on their
> failure to follow the applicable procedures. These recommendations
> concerning disciplinary review of a discrete incident do not involve the policy
> formulations protected under the deliberative process privilege.

*Id*. at *9.  *See also Qamhiyah v. Iowa State Univ. of Sci. & Tech.*, 245 F.R.D. 393, 399 n.6 (S.D.

Iowa 2007) ("The decision whether to grant plaintiff's tenure had little to do with the formulation

of policy or an important governmental decision of the kind for which the privilege is typically reserved.").

Under this standard, it is clear that the Anthem-related documents withheld by OPM are not deliberative, as they do not involve the type of policy formulations the deliberative privilege is intended to protect.

### 3. OPM must document that it made reasonable efforts to segregate factual material.

Even if the documents at issue are found to be predecisional and deliberative, they would not be privileged in their entirety. "[D]ocuments are not deliberative when they are a compilation of facts discovered during an investigation. To the contrary, when "purely factual material appear[s] in . . . documents in a form that is severable without compromising the private remainder of the documents," the factual information itself must be produced. *EPA v. Mink*, 410 U.S. 73, 91, 93 S. Ct. 827, 35 L. Ed. 2d 119 (1973).

OPM has taken the erroneous position that documents called "Meeting Write-Ups" are privileged in their entirety, while providing no detailed analysis of the content of those documents.  OPM's privilege log states: "'Meeting Write-Ups' are a form of workpaper documenting conversations or interviews between auditors and representatives of the audited entity, and reveal the mental process of the auditor on possible conclusions to draw from information that is shared during the meeting."

Factual material in the OPM Anthem documents, including "Meeting Write-Ups," is not protected under the deliberative process privilege "unless the material is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations." *Biological Diversity*, 2008 U.S. Dist. LEXIS 98387, at *25, quoting *Sealed Case*, 121 F.3d at 737. *See also Dobyns v. United States*, 123 Fed. Cl. 481,

486 (2015) (the privilege "protects only the recommendations, drafts, proposals and suggestions being made or created incident to the promulgation of a policy … [and] does not pertain to the facts memorialized or contained in an otherwise privileged document, unless those facts are inextricably intertwined with the recommendation being made.").  OPM bears the burden of justifying nondisclosure of any withheld records or segments of records, *NLRB v. Robbins Tire and Rubber Co.*, 437 U.S. 214, 224, 98 S. Ct. 2311, 57 L. Ed. 2d 159 (1978), and does not satisfy that burden where it "simply states in its index entries that facts and opinions are 'intertwined' without providing any particularized information to so prove." *Biological Diversity v*, , 2008 U.S. Dist. LEXIS 98387, at *25 . In asserting the privilege, OPM is required to "document any inability on its part to parse the records, such that incomplete segments of records would be rendered meaningless if disclosed. *See, e.g., National Sec. Archive Fund v. CIA,* 402 F. Supp. 2d 211, 220-21 (D.D.C. 2005) (holding that no reasonably segregable information exists if "non-exempt information would produce only incomplete, fragmented, unintelligible sentences composed of isolated, meaningless words").

Of particular relevance, courts hold that the deliberative process privilege does not extend to facts such as who conducted investigations and whom they interviewed, the actions taken by the investigator during the investigations, and communications between the investigating agency and witnesses.  *See Cuban*, 2013 U.S. Dist. LEXIS 37167, at *26-29, citing *Blanks v. Lockheed Martin Corp.*, No. 4:05cv137 LR, 2006 U.S. Dist. LEXIS 46770, 2006 WL 1892512, at *3 (S.D. Miss. July 10, 2006). *See also Nev. Partners Fund, LLC v. United States*, No. 3:06cv379-HTW-MTP, 2008 U.S. Dist. LEXIS 47853 (S.D. Miss May 12, 2008) (holding the deliberative process privilege does not apply to reports describing acts performed by an IRS agent during the process of examining tax returns).

OPM's withholding of the contested documents in their entirety – documents that

presumably include such information as the names of interviewees, identification of documents

reviewed, and descriptions of actions taken in the course of the 2013 Audit -- indicates that, if

the deliberative process privilege applies to these documents at all, OPM has utterly failed to

comply with its obligation to segregate and produce the factual portions of the documents.

### C. If the Qualified Deliberative Process Privilege is Applicable at All, it is Overcome here by Plaintiffs' Need for the Information and the Extremely Low Level of Potential Harm Posed by Production of the Documents

The deliberative process privilege "may be overcome by a showing of sufficient need"

based upon balancing factors of evidentiary need including: (1) "the relevance of the evidence

sought; (2) the availability of other evidence; (3) the seriousness of the litigation; (4) the role of

the government, and (5) the possibility of future timidity by the government" against (6) "the

harm resulting from disclosure".  *EEOC v. FAPS, Inc.*, 2012 U.S. Dist. LEXIS 65591, *20

(D.N.J. May 10, 2012), citing *Sealed Case*, 121 F.3d at 737-38.  *Friedman v. Bache Halsey

Stuart Shields, Inc.*, 738 F.2d 1336, 1344 (D.C. Cir. 1984) (same).

### 1. Information obtained during OPM's IT security audits is relevant.

Plaintiffs' need for the withheld information is substantial.  Information obtained and

observations by OPM during IT security audits regarding about vulnerabilities or sub-standard IT

security practices that may have enabled hackers to steal 80 million Affected Persons' Personal

Information from Anthem's Data Base in 2014 and 2015 are certainly relevant to Plaintiffs'

claims.  Similarly, information pertaining to the security of Personal Information stored on

Anthem's network and the facts surrounding the "difficulties" WellPoint/Anthem caused by

refusing OPM access to properly perform IT security audits and the effect such conduct had on

modification or potential modification on the Federal BCBSA Contract will be useful in efforts

to prove, among other things, benefit of the bargain damages and to prevent future breaches through injunctive relief.

## 2.      OPM is the only source of IT security audit backup.

The OPM possesses the only reliable record of the facts and observations that form the basis of the findings and recommendations in the 2013 Audit Report.  Plaintiffs' counsel cannot go back in time to assess WellPoint/Anthem's IT security and create a contemporaneous record during the months leading up to the Data Breach like OPM did.  To suggest Plaintiffs' counsel redo something comparable to the IT security audit OPM did in 2013 would impose an enormous burden and expense if it is even possible.  Taking OPM's interviews of WellPoint personnel as an example, assuming Plaintiffs' counsel could somehow accurately identify the individuals OPM interviewed and the particular topics each interviewee was questioned about, there can be little doubt that, given the complexity of the IT systems and with the passing of more than three years, memories will have faded.  Indeed, even at the time the 2013 Audit was being conducted, as the 2013 Audit Report states, WellPoint personnel provided inconsistent responses to OPM's requests for information.

The TAC alleges that WellPoint took steps to frustrate the 2013 Audit. TAC ¶ 342. The 2013 Audit Report states WellPoint provided "conflicting statements" during field work that along with WellPoint's inability to provide evidence of configuration compliance scans ultimately led to OPM's documenting an audit scope limitation and its inability to independently attest that WellPoint's computer servers maintain a secure configuration.  *See* 2013 Audit Report at 10.  Evidence of WellPoint's representations and acts to frustrate the 2013 Audit that potentially hid IT security vulnerabilities or the severity of those vulnerabilities would be important proof of Plaintiffs' claims.  In 2013, OPM warned that "Failure to implement a thorough configuration compliance auditing program increases the risk that insecurely

configured servers remain undetected, creating a potential gateway for . . . hacking activity that could lead to data breaches." 2013 Audit Report at 10.  The hacking of Anthem's computer system commenced shortly thereafter and led to Anthem's massive Data Breach.

OPM is the only source for the internal emails and memoranda discussing "difficulties" OPM encountered when WellPoint prohibited OPM access to WellPoint's servers to conduct standard vulnerability scans and configuration compliance tests and the issues that conduct had on the Federal BCBSA Contract contracting process and language.

### 3.       The litigation is serious.

The litigation is serious. *See* § II *supra*. Plaintiffs have filed a TAC asserting claims on behalf of 80 million Affected Individuals.  Defendants have answered the TAC.  Discovery is ongoing.  Fact discovery is currently scheduled to close December 1, 2016.

### 4.       OPM's IT security audits were undertaken to benefit federal employees.

While OPM is a non-party to the underlying litigation, OPM is party to the Federal BCBSA Contract, the contract pursuant to which the Federal Employee Plaintiffs seek to enforce third-party beneficiary claims.  OPM's IT security audits of WellPoint/Anthem and the reports generated therefrom were undertaken specifically for the benefit of the members of the Federal Employee Class in the underlying action seeking to enforce their rights under the Federal BCBSA Contract.

### 5.       Possibility of future timidity of the government is minimal.

The withheld documents appear to have been prepared and used by field audit staff, lower echelon government employees. In addition to the very limited disclosure and use of the documents at issue provided under the Protective Order, the expectation and need for confidentiality is less when documents have not been prepared and used by the Commissioner

but by government staffers.  *See American Telephone*, 524 F. Supp. at 1387 (D.D.C. 1981)

(finding it more important that Commissioners feel free to exchange ideas during their

deliberations without fear of disclosure than it is for lower echelon staff members to have that

latitude, and a stronger showing of need for the information by defendants will therefore be

necessary to compel testimony by the Commissioners).

<div align="center">

**6.     The level of potential for harm, if any, is minimal.**

</div>

Appropriate precautions are in place to maintain confidentiality of information produced

in the action and the use of such information is restricted.  *See* Protective Order.  Courts have

recognized that potential harm to the government from disclosure of privileged information is

minimal when appropriate precautions are taken.  *Friedman*, 738 F.2d at 1344.

To the extent OPM has a legitimate interest in preventing public disclosure of its IT

security audit backup and related emails and other information, OPM would be permitted to

designate those documents "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL –

ATTORNEYS' EYES ONLY."  Such OPM produced documents could then be used solely for

prosecuting, defending, or attempting to settle the underlying action. When the litigation is

terminated, documents OPM designates as confidential would be returned to OPM or securely

destroyed along with written certification of such secure destruction or deletion.  Thus, the

Protective Order eliminates much if not all potential harm of production.

<div align="center">

**CONCLUSION**

</div>

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an Order that either: (1) the law enforcement privilege does not apply to each of the withheld documents and therefore the withheld documents should be produced; (2) if an asserted privilege does apply to any withheld document, that balancing Plaintiffs' need for production exceeds any risk of potential harm and that each such withheld document should be produced; or (3) if an asserted privilege does apply to withheld documents and the Court finds that Plaintiffs' need for production does not exceed any risk of harm, the factual information in the withheld documents should be produced.

<div style="text-align:center">Respectfully submitted,</div>

Dated: October 25, 2016

By: _____

COHEN MILSTEIN SELLERS & TOLL PLLC
ANDREW N. FRIEDMAN (DC Bar No. 375595)
afriedman@cohenmilstein.com
GEOFFREY GRABER
ggraber@cohenmilstein.com
SALLY M. HANDMAKER (ECF No. 1005414)
shandmaker@cohenmilstein.com
ERIC KAFKA
ekafka@cohenmilstein.com
1100 New York Ave. NW, Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699


ALTSHULER BERZON LLP
EVE CERVANTEZ
ecervantez@altshulerberzon.com
JONATHAN WEISSGLASS
jweissglass@altshulerberzon.com
DANIELLE LEONARD
dleonard@altshulerberzon.com

MEREDITH JOHNSON
mjohnson@altshulerberzon.com
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

*Lead Plaintiffs' Counsel*

STULL, STULL & BRODY
PATRICK  K. SLYNE
pkslyne@ssbny.com
6 East 45th Street, Fifth Floor
New York, New York 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022

MILBERG LLP
HENRY J. KELSTON
hkelston@milberg.com
6 East 45th Street, Fifth Floor
New York, New York 10017
Telephone: (646) 733-5747
Facsimile: (212) 868-1229

1  ALTSHULER BERZON LLP
   EVE CERVANTEZ (SBN 164709)
2  ecervantez@altshulerberzon.com
   JONATHAN WEISSGLASS (SBN 185008)
3  jweissglass@altshulerberzon.com
   DANIELLE E. LEONARD (SBN 218201)
4  dleonard@altshulerberzon.com
   MEREDITH A. JOHNSON (SBN 291018)
5  mjohnson@altshulerberzon.com
   177 Post Street, Suite 300
6  San Francisco, CA 94108
   Telephone:  (415) 421-7151
7  Facsimile: (415) 362-8064

8  COHEN MILSTEIN SELLERS & TOLL PLLC
   ANDREW N. FRIEDMAN (admitted *pro hac vice*)
9  afriedman@cohenmilstein.com
   GEOFFREY GRABER (SBN 211547)
10 ggraber@cohenmilstein.com
   SALLY M. HANDMAKER (SBN 281186)
11 shandmaker@cohenmilstein.com
   ERIC A. KAFKA (admitted *pro hac vice*)
12 ekafka@cohenmilstein.com
   1100 New York Ave. NW
13 Suite 500, East Tower
   Washington, DC 20005
14 Telephone:  (202) 408-4600
   Facsimile:  (202) 408-4699
15
   *Lead Plaintiffs' Counsel*
16
                    UNITED STATES DISTRICT COURT
17              NORTHERN DISTRICT OF CALIFORNIA
                         SAN JOSE DIVISION
18
19                                    |  Case No. 15-MD-02617-LHK
                                      |
20 **IN RE ANTHEM, INC. DATA          |  CERTIFICATE OF SERVICE**
   **BREACH LITIGATION**              |
21                                    |
22
23
24
25
26
27
28

## PROOF OF SERVICE

On October 25, 2016, I caused the following documents to be served to the parties in the attached service list:

**Notice of Motion, and Motion to Compel Compliance with *Subpoena Duces Tecum***

As permitted by Fed. R. Civ. P. 5(b)(2)(E), various attorneys in the attached service list agreed to be served by email. The remaining attorneys are being served by U.S. Mail pursuant to Fed. R. C. P. 5(b)(2)(C). I caused the foregoing documents to be delivered in PDF format by electronically transmitting a PDF version to the e-mail addresses listed in the attached service list or by serving hard copies of same via U.S. Mail, as noted below.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: October 25, 2016          By: _____ /s/  *Shireen Hamdan* _____
                                                    Shireen Hamdan

# SERVICE LIST

1

2

3   Craig A. Hoover
    craig.hoover@hoganlovells.com
4   E. Desmond Hogan
    desmond.hogan@hoganlovells.com
5   Peter R. Bisio
    peter.bisio@hoganlovells.com
6   Allison M. Holt
    allison.holt@hoganlovells.com
7   **Hogan Lovells US LLP**                     **Served via Email**
8   555 Thirteenth Street, NW
    Washington, DC 20004
9   Telephone:    (202) 637-5600
    Facsimile:    (202) 637-5910
10

11
    Michael Maddigan
12  michael.maddigan@hoganlovells.com
    **Hogan Lovells US LLP**                     **Served via Email**
13  1999 Avenue of the Stars, Suite 1400
    Los Angeles, CA 90067
14  Telephone:    (310) 785-4600
    Facsimile:    (310) 785-4601
15

16

17  Chad R. Fuller
    chad.fuller@troutmansanders.com
18  **Troutman Sanders LLP**                     **Served via Email**
19  11682 El Camino Real, Suite 400
    San Diego, CA 92130
20  Telephone:    (858) 509-6056
    Facsimile:    (858) 509-6040
21

22  John D. Martin
23  john.martin@nelsonmullins.com
    Lucile H. Cohen
24  lucie.cohen@nelsonmullins.com
    **Nelson Mullins Riley & Scarborough LLP**   **Served via Email**
25  1320 Main Street, 17th Floor
    Columbia, SC 29201
26  Telephone:    (803) 255-9241
    Facsimile:    (858) 256-7500
27

28

---

**CERTIFICATE OF SERVICE**
Case No. 15-MD-02617-LHK

Brian P. Kavanaugh
brian.kavanaugh@kirkland.com
Tim Pickert
tim.pickert@kirkland.com
Kate Warner
kate.warner@kirkland.com
**Kirkland & Ellis LLP**                           **Served via Email**
300 North LaSalle Street
Chicago, IL 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200


Joseph E. Borson
**U.S. Department of Justice**                      **Served via U.S. Mail**
20 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone:    (202) 514-1944
Facsimile:    (202) 616-8460


Robin Jacobsohn
**U.S. Office of Personnel Management**             **Served via U.S. Mail**
1900 E Street NW
Washington, D.C. 20415
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

ALTSHULER BERZON LLP
EVE CERVANTEZ
ecervantez@altshulerberzon.com
JONATHAN WEISSGLASS
jweissglass@altshulerberzon.com
DANIELLE LEONARD
dleonard@altshulerberzon.com
MEREDITH JOHNSON
mjohnson@altshulerberzon.com
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

COHEN MILSTEIN SELLERS & TOLL PLLC
ANDREW N. FRIEDMAN
afriedman@cohenmilstein.com
GEOFFREY GRABER
ggraber@cohenmilstein.com
SALLY M. HANDMAKER
shandmaker@cohenmilstein.com
ERIC KAFKA
ekafka@cohenmilstein.com
1100 New York Ave. NW Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

*Lead Plaintiffs' Counsel*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **IN RE ANTHEM, INC. DATA BREACH LITIGATION** | Misc. No. <br><br> **Declaration of Andrew N. Friedman In Support of Motion to Compel Compliance with *Subpoena Duces Tecum*** |

I, Andrew N. Friedman, declare and state as follows:

1.      I am a member of the firm Cohen Milstein Sellers & Toll PLLC, Co-Lead

Counsel for Plaintiffs in this action.  I submit this declaration in support of Plaintiffs' Motion to

Compel Compliance with *Subpoena Duces Tecum.*

2.      Attached hereto as Exhibit A is a true and correct copy of the *Subpoena Duces*

*Tecum* addressed to the U.S. Office of Personnel Management ("OPM") in *In re: Anthem, Inc.*

*Data Breach Litigation*, 15-MD-02617-LHK, pending in the United States District Court for the

Northern District of California (San Jose Division) before The Honorable Lucy H. Koh.

3.      Attached hereto as Exhibit B is a true and correct copy of the Third Consolidated

and Amended Class Action Complaint dated July 11, 2016 (Redacted Version Of Document

Sought To Be Sealed) (ECF No. 537-4).[1]

4.      Attached hereto as Exhibit C is a true and correct copy of Anthem's Statement

regarding cyber attack against Anthem.

5.      Attached hereto as Exhibit D is a true and correct copy of the U.S. Office of

Personnel Management, Office of the Inspector General, Office of Audits, Final Audit Report,

Audit Of Information Systems General And Applications Controls At Wellpoint Inc., dated

September 10, 2013 (Redacted).

6.      Attached hereto as Exhibit E is a true and correct copy of email correspondence

between OPM OIG and Information Security Media Group, dated March 4-5, 2015, regarding

interference with the 2013 audit and requests to conduct a limited follow-on IT security audit at

Anthem (Redacted).

7.      Attached hereto as Exhibit F is a true and correct copy of U.S. Judicial Panel on

---

[1] "ECF No. __" references in this declaration refer to docket entries in *In re: Anthem, Inc. Data Breach Litigation*, 15-MD-02617-LHK (N.D. Cal).

Multidistrict Litigation, MDL No. 2617, Transfer Order, dated June 12, 2015 (ECF No. 1).

8.      Attached hereto as Exhibit G is a true and correct copy of the Stipulated Protective Order For Litigation Involving Highly Sensitive Confidential Information And/Or Trade Secrets, dated September 18, 2015 (ECF No. 293).

9.      Attached hereto as Exhibit H is a true and correct copy of the Order Granting In Part And Denying In Part Anthem Defendants' Motion To Dismiss And Order Granting In Part And Denying In Part Non-Anthem Defendants' Motion To Dismiss, dated February 14, 2016 ("First MTD Order") (ECF No. 468).

10.      Attached hereto as Exhibit I is a true and correct copy of the Order Granting In Part And Denying In Part Anthem Defendants' Second Motion To Dismiss, Granting In Part And Denying In Part Non-Anthem Defendants' Second Motion To Dismiss, And Denying Motion For Clarification [Public Version], dated May 27, 2016 ("Second MTD Order") (ECF No. 524).

11.      Attached hereto as Exhibit J is a true and correct copy of The Anthem Defendants' Answer To Third Consolidated Amended Class Action Complaint, dated August 4, 2016 (ECF No. 581).

12.      Attached hereto as Exhibit K is a true and correct copy of a Case Management Order, dated July 22, 2016 (ECF No. 556).

13.      Attached hereto as Exhibit L is a true and correct copy of Plaintiffs' request for records and information ("Touhy Request") addressed to OPM, dated May 12, 2016.

14.      Attached hereto as Exhibit M is a true and correct copy of a letter setting forth OPM's objections to the Subpoena pursuant to Federal Rule of Civil Procedure 45(d)(2)(B), dated May 27, 2016.

15.    Attached hereto as Exhibit N is a true and correct copy of a June 6, 2016 letter from Andrew N. Friedman to Joseph E. Borson supplementing Plaintiffs' Touhy Request, without exhibits.

16.    Attached hereto as Exhibit O is a true and correct copy of a June 16, 2016 letter from Joseph E. Borson to Andrew N. Friedman setting forth request-by-request the documents OPM's program offices and OPM Office of the Inspector General had identified as responsive to Plaintiffs' information requests.

17.    Attached hereto as Exhibit P is a true and correct copy of OPM's final response to Plaintiffs' Touhy Request, dated July 15, 2016.

18.    Attached hereto as Exhibit Q is a true and correct copy of an August 9, 2016 letter from Joseph E. Borson to Andrew N. Friedman stating that OPM has completed its search and turned over to Plaintiffs all non-privileged, responsive documents identified in its search.

19.    Attached hereto as Exhibit R is a true and correct copy of an August 15, 2016 letter from Patrick Slyne to Joseph E. Borson setting forth a list of categories of documents for which Plaintiffs requested OPM to produce its privilege log.

20.    Attached hereto as Exhibit S is a true and correct copy of a September 9, 2016 letter from Joseph E. Borson to Patrick Slyne with attached OPM privilege log.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 25, 2016.

By:_____

ANDREW N. FRIEDMAN
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

*Lead Plaintiffs' Counsel*

# Exhibit A

1  ALTSHULER BERZON LLP
   EVE CERVANTEZ (SBN 164709)
2  ecervantez@altshulerberzon.com
3  JONATHAN WEISSGLASS (SBN 185008)
   jweissglass@altshulerberzon.com
4  DANIELLE E. LEONARD (SBN 218201)
   dleonard@altshulerberzon.com
5  MEREDITH A. JOHNSON (SBN 291018)
   mjohnson@altshulerberzon.com
6  177 Post Street, Suite 300
7  San Francisco, CA 94108
   Telephone: (415) 421-7151
8  Facsimile: (415) 362-8064

9  COHEN MILSTEIN SELLERS & TOLL PLLC
   ANDREW N. FRIEDMAN (admitted *pro hac vice*)
10 afriedman@cohenmilstein.com
11 GEOFFREY GRABER (SBN 211547)
   ggraber@cohenmilstein.com
12 SALLY M. HANDMAKER (SBN 281186)
   shandmaker@cohenmilstein.com
13 ERIC KAFKA (admitted *pro hac vice*)
14 ekafka@cohenmilstein.com
   1100 New York Ave. NW
15 Suite 500, West Tower
   Washington, DC 20005
16 Telephone:  (202) 408-4600
   Facsimile:  (202) 408-4699
17

18 *Lead Plaintiffs' Counsel*

19              **UNITED STATES DISTRICT COURT**
20            **NORTHERN DISTRICT OF CALIFORNIA**
                    **SAN JOSE DIVISION**
21

| *In Re Anthem, Inc. Data Breach Litigation* | Case No:  15-md-02617-LHK (NC) |
|---|---|
| | **PLAINTIFFS' NOTICE OF DOCUMENT SUBPOENA** |

22

23

24

25

26

27

28

1     Please take notice that, pursuant to Federal Rule of Civil Procedure 45, Plaintiffs will be

2  serving a document subpoena on the U.S. Office of Personnel Management. A copy of this subpoena

3  is attached.

4

5     Dated:  May 11, 2016      By: /s/ Andrew N. Friedman        

6                        **COHEN MILSTEIN SELLERS & TOLL PLLC**
                        ANDREW N. FRIEDMAN (admitted pro hac vice)

7                        afriedman@cohenmilstein.com
                        GEOFFREY GRABER (SBN 211547)

8                        ggraber@cohenmilstein.com
                        SALLY M. HANDMAKER (SBN 281186)

9                        shandmaker@cohenmilstein.com
                        ERIC KAFKA (admitted pro hac vice)

10                      ekafka@cohenmilstein.com
                        1100 New York Ave. NW

11                      Suite 500, West Tower

12                      Washington, DC 20005
                      Telephone:  (202) 408-4600

13                      Facsimile:  (202) 408-4699

14

15                      **ALTSHULER BERZON LLP**
                      EVE CERVANTEZ (SBN 164709)

16                      ecervantez@altshulerberzon.com
                      JONATHAN WEISSGLASS (SBN 185008)

17                      jweissglass@altshulerberzon.com
                      DANIELLE E. LEONARD (SBN 218201)

18                      dleonard@altshulerberzon.com
                      MEREDITH A. JOHNSON (SBN 291018)

19                      mjohnson@altshulerberzon.com
                      177 Post Street, Suite 300

20                      San Francisco, CA 94108

21                      Telephone: (415) 421-7151
                      Facsimile: (415) 362-8064

22

23                      *Lead Plaintiffs' Counsel*

24                      **GIRARD GIBBS LLP**
                      ERIC GIBBS

25                      DAVID M. BERGER
                      1 Kaiser Plaza, Suite 1125

26                      Oakland, California 94612
                      Telephone:  (510) 981-4800

27                      Facsimile:  (415) 981-4846

28

<div align="center">1</div>

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LEIFF CABRASER HEIMANN & BERNSTEIN, LLP**
MICHAEL W. SOBOL
NICOLE D. SUGNET
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339

*Plaintiffs' Steering Committee*

2

**PROOF OF SERVICE**

I declare that I am over the age of eighteen (18) and not a party to this action.  On May 11, 2016, I served a copy of the foregoing documents as follows:

**PLAINTIFFS' NOTICE OF DOCUMENT SUBPOENA**

on the following interested party(ies) in this action:

Craig Alan Hoover
E. Desmond Hogan
Peter R. Bisio
HOGAN LOVELLS US LLP
555 13th Street NW
Washington, DC 20004
Phone: 202-637-5600
Fax: 202-637-5910
craig.hoover@hoganlovells.com
desmond.hogan@hoganlovells.com
peter.bisio@hoganlovells.com

Brian P. Kavanaugh
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Phone: 312-862-2015
Fax: 312-862-2200
Brian.kavanaugh@kirkland.com

[X]    BY MAIL: by placing the document(s) listed above for collection and mailing following the firm's ordinary business practice in a sealed envelope with postage thereon fully prepaid for deposit in the United States mail at Washington, DC addressed as set forth above.

[__]    BY OVERNIGHT DELIVERY: by depositing the document(s) listed above in a sealed envelope for collection and delivery by FedEx with delivery fees paid or provided for in accordance with ordinary business practices.

[X]    BY EMAIL: by electronically transmitting a PDF version of above listed documents to the email addresses set forth above on this date.

[__]    BY FACSIMILE: I caused all pages to be sent to the recipient(s) via facsimile to the office(s) of the addressee(s) shown above, and the transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the District of Columbia that the above is true and correct.

1

2  Executed on May 11, 2016

3  Charles Conway

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' NOTICE OF DOCUMENT SUBPOENA
Case No:  15-md-02617-LHK (NC)

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | | |
|---|---|---|
| In Re Anthem, Inc. Data Breach Litigation | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  5:15-md-02617-LHK |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Robin Jacobsohn, Esq., General Counsel, U.S. Office of Personnel Management, 1900 E Street NW, Washington, DC 20415-1100

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attached Schedule A

| Place: Andrew Friedman | Date and Time: |
|---|---|
| Cohen, Milstein, Sellers & Toll, PLLC, 1100 New York Ave NW Suite 500 E, Washington, DC 20005 | 06/03/2016 9:00 am |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  05/12/2016

*CLERK OF COURT*

OR

_____
*Signature of Clerk or Deputy Clerk*

_____
*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Plaintiffs
_____ , who issues or requests this subpoena, are:

A. Friedman,Cohen Milstein,1100 New York Ave NW,Washington, DC 20005, AFriedman@cohenmilstein 202-408-4600

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# SCHEDULE A

## DEFINITIONS

1.       "Anthem" means the Anthem Defendants and Anthem, Inc.'s past and present parents, subsidiaries, affiliates, predecessors, including but not limited to WellPoint Inc. ("WellPoint"), successors, employees, independent contractors, officers, agents, vendors, accountants, and all other persons or entities acting on its behalf or under its direct or indirect control. The Anthem Defendants include Anthem, Inc. and the Anthem Affiliates. The Anthem Affiliates include: Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc.; Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana; Blue Cross of California, Inc. d/b/a Anthem Blue Cross of California; Anthem Blue Cross Life and Health Insurance Company; Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado in Colorado and d/b/a Anthem Blue Cross and Blue Shield of Nevada in Nevada; Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut; Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield of Kentucky; Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine; HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue Shield of Missouri; RightChoice Managed Care, Inc. d/b/a Anthem Blue Cross and Blue Shield of Missouri; Healthy Alliance Life Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Missouri; Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield of New Hampshire; Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield; Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio; Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia; HMO HealthKeepers, Inc. d/b/a Anthem Blue Cross and Blue Shield of

Virginia; Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield of

Wisconsin; Compcare Health Services Insurance Corporation d/b/a Anthem Blue Cross and Blue

Shield of Wisconsin; Amerigroup Corporation; Amerigroup Services, Inc.; Amerigroup Kansas

Inc.; HealthLink, Inc.; Unicare Life & Health Insurance Company; CareMore Health Plan; The

Anthem Companies, Inc.; The Anthem Companies of California, Inc.

2.       "Audit" refers to the OPM OIG Audit of Information Systems General and

Application Controls at WellPoint Inc. which is the subject of the Audit Report.

3.       "Audit Report" refers to the OPM OIG Office of Audits, Final Audit Report,

Audit of Information Systems General and Application Controls at Wellpoint Inc., dated

September 10, 2013.

4.       "Communication" means the transmittal of information expressed by any means.

5.       "Data Breach" refers to the data breach or breaches initially reported by Anthem

in February 2015.

6.       "Document" or "documents" includes all documents, communications,

information, or tangible things within the scope of Federal Rules of Civil Procedure 26 and 34,

including ESI, and all versions and drafts of documents.

7.       "Enrollee" means any person that is or was enrolled in a health benefits plan made

available under the Federal Employees Health Benefits Program.

8.       "ESI" or "Electronically Stored Information" means information that is stored in

electronic media, regardless of the media or whether it is in the original format in which it is

created, and that is retrievable in perceivable form and includes metadata, system data, deleted

data, and fragmented data.

9.      "Network(s)" includes, without limitation, any computer system, server (whether physical or virtual), desktop computer, laptop computer, tablet computer, smart phone, cellular telephone, networking equipment, internet site, intranet site, and the software, programs, applications, scripts, operating systems, and/or databases (including cloud storage provided by third party providers) used to control, access, store, add, delete, or modify and information stored on any of the foregoing non-exclusive list.

10.      "OIG" means the U.S. Office of Personnel Management Office of the Inspector General and its employees, independent contractors, officers, agents, vendors, accountants, and all other persons or entities acting on its behalf or under its direct or indirect control.

11.      "OPM" means the U.S. Office of Personnel Management and its employees, independent contractors, officers, agents, vendors, accountants, and all other persons or entities acting on its behalf, including but not limited to OIG, or under its direct or indirect control.

12.      "Personally Identifiable Information" or "PII" is information that can be used on its own or with other information to identify a single person, including name, address, social security number, data and place of birth, mother's maiden name, and biometric records, and also may include PHI.

13.      "Protected Health Information" or "PHI" has the same scope and definition as set forth in 45 C.F.R. § 160.103.

14.      "You" or "Your" refers to the person or entity responding to this subpoena.

**<u>INSTRUCTIONS</u>**

15.      Unless otherwise stated, the relevant time period for these document requests is January 1, 2011 through the present.

16.      All ESI shall be produced in accordance with the Stipulated Order Re: Discovery of Electronically Stored Information entered in this action on November 4, 2015, Dkt. No. 352,

unless the parties agree otherwise. The Stipulated Order Re: Discovery of Electronically Stored Information is attached hereto as Exhibit 1.

17.     If You withhold documents or ESI otherwise discoverable under the Federal Rules of Civil Procedure by claiming that they are privileged or subject to protection as trial preparation material, You must make that claim in accordance with Federal Rule of Civil Procedure 26(b)(5) and the Stipulated ESI Protocol entered in this action.

18.     If any document is known to have existed but no longer exists, has been destroyed, or is otherwise unavailable and You would otherwise produce the document, You must identify the document, the reason for its destruction (if applicable), the name of each person known or reasonably believed by You to have present possession, custody, or control of the original and any copy thereof (if applicable), and a description of the disposition of each copy of the document or ESI.

19.     If no documents or ESI responsive to a request exist, please state that no responsive documents exist.

20.     If You assert an objection to any request You must nonetheless respond and produce any responsive documents that are not subject to the stated objection.  If You object to part of a request or category You must specify the portion of the request to which You object and You must produce documents responsive to the remaining parts of the request.

## DOCUMENTS AND ESI REQUESTED

### REQUEST FOR PRODUCTION NO. 1:

All documents that reflect the circumstances that led to OPM's decision in or prior to 2013 to conduct an information systems environment and applications audit at Anthem.

**REQUEST FOR PRODUCTION NO. 2:**

All documents that reflect the OPM's risk assessment of Anthem's information systems environment and applications.

**REQUEST FOR PRODUCTION NO. 3:**

All documents regarding OPM's auditing, testing,  or monitoring of the security of Anthem's Networks and/or the security of FEHB Plan Enrollees' PII or PHI on Anthem's Networks, including all communications between and among OPM, Anthem, and any third-party vendors involved in the Audit, and OPM's internal communications regarding the Audit.

**REQUEST FOR PRODUCTION NO. 4:**

All documents regarding Anthem's compliance or noncompliance with the terms of Contract No. 1039 (including any amendments or modifications thereto) related to security and/or the confidentiality of Enrollees' PII or PHI on Anthem's Networks.

**REQUEST FOR PRODUCTION NO. 5:**

All documents regarding statements in the Audit Report, including that:

(a)      "There was one element of our audit in which WellPoint applied external interference with the application of audit procedures, resulting in our inability to fully comply with GAS requirement of independence.";

(b)      "when we requested to conduct this test at WellPoint [using automated tools to evaluate the configuration of a sample of computer servers], we were informed that a corporate policy prohibited external entities from connecting to the WellPoint network.";

(c)      "we attempted to obtain additional information from WellPoint, but the Plan was unable to provide satisfactory evidence that it has ever had a program in place to routinely monitor the configuration of its servers";

(d)     "WellPoint has configured its servers to record the activity of privileged users (i.e., system administrators).  However, the event logs generated by these servers are only reviewed retroactively if a problem has been reported or detected . . . Failure to routinely review elevated user activity increases the risk that malicious activity could go undetected and sensitive information could be compromised";

(e)     "WellPoint has not implemented technical controls to prevent rogue devices (laptops, workstations, or routers not issued by or approved by the company) from connecting to its network";

(f)     "during our review we discovered that several specific servers containing Federal data are not subject to routine vulnerability scanning, and we could not obtain evidence indicating that these servers have ever been subject to a vulnerability scan . . . Failure to perform full scope vulnerability scanning increases the risk that WellPoint's systems are compromised and sensitive data stolen or destroyed.";

(g)     "In order to evaluate an FEHBP carrier's configuration compliance auditing program, we typically use automated tools to document the actual configuration of a sample of servers.  We then compare the results to the company's approved baseline configuration . . . When we requested to conduct this test at WellPoint, we were informed that a corporate policy prohibited external entities from connecting to the WellPoint network.";

(h)     "In an effort to meet our audit objective, we attempted to obtain additional information about WellPoint's configuration compliance auditing program.  We were initially provided a description of what appeared to be a thorough configuration compliance auditing program at WellPoint.  However, when we requested documentation to support this description, WellPoint was unable to provide any evidence that a configuration compliance auditing program

had ever been in place at the company . . . Failure to implement a thorough configuration compliance auditing program increases the risk that insecurely configured servers remain undetected, creating a potential gateway for malicious virus and hacking activity that could lead to data breaches.";

(i)     "During the fieldwork phase of the audit, WellPoint provided us with conflicting statements regarding its plans to transition to Tivoli Endpoint Manager.  These conflicting statements along with WellPoint's inability to provide evidence that it performs configuration compliance scans ultimately led to us documenting a formal scope limitation."; and

(j)     "WellPoint has created Technical Configuration Standards (TCS) that outline approved configuration settings for server and mainframe security software . . . However, we found several mainframe security settings that were not in compliance with the TCS."

## REQUEST FOR PRODUCTION NO. 6:

Documents that reflect or discuss the value or importance FEHB Plan Enrollees place on participating plans maintaining the security and confidentiality of their PII or PHI.

## REQUEST FOR PRODUCTION NO. 7:

Documents that reflect or discuss the value or importance OPM places on FEHB Program participating plans maintaining the security and confidentiality of Enrollee's PII or PHI.

## REQUEST FOR PRODUCTION NO. 8:

All documents that concern or describe any "external interference" related to the Audit, including but not limited to documents that identify persons or entities that engaged in any external interference.

**REQUEST FOR PRODUCTION NO. 9:**

All documents regarding OPM's response or follow-up to the Audit, including consideration of whether to conduct further audit procedures or to obtain additional information related to the security of Anthem's Networks or security of PII or PHI on Anthem's Networks.

**REQUEST FOR PRODUCTION NO. 10:**

All documents that reflect any resistance, refusal or interference by Anthem with any request or attempt by OPM to conduct audit or other procedures, subsequent to the Audit, related to the security of Anthem's Networks, or the security of PII or PHI on Anthem's Networks.

**REQUEST FOR PRODUCTION NO. 11:**

Documents that set forth the right of OPM to conduct audits of the security of Anthem's Networks, including, but not limited to, the right to conduct vulnerability scans on Anthem's Networks or to use automated tools to evaluate the configuration of a sample of Anthem's computer servers.

**REQUEST FOR PRODUCTION NO: 12:**

All documents memorializing or recording any meeting (or circulated in connection with any meeting) concerning the Audit (including Anthem's compliance with any request for access to Anthem's Networks or for information related to the Audit) or the security of Anthem's Networks or security of PII or PHI on Anthem's Networks.

**REQUEST FOR PRODUCTION NO: 13:**

All documents regarding requests by OPM to conduct vulnerability scans on Anthem's Networks, including discussions related to any response by Anthem.

**REQUEST FOR PRODUCTION NO. 14:**

Documents that set forth the current status of OPM's requests or attempts to conduct vulnerability scans or any other audit or other procedures related to the security of Anthem's Networks or the security of PII or PHI on Anthem's Networks.

**REQUEST FOR PRODUCTION NO. 15:**

All documents that reflect OPM's communications with Anthem regarding the Data Breach.

**REQUEST FOR PRODUCTION NO. 16:**

All documents memorializing or recording any meeting (or circulated in connection with any meeting) OPM had with Anthem concerning the Data Breach.

**REQUEST FOR PRODUCTION NO. 17:**

Documents concerning any complaints and/or concerns received by the OPM from or on behalf any FEHB Plan Enrollee regarding the Data Breach.

# EXHIBIT 1

1
2
3
4
5

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

6
7
8
9
10
11
12
13
14

| | |
|---|---|
| IN RE ANTHEM, INC. DATA BREACH LITIGATION | Case Number: 15-MD-02617-LHK (NC)<br><br>[PROPOSED] STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION |

15
16
17
18
19
20
21
22
23
24
25
26
27
28

## 1. PURPOSE

This Order will govern discovery of electronically stored information ("ESI") in this case as a supplement to the Federal Rules of Civil Procedure, this Court's Guidelines for the Discovery of Electronically Stored Information, and any other applicable orders and rules. All disclosures and productions made pursuant to this Stipulated Order Re: Discovery of Electronically Stored Information ("Protocol") are subject to the Stipulated Protective Order for Litigation Involving Highly Sensitive Confidential Information and/or Trade Secrets [Dkt. No. 293] and any other Orders entered in this matter.

## 2. COOPERATION

The parties are aware of the importance the Court places on cooperation and commit to cooperate in good faith throughout the matter consistent with this Court's Guidelines for the Discovery of ESI.

1

No. 15-MD-02617-LHK (NC)
[PROPOSED] STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION

### 3. LIAISON

The parties have identified liaisons to each other who are and will be knowledgeable about and responsible for discussing their respective ESI. Each e-discovery liaison will be, or have access to those who are, knowledgeable about the technical aspects of e-discovery, including the location, nature, accessibility, format, collection, search methodologies, and production of ESI in this matter. The parties will rely on the liaisons, as needed, to confer about ESI and to help resolve disputes without court intervention.

### 4. PRESERVATION

The parties have discussed their preservation obligations and needs and agree that preservation of potentially relevant ESI will be reasonable and proportionate. To reduce the costs and burdens of preservation and to ensure proper ESI is preserved, the parties agree that:

a) Only ESI created or received after January 1, 2011 will be preserved throughout this litigation, except that ESI produced in *Blue Cross of California Website Security Cases*, Orange County Superior Court, JCCP 4647, that predates January 1, 2011 shall also be preserved;

b) The parties will exchange a list of the data sources and types of ESI they believe should be preserved, and the custodians, or general job titles or descriptions of custodians, for whom they believe ESI should be preserved, e.g., "HR head," "scientist," and "marketing manager." The parties shall add or remove data sources, ESI types, and custodians as reasonably necessary and following good faith discussion among parties to the litigation;

c) The parties will meet and confer to identify data sources that are not reasonably accessible because of undue burden or cost pursuant to Fed. R. Civ. P. 26(b)(2)(B) where ESI from these sources will be preserved but not searched, reviewed, or produced;

d) In addition to the agreements above, the parties will meet and confer to identify data sources that (a) could contain relevant information but (b) under the proportionality factors, should not be preserved.

e) Among the sources of data the parties agree are not reasonably accessible or are unduly burdensome to preserve, the parties agree not to preserve the following: backup tapes or other long-term storage media that were created for disaster recovery purposes; versions of documents automatically saved by computer programs in cache files, temporary files, or similarly inaccessible locations;

2

voicemail; and instant messaging;[1]

    f)  As additional data sources are identified as a result of investigation, the parties may identify additional data sources that may or may not need to be preserved pursuant to subsections (c), (d), or (e) above. The parties will meet and confer about preserving such ESI as the data sources are identified.

## 5. SEARCH

The parties agree that within 21 days of executing this protocol, and, subsequently, within 14 days of any party serving responses and objections to requests for production, the producing party will provide proposed search protocols to be used for locating responsive ESI. The search protocols will, among other things, identify the data sources and custodians each party believes will possess responsive information and, if appropriate, propose search terms. The parties will meet and confer about methods to search ESI if either party requests such a meet and confer within 14 days after the deadline for exchanging proposed search protocols. If a party requests such a meet and confer, the parties will meet and confer within 7 days.

## 6. PRODUCTION FORMATS

The parties agree to produce documents in accordance with this Protocol and the attached Exhibit A, which provides technical specifications. If particular documents warrant a different format, the parties will cooperate to arrange for the mutually acceptable production of such documents.

## 7. PHASING

When a party propounds discovery requests pursuant to Fed. R. Civ. P. 34, the parties agree to phase the production of ESI. The parties will promptly meet and confer regarding how best to phase the production of ESI and what sources and custodians will comprise the initial production(s). Following the initial production(s), the parties will continue to prioritize the order of subsequent productions.

---

[1] For employees: (a) with direct or management responsibility for IT security or IT policies who were involved in the discovery, investigation, or mitigation of the data breach; (b) whose credentials were used in perpetrating the data breach; or (c) disclosed by Anthem in its initial disclosures, Anthem will take reasonable steps to retain instant messages to the extent they were captured and retained in the ordinary course.

3

## 8. DOCUMENTS PROTECTED FROM DISCOVERY

a)  The parties and their attorneys do not intend by this Protocol to waive their rights to any protection or privilege, including but not limited to, the attorney-client privilege and the attorney work product doctrine. All parties preserve their attorney-client privileges, attorney work product, and other privileges, and there is no intent by the Protocol, or the production of documents pursuant to the Protocol, to in any way waive or weaken these privileges.

b)  Pursuant to Fed. R. Evid. 502(d), the production of a privileged or work-product-protected document, whether inadvertent or otherwise, is not a waiver of privilege or protection from discovery in this case or in any other federal or state proceeding. For example, the mere production of privileged or work-product-protected documents in this case as part of a mass production is not itself a waiver in this case or in any other federal or state proceeding.

Upon learning of the production of a privileged or work-product-protected document, the producing party will promptly give all counsel of record written notice of the production. The producing party need not provide any explanation or evidence regarding the reasonableness of efforts taken to prevent such production and the receiving party agrees not to challenge the reasonableness of such efforts. Upon receiving notice of a production or upon determining that information it received is privileged or work-product-protected, the receiving party must promptly return, sequester, and/or destroy the document(s) and all copies and sequester and/or destroy any notes that reproduce, copy, or otherwise disclose the substance of the privileged or work-product-protected information and notify the producing party when this is complete.

If a receiving party challenges a claim that information produced, disclosed, exhibited, or communicated is privileged or work-product-protected, the receiving party may, in connection with a good faith challenge, make reference to the contents of the information in a submission to the Court, so long as such filing is under seal.  The parties also must follow the procedures for submitting discovery disputes to the Court, including U.S. Magistrate Judge Nathanael Cousins's Civil Standing Order, if applicable.

A receiving party is under a good faith obligation to promptly alert the producing party if the receiving party believes, or it is reasonably apparent that, information produced, disclosed, exhibited, or communicated by a producing party is privileged or work-product-protected either on its face or in light of facts known to the receiving party.

To the extent any party is aware that it has obtained, or it is reasonably apparent that the party has obtained, privileged or work-product-protected information through production, disclosure, or communications, such information may not be submitted to the Court (except in connection with a challenge of the privilege assertion, as described above) or presented for admission into evidence or sought in

4

1   discovery in this proceeding or in any other proceeding or action.

2   c)  Communications need not be placed on a privilege log if they are: (a) between a
       party and its in-house litigation counsel, in-house privacy counsel, or outside
3      counsel, (b) dated on or after January 27, 2015, (c) created exclusively for the
       purpose of obtaining legal advice regarding legal issues related to providing notice
4      of the cyber attack or about representing the Company in potential litigation or
       regulatory investigations, and (d) not part of directing or facilitating an
5      investigation of facts related to the data breach.

6   d)  The parties agree that communications may be identified on a privilege log by
       category, rather than individually, if the parties agree on categories, provided that
7      sufficient information is included in the category privilege log to assess the nature
       of the claim for withholding production and the scope of the communications
8      withheld.

9   e)  Redacted documents need not be logged as long as (a) for emails, the bibliographic
       information (i.e., to, from, cc: and bcc: recipients, date, and time) is not redacted,
10     and the reason for the redaction is noted on the face of the document in the
       redaction box; and (b) for non-email documents, the reason for the redaction is
11     noted on the face of the document in the redaction box.

12

13  **9.  MODIFICATION**

14      This Stipulated Order may be modified by a Stipulated Order of the parties or by the

15  Court for good cause shown.

16      **IT IS SO STIPULATED**, through Counsel of Record.

17                                          **COHEN MILSTEIN SELLERS & TOLL PLLC**
                                            ANDREW N. FRIEDMAN
18                                          DOUGLAS J. MCNAMARA
                                            SALLY M. HANDMAKER
19

20  Dated:  November 2, 2015               By: /s/ Andrew N. Friedman

21                                          COHEN MILSTEIN SELLERS & TOLL PLLC
                                            ANDREW N. FRIEDMAN (admitted pro hac vice)
22                                          afriedman@cohenmilstein.com
                                            SALLY M. HANDMAKER (SBN 281186)
23                                          shandmaker@cohenmilstein.com
                                            ERIC KAFKA (admitted pro hac vice)
24                                          ekafka@cohenmilstein.com
                                            1100 New York Ave. NW
25                                          Suite 500, West Tower
                                            Washington, DC 20005
26

27                                          5

28

1
2

Telephone: (202) 408-4600
Facsimile: (202) 408-4699

3

**ALTSHULER BERZON LLP**
EVE H. CERVANTEZ
JONATHAN WEISSGLASS
DANIELLE E. LEONARD
MEREDITH JOHNSON

4
5
6

Dated: November 2, 2015        By: /s/ Eve H. Cervantez

7
8

ALTSHULER BERZON LLP
EVE CERVANTEZ (SBN 164709)
ecervantez@altshulerberzon.com
JONATHAN WEISSGLASS (SBN 185008)
jweissglass@altshulerberzon.com
DANIELLE E. LEONARD (SBN 218201)
dleonard@altshulerberzon.com
MEREDITH A. JOHNSON (SBN 291018)
mjohnson@altshulerberzon.com
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

9
10
11
12
13
14
15
16

*Lead Plaintiffs' Counsel*

17
18

**HOGAN LOVELLS US LLP**
CRAIG A. HOOVER
E. DESMOND HOGAN
PETER R. BISIO
ALLISON M. HOLT

19
20

Dated: November 2, 2015        By: /s/ Craig A. Hoover

21
22

Craig A. Hoover (SBN 113965)
craig.hoover@hoganlovells.com
E. Desmond Hogan (admitted pro hac vice)
desmond.hogan@hoganlovells.com
Peter R. Bisio (admitted pro hac vice)
peter.bisio@hoganlovells.com
Allison M. Holt (admitted pro hac vice)
allison.holt@hoganlovells.com
555 Thirteenth Street, NW

23
24
25
26
27
28

6

No. 15-MD-02617-LHK (NC)
[PROPOSED] STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED
INFORMATION

1

Washington, DC  20004-1109
Telephone:     (202) 637-5600
2
Facsimile:     (202) 637-5910

3

Michael Maddigan (SBN 163450)
4
michael.maddigan@hoganlovells.com
1999 Avenue of the Stars, Suite 1400
5
Los Angeles, CA  90067
Telephone:     (310) 785-4600
6
Facsimile:     (310) 785-4601
7
Maren J. Clouse (SBN 228726)
maren.clouse@hoganlovells.com
8
4085 Campbell Ave., Suite 100
Menlo Park, CA  94025
9
Telephone:     (650) 463-4000
10
Facsimile:     (650) 463-4199

11

*Attorneys for Defendants Anthem, Inc., and certain*
*of its affiliates that have been named as defendants*
12
*in the Consolidated Amended Complaint*
*(collectively, "Anthem") and Defendants Horizon*
13
*Healthcare Services, Inc., Blue Cross and Blue*
*Shield of Arizona, Inc., Highmark West Virginia,*
14
*Inc., and Blue Cross Blue Shield of Michigan*

15

16
**TROUTMAN SANDERS LLP**
CHAD R. FULLER

17

Dated: November 2, 2015            By: /s/ Chad R. Fuller
18

19
Chad R. Fuller (SBN 190830)
chad.fuller@troutmansanders.com
20
11682 El Camino Real, Suite 400
San Diego, CA 92130
21
Telephone:     (858) 509-6056
Facsimile:     (858) 509-6040
22

23
*Attorney for Anthem*

24
**NELSON MULLINS RILEY &**
**SCARBOROUGH LLP**
25
JOHN D. MARTIN
LUCILE H. COHEN
26

27

28
7

No. 15-MD-02617-LHK (NC)
[PROPOSED] STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED
INFORMATION

1    Dated: November 2, 2015      By: /s/ John D. Martin

2

3                                John D. Martin (admitted pro hac vice)
john.martin@nelsonmullins.com
Lucile H. Cohen (admitted pro hac vice)

4                                lucie.cohen@nelsonmullins.com
1320 Main Street, 17th Floor

5                                Columbia, SC 29201

6                                Telephone:    (803) 255-9241
Facsimile:    (858) 256-7500

7

8                                *Attorneys for Anthem*

9        **IT IS ORDERED** that the forgoing Agreement is approved.

10    Dated:

11                    UNITED STATES MAGISTRATE JUDGE
NATHANAEL COUSINS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

No. 15-MD-02617-LHK (NC)
[PROPOSED] STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED
INFORMATION

1

## ECF CERTIFICATION

2

Pursuant to Local Rule 5-1(i)(3), the filing attorney attests that she has obtained

3

concurrence regarding the filing of this document from the signatories to the document.

4

5       Dated:   November 2, 2015

6                                         /s/ Eve Cervantez
                                          Eve
7    Cervantez

8                                         Co-Lead Plaintiffs' Counsel

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

No. 15-MD-02617-LHK (NC)
[PROPOSED] STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED
INFORMATION

**EXHIBIT A**
**TO [PROPOSED] STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY**
**STORED INFORMATION**

**<u>Production Specifications</u>**

ESI shall be produced as .OPT and .LFP load files, with TIFF images and document level .txt files for all documents containing extracted full text or OCR text. PowerPoint, Excel, and Access files will be produced natively providing links to the native documents and TIFF placeholders. If a particular document warrants a different format, the parties will cooperate in good faith to arrange for the mutually acceptable production format. For example, the parties will meet and confer about the appropriate production format for non-Access databases, if necessary. The parties agree not to degrade the searchability of documents as part of the document production process. No Party has an obligation to create or manually code metadata fields that are not automatically generated by the processing of the ESI, or that do not exist as part of the original metadata of the document. If particular types of metadata would be burdensome or costly to obtain, the parties will meet and confer in good faith about whether it is necessary to produce such metadata and ways to reduce the burden and cost of production. When the native PowerPoint, Excel, or Access file is produced, the producing party will make reasonable efforts to preserve the integrity of the electronic document's contents, i.e., the original formatting of the document and its metadata. Unless otherwise agreed by the parties, all productions must also be made in accordance with the following specifications:

a)   a load file for images;

b)   a delimited load file (.dat) using Concordance standard delimiters and containing a field with the full path and filename to native files produced and metadata fields identified below (for ESI);

c)   document level .txt files for all documents containing extracted full text or OCR text (if extracted full text is unavailable);

d)   if a TIFF file is permitted by this Order to be, and is, produced instead of a native file, the producing party will make reasonable efforts to ensure that all hidden text (e.g., track changes, hidden columns, comments, notes, markups, etc.) will be

1

expanded, extracted, and rendered in the TIFF file.  This specifically includes, but is not limited to, the inclusion of any notes or comments contained within any PowerPoint slides/presentations that are produced in TIFF format;

e)   redacted PowerPoint documents produced in TIFF format will be imaged in color if color is necessary to read the document; and

f)   the following fields and metadata to the extent the information is available from the source of collection (except for the vendor-generated fields related to litigation production, such as BegDoc and EndDoc):

| FIELDS | | | | |
|---|---|---|---|---|
| Field | Data Type | Loose Native Files & Attachments | Email & Attachments | Calendar Entries |
| BegDoc | Integer – Text | Start Bates | Start Bates | StartBates |
| EndDoc | Integer – Text | End Bates | End Bates | EndBates |
| AttachCount | Integer– Text | Number of attachments | Number of attachments | Number of attachments |
| BegAttach | Integer – Text | Starting Bates number of document family | Starting Bates number of document family | Starting Bates number of document family |
| EndAttach | Integer – Text | Ending Bates number of document family | Ending Bates number of document family | Ending Bates number of document family |
| Custodian | Text– Paragraph | Custodian of the document | Custodian of the document | Custodian of the document |

| FIELDS | | | | |
|---|---|---|---|---|
| Field | Data Type | Loose Native Files & Attachments | Email & Attachments | Calendar Entries |
| Duplicate Custodian | Text–Paragraph | All production custodians of the document with the same md5 hash value, even if de-duplicated prior to production | All production custodians of the document with the same md5 hash value, even if de-duplicated prior to production | All production custodians of the document with the same md5 hash value, even if de-duplicated prior to production |
| File Extension | Text–paragraph | File extension associated with file | File extension associated with email | File extension associated with calendar entry |
| FileName | Integer–Text | File Name | | |
| From | Text–paragraph | | Sender of message | Sender of calendar invite |
| To | Text–paragraph | | Recipients of message | Recipients of calendar invite |
| CC | Text–paragraph | | Copied recipients | |
| BCC | Text–paragraph | | Blind copied recipients | |
| Subject | Text–paragraph | | Subject of message | Subject of calendar appointment |
| DateTimeSent | Date time (mmddyyyy HH:mm:ss Z) | | Date and time message sent | Date and time calendar invite sent (if any) |

| FIELDS | | | | |
|---|---|---|---|---|
| Field | Data Type | Loose Native Files & Attachments | Email & Attachments | Calendar Entries |
| DateTimeCreated | Date time (mmddyyyy HH:mm:ss Z) | Date and time file was created | | |
| DateTimeModified | Date time (mmddyyyy HH:mm:ss Z) | Date file was last modified | | |
| Title | Text–paragraph | Title from document metadata | | |
| Author | Text–paragraph | Document authors from metadata | | |
| LastModified By | Text–paragraph | Document modifier from metadata | | |
| MD-5 Hash Value or SHA-1 Hash Value | Integer–Text | Hash value | Hash value | Hash value |
| Redaction | Integer–Text | Indicates whether a redaction has been made to any page of the document (<yes> or <no>) | Indicates whether a redaction has been made to any page of the document (<yes> or <no>) | Indicates whether a redaction has been made to any page of the document (<yes> or <no>) |
| File/folder path | Text–Paragraph | Full path to the file at its original location | Path to the email's folder location | Path to the calendar entry's folder location |

4

| FIELDS | | | | |
|---|---|---|---|---|
| Field | Data Type | Loose Native Files & Attachments | Email & Attachments | Calendar Entries |
| Conversation thread | Text– paragraph | | Field of metadata tying related emails, where available in the email metadata | |

Bates Numbering and Other Unique Identifiers. Every item or file of ESI that is produced shall be identified by a unique page identifier ("Bates Number"), or a Volume number for any storage device (i.e., CD, USB, hard drive) containing such files. All ESI that is permitted to be, and is, produced in image format shall contain a unique Bates Number on each page of the document.

Production Media. The Producing Party may produce documents via secure file transfer mechanism and/or on readily accessible computer or electronic media as the Parties may hereafter agree upon, including CD-ROM, DVD, external hard drive (with standard PC compatible interface) ("Production Media"). Each item of Production Media shall include: (1) the identity of the producing party; (2) the production date, and (3) the Bates Number range of the materials contained on the Production Media item. In order to further protect any sensitive data produced, all Production Media will be encrypted and the producing party will provide a decryption key to the receiving party in a communication separate from the production itself.

Attachments. Email attachments and embedded files or links must be mapped to their parent by the Document or Production number. If attachments or embedded files are combined with their parent documents, then "BegAttach" and "EndAttach" fields (or the functional equivalent) listing the unique beginning and end number for each attachment or embedded document must be included.

Redactions. Pursuant to the Protective Order [Dkt. 293] a producing party may, but is not required to, perform redactions of documents containing Confidential Health Information,

5

as that term is defined in the Protective Order. To the extent a document is produced in redacted form, any redactions shall be clearly indicated on the face of the document, each redacted portion of the document from which information is redacted shall bear a designation that it has been redacted, and a metadata field shall indicate that the document contains redactions. Where a responsive document contains both redacted and non-redacted content, the producing party shall produce the remainder of the non-redacted portions of the document. To the extent that a producing party redacts documents, redacted documents shall be produced in TIFF image, except for Excel and Access documents. If a producing party intends to redact Excel and Access documents, the producing party will inform the receiving party so that the parties can meet and confer to discuss the format of production for such documents. If, after meeting and conferring, the receiving party determines that TIFF images of redacted Excel or Access documents would be unusable/not readable, the producing party shall produce the redacted Excel or Access files in native format.

Privilege Logs. The Parties agree that for each document identified on a privilege log pursuant to the Protocol, the following information will be provided in an Excel document:

- Privilege log reference number;
- Bates range of document (if applicable);
- Author(s) (designating which, if any, are attorneys);
- Recipient(s), including copyee(s) (designating which, if any, are attorneys);
- Description of the documents (or redacted portion of the document) as set forth in Rule 26(b)(5)(A)(ii) of the Federal Rules of Civil Procedure; and
- Privilege claimed.

Paper Documents. All hard copy documents ("Paper Documents") shall be produced as static images: The images will be in black-and-white, single page, 300 DPI, Group IV*tiff images with corresponding OCR text in document level .TXT format and standard load files, which can be used with commercially available litigation software packages. The parties will meet and confer in response to reasonable requests for production of specific images in color. Producing Paper Documents in this form does not change their character from Paper

Documents into ESI.  For Paper Documents, the parties need only populate the BegBates and EndBates fields, and the Custodian fields to the extent the information is available.  To the extent information in the Custodian fields is not available, the parties shall so indicate.  The parties may meet and confer to discuss whether additional metadata for Paper Documents should be exchanged.

Foreign Language Text.  The parties will use reasonable industry standards, software, and techniques, or their reasonable equivalents, (including but not limited to the use of UTF-8 format for text and load files) to attempt to ensure that all technologies and processes used to collect, process and produce the text of any document—including all TIFF conversion and OCR processes, and the extraction of text from native files—preserves all foreign language text, punctuation and other characteristics as they exist in the source native file.

# Exhibit B

ALTSHULER BERZON LLP
EVE CERVANTEZ (SBN 164709)
ecervantez@altshulerberzon.com
JONATHAN WEISSGLASS (SBN 185008)
jweissglass@altshulerberzon.com
DANIELLE LEONARD (SBN 218201)
dleonard@altshulerberzon.com
MEREDITH JOHNSON (SBN 291018)
mjohnson@altshulerberzon.com
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

COHEN MILSTEIN SELLERS & TOLL PLLC
ANDREW N. FRIEDMAN (admitted *pro hac vice*)
afriedman@cohenmilstein.com
GEOFFREY GRABER (SBN 211547)
ggraber@cohenmilstein.com
SALLY M. HANDMAKER (SBN 281186)
shandmaker@cohenmilstein.com
ERIC KAFKA (admitted *pro hac vice*)
ekafka@cohenmilstein.com
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| *In Re Anthem, Inc. Data Breach Litigation* | Case No:  15-md-02617-LHK |
| | **THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| | DEMAND FOR JURY TRIAL |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

---

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................1

II. JURISDICTION AND VENUE............................................................3

III. PARTIES ...........................................................................4

  A.  Plaintiffs .......................................................................4

  B.  Defendants ....................................................................49

IV. STATEMENT OF FACTS ..............................................................53

  A.  The Anthem Database .........................................................53

  B.  Defendants' Privacy Policies, Representations, Omissions, and Contract Terms Pertaining to Data Security and Confidentiality ..........................................54

    1.  Anthem and Anthem Affiliates.............................................54

      a.  Anthem's Privacy Policies, Representations, and Omissions............................55

      b.  Anthem's Insurance and Health Benefits Contracts Include Anthem's Privacy Policies.......................................................61

        i.   Individual contracts...................................................62

        ii.  Group contracts .....................................................66

    2.  Non-Anthem BCBS Defendants .........................................73

      a.  The BlueCard Program .............................................73

      b.  The Fourteen Non-Anthem Defendants' Privacy Policies, Representations, and Omissions ...........................................85

      c.  Each of the Fourteen Non-Anthem Defendants' Insurance and Health Benefits Contracts Include Specific Privacy Promises.......................87

    3.  Blue Cross Blue Shield Association and the Federal Contract .....................97

  C.  Defendants Had an Obligation to Protect Personal Information under Federal and State Law and the Applicable Standard of Care .............................100

  D.  Defendants Were On Notice of Cyber Attack Threats, and the Inadequacy of Their Data Security..................................................104

i

E.  Anthem Allowed a Massive Data Breach ...............................................106

F.  Anthem's Data Breach Was a Direct Result of Anthem's Inadequate Data Security ...........114

G.  Defendants Breached Their Contracts To Protect Personal Information ..............................118

    1.  Anthem's Breach of Specific Contract Promises...........................................................118

    2.  The Non-Anthem BCBS Defendants' Breach of Their Specific Contract Promises ......121

    3.  BCBSA and Anthem and Non-Anthem Defendants' Breach of the Federal Contract ....122

H.  Affected Individuals Were Grievously Harmed By the Anthem Data Breach ....................123

V. CLASS ALLEGATIONS ...............................................................................126

A.  Statewide Classes ...............................................................................126

B.  Federal Employee Class ......................................................................128

C.  Certification of the Proposed Classes is Appropriate ..........................128

VI. CAUSES OF ACTION.................................................................................132

    COUNT I – NEGLIGENCE ...............................................................133

    COUNT II – NEGLIGENCE PER SE...................................................134

    COUNT III – BREACH OF CONTRACT (ANTHEM DEFENDANTS)...........................136

    COUNT IV – BREACH OF CONTRACT (NON-ANTHEM DEFENDANTS).................139

    COUNT V – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.........................................142

        A.  Anthem Defendants ...................................................................142

        B.  Non-Anthem Defendants ...........................................................144

    COUNT VI – THIRD-PARTY BENEFICIARY CLAIM FOR BREACH OF CONTRACT UNDER FEDERAL LAW....................146

    COUNT VII – NEGLIGENT MISREPRESENTATION....................................150

    COUNT VIII – UNJUST ENRICHMENT ...............................................150

    COUNT IX – STATE CONSUMER PROTECTION LAWS..............................152

ii

Arizona
ARIZONA CONSUMER FRAUD ACT
A.R.S. § 44-1521, et seq. ...................................................................152

California
CALIFORNIA UNFAIR COMPETITION LAW,
CAL. BUS. & PROF. CODE § 17200, et seq..........................................154

Colorado
COLORADO CONSUMER PROTECTION ACT,
COLO. REV. STAT. § 6-1-101, et. seq....................................................158

Connecticut
CONNECTICUT UNFAIR TRADE PRACTICES ACT,
C.G.S. § 42-110a et seq., ......................................................................160

District of Columbia
DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT,
D.C. CODE § 28-3904, et seq..................................................................162

Hawaii
HAWAII UNFAIR PRACTICES AND UNFAIR COMPETITION STATUTE,
HAW. REV. STAT. § 480-1, et seq. .......................................................164

Illinois
ILLINOIS CONSUMER FRAUD ACT,
815 Ill. COMP. STAT. 505/1 et seq. ......................................................166

ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT,
815 Ill. COMP. STAT. § 510/2(a) et. seq. ..............................................168

Indiana
INDIANA DECEPTIVE CONSUMER SALES ACT,
IND. CODE § 24-5-0.5-3...........................................................................169

Kentucky
KENTUCKY CONSUMER PROTECTION ACT,
KY REV. STAT. § 367.110, et. seq. .......................................................172

Maine
MAINE UNFAIR TRADE PRACTICES ACT
5 ME. REV. STAT. §205...........................................................................174

MAINE UNIFORM DECEPTIVE TRADE PRACTICES ACT,
10 ME. REV. STAT. § 1212, et. seq. .....................................................176

Maryland
MARYLAND CONSUMER PROTECTION ACT,

iii

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

MD CODE COMMERCIAL LAW, § 13-301, et. seq. ..................................................177

Massachusetts
MASSACHUSETTS CONSUMER PROTECTION ACT,
MASS. GEN. LAWS ANN. CH. 93A, § 1, et. seq.......................................................179

Minnesota
MINNESOTA CONSUMER FRAUD ACT,
MINN. STAT. § 325F.68, et. seq. AND MINN. STAT. §8.31, et. seq.........................182

MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT,
MINN. STAT. § 325D.43, et. seq....................................................................................184

Missouri
MISSOURI MERCHANDISING PRACTICES ACT,
MO. STAT. § 407.010, et seq..........................................................................................186

Montana
MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION
ACT, MCA § 30-14-101, et seq.......................................................................................188

Nebraska
NEBRASKA CONSUMER PROTECTION ACT,
NEB. REV. STAT. § 59-1601, et. seq. ..........................................................................191

NEBRASKA UNIFORM DECEPTIVE TRADE PRACTICES ACT,
NEB. REV. STAT. § 87-301, et. seq. ............................................................................193

Nevada
NEVADA DECEPTIVE TRADE PRACTICES ACT,
NEV. REV. STAT. § 598.0915, et. seq.; NEV. REV. STAT. § 41.600, et. seq. ............195

New Jersey
NEW JERSEY CONSUMER FRAUD ACT,
N.J. STAT. ANN. § 56:8-1, et. seq..................................................................................197

New Mexico
NEW MEXICO UNFAIR PRACTICES ACT,
N.M. STAT. ANN. § 57-12-1, et. seq.............................................................................199

New York
NEW YORK GENERAL BUSINESS LAW,
N.Y. GEN. BUS. LAW § 349, et. seq. .........................................................................202

North Carolina
NORTH CAROLINA UNFAIR TRADE PRACTICES ACT,
N.C. GEN. STAT. ANN. § 75-1.1, et. seq.....................................................................204

iv

North Dakota
NORTH DAKOTA UNLAWFUL SALES OR ADVERTISING ACT,
N.D. CENT. CODE §§ 51-10-01, et. seq...................................................................206

Oklahoma
OKLAHOMA CONSUMER PROTECTION ACT,
15 OKL. STAT. ANN. § 751, et. seq. ........................................................................208

Pennsylvania
PENNSYLVANIA UNFAIR TRADE PRACTICES,
73 PA STAT. ANN. § 201-1, et. seq. .........................................................................210

Rhode Island
RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT,
R.I. GEN. LAWS § 6-13.1, et. seq. ...........................................................................213

South Dakota
SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER
PROTECTION ACT, S.D. CODIFIED LAWS § 37-24-1, et. seq...............................215

Tennessee
TENNESSEE CONSUMER PROTECTION ACT,
TENN. CODE ANN. §§ 47-18-101, et. seq. ...............................................................218

Texas
TEXAS DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION
ACT TEX. BUS. & COM. CODE § 17.41, et. seq.......................................................220

Vermont
VERMONT CONSUMER FRAUD ACT,
9 VT. STAT. ANN. §§ 2451, et. seq. .........................................................................223

Washington
WASHINGTON CONSUMER PROTECTION ACT,
WASH. REV. CODE § 19.86.020, et. seq....................................................................225

West Virginia
WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT
W. VA. CODE § 46A-6-101, et. seq. .........................................................................227

COUNT X – DATA BREACH STATUTES..................................................................229

California
CALIFORNIA CUSTOMER RECORDS ACT,
CAL. CIV. CODE § 1798.80, et. seq. ........................................................................229

Colorado
COLO. REV. STAT. ANN. § 6-1-716(2), et. seq. .......................................................231

v

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Delaware
DEL. CODE ANN. TIT. 6 § 12B-102(a), et seq. ........................................................232

District of Columbia
D.C. CODE § 28-3852(a), et. seq. ...........................................................................232

Georgia
GA. CODE ANN. § 10-1-912(a), et. seq. ..................................................................233

Hawaii
HAW. REV. STAT. § 487N-2(a), et. seq. ..................................................................234

Iowa
IOWA CODE ANN. § 715C.2(1), et. seq. ..................................................................235

Kansas
KAN. STAT. ANN. § 50-7a02(a), et. seq. .................................................................235

Louisiana
LA. REV. STAT. ANN. § 51:3074(A), et. seq. ............................................................236

Michigan
MICH. COMP. LAWS ANN. § 445.72(1), et. seq. .......................................................237

New Hampshire
N.H. REV. STAT. ANN. § 359-C:20(I)(a), et. seq. ....................................................238

Oregon
OR. REV. STAT. ANN. § 646A.604(1), et. seq. .........................................................238

South Carolina
S.C. CODE ANN. § 39-1-90(A), et. seq. ..................................................................239

Tennessee
TENN. CODE ANN. § 47-18-2107(b), et. seq. ...........................................................240

Virginia
VA. CODE ANN. § 18.2-186.6(B), et. seq. ...............................................................241

Washington
WASH. REV. CODE ANN. § 19.255.010(1), et. seq. ...................................................242

Wisconsin
WIS. STAT. ANN. § 134.98(2), et. seq. ....................................................................243

Wyoming
WYO. STAT. ANN. § 40-12-502(a), et. seq. ..............................................................243

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

COUNT XI – STATE UNFAIR INSURANCE PRACTICE STATUTES ..........................244

Arizona
ARIZONA UNFAIR INSURANCE PRACTICES STATUTE,
(A.R.S. § 20-442, 443, 444)................................................................244

Massachusetts
UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS
AND PRACTICES IN THE BUSINESS OF INSURANCE,
(MASS. GEN. LAWS ANN. CH. 176D, § 1, et seq.) ......................................246

New Mexico
TRADE PRACTICES AND FRAUDS IN INSURANCE BUSINESS,
(N.M. STAT. ANN. § 59A-16-1, et seq.) ........................................247

North Dakota
PROHIBITED PRACTICES IN INSURANCE BUSINESS,
(N.D. CENT. CODE § 26.1-04-01, et seq.)................................248

Texas
TEXAS UNFAIR AND DECEPTIVE INSURANCE PRACTICE LAWS,
(TEX. INS. CODE §§ 541.003, 541.051, 541.052, 541.061, 541.151)..........................249

West Virginia
UNFAIR TRADE PRACTICES IN THE BUSINESS OF INSURANCE,
(W. VA. CODE § 33-11-1, et seq.)..............................................250

COUNT XII:  STATE INSURANCE PERSONAL INFORMATION PRIVACY
STATUTES............................................................................251

Arizona
ARIZONA INSURANCE INFORMATION AND PRIVACY PROTECTION ACT,
(A.R.S. §20-2113, § 20-2118(b))....................................................251

Connecticut
CONNECTICUT INSURANCE INFORMATION AND PRIVACY PROTECTION
ACT, (CONN. GEN. STAT. §38a-988, 995, 999) ..........................253

Georgia
GEORGIA INSURANCE INFORMATION AND PRIVACY PROTECTION ACT,
(GA. CODE §33-39-14, 21(b))........................................................254

Illinois
ILLINOIS INSURANCE INFORMATION AND PRIVACY PROTECTION ACT,
(215 ILCS 5/1014, 1021) ..............................................................255

vii

Maine
MAINE INSURANCE INFORMATION AND PRIVACY PROTECTION ACT,
(ME. REV. STAT. 24-A, § 2215(1), 24-A, § 2217(2)) .................................256

Massachusetts
MASSACHUSETTS INSURANCE INFORMATION AND PRIVACY
PROTECTION ACT, (MASS. GEN. LAWS CH. 175I, § 1, et seq.) ...........................257

Minnesota
MINNESOTA INSURANCE FAIR INFORMATION REPORTING ACT,
(MINN. STAT. § 72A.49, et seq.) .................................................258

Montana
MONTANA INSURANCE INFORMATION AND PRIVACY PROTECTION ACT,
(MONT. CODE § 33-19-101, et seq.) ...........................................259

New Jersey
NEW JERSEY INSURANCE INFORMATION PRACTICES ACT,
(N.J. STAT. § 17:23A-1, et seq.)...................................................260

North Carolina
NORTH CAROLINA CONSUMER AND CUSTOMER INFORMATION PRIVACY
ACT, (N.C. GEN. STAT. § 58-39-1, et seq.) ................................261

Ohio
OHIO INSURANCE TRANSACTION INFORMATION STANDARDS LAW,
(OHIO REV. CODE § 3904.13, §3904.21(b)................................263

Oregon
OREGON USE AND DISCLOSURE OF INSURANCE INFORMATION,
(OR. REV. STAT. § 746.600, et seq.) ...........................................264

COUNT XIII:  STATE MEDICAL AND HEALTH INFORMATION PRIVACY
STATUTES.................................................................265

California
CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT,
(CIVIL CODE §56 et seq.) .........................................................265

Maryland
MARYLAND DISCLOSURE REQUIREMENTS FOR INSURERS,
(MD. CODE, INS. § 4-403)..........................................................267

MARYLAND DISCLOSURE REQUIREMENTS FOR NONPROFIT HEALTH
SERVICE PLANS, (MD. CODE, INS. § 14-138) .........................................268

MARYLAND CONFIDENTIALITY OF MEDICAL RECORDS ACT,
(MD. CODE, HEALTH-GEN. § 4-301, et seq.) ...........................................269

viii

Minnesota
MINNESOTA HEALTH RECORDS ACT,
(MINN. STAT. § 144.291, et seq.) ...................................................................270

Rhode Island
RHODE ISLAND CONFIDENTIALITY OF HEALTH CARE INFORMATION ACT,
(R.I. GEN. LAWS § 5-37.3-1, et seq.) ...........................................................271

Virginia
VIRGINIA INSURANCE INFORMATION AND PRIVACY PROTECTION ACT,
(VA. CODE § 38.2-600, et seq.)........................................................................272

VIRGINIA HEALTH RECORDS PRIVACY STATUTE,
(VA. CODE § 32.1-127.1:03) ............................................................................273

Washington
WASHINGTON UNIFORM HEALTH CARE INFORMATION ACT,
(WASH. REV. CODE §70.02.045, § 70.02.170) .............................................274

Wisconsin
WISCONSIN INSURANCE MEDICAL INFORMATION PRIVACY STATUTE,
(WIS. STAT. § 610.70)........................................................................................275

WISCONSIN CONFIDENTIALITY OF HEATH RECORDS LAW,
(WIS. STAT. § 146.82(5), §142.84) ................................................................276

VII. PRAYER FOR RELIEF.............................................................................................277

VIII. DEMAND FOR JURY TRIAL..................................................................................279

INDEX OF EXHIBITS AND EXHIBITS  ........................................................................280

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

Plaintiffs identified below (collectively, "Plaintiffs"), individually, and on behalf of the Classes defined below of similarly situated persons, file this Second Consolidated Amended Class Action Complaint. Plaintiffs file suit against Anthem, Inc., Anthem's affiliates and subsidiaries identified below, the Blue Cross Blue Shield Association, and other Blue Cross Blue Shield licensees identified below (collectively, "Defendants").

## I.    INTRODUCTION

1.      In 2014 and 2015, Anthem, Inc. experienced one of the largest data security breaches in history (the "Anthem Data Breach"). Cyberattackers stole the personal information of approximately 80 million Americans ("Affected Individuals").

2.      Despite the fact that it was storing sensitive personal information that it knew was valuable to, and vulnerable to, cyberattackers, Anthem and its fellow Defendants failed to take even the most basic security precautions that could have protected Affected Individuals' data.  Instead, Anthem and other Defendants used grossly inadequate computer systems and data security practices that allowed the hackers to easily make off with Affected Individuals' personal data.  Stealing this much data takes time, and there were numerous steps along the way when any company following standard IT security practices would have foiled the hackers.  But Anthem and its fellow Defendants failed to take these basic precautions.

3.      Anthem and its fellow Defendants placed the personal information of approximately 80 million Americans in one centralized database (the "Anthem Database"). The Anthem Database included the types of information that federal and state law requires companies to take security measures to protect: names, dates of birth, Social Security numbers, health care ID numbers, home addresses, email addresses, employment information, income data, and confidential medical records ("Personal Information").  This data should have received extra protection, not substandard protection.

4.      Defendants informed their customers and the public, including Plaintiffs and Affected Individuals, that they had privacy policies and practices that protected the confidentiality of sensitive personal information that they collect.  Defendants made these privacy policies and commitments available in a variety of documents, including on Defendants' websites, and in written privacy notices provided to Plaintiffs and Affected Individuals.  Defendants included these privacy policies and

1

1   commitments to maintain the confidentiality of their members' sensitive information as terms of their

2   insurance and health benefits contracts with those members, including the contracts they entered into

3   with Plaintiffs and Affected Individuals.  In these contract terms and other representations to Plaintiffs

4   and Affected Individuals and the public, Defendants promised that they would take specific measures

5   to protect their members' information, consistent with industry standards and federal and state law.

6   They did not.

7        5.       Having done the cyberattackers the favor of compiling the highly sensitive information

8   of 80 million individuals in one place, Defendants failed to implement basic industry-accepted data

9   security tools to prevent cyberattackers from accessing the Anthem Database:  Defendants did not

10  require the users of their computer systems to use a two-factor authentication procedure to enter their

11  computer systems; Defendants did not require users to change their passwords; and Defendants

12  allowed users to access personal information even when those users did not need to access that

13  information for job-related purposes. Defendants also failed to encrypt the sensitive personal

14  information within the Anthem Database. If Defendants had taken even one of these basic security

15  steps, the cyberattackers would not have been able to access or use Affected Individuals' sensitive

16  personal information.

17       6.       Any company with reasonable data security practices and procedures – especially one

18  guarding valuable data that was a known target for cyberattackers – would monitor for a data security

19  breach. In other words, even if a company negligently left the "bank vault" open (as Defendants did),

20  it would still have videos monitoring the bank vault, and alarms that would go off if intruders tried to

21  leave with the loot. However, Defendants failed to implement (or turned off) many standard

22  monitoring and alerting systems. Defendants did have some monitoring systems turned on, and those

23  systems sent out alerts when the cyberattackers entered various parts of Defendants' computer systems

24  and when the cyberattackers stole valuable personal information from the Anthem Database.

25  Defendants either failed to review many of these alerts, or ignored the alerts. As time went on, the

26  cyberattackers were stealing so much data (i.e., highly sensitive personal information) that basic

27  information technology maintenance systems should have recognized and stopped the attack.

28  Unfortunately, Defendants failed to properly implement those systems as well.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

7.    Since the Anthem Data Breach, Affected Individuals have been repeatedly harmed. For example, Affected Individuals have had fake tax returns filed in their names, allowing criminals to abscond with their tax refunds, have had bank accounts drained, and have had credit cards or fraudulent loans taken out in their names.  They have spent countless hours filing police reports and poring over credit reports to combat identity theft, but new fraud is still being perpetrated against them using the sensitive information taken during the Anthem Data Breach.  Many are now paying monthly or annual fees for identity theft and credit monitoring services.  Now that their sensitive personal information (e.g., their Social Security numbers, dates of birth, and home addresses) has been released, Affected Individuals must worry about being victimized throughout the rest of their lives.

8.    Because Defendants failed to provide even minimally adequate computer systems and data security practices, Affected Individuals are forced to suffer the consequences. This Court must hold Defendants accountable.

## II.    JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in each of the proposed classes, and at least one member of the class of Plaintiffs is a citizen of a state different from a Defendant. The Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because the action includes a claim arising under federal law, the Federal Employee Plaintiffs' and Class Members' third-party beneficiary claim for breach of contract.

10.    This Court has personal jurisdiction over Defendants because Defendants conduct business in the state of California.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) based on the transfer order of the Judicial Panel on Multidistrict Litigation.  Venue was proper in this Court with respect to the actions originally filed in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in, was directed to, and/or emanated from this District.

# III.    PARTIES

## A.    Plaintiffs

### Alabama

12.    Plaintiff Cindy Chadwick is a former citizen and resident of the State of Alabama and current citizen and resident of the State of Tennessee. Ms. Chadwick was enrolled in a Blue Cross Blue Shield of Georgia health plan and paid premiums on a regular basis. Anthem and Blue Cross Blue Shield of Georgia collected and received Ms. Chadwick's Personal Information, which Anthem maintained in its database. Ms. Chadwick received a letter from Anthem informing her that her Personal Information may have been compromised as a result of the Anthem data breach. After being notified of the breach, Ms. Chadwick placed credit freezes on her credit reports with the three major U.S. consumer credit reporting agencies in order to detect potential identity theft and fraudulent activity. In order to have the fee waived for placing the credit freezes on her reports, Ms. Chadwick was required to file a police report regarding the breach. As a result of the Anthem data breach, Ms. Chadwick has spent numerous hours monitoring her bank and credit accounts and addressing issues arising from the Anthem data breach.

### Arizona

13.    Plaintiff Pearl Bruno is a citizen and resident of the State of Arizona. Ms. Bruno was enrolled in a Blue Cross and Blue Shield of Georgia, Inc. health plan and paid premiums on a regular basis. Blue Cross and Blue Shield of Georgia, Inc. and Anthem collected and received Ms. Bruno's Personal Information, which Anthem maintained in its database. Ms. Bruno received a letter from Anthem informing her that her Personal Information may have been compromised as a result of the Anthem Data Breach. Ms. Bruno now engages in monthly monitoring of her credit and her bank accounts. As a result of the Anthem breach, Ms. Bruno has spent numerous hours addressing issues arising from the Anthem data breach.

### California

14.    Plaintiff Michael Bronzo is a citizen and resident of the State of California. Mr. Bronzo was enrolled in a Blue Cross of California, Inc. d/b/a Anthem Blue Cross of California health plan that he purchased individually, and for which he paid premiums on a regular basis. Blue Cross of

4

California, Inc. and Anthem collected and received Mr. Bronzo's Personal Information, which Anthem maintained in its database. Mr. Bronzo received a letter from Anthem informing him that his information may have been compromised as a result of the Anthem data breach. Mr. Bronzo subsequently received a letter from the IRS informing him that someone had filed a false tax return in his name using his Personal Information. Mr. Bronzos's state tax refund of approximately $700 and his Federal tax refund of approximately $7,000 were delayed. Mr. Bronzo pays approximately $216 annually for identity theft and credit monitoring services in order to monitor for identity theft and fraudulent activity resulting from the Anthem breach. As a result of the Anthem breach, Mr. Bronzo has spent numerous hours addressing issues arising from the Anthem data breach.

15.     Plaintiff Daniel Randrup is a citizen and resident of the State of California. Mr. Randrup was employed by San Joaquin County Office of Education and was enrolled in a health plan through the Self-Insured Schools of California, that was administered by Anthem Blue Cross Life and Health Insurance Company and BlueCross of California, Inc., d/b/a Anthem Blue Cross of California, and paid premiums on a regular basis. Anthem Blue Cross Life and Health Insurance Company, Anthem Blue Cross of California, and Anthem collected and received Mr. Randrup's Personal Information, which Anthem maintained in its database. Mr. Randrup received a letter from Anthem and his employer informing him that his information may have been compromised as a result of the Anthem data breach. Mr. Randrup subsequently received notification from the California Franchise Tax Board stating that he owed thousands of dollars in additional withholding tax based on a tax return that Mr. Randrup did not file. As a result, Mr. Randrup was forced to submit affidavits to the IRS and California Franchise Tax Board, file a police report, file a report with the Federal Trade Commission, and spend significant time and effort attempting to resolve the issue. Mr. Randrup still has not received his expected 2014 tax return payment. As a result of the Anthem breach, Mr. Randrup has spent numerous hours addressing issues relating to his tax fraud, monitoring his accounts, and addressing issues arising from the Anthem data breach.

16.     Plaintiff Mary Ella Carter is a citizen and resident of the State of California. Ms. Carter was enrolled in a Blue Cross of California, Inc. d/b/a Anthem Blue Cross of California health plan through her husband's employer, a California county, and paid premiums on a regular basis. Blue

5

Cross of California and Anthem collected and received Ms. Carter and her family's Personal Information, which Anthem maintained in its database.  In approximately March, 2015, Ms. Carter received notification from All-Clear ID that her minor daughter's Social Security Number had been compromised. She contacted All-Clear ID for assistance, but they were unable to provide Ms. Carter with any guidance to protect her daughter's Personal Information. As a result of the Anthem breach, Ms. Carter placed credit freezes on her daughter's credit reports with U.S. consumer credit reporting service TransUnion in order to detect potential additional identity theft and fraudulent activity. As a result of the Anthem breach, Ms. Carter has spent her own money and numerous hours addressing issues arising from the Anthem data breach.

17.     Plaintiff Kenneth Coonce is a citizen and resident of the State of California. Mr. Coonce was enrolled in Blue Cross of California, Inc. d/b/a Anthem Blue Cross of California health plan and paid premiums on a regular basis. Blue Cross of California and Anthem collected and received Mr. Coonce's Personal Information, which Anthem maintained in its database. Mr. Coonce received a letter from Anthem in March 2015 informing him that his personal information may have been compromised as a result of the Anthem breach. In September 2015, Mr. Coonce was notified by his credit union's fraud department that his debit card number had been stolen and used for unauthorized charges.  Mr. Coonce was forced to submit numerous forms to the credit union and to file a police report in order to reverse the charges, and spent hours on the phone and in person with the bank's customer representatives as well as additional time filling out a police report.  Mr. Coonce pays approximately $312 annually for identity theft and credit monitoring services in order to monitor for identity theft and fraudulent activity resulting from the Anthem breach. As a result of the Anthem breach, Mr. Coonce has spent numerous hours addressing issues arising from the Anthem data breach.

18.     Plaintiff Steve Kawai is a citizen and resident of the State of California. Mr. Kawai was employed by the State of California and enrolled in a CALPERS health plan administered by Anthem Blue Cross Life and Health Insurance Company and Blue Cross of California, Inc., d/b/a Anthem Blue Cross of California, and paid premiums on a regular basis. Anthem Blue Cross Life and Health Insurance Company, Blue Cross of California, and Anthem collected and received Mr. Kawai's personal information, which Anthem maintained in its database. Mr. Kawai received an e-mail from

6

CalPERS, the administrator of his health insurance plan, informing him that his information may have been compromised as a result of the Anthem data breach. As a result of the Anthem breach, Mr. Kawai has spent numerous hours monitoring his accounts and addressing issues arising from the Anthem data breach.

19.     Plaintiff Kenneth Solomon is a citizen and resident of the State of California. Mr. Solomon was enrolled in an Anthem Blue Cross Life and Health Insurance Company Individual PPO and an Anthem Blue Cross Life and Health Insurance Company Class F Medicare Supplement health plan that he purchased independently and paid premiums for on a regular basis. Anthem Blue Cross Life and Health Insurance Company and Anthem collected and received Mr. Solomon's Personal Information, which Anthem maintained in its database. Mr. Solomon received a letter from Anthem informing him that his Personal Information may have been compromised as a result of the Anthem breach. As a result of the Anthem breach, Mr. Solomon has spent numerous hours addressing issues arising from the Anthem data breach.

20.     Plaintiffs Daniel Tharp and Kelly Tharp are husband and wife and citizens and residents of the State of California. Mr. and Mrs. Tharp enrolled in a group health plan offered by the Ironworkers' Employees Benefit Corporation (IBEC), the Plan Administrator for a union welfare fund, serviced by Anthem Blue Cross Life and Health Insurance Company and Blue Cross of California, Inc., d/b/a Anthem Blue Cross of California, and paid premiums on a regular basis. Anthem Blue Cross Life and Health Insurance Company, Anthem Blue Cross of California, and Anthem collected and received the Tharps' Personal Information, which Anthem maintained in its database. On or about February 7, 2015, after the announcement of the Anthem breach, the Tharps attempted to electronically file their taxes but the filing was rejected because someone else had filed a false tax return using their Personal Information.  In April, 2015, the Tharps received a confirmatory letter from the IRS informing them that someone may have attempted to impersonate them by using their names and Social Security numbers to file a 2014 federal tax return. Mr. and Mrs. Tharp were forced to submit numerous forms to the IRS, file a police report, and spend hours on the phone with IRS representatives to correct their tax filing. As a result, their 2014 tax return payments were delayed by approximately six months. The Tharps had to spend money for postage and facsimile costs in order to

7

1    correspond with the IRS. The Tharps also spent approximately $60 out-of-pocket to place credit

2    freezes on their credit reports with the three major U.S. consumer credit reporting agencies in order to

3    detect potential identity theft and fraudulent activity. As a result of the Anthem breach, the Tharps

4    have spent numerous hours monitoring their accounts and addressing issues arising from the Anthem

5    data breach.

6         21.    Plaintiffs Joseph and Karen Jo Blanchard are citizens and residents of the State of

7    California. Mr. and Mrs. Blanchard were enrolled in a Health Care Service Corporation d/b/a Blue

8    Cross and Blue Shield of Texas health plan and paid premiums on a regular basis. Health Care Service

9    Corporation d/b/a Blue Cross and Blue Shield of Texas and Anthem collected and received Mr. and

10   Mrs. Blanchard's Personal Information, which Anthem maintained in its database. Mrs. Blanchard

11   received a letter from Anthem informing her that her Personal Information may have been

12   compromised as a result of the Anthem breach. Later, Mrs. Blanchard received an email from

13   Anthem/AllClear addressed to her husband, Joseph Blanchard, which stated "Anthem is truly sorry for

14   any inconvenience caused by the incident" and invited him to sign up for credit monitoring. Following

15   announcement of the Anthem breach, at least 10 credit cards or credit accounts were opened or

16   attempted to be opened in Mr. Blanchard's name and using his Personal Information. In most

17   instances, hundreds or thousands of dollars were charged on the credit cards and Mr. Blanchard had to

18   personally dispute every charge by making phone calls, submitting affidavits, sending identification,

19   and filing police reports at his expense. Because of the rampant fraud on Mr. Blanchard's accounts,

20   Mr. Blanchard's credit card company denied him an increase in his credit limit during the middle of a

21   home remodel. Additionally, Mr. Blanchard's near-perfect credit score decreased by approximately

22   130 points. Mr. Blanchard placed credit freezes on his credit reports with the three major U.S.

23   consumer credit reporting agencies in order to detect potential identity theft and fraudulent activity. As

24   a result of the Anthem breach, Mr. and Mrs. Blanchard have spent dozens of hours addressing credit

25   fraud, monitoring their accounts, and addressing issues arising from the Anthem data breach.

26        22.    Plaintiff Lillian Brisko is a citizen and resident of the State of California. Ms. Brisko

27   was enrolled in a Blue Shield of California health plan and paid premiums on a regular basis. Blue

28   Shield of California and Anthem collected and received Ms. Brisko's Personal Information, which

Anthem maintained in its database. Ms. Brisko received a letter from Anthem informing her that her Personal Information may have been compromised as a result of the Anthem breach. An Anthem customer representative later confirmed to Ms. Brisko that her Personal Information was in fact compromised. Ms. Brisko and her husband received a letter from the IRS requesting them to verify their identities for their 2014 tax return. Ms. Brisko was later informed by an IRS agent that someone had filed a false tax return in her name using her Personal Information. After contacting the consumer reporting agencies, Ms. Brisko learned that someone had also fraudulently taken out a $3,000 loan in her name from a Check 'n Go store in another city. As a result, Ms. Brisko and her husband were forced to travel to the IRS offices, submit affidavits to the IRS, file a police report, file a complaint with the Federal Trade Commission, and submit extensive documentation to the lending company. Ms. Brisko spent $82.15 in unreimbursed notary fees, USPS fees and FedEx fees to address these issues. As a result of the Anthem breach, Ms. Brisko has spent over 200 hours addressing issues relating to her tax and credit fraud, monitoring her accounts, and addressing issues arising from the Anthem data breach.

23.    Plaintiff Alvin Lawson is a citizen and resident of the State of California. Mr. Lawson was enrolled in a Blue Cross Blue Shield Association Federal Employee PPO health plan through his wife's employer, the U.S. Postal Service, and paid premiums on a regular basis. The Blue Cross Blue Shield Association and Anthem collected and received Mr. Lawson's Personal Information, which Anthem maintained in its database. Mr. Lawson received a letter from Anthem informing him that his Personal Information may have been compromised as a result of the Anthem breach. As a result of the Anthem breach, Mr. Lawson has spent numerous hours monitoring his accounts and addressing issues arising from the Anthem data breach.

### Colorado

24.    Plaintiff James Schatzman is a citizen and resident of the State of Colorado. Mr. Schatzman was enrolled in an Anthem Blue Cross Blue Shield health plan and paid premiums on a regular basis. Anthem Blue Cross Blue Shield and Anthem collected and received Mr. Schatzman's Personal Information, which Anthem maintained in its database. Mr. Schatzman subsequently received a letter from the IRS informing him that someone had filed a false tax return in his name using his

<div align="center">9</div>

Personal Information. The IRS informed Mr. Schatzman the suspicious tax return was likely a result of the Anthem data breach. Mr. Schatzman's $7,000 tax refund was delayed for 6 months. As a result of the Anthem data breach, Mr. Schatzman has spent numerous hours addressing issues arising from the Anthem data breach.

### Connecticut

25.     Plaintiff Janet Brunton is a citizen and resident of the State of Connecticut. Ms. Brunton was enrolled in an AT&T East Bargained Employee Medical Program health plan that was administered by Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Illinois and Ms. Brunton paid premiums on a regular basis. Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Illinois and Anthem collected and received Ms. Brunton's Personal Information, which Anthem maintained in its database.  Ms. Brunton also was enrolled in an Anthem Health Plans, Inc. insurance plan, and paid premiums on a regular basis. Anthem Health Plans, Inc. and Anthem collected and received Ms. Brunton's Personal Information, which Anthem maintained in its database. Ms. Brunton received a letter from Anthem informing her that her Personal Information may have been compromised as a result of the Anthem data breach. Ms. Brunton subsequently received notice from her tax preparer that the IRS had received a false tax return filed in Ms. Brunton's name using her Personal Information. Ms. Brunton's approximately $10,000 tax return was delayed four months. As a result of the Anthem breach, Ms. Brunton has spent numerous hours addressing issues arising from the Anthem data breach.

26.     Plaintiff Kimberly Kos-Williams is a citizen and resident of the State of Connecticut. Ms. Kos-Williams was enrolled in an Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut health plan that she purchased directly from Anthem, and paid premiums on a regular basis. Blue Cross and Blue Shield of Connecticut and Anthem collected and received Ms. Kos-Williams's Personal Information, which Anthem maintained in its database. Ms. Kos-Williams, her husband, and her two sons received a letter from Anthem informing them that their Personal Information may have been compromised as a result of the Anthem breach. In or about April of 2015, Ms. Kos-Williams and her husband learned from the IRS that a false tax return had been filed in their names using their Personal Information. Ms. Kos-Williams and her husband were forced to submit

10

1  affidavits to the IRS, file a complaint with the Federal Trade Commission, and report the fraudulent

2  return to the State of Connecticut. Their 2014 tax refund was delayed until approximately May 2015.

3  As a result of the Anthem breach, Ms. Kos-Williams has spent numerous hours addressing issues

4  arising from the Anthem data breach.

5       27.    Plaintiff Gary Lasneski is a citizen and resident of the State of Connecticut. Mr.

6  Lasneski was enrolled in Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of

7  Connecticut PPO health plan and an Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue

8  Shield of Connecticut HMO health plan that he purchased independently and paid premiums for on a

9  regular basis. Blue Cross and Blue Shield of Connecticut and Anthem collected and received Mr.

10  Lasneski's Personal Information, which Anthem maintained in its database. Mr. Lasneski received a

11  letter from Anthem informing him that his Personal Information may have been compromised as a

12  result of the Anthem breach. Mr. Lasneski subsequently received a letter from the IRS indicating that

13  someone had tried to file a false tax return in his name using his Personal Information. Mr. Laneski

14  also received letters from Best Buy, Office Depot, and Capitol One indicating that someone was trying

15  to open credit accounts in his name using his Personal Information including his name, address, Social

16  Security number and other personally-identifiable information. As a result, Mr. Lasneski has placed

17  extended fraud alerts on his credit reports with the three major U.S. consumer credit reporting agencies

18  in order to detect potential identity theft and fraudulent activity. Because of the fraud tied to Mr.

19  Lasneski's accounts, Mr. Lasneski has been delayed in getting approval for small business loans

20  relating to his business. As a result of the Anthem breach, Mr. Lasneski has spent numerous hours

21  addressing fraudulent activity, monitoring his accounts, and addressing issues arising from the Anthem

22  data breach.

23       28.    Plaintiff Ralph Staffieri is a citizen and resident of the State of Connecticut. Mr.

24  Staffieri was enrolled in an Anthem Blue Cross Blue Shield Association Federal health plan through

25  his employer, the federal government, and paid premiums on a regular basis. The Blue Cross Blue

26  Shield Association and Anthem collected and received Mr. Staffieri's Personal Information, which

27  Anthem maintained in its database. Mr. Staffieri received a letter from Anthem informing him that his

28  Personal Information may have been compromised as a result of the Anthem breach. As a result of the

1    Anthem breach, Mr. Staffieri has spent numerous hours monitoring his accounts and addressing issues

2    arising from the Anthem data breach.

3        29.    Plaintiff Jessica Holguin is a citizen and resident of the State of Connecticut. Ms.

4    Holguin was enrolled in a Blue Cross and Blue Shield of Vermont health plan and paid premiums on a

5    regular basis. Ms. Holguin's father, who was enrolled in the same health plan, received a letter from

6    Anthem informing him that his Personal Information may have been compromised as a result of the

7    Anthem breach. Ms. Holguin subsequently contacted the U.S. Department of Education to update her

8    student loan account information and learned that the Department had received a check for $5,000

9    from an IRS federal tax return that was fraudulently filed in Ms. Holguin's name. Ms. Holguin

10   contacted the IRS and confirmed that a false tax return had been filed in her name using her Personal

11   Information. Ms. Holguin was advised by the IRS that when she filed her 2014 tax return it would take

12   approximately 180 days to receive her anticipated $9,000 refund, which she still has not received. Ms.

13   Holguin, who has two young children, intended to use her anticipated 2014 tax refund to help pay for

14   her family's living expenses and is now experiencing financial difficulties due to the lengthy delay in

15   receiving her tax refund as a result of the fraudulent filing. As a result of the Anthem breach, Ms.

16   Holguin has spent over 50 hours addressing issues relating to tax fraud, monitoring her accounts, and

17   addressing issues arising from the Anthem data breach.

18                                   **Delaware**

19       30.    Danielle DiFonzo is a citizen and resident of the State of Delaware. Ms. DiFonzo was

20   enrolled in an Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut

21   health plan and paid premiums on a regular basis. Anthem Blue Cross and Blue Shield of Connecticut

22   and Anthem collected and received Ms. DiFonzo's Personal Information, which Anthem maintained in

23   its database. Following announcement of the Anthem breach, fraudsters attempted to open numerous

24   credit applications in Ms. DiFonzo's name and using her Personal Information. At least one attempt

25   was successful and Ms. DiFonzo spent considerable time and effort addressing the issue, including

26   taking a trip to the state police office to report the fraud. Mr. DiFonzo pays approximately $120

27   annually for identity theft and credit monitoring services in order to monitor for identity theft and

28   fraudulent activity resulting from the Anthem breach. As a result of the Anthem breach, Ms. DiFonzo

**THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**
**CASE NO. 15-md-02617-LHK**

1  has spent numerous hours monitoring her accounts and addressing issues arising from the Anthem data

2  breach.

3  **Florida**

4      31.      Plaintiff Glenn Kahn is a citizen and resident of the State of Florida. Mr. Kahn was

5  enrolled in an Anthem Blue Cross Life and Health Insurance Company health plan and paid premiums

6  on a regular basis. Anthem Blue Cross Life and Health Insurance Company and Anthem collected and

7  received Mr. Kahn's Personal Information, which Anthem maintained in its database. Mr. Kahn

8  received a letter from Anthem informing him that his Personal Information may have been

9  compromised as a result of the Anthem data breach. As a result of the Anthem data breach, Mr. Kahn

10  has spent numerous hours addressing issues arising from the Anthem data breach.

11      32.      Plaintiff Gerald Keaton is a citizen and resident of the State of Florida. Mr. Keaton was

12  enrolled in a BlueCross and BlueShield of Georgia, Inc. health plan and paid premiums on a regular

13  basis. BlueCross and BlueShield of Georgia and Anthem collected and received Mr. Keaton's Personal

14  Information, which Anthem maintained in its database. Mr. Keaton received a letter from Anthem

15  informing him that his personal information may have been compromised as a result of the Anthem

16  breach. Mr. Keaton subsequently received a letter from the IRS informing him that someone had filed

17  a false tax return in his name using his Personal Information. As a result of the Anthem breach, Mr.

18  Keaton and his wife were forced to submit affidavits to the IRS and take additional trips to their

19  accountant's office to file paper tax returns. Their 2014 tax return payment was delayed until

20  approximately July 2015 and they are forced to file paper returns for at least the next two years. As a

21  result of the Anthem breach, Mr. Keaton has spent numerous hours addressing issues arising from the

22  Anthem data breach.

23      33.      Plaintiff John McAffry is a citizen and resident of the State of Florida. Mr. McAffry

24  was enrolled in a state-sponsored Community Insurance Company d/b/a Anthem Blue Cross and Blue

25  Shield health plan through his employer, the City of Cincinnati, and paid premiums on a regular basis.

26  Anthem Blue Cross and Blue Shield and Anthem collected and received Mr. McAffry's Personal

27  Information, which Anthem maintained in its database. Mr. McAffry received notice via his personal

28  Anthem online insurance portal informing him that his Personal Information may have been

13

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

compromised as a result of the Anthem breach. Mr. McAffry pays approximately $120 annually for identity theft and credit monitoring services in order to monitor for identity theft and fraudulent activity resulting from the Anthem breach. As a result of the Anthem breach, Mr. McAffry has spent numerous hours addressing issues arising from the Anthem data breach.

34.     Plaintiff Charles Platt is a citizen and resident of the State of Florida. Mr. Platt was enrolled in a Blue Cross and Blue Shield of Florida Blue Options health plan that he purchased independently and paid premiums for on a regular basis. Blue Cross and Blue Shield of Florida and Anthem collected and received Mr. Platt's Personal Information, which Anthem maintained in its database. Mr. Platt received a letter from Blue Cross and Blue Shield of Florida and Anthem informing him that his Personal Information may have been compromised as a result of the Anthem breach. As a result of the Anthem breach, Mr. Platt has spent numerous hours addressing issues arising from the Anthem data breach.

**Georgia**

35.     Plaintiff John Thomas, II is a citizen and resident of the State of Georgia. Mr. Thomas was enrolled in a Blue Cross and Blue Shield of Georgia, Inc. and Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc. PPO state health benefit plan through his employer, a county school board, and paid premiums on a regular basis. Blue Cross and Blue Shield of Georgia, Blue Cross and Blue Shield Healthcare Plan of Georgia, and Anthem collected and received Mr. Thomas's Personal Information, which Anthem maintained in its database. Mr. Thomas received a letter from Anthem informing him that his Personal Information may have been compromised as a result of the Anthem breach. Mr. Thomas's wife subsequently received a letter from the IRS informing them that someone had attempted to file a false tax return in their names using their Personal Information. As a result of the Anthem breach, Mr. Thomas and his wife have spent numerous hours addressing issues arising from the Anthem data breach.

36.     Plaintiff Lauren Roberts is a citizen and resident of the State of Georgia. Ms. Roberts was enrolled in a BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota health plan and paid premiums on a regular basis. Blue Cross and Blue Shield of Minnesota and Anthem collected and received Ms. Roberts's Personal Information, which Anthem maintained in its database. Ms. Roberts

14

1    was also enrolled in a Blue Cross and Blue Shield of Georgia, Inc. health plan and paid premiums on a

2    regular basis. Blue Cross and Blue Shield of Georgia and Anthem collected and received Ms.

3    Roberts's Personal Information, which Anthem maintained in its database. Ms. Roberts received a

4    letter from Anthem informing her that her Personal Information may have been compromised as a

5    result of the Anthem breach. In February 2015, Ms. Roberts received a letter from the health insurance

6    marketplace indicating that someone had fraudulently opened a health insurance policy in her name

7    using her Personal Information. Ms. Roberts spent significant time and effort attempting to cancel the

8    fraudulent policy that was taken out in her name. Ms. Roberts pays approximately $180 annually for

9    identity theft and credit monitoring services in order to monitor for identity theft and fraudulent

10   activity resulting from the Anthem breach. As a result of the Anthem breach, Ms. Roberts has spent

11   numerous hours addressing issues arising from the Anthem data breach.

12          37.     Plaintiff Karen Coppedge is a citizen and resident of the State of Georgia. Ms.

13   Coppedge was enrolled in a health plan that was administered by Anthem Blue Cross Life and Health

14   Insurance Company and Blue Cross of California, Inc., d/b/a Anthem Blue Cross of California, and

15   paid premiums on a regular basis. Anthem Blue Cross Life and Health Insurance Company, Anthem

16   Blue Cross of California and Anthem collected and received Ms. Coppedge's Personal Information,

17   which Anthem maintained in its database. Ms. Coppedge, her husband, and her four daughters

18   received letters from Anthem informing them that their Personal Information may have been

19   compromised as a result of the Anthem breach. As a result of the Anthem breach, Ms. Coppedge has

20   spent numerous hours addressing issues arising from the Anthem data breach.

21          38.     Plaintiff Allison Swank is a citizen and resident of the State of Georgia. Ms. Swank was

22   enrolled in a state-sponsored Blue Cross and Blue Shield of Georgia, Inc. and Blue Cross and Blue

23   Shield Healthcare Plan of Georgia, Inc. through her employer, a Georgia public school, and paid

24   premiums on a regular basis. Blue Cross and Blue Shield of Georgia, Inc., Blue Cross and Blue Shield

25   Healthcare Plan of Georgia, Inc., Anthem collected and received Ms. Swank's Personal Information,

26   which Anthem maintained in its database. Ms. Swank received an email and a subsequent letter from

27   Anthem informing her that her Personal Information may have been compromised as a result of the

28   Anthem breach. As a result of the Anthem breach, Ms. Swank has spent numerous hours addressing

1    issues arising from the Anthem data breach.

2         39.    Plaintiff Kevin Donnelly is a citizen and resident of the State of Georgia. Mr. Donnelly

3    was enrolled in a Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio

4    health plan and paid premiums on a regular basis. Community Insurance Company and Anthem

5    collected and received Mr. Donnelly's Personal Information, which Anthem maintained in its

6    database. Mr. Donnelly received a letter from Anthem informing him that his Personal Information

7    may have been compromised as a result of the Anthem breach. Additionally, Mr. Donnelly suffered

8    from extensive identity theft when someone opened a fraudulent company in his name using his

9    Personal Information. As a result of the Anthem breach, Mr. Donnelly was forced to file police reports

10   for the identity theft, freeze his wife's and his credit reports with the three major U.S. consumer credit

11   reporting agencies in order to detect potential additional identity theft and fraudulent activity, and

12   assist the Georgia Attorney General's office with the dissolution of the fraudulently created

13   corporation. As a result of the Anthem breach, Mr. Donnelly has spent numerous hours addressing

14   issues arising from the Anthem data breach.

15        40.    Plaintiff Harold Lott is a citizen and resident of the State of Georgia. Mr. Lott was

16   enrolled in a Blue Cross and Blue Shield of Georgia, Inc. health plan through Medicare and paid

17   premiums on a regular basis. Blue Cross and Blue Shield of Georgia and Anthem collected and

18   received Mr. Lott's Personal Information, which Anthem maintained in its database. Mr. Lott

19   contacted Anthem after seeing a story on the news about the breach, and Anthem informed him that

20   his information had been compromised. As a result of the Anthem breach, Mr. Lott has spent

21   numerous hours addressing issues arising from the Anthem data breach.

22        41.    Plaintiff Kurt McLaughlin is a citizen and resident of the State of Georgia. Mr.

23   McLaughlin was enrolled in an HM Health Insurance Company d/b/a Highmark Health Insurance

24   Company health plan and paid premiums on a regular basis. Anthem and Highmark Health Insurance

25   Company collected and received Mr. McLaughlin's Personal Information, which Anthem maintained

26   in its database. Mr. McLaughlin received a letter from Anthem informing him that his Personal

27   Information may have been compromised as a result of the Anthem data breach. As a result of the

28   Anthem data breach, Mr. McLaughlin has spent numerous hours monitoring his accounts and

16

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1  addressing issues arising from the Anthem data breach.

2                                          **Idaho**

3        42.     Plaintiff Cynthia Kelley is a citizen and resident of the State of Idaho. Ms. Kelley was

4  enrolled in an Anthem Blue Cross Life and Health Insurance Company and Anthem health plan

5  through the Motion Picture Industry Pension & Health Plans. Ms. Kelley was notified of the Anthem

6  breach through the Motion Picture Industry Pension and Health Plans website. As a result of the

7  Anthem breach, Ms. Kelley spent significant time monitoring her accounts and took trips to her bank

8  two hours away in order to put blocks on her accounts. Ms. Kelley pays approximately $302 annually

9  for identity theft and credit monitoring services in order to monitor for identity theft and fraudulent

10 activity resulting from the Anthem breach. As a result of the Anthem breach, Ms. Kelley has spent

11 numerous hours monitoring her accounts and addressing issues arising from the Anthem data breach.

12                                        **Illinois**

13       43.     Plaintiff Mary Wicklund is a citizen and resident of the State of Illinois. Ms. Wicklund

14 was enrolled in a group health plan administered by Health Care Service Corporation d/b/a Blue Cross

15 and Blue Shield of Illinois, for which she paid premiums on a regular basis.  Health Care Service

16 Corporation d/b/a Blue Cross and Blue Shield of Illinois and Anthem collected and received Ms.

17 Wicklund's Personal Information, which Anthem maintained in its database. Ms. Wicklund received a

18 letter from Anthem informing her that her Personal Information may have been compromised as a

19 result of the Anthem data breach. As a result of the Anthem breach, Ms. Wicklund has spent numerous

20 hours addressing issues arising from the Anthem data breach.

21       44.     Plaintiff David Klemer is a citizen and resident of the State of Illinois. Mr. Klemer was

22 enrolled in a Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Illinois – Blue

23 Advantage HMO health plan and his wife paid premiums on a regular basis. Prior to that, Mr. Klemer

24 was enrolled in a Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield of

25 Wisconsin health plan through his employer, a government entity, and paid premiums on a regular

26 basis. Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Illinois and Anthem

27 collected and received Mr. Klemer's Personal Information, which Anthem maintained in its database.

28 Mr. Klemer and his wife received a letter from Anthem informing them that their Personal Information

                                          17

1  may have been compromised as a result of the Anthem breach. Mr. Klemer and his wife subsequently

2  received a letter from the IRS informing them that someone had filed a false tax return in their name

3  using their Personal Information. Mr. Klemer and his wife's tax refund of approximately $580 was

4  delayed two months. As a result of the Anthem breach, Mr. Klemer has spent numerous hours

5  addressing issues arising from the Anthem data breach.

6          45.     Plaintiff Nadine Foster is a citizen and resident of the State of Illinois. Mrs. Foster was

7  enrolled in Unicare Life & Health Insurance Company insurance and paid premiums on a regular

8  basis. Unicare and Anthem collected and received Mrs. Foster's Personal Information, which Anthem

9  maintained in its database. Mrs. Foster's husband and two of her daughters received letters from

10 Anthem informing them that their Personal Information may have been compromised as a result of the

11 Anthem data breach. Mrs. Foster subsequently received a notice from the IRS informing her that her

12 name and Social Security Number were compromised. Mrs. Foster and her husband were forced to file

13 police reports, sign Federal Trade Commission affidavits, and file their taxes by mail. As a result of

14 the Anthem data breach, Mrs. Foster has spent numerous hours addressing issues arising from the

15 Anthem data breach.

16         46.     Plaintiff Cynthia Reichrath is a citizen and resident of the State of Illinois. Ms.

17 Reichrath was enrolled in a HealthLink, Inc. State of Illinois health plan through her husband's

18 employer, the State of Illinois Department of Corrections, and paid premiums on a regular basis.

19 HealthLink and Anthem collected and received Ms. Reichrath's Personal Information, which Anthem

20 maintained in its database. Ms. Reichrath received a letter from Anthem informing her that her

21 Personal Information may have been compromised as a result of the Anthem breach. As a result of the

22 Anthem breach, Ms. Reichrath has spent numerous hours monitoring her accounts and addressing

23 issues arising from the Anthem data breach.

24         47.     Plaintiff Wanda Pratt is a citizen and resident of the State of Illinois. Ms. Pratt was

25 enrolled in a Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Illinois PPO health

26 plan and paid premiums on a regular basis. Health Care Service Corporation d/b/a Blue Cross and

27 Blue Shield of Illinois and Anthem collected and received Ms. Pratt's Personal Information, which

28 Anthem maintained in its database. Ms. Pratt received a letter from Anthem and Blue Cross Blue

18

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1    Shield of Illinois informing her that her Personal Information may have been compromised as a result

2    of the Anthem breach. Ms. Pratt pays approximately $360 annually for identity theft and credit

3    monitoring services in order to monitor for identity theft and fraudulent activity resulting from the

4    Anthem breach. As a result of the Anthem breach, Ms. Pratt has spent numerous hours monitoring her

5    accounts and addressing issues arising from the Anthem data breach.

6                                               **Indiana**

7           48.    Plaintiff Brent Harris is a citizen and resident of the State of Indiana. Mr. Harris was

8    enrolled in an Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of

9    Indiana/Bronze Pathway X HMO health plan that he purchased individually, and paid premiums for on

10   a regular basis. Anthem and Anthem Blue Cross Blue Shield of Indiana collected and received Mr.

11   Harris's Personal Information, which Anthem maintained in its database. Mr. Harris received a letter

12   and email from Anthem informing him that his Personal Information may have been compromised as a

13   result of the Anthem breach. As a result of the Anthem breach, Mr. Harris has spent numerous hours

14   addressing issues arising from the Anthem data breach.

15          49.    Plaintiff Steven Quinnette is a citizen and resident of the State of Indiana. Mr.

16   Quinnette was enrolled in an Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue

17   Shield of Indiana health plan through the Archdioceses of Indianapolis, and paid premiums on a

18   regular basis. Anthem and Anthem Blue Cross and Blue Shield of Indiana collected and received Mr.

19   Quinnette's Personal Information, which Anthem maintained in its database. Mr. Quinnette received

20   an email from his employer and a letter from Anthem informing him that his Personal Information

21   may have been compromised as a result of the Anthem breach. Mr. Quinnette was notified by All

22   Clear ID that his son, a minor victim of the Anthem data breach, had suspicious use of his Social

23   Security Number. As a result of the Anthem breach, Mr. Quinnette has spent numerous hours

24   addressing issues arising from the Anthem data breach.

25          50.    Plaintiff Darrell Hunter is a citizen and resident of the State of Indiana. Mr. Hunter was

26   enrolled in a Blue Cross and Blue Shield of Massachusetts, Inc. health plan, and paid premiums on a

27   regular basis. Blue Cross and Blue Shield of Massachusetts and Anthem collected and received Mr.

28   Hunter's Personal Information, which Anthem maintained in its database. Mr. Hunter's wife received

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1  a letter from her employer informing them that their Personal Information may have been

2  compromised as a result of the Anthem breach. Mr. Hunter and his wife subsequently received

3  notification from the IRS informing them that someone had filed a false tax return in their name using

4  their Personal Information. Mr. Hunter and his wife were forced to submit affidavits to the IRS and

5  contact their congressman for assistance. Their 2014 tax return payment of approximately $2,000 was

6  delayed five months. Additionally Mr. Hunter pays approximately $348 annually for identity theft and

7  credit monitoring services in order to monitor for identity theft and fraudulent activity resulting from

8  the Anthem breach. As a result of the Anthem breach, Mr. Hunter has spent numerous hours

9  addressing issues arising from the Anthem data breach.

10       51.     Plaintiff Cheryl Grissom is a citizen and resident of the State of Indiana. Ms. Grissom

11  was enrolled in an Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of

12  Indiana health plan that she purchased individually and she paid premiums on a regular basis. Anthem

13  and Anthem Blue Cross and Blue Shield of Indiana collected and received Ms. Grissom's Personal

14  Information, which Anthem maintained in its database. Ms. Grissom received a letter from Anthem

15  informing her that her Personal Information may have been compromised as a result of the Anthem

16  breach. Ms. Grissom subsequently received a letter from the IRS informing her that someone had filed

17  a false tax return in her name using her Personal Information. Ms. Grissom still has not received her

18  2014 tax return payment in the approximate amount of $10,262. As a result of the Anthem breach, Ms.

19  Grissom has spent numerous hours addressing issues arising from the Anthem data breach.

20       52.     Plaintiff Melinda Lambert is a citizen and resident of the State of Indiana. Mrs.

21  Lambert was enrolled in an Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue

22  Shield of Indiana PPO health plan and paid premiums on a regular basis. Anthem and Anthem Blue

23  Cross Blue Shield of Indiana collected and received Ms. Lambert's Personal Information, which

24  Anthem maintained in its database. Mrs. Lambert and her husband received a letter from Anthem

25  informing them that their Personal Information may have been compromised as a result of the Anthem

26  breach. Mrs. Lambert and her husband subsequently received a letter from the IRS informing them

27  that someone had filed a false tax return in their name using their Personal Information. Additionally,

28  Ms. Lambert pays approximately $40 annually for identity theft and credit monitoring services in

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1  order to monitor for identity theft and fraudulent activity resulting from the Anthem breach. As a result

2  of the Anthem breach, Mrs. Lambert and her husband have spent numerous hours addressing issues

3  arising from the Anthem data breach.

4       53.    Plaintiff Amy Whittaker is a citizen and resident of the State of Indiana. Ms. Whittaker

5  was enrolled in an Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of

6  Indiana health plan and paid premiums on a regular basis. Ms. Whittaker was previously enrolled in a

7  health plan sponsored by WalMart, and administered by Arkansas Blue Cross and Blue Shield, and

8  paid premiums on a regular basis.  Anthem, Anthem Blue Cross and Shield of Indiana, and Arkansas

9  Blue Cross and Blue Shield collected and received Ms. Whittaker's Personal Information, which

10  Anthem maintained in its database. Ms. Whittaker's husband received a letter from Anthem informing

11  him that his Personal Information may have been compromised as a result of the Anthem breach. Ms.

12  Whittaker and her husband subsequently received an email from their tax preparer informing them that

13  a false tax return had been filed in their name using their Personal Information. Ms. Whittaker and her

14  husband still have not received their 2014 tax return payment in the approximate amount of $500. As a

15  result of the Anthem breach, Ms. Whittaker has spent numerous hours addressing issues arising from

16  the Anthem data breach.

17       54.    Plaintiff Stephen Grose is a citizen and resident of the State of Indiana. Mr. Grose was

18  enrolled in a Blue Cross Blue Shield of Michigan health plan and paid premiums on a regular basis.

19  Anthem and Blue Cross Blue Shield of Michigan collected and received Mr. Grose's Personal

20  Information, which Anthem maintained in its database. Mr. Grose received a letter from Anthem

21  informing him that his Personal Information may have been compromised as a result of the Anthem

22  data breach. As a result of the Anthem data breach, Mr. Grose has spent numerous hours monitoring

23  his accounts and addressing issues arising from the Anthem data breach.

24  **Iowa**

25       55.    Plaintiffs Shantel and Rahman Jones are citizens and residents of the State of Iowa. Mr.

26  and Mrs. Jones were enrolled in a Health Care Service Corporation d/b/a Blue Cross and Blue Shield

27  of Texas health plan and paid premiums on a regular basis. Health Care Service Corporation d/b/a

28  Blue Cross and Blue Shield of Texas and Anthem collected and received Mr. and Mrs. Jones's

1    Personal Information, which Anthem maintained in its database. Mrs. Jones received a letter informing

2    her that her Personal Information may have been compromised as a result of the Anthem breach. As a

3    result of the Anthem breach, Mr. and Mrs. Jones have spent numerous hours addressing issues arising

4    from the Anthem data breach.

5                                                    **Kansas**

6          56.    Plaintiff Jason Jenkins is a citizen and resident of the State of Kansas. Mr. Jenkins was

7    enrolled in a Rocky Mountain Hospital and Medical Service, Inc. health plan and paid premiums on a

8    regular basis. Rocky Mountain Hospital and Medical Service, Inc. and Anthem collected and received

9    Mr. Jenkins's Personal Information, which Anthem maintained in its database. Mr. Jenkins received a

10   letter from Anthem informing him that his Personal Information may have been compromised as a

11   result of the Anthem breach. As a result of the Anthem breach, Mr. Jenkins has spent numerous hours

12   monitoring his accounts and addressing issues arising from the Anthem data breach.

13         57.    Plaintiff Kelli Smith is a citizen and resident of the State of Kansas. Mrs. Smith and her

14   husband Joseph enrolled their three minor children in an Amerigroup KanCare health plan (a managed

15   care health benefits network run by Amerigroup Kansas, Inc. and Amerigroup Corporation) that they

16   purchased independently and paid premiums for on a regular basis. Amerigroup Corporation,

17   Amerigroup Kansas, Inc., and Anthem collected and received the Personal Information of Mrs. Smith

18   and her three minor children, which Anthem maintained in its database. Mrs. Smith received a letter

19   from Anthem informing her that the Personal Information of herself and her minor children may have

20   been compromised as a result of the Anthem breach. Mrs. Smith was subsequently notified by her

21   accountant that someone had filed a false tax return in her and her husband's name using their

22   Personal Information. As a result of the Anthem breach, Mrs. Smith and her husband were forced to

23   travel to the IRS office, submit documentation to the IRS, file a police report, pay postage, and take

24   multiple trips to the post office and police precinct to address issues relating to tax fraud at their

25   expense. Mrs. Smith and her husband will need to use a PIN to file her taxes in the future, and her

26   2014 tax refund payment was delayed by more than six months. This delay caused hardships to Mrs.

27   Smith and her husband who needed their tax refund to pay down medical bills. As a result of the

28   Anthem breach, Mrs. Smith and her husband have spent numerous hours addressing issues relating to

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1    their tax fraud, monitoring their accounts, and addressing issues arising from the Anthem data breach.

2    **Kentucky**

3        58.    Plaintiff Dianne Reistroffer is a citizen and resident of the State of Kentucky. Ms.

4    Reistroffer was enrolled in an Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and

5    Blue Shield of Kentucky Medicare Select health plan that she purchased directly from Anthem, and

6    she paid premiums on a regular basis. Anthem Blue Cross and Blue Shield of Kentucky and Anthem

7    collected and received Ms. Reistroffer's Personal Information, which Anthem maintained in its

8    database. Ms. Reistroffer received a letter from Anthem informing her that her Personal Information

9    may have been compromised as a result of the Anthem breach. Ms. Reistroffer pays approximately

10   $108 annually for identity theft and credit monitoring services in order to monitor for identity theft and

11   fraudulent activity resulting from the Anthem Breach. As a result of the Anthem breach, Ms.

12   Reistroffer has spent numerous hours addressing issues arising from the Anthem data breach.

13       59.    Plaintiff Christopher Ruberg is a citizen and resident of the State of Kentucky. Mr.

14   Ruberg was enrolled in an Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue

15   Shield of Kentucky Blue Access PPO health plan that he purchased directly from Anthem, and paid

16   premiums on a regular basis. Anthem Blue Cross and Blue Shield of Kentucky and Anthem collected

17   and received Mr. Ruberg's Personal Information, which Anthem maintained in its database. Mr.

18   Ruberg received two emails and a letter from Anthem informing him that his Personal Information

19   may have been compromised as a result of the Anthem breach. As a result of the Anthem breach, Mr.

20   Ruberg has spent numerous hours addressing issues arising from the Anthem data breach.

21       60.    Plaintiff Frank Bailey is a citizen and resident of the State of Kentucky. Mr. Bailey was

22   enrolled in a BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota health plan and paid

23   premiums on a regular basis. Blue Cross and Blue Shield of Minnesota and Anthem collected and

24   received Mr. Bailey's Personal Information, which Anthem maintained in its database. Mr. Bailey

25   received a letter from Anthem informing him that his Personal Information may have been

26   compromised as a result of the Anthem breach. As a result of the Anthem breach, Mr. Bailey has spent

27   numerous hours monitoring his accounts and addressing issues arising from the Anthem data breach.

28       61.    Plaintiff Jason Baker is a citizen and resident of the State of Kentucky. Mr. Baker was

23

1    enrolled in an Anthem Blue Cross Blue Shield Association Federal Employees Program health plan

2    through his employer, the SSA Office of the Inspector General, and paid premiums on a regular basis.

3    The Blue Cross Blue Shield Association and Anthem collected and received Mr. Baker's Personal

4    Information, which Anthem maintained in its database. Mr. Baker received a letter from Anthem

5    informing him that his Personal Information may have been compromised as a result of the Anthem

6    breach. After the announcement of the Anthem breach, the IRS notified Mr. Baker that his tax return

7    had been rejected because someone had filed a false return in his name using his Personal Information.

8    As a result of the Anthem breach, Mr. Baker was forced to call and submit affidavits to the IRS, file a

9    police report, file a complaint with the Federal Trade Commission, and place credit freezes on his

10   credit reports with the three major U.S. consumer credit reporting agencies. His tax return was delayed

11   for a number of months and Mr. Baker will only be able to file in future years after receiving a unique

12   PIN from the IRS for the rest of his life.  In addition, after the Anthem breach was announced,

13   someone opened a Green Dot prepaid debit card in Mr. Baker's name and using his Personal

14   Information, and used it to make fraudulent purchases. Mr. Baker spent significant time and effort

15   attempting to get the fraudulent account closed. As a result of the Anthem breach, Mr. Baker has spent

16   a significant number of hours addressing tax and credit fraud, monitoring his accounts, and addressing

17   issues arising from the Anthem data breach.

18                                    **Louisiana**

19          62.    Plaintiff Meredith Fisse is a citizen and resident of the State of Louisiana. Ms. Fisse

20   was enrolled in an Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of

21   Virginia health insurance plan through her father's employer where Ms. Fisse's father paid premiums

22   on a regular basis. Anthem Blue Cross Blue Shield collected and received Ms. Fisse's Personal

23   Information, which Anthem maintained in its database. Anthem confirmed to Ms. Fisse's parents that

24   Ms. Fisse's Personal Information may have been compromised as a result of the Anthem breach. Ms.

25   Fisse only became aware that her Personal Information was compromised after her parents contacted

26   Anthem directly to inquire. As a result of the Anthem breach, Ms. Fisse and her parents have spent

27   time and effort monitoring their accounts in order to account for possible fraud or identity theft

28   relating to the Anthem breach.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

**Maine**

63.     Plaintiff Robin Wilkey is a citizen and resident of the State of Maine. Ms. Wilkey was enrolled in an Anthem Blue Cross Blue Shield—Anthem Health Plans of Maine, Inc., Maine Education Trust (MEA Benefits Trust) health plan through her employer, a public school, and paid premiums on a regular basis while her husband was enrolled in that plan. Anthem and Anthem Health Plans of Maine, Inc. collected and received Ms. Wilkey's Personal Information, which Anthem maintained in its database. Ms. Wilkey and her husband placed credit freezes on their credit reports with the three major U.S. consumer credit reporting agencies in order to detect potential identity theft and fraudulent activity. In February 2015 Ms. Wilkey was notified by her accountant that someone had filed a false tax return in her name using her Personal Information. As a result of the Anthem breach, Ms. Wilkey was forced to submit an affidavit to the IRS, file a police report, take trips to the bank and post office, and make calls to the State of Maine's Insurance Bureau. Ms. Wilkey's $4,400 tax refund was delayed six months and Ms. Wilkey was forced to take odd jobs over the summer. Ms. Wilkey also submitted an identity theft claim to the All Clear ID service that Anthem offered as a result of the breach and that claim was denied. As a result of the Anthem data breach, Ms. Wilkey has spent over 100 hours addressing issues arising from the Anthem data breach.

64.     Plaintiff Gary Bellegarde is a citizen and resident of the State of Maine. Mr. Bellegarde was enrolled in a Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine plan and paid premiums on a regular basis. Anthem and Blue Cross and Blue Shield of Maine collected and received Mr. Bellegarde's Personal Information, which Anthem maintained in its database. Mr. Bellegarde received a letter from Anthem informing him that his Personal Information may have been compromised as a result of the Anthem breach, as did his wife, who was a member of the same health plan. After announcement of the Anthem breach, Mr. Bellegarde received a call from his accounting firm informing him that his tax returns had been rejected because someone had filed a false tax return in his name using his Personal Information. Mr. Bellegarde had to drive to the local IRS office to provide proof of identification and fill out an affidavit. As a result, his 2014 tax refund payment was delayed by four months. Mr. Bellegarde also had to travel to the state capital with the paper returns to prevent possible state tax fraud. As a result of the Anthem breach, Mr. Bellegarde has spent numerous

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1    hours monitoring his accounts and addressing issues arising from the Anthem data breach.

2        65.    Plaintiff Mark Hatcher is a citizen and resident of the State of Maine. Mr. Hatcher

3    purchased a Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine health

4    plan independently and paid premiums on a regular basis. Anthem and Anthem Blue Cross and Blue

5    Shield of Maine collected and received Mr. Hatcher's Personal Information, which Anthem

6    maintained in its database. Mr. Hatcher received a letter from Anthem informing him that his Personal

7    Information may have been compromised as a result of the Anthem breach. After announcement of the

8    Anthem breach, Mr. Hatcher's Social Security Number was used to change the PIN on his bank

9    account and the account balance of approximately $913 was withdrawn. During the period before the

10   unauthorized charges were returned, Mr. Hatcher was unable to pay several bills, which damaged his

11   credit, but also left him unable to purchase necessities. One of the bills Mr. Hatcher was unable to pay

12   during this period was his monthly premium to Anthem, and his policy lapsed. Anthem would not

13   reinstate Mr. Hatcher's policy, forcing him to wait until the next open enrollment period to reenroll

14   and leaving him without health insurance coverage in the interim. Mr. Hatcher also incurred a $20.00

15   late fee for the storage unit he was renting.  The late payment was a result of a failed auto-payment

16   which fell 2 days after his bank account was breached and during the time his bank account was

17   frozen. As a result of the Anthem breach, Mr. Hatcher has spent numerous hours monitoring his

18   accounts and addressing issues arising from the Anthem data breach.

19                                      **Maryland**

20       66.    Plaintiff Don West is a citizen and resident of the State of Maryland. Mr. West enrolled

21   in a CareFirst of Maryland health plan and paid premiums on a regular basis. CareFirst of Maryland

22   and Anthem collected and received Mr. West's Personal Information, which Anthem maintained in its

23   database. Mr. West received a letter from Anthem and his employer informing him that his Personal

24   Information may have been compromised as a result of the Anthem breach. In or about February 2015,

25   Mr. West was notified that someone had filed a false tax return under his name using his Personal

26   Information. Mr. West was forced to submit affidavits to the IRS, file a police report, and file his taxes

27   by mail. Mr. West's federal tax refund of $1,700 was delayed six months and Mr. West's State of

28   Maryland tax refund of $400 was delayed eight months. Mr. West received notification that an attempt

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1   was made to open a Capital One credit card with Mr. West's Personal Information. As a result of the

2   Anthem breach, Mr. West has spent numerous hours addressing issues arising from the Anthem data

3   breach.

4         67.   Plaintiff Denese Depeza is a citizen and resident of the State of Maryland. Ms. Depeza

5   was enrolled in a CareFirst BlueChoice, Inc. health plan and paid premiums on a regular basis.

6   Anthem and CareFirst BlueChoice, Inc. collected and received Ms. Depeza's Personal Information,

7   which Anthem maintained in its database. Ms. Depeza received a letter from Anthem informing her

8   that her Personal Information may have been compromised as a result of the Anthem data breach. As a

9   result of the Anthem data breach, Ms. Depeza has spent numerous hours monitoring her accounts and

10  addressing issues arising from the Anthem data breach.

11  **Massachusetts**

12        68.   Plaintiff Fazi Zand is a citizen and resident of the State of Massachusetts. Mr. Zand was

13  enrolled in an Anthem Blue Cross Life and Health Insurance Company health plan and paid premiums

14  on a regular basis. Anthem Blue Cross Life and Health Insurance Company and Anthem collected and

15  received Mr. Zand's Personal Information, which Anthem maintained in its database. Mr. Zand

16  received notification e-mails from Anthem and his employer informing him that his information may

17  have been compromised as a result of the Anthem data breach. As a result of the Anthem breach, Mr.

18  Zand has spent numerous hours monitoring his accounts and addressing issues arising from the

19  Anthem data breach.

20        69.   Plaintiff Claudia Cass is a citizen and resident of the State of Massachusetts. Ms. Cass

21  was enrolled in the New York State Health Insurance Program (NYSHIP) for Government Employees.

22  Empire HealthChoice Assurance, Inc. d/b/a Empire BlueCross Blue Shield, an Anthem Affiliate,

23  provided services under the NYSHIP plan. Anthem and Empire BlueCross Blue Shield collected and

24  received Ms. Cass's Personal Information, which Anthem maintained in its database. Ms. Cass

25  received a letter from Anthem informing her that her Personal Information may have been

26  compromised as a result of the Anthem breach. Ms. Cass then learned from an Anthem representative

27  that her daughter's Personal Information was also compromised. After announcement of the Anthem

28  breach, Ms. Cass received a notification that her tax return had been rejected because someone had

27

1  filed a false tax return in her name using her Personal Information and a refund had already been

2  given. The IRS sent Ms. Cass to her local Social Security office, the police, and her bank. Ms. Cass

3  will need to use a PIN to file her taxes in the future, and her 2014 tax refund payment was delayed by

4  almost six months. Additionally, Ms. Cass pays approximately $100 annually for identity theft and

5  credit monitoring services in order to monitor for identity theft and fraudulent activity resulting from

6  the Anthem breach. As a result of the Anthem breach, Ms. Cass has spent numerous hours monitoring

7  her accounts and addressing issues arising from the Anthem data breach.

8       70.    Plaintiff Robert Roy is a citizen and resident of the State of Massachusetts. Mr. Roy

9  was enrolled in a Unicare Life & Health Insurance Company health plan through his employer, the

10  Commonwealth of Massachusetts, and he paid premiums on a regular basis. Unicare Life & Health

11  Insurance Company and Anthem collected and received Mr. Roy's Personal Information, which

12  Anthem maintained in its database. Mr. Roy received a letter from Anthem informing him that his

13  Personal Information may have been compromised as a result of the Anthem breach. Mr. Roy pays

14  approximately $252 annually for identity theft and credit monitoring services in order to monitor for

15  identity theft and fraudulent activity resulting from the Anthem breach. Mr. Roy was subsequently

16  notified by his CPA that someone had filed a false tax return under his name using his Personal

17  Information. As a result of the Anthem breach, Mr. Roy was forced to submit an affidavit to the IRS,

18  file a police report, and file his taxes by mail. Mr. Roy's $1,700 tax refund was delayed 2.5 months.

19  As a result of the Anthem breach, Mr. Roy has spent numerous hours addressing issues arising from

20  the Anthem data breach.

21       71.    Plaintiff Carrie Ramos is a citizen and resident of the State of Massachusetts. Ms.

22  Ramos was enrolled in a state-sponsored Blue Cross and Blue Shield of Massachusetts, Inc. Preferred

23  Blue PPO and paid premiums on a regular basis. Blue Cross and Blue Shield of Massachusetts and

24  Anthem collected and received Ms. Ramos's Personal Information, which Anthem maintained in its

25  database. Around March 2015, Ms. Ramos received a letter from Blue Cross and Blue Shield of

26  Massachusetts informing her that some of her Personal Information was accessed during the breach.

27  She subsequently received a letter from Anthem informing her that her Personal Information may have

28  been compromised as a result of the Anthem breach. As a result of the Anthem breach, Ms. Ramos has

1  spent numerous hours addressing issues arising from the Anthem data breach.

2      72.    Plaintiff Lisa Daniels is a citizen and resident of the State of Massachusetts.  Ms.

3  Daniels was enrolled in a Healthy Alliance Life Insurance Company d/b/a Anthem Blue Cross and

4  Blue Shield of Missouri plan and paid premiums on a regular basis.  Anthem and Anthem Blue Cross

5  and Blue Shield of Missouri collected and received Ms. Daniels' Personal Information, which Anthem

6  maintained in its database.  Ms. Daniels received a letter from Anthem informing her that her Personal

7  Information may have been compromised as a result of the breach.  As a result of the Anthem breach,

8  Ms. Daniels has spent numerous hours monitoring her accounts and addressing issues arising from the

9  Anthem data breach.

10                                    **Michigan**

11      73.    Plaintiff Michelle Kaseta-Collins is a citizen and resident of the State of Michigan.

12  During the relevant period, Ms. Kaseta-Collins was enrolled in several different health plans. Ms.

13  Kaseta-Collins was enrolled in a Blue Cross and Blue Shield of Michigan MESSA health plan through

14  her employer, a public university, and paid premiums on a regular basis. Ms. Kaseta-Collins was

15  enrolled in a Blue Cross and Blue Shield of Michigan Community Blue PPO ASC health plan through

16  her employer, a public school, and paid premiums on a regular basis. Ms. Kaseta-Collins was also

17  enrolled in a CareFirst of Maryland, Inc. health plan and paid premiums on a regular basis. Blue Cross

18  Blue Shield of Michigan, CareFirst of Maryland, Inc. and Anthem collected and received Ms. Kaseta-

19  Collins' Personal Information, which Anthem maintained in its database. Ms. Kaseta-Collins and her

20  daughter received a letter from Anthem informing them that their Personal Information may have been

21  compromised as a result of the Anthem breach. Ms. Kaseta-Collins placed credit freezes on her and

22  her daughter's credit reports with the three major U.S. consumer credit reporting agencies in order to

23  detect potential identity theft and fraudulent activity. As a result of the Anthem breach, Ms. Kaseta-

24  Collins has spent numerous hours addressing issues arising from the Anthem data breach.

25      74.    Plaintiff Lyle Nichols is a citizen and resident of the State of Michigan. Mr. Nichols

26  was enrolled in an Anthem Blue Cross Blue Shield health plan. Anthem and Anthem Blue Cross Blue

27  Shield collected and received Mr. Nichols's Personal Information, which Anthem maintained in its

28  database. Mr. Nichols received a letter from Anthem informing him that his Personal Information may

29

have been compromised as a result of the Anthem data breach. After learning of the Anthem breach, Mr. Nichols contacted the three major credit reporting agencies, wrote a letter to the Michigan Attorney General's office, and contacted Anthem to determine what information was compromised. Mr. Nichols now engages in regular monitoring of his credit and bank accounts. As a result of the Anthem data breach, Mr. Nichols has spent numerous hours monitoring his accounts and addressing issues arising from the Anthem data breach.

**Minnesota**

75.     Plaintiff Hank Maurer is a citizen and resident of the State of Minnesota. Mr. Maurer was enrolled in an Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield health plan and paid premiums on a regular basis. Anthem Blue Cross and Blue Shield and Anthem collected and received Mr. Maurer's Personal Information, which Anthem maintained in its database. Mr. Maurer received a letter from Anthem informing him that his Personal Information may have been compromised as a result of the Anthem breach. Mr. Maurer pays approximately $180 annually for identity theft and credit monitoring services in order to monitor for identity theft and fraudulent activity resulting from the Anthem breach. As a result of the Anthem breach, Mr. Maurer has spent numerous hours addressing issues arising from the Anthem data breach.

76.     Plaintiff Jack Wenglewick is a citizen and resident of the State of Minnesota. During the relevant period, Mr. Wenglewick was enrolled in multiple health plans. Mr. Wenglewick was enrolled in a Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Illinois health plan and an Anthem Blue Cross Life and Health Insurance Company Choice Plus PPO health plan and paid premiums on a regular basis. Anthem, Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Illinois, and Anthem Blue Cross Life and Health Insurance Company collected and received Mr. Wenglewick's Personal Information, which Anthem maintained in its database.  Mr. Wenglewick received notification e-mails from Anthem and his employer informing him that his Personal Information may have been compromised as a result of the Anthem data breach. As a result of the Anthem breach, Mr. Wenglewick has spent numerous hours monitoring his accounts and addressing issues arising from the Anthem data breach.

30

**Mississippi**

77.     Plaintiff Charles McCullough is a citizen and resident of the State of Mississippi. Mr. McCullough was enrolled in an Anthem Health Plans of Virginia, Inc. health plan through Yokohama Tire Corporation, and paid premiums on a regular basis. Blue Cross Blue Shield and Anthem collected and received Mr. McCullough's Personal Information, which Anthem maintained in its database. Mr. McCullough received a letter from Anthem informing him that his Personal Information may have been compromised as a result of the Anthem breach. Mr. McCullough also placed fraud alerts on his credit reports with the three major U.S. consumer credit reporting agencies in order to detect potential identity theft and fraudulent activity. As a result of the Anthem breach, Mr. McCullough has spent numerous hours addressing issues arising from the Anthem data breach.

**Missouri**

78.     Plaintiff Debbie Stein is a citizen and resident of the State of Missouri. Ms. Stein was enrolled in a RightChoice Managed Care, Inc. d/b/a Anthem Blue Cross and Blue Shield of Missouri Blue Access Choice health plan through her employer, a Missouri public school, and paid premiums on a regular basis. RightChoice Managed Care, Inc. and Anthem collected and received Ms. Stein's Personal Information, which Anthem maintained in its database. Ms. Stein received a letter from Anthem informing her that her Personal Information may have been compromised as a result of the Anthem breach. Ms. Stein subsequently received a fraudulent tax refund check from the IRS. She filed an identity theft affidavit with the IRS. Ms. Stein also placed credit freezes on her credit reports with the three major U.S. consumer credit reporting agencies in order to detect potential identity theft and fraudulent activity. As a result of the Anthem breach, Ms. Stein took time off of work and has spent numerous hours addressing issues arising from the Anthem data breach.

79.     Plaintiff Melody Eads is a citizen and resident of the State of Missouri. Ms. Eads was enrolled in a RightChoice Managed Care, Inc. d/b/a Anthem Blue Cross and Blue Shield of Missouri Blue Access PPO health plan and paid premiums on a regular basis. RightChoice Managed Care, Inc. and Anthem collected and received Ms. Eads's Personal Information, which Anthem maintained in its database. Ms. Eads received a letter from her employer and Anthem informing her that her Personal Information may have been compromised as a result of the Anthem breach. Ms. Eads subsequently

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1 received a letter from the IRS indicating that someone had tried to file a false tax return in her name

2 using her Personal Information. As a result, Ms. Eads was forced to submit affidavits to the IRS and

3 file a police report documenting the fraud. As a result of the Anthem breach, Ms. Eads has spent over

4 100 hours addressing tax fraud, monitoring her accounts, and addressing issues arising from the

5 Anthem data breach.

6      80.     Plaintiff Christopher Allen is a citizen and resident of the State of Missouri. Mr. Allen

7 was enrolled in an Anthem Blue Cross and Blue Shield / RightChoice Managed Care, Inc. health

8 insurance plan, and paid premiums on a regular basis. Anthem Blue Cross and Blue Shield /

9 RightChoice Managed Care, Inc. and Anthem collected and received Mr. Allen's Personal

10 Information, which Anthem maintained in its database. Mr. Allen received two letters from Anthem

11 informing him that his and his family's Personal Information may have been compromised as a result

12 of the Anthem breach. Mr. Allen subsequently received a letter from the IRS informing him that

13 someone had filed a false tax return in his name using his Personal Information. As a result, his 2014

14 tax refund payment was delayed by a number of months. As a result of the Anthem breach, Mr. Allen

15 has spent numerous hours monitoring his family's accounts and addressing issues arising from the

16 Anthem data breach.

17      81.     Plaintiff Jill Noble is a citizen and resident of the State of Missouri. Ms. Noble was

18 enrolled in a Healthy Alliance Life Insurance Company, Inc. health plan administered by RightChoice

19 Managed Care, Inc. for which premiums were paid on a regular basis. Anthem, Healthy Alliance Life

20 Insurance Company, Inc., and RightChoice Managed Care, Inc. collected and received Ms. Noble's

21 Personal Information, which Anthem maintained in its database. Ms. Noble received a letter from

22 Anthem and an email from her employer informing her that her Personal Information may have been

23 compromised as a result of the Anthem Data Breach. Ms. Noble now engages in daily monitoring of

24 her credit and bank accounts. As a result of the Anthem Data Breach, Ms. Noble has spent numerous

25 hours addressing issues arising from the Anthem Data Breach.

26      82.     Plaintiffs Cherri and Gregory Hawes are citizens and residents of the State of Missouri.

27 Mrs. Hawes was enrolled in a Healthy Alliance Life Insurance Company, Inc. health plan administered

28 by RightChoice Managed Care, Inc. that she paid premiums for on a regular basis. Mr. Hawes was

1    enrolled in an HMO Missouri, Inc. health plan administered by RightChoice Managed Care, Inc. that

2    he purchased independently and paid premiums for on a regular basis. Anthem, Health Alliance Life

3    Insurance Company, Inc., HMO Missouri, Inc., and RightChoice Managed Care, Inc. collected and

4    received Mr. and Mrs. Hawes' Personal Information, which Anthem maintained in its database. Mr.

5    and Mrs. Hawes each received a letter from Anthem informing them that their Personal Information

6    may have been compromised as a result of the Anthem Data Breach. Mr. and Mrs. Hawes learned

7    someone had filed a false tax return in their name using their Personal Information. As a result of the

8    Anthem Data Breach, Mr. and Mrs. Hawes were forced to submit documentation to the IRS and file a

9    police report, as well as contact their bank, credit reporting agencies, and the Social Security office in

10   order to address the tax fraud. Mr. and Mrs. Hawes' tax refund of $5,600 was delayed by more than

11   six months. As a result of the Anthem Data Breach, Mr. and Mrs. Hawes now engage in regular

12   monitoring of their credit and bank accounts, will need to use a PIN to file their taxes in the future, and

13   have spent numerous hours addressing issues arising from the Anthem Data Breach.

14        83.    Plaintiff Christina Renkoski (previously Novak) is a citizen and resident of the State of

15   Missouri. Mrs. Renkoski was enrolled in a HMO Missouri, Inc. health plan administered by

16   RightChoice Managed Care, Inc. that she paid premiums for on a regular basis. Anthem, HMO

17   Missouri, Inc., and RightChoice Managed Care, Inc. collected and received Mrs. Renkoski's Personal

18   Information, which Anthem maintained in its database. Mrs. Renkoski received a letter from Anthem

19   informing her that her Personal Information may have been compromised as a result of the Anthem

20   Data Breach. Mrs. Renkoski now engages in regular monitoring of her credit and bank accounts. As a

21   result of the Anthem Data Breach, Mrs. Renkoski has spent numerous hours addressing issues arising

22   from the Anthem Data Breach.

23                                        **Montana**

24        84.    Plaintiff Shawn Crane is a citizen and resident of the State of Montana. Mr. Crane was

25   enrolled in an Anthem health plan and paid premiums on a regular basis. Anthem and Anthem Blue

26   Cross and Blue Shield collected and received Mr. Crane's Personal Information, which Anthem

27   maintained in its database. Mr. Crane received a letter from Anthem informing him that his Personal

28   Information may have been compromised as a result of the Anthem data breach. Mr. Crane now

33

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1    engages in monthly monitoring of his credit and his bank accounts. As a result of the Anthem breach,

2    Mr. Crane has spent numerous hours addressing issues arising from the Anthem data breach.

3                                                  **Nebraska**

4             85.      Plaintiff Troy Hobbs is a citizen and resident of the State of Nebraska. Mr. Hobbs was

5    enrolled in a Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield of

6    Wisconsin health plan and paid premiums on a regular basis. Anthem Blue Cross and Blue Shield of

7    Wisconsin and Anthem collected and received Mr. Hobbs's Personal Information, which Anthem

8    maintained in its database. Mr. Hobbs received a letter from Anthem informing him that his Personal

9    Information may have been compromised as a result of the Anthem breach. In or around February

10   2015, Mr. Hobbs and his spouse attempted to file their taxes online and received an error message

11   stating their taxes had already been filed, even though Mr. and Mrs. Hobbs had not yet filed a tax

12   return. Mr. Hobbs subsequently received a letter from the IRS informing him that someone had filed a

13   false tax return in his name using his Personal Information. Mr. Hobbs was forced to contact and

14   submit documents to the IRS and file a police report relating to the tax fraud at his own expense.

15   Additionally, Mr. Hobbs's 2014 tax refund payment was delayed by at least six months. In September

16   of 2015, Mr. Hobbs learned that someone had taken out an online loan in his name and using his

17   Personal Information in the amount of $1720. Mr. Hobbs is still in the process of attempting to clear

18   his name with respect to the fraudulent loan. As a result of the Anthem breach, Mr. Hobbs has spent

19   numerous hours addressing issues relating to his tax and credit fraud, monitoring his accounts, and

20   addressing issues arising from the Anthem data breach.

21                                                 **Nevada**

22            86.      Plaintiff David Ifversen is a citizen and resident of the State of Nevada. Mr. Ifversen

23   was enrolled in an Anthem Blue Cross Blue Shield Association Federal Employees Program health

24   plan through his employer, the U.S. State Department, and paid premiums on a regular basis. The Blue

25   Cross Blue Shield Association and Anthem collected and received Mr. Ifversen's Personal

26   Information, which Anthem maintained in its database. Mr. Ifversen received a letter from Anthem

27   informing him that his Personal Information may have been compromised as a result of the Anthem

28   breach. As a result of the Anthem breach, Mr. Ifversen has spent numerous hours addressing issues

                                                        34

1    arising from the Anthem data breach.

2        87.    Plaintiff Angelin Gonzalez is a citizen and resident of the State of Nevada. Ms.

3    Gonzalez enrolled in an Anthem Blue Cross Blue Shield health plan that she purchased independently

4    and paid premiums for on a regular basis. Anthem Blue Cross Blue Shield collected and received Ms.

5    Gonzalez's Personal Information, which Anthem maintained in its database. Ms. Gonzalez received a

6    letter from Anthem informing her that her Personal Information may have been compromised as a

7    result of the Anthem data breach. After the announcement of the Anthem breach, Ms. Gonzalez and

8    her husband received a bill from a utility company relating to a property they did not own. They were

9    told someone opened the account online using their Personal Information. Ms. Gonzalez and her

10    husband were forced to send paperwork to the utility company to attempt to fix the problem and file a

11    police report. As a result of the Anthem breach, Ms. Gonzalez and her husband have spent significant

12    time and expense addressing issues arising from the Anthem data breach.

13                                         **New Hampshire**

14        88.    Plaintiff Joseph LeBrun is a citizen and resident of the State of New Hampshire. Mr.

15    LeBrun was enrolled in an Anthem Health Plans of New Hampshire, Inc. health plan and paid

16    premiums on a regular basis. Anthem Health Plans of New Hampshire, Inc. and Anthem collected and

17    received Mr. LeBrun's Personal Information, which Anthem maintained in its database. Mr. LeBrun

18    received a letter from Anthem informing him that his Personal Information may have been

19    compromised as a result of the Anthem breach. Mr. LeBrun subsequently received a letter from the

20    IRS informing him that someone had filed a false tax return using his Personal Information. Mr.

21    LeBrun also placed credit freezes on his credit reports with the three major U.S. consumer credit

22    reporting agencies in order to detect potential identity theft and fraudulent activity. As a result of the

23    Anthem breach, Mr. LeBrun has spent numerous hours addressing issues arising from the Anthem data

24    breach.

25        89.    Plaintiff Brenda Harrington is a citizen and resident of the State of New Hampshire.

26    Ms. Harrington was enrolled in an Anthem Health Plans of New Hampshire, Inc. health plan that she

27    purchased directly from Anthem, and paid premiums on a regular basis. Anthem Health Plans of New

28    Hampshire, Inc. and Anthem collected and received Ms. Harrington's Personal Information, which

Anthem maintained in its database. Ms. Harrington received a letter from Anthem informing her that her Personal Information may have been compromised as a result of the Anthem breach. Ms. Harrington subsequently received a letter from the IRS informing her that someone had filed a false tax return in her name using her Personal Information. As a result of the Anthem breach, Ms. Harrington was forced to submit affidavits to the IRS and file paper tax returns. As a result of the Anthem breach, Ms. Harrington has spent numerous hours addressing issues arising from the Anthem data breach.

## New Jersey

90.      Plaintiff Elizabeth Ames is a resident and citizen of the State of New Jersey. Ms. Ames was enrolled in a Horizon Blue Cross Blue Shield of New Jersey health plan that she purchased independently from Horizon Blue Cross Blue Shield of New Jersey and was previously enrolled in a Blue Cross and Blue Shield of Florida health plan.  Ms. Ames paid premiums on a regular basis. Horizon Blue Cross Blue Shield of New Jersey, Blue Cross and Blue Shield of Florida, and Anthem collected and received Ms. Ames's Personal Information, which Anthem maintained in its database. Ms. Ames received a letter from Anthem informing her that her Personal Information may have been compromised as a result of the data breach. As a result of the Anthem breach, Ms. Ames has spent numerous hours addressing issues arising from the Anthem data breach.

## New Mexico

91.      Plaintiff Ronald Percy is a citizen and resident of the State of New Mexico. Mr. Percy was enrolled in a Unicare Life & Health Insurance Company Security Choice Medicare health plan that he purchased independently and paid premiums for on a regular basis. Unicare Life & Health Insurance Company Security Choice Medicare and Anthem collected and received Mr. Percy's Personal Information, which Anthem maintained in its database. Mr. Percy received a letter from Anthem informing him that his Personal Information may have been compromised as a result of the Anthem breach. Mr. Percy and his wife Linda placed credit freezes on their credit reports with the three major U.S. consumer credit reporting agencies in order to detect potential identity theft and fraudulent activity. Additionally, Mr. Percy and his wife pay approximately $230 annually for identity theft and credit monitoring services in order to monitor for identity theft and fraudulent activity

36

1    resulting from the Anthem breach. As a result of the Anthem breach, Mr. Percy and his wife have

2    spent numerous hours monitoring their accounts and addressing issues arising from the Anthem data

3    breach.

4                                      <u>**New York**</u>

5           92.     Plaintiff Barbara Gold is a citizen and resident of the State of New York. Ms. Gold was

6    enrolled in a state-sponsored Empire HealthChoice Assurance, Inc. d/b/a Empire BlueCross Blue

7    Shield health plan through her husband's employer, the State of New York, and paid premiums on a

8    regular basis. Empire BlueCross and BlueShield and Anthem collected and received Ms. Gold's

9    Personal Information, which Anthem maintained in its database. Ms. Gold received a letter from

10   Anthem informing her that her Personal Information may have been compromised as a result of the

11   Anthem breach. Anthem confirmed to Ms. Gold over the telephone that her data was in fact

12   compromised. Ms. Gold pays approximately $191 annually for identity theft and credit monitoring

13   services in order to monitor for identity theft and fraudulent activity resulting from the Anthem breach.

14   As a result of the Anthem breach, Ms. Gold has spent numerous hours addressing issues arising from

15   the Anthem data breach, which has caused her undue distress.

16          93.     Plaintiff Matthew Gates is a citizen and resident of the State of New York. Mr. Gates

17   was enrolled in a health plan sponsored by his employer, Verizon, and administered by Anthem

18   Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield, and paid premiums on a regular

19   basis. Anthem Blue Cross and Blue Shield and Anthem collected and received Mr. Gates's Personal

20   Information, which Anthem maintained in its database. Mr. Gates received a letter from Anthem

21   informing him that his Personal Information may have been compromised as a result of the Anthem

22   breach. Mr. Gates's minor son, who was a member of the same health plan, subsequently received a

23   letter from the IRS seeking confirmation of his identity. As a result of the Anthem breach, Mr. Gates

24   and his wife spent numerous hours on the phone with the IRS and police attempting to correct their

25   son's tax filing. As a result, his 2014 tax refund payment was delayed by six months. As a result of the

26   Anthem breach, Mr. Gates and his family have spent numerous hours monitoring their accounts and

27   addressing issues arising from the Anthem data breach.

28          94.     Plaintiff Juan Carlos Cerro is a citizen and resident of the State of New York. Mr. Cerro

                                                 37

was enrolled in a state-sponsored Empire HealthChoice Assurance, Inc. d/b/a Empire BlueCross Blue Shield health plan through his wife's employer, a New York public school, and paid premiums on a regular basis. Empire BlueCross and BlueShield and Anthem collected and received Mr. Cerro's Personal Information, which Anthem maintained in its database. Mr. Cerro received a letter from Anthem informing him that his Personal Information may have been compromised as a result of the Anthem breach. Mr. Cerro and his wife subsequently received a letter from the IRS informing them that someone had filed a false tax return in their name using their Personal Information. As a result of the Anthem breach, Mr. Cerro and his wife were forced to submit affidavits to the IRS, file a police report, file a complaint with the Federal Trade Commission, and take trips to the Social Security Administration office. Their 2014 tax return payment was delayed until September 2015. Mr. Cerro and his wife also placed credit freezes on their credit reports with the three major U.S. consumer credit reporting agencies in order to detect potential identity theft and fraudulent activity. Additionally, Mr. Cerro pays approximately $300 annually for identity theft and credit monitoring services in order to monitor for identity theft and fraudulent activity resulting from the Anthem breach. As a result of the Anthem breach, Mr. Cerro has spent numerous hours addressing issues arising from the Anthem data breach.

95.     Plaintiff Marne Onderdonk is a citizen and resident of the State of New York. Ms. Onderdonk was enrolled in the New York State Health Insurance Program (NYSHIP) for Government Employees, and paid premiums on a regular basis. Empire HealthChoice Assurance, Inc. d/b/a Empire BlueCross BlueShield, an Anthem Affiliate, provided services under the NYSHIP plan. Empire BlueCross Blue Shield and Anthem collected and received Ms. Onderdonk's Personal Information, which Anthem maintained in its database. Ms. Onderdonk placed credit freezes on her credit reports with the three major U.S. consumer credit reporting agencies in order to detect potential identity theft and fraudulent activity, which has caused her delays when applying for credit. Additionally, Ms. Onderdonk pays approximately $240 annually for identity theft and credit monitoring services in order to monitor for identity theft and fraudulent activity resulting from the Anthem breach. As a result of the Anthem breach, Ms. Onderdonk has spent numerous hours monitoring her accounts and addressing issues arising from the Anthem data breach.

96.     Plaintiff Frank Pacilio is a citizen and resident of the State of New York. Mr. Pacilio was enrolled in an Empire Blue Cross Blue Shield health plan that he paid premiums for on a regular basis. Anthem and Empire Blue Cross Blue Shield collected and received Mr. Pacilio's Personal Information, which Anthem maintained in its database. Mr. Pacilio received a letter from his employer informing him that his Personal Information may have been compromised as a result of the Anthem data breach. As a result of the Anthem data breach, Mr. Pacilio has spent numerous hours monitoring his accounts and addressing issues arising from the Anthem data breach.

97.     Plaintiff Valerie Brescia is a citizen and resident of the State of New York. Ms. Brescia was enrolled in an Empire Blue Cross Blue Shield health plan that she purchased independently and paid premiums for on a regular basis. Anthem and Empire Blue Cross Blue Shield collected and received Ms. Brescia's Personal Information, which Anthem maintained in its database. Ms. Brescia received an email informing her that her Personal Information may have been compromised as a result of the Anthem data breach. Ms. Brescia pays approximately $360 annually for identity theft and credit monitoring services in order to monitor for identity theft and fraudulent activity resulting from the Anthem breach. In March 2015, Ms. Brescia received a "black market website notification" from her monitoring service indicating that her Personal Information was being offered for sale on the dark web. As a result of the Anthem data breach, Ms. Brescia has spent numerous hours monitoring her accounts and addressing issues arising from the Anthem data breach.

**North Carolina**

98.     Plaintiff Randy Polacsek is a citizen and resident of the State of North Carolina. Mr. Polacsek was enrolled in a Blue Shield of California health plan and paid premiums on a regular basis. Prior to that, Mr. Polacsek was enrolled in a Blue Cross Blue Shield of Massachusetts health plan and paid premiums on a regular basis. These entities and Anthem collected and received Mr. Polacsek's Personal Information, which Anthem maintained in its database. Mr. Polacsek received a letter from Anthem informing him that his Personal Information may have been compromised as a result of the Anthem breach. In March 2015, Mr. Polacsek was informed by a detective in Illinois that someone had a credit card in Illinois with Mr. Polacsek's Personal Information. Mr. Polacsek had his credit cards cancelled and reissued. As a result of the Anthem data breach, Mr. Polacsek has spent numerous hours

1    addressing issues arising from the Anthem data breach.

2          99.    Plaintiff Francis Nicosia is a citizen and resident of the State of North Carolina.   Mr.

3    Nicosia was enrolled in multiple health plans.  He was enrolled in a Blue Cross and Blue Shield of

4    North Carolina, Inc. health plan. He was also enrolled in a Blue Cross of California health plan. He

5    was also enrolled in an Anthem Blue Cross Life and Health Insurance Company health plan. Blue

6    Cross and Blue Shield of North Carolina, Blue Cross of California, Anthem Blue Cross Life and

7    Health Insurance Company, and Anthem collected and received Mr. Nicosia's Personal Information,

8    which Anthem maintained in its database. Mr. Nicosia paid premiums for his health plans on a regular

9    basis. Following Anthem's announcement of the data breach, Mr. Nicosia received a letter from the

10   IRS informing him that someone had filed a false tax return in his name using his Personal

11   Information. Mr. Nicosia thereafter called Anthem and was informed that his Personal Information

12   may have been compromised by the Anthem breach. Mr. Nicosia still has not received his 2014 tax

13   return payment. Additionally, Mr. Nicosia pays approximately $780 annually for identity theft and

14   credit monitoring services in order to monitor for identity theft and fraudulent activity resulting from

15   the Anthem breach. As a result of the Anthem breach, Mr. Nicosia has spent numerous hours

16   addressing issues arising from the Anthem data breach.

17                                          **Ohio**

18         100.    Plaintiff Connie McDaniel is a citizen and resident of the State of Ohio.  Ms. McDaniel

19   was enrolled in a Blue Cross and Blue Shield of Alabama plan and paid premiums on a regular basis.

20   Blue Cross and Blue Shield of Alabama and Anthem collected and received Ms. McDaniel's Personal

21   Information, which Anthem maintained in its database.  Ms. McDaniel received a letter from Anthem

22   informing her that her Personal Information may have been compromised as a result of the Anthem

23   breach.  After the announcement of the Anthem breach, Ms. McDaniel was notified that her joint tax

24   return had been rejected because someone had filed a false return in her name using her Personal

25   Information.  Ms. McDaniel went to the local police department to file a report, called credit reporting

26   agencies, went to her bank and credit union, and communicated with the IRS regarding this matter.  As

27   a result, her 2014 tax refund payment was delayed by three months.  As a result of the Anthem breach,

28   Ms. McDaniel has spent numerous hours monitoring her accounts and addressing issues arising from

1    the Anthem data breach.

2        101.    Plaintiff Rachel Calo is a citizen and resident of the State of Ohio. Ms. Calo was

3    enrolled in an Anthem Insurance Companies' health plan and paid premiums on a regular basis.

4    Anthem Insurance Companies and Anthem collected and received Ms. Calo's Personal Information,

5    which Anthem maintained in its database. Ms. Calo received a letter from Anthem informing her that

6    her Personal Information may have been compromised as a result of the Anthem breach, as did her

7    minor children, who were members of the same health plan. As a result of the Anthem breach, Ms.

8    Calo has spent numerous hours monitoring her accounts and addressing issues arising from the

9    Anthem data breach.

10       102.    Plaintiff Nicholas Bowes is a citizen and resident of the State of Ohio. Mr. Bowes was

11   enrolled in a Community Insurance Company health plan through his employer, a public university,

12   and was previously enrolled in an Anthem Insurance Companies health plan through a parent. Mr.

13   Bowes paid premiums on a regular basis. Anthem, Community Insurance Company, and Anthem

14   Insurance Companies collected and received Mr. Bowes' Personal Information, which Anthem

15   maintained in its database. Mr. Bowes received a letter from Anthem informing him that his Personal

16   Information may have been compromised as a result of the Anthem breach and also received

17   notification from his employer. As a result of the Anthem breach, Mr. Bowes has spent numerous

18   hours monitoring his accounts and addressing issues arising from the Anthem data breach.

19       103.    Plaintiff Martin Williams is a citizen and resident of the State of Ohio. Mr. Williams

20   was enrolled in a Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio

21   health plan, which he purchased independently. Mr. Williams paid premiums on a regular basis.

22   Anthem collected and received Mr. Williams' Personal Information, which Anthem maintained in its

23   database. Mr. Williams received a letter from Anthem informing him that his Personal Information

24   may have been compromised as a result of the Anthem breach, as did his wife. After announcement of

25   the Anthem breach, Mr. Williams was notified of fraudulent charges to one of his accounts, resulting

26   in cancellation and reissuance of the affected card. As a result of the Anthem breach, Mr. Williams has

27   spent numerous hours monitoring his accounts and addressing issues arising from the Anthem data

28   breach.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

**Oklahoma**

104.     Plaintiff Rosanne M. Stanley is a citizen and resident of the State of Oklahoma. Ms. Stanley was enrolled in an Anthem Insurance Companies, Inc. d/b/a Blue Cross Blue Shield of Indiana health plan and paid premiums on a regular basis. Anthem Insurance Companies, Inc. and Anthem collected and received Ms. Stanley's Personal Information, which Anthem maintained in its database. Ms. Stanley received a letter from Anthem informing her that her Personal Information may have been compromised as a result of the Anthem breach. Ms. Stanley now closely reviews her identity theft and credit monitoring services and monitors her bank accounts. As a result of the Anthem breach, Ms. Stanley has spent numerous hours addressing issues arising from the Anthem data breach.

**Pennsylvania**

105.     Plaintiff Gregory Kremer is a citizen and resident of the State of Pennsylvania. Mr. Kremer was enrolled in a Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Illinois health plan and paid premiums on a regular basis. Prior to that, Mr. Kremer was enrolled in a Community Insurance Company, d/b/a Anthem Blue Cross and Blue Shield of Ohio health plan and paid premiums on a regular basis Blue Cross Blue Shield of Illinois, Community Insurance Company, and Anthem collected and received Mr. Kremer's Personal Information, which Anthem maintained in its database. Mr. Kremer received a letter from Anthem informing him that his Personal Information may have been compromised as a result of the Anthem breach. Mr. Kremer has enrolled in an identity theft and credit monitoring service in order to monitor for identity theft and fraudulent activity resulting from the Anthem breach. As a result of the Anthem breach, Mr. Kremer has spent numerous hours addressing issues arising from the Anthem data breach.

106.     Plaintiff Denise Masloski is a citizen and resident of the State of Pennsylvania. Ms. Masloski was enrolled in a Highmark Inc. d/b/a Highmark Blue Shield health plan and paid premiums on a regular basis. Highmark Inc. d/b/a Highmark Blue Shield and Anthem collected and received Ms. Masloski's Personal Information, which Anthem maintained in its database.  When Ms. Masloski was unable to file her 2014 tax return she learned that someone had filed a false tax return in her name using her Personal Information. As a result of the Anthem breach, Ms. Masloski was forced to submit affidavits to the IRS, travel to the Social Security Administration office to verify her identity, and

42

1    spend numerous hours on the phone with the IRS. She still has not received her tax refund for

2    $3,425.00. As a result of the Anthem breach, Ms. Masloski has been denied access to her federal tax

3    refund and has spent numerous hours addressing issues arising from the Anthem data breach.

4                                              **Rhode Island**

5           107.    Plaintiff Alan Voll is a citizen and resident of the State of Rhode Island. Mr. Voll was

6    enrolled in an Anthem Blue Cross Blue Shield health plan and paid premiums on a regular basis.

7    Anthem Blue Cross Blue Shield and Anthem collected and received Mr. Voll's Personal Information,

8    which Anthem maintained in its database. After the Anthem Data Breach, but prior receiving notice of

9    the breach from Anthem, someone accessed Mr. Voll's AT&T account and made unauthorized phone

10   calls. Mr. Voll spent time and effort attempting to have the unauthorized phone calls removed from his

11   account statement. Mr. Voll subsequently received a letter from Anthem informing him that his

12   Personal Information may have been compromised as a result of the Anthem data breach.  As a result

13   of the Anthem data breach, Mr. Voll has spent numerous hours addressing issues arising from the

14   Anthem data breach.

15                                            **South Carolina**

16          108.    Plaintiff Lakeysha Gant is a citizen and resident of the State of South Carolina. Ms.

17   Gant was enrolled in an Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue

18   Shield of Virginia Bronze Plus Choice health plan and paid premiums on a regular basis. Anthem

19   Health Plans of Virginia, Inc. and Anthem collected and received Ms. Gant's personal information,

20   which Anthem maintained in its database. Ms. Gant received a letter from Anthem informing her that

21   her information may have been compromised as a result of the Anthem data breach. Ms. Gant now

22   engages in frequent monitoring of her credit and her bank accounts. As a result of the Anthem breach,

23   Ms. Gant has spent numerous hours addressing issues arising from the Anthem data breach.

24                                              **Tennessee**

25          109.    Plaintiff Jonathan B. Pulcini is a citizen and resident of the State of Tennessee. Mr.

26   Pulcini was enrolled in an Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue

27   Shield of Indiana health plan and paid premiums on a regular basis. Anthem and Anthem Insurance

28   Companies, Inc. collected and received Mr. Pulcini's Personal Information, which Anthem maintained

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

in its database. Mr. Pulcini received a letter from Anthem informing him that his Personal Information may have been compromised as a result of the Anthem breach. Mr. Pulcini now closely reviews his identity theft and credit monitoring services and monitors his bank accounts. As a result of the Anthem breach, Mr. Pulcini has spent numerous hours addressing issues arising from the Anthem data breach.

110.    Plaintiff Ted Hagen is a citizen and resident of the State of Tennessee. Mr. Hagen was enrolled in an Anthem BlueCross BlueShield health plan and paid premiums on a regular basis. Anthem BlueCross BlueShield and Anthem collected and received Mr. Hagen's Personal Information, which Anthem maintained in its database. Mr. Hagen received a letter from Anthem informing him that his Personal Information may have been compromised as a result of the Anthem data breach. As a result of the Anthem data breach, Mr. Hagen has spent numerous hours monitoring his accounts and addressing issues arising from the Anthem data breach.

**Texas**

111.    Plaintiff Lane Wagner is a citizen and resident of the State of Texas. Mr. Wagner was enrolled in a Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Texas health plan that he purchased individually, and he paid premiums on a regular basis. Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Texas and Anthem collected and received Mr. Wagner's Personal Information, which Anthem maintained in its database. Mr. Wagner received a letter from Anthem informing him that his Personal Information may have been compromised as a result of the Anthem breach. Mr. Wagner pays approximately $480 annually for identity theft and credit monitoring services in order to monitor for identity theft and fraudulent activity resulting from the Anthem breach. That service notified Mr. Wagner that his Personal Information was for sale on two dark web sites. Mr. Wagner then placed credit freezes on his credit reports with the three major U.S. consumer credit reporting agencies in order to detect potential identity theft and fraudulent activity. Mr. Wagner also filed a police report and filed a complaint with the Federal Trade Commission. As a result of the Anthem breach, Mr. Wagner has spent numerous hours addressing issues arising from the Anthem data breach.

112.    Plaintiff Joseph Beckerman is a citizen and resident of the State of Texas. Mr. Beckerman was enrolled in a Blue Cross of California, Inc. d/b/a Anthem Blue Cross of California

44

1   PPO health plan and an Anthem Blue Cross Life and Health Insurance Company Blue View Plus

2   Insurance Vision health plan. Mr. Beckerman paid premiums on a regular basis. Anthem, Blue Cross

3   of California, Inc., and Anthem Blue Cross Life and Health Insurance Company collected and received

4   Mr. Beckerman's Personal Information, which Anthem maintained in its database. Mr. Beckerman

5   received a letter from Anthem informing him that his Personal Information may have been

6   compromised as a result of the Anthem breach. Mr. Beckerman pays approximately $700 annually for

7   identity theft and credit monitoring services for himself and his three children, who were members of

8   the same health plan, in order to monitor for identity theft and fraudulent activity resulting from the

9   Anthem breach. As a result of the Anthem breach, Mr. Beckerman has spent numerous hours

10  monitoring his accounts and addressing issues arising from the Anthem data breach on behalf of

11  himself and his three children.

12  **Utah**

13      113.    Plaintiff William Ansah-Dawson is a citizen and resident of the State of Utah. Mr.

14  Dawson was enrolled in an Anthem Insurance Companies, Inc. health plan and paid premiums on a

15  regular basis. Anthem Insurance Companies, Inc. and Anthem collected and received Mr. Dawson's

16  Personal Information, which Anthem maintained in its database. Mr. Dawson received a letter from

17  Anthem informing him that his Personal Information may have been compromised as a result of the

18  Anthem data breach. Mr. Dawson now engages in monthly monitoring of his credit and his bank

19  accounts. As a result of the Anthem breach, Mr. Dawson has spent numerous hours addressing issues

20  arising from the Anthem data breach.

21      114.    Plaintiff C. Wheelwright is a citizen and resident of the State of Utah. Mr. Wheelwright

22  was enrolled in an Anthem Insurance Companies, Inc. and Anthem, Inc. health plan and paid

23  premiums on a regular basis. Anthem Insurance Companies, Inc. and Anthem collected and received

24  Mr. Wheelwright's Personal Information, which Anthem maintained in its database. Mr. Wheelwright

25  received a letter from Anthem informing him that his Personal Information may have been

26  compromised as a result of the Anthem data breach. Mr. Wheelwright now engages in monthly

27  monitoring of his credit and his bank accounts. As a result of the Anthem breach, Mr. Wheelwright

28  has spent numerous hours addressing issues arising from the Anthem data breach.

45

**Virginia**

115.     Plaintiff Amanda Davis is a citizen and resident of the State of Virginia. Mrs. Davis was enrolled in a state-sponsored HMO HealthKeepers, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia health plan through her employer, a public school. During the relevant period, Mrs. Davis was also insured under an Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia health plan that she purchased independently through the health insurance marketplace. Mrs. Davis paid premiums for her health plans on a regular basis. HMO HealthKeepers, Inc., Anthem Health Plans of Virginia, Inc., and Anthem collected and received Mrs. Davis's Personal Information, which Anthem maintained in its database. Mrs. Davis received a letter from Anthem informing her that her Personal Information may have been compromised as a result of the Anthem breach. Mrs. Davis subsequently learned that someone had filed a false tax return in her name using her Personal Information and later received a letter from the IRS confirming the same. As a result, Mrs. Davis and her husband did not receive their 2014 tax refund payment until November of 2015, over seven months late. Because of the delay in receiving their tax refund, Mrs. Davis and her husband have experienced difficulties submitting current tax returns for their student loan income based repayment plans which caused their percentage of monthly principal to increase sixfold. Mrs. Davis and her husband placed credit freezes on their credit reports with the three major U.S. consumer credit reporting agencies in order to detect potential identity theft and fraudulent activity. Additionally, Mrs. Davis and her husband pay approximately $480 annually for identity theft and credit monitoring services in order to monitor for identity theft and fraudulent activity resulting from the Anthem breach. As a result of the Anthem breach, Mrs. Davis and her husband have spent numerous hours attempting to renegotiate their student loan terms, monitoring their accounts and addressing issues arising from the Anthem data breach.

116.     Plaintiff Michael S. Weinberger is a citizen and resident of the State of Virginia. Mr. Weinberger was enrolled in an Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana health plan and paid premiums on a regular basis. Anthem Insurance Companies, Inc. and Anthem collected and received Mr. Weinberger's Personal Information, as well as that of his wife, Karen H. Weinberger and his daughter, Alyssa D. Weinberger, which Anthem maintained in its

46

1   database. Mr. Weinberger received an e-mail and letter from Anthem informing him that his Personal

2   Information may have been compromised as a result of the Anthem breach.  Thereafter, Mr.

3   Weinberger, his wife and his daughter, spent numerous hours addressing issues arising from the

4   Anthem data breach.  In February 2016, Mr. Weinberger was notified that the IRS had detected a

5   suspicious use of Mr. Weinberger's Social Security number to access an e-file PIN number that could

6   be used to electronically file tax returns.  Mr. Weinberger spent time researching the implications of

7   this and concluded that placing a fraud alert on his credit file was an unfortunate additional, but

8   necessary burden to safeguard his credit rating and prevent identity theft.  Now, when he applies for

9   new credit, he will have to go through the hassle of presenting additional documentation that he is

10  indeed who he claims to be.

11                                              **Washington**

12          117.    Plaintiff Vernon Davitte is a citizen and resident of the State of Washington. Mr.

13  Davitte was enrolled in a Healthy Alliance Life Insurance Company d/b/a Anthem Blue Cross and

14  Blue Shield of Missouri health plan and paid premiums on a regular basis. Healthy Alliance Life

15  Insurance Company and Anthem collected and received Mr. Davitte's Personal Information, which

16  Anthem maintained in its database. Mr. Davitte received a letter from Anthem informing him that his

17  Personal Information may have been compromised as a result of the Anthem breach. Mr. Davitte pays

18  approximately $192 annually for identity theft and credit monitoring services in order to monitor for

19  identity theft and fraudulent activity resulting from the Anthem breach. Mr. Davitte placed a credit

20  freeze on his credit report with Experian in order to detect potential identity theft and fraudulent

21  activity. As a result of the Anthem breach, Mr. Davitte has spent numerous hours addressing issues

22  arising from the Anthem data breach.

23          118.    Plaintiff Jennifer Mertlich is a citizen and resident of the State of Washington. Ms.

24  Mertlich was enrolled in a health plan administered by Anthem Blue Cross Life and Health Insurance

25  Company and Anthem Blue Cross of California, and paid premiums on a regular basis.   Anthem Blue

26  Cross of California, Anthem Blue Cross Life and Health Insurance Company, and Anthem collected

27  and received Ms. Mertlich's Personal Information, which Anthem maintained in its database. Ms.

28  Mertlich received a letter from Anthem informing her that her Personal Information may have been

                                                   47

1   compromised as a result of the Anthem data breach. After the announcement of the Anthem breach, at

2   least four fraudulent credit cards or credit accounts were opened or attempted to be opened in Ms.

3   Mertlich's name and using her Personal Information. In most instances, the credit accounts were

4   maxed out and Ms. Mertlich had to personally dispute the fraudulent charges by making phone calls

5   and submitting documentation. In addition, someone who purchased Ms. Mertlich's Personal

6   Information used it to create a fake identification card using Ms. Mertlich's name, address and other

7   Personal Information. Ms. Mertlich was forced to file two separate police reports in different cities and

8   spend significant time and expense addressing the extensive fraud perpetrated against her. Ms.

9   Mertlich had to purchase credit freezes on her credit reports with the three major U.S. consumer credit

10   reporting agencies in order to detect potential identity theft and fraudulent activity. Ms. Mertlich also

11   paid approximately $120 over the course of a year for identity theft and credit monitoring services in

12   order to monitor for identity theft and fraudulent activity resulting from the Anthem breach. As a result

13   of the Anthem breach, Ms. Mertlich has spent significant time, effort and expense addressing credit

14   fraud, monitoring her accounts, and addressing issues arising from the Anthem data breach.

15        119.    Plaintiff Simon Kaufman is a citizen and resident of the State of Washington. Mr.

16   Kaufman was enrolled in an Amerigroup Washington, Inc. health plan and paid premiums on a regular

17   basis. Anthem and Amerigroup Washington, Inc. collected and received Mr. Kaufman's Personal

18   Information, which Anthem maintained in its database. Mr. Kaufman received a letter from Anthem

19   informing him that his Personal Information may have been compromised as a result of the Anthem

20   data breach. As a result of the Anthem breach, Mr. Kaufman has spent numerous hours addressing

21   issues arising from the Anthem data breach.

22                                           **West Virginia**

23        120.    Plaintiff Lisa Shiltz is a resident and citizen of the State of West Virginia. Ms. Shiltz

24   was enrolled in an Anthem Health Plans of Kentucky, Inc. health plan and paid premiums on a regular

25   basis. Anthem Health Plans of Kentucky, Inc. and Anthem collected and received Ms. Shilz's Personal

26   Information, which Anthem maintained in its database.  Ms. Shiltz received a letter from Anthem

27   informing her that her Personal Information may have been compromised as a result of the data

28   breach. Ms. Shiltz subsequently had identity thieves attempt to open bank accounts in her name. As a

result of the Anthem breach, Ms. Shiltz has spent numerous hours addressing issues arising from the Anthem data breach.

<div align="center"><u>**Wisconsin**</u></div>

121.    Plaintiff Susan H. Jones is a citizen and resident of the State of Wisconsin. Ms. Jones was enrolled in a Compcare Health Services Insurance Corporation d/b/a Anthem Blue Cross and Blue Shield of Wisconsin health insurance plan and paid premiums on a regular basis. Compcare Health Services Insurance Corporation and Anthem collected and received Ms. Jones's Personal Information, which Anthem maintained in its database. Ms. Jones received a letter from Anthem informing her that her Personal Information may have been compromised as a result of the Anthem breach. Ms. Jones subsequently received a letter from the IRS informing her that someone had filed a false tax return using her Personal Information. As a result of the Anthem breach, Ms. Jones has spent numerous hours addressing issues arising from the Anthem data breach.

122.    Plaintiff Jennifer Rud is a citizen and resident of the State of Wisconsin. Ms. Rud was enrolled in an Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana health plan and paid premiums on a regular basis. Prior to that, Ms. Rud was enrolled in a Blue Cross Blue Shield of Minnesota health plan. Anthem Insurance Companies, Inc., Blue Cross Blue Shield of Minnesota, and Anthem collected and received Ms. Rud's Personal Information, which Anthem maintained in its database. Ms. Rud received a letter from Anthem informing her that her Personal Information may have been compromised as a result of the Anthem breach. Ms. Rud subsequently received a letter from the IRS informing her that someone had filed a false tax return using her Personal Information. As a result of the Anthem Breach, Ms. Rud was required to submit five forms of identification to the IRS, file a police report, and delay purchase of a house. Her tax refund has also been delayed. As a result of the Anthem breach, Ms. Rud has spent numerous hours addressing issues arising from the Anthem data breach.

**B.    Defendants**

123.    Defendant Anthem, Inc. ("Anthem") is incorporated and headquartered in Indiana. Anthem is one of the largest health benefits and health insurance companies in the United States. Anthem serves its medical members through its health benefits and insurance subsidiaries and

<div align="center">49</div>

affiliates ("Anthem Affiliates"). Anthem is the parent company of the Anthem Affiliates. Anthem also cooperated with other independent Blue Cross Blue Shield licensee insurance and health benefit companies ("non-Anthem BCBS") to create the BlueCard program.

124.    Defendant Blue Cross and Blue Shield of Georgia, Inc. is incorporated and headquartered in Georgia.  Defendant is an Anthem Affiliate.

125.    Defendant Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc. is incorporated and headquartered in Georgia.  Defendant is an Anthem Affiliate.

126.     Defendant Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana is incorporated and headquartered in Indiana. Defendant is an Anthem Affiliate.

127.    Defendant Blue Cross of California, Inc. d/b/a Anthem Blue Cross of California is incorporated and headquartered in California. Defendant is an Anthem Affiliate.

128.    Defendant Anthem Blue Cross Life and Health Insurance Company is incorporated and headquartered in California. Defendant is an Anthem Affiliate.

129.    Defendant Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado in Colorado and d/b/a Anthem Blue Cross and Blue Shield of Nevada in Nevada, is incorporated and headquartered in Colorado. Defendant is an Anthem Affiliate.

130.    Defendant Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut is incorporated and headquartered in Connecticut. Defendant is an Anthem Affiliate.

131.    Defendant Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield of Kentucky is incorporated and headquartered in Kentucky. Defendant is an Anthem Affiliate.

132.    Defendant Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine is incorporated and headquartered in Maine. Defendant is an Anthem Affiliate.

133.    Defendant HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue Shield of Missouri is incorporated and headquartered in Missouri. Defendant is an Anthem Affiliate.

134.    Defendant RightChoice Managed Care, Inc. d/b/a Anthem Blue Cross and Blue Shield of Missouri is incorporated and headquartered in Missouri. Defendant is an Anthem Affiliate.

135.    Defendant Healthy Alliance Life Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Missouri is incorporated and headquartered in Missouri. Defendant is an Anthem

50

Affiliate.

136.     Defendant Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield of New Hampshire is incorporated and headquartered in New Hampshire. Defendant is an Anthem Affiliate.

137.     Defendant Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield is incorporated and headquartered in New York. Defendant is an Anthem Affiliate.

138.     Defendant Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio is incorporated and headquartered in Ohio. Defendant is an Anthem Affiliate.

139.     Defendant Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia is incorporated and headquartered in Virginia. Defendant is an Anthem Affiliate.

140.     HMO HealthKeepers, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia is incorporated and headquartered in Virginia. Defendant is an Anthem Affiliate.

141.     Defendant Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield of Wisconsin is incorporated and headquartered in Wisconsin. Defendant is an Anthem Affiliate.

142.     Defendant Compcare Health Services Insurance Corporation d/b/a Anthem Blue Cross and Blue Shield of Wisconsin is incorporated and headquartered in Wisconsin. Defendant is an Anthem Affiliate.

143.     Defendant Amerigroup Corporation is incorporated and headquartered in Delaware. Defendant is an Anthem Affiliate.

144.     Defendant Amerigroup Services, Inc. is incorporated and headquartered in Virginia. Defendant is an Anthem Affiliate.

145.     Defendant Amerigroup Kansas Inc. is incorporated and headquartered in Kansas. Defendant is an Anthem Affiliate.

146.     Defendant Amerigroup Washington, Inc. is incorporated and headquartered in Washington. Defendant is an Anthem Affiliate.

147.     Defendant HealthLink, Inc. is incorporated in Illinois and headquartered in Missouri. Defendant is an Anthem Affiliate.

51

148.    Defendant Unicare Life & Health Insurance Company is incorporated and headquartered in Indiana. Defendant is an Anthem Affiliate.

149.    Defendant CareMore Health Plan is incorporated and headquartered in California. Defendant is an Anthem Affiliate.

150.    Defendant The Anthem Companies, Inc. is incorporated and headquartered in Indiana. Defendant is an Anthem Affiliate.

151.    Defendant The Anthem Companies of California, Inc. is incorporated in California and headquartered in Indiana. Defendant is an Anthem Affiliate.

152.    Discovery may reveal additional Anthem Affiliate Defendants.

153.    Defendant Blue Cross and Blue Shield of Alabama is incorporated and headquartered in Alabama. Defendant is a non-Anthem BCBS company.

154.    Defendant USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield is incorporated and headquartered in Arkansas. Defendant is a non-Anthem BCBS company.

155.    Defendant California Physicians' Service, Inc. d/b/a Blue Shield of California is incorporated and headquartered in California. Defendant is a non-Anthem BCBS company.

156.    Defendant Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Illinois and Blue Cross and Blue Shield of Texas is incorporated and headquartered in Illinois. Defendant is a non-Anthem BCBS company.

157.    Defendant Blue Cross and Blue Shield of Florida, Inc. is incorporated and headquartered in Florida. Defendant is a non-Anthem BCBS company.

158.    Defendant CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield is incorporated and headquartered in Maryland. Defendant is a non-Anthem BCBS company.

159.    Defendant Blue Cross and Blue Shield of Massachusetts, Inc. is incorporated and headquartered in Massachusetts. Defendant is a non-Anthem BCBS company.

160.    Defendant Blue Cross and Blue Shield of Michigan is incorporated and headquartered in Michigan. Defendant is a non-Anthem BCBS company.

161.    Defendant BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota is incorporated and headquartered in Minnesota. Defendant is a non-Anthem BCBS company.

162.    Defendant Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross and Blue Shield of New Jersey is incorporated and headquartered in New Jersey. Defendant is a non-Anthem BCBS company.

163.    Defendant Blue Cross and Blue Shield of North Carolina, Inc. is incorporated and headquartered in North Carolina. Defendant is a non-Anthem BCBS company.

164.    Defendant Highmark Inc. d/b/a Highmark Blue Shield and d/b/a Highmark Blue Cross Blue Shield is incorporated and headquartered in Pennsylvania. Defendant is a non-Anthem BCBS company.  Defendant HM Health Insurance Company d/b/a Highmark Health Insurance Company is a wholly owned subsidiary of Highmark Inc., which is incorporated and headquartered in Pennsylvania. Defendant is a non-Anthem BCBS company.

165.    Defendant Blue Cross and Blue Shield of Vermont is incorporated and headquartered in Vermont. Defendant is a non-Anthem BCBS company.

166.    Defendant Blue Cross Blue Shield Association ("BCBSA") is incorporated and headquartered in Illinois.

167.    Discovery may reveal additional non-Anthem BCBS Defendants.

## IV.    STATEMENT OF FACTS

### A.    The Anthem Database

168.    Anthem is one of the largest health benefits and health insurance companies in the United States. Anthem serves its medical members through its fourteen Blue Cross Blue Shield ("BCBS") licensee affiliates ("Anthem BCBS Affiliates"), as well as its non-Blue Cross Blue Shield affiliates ("Anthem non-BCBS Affiliates"), such as Amerigroup Corporation, CareMore Health Group, Inc., HealthLink, and UniCare. (Collectively, Anthem's health benefits and insurance subsidiaries and affiliates will be referred to as "Anthem Affiliates.")

169.    Anthem also cooperated with other independent Blue Cross Blue Shield licensee insurance and health benefit companies ("non-Anthem BCBS") to create the BlueCard program. Under the BlueCard program, members of one BCBS licensee may access another BCBS licensee's provider networks and discounts when the members are out of state. Thus, non-Anthem BCBS

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1  members may access an Anthem BCBS Affiliate's provider discounts and network when they travel to

2  an area where an Anthem Affiliate serves as the BCBS licensee.

3      170.    As health insurance and health benefits companies, Anthem, Anthem Affiliates, and

4  non-Anthem BCBS collect, receive, and access their customers' and members' extensive individually

5  identifiable health record information. These records include personal information (such as names,

6  dates of birth, Social Security numbers, health care ID numbers, home addresses, email addresses, and

7  employment information, including income data) and individually-identifiable health information

8  (pertaining to the individual claims process, medical history, diagnosis codes, payment and billing

9  records, test records, dates of service, and all other health information that an insurance company has

10  or needs to have to process claims). (Collectively, both the personal information and individually

11  identifiable health information will be referred to as "Personal Information.")

12      171.    Anthem created a common computer database that it referred to as a "single data

13  warehouse" and the "main subscriber file" containing Personal Information for tens of millions of

14  individuals (the "Anthem Database"). The Anthem Database includes Personal Information that was

15  provided by current and former customers or members of Anthem Affiliates. The Anthem Database

16  also includes Personal Information for current and former customers or members of non-Anthem

17  BCBS plans who obtained health care services in areas where Anthem Affiliates serve as the BCBS

18  licensees, as well as employees of self-insured employer groups where Anthem received information

19  about non-Anthem members to provide analytics and administrative services. The Anthem Database

20  also contains Personal Information for Anthem and Anthem Affiliate employees.

21      172.    Anthem publicly admitted that the Anthem Database contained information from

22  former customers or members going back to 2004, and that Anthem generally retains data for 10 years,

23  even though Anthem acknowledges it is not legally required to retain data going back that far in time.

24      173.    Further discovery may demonstrate that the Anthem Database contained information

25  regarding additional individuals.

26  **B.    Defendants' Privacy Policies, Representations, Omissions, and Contract Terms**
        **Pertaining to Data Security and Confidentiality**
27

28      **1.    Anthem and Anthem Affiliates**

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1

a.      **Anthem's Privacy Policies, Representations, and Omissions**

2          174.    At all times relevant to this litigation, Anthem and its Affiliates have had privacy

3    policies committing to maintain and protect the confidentiality of information that Anthem and its

4    Affiliates collected from their customers in the course of doing business, including personal and

5    health-related information.

6          175.    At all times relevant to this litigation, Anthem's and its Affiliates' privacy policies

7    included a "Personal Information (Including Social Security Number) Privacy Protection Policy" that

8    applied to all members with whom Anthem does business.  Since at least 2010 (and on information

9    and belief for many years prior to that), that Policy has stated the following:

> **Anthem Blue Cross and Blue Shield maintains policies that protect the confidentiality of personal information, including Social Security numbers, obtained from its members and associates in the course of its regular business functions. Anthem Blue Cross and Blue Shield is committed to protecting information about its customers and associates, especially the confidential nature of their personal information (PI).** [1]
> Personal Information is information that is capable of being associated with an individual through one or more identifiers including but not limited to, a Social Security number, a driver's license number, a state identification card number, an account number, a credit or debit card number, a passport number, an alien registration number or a health insurance identification number, and does not include publicly available information that is lawfully made available to the general public from federal, state or local government records or widely distributed media.
>
> - **Anthem Blue Cross and Blue Shield is committed to protecting the confidentiality of Social Security numbers and other Personal Information.**
>
> - **Anthem Blue Cross and Blue Shield's Privacy Policy imposes a number of standards to:**
>   - **guard the confidentiality of Social Security numbers and other personal information,**
>   - **prohibit the unlawful disclosure of Social Security numbers, and**
>   - **limit access to Social Security numbers.**
>
> Anthem Blue Cross and Blue Shield will not use or share Social Security numbers or personal information with anyone outside the company except when permitted or required by federal and state law.
> **Anthem Blue Cross and Blue Shield Associates must only access Social Security**

---

[1] In some of their materials, Defendants utilized the term "Personal Health Information" ("PHI") to refer to health information and "Personally Identifiable Information" ("PII" or "PI") to refer to non-health individually identifiable information.

55

**numbers or personal information as required by their job duties. Anthem Blue Cross and Blue Shield has in place a minimum necessary policy which states that associates may only access, use or disclose Social Security numbers or personal information to complete a specific task and as allowed by law.**

**Anthem Blue Cross and Blue Shield safeguards Social Security numbers and other personal information by having physical, technical, and administrative safeguards in place.**

If you have questions regarding this policy, please contact Customer Service by dialing the number that is located on the back of your ID card.

(Emphasis added).  The exact language of this Policy has not changed since 2010, and on information and belief, for many years prior to that.

176.    Since at least 2010 (and on information and belief for many years prior to that), the Anthem website and the website for every Anthem BCBS Affiliate and for other Anthem Affiliates has posted this Personal Information (Including Social Security Number) Privacy Protection Policy in its entirety.   The Anthem and Anthem Blue Cross California webpages setting forth this Policy as it appeared during 2014 and 2015 are attached hereto as Exhibits 1-4.

177.    This Personal Information (Including Social Security Number) Privacy Protection Policy was made available to Anthem customers and the public in many Anthem documents and websites, and, as discussed further below, is incorporated as a term of Anthem and its Affiliates' individual and group insurance or benefits contracts, including the contracts between Anthem and its Affiliates' and Plaintiffs and Affected Individuals.

178.    At all times relevant to this litigation, Anthem and its Affiliates have maintained "Privacy" sections of their websites, where the Personal Information (Including Social Security Number) Privacy Protection Policy is posted.  The "Privacy" website of Anthem and its Affiliates has also stated, at all relevant times to this litigation, that:

Anthem is fully committed to the spirit and letter of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), including but not limited to the Privacy Rule that was issued pursuant to HIPAA. A major provision of the Privacy Rule is to safeguard sensitive, personal information about members. This information is referred to as Protected Health Information (PHI), and includes individually identifiable health care and demographic data. HIPAA allows Anthem to use and disclose certain member information for clearly defined treatment, payment and health care operations (TPO). However, members have the right to restrict the release of information about them beyond these uses. The Individual Authorization Form provides the means for members to identify who can see their PHI and what specific

56

> PHI can be seen for purposes other than TPO. If you need to have your PHI disclosed to someone outside of Anthem for purposes other than TPO, complete the form and submit it to your local Anthem office. This address is located on the back of your Anthem identification card. If you have questions, please contact your local customer service unit. The telephone number is on the back of your identification card.

Ex. 1-4.

179.    Anthem and its Affiliates also describe their privacy policies and practices in the annual Privacy Notices.  At all times relevant to this litigation, Anthem and its Affiliates all provided annual notices to customers required by federal and state law and made those notices available on their Privacy webpages.

180.    All times relevant to this litigation, and since at least 2010 (and on information and belief for many years prior), the "Privacy" sections of the Anthem and Anthem's BCBS Affiliate websites have stated:

> The Health Insurance Portability and Accountability Act of 1996 (HIPAA) Privacy Rule allows members the right to receive a notice that describes how individual health information may be used and/or disclosed and how to acquire access to this information. Anthem Blue Cross and its affiliated health plans are federally mandated to send a notice (Notice of Privacy Practices) to members of their fully insured health benefits plans.
> Anthem Blue Cross and its affiliated health plans have developed the following Notices of Privacy Practices based upon Federal and individual State regulations. Please select the appropriate link(s) below, as they apply to you.

Ex. 1-4.  The websites then contain hyperlinks to the privacy notice named: "Anthem Blue Cross and Blue Shield Privacy Practices" in English and Spanish.  At all times relevant to this litigation, Anthem's other non-BCBS Affiliates also posted similar representations on their Privacy websites.

181.    The Anthem privacy notices as they appeared in 2014 and 2015 are attached as Exhibit 5.  The Privacy Notices of Anthem's BCBS Affiliates are identical to the Anthem Privacy Notices.  These Privacy Notices contained descriptions of Anthem's privacy policies and practices and set forth in detail how those policies require Anthem and Anthem's BCBS Affiliates to protect and maintain the confidentiality of Personal Information, including:

> We may collect, use and share your nonpublic personal information (PI) as described in this notice. PI identifies a person and is often gathered in an insurance matter.
> We may collect PI about you from other persons or entities, such as doctors, hospitals, or other carriers. We may share PI with persons or entities outside of our company—without your OK in some cases. If we take part in an activity that would require us to give you a

chance to opt out, we will contact you. We will tell you how you can let us know that you do not want us to use or share your PI for a given activity. You have the right to access and correct your PI. Because PI is defined as any information that can be used to make judgements about your health, finances, character habits, hobbies, reputation, career and credibility, **we take reasonable safety measures to protect the PI we have about you.** A more detailed state notice is available upon request. Please call the phone number printed on your ID card.

Ex. 5 (emphasis added).

182.    These Privacy Notices also discussed Personal Health Information, and stated:

**We are dedicated to protecting your PHI, and have set up a number of policies and practices to help make sure your PHI is kept secure.**
**We have to keep your PHI private. If we believe your PHI has been breached, we must let you know.**
**We keep your oral, written and electronic PHI safe using physical, electronic, and procedural means. These safeguards follow federal and state laws. Some of the ways we keep your PHI safe include securing offices that hold PHI, password-protecting computers, and locking storage areas and filing cabinets. We require our employees to protect PHI through written policies and procedures. These policies limit access to PHI to only those employees who need the data to do their job.** Employees are also required to wear ID badges to help keep people who do not belong out of areas where sensitive data is kept. Also, where required by law, our affiliates and nonaffiliates must protect the privacy of data we share in the normal course of business. They are not allowed to give PHI to others without your written OK, except as allowed by law and outlined in this notice.

Ex. 5 (emphasis added).

183.    These Privacy Notices also promise to keep the "financial information of our current and former members private, as required by law, accreditation standards, and our rules." Ex. 5.

184.    These Privacy Notices also promise to follow state and federal law: "HIPAA (the federal privacy law) generally does not pre-empt, or override, other laws that give people greater privacy protections. As a result, if any state or federal privacy law requires us to provide you with more privacy protections, then we must also follow that law in addition to HIPAA." Ex. 5.

185.    At all times relevant to this litigation, Anthem's other non-BCBS Affiliates also posted Privacy Notices on their websites containing specific policies and practices to maintain the confidentiality of members' personal information substantially similar to Anthem's Privacy Notices.

186.    On information and belief, in all years relevant to this litigation, in addition to making the then-current annual notices always available online, Anthem and its Affiliates all mailed by post or e-electronic mail the same annual privacy notices to individuals as well as to members enrolled in

Anthem Affiliate group plans.  Anthem gave its customers the option of electing to receive correspondence electronically, including the required annual Privacy Notices.

187.    Many documents provided by Anthem and its Affiliates to customers, including as discussed further below their contract documents, referred to these Privacy policies and notices and encouraged customers to view online the information regarding their privacy policies and practices set forth in those notices.

188.    At all times relevant to this litigation, Anthem and its Affiliates advertised their services on their websites, including advertising privacy policies.  Individuals or employers interested in purchasing insurance from Anthem and its Affiliates can review the information provided by Anthem and its Affiliates regarding individual plans, including the privacy policies, can "Get a Quote," and can complete and submit an application through the websites.

189.    In addition, for example, advertising materials that Anthem makes available on its website describing all of the individual plans that it sells state, under "Important Plan Information" that:  "As a member, you have rights and responsibilities. **You have the right to expect the privacy of your personal health information to be protected, consistent with state and federal laws and our policies.**"  (Emphasis added).  Likewise, the materials describing group plans refer to privacy policies under the "General Provisions" applicable to all plans.   On information and belief, at all times pertaining to this lawsuit Anthem and its Affiliates all included references to Anthem's privacy policies and websites in materials advertising Anthem's services and plans to potential customers.

190.    In addition, Anthem and its Affiliates all provide links to the privacy policies from other areas of Anthem's websites.  For example, Anthem California has a FAQ (Frequently Asked Questions) page on Anthem's website where Anthem provides the following question: "What is HIPAA and what are my privacy rights at Anthem California?"  Anthem then provides as the answer, the link to Anthem's Privacy website, containing Anthem's Privacy policies and notices.

191.    The Anthem and Affiliate websites, Privacy Notices, advertisements, and other documents described above, and contract documents described below, are only some of the many documents in which Anthem and its Affiliates set forth their privacy policies and commitments to maintain the confidentiality of member's personal and medical information, including documents

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1 provided to Affected Individuals, the public, business associates, and the government.

2      192. Anthem and its Affiliates provided documents containing their privacy policies, and

3 made those policies available online, to all Affected Individuals at the time that all Affected

4 Individuals enrolled and paid premiums for insurance and/or health benefits policies and plans sold by

5 Anthem and its Affiliates.

6      193. At no point in time prior to any Affected Individual enrolling in and paying premiums

7 for insurance and/or health benefits policies provided by Anthem and its Affiliates did Anthem or its

8 Affiliates ever inform any Affected Individual that Anthem did not comply with its privacy policies

9 with respect to personal information, including the Personal Information (Including Social Security

10 Number) Privacy Protection Policy or the representations regarding those policies and practices set

11 forth in Anthem's Privacy Notices.

12      194. At no point in time prior to any Affected Individual enrolling in and paying premiums

13 for insurance and/or health benefits policies provided by Anthem and its Affiliates did Anthem ever

14 inform any Affected Individual that Anthem:

- did not take reasonable measures to protect individuals' personal information from disclosure to third parties;

- did not use physical, electronic, or technical means to protect individuals' personal information from disclosure to third parties;

- permitted Anthem employees and/or associates to access individuals' personal information, including Social Security Numbers, when it was not necessary to perform their job duties;

- did not use double-factor authentication to protect access to individuals' personal information;

- maintained the Personal Information of all Anthem and Anthem Affiliate customers and Blue Card participants, among others, in a single Database that lacked adequate data security;

- did not destroy or otherwise remove Personal Information from Anthem's Database after a reasonable amount of time, or the time period as required by state or federal law;

- did not comply with industry standards for protecting personal or health-related information; and

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

- did not comply with state or federal laws pertaining to the confidentiality of personal and health-related information.

195.     Plaintiffs and Affected Individuals would not have enrolled in, purchased or otherwise paid premiums to Anthem and its Affiliates for insurance or health benefits services had Anthem and its Affiliates disclosed that they did not have adequate safeguards, procedures and systems to reasonably protect their members' data security.

**b.     Anthem's Insurance and Health Benefits Contracts Include Anthem's Privacy Policies**

196.     When Anthem and its Affiliates sell insurance and health benefits services, they enter into contracts with the individuals they insure and to whom they provide health benefits services, including all of the Affected Individuals who were enrolled as members of Anthem plans.  As set forth below, all of Anthem's and its Affiliates' contracts with Affected Individuals included as binding contract terms Anthem's privacy policies.[2]

197.     In the "Glossary" of terms made available to the public and all Anthem customers on Anthem's website, Anthem defines "Member" as "[a]ny person who is enrolled in and covered by a Health Benefit Plan."

198.     Anthem defines "Health Benefit Plan" as "a policy, contract, evidence of coverage, certificate or agreement issued by a Health Plan to provide, deliver, arrange for, pay for or reimburse any of the costs of health care services."  The Health Benefit Plans sold by Anthem and its Affiliates include insurance policies and other types of health benefit contracts including but not limited to Health Maintenance Organization ("HMO") policies.

199.     Anthem defines "Contract" as "Health Benefit Plan."

200.     Plaintiffs and Affected Individuals who received insurance or health benefits services from Anthem and its Affiliates did so as a result of purchasing either individual policies from Anthem, or enrolling under the terms and conditions of a group contract with Anthem.

---

[2] Plaintiffs have attached hereto as Exhibits 6-12 documents pertaining to the California Plaintiffs who were enrolled in Anthem plans (Bronzo, Carter, Coonce, Kawai, Randrup, Solomon, Tharps) and discuss those documents as examples throughout this section.

61

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1

**(i)       Individual contracts**

2          201.     The many Plaintiffs and Affected Individuals who purchased individual insurance or

3    health benefits policies from Anthem and its Affiliates, entered into contracts with Anthem and its

4    Affiliates when they applied and paid for insurance and Anthem issued them a policy.

5          202.     Anthem provides the individuals who purchase insurance from it with contracts setting

6    forth the terms and conditions of their insurance policies.  Those individual policy documents are

7    sometimes called the "contract," the "policy agreement," or "Evidence of Coverage."

8          203.     For example, excerpts from the individual insurance policy contract (the "Combined

9    Evidence of Coverage and Disclosure Form") provided by Anthem to California Plaintiff Michael

10   Bronzo for 2015 coverage are attached hereto as Exhibit 6.  This document states clearly that the

11   Agreement set forth in the Evidence of Coverage and documents incorporated therein constitutes a

12   contract.  *Id*. at p.21.[3]

13         204.     Anthem, like all insurers, drafts its insurance policy contracts and provides them to its

14   Members. Plaintiffs and the Affected Individuals did not draft these contracts. On information and

15   belief, Anthem uses template documents to generate its insurance policy contracts provided to

16   customers, and these documents use language and structure that is consistent across plans (despite

17   containing differences in medical services covered, deductibles, and the like).

18         205.     Consideration for the services provided by Anthem and its Affiliates pursuant to these

19   individual contracts is the payment of premiums by Plaintiffs and Affected Individuals to Anthem, as

20   required by Anthem.  All of the Plaintiffs who purchased individual policies from Anthem and its

21   Affiliates paid premiums to Anthem and its Affiliates.

22         206.     For example, the Combined Evidence of Coverage provided by Anthem to California

23   Plaintiff Michael Bronzo states:  "*In consideration for the payment of the Premiums stated in this*

24   *Agreement, we will provide the services and benefits listed in this agreement to You and Your enrolled*

25

26   _____

27        [3] Because Anthem's insurance policies contracts consist of hundreds of pages describing medical
     benefits and coverage that are not relevant to the terms breached by Anthem and its Affiliates here,
     Plaintiffs have provided the relevant excerpts rather than attach the entire contract documents.  Page
28   citations are to the original document page numbers.

62

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

*Dependents.*" Ex. 6 at p.21 (emphasis added).  As set forth above, Mr. Bronzo paid Anthem premiums required by this insurance contract.

207.    The Plaintiffs and Affected Individuals whose information was disclosed in the Anthem Data Breach all entered into those individual policy contracts prior to the Anthem Data Breach in 2014 and 2015.  Anthem's privacy policies and notices remained the same at all relevant times to this litigation.  The individual policy contracts between Anthem and its Affiliates and Plaintiffs and Affected Individuals are generally ongoing, but in some instances may be superseded by a subsequent contract document when Anthem and its Affiliates changed the terms, and issued a new contract.  Where superseding contracts were issued by Anthem and its Affiliates for ongoing policies, the 2014 and 2015 policy contracts contain the governing terms.

208.    All of the individual policy contracts entered into between Plaintiffs and Affected Individuals and Anthem and its Affiliates incorporated Anthem's then-current privacy policies pertaining to personal information collected by Anthem in the course of doing business, including but not limited to the "Personal Information (Including Social Security Number) Privacy Protection Policy" and the information regarding Anthem's privacy policies and practices provided in then-current annual Privacy Notice available at the time of contract.

209.    Anthem and its Affiliates' individual policy contracts incorporated these policies either by setting forth or attaching Anthem's privacy policies and notices directly in or as an appendix to the contract document, or by incorporating those policies by express reference, such as by referring individuals to Anthem's websites setting forth those policies and practices.  As discussed above, Anthem has had privacy policies, including the policies set forth in its website and Privacy Notices at all times relevant to this litigation, and all of Anthem's and its Affiliates' contracts with Plaintiffs and Affected Individuals incorporated those privacy policies.

210.    As Plaintiffs allege above and as the attached examples reflect, Anthem and its Affiliates drafted all of the individual policy contracts to include references to Anthem's privacy policies and notices and to Anthem's websites where those privacy policies were set forth for its Members.  There is no material difference in the manner in which these contracts incorporate Anthem's privacy policies, which by Anthem's own terms are policies that are uniform across all

63

Anthem Members.

211.    For example, the 2015 Combined Evidence of Coverage contract between Anthem and Plaintiff Michael Bronzo (produced by Anthem in discovery as a plan document applicable to Mr. Bronzo) attached as Exhibit 6 expressly incorporates Anthem's privacy policies and practices, through repeated express references, including by:

- Express reference to Anthem's Notice of Privacy Practices and Anthem's website where privacy policies are located: "You have the right to receive a copy of the Notice of Privacy Practices.  You may obtain a copy by calling our customer service department at 1-855-383-7247 or by accessing our website at www.anthem/ca."  Ex. 6 at p.24.  (On information and belief, Anthem has used this language regarding the right to receive the Privacy Notice consistently in its individual policy contracts since at least 2009).

- Express reference to policies pertaining to the confidentiality of information gathered by Anthem from medical providers:  "We are entitled to receive from any Provider of service information about You that is necessary to administer claims on Your behalf according to federal/State law.  This right is subject to all applicable confidentiality requirements…  A STATEMENT DESCRIBING OUR POLICIES AND PROCEDURES FOR PRESERVING THE CONFIDENTIALITY OF MEDICAL RECORDS IS AVAILABLE AND WILL BE FURNISHED UPON REQUEST."  Ex. 6 at p.158 (emphasis in original).

- Attachment of the "Member Rights and Responsibilities" to the contract document:  Mr. Bronzo's contract also includes as "Appendix I" a statement of "Member Rights and Responsibilities," which states:  "As Your health care partner, we're committed to making sure Your rights are respected while providing Your health benefits."  Included in the "Rights" set forth by Anthem is:  "You have the right to: … Expect us to keep Your personal health information private.  This is as long as it follows State and federal laws and our privacy policies."  Ex. 6 at 187.

- Express reference to Anthem's website.  Mr. Bronzo's contract also repeatedly refers to the Anthem website for additional information regarding the terms and conditions of his contract with Anthem in general, and at all relevant times Anthem's website set forth Privacy policies pertaining to its Members.  Ex. 6 at p.24.

212.    All of Anthem and its Affiliates' contracts with Plaintiffs and Affected Individuals required Plaintiffs and Affected Individuals to provide Anthem and its Affiliates with Personal Information in the enrollment and claims process, and to allow Anthem and its Affiliates to obtain Personal Information from health care providers.   The privacy policies published by Anthem and its Affiliates and provided by Anthem and its Affiliates pertained to this Personal Information acquired by Anthem and its Affiliates pursuant to this contractual relationship.  In light of the contract language

64

and all of the information provided by Anthem and its Affiliates to Plaintiffs and Affected Individuals at the time of contract, it was objectively reasonable for Plaintiffs and Affected Individuals to understand their contracts to include Anthem and its Affiliate's privacy policies.

213.    In addition, all of the individual policy contracts with Plaintiffs and Affected Individuals entered into by Anthem and its Affiliates incorporated Anthem's promise to comply with applicable state and federal laws and regulations pertaining to the confidentiality of personal information.

214.    In addition to the information that was available at all times on Anthem and its Affiliates' websites, other documents provided to individual policyholder Plaintiffs and Affected Individuals, at or before the time of contract, also refer to Anthem's commitment to maintain the confidentiality of personal information, including Social Security Numbers.  For example, Anthem requires all individuals to submit applications for individual insurance policies that include personal information, including Social Security Numbers.  Anthem California's individual application form specifically states with respect to Social Security Numbers:

> Anthem is required by the IRS to collect this information. It is used for internal purposes only and will not be disclosed unless you select the health savings account option in this Application or to federal and state agencies as required by applicable law.

Other Anthem Affiliates make similar representations on their individual policy applications regarding maintaining the confidentiality of Social Security Numbers.

215.    As a result of the documents and information provided to them at the time of contract and throughout their relationship, it was objectively reasonable for Plaintiffs and Affected Individuals to understand their contracts with Anthem and its Affiliates to include the privacy policies and notices pertaining to the personal information about them that would be collected by Anthem and its Affiliates in the course of providing insurance and health benefits services to them pursuant to these contracts.

216.    Nowhere in any of the individual policy contracts between Plaintiffs and Anthem and its Affiliates does Anthem state that it did *not* intend to be contractually bound by its advertised and published privacy policies and notices.

217.    No other document provided by Anthem and its Affiliates to its customers at the time of

65

1  enrollment in their individual insurance and health benefits policies informed Plaintiffs that Anthem

2  did not intend to be contractually bound by its advertised and published privacy policies and notices.

3     **(ii)     Group contracts**

4     218.     The Plaintiffs and Affected Individuals who purchased their insurance or health

5  benefits from Anthem and its Affiliates as part of a group also entered into contracts with Anthem and

6  its Affiliates.

7     219.     In the "Glossary" of terms made available to the public and all Anthem customers on

8  Anthem's website, Anthem defines Group as an "employer, association or trust that applies for and

9  accepts Health Benefit Plans on behalf of its Members."

10     220.     Anthem defines "Subscriber" as "Eligible employees, retired employees or members of

11  the Group whose coverage is in effect and whose name appears on I.D. Cards. It also means the

12  individual in whose name a Contract is issued. The Subscriber can usually enroll dependents under

13  family coverage."

14     221.     Anthem defines "Contract Holder" as "Subscriber."

15     222.     Anthem defines "Premiums" as "The actual amount of money charged by the Health

16  Plan for active coverage. Part of the premium may be paid by an employer and part may be paid by the

17  member themselves."

18     223.     Anthem and its Affiliates enter into contracts with the Group on whose behalf an

19  insurance policy or services plan is purchased, and individual Members who are eligible to participate

20  form their contracts with Anthem and its Affiliates by enrolling in that plan.  The contracts between

21  Plaintiffs and Affected Individuals who enrolled pursuant to group plans were therefore formed with

22  Anthem after a Group applied for and entered into an insurance policy or health benefits services

23  contract with Anthem, and when Plaintiffs and Affected Individuals enrolled as Subscribers/Members

24  under that group policy.  As the documents provided to Members by Anthem at the time of enrollment

25  make clear, once Plaintiffs enrolled, Anthem and its Affiliates were required to provide services and

26  benefits to those Plaintiffs, and the Plaintiff Members could enforce those contracts.

27     224.     The types of contracts entered into by Anthem and its Affiliates with Groups and their

28  Members include group insurance policies (in which Anthem is acting as the insurer of risk), group

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1  health benefits plans including HMOs, and employer or other group self-funded plans for which

2  Anthem and its Affiliates provide services other than insuring or funding health benefits, including

3  acting as the claims administrator.  Plaintiffs will refer to the latter type of group contract as an

4  Administrative Services Contract for a Self-Funded Plan.

5  225.  Anthem and its Affiliates issue two documents when creating a Group insurance policy

6  or health benefits plan:  the Plan Booklet (sometimes alternatively called Member Benefits Booklet,

7  Certificate, or Evidence of Coverage), and a Group Agreement.  The Group Agreement constitutes an

8  agreement between Anthem and its Affiliates and the Group, and incorporates the terms and

9  conditions in the Plan Booklet.  The Plan Booklet is the document provided at the time of enrollment

10  to Members.

11  226.  When an individual enrolls in a group policy or plan with Anthem and its Affiliates, he

12  forms a contract that includes the terms and conditions set forth in the documents pertaining to that

13  group policy or plan provided to that member by Anthem and its Affiliates at the time of enrollment,

14  which always will include the Plan Booklet.  Anthem and its Affiliates did not provide Plaintiffs or

15  Affected Individuals with copies of their Group Agreement for their group policy or plan at the time of

16  enrollment.

17  227.  For example, Plaintiff Kenneth Coonce enrolled in a group plan with Anthem Blue

18  Cross in California (an Anthem Blue Cross Small Group PPO plan offered by Mr. Coonce's

19  employer).  Upon enrollment, Mr. Coonce was provided the Plan Booklet (called an "Evidence of

20  Coverage" by Anthem Blue Cross of California). The Evidence of Coverage booklet provided by

21  Anthem to Mr. Coonce is dated 07-01-2012, and has not changed since that effective date, and was the

22  operative contract document applicable in 2014 and 2015.  Ex. 8-1.  Although that Plan Booklet states

23  that the contract is governed by the Group Agreement, the Group Agreement at all times also

24  incorporated the Plan Booklet provided to Mr. Coonce.  This is the standard structure for Anthem's

25  Group contracts, all of which expressly incorporate the Plan Booklets provided to Members.  See Ex.

26  8-2 at 2; 8-3 at 2. Relevant excerpts of the Group Agreements for 2014 and 2015, produced in

27  discovery by Anthem, for Mr. Coonce's employer group are attached as Ex. 8-2, 8-3.

28  228.  When Plaintiffs enrolled in their Group plans and thereby entered into contracts with

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

Anthem and its Affiliates governed by the terms and conditions set forth in the Plan Booklet provided by Anthem to Plaintiffs, consideration for that contract was provided by Plaintiffs to Anthem and its Affiliates in many forms, including the premiums paid by and on behalf of Plaintiffs to Anthem and its Affiliates, and Plaintiffs' performance under the terms and conditions of the contract, including by providing Anthem and its Affiliates with the personal and confidential information required by these contracts.

229.    All of the contracts between Plaintiffs and Affected Individual who enrolled with Anthem and its Affiliates pursuant to Group policies or plans and whose data was disclosed in the Anthem Data Breach were formed prior to the Anthem Data Breach in 2014 and 2015. These group policies and plans are written by Anthem to be ongoing and automatically renewing. To the extent that Anthem and its Affiliates changed the terms or price of any specific group plan, they issued new contract documents including new Plan Booklets that superseded the previous documents.

230.    Anthem and its Affiliates draft group policy contract documents, including the Plan Booklets provided to Members. Plaintiffs and the Affected Individuals did not draft these contract documents. On information and belief, Anthem and its Affiliates use template documents to generate insurance policy contract documents, provided to customers, and these documents use language and structure that is consistent across plans and types of plans.

231.    All of the group contracts under which Plaintiffs and Affected Individuals enrolled and thereby formed contracts with Anthem and its Affiliates incorporated Anthem and its Affiliates' then-current privacy policies pertaining to personal information, including but not limited to the "Personal Information (Including Social Security Number) Privacy Protection Policy" and the information regarding Anthem and its Affiliates' privacy policies and practices provided in then-current annual Privacy Notices available at the time of contract.

232.    The Plan Booklets provided to Plaintiffs and Affected Individuals by Anthem and its Affiliates incorporated these policies either by setting forth in or attaching Anthem and its Affiliates' privacy policies and notices directly to the Plan Booklet, or by incorporating those policies by express reference in the Plan Booklet and/or Group Agreement, such as by referring individuals to Anthem's websites setting forth those policies and practices. As discussed above, Anthem and its Affiliates have

68

had privacy policies, including the policies set forth in their website and Privacy Notices at all times relevant to this litigation, and all of Anthem and its Affiliates' contracts incorporated those privacy policies.

233.    For example, the Evidence of Coverage (Plan Booklet) provided by Anthem to Plaintiff Coonce stated, in language common to Anthem's group contract documents:

- "You also have the right to receive a copy of the Member Rights and Responsibilities Statement and/or the Notice of Privacy Practices. You may obtain either document by calling our customer service department toll free at (800)627-8797 or by accessing our website at www.anthem.com." Ex. 8-1 at p.1.

- "Receipt of Information.  We are entitled to receive from any provider of services information about you which is necessary to administer claims on your behalf….
  A STATEMENT DESCRIBING OUR POLICIES AND PROCEDURES REGARDING THE CONFIDENTIALITY OF MEDICAL RECORDS IS AVAILABLE AND WILL BE FURNISHED TO YOU UPON REQUEST.  Ex. 8-1 at p. 84.

- Anthem also attached the Anthem Privacy Notice (discussed above at ¶¶181-84) to the Evidence of Coverage. Ex. 8-1.

- Anthem also attached "Your Rights and Responsibilities as an Anthem Member" to the EOC, which states "You have the right to: … Privacy, when it comes to your personal health information, as long as it follows state and Federal laws, and our privacy rules." Ex. 8-1.

234.    All of Anthem and its Affiliates' contracts with Plaintiffs and Affected Individuals, and contracts with their Groups, required Plaintiffs and Affected Individuals to provide Anthem and its Affiliates with Personal Information in the enrollment and claims process, and to allow Anthem and its Affiliates to obtain Personal Information from health care providers.   The privacy policies published by Anthem and its Affiliates and provided by Anthem and its Affiliates pertained to this Personal Information acquired by Anthem and its Affiliates pursuant to this contractual relationship.  In light of the contract language and all of the information provided by Anthem and its Affiliates to Plaintiffs and Affected Individuals at the time of contract, it was objectively reasonable for Plaintiffs and Affected Individuals to understand their contracts and their Groups' contracts to include Anthem and its Affiliate's privacy policies.

235.    In addition, all of the group contracts under which Plaintiffs and Affected Individuals enrolled and thereby formed contracts with Anthem and its Affiliates incorporated Anthem's promise

69

1    to comply with applicable state and federal laws and regulations pertaining to the confidentiality of

2    personal information.

3        236.    The Group Agreement and Plan Booklet for all group policies and plans also constitute

4    a contract between Anthem and its Affiliates and the Group, and the individual Members enrolled in

5    that plan are the intended beneficiaries of those contracts.

6        237.    Anthem's Group Agreements also incorporate Anthem's existing privacy policies.  For

7    example, the Group Agreements for Mr. Coonce's group plan incorporate the Plan Booklet (Evidence

8    of Coverage) (Ex. 8-2 at 2; 8-3 at 2), which in turn incorporate Anthem's privacy policies and notices

9    (Ex. 8-1 at p.1).  Some Group Agreements also contain specific additional provisions committing to

10   maintain the confidentiality of information provided to Anthem.

11       238.    As discussed above, some Group plans sold by Anthem and its Affiliates provided

12   insurance or health benefits, and others were Administrative Services Contracts for a Self-Funded

13   Plans.

14       239.    Where Anthem entered into a contract only for Administrative Services, Anthem and

15   the Group purchasing the services entered into an "Administrative Services Contract."   In some cases

16   Anthem provided an Evidence of Coverage or Plan Booklet to Members enrolled in self-funded plans,

17   and in other cases the Group issued a Summary Plan Description regarding the employer's health

18   benefits plan.[4]

19       240.    The Administrative Services Contracts between Anthem and the Groups in which

20   Plaintiffs and Affected Individuals enrolled are contracts, and the individual Members enrolled in

21   those plans are the intended beneficiaries of those contracts, including specifically the contract terms

22   pertaining to the confidentiality of Members' information.

23       241.    All of Anthems' Administrative Services Contracts for Self-Funded Plans in which

24   Plaintiffs and Affected Individuals enrolled incorporated Anthem's then-current privacy policies

25

26       [4] A Summary Plan Description ("SPD") is a document required to be provided by an employer
     who offers Employee benefit plans covered by Employee Retirement Income Security Act (ERISA).
27   *See* 29 C.F.R. §2520.102-3(Contents of ERISA summary plan description);
     http://www.dol.gov/general/topic/health-plans/planinformation.  The SPD is not an insurance
28   contract, nor is it a document created or provided by Anthem.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

pertaining to personal information, including but not limited to the "Personal Information (Including Social Security Number) Privacy Protection Policy" and the information regarding Anthem's privacy policies and practices provided on Anthem's website at the time of contract. All contracts benefitting Plaintiffs and Affected Individuals were formed prior to the Anthem Data Breach. The relevant privacy policies were the same during the relevant time period.

242. For example, California Plaintiffs Daniel and Kelly Tharp enrolled in a group plan for which Anthem provided health benefits services pursuant to an Administrative Services Agreement between Anthem and the Ironworkers' Employees Benefit Corporation (IBEC), the Plan Administrator for a union welfare fund. Anthem did not provide insurance under this contract, as the health benefits were self-funded by the Group (a union welfare fund). Anthem provided other services, including claims administration, making payments to Providers on behalf of Members, and other services, as set forth in the group contract. The Tharps enrolled in a self-funded health benefits plan for which Anthem Blue Cross was the service provider, and thereby were the intended beneficiaries of the terms and conditions of the services contracts between Anthem and the IEBC. Like other Plaintiffs to whom Anthem provided services governed by a group contract, upon enrollment, Anthem issued the Tharps Anthem membership cards, and the Tharps were required to provide Anthem with confidential personal information to receive services from Anthem.

243. Anthem's group Administrative Services Agreements, including the example contract between Anthem and the IEBC that governed Plaintiff Tharps' plan, incorporate Anthem's privacy policies, and also contain additional specific provisions governing the use of Member personal information provided to Anthem in the course of doing business for the Members.

244. The Administrative Services Agreement between Anthem and the IEBC in effect from 2011 through 2014, and renewed in 2015 provides the terms and conditions that govern the Tharps' contracts with Anthem.[5] Ex. 12-1. That Agreement expressly incorporates by reference Anthem's then-current standard policies: "Anthem's standard policies and procedures, as they may be amended

_____

[5] Anthem produced in discovery to the Tharps the Administrative Services Agreement between Anthem and the IEBC effective from 2011 through 2014, that was renewed and amended in 2015.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1   from time-to-time, will be used in the provision of services specified in this Agreement." *Id*. at p.6.

2   Anthem's standard policies pertaining to privacy of information were set forth on Anthem's Privacy

3   website at all times.

4          245.    Like other services agreements entered into by Anthem, the Administrative Services

5   Agreement with the IEBC also specifically contains a section pertaining to confidential information.

6   Anthem specifically agrees that: "Each Party shall maintain the other Party's Information in strict

7   confidence, and shall institute commercially reasonable safeguards to protect the information."  (Ex.

8   12-1 at 14).   Other Administrative Services Agreements are similar.  See Ex. 10-1, 9-1, 13. (Relevant

9   excerpts of contracts pertaining to Plaintiffs Randrup, Kawai, and Gates).

10         246.    As a result of the documents and information provided to them at the time of contract

11  and throughout their relationship, it was objectively reasonable for Plaintiffs and Affected Individuals

12  who enrolled under group plans with Anthem and its Affiliates to understand their contracts with

13  Anthem and its Affiliates to include the privacy policies and notices pertaining to the personal

14  information about them that would be collected by Anthem in the course of providing the insurance

15  and health benefits services to them pursuant to these contracts.

16         247.    Nowhere in any of the contract documents between Plaintiffs and Anthem and its

17  Affiliates and individuals enrolled in group plans or with their Groups (including but not limited to the

18  Plan Booklet) do they state that Anthem and its Affiliates did *not* intend to be contractually bound by

19  its advertised and published privacy policies and notices.

20         248.    No other document provided by Anthem and its Affiliates to its customers at the time of

21  enrollment informed Plaintiffs that Anthem did not intend to be contractually bound by its advertised

22  and published privacy policies and notices.

23         249.    Some Plaintiffs and Affected Individuals received coverage for medical expenses

24  through ERISA-defined "employee welfare benefit plans."  29 U.S.C. §§1002(1), 1002(3).  Their

25  employer or group established these plans.  An employee welfare benefit plan is a promise by a

26  covered employer to provide certain benefits.  29 U.S.C. §1002(1).  ERISA plans must be maintained

27  pursuant to a written instrument.  29 U.S.C. §1102(a).  Anthem sells group insurance, health benefits,

28  or administrative services to ERISA plans.  Anthem's group insurance, health benefits, or service

"plans" are not "employee welfare benefit plans" as that term is used in ERISA, 29 U.S.C. §1002(1), 1002(3), and §1102(a).   In selling group insurance/health benefits/administrative services contracts to employers, Anthem does not necessarily become the ERISA Plan Administrator or ERISA fiduciary for any ERISA plan provided by the employer.  *See* Ex. 7-1 at 144; Ex. 8-2 at 4; Ex. 8-3 at 9; Ex. 12-1 at 2, 4, 8-9; Ex. 13 at 2-3, 10.

## 2.   Non-Anthem BCBS Defendants

### a.   The BlueCard Program

250.   According to Anthem, "The BlueCard program is a national program that enables members of one Blue Cross and Blue Shield (BCBS) Plan to obtain healthcare services while traveling or living in another Blue Cross and Blue Shield Plan's service area." BlueCard links participating health-care providers and the independent Blue Cross and Blue Shield Plans across the country through a single electronic network for outpatient and inpatient claims processing and reimbursement. The BlueCard program was established according to uniform rules created by the Blue Cross Blue Shield Association, and on information and belief, contracts between the participating entities including Anthem and the BCBS companies.  The data for claims processed in the BlueCard program is maintained by Anthem in the Anthem Database.

251.   When Plaintiffs and Affected Individuals who were enrolled in insurance or health benefits plans with the Non-Anthem Defendants used the BlueCard program, Non-Anthem Defendants provided Anthem with those Plaintiffs' and Affected Individual's Personal Information, which was consequently stored in the Anthem Data Base and disclosed in the Anthem Data Breach.

252.   Of the Affected Individuals whose data was stored in the Anthem Database and accessed in the Anthem Data Breach, at least 317,235 were enrolled in a health insurance or health benefits plan with Blue Cross Blue Shield of Alabama. The following chart sets forth the number of residents of each state who were Affected Individuals enrolled with Blue Cross Blue Shield of Alabama:

| State | Affected Individuals | State | Affected Individuals |
|---|---|---|---|
| Alabama | 49,201 | North Carolina | 2,757 |
| Alaska | 49 | North Dakota | 15 |
| Arizona | 676 | Nebraska | 277 |

73

| State | Individuals | State | Individuals |
|---|---|---|---|
| Arkansas | 712 | Nevada | 4,793 |
| California | 25,984 | New Hampshire | 2,415 |
| Colorado | 8,805 | New Jersey | 2,060 |
| Connecticut | 3,828 | New Mexico | 169 |
| Delaware | 56 | New York | 17,046 |
| D.C. | 60 | Ohio | 34,484 |
| Florida | 3,463 | Oklahoma | 377 |
| Georgia | 22,853 | Oregon | 167 |
| Hawaii | 31 | Pennsylvania | 1,150 |
| Idaho | 121 | Puerto Rico | 5 |
| Illinois | 3,888 | Rhode Island | 75 |
| Indiana | 32,646 | South Carolina | 1,304 |
| Iowa | 371 | South Dakota | 41 |
| Kansas | 340 | Tennessee | 2,614 |
| Kentucky | 34,450 | Texas | 2,250 |
| Louisiana | 376 | Utah | 187 |
| Maine | 3,515 | Vermont | 192 |
| Maryland | 637 | Virgin Islands | 0 |
| Massachusetts | 993 | Virginia | 22,681 |
| Michigan | 1,983 | Washington | 282 |
| Minnesota | 417 | West Virginia | 1,319 |
| Mississippi | 711 | Wisconsin | 10,371 |
| Missouri | 13,801 | Wyoming | 176 |
| Montana | 61 | **Total** | 317,235 |

253.    Of the Affected Individuals whose data was stored in the Anthem Database and accessed in the Anthem Data Breach, at least 280,997 were enrolled in a health insurance or health benefits plan with USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield. The following chart sets forth the number of residents of each state who were Affected Individuals enrolled with Arkansas Blue Cross and Blue Shield:

| State | Affected Individuals | State | Affected Individuals |
|---|---|---|---|
| Alabama | 942 | North Carolina | 1,799 |
| Alaska | 75 | North Dakota | 104 |
| Arizona | 985 | Nebraska | 307 |
| Arkansas | 28,584 | Nevada | 9,123 |
| California | 17,428 | New Hampshire | 2,644 |
| Colorado | 10,840 | New Jersey | 874 |
| Connecticut | 2,761 | New Mexico | 280 |
| Delaware | 132 | New York | 10,099 |
| D.C. | 15 | Ohio | 34,316 |
| Florida | 2,452 | Oklahoma | 1,073 |
| Georgia | 12,825 | Oregon | 380 |

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

| State | | State | |
|---|---:|---|---:|
| Hawaii | 16 | Pennsylvania | 853 |
| Idaho | 218 | Puerto Rico | 2 |
| Illinois | 4,355 | Rhode Island | 91 |
| Indiana | 31,266 | South Carolina | 1,102 |
| Iowa | 499 | South Dakota | 105 |
| Kansas | 890 | Tennessee | 1,941 |
| Kentucky | 23,569 | Texas | 2,682 |
| Louisiana | 508 | Utah | 887 |
| Maine | 2,737 | Vermont | 148 |
| Maryland | 355 | Virgin Islands | 0 |
| Massachusetts | 295 | Virginia | 18,985 |
| Michigan | 1,238 | Washington | 437 |
| Minnesota | 439 | West Virginia | 1,727 |
| Mississippi | 417 | Wisconsin | 15,606 |
| Missouri | 30,927 | Wyoming | 505 |
| Montana | 159 | **Total** | 280,997 |

254.   Of the Affected Individuals whose data was stored in the Anthem Database and accessed in the Anthem Data Breach, at least 119,176 were enrolled in a health insurance or health benefits plan with California Physicians' Service, Inc. d/b/a Blue Shield of California. The following chart sets forth the number of residents of each state who were Affected Individuals enrolled with Blue Shield of California:

| State | Affected Individuals | State | Affected Individuals |
|---|---:|---|---:|
| Alabama | 36 | North Carolina | 224 |
| Alaska | 22 | North Dakota | 8 |
| Arizona | 668 | Nebraska | 73 |
| Arkansas | 52 | Nevada | 12,140 |
| California | 63,702 | New Hampshire | 1,385 |
| Colorado | 9,542 | New Jersey | 232 |
| Connecticut | 2,195 | New Mexico | 62 |
| Delaware | 20 | New York | 815 |
| D.C. | 75 | Ohio | 5,583 |
| Florida | 464 | Oklahoma | 54 |
| Georgia | 2,343 | Oregon | 189 |
| Hawaii | 25 | Pennsylvania | 195 |
| Idaho | 80 | Puerto Rico | 3 |
| Illinois | 790 | Rhode Island | 17 |
| Indiana | 3,669 | South Carolina | 94 |
| Iowa | 39 | South Dakota | 25 |
| Kansas | 63 | Tennessee | 201 |
| Kentucky | 2,770 | Texas | 685 |
| Louisiana | 44 | Utah | 279 |

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

| State | Affected Individuals | State | Affected Individuals |
|---|---:|---|---:|
| Maine | 400 | Vermont | 43 |
| Maryland | 235 | Virgin Islands | 1 |
| Massachusetts | 364 | Virginia | 3,817 |
| Michigan | 229 | Washington | 281 |
| Minnesota | 96 | West Virginia | 83 |
| Mississippi | 28 | Wisconsin | 2,300 |
| Missouri | 2,311 | Wyoming | 56 |
| Montana | 69 | **Total** | **119,176** |

255.    Of the Affected Individuals whose data was stored in the Anthem Database and accessed in the Anthem Data Breach, at least 1,411,644 were enrolled in a health insurance or health benefits plan with Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Illinois. The following chart sets forth the number of residents of each state who were Affected Individuals enrolled with Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Illinois:

| State | Affected Individuals | State | Affected Individuals |
|---|---:|---|---:|
| Alabama | 2,189 | North Carolina | 5,291 |
| Alaska | 280 | North Dakota | 233 |
| Arizona | 4,513 | Nebraska | 831 |
| Arkansas | 1,652 | Nevada | 22,250 |
| California | 208,945 | New Hampshire | 6,589 |
| Colorado | 55,815 | New Jersey | 12,805 |
| Connecticut | 28,820 | New Mexico | 1,110 |
| Delaware | 453 | New York | 82,404 |
| D.C. | 654 | Ohio | 105,783 |
| Florida | 11,098 | Oklahoma | 2,327 |
| Georgia | 41,032 | Oregon | 1,312 |
| Hawaii | 361 | Pennsylvania | 4,605 |
| Idaho | 652 | Puerto Rico | 25 |
| Illinois | 265,801 | Rhode Island | 346 |
| Indiana | 168,871 | South Carolina | 3,802 |
| Iowa | 1,922 | South Dakota | 375 |
| Kansas | 1,932 | Tennessee | 5,318 |
| Kentucky | 77,450 | Texas | 12,684 |
| Louisiana | 1,409 | Utah | 1,157 |
| Maine | 5,306 | Vermont | 477 |
| Maryland | 3,210 | Virgin Islands | 12 |
| Massachusetts | 2,832 | Virginia | 51,737 |
| Michigan | 8,187 | Washington | 7,009 |
| Minnesota | 2,490 | West Virginia | 4,196 |
| Mississippi | 1,140 | Wisconsin | 106,989 |
| Missouri | 73,053 | Wyoming | 1,396 |
| Montana | 514 | **Total** | **1,411,644** |

76

256.    Of the Affected Individuals whose data was stored in the Anthem Database and accessed in the Anthem Data Breach, at least 113,725 were enrolled in a health insurance or health benefits plan with Blue Cross and Blue Shield of Florida, Inc. The following chart sets forth the number of residents of each state who were Affected Individuals enrolled with Blue Cross and Blue Shield of Florida:

| State | Affected Individuals | State | Affected Individuals |
|---|---|---|---|
| Alabama | 161 | North Carolina | 425 |
| Alaska | 7 | North Dakota | 12 |
| Arizona | 132 | Nebraska | 11 |
| Arkansas | 25 | Nevada | 1,104 |
| California | 5,049 | New Hampshire | 614 |
| Colorado | 2,223 | New Jersey | 617 |
| Connecticut | 1,154 | New Mexico | 40 |
| Delaware | 12 | New York | 4,197 |
| D.C. | 14 | Ohio | 3,142 |
| Florida | 77,427 | Oklahoma | 37 |
| Georgia | 3,957 | Oregon | 27 |
| Hawaii | 361 | Pennsylvania | 169 |
| Idaho | 10 | Puerto Rico | 4 |
| Illinois | 244 | Rhode Island | 22 |
| Indiana | 2,780 | South Carolina | 155 |
| Iowa | 11 | South Dakota | 5 |
| Kansas | 33 | Tennessee | 332 |
| Kentucky | 3,663 | Texas | 281 |
| Louisiana | 42 | Utah | 41 |
| Maine | 304 | Vermont | 40 |
| Maryland | 144 | Virgin Islands | 3 |
| Massachusetts | 117 | Virginia | 2,723 |
| Michigan | 129 | Washington | 37 |
| Minnesota | 21 | West Virginia | 95 |
| Mississippi | 44 | Wisconsin | 720 |
| Missouri | 775 | Wyoming | 27 |
| Montana | 6 | **Total** | 113,725 |

257.    Of the Affected Individuals whose data was stored in the Anthem Database and accessed in the Anthem Data Breach, at least 120,765 were enrolled in a health insurance or health benefits plan with CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield. The following chart sets forth the number of residents of each state who were Affected Individuals enrolled with

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

CareFirst of Maryland, Inc.:

| State | Affected Individuals | State | Affected Individuals |
|---|---|---|---|
| Alabama | 81 | North Carolina | 558 |
| Alaska | 132 | North Dakota | 10 |
| Arizona | 196 | Nebraska | 45 |
| Arkansas | 139 | Nevada | 2,154 |
| California | 11,930 | New Hampshire | 602 |
| Colorado | 4,759 | New Jersey | 995 |
| Connecticut | 2,274 | New Mexico | 66 |
| Delaware | 316 | New York | 4,369 |
| D.C. | 734 | Ohio | 6,662 |
| Florida | 811 | Oklahoma | 78 |
| Georgia | 1,161 | Oregon | 81 |
| Hawaii | 22 | Pennsylvania | 996 |
| Idaho | 34 | Puerto Rico | 0 |
| Illinois | 821 | Rhode Island | 33 |
| Indiana | 2,897 | South Carolina | 287 |
| Iowa | 84 | South Dakota | 15 |
| Kansas | 60 | Tennessee | 209 |
| Kentucky | 2,336 | Texas | 585 |
| Louisiana | 112 | Utah | 86 |
| Maine | 603 | Vermont | 102 |
| Maryland | 53,206 | Virgin Islands | 2 |
| Massachusetts | 294 | Virginia | 13,878 |
| Michigan | 303 | Washington | 232 |
| Minnesota | 96 | West Virginia | 1,096 |
| Mississippi | 86 | Wisconsin | 1,807 |
| Missouri | 2,257 | Wyoming | 60 |
| Montana | 13 | **Total** | 120,765 |

258.     Of the Affected Individuals whose data was stored in the Anthem Database and accessed in the Anthem Data Breach, at least 430,164 were enrolled in a health insurance or health benefits plan with Blue Cross and Blue Shield of Massachusetts, Inc. The following chart sets forth the number of residents of each state who were Affected Individuals enrolled with Blue Cross Blue Shield of Massachusetts, Inc.:

| State | Affected Individuals | State | Affected Individuals |
|---|---|---|---|
| Alabama | 184 | North Carolina | 1,425 |
| Alaska | 15 | North Dakota | 11 |
| Arizona | 710 | Nebraska | 215 |
| Arkansas | 153 | Nevada | 3,548 |
| California | 44,314 | New Hampshire | 60,017 |

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

| | | | |
|---|---:|---|---:|
| Colorado | 12,498 | New Jersey | 5,535 |
| Connecticut | 25,802 | New Mexico | 102 |
| Delaware | 125 | New York | 52,180 |
| D.C. | 454 | Ohio | 18,401 |
| Florida | 3,104 | Oklahoma | 95 |
| Georgia | 6,674 | Oregon | 312 |
| Hawaii | 42 | Pennsylvania | 1,802 |
| Idaho | 106 | Puerto Rico | 17 |
| Illinois | 2,451 | Rhode Island | 1,746 |
| Indiana | 15,756 | South Carolina | 668 |
| Iowa | 106 | South Dakota | 33 |
| Kansas | 249 | Tennessee | 583 |
| Kentucky | 5,993 | Texas | 1,550 |
| Louisiana | 170 | Utah | 254 |
| Maine | 14,039 | Vermont | 1,454 |
| Maryland | 1,263 | Virgin Islands | 12 |
| Massachusetts | 109,870 | Virginia | 16,408 |
| Michigan | 752 | Washington | 682 |
| Minnesota | 754 | West Virginia | 565 |
| Mississippi | 102 | Wisconsin | 9,593 |
| Missouri | 6,860 | Wyoming | 136 |
| Montana | 274 | **Total** | 430,164 |

259.    Of the Affected Individuals whose data was stored in the Anthem Database and accessed in the Anthem Data Breach, at least 455,854 were enrolled in a health insurance or health benefits plan with Blue Cross Blue Shield of Michigan. The following chart sets forth the number of residents of each state who were Affected Individuals enrolled with Blue Cross Blue Shield of Michigan:

| State | Affected Individuals | State | Affected Individuals |
|---|---:|---|---:|
| Alabama | 948 | North Carolina | 1,978 |
| Alaska | 39 | North Dakota | 19 |
| Arizona | 1,331 | Nebraska | 111 |
| Arkansas | 386 | Nevada | 7,047 |
| California | 22,887 | New Hampshire | 1,338 |
| Colorado | 11,969 | New Jersey | 2,073 |
| Connecticut | 9,597 | New Mexico | 119 |
| Delaware | 269 | New York | 10,311 |
| D.C. | 115 | Ohio | 65,047 |
| Florida | 4,654 | Oklahoma | 300 |
| Georgia | 10,656 | Oregon | 255 |
| Hawaii | 48 | Pennsylvania | 1,169 |
| Idaho | 75 | Puerto Rico | 28 |
| Illinois | 6,222 | Rhode Island | 61 |

79

| | | | | |
|---|---|---|---|---|
| Indiana | 61,059 | | South Carolina | 1,083 |
| Iowa | 404 | | South Dakota | 94 |
| Kansas | 396 | | Tennessee | 2,456 |
| Kentucky | 30,122 | | Texas | 1,924 |
| Louisiana | 152 | | Utah | 189 |
| Maine | 982 | | Vermont | 130 |
| Maryland | 840 | | Virgin Islands | 6 |
| Massachusetts | 469 | | Virginia | 10,534 |
| Michigan | 133,012 | | Washington | 292 |
| Minnesota | 381 | | West Virginia | 1,123 |
| Mississippi | 241 | | Wisconsin | 19,967 |
| Missouri | 30,759 | | Wyoming | 135 |
| Montana | 52 | | **Total** | 455,854 |

260.    Of the Affected Individuals whose data was stored in the Anthem Database and accessed in the Anthem Data Breach, at least 351,419 were enrolled in a health insurance or health benefits plan with Blue Cross Blue Shield of Minnesota. The following chart sets forth the number of residents of each state who were Affected Individuals enrolled with Blue Cross Blue Shield of Minnesota:

| State | Affected Individuals | | State | Affected Individuals |
|---|---|---|---|---|
| Alabama | 378 | | North Carolina | 1,339 |
| Alaska | 69 | | North Dakota | 452 |
| Arizona | 1,490 | | Nebraska | 718 |
| Arkansas | 426 | | Nevada | 5,338 |
| California | 59,499 | | New Hampshire | 1,926 |
| Colorado | 20,685 | | New Jersey | 2,833 |
| Connecticut | 10,835 | | New Mexico | 241 |
| Delaware | 85 | | New York | 17,570 |
| D.C. | 70 | | Ohio | 29,261 |
| Florida | 2,513 | | Oklahoma | 336 |
| Georgia | 5,302 | | Oregon | 562 |
| Hawaii | 74 | | Pennsylvania | 1,182 |
| Idaho | 425 | | Puerto Rico | 5 |
| Illinois | 6,773 | | Rhode Island | 94 |
| Indiana | 25,114 | | South Carolina | 528 |
| Iowa | 1,716 | | South Dakota | 545 |
| Kansas | 1,049 | | Tennessee | 1,077 |
| Kentucky | 12,103 | | Texas | 2,578 |
| Louisiana | 152 | | Utah | 453 |
| Maine | 1,290 | | Vermont | 159 |
| Maryland | 780 | | Virgin Islands | 1 |
| Massachusetts | 1,013 | | Virginia | 13,240 |

80

| | | | | |
|---|---|---|---|---|
| Michigan | 1,597 | Washington | 859 |
| Minnesota | 38,563 | West Virginia | 723 |
| Mississippi | 149 | Wisconsin | 56,704 |
| Missouri | 19,876 | Wyoming | 360 |
| Montana | 309 | **Total** | 351,419 |

261.    Of the Affected Individuals whose data was stored in the Anthem Database and

accessed in the Anthem Data Breach, at least 510,525 were enrolled in a health insurance or health

benefits plan with Horizon Healthcare Services d/b/a/ Blue Cross Blue Shield of New Jersey. The

following chart sets forth the number of residents of each state who were Affected Individuals enrolled

with Horizon Healthcare Services d/b/a/ Blue Cross Blue Shield of New Jersey:

| State | Affected Individuals | State | Affected Individuals |
|---|---|---|---|
| Alabama | 328 | North Carolina | 2,397 |
| Alaska | 25 | North Dakota | 11 |
| Arizona | 874 | Nebraska | 197 |
| Arkansas | 219 | Nevada | 3,992 |
| California | 38,840 | New Hampshire | 4,411 |
| Colorado | 11,260 | New Jersey | 212,781 |
| Connecticut | 19,981 | New Mexico | 131 |
| Delaware | 461 | New York | 84,037 |
| D.C. | 92 | Ohio | 24,135 |
| Florida | 4,250 | Oklahoma | 142 |
| Georgia | 9,156 | Oregon | 167 |
| Hawaii | 42 | Pennsylvania | 7,116 |
| Idaho | 80 | Puerto Rico | 50 |
| Illinois | 3,935 | Rhode Island | 302 |
| Indiana | 20,099 | South Carolina | 1,242 |
| Iowa | 213 | South Dakota | 43 |
| Kansas | 227 | Tennessee | 824 |
| Kentucky | 10,770 | Texas | 1,948 |
| Louisiana | 174 | Utah | 228 |
| Maine | 2,857 | Vermont | 427 |
| Maryland | 914 | Virgin Islands | 0 |
| Massachusetts | 2,817 | Virginia | 18,333 |
| Michigan | 1,389 | Washington | 343 |
| Minnesota | 658 | West Virginia | 946 |
| Mississippi | 106 | Wisconsin | 5,872 |
| Missouri | 10,581 | Wyoming | 63 |
| Montana | 39 | **Total** | 510,525 |

262.    Of the Affected Individuals whose data was stored in the Anthem Database and

81

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

accessed in the Anthem Data Breach, at least 203,935 were enrolled in a health insurance or health benefits plan with Blue Cross and Blue Shield of North Carolina. The following chart sets forth the number of residents of each state who were Affected Individuals enrolled with Blue Cross and Blue Shield of North Carolina:

| State | Affected Individuals | State | Affected Individuals |
|---|---|---|---|
| Alabama | 306 | North Carolina | 78,866 |
| Alaska | 11 | North Dakota | 21 |
| Arizona | 479 | Nebraska | 41 |
| Arkansas | 162 | Nevada | 1,294 |
| California | 13,733 | New Hampshire | 1,029 |
| Colorado | 6,197 | New Jersey | 977 |
| Connecticut | 2,474 | New Mexico | 60 |
| Delaware | 46 | New York | 12,228 |
| D.C. | 84 | Ohio | 13,224 |
| Florida | 1,386 | Oklahoma | 98 |
| Georgia | 6,896 | Oregon | 91 |
| Hawaii | 13 | Pennsylvania | 563 |
| Idaho | 25 | Puerto Rico | 6 |
| Illinois | 814 | Rhode Island | 40 |
| Indiana | 9,862 | South Carolina | 2,062 |
| Iowa | 165 | South Dakota | 25 |
| Kansas | 123 | Tennessee | 790 |
| Kentucky | 8,844 | Texas | 673 |
| Louisiana | 58 | Utah | 121 |
| Maine | 892 | Vermont | 124 |
| Maryland | 536 | Virgin Islands | 5 |
| Massachusetts | 324 | Virginia | 29,821 |
| Michigan | 387 | Washington | 109 |
| Minnesota | 170 | West Virginia | 917 |
| Mississippi | 61 | Wisconsin | 2,720 |
| Missouri | 3,893 | Wyoming | 60 |
| Montana | 29 | **Total** | 203,935 |

263.    Of the Affected Individuals whose data was stored in the Anthem Database and accessed in the Anthem Data Breach, at least 477,966 were enrolled in a health insurance or health benefits plan with Highmark Inc. d/b/a Highmark Blue Shield. The following chart sets forth the number of residents of each state who were Affected Individuals enrolled with Highmark Inc. d/b/a Highmark Blue Shield:

| State | Affected Individuals | State | Affected Individuals |
|---|---|---|---|

82

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

| State | | State | |
|---|---|---|---|
| Alabama | 1,163 | North Carolina | 2,407 |
| Alaska | 64 | North Dakota | 60 |
| Arizona | 1,231 | Nebraska | 1,965 |
| Arkansas | 633 | Nevada | 6,279 |
| California | 39,139 | New Hampshire | 2,423 |
| Colorado | 17,555 | New Jersey | 2,521 |
| Connecticut | 7,071 | New Mexico | 199 |
| Delaware | 163 | New York | 19,870 |
| D.C. | 173 | Ohio | 99,138 |
| Florida | 4,363 | Oklahoma | 347 |
| Georgia | 9,845 | Oregon | 468 |
| Hawaii | 43 | Pennsylvania | 55,535 |
| Idaho | 348 | Puerto Rico | 14 |
| Illinois | 9,281 | Rhode Island | 87 |
| Indiana | 72,635 | South Carolina | 1,414 |
| Iowa | 631 | South Dakota | 105 |
| Kansas | 496 | Tennessee | 2,789 |
| Kentucky | 34,121 | Texas | 3,007 |
| Louisiana | 803 | Utah | 446 |
| Maine | 2,521 | Vermont | 305 |
| Maryland | 1,387 | Virgin Islands | 3 |
| Massachusetts | 1,012 | Virginia | 28,490 |
| Michigan | 2,338 | Washington | 686 |
| Minnesota | 903 | West Virginia | 10,812 |
| Mississippi | 301 | Wisconsin | 12,147 |
| Missouri | 17,228 | Wyoming | 857 |
| Montana | 144 | **Total** | 477,966 |

264.    Of the Affected Individuals whose data was stored in the Anthem Database and accessed in the Anthem Data Breach, at least 422,731 were enrolled in a health insurance or health benefits plan with Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Texas. The following chart sets forth the number of residents of each state who were Affected Individuals enrolled with Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Texas:

| State | Affected Individuals | State | Affected Individuals |
|---|---|---|---|
| Alabama | 892 | North Carolina | 1,541 |
| Alaska | 117 | North Dakota | 422 |
| Arizona | 1,348 | Nebraska | 264 |
| Arkansas | 723 | Nevada | 8,224 |
| California | 82,507 | New Hampshire | 4,221 |
| Colorado | 42,066 | New Jersey | 1,964 |
| Connecticut | 5,205 | New Mexico | 1,270 |
| Delaware | 86 | New York | 12,509 |

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

| State | Value | State | Value |
|---|---|---|---|
| D.C. | 88 | Ohio | 34,290 |
| Florida | 2,815 | Oklahoma | 1,954 |
| Georgia | 11,607 | Oregon | 368 |
| Hawaii | 72 | Pennsylvania | 1,729 |
| Idaho | 191 | Puerto Rico | 17 |
| Illinois | 4,598 | Rhode Island | 121 |
| Indiana | 19,110 | South Carolina | 883 |
| Iowa | 309 | South Dakota | 92 |
| Kansas | 586 | Tennessee | 1,757 |
| Kentucky | 20,736 | Texas | 94,803 |
| Louisiana | 1,710 | Utah | 822 |
| Maine | 3,190 | Vermont | 158 |
| Maryland | 791 | Virgin Islands | 7 |
| Massachusetts | 1,025 | Virginia | 21,352 |
| Michigan | 1,297 | Washington | 685 |
| Minnesota | 714 | West Virginia | 2,454 |
| Mississippi | 430 | Wisconsin | 11,891 |
| Missouri | 14,583 | Wyoming | 1,899 |
| Montana | 238 | **Total** | 422,731 |

265.    Of the Affected Individuals whose data was stored in the Anthem Database and accessed in the Anthem Data Breach, at least 18,362 were enrolled in a health insurance or health benefits plan with Blue Cross and Blue Shield of Vermont. The following chart sets forth the number of residents of each state who were Affected Individuals enrolled Blue Cross and Blue Shield of Vermont:

| State | Affected Individuals | State | Affected Individuals |
|---|---|---|---|
| Alabama | 5 | North Carolina | 40 |
| Alaska | 1 | North Dakota | 0 |
| Arizona | 18 | Nebraska | 2 |
| Arkansas | 1 | Nevada | 20 |
| California | 484 | New Hampshire | 2,205 |
| Colorado | 135 | New Jersey | 51 |
| Connecticut | 317 | New Mexico | 2 |
| Delaware | 0 | New York | 1,902 |
| D.C. | 18 | Ohio | 382 |
| Florida | 70 | Oklahoma | 2 |
| Georgia | 67 | Oregon | 5 |
| Hawaii | 0 | Pennsylvania | 18 |
| Idaho | 6 | Puerto Rico | 0 |
| Illinois | 20 | Rhode Island | 5 |
| Indiana | 56 | South Carolina | 17 |
| Iowa | 1 | South Dakota | 1 |

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

| Kansas | 3 | Tennessee | 11 |
|---|---|---|---|
| Kentucky | 100 | Texas | 15 |
| Louisiana | 1 | Utah | 4 |
| Maine | 1,010 | Vermont | 10,887 |
| Maryland | 24 | Virgin Islands | 0 |
| Massachusetts | 132 | Virginia | 195 |
| Michigan | 22 | Washington | 4 |
| Minnesota | 3 | West Virginia | 1 |
| Mississippi | 0 | Wisconsin | 66 |
| Missouri | 23 | Wyoming | 6 |
| Montana | 4 | **Total** | 18,362 |

b.      **The Fourteen Non-Anthem Defendants' Privacy Policies, Representations, and Omissions**

266.     At all times relevant to this litigation, all Non-Anthem BCBS Defendants made representations to their customers and the public regarding their policies and practices for maintaining and protecting the confidentiality of personal and health-related information, including on their websites and in many documents made available to Plaintiffs and Affected Individuals.

267.     At all times relevant to this litigation, all non-Anthem BCBS Defendants posted descriptions of their privacy practices for safeguarding their members' Personal Information on their websites.

268.     At all times relevant to this litigation, all non-Anthem BCBS Defendants posted online and mailed to their customers Privacy Notices setting forth their commitment to comply with applicable state and federal laws and their policies with respect to safeguarding Personal Information in compliance with state and federal laws.

269.     The website homepage of each of the fourteen Non-Anthem BCBS Defendants has at all times relevant to this litigation contained a link to that entity's privacy practices and notices explaining to their customers its duties and practices with respect to maintaining the confidentiality of personal and financial information.  In these notices, all of the Non-Anthem BCBS Defendants state that they will maintain the confidentiality of Members' personal and financial information, including by imposing procedural and technical safeguards.

270.     The Non-Anthem BCBS Defendants' BCBS Privacy Notices set forth on their websites also all state that they will use or disclose Members' personal and financial information for limited,

85

enumerated purposes. Among the enumerated purposes are providing information to "business associates." The Non-Anthem BCBS Defendants tell their customers that they will require business associates to agree to maintain the confidentiality of Member's information.

271. For example, at all times relevant to this litigation Blue Shield of California represented in its "Notice of privacy practices" available on its website:

> "At Blue Shield, we understand the importance of keeping your personal information private, and we take our obligation to do so very seriously....We maintain physical, technical, and administrative safeguards to ensure the privacy of your PHI. To protect your privacy, only Blue Shield workforce members who are authorized and trained are given access to our paper and electronic records and to non-public areas where this information is stored....Please note that before we share your PHI, we obtain the vendor's or accreditation organization's written agreement to protect the privacy of your PHI."

The full text of Blue Shield of California's "Notice of privacy practices" is attached hereto as Exhibit 15-3, *see also* 15-4.

272. Each of the Non-Anthem Defendants made available its privacy policies to its customers and the public in many documents and websites, and as discussed further below, these policies and representations regarding maintaining and protecting the confidentiality of Personal Information were incorporated as a term of every Non-Anthem Defendant's insurance and health benefits contracts.

273. At no point in time prior to any Plaintiff or other Affected Individual enrolling in and paying premiums for insurance and/or health benefits policies sold by the Non-Anthem BCBS Defendants did any Non-Anthem BCBS Defendant ever inform any Plaintiff or other Affected Individual that it did not comply with its privacy policies pertaining to Personal Information.

274. Nor did any Non-Anthem Defendant ever inform any Plaintiff or other Affected Individual that it:

- Did not take reasonable measures to determine whether Anthem maintained or required sufficient data security protections for the Anthem Database in which members' Personal Information was stored as a result of the BlueCard program;

- Did not take reasonable measures to determine whether Anthem could protect individuals' Personal Information from disclosure to third parties.

- Did not take reasonable measures to insure that Anthem was destroying or otherwise

86

removing the Personal Information of Non-Anthem Defendants' members from the Anthem Database after a reasonable amount of time, or the time period as required by state or federal law.

- Did not take reasonable measures to determine whether Anthem was using technology or processes such as two-factor authentication or encryption to protect the Personal Information of Non-Anthem Defendants' members;

- Did not take reasonable measures to determine whether Anthem was properly auditing its Database access to determine (and potentially halt) any improper access or breaches;

- Did not take reasonable measures to determine whether Anthem was complying with federal or state requirements pertaining to the security of Personal Information of Non-Anthem Defendants' members.

275.    Plaintiffs and Affected Individuals would not have purchased or otherwise paid premiums to the Non-Anthem BCBS Defendants for insurance or health benefits services, including the BlueCard program, had the Non-Anthem BCBS Defendants disclosed that they did not have adequate procedures to protect their Members' Personal Information, and that they did not ensure that entities with whom they did business, including the BlueCard program had adequate safeguards, procedures and systems to reasonably protect the Non-Anthem BCBS Defendants' members' personal information.

c.    **Each of the Fourteen Non-Anthem Defendants' Insurance and Health Benefits Contracts Include Specific Privacy Promises**

276.    The Non-Anthem Defendants enter into individual and group insurance contracts and administrative service agreements in substantially the same manner as set forth above with respect to Anthem, and create contract documents in substantially the same form as described above with respect to Anthem (i.e., individual policy documents and group contracts in which individuals enroll subject to the terms and conditions set forth in a Plan Booklet).  On information and belief, each of the Non-Anthem Defendants 1) drafted the contract documents provided to their customers and 2) used template documents that contained uniform language and structure to create their group and individual policy contract documents and administrative service agreements.

277.    All Plaintiffs and Affected Individuals who purchased insurance and health benefits services from the Non-Anthem Defendants formed contracts directly with a Non-Anthem Defendant

1    by purchasing an individual policy or enrolling in a group plan, and were the intended beneficiaries of

2    group agreements between the Non-Anthem Defendants and groups of which Plaintiffs and Affected

3    Individuals were enrolled as a Member, including self-funded plans for which Non-Anthem

4    Defendants provided administrative services.

5         278.    All Plaintiffs and Affected Individuals who purchased insurance and health benefits

6    services from a Non-Anthem Defendant (and whose personal information was transferred to Anthem

7    and ultimately disclosed in the Anthem Data Breach) formed their contracts with a Non-Anthem

8    Defendant prior to the Anthem Data Breach.  As with Anthem, for Plaintiffs who entered into ongoing

9    contracts prior to 2014, if the Non-Anthem Defendant altered the plan terms and issued a new Plan

10   Booklet or contract, the operative contract documents are the documents in effect in 2014 and 2015.

11   All Plaintiffs and Affected Individuals (and their employers on their behalf) paid premiums to the

12   Non-Anthem Defendant with whom they entered into a contract for insurance or health benefits,

13   and/or for group plans, had premiums or fees paid on their behalf.

14        279.    Each of the Non-Anthem BCBS Defendants provided documents containing their

15   privacy policies, and made those policies available online, to their Affected Individual customers prior

16   to those customers enrolling and paying premiums for insurance and/or health benefits policies

17   provided by the Non-Anthem BCBS Defendants.

18        280.    The contracts with Plaintiffs and Affected individuals entered into by the Non-Anthem

19   Defendants all incorporated the then-current privacy policies and notices set forth on that Non-Anthem

20   Defendant's website.

21        281.    The contract documents provided by each of the Non-Anthem Defendants to their

22   Plaintiff and Affected Individual customers contained contract terms committing to maintain the

23   confidentiality of personal information.

24        282.    For example, the 2014 and 2015 "About Your Benefits" Plan Booklet from Horizon

25   Blue Cross Blue Shield of New Jersey (Horizon BCBSBJ"), the Privacy Policy posted on Horizon

26   BCBSNJ's website, and, on information and belief, Horizon BCBSNJ's mailed Privacy Notice, all

27   stated:

28        NOTICE OF INFORMATION PRIVACY PRACTICES

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

**Horizon Blue Cross Blue Shield of New Jersey and its affiliated companies want you to know that we recognize out obligation to keep information about you secure and confidential**. . . . [W]e do not share your information except to conduct our business[.] As required by law, we publish this Notice to explain the information that we collect and how we maintain, use and disclose it in administering your benefits. **We will abide by the statements made in this Notice.** Except as permitted by law and as explained in this Notice, we do not disclose any information about our past, present or future customers to anyone. When we use the term 'Customer Information,' we are referring to financial or health information that is 'nonpublic,' including any information from which a judgment could possibly be made about you. When we use the term 'Protected Health Information' or 'PHI,' we are referring to individually identifiable oral, written and electronic information concerning the provision of, or payment for, health care to you. We refer to Customer Information and PHI collectively as 'Private Information.'

…

HOW DO WE PROTECT PRIVATE INFORMATION?

Our employees get training regarding the need to maintain your Private Information in the strictest confidence. They agree to be bound by that promise of confidentiality and are subject to disciplinary action if they violate that promise. **We also maintain appropriate administrative, technical and physical safeguards to reasonably protect your Private Information. In addition, in those situations where we rely on a third party to perform business, professional or insurance services or functions for us, that third party must agree to safeguard your Private Information. That business associate must also agree to use it only as required to perform its functions for us and as otherwise permitted by our contract and the law.** Finally, if we or our business associate causes a 'breach' of privacy as that term is defined under federal law, we will notify you without unreasonable delay of the occurrence. In these ways, we carry out our confidentiality commitments to you. (Emphasis added).

Relevant excerpts of the Horizon Blue Cross Blue Shield New Jersey Benefits Booklet and the Privacy Notice posted on its website are attached hereto as Ex. 14-1, 14-2 (Plaintiff Ames 2014 and 2015 contract documents with Horizon BCBSNJ); Ex. 14-3 (Horizon BCBSNJ website and privacy notices as set forth in 2014 and 2015).

283.    All of Non-Anthem Defendants' contracts with Plaintiffs and Affected Individuals required Plaintiffs and Affected Individuals to provide the Non-Anthem Defendants with Personal Information in the enrollment and claims process, and to allow the Non-Anthem Defendants to obtain Personal Information from health care providers.   The privacy policies published by the Non-Anthem Defendants and provided by the Non-Anthem Defendants pertained to this Personal Information acquired by the Non-Anthem Defendants pursuant to this contractual relationship.  In light of the contract language and all of the information provided by the Non-Anthem Defendants to Plaintiffs and Affected Individuals at the time of contract, it was objectively reasonable for Plaintiffs and Affected

89

Individuals to understand their contracts to include Non-Anthem Defendants' privacy policies.

284.    The Non-Anthem Defendants' contracts with Plaintiffs, Affected Individuals, and/or their employers on their behalf, contain contract terms pertaining to the BlueCard program.

285.    The Non-Anthem Defendants' contracts with Plaintiffs and Affected Individuals also contained additional specific terms committing to maintaining the confidentiality of personal information in the context of Members' use of the BlueCard Program.

286.    The Non-Anthem Defendants' contract documents, including contracts with Plaintiffs and Affected Individuals and/or their employers on their behalf, contain language similar to the following language with respect to that BCBS Defendant:

> Under the BlueCard Program, when you obtain Covered Services within the geographic area served by a Host Plan, Blue Shield will remain responsible for fulfilling our contractual obligations.

Ex. 15-1 (Plaintiff Brisko's contract documents with Blue Shield of California).

287.    The Non-Anthem Defendants' contracts with Plaintiffs and Affected Individuals also contained additional specific terms promising that they would provide their members' Personal Information only to business associates who themselves promised to protect the confidentiality of that Personal Information.

288.    As a result of the documents and information provided to them at the time of contract and throughout their relationship by the Non-Anthem Defendant, it was objectively reasonable for Plaintiffs and Affected Individuals who purchased individual policies from or enrolled under group plans with Non-Anthem Defendants to understand their contracts with Non-Anthem Defendants to include the privacy policies and notices pertaining to the personal information about them that would be collected in the course of providing the insurance and health benefits services to them pursuant to these contracts, including the Non-Anthem Defendants' commitment to ensuring the confidentiality of information provided to business associates and/or other entities as a result of the BlueCard program.

289.    Nowhere in any of the contract documents between Plaintiffs and any Non-Anthem Defendant (including but not limited to the Plan Booklet) did any Non-Anthem Defendant state that it did *not* intend to be contractually bound by its advertised and published privacy policies and notices.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

290.     No other document provided any Non-Anthem Defendant to its customers at the time of enrollment informed Plaintiffs that the Non-Anthem Defendant did not intend to be contractually bound by its advertised and published privacy policies and notices.

291.     Some Plaintiffs and Affected Individuals received coverage for medical expenses through ERISA-defined "employee welfare benefit plans." 29 U.S.C. §§1002(1), 1002(3).  Their employer or group established these plans.  An employee welfare benefit plan is a promise by a covered employer to provide certain benefits.  29 U.S.C. §1002(1).  ERISA plans must be maintained pursuant to a written instrument.  29 U.S.C. §1102(a).  Non-Anthem Defendants sell group insurance, health benefits, or administrative services to ERISA plans.  Non-Anthem Defendants' group insurance, health benefits, or service "plans" are not "employee welfare benefit plans" as that term is used in ERISA, 29 U.S.C. §1002(1), 1002(3), and §1102(a).  In selling group insurance/health benefits/administrative services contracts to employers, Non-Anthem Defendants do not necessarily become the ERISA Plan Administrator or ERISA fiduciary for any ERISA plan provided by the employer.

292.     Attached to this Complaint as Exhibits 14-27 are excerpts from examples of named Plaintiffs' contract documents with each of the fourteen Non-Anthem Defendants, consistent with the above general allegations pertaining to all Non-Anthem Defendants.  On information and belief, each Non-Anthem BCBS Defendant used uniform contract language across its contracts, which it drafted based on templates, and therefore all of the Non-Anthem BCBS Defendants' contracts with Affected Individuals contain the terms as described for each Defendant with respect to these Plaintiff contract documents that are provided as examples.

### Non-Anthem Defendant BCBS of Alabama

293.     Plaintiff Connie McDaniel and Non-Anthem Defendant BCBS of Alabama entered into a contract when Plaintiff McDaniel enrolled pursuant to a group plan prior to the Anthem Data Breach (and Plaintiff McDaniel was also the intended beneficiary of her group's contract with BCBS Alabama).  The contract documents drafted by BCBS Alabama include at least the Plan Booklet for her PPO plan, which includes a promise to protect the confidentiality of its members' Personal Information, incorporates by reference the BCBS Alabama Privacy Notices and other information

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1    made available on the BCBS Alabama website, and states that BCBS Alabama will remain responsible

2    for fulfilling its contractual obligations when members obtain services through the BlueCard Program.

3    Attached as Exhibit 16 are relevant excerpts of the contract documents produced by BCBS Alabama in

4    discovery for Plaintiff McDaniel (the 2012 PPO plan booklet, in effect during 2014 and 2015), and

5    incorporated website privacy policies and privacy notices as those appeared in 2014 and 2015.

6    **Non-Anthem Defendant USAable Mutual Insurance (d/b/a Arkansas BCBS)**

7    294.    Non-Anthem Defendant Arkansas BCBS entered into contracts with class members

8    who enrolled in BCBS Arkansas plans prior to the Anthem Data Breach.  The contract documents

9    drafted by BCBS Arkansas include at least the Evidence of Coverage booklet provided to all Members

10   enrolled in these plans, as well as the individual enrollment forms, which expressly incorporate BCBS

11   Arkansas privacy notices, which were available at all times on the BCBS Arkansas website.  Attached

12   as Exhibit 17 are relevant excerpts of exemplar contract documents produced by USAable Mutual

13   Insurance in discovery and incorporated website privacy policies and privacy notices, as those

14   websites appeared in 2010 and as those website notices have appeared since they were amended in

15   2013.

16   **Non-Anthem Defendant California Physicians Service (d/b/a Blue Shield of California)**

17   295.    Plaintiff Lillian Brisko and Non-Anthem Defendant Blue Shield of California entered

18   into a contract when Plaintiff Brisko enrolled in a group plan prior to the Anthem Data Breach (and

19   Plaintiff Brisko was also the intended beneficiary of her group's contract with Blue Shield of

20   California).  The contract documents drafted by Blue Shield of California include the Plan Booklet

21   ("Combined Evidence of Coverage and Disclosure Form"), which includes a promise to protect the

22   confidentiality of its members' Personal Information, incorporates Blue Shield's privacy policies and

23   notices by reference, incorporates by reference the Blue Shield of California website, which at all

24   times has included Blue Shield of California's privacy webpage and privacy notices, and states the

25   Blue Shield of California will remain responsible for contractual obligations when Members use the

26   BlueCard program. Attached as Exhibit 15 are relevant excerpts of the contract documents produced

27   by Blue Shield of California in discovery for Plaintiff Brisko that were in effect during 2014, and the

28   incorporated website privacy policies and privacy notices, as those websites have appeared since 2014.

**Non-Anthem Defendant BCBS of Florida**

296.     Plaintiff Charles Platt and Non-Anthem Defendant BCBS of Florida entered into a contract when Plaintiff Platt purchased an individual insurance policy prior to the Anthem Data Breach.  The contract documents drafted by BCBS Florida include the "Non-Group Contract" provided to Plaintiff Platt, which includes a promise to protect the confidentiality of its members' Personal Information, attaches the BCBS Florida Privacy Notice, incorporates by reference other information made available on the BCBS Florida website and states that BCBS Florida will remain responsible for fulfilling its contractual obligations when members obtain services through the BlueCard Program.  Attached as Exhibit 18 are relevant excerpts of the BCBS Florida contract documents for Plaintiff Platt that were in effect prior to and during the Anthem Data Breach, and incorporated website privacy notices, as those notices have appeared since 2013.

**Non-Anthem Defendant Health Care Service Corporation
d/b/a BCBS of Illinois and d/b/a BCBS of Texas**

297.     Plaintiff David Klemer and Non-Anthem Defendant Health Care Service Corporation d/b/a BCBS of Illinois entered into a contract when Plaintiff Klemer was enrolled as a Member of a group plan with BCBS of Illinois prior to the Anthem Data Breach (and Plaintiff Klemer was also the intended beneficiary of his group's contract with BCBS of Illinois).  The contract documents drafted by Health Care Service Corporation d/b/a BCBS of Illinois included a Plan Booklet (called a "Certificate") for the "Blue Print Blue Advantage HMO," as well as the group and individual enrollment forms. The Plan Booklet incorporates by reference information about BCBS of Illinois on the BCBS of Illinois website, which contains several explanations of BCBS of Illinois' privacy policies and practices with respect to personal information about its Members, including committing to protecting the confidentiality of information and restricting access for employees and business associates acting on behalf of BCBS of Illinois.  In addition, the individual enrollment applications for BCBS group plans (which once completed and submitted are incorporated by reference into BCBS contracts, including Mr. Klemer's contract) require submission of Social Security Numbers, and state: "Your Social Security number is used for internal purposes only."  Attached as Exhibit 19 are relevant excerpts of the Health Care Service Corporation d/b/a BCBS of Illinois contract documents that were

93

1  in effect prior to and during the Anthem Data Breach, the incorporated BCBS of Illinois websites as

2  they appeared in 2014, and the BCBS of Illinois enrollment application.

3  298.  Plaintiff Lance Wagner and Non-Anthem Defendant Health Care Service Corporation

4  d/b/a BCBS of Texas entered into a contract when Plaintiff Wagner purchased an individual insurance

5  policy prior to the Anthem Data Breach.  The contract documents drafted by Health Care Service

6  Corporation d/b/a BCBS of Texas include a Plan Booklet that promises to protect the confidentiality of

7  its members' Personal Information, attaches the BCBS of Texas Privacy Notice, incorporates by

8  reference other information made available on the BCBS of Texas website, and states that BCBS of

9  Texas will remain responsible for fulfilling its contractual obligations when members obtain services

10  through the BlueCard Program.  Attached as Exhibit 26 are relevant excerpts of the Health Care

11  Service Corporation d/b/a BCBS of Texas contract documents for Plaintiff Wagner that were in effect

12  prior to the Anthem Data Breach, and the incorporated BCBS of Texas website privacy policies and

13  privacy notices, as those documents appeared in 2014 and 2015.

14  **Non-Anthem Defendant CareFirst of Maryland (d/b/a Carefirst BCBS)**

15  299.  Plaintiff Don West and Non-Anthem Defendant CareFirst of Maryland entered into a

16  contract when Plaintiff West enrolled in a group plan prior to the Anthem Data Breach (and Plaintiff

17  West was also the intended beneficiary of his group's contract with BCBS CareFirst of Maryland).

18  The contract documents drafted by CareFirst of Maryland include the Group Agreement and Evidence

19  of Coverage, which includes a promise to protect the confidentiality of its members' Personal

20  Information, and states that CareFirst of Maryland will remain responsible for fulfilling its contractual

21  obligations when members obtain services through the BlueCard Program.  Attached as Exhibit 20 are

22  relevant excerpts of the CareFirst of Maryland contract documents for Plaintiff West that were in

23  effect prior to and during the Anthem Data Breach, and the CareFirst of Maryland website privacy

24  notices, as those notices have appeared since 2013.

25  **Non-Anthem Defendant BCBS of Massachusetts**

26  300.  Plaintiff Carrie Ramos and Non-Anthem Defendant BCBS of Massachusetts entered

27  into a contract when Plaintiff Ramos enrolled pursuant to a group plan prior to the Anthem Data

28  Breach (and Plaintiff Ramos also was the intended beneficiary of her group's contract with BCBS

Massachusetts).  The contract documents drafted by BCBS Massachusetts include at least the Plan

Booklet ("Subscriber Certificate"), which includes a promise to protect the confidentiality of its

members' Personal Information and incorporates by reference the BCBS Massachusetts privacy notice

("Commitment to Confidentiality").  BCBS Massachusetts has also produced in discovery for Plaintiff

Ramos the agreement with her group, which specifically promises to protect the confidentiality of

Members' personal information, and commits that BCBS Massachusetts will be bound by contractual

obligations when Members use BlueCard services.  Attached as Exhibit 21 are relevant excerpts of the

contract documents produced by BCBS Massachusetts in discovery for Plaintiff Ramos applicable

during 2014 and incorporated website privacy notices as they have appeared since 2014.

### Non-Anthem Defendant BCBS of Michigan

301.    Plaintiff Michelle Kaseta-Collins and Non-Anthem Defendant Blue Cross and Blue

Shield of Michigan entered into a contract when Plaintiff Kaseta-Collins enrolled in a Blue Care HMO

from BCBS Michigan (and Plaintiff Kaseta-Collins also was the intended beneficiary of her group's

contract with BCBS Michigan).  The contract documents drafted by BCBS Michigan include at least

the Plan Booklet ("Certificate"), which includes a promise to protect the confidentiality of its

members' Personal Information, incorporates by reference the Blue Care Network's policies, which at

all times have been set forth on the BCBS Michigan website, including BCBS Michigan's Privacy

Notice applicable to Blue Care plans.  Attached as Exhibit 22 are relevant excerpts of the BCBS

Michigan contract documents for Plaintiff Kaseta-Collins and BCBS Michigan website privacy notices

as they have appeared since 2013.

### Non-Anthem Defendant BCBS of Minnesota

302.    Plaintiff Lauren Roberts entered into a contract with BCBS Minnesota when Plaintiff

Roberts enrolled in a group plan with BCBS Minnesota prior to the Anthem Data Breach.  On

information and belief, the contract documents drafted by BCBS Minnesota include the Plan Booklet

(called a "Certificate of Coverage") that includes a promise to keep Member Personal Information

confidential and that incorporates BCBS Minnesota's privacy policies and notices, which have been

made available at all times on the BCBS Minnesota website, as well as the individual enrollment

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1   form/application.[6] Attached as Exhibit 23 are relevant excerpts of BCBS Minnesota website privacy

2   policies and privacy notices, and enrollment forms, as those documents appeared in 2014.

3                          **Non-Anthem Defendant Horizon BCBSNJ**

4          303.   Plaintiff Elizabeth Ames entered into a contract when Plaintiff Ames purchased an

5   individual insurance policy from Horizon BCBSNJ prior to the Anthem Data Breach.  The contract

6   documents drafted by Horizon BCBSNJ include policy documents that promise to protect the

7   confidentiality of Member's personal information, including when that information is given to

8   business associates, and incorporate the Horizon BCBSNJ websites, which at all times have made the

9   Horizon BCBSNJ privacy policies and notices available, as well as information regarding the

10   BlueCard plan.  Attached as Exhibit 14 are relevant excerpts of Plaintiff Ames's 2014 and 2015

11   Horizon BCBSNJ contract documents and incorporated Horizon BCBSNJ website privacy policies

12   and privacy notices, as those documents appeared in 2014 and 2015.

13                       **Non-Anthem Defendant BCBS of North Carolina**

14          304.   Plaintiff Frank Nicosia and Non-Anthem Defendant BCBS North Carolina entered into

15   a contract when Plaintiff Nicosia enrolled pursuant to a group plan prior to the Anthem Data Breach

16   (and Plaintiff Nicosia also was the intended beneficiary of his group's contract with BCBS North

17   Carolina).  The contract documents drafted by BCBS North Carolina include a 2014 Plan Booklet

18   ("Benefit Booklet") that promises to protect the confidentiality of Member's personal information,

19   incorporates by reference the BCBS North Carolina privacy notices found on the BCBS North

20   Carolina website, and states that BCBS North Carolina will be bound by contractual obligations when

21   Members use BlueCard services.  Attached as Exhibit 24 are relevant excerpts of the contract

22   documents produced by BCBS North Carolina in discovery for Plaintiff Nicosia applicable during

23   2014 and the incorporated website privacy notices as those have appeared since 2014.

24             **Non-Anthem Defendant Highmark Inc. (d/b/a Highmark Blue Shield**
25                   **and d/b/a Highmark Blue Cross Blue Shield)**

26          305.   Plaintiff Denise Masloski and Non-Anthem Defendant Highmark Blue Shield entered

27   _____

28      [6] BCBS Minnesota has produced copies of its privacy policies and notices, but has yet to produce
any contract or plan documents for Plaintiff Roberts in discovery.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

into a contract when Plaintiff Masloski was enrolled pursuant to a group plan prior to the Anthem Data Breach.[7]  On information and belief, the contract documents drafted by Highmark Blue Shield include a Plan Booklet (called a "Certificate of Coverage") that includes a promise to keep Member Personal Information confidential and that incorporates Highmark Blue Shield's privacy policies and notices, which have been made available at all times on Highmark Blue Shield website, as well as the individual enrollment form/application.  Attached as Exhibit 25 are relevant excerpts of Highmark Blue Shield website privacy notices, as those documents appeared since 2014.

### Non-Anthem Defendant BCBS of Vermont

306.    Plaintiff Jessica Holguin and Non-Anthem Defendant BCBS Vermont entered into a contract when Plaintiff Holguin enrolled pursuant to a group plan prior to the Anthem Data Breach (and Plaintiff Holguin also was the intended beneficiary of her group's contract with BCBS Vermont). The contract documents drafted by BCBS Vermont include a 2014 Plan Booklet ("Plan J Comprehensive Certificate") that promises to protect the confidentiality of Member's personal information, incorporates BCBS Vermont's privacy notices (also found on the BCBS Vermont website), states that BCBS Vermont requires business associates to agree to protect Members' information, and states that BCBS Vermont will be bound by its contractual obligations when Members use BlueCard services.  Attached as Exhibit 27 are relevant excerpts of the contract documents produced by BCBS Vermont in discovery for Plaintiff Holguin applicable beginning in 2014 and the incorporated website privacy notices as they appeared since 2014.

### 3.    Blue Cross Blue Shield Association and the Federal Contract

307.    The Blue Cross and Blue Shield Association ("BCBSA"), Anthem and its BCBS Affiliates, and non-Anthem BCBS also contracted to protect the Personal Information of federal government employees who enrolled in the Blue Cross Blue Shield Service Benefit Plan.

308.    The Federal Employees Health Benefits Act of 1959 establishes a comprehensive program of health insurance for federal employees and authorizes the Office of Personnel Management ("OPM") to contract with private carriers to offer federal employees an array of health

---

[7] Defendant Highmark Inc. has produced no insurance contracts or plans in discovery.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1  plans.

2      309.    Among the plans offered to federal employees is the Blue Cross Blue Shield Service

3  Benefit Plan ("Federal BCBSA Plan").

4      310.    The Federal BCBSA Plan is governed by Contract No. CS 1039 ("Federal BCBSA

5  Contract") between OPM and BCBSA, acting on behalf of, and as agent for, the local BCBS plans

6  (Anthem BCBS Affiliates and non-Anthem BCBS) that process claims under the Federal BCBSA Plan

7  and underwrite the plan in their localities.  The Federal BCBSA Plan has been described by the

8  Congressional Committee on Oversight and Government Reform as an "aggregation" of BCBS local

9  plans.  The Federal BCBSA Contract operative in 2014 and 2015 is attached as Exhibit 28.

10      311.    The Federal BCBSA Contract incorporates as Appendix A the Plan Booklet (called the

11  "FEHB Brochure") describing the benefits and services to which Enrollees are entitled.  The Federal

12  BCBSA Contract requires BCBSA to distribute this FEHB Brochure to all Enrollees.  The FEHB

13  Brochures for 2014 and 2015 are attached as Exhibit 29, 30.  At all times relevant to this litigation, the

14  then-current year's FEHB Brochure has been made available on the BCBS Federal Employee Program

15  website (www.fepblue.org, maintained by BCBSA, the Anthem BCBS Affiliates, and the non-Anthem

16  BCBS for the Federal BCBSA Plan).

17      312.    Enrollees are federal employees, including Plaintiffs Alvin Lawson, Ralph Staffieri,

18  David Ifversen, and Jason Baker, who elected to obtain coverage and benefits under the Federal

19  BCBSA Plan.

20      313.    Enrollees of the Federal BCBSA Plan including Plaintiffs and Affected Individuals, are

21  the intended beneficiaries of the benefits and services set forth in the Federal BCBSA Contract,

22  including but not limited to the benefits and services listed in the FEHB Brochure incorporated into

23  that contract, including the contract terms pertaining to the confidentiality of Enrollees' personal

24  information.

25      314.    All Plaintiffs and Affected Individuals who are Enrollees in the Federal BCBSA Plan

26  enrolled in that Plan prior to the Anthem Data Breach.

27      315.    In the Federal BCBSA Contract, BCBSA, as agent for the Anthem BCBS Affiliates and

28  non-Anthem BCBS, agreed to protect the Personal Information of the Enrollees in the Federal BCBSA

98

1    Plan.  The contract requires OPM and Enrollees to provide confidential Personal Information,

2    including Social Security Numbers, to BCBSA, as agent for the Anthem BCBS Affiliates and non-

3    Anthem BCBS, in order for it to administer the Federal BCBSA Plan.  Under the agreement, BCBSA,

4    as agent for the Anthem BCBS Affiliates and non-Anthem BCBS, was limited to using "the personal

5    data on employees and annuitants that is provided by agencies and OPM, including social security

6    numbers, for only those routine uses stipulated for the data . . . ."  Ex. 28-1 at I-3.

7           316.    BCBSA, as agent for the Anthem BCBS Affiliates and non-Anthem BCBS, agreed to

8    specific obligations with respect to protecting this and other sensitive Personal Information.  At all

9    times relevant to this litigation, under the Federal BCBSA Contract, BCBSA, as agent for the Anthem

10   BCBS Affiliates and non-Anthem BCBS, expressly contracted to:

11              a) "hold all medical records, and information relating thereto, of federal subscribers,

12              confidential" (with limited exceptions that do not apply here);

13              b) maintain the "necessary resources to meet its obligations under the contract,"

14              including security obligations;

15              c) permit the OPM to use NIST SP 800-53 (Security and Privacy Controls for Federal

16              Information Systems and Organizations) or its equivalent as a benchmark for

17              conducting audits of information systems and to recommend that BCBSA, Anthem,

18              the Anthem BCBS Affiliates, and the non-Anthem BCBS, adopt a best practice drawn

19              from NIST SP 800-53;

20              d) either adopt recommendations made by the OPM, or represent that it is already in

21              compliance with the recommendation, or explain why its current practice,

22              notwithstanding its refusal to adopt the recommendation, is equally if not more

23              appropriate for its business purposes than the recommended best practice;

24              e) demonstrate to the OPM their compliance with either a recommended best practice

25              or an alternative current practice they had adopted; and

26              f) permit OPM "to inspect or evaluate the work performed or being performed under

27              the contract."

28   Ex. 28-1 at I-3, I-9; 28-2 at 6.

317.    The FEHB Brochures for 2014 and 2015 both state, "If you are enrolled in this Plan, you are entitled to the benefits described in this brochure."  The Brochures define "you/your" to mean "the enrollee (the contract holder eligible for enrollment and coverage under the Federal Employees Health Benefits Program and enrolled in the Plan) and each covered family member."   Under the heading "Your Medical and Claims Records are Confidential," the Brochure promises that "We will keep your medical and claims information confidential."  Ex. 29 at 5, 14, 149; Ex. 30 at 5, 14, 153.

318.    The FEHB Brochures for 2014 and 2015 also incorporate by reference the Notice of Privacy Policy, available at all times at www.fepblue.org.  The 2015 Notice of Privacy Practice states:

> This notice describes how we, the Blue Cross and Blue Shield (BCBS) Service Benefit Plan, may use and disclose your protected health information (PHI) ..  It also includes our legal obligations concerning your PHI. . . . Members receive a copy of this Notice at the time of enrollment and annually thereafter.
> …
> We have measures in place to protect PHI [Personal Health Information] according to state and federal standards. The measures are designed to protect oral, written, and electronic PHI, and include:
> - Security and privacy training for all employees.
> - Employee access is limited to need-to-know basis. . . .
> - All users of our electronic systems are required to use strong passwords.
> - All users must change their computer passwords periodically.

The Notice of Privacy Policy in effect for 2014 and 2015 are attached hereto as Exhibit 31.

319.    The www.fepblue.org website also states on its "Rights and Responsibilities" page that the plan will "hold all our member records confidential, and will only release them to the appropriate entities if required to do so by law."  Ex. 32.

320.    The www.fepblue.org website has at all relevant times been incorporated by reference into the FEHB Brochure.  Ex 29 at 14, Ex. 30 at 14.

**C.    Defendants Had an Obligation to Protect Personal Information under Federal and State Law and the Applicable Standard of Care**

321.    Defendants are entities covered by HIPAA (see 54 C.F.R. § 160.102) and as such are required to comply with the HIPAA Privacy Rule and Security Rule, 45 CFR Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information").

322.    HIPAA limits the permissible uses of "protected health information" and prohibits

100

unauthorized disclosures of "protected health information."[8]  In response to the Anthem Data Breach, a senior Department of Health and Human Services advisor explained that "[t]he personally identifiable information health plans maintain on enrollees and members — including names and social security numbers — is protected under HIPAA, even if no specific diagnostic or treatment information is disclosed."[9]

323.   HIPAA requires that Defendants implement appropriate safeguards for this information.[10]

324.   HIPAA requires that Defendants provide notice of a breach of unsecured protected health information, which includes protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons – i.e. non-encrypted data.[11]

325.   Additionally, HIPPA requires that Defendants:

(a) Implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights, see 45 CFR § 164.312(a)(1);

(b) Implement policies and procedures to prevent, detect, contain, and correct security violations, see 45 CFR § 164.306(a)(1);

(c) Protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information, see 45 CFR § 164.306(a)(2);

(d) Protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually

---

[8] 45 C.F.R. § 164.502 (2009).

[9] Elizabeth Weise, *Anthem fined $1.7 million in 2010 breach*, USA TODAY (Feb. 5, 2015, 6:13 PM), http://www.usatoday.com/story/tech/2015/02/05/anthem-health-care-computer-security-breach-fine-17-million/22931345.

[10] 45 C.F.R. § 164.530(c)(1) (2009).

[11] 45 C.F.R. § 164.404 (2009); 45 C.F.R. § 164.402 (2009).

101

identifiable health information, see 45 CFR § 164.306(a)(3);

(e) Ensure compliance with the HIPAA security standard rules by its workforce, see 45 CFR § 164.306(a)(4); and

(f) Effectively train all members of its workforce on the policies and procedures with respect to protected health information as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of protected health information in violation of 45 § CFR 164.530(b).

326.    Defendants are also entities covered by Gramm-Leach-Bliley, 15 U.S.C. § 6801, et. seq. Thus, each Defendant had an "affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801.

327.    Defendants are prohibited by the Federal Trade Commission Act (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission has found that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the Federal Trade Commission Act.[12]

328.    As described below, Defendants are also required by various state laws and regulations to protect individuals' Personal Information.

329.    In addition to their obligations under federal and state laws, Defendants owed a duty to Affected Individuals, who entrusted them with sensitive Personal Information, to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Personal Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Affected Individuals to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems and

---

[12] See e.g., *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3d Cir. 2015).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

networks, and the personnel responsible for them, adequately protected the Personal Information of the Affected Individuals.

330.     Defendants owed a duty to Affected Individuals, who entrusted them with sensitive Personal Information, to design, maintain, and test their computer systems to ensure that the Personal Information in Defendants' possession was adequately secured and protected.

331.     Defendants owed a duty to Affected Individuals, who entrusted them with sensitive Personal Information, to create and implement reasonable data security practices and procedures to protect the Personal Information in their possession, including adequately training their employees and others who accessed Personal Information within their computer systems on how to adequately protect Personal Information.

332.     Defendants owed a duty to Affected Individuals, who entrusted them with sensitive Personal Information, to implement processes that would detect a breach of their data security systems in a timely manner.

333.     Defendants owed a duty to Affected Individuals, who entrusted them with sensitive Personal Information, to act upon data security warnings and alerts in a timely fashion.

334.     Defendants owed a duty to Affected Individuals, who entrusted them with sensitive Personal Information, to disclose if their computer systems and data security practices were inadequate to safeguard individuals' Personal Information from theft because such an inadequacy would be a material fact in the decision to purchase insurance or other health care services from Defendants, or to entrust Personal Information with Defendants.

335.     Defendants owed a duty to Affected Individuals, who entrusted them with sensitive Personal Information, to disclose in a timely and accurate manner when data breaches occurred.

336.     Defendants owed a duty of care to Affected Individuals because they were foreseeable and probable victims of any inadequate data security practices. Anthem collected Affected Individuals' Personal Information either directly or indirectly from Anthem Affiliates, Non-Anthem BCBS, and/or BCBSA.  Anthem knew that a breach of its data systems would cause Affected Individuals to incur damages. Anthem Affiliates and Non-Anthem BCBS collected their current and former customers and members' Personal Information, and provided that information to Anthem.

Thus, Anthem Affiliates and Non-Anthem BCBS knew that a breach of Anthem's system would cause those people to incur damages.

**D.   Defendants Were On Notice of Cyber Attack Threats, and the Inadequacy of Their Data Security**

337.   Defendants knew or should have known that Anthem and Anthem Affiliates had previous problems with their data security.

338.   In late 2009 and early 2010, over 600,000 customers of Wellpoint (Anthem's former trade name) and Blue Cross of California had their personal information and protected healthcare information compromised due to a data breach.[13] Customers' Personal Information had not been password protected.[14]

339.   In 2013, the Department of Health and Human Services fined Anthem $1.7 million for HIPAA violations. The HHS' Office for Civil Rights found that Anthem "had not enacted appropriate administrative, technical, and physical safeguards for data as required by HIPAA."[15]

340.   Also in 2013, the OIG conducted an audit of Wellpoint's information system pursuant to the Federal BCBSA Contract.  In September 10, 2013, the OIG issued a report titled Audit of Information System General and Applications Controls at Wellpoint, Inc.  The purpose of the audit was to examine the "information systems used to process BCBSA's [insurance claims], as well as the various business processes and IT systems used to support these applications."

341.   One of the tests OIG routinely conducts is a configuration compliance audit, which is the process of routinely comparing the actual security configuration of computer servers to an approved baseline configuration.  In its audit report, OIG noted that "[f]ailure to implement a thorough configuration compliance auditing program increases the risk that insecurely configured servers remain undetected, creating a potential gateway for malicious virus and hacking activity that could

---

[13] Settlement Agreement, *Blue Cross of California Website Security Cases,* Case No. JCCP 4647 (Apr. 18, 2011 Cal. Super. Ct.), https://anthembluecrosssecuritysettlement.com/SettlementAgreement.pdf.

[14] *Id.*

[15] Rachel Landen and Joseph Conn, *WellPoint to pay $1.7 million HIPAA penalty*, MODERN HEALTHCARE (July 11, 2013), http://www.modernhealthcare.com/article/20130711/NEWS/307119954 (last visited Oct. 19, 2015).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1    lead to data breaches."  Despite the importance of ensuring the sufficiency of its configuration

2    compliance auditing program, Wellpoint frustrated OIG's efforts to perform this test, claiming that

3    company policy prohibited external entities such as OIG from accessing Wellpoint's network.  As a

4    result, the Federal BCBSA Plan "was unable to provide satisfactory evidence to confirm that it had a

5    program in place to routinely monitor the configuration of its servers."  After the Anthem Data

6    Breach, Anthem again refused to submit itself to standard tests for determining the vulnerability of its

7    computer systems, again citing "corporate policy."

8         342.    Despite Wellpoint's efforts to frustrate the OIG audit, OIG was able to determine that

9    Wellpoint's information systems were deficient in at least the following ways: (i) weaknesses in

10   privileged user monitoring, (ii) no implementation of controls to prevent rogue devices from accessing

11   the network, (iii) not subjecting all servers to routine vulnerability scans, and (iv) Wellpoint's

12   mainframe password settings were not in compliance with its own standards.  OIG offered numerous

13   recommendations for how Wellpoint could improve its data security procedures.  On information and

14   belief, Wellpoint failed to implement all or many of OIG's recommendations.

15        343.    Defendants were also on notice that healthcare companies were targets for cyberattacks.

16   Indeed, Anthem publicly admitted that Anthem itself is subject to several hundred credible hacking

17   threats per month.

18        344.    Defendants were on notice that the FBI was concerned about healthcare company data

19   security. In August 2014, after a cyber-attack on Community Health Systems, Inc., the FBI warned

20   companies within the healthcare industry that hackers were targeting them.[16] The warning stated that

21   "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose

22   of obtaining Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."

23        345.    Defendants were on notice that the federal government was concerned about healthcare

24   company data encryption and Anthem knew a large portion of the Anthem Database was not

25   encrypted.  The United States Department of Health and Human Services' Office for Civil Rights

26

27        [16] Jim Finkle, *FBI warns healthcare firms that they are targeted by hackers,* REUTERS (Aug.
     2014, 4:32 PM), http://www.reuters.com/article/2014/08/20/us-cybersecurity-healthcare-fbi-
28   idUSKBN0GK24U20140820.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

urges health care providers and insurers to encrypt data containing sensitive personal information. In April 2014, the Department fined Concentra Health Services and QCA Health Plan Inc. of Arkansas approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, the DHHS' Office of Human Rights' deputy director of health information privacy, stated "[our] message to these organizations is simple: encryption is your best defense against these incidents."

346.    Defendants were also on notice of the threat of cyberattacks due to prior, high-profile security breaches at retail chains such as Home Depot, Target, and Neiman Marcus, as well as the hundreds of credible cyber threats that Anthem received on a monthly basis.

**E.    Anthem Allowed a Massive Data Breach**

347.    In February, 2015, after it began to receive media inquiries, Anthem announced to the general public that cyberattackers had breached the Anthem Database, and accessed Personal Information about individuals in the Anthem Database.[17]

348.    Anthem later announced that the hackers had accessed Personal Information for 78.8 million people.[18]

349.    Anthem admits that the information accessed about Affected Individuals included names, dates of birth, Social Security numbers, health care ID numbers, home addresses, email addresses, and employment information, including income data.[19]

350.    On information and belief, medical and health care information was also stolen from Affected Individuals during or as a result of the Anthem Data Breach.  On information and belief, the data that Anthem admits was compromised, including Social Security Numbers and dates of birth, can be used to access medical and health care information through Anthem, Anthem affiliates, and non-Anthem BCBS' online portals.  News reports corroborate that medical data was stolen from Affected

---

[17] https://www.anthemfacts.com/ (last visited Oct. 19, 2015)

[18] Anna Mathews, *Anthem: Hacked Database Included 78.8 Million People*, WALL STREET JOURNAL (Feb. 24, 2015, 2:49 PM), http://www.wsj.com/articles/anthem-hacked-database-included-78-8-million-people-1424807364.

[19] https://www.anthemfacts.com/ (last visited Oct. 19, 2015).

Individuals during the Anthem Data Breach.

351.    On or about January 29, 2015, after Anthem realized the extent of the breach, Anthem retained a third-party cybersecurity company, Mandiant, to assist in assessing and responding to the Anthem Data Breach and to assist in developing security protocols for Anthem. Mandiant created an Intrusion Investigation Report, which it provided to Anthem in July 2015 ("Mandiant Report").

352.    The Mandiant Report demonstrates that Anthem and Anthem Affiliates' computer systems and data security practices were grossly inadequate to secure the highly sensitive and valuable Personal Information that had been entrusted to them. Anthem and Anthem Affiliates' failures were widespread.

353.    First, Anthem and Anthem Affiliates failed to implement basic industry-accepted data security tools to prevent cyberattackers from accessing the Anthem Database:   (i) Anthem and Anthem Affiliates did not implement a two-factor authentication procedure for users to enter their computer system, instead allowing users to access the Anthem Database from external computers using only a single password.  (Conversely, in a two-factor authentication system, a user first enters his or her password, and then the user is sent a one-time second password (the second factor) to a personal device. The user receives a different second password every time that the user signs on to his or her account.)  Two-factor authentication has been a security best practice for remotely accessible systems for decades, and its importance is widely known by Information Technology professionals. (ii) Anthem and Anthem Affiliates did not require users to change their passwords on a regular basis, and allowed some users to keep the same password for years. (iii) Anthem and Anthem Affiliates allowed Anthem employees to access Personal Information even when those users did not need to access that information for job-related purposes. ███████████████████████████████ ███████████████████████████████████ ███████████████  If Anthem had implemented any of these basic data security tools, the cyberattackers would not have been able to access Affected Individuals' Personal Information, or would not have been able to access so much of Affected Individuals' Personal Information.

354.    Second, Anthem and Anthem Affiliates failed to implement basic policies and procedures that could have prevented the attack.  Anthem failed to train employees to identify, report,

107

1   and delete "phishing" email, ██████████████████████████████████

2   ████████████████████████████████████████████.

3        355.    Third, Anthem and Anthem Affiliates failed to implement monitoring and alerting that

4   would have alerted them to the cyberattack during the many months and years that the attack was

5   ongoing. Anthem and Anthem Affiliates failed to even implement simple Information Technology

6   maintenance systems that would have discovered the cyberattackers. Even if the cyberattackers gained

7   access to the Anthem Database, Anthem could have and should have, but failed to, discover the data

8   breach before any data was exfiltrated.

9        356.    Fourth, even when Anthem and Anthem Affiliates did implement monitoring and

10   alerting systems, on information and belief, they simply ignored the alerts. If Anthem and Anthem

11   Affiliates had taken proper steps once systems alerts were triggered, they could have averted the

12   Anthem Data Breach.

13        357.    Fifth, Anthem and Anthem Affiliates failed to encrypt the sensitive Personal

14   Information within the Anthem Database. If Anthem and Anthem Affiliates had encrypted the

15   sensitive Personal Information within the Anthem Database, then even if the cyberattackers accessed

16   the Anthem Database, the cyberattackers would have been unable to use the Affected Individuals'

17   Personal Information.  Anthem took none of these basic security steps to protect Affected Individuals'

18   sensitive Personal Information.

19        358.    ████████████████████████████████████

20   ████████████████████████████████████████████

21   ████████████████████████████████████

22   █████████████████████████ If it had, it could have taken steps to stop the eventual Anthem

23   Data Breach.

24        359.    ██████████████████████████████

25   ████████████████████████████████████

26   ████████████████████████████████████

27   ████████████████████████████████████

28        360.    ██████████████ attack occurred because Anthem and Anthem Affiliates did not use



practices consistent with industry standards.

These are all common security best practices, especially in high-security environments.

361.

362.

If Anthem and Anthem Affiliates had investigated at this point, they could have prevented the cyberattackers from accessing Affected Individuals' Personal Information.

363.

If Anthem and Anthem Affiliates had investigated at this point, they could have prevented the cyberattackers from accessing Affected Individuals' Personal Information.

364.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1

2

3

4                     If Anthem and Anthem Affiliates had

5 investigated at this point, they could have prevented the cyberattackers from accessing Affected

6 Individuals' Personal Information.

7        365.     According to the Mandiant Report, during October 2014, the cyberattackers performed

8 reconnaissance and collected information about the Anthem Database. The cyberattackers connected

9 to the Anthem Database on November 12, 2014.

10        366.

11

12

13

14

15

16       If Anthem had investigated at this point, they could have prevented the cyberattackers from

17 accessing Affected Individuals' Personal Information.

18       367.

19

20

21

22

23       368.

24

25

26

27

28

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

369. ████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

370.    According to the Mandiant Report, in December 2014 and January 2015, the cyberattackers extracted massive amounts of data, including Personal Information, from the Anthem Database. ████████████████████

██████████████████████████████

██████████████████████████████

371.    The cyberattackers' data extraction demonstrates that Anthem and Anthem Affiliates not only have a faulty monitoring and alerting system for data security; they lack proper monitoring and alerting within their broader Information Technology maintenance system.

372. ████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

373.    On information and belief, this event demonstrates that Anthem and Anthem Affiliates lack further elements of a reasonable security system. ████████████████

██████████████████████████████

████████████████

374. ████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████████

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1 ███████████████████████████████████████

375.    According to the Mandiant Report, on or around January 27, 2015, the cyberattackers' unauthorized access and data extraction was noticed by an Anthem or Anthem Affiliate system administrator, who saw that someone else was working remotely from the administrator's user account.

376.    According to the Mandiant Report, after they discovered the attacker on January 27, 2015, Anthem and Anthem Affiliates implemented containment measures, and the cyberattack ceased by January 31, 2015.

377.    According to the Mandiant Report, after discovering the Anthem Data Breach, Anthem and Anthem Affiliates implemented additional containment measures, including resetting passwords of compromised accounts, implementing a multi-factor authentication requirement, ███████ ████████████████████████████████████ ████████████████████████████

378.    Anthem and Anthem Affiliates' containment measures, and the speed with which many of them were implemented after the Anthem Data Breach was discovered, demonstrate that they already understood proper data security practices, but had chosen not to implement them.

379.    Anthem and Anthem Affiliates' containment measures also demonstrate further inadequate aspects of their computer systems and data security practices, as these are all measures that should have been in place before the Anthem Data Breach.  First, prior to the Anthem Data Breach, Anthem and Anthem Affiliates did not implement reasonable methods to protect user passwords, such as a routine password change policy (under which users would be required to change their passwords within a certain time period, e.g., 90 days) ██████████████████ ███████████████████████████████ This is further evidence that that Anthem and Anthem Affiliates had no routine password change policy). ██████ ████████████████████████████████ Third, prior to the Anthem Data Breach, Anthem and Anthem Affiliates did not enable all logging functions.

380.    The Mandiant Report identified yet another way in which Anthem and Affiliates failed

112

1    to take reasonable measures to secure the Personal Information in their possession.  Attackers

2    exploited the account of a user with access to Personal Information who did not have a job function

3    that required him or her to access Personal Information, demonstrating that Anthem and Anthem

4    Affiliates lacked proper internal access controls for Personal Information.

5         381.    Anthem and Anthem Affiliates also lacked reasonable encryption policies. Anthem's

6    Information Technology Executive, Stacia Grosso, publicly admitted that a large portion of the

7    Anthem Database was not encrypted. Instead, Anthem and Anthem Affiliates only used encryption

8    when data was being moved around within their information environment and for such things as

9    mobile phones and laptops. Anthem also promised after the Anthem Data Breach that it would

10   investigate encryption best practices and determine whether it should encrypt the Anthem Database.  If

11   Anthem had encrypted the data in the Anthem Database, then the cyberattackers would have been

12   unable to use Affected Individuals' Personal Information.

13        382.    On information and belief, Anthem and Anthem Affiliates not only failed to generally

14   encrypt the Anthem Database, they failed to implement specific encryption for sensitive Personal

15   Information within the Anthem Database. Standard industry practice is to encrypt sensitive Personal

16   Information, such as Social Security Numbers. If Anthem had encrypted the sensitive Personal

17   Information within the Anthem Database, even if cyberattackers accessed the Anthem Database, the

18   cyberattackers would have been unable to use the Affected Individuals' Personal Information.

19        383.    The cyberattackers stole Personal Information for approximately 79 million Affected

20   Individuals. On information and belief, Anthem and Anthem Affiliates have still not implemented

21   necessary computer systems and date security practices to ensure that Affected Individuals' Personal

22   Information will not be accessed or stolen by additional cyberattackers.  The remediation measures

23   implemented by Anthem and Anthem Affiliates provided only an immediate stop to the present attack

24   and did not indicate that Anthem and Anthem Affiliates had made any changes to the policies,

25   procedures, management methods, or practices which allowed these attacks to occur in the first place.

26   Each day, new individuals' Personal Information is entered into the Anthem Database, and this

27   Personal Information is at risk until Anthem and Anthem Affiliates improve their data security.

28   Anthem and Anthem Affiliates must put into place a security management framework, as defined by

113

1   numerous government standards, and conduct audits by third-party independent auditors on a regular

2   basis, to ensure that it keeps abreast of future threats to the Personal Information in its care.

3   **F.    Anthem's Data Breach Was a Direct Result of Anthem's Inadequate Data Security**

4          384.    Affected Individuals' Personal Information was compromised in the Anthem Data

5   Breach because Defendants violated their promises and legal obligations to maintain the security of

6   the highly sensitive Personal Information that Affected Individuals entrusted to Defendants.

7          385.    Despite their promises and legal obligations, Defendants did not provide reasonable or

8   adequate security for Affected Individuals' Personal Information. As the creator and main operator of

9   the Anthem Database, Anthem is responsible for the inadequate and unreasonable computer systems

10  and data security practices as well as the unnecessarily large amount of unneeded data contained in

11  that database.

12         386.    Despite their promises and legal obligations, Anthem Affiliates, in conjunction with

13  Anthem, operated and maintained the deficient Anthem computer systems and data security practices.

14  Anthem Affiliates placed the Personal Information that they had been entrusted with in the Anthem

15  Database. Instead of having independent Privacy Offices, Anthem Affiliates worked with Anthem's

16  Privacy Office to create their data security practices. Anthem Affiliates continued to rely on the

17  Anthem Database even though there were multiple public indications and warnings that Anthem's

18  computer systems and data security practices were inadequate.

19         387.    Despite their promises and legal obligations, BCBSA and non-Anthem BCBS allowed

20  the Personal Information that their current and former customers and members had entrusted with

21  them to be placed in to the Anthem Database even though there were multiple public indications and

22  warnings that the Anthem and Anthem Affiliates' computer systems and data security practices were

23  inadequate.

24         388.    Defendants breached their duties to Affected Individuals by the conduct alleged in the

25  Complaint.

26         389.    Defendants breached their duty to Affected Individuals to design, maintain, and test

27  their computer systems to ensure that Affected Individuals' Personal Information was adequately

28  secured in many ways, including, but not limited to:

114

a) failing to create a two-factor-authentication system for users;

b) failing to encrypt the Anthem Database or the sensitive Personal Information within the Anthem Database;

████████████████████████████

d) failing to require users to create new passwords within a limited time period, such as 90 days;

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

f) failing to restrict access to sensitive Personal Information within the Anthem Database to users who had a job-related reason to be accessing that particular Personal Information;

g) failing to turn on all of the logging functions on all their computer systems;

h) failing to aggregate and monitor logging functions;

████████████████████████████████████████

████████

████████████████████████████████████████

k) failing to implement internal proper access controls for Personal Information, allowing users to access Personal Information even though they did not have job functions that required them to access Personal Information ; and

l) failing to adequately update their computer systems even though those systems had been demonstrated to be inadequate by 2014 because of previous security breaches.

390.    Defendants breached their duty to Affected Individuals to create and implement

reasonable data security practices and procedures to protect the Personal Information in their possession in many ways, including, but not limited to:

> a) failing to respond to all system alerts;

> b) continuing to use social security numbers (SSNs) to identify members even though other health insurance companies switched to unique member identification numbers (MINS) as early as 2003;

> c) failing to adequately train all users of the Anthem Database on data security practices;

> d) needlessly maintaining information regarding former customers (as far back to 2004) on their databases and servers.[20]  Had Defendants simply put inactive members' information on backup servers or tapes, the scope of the breach would have been smaller;

> e) failing to adequately train users of Anthem and Affiliates' computer system on how to identify spear-fishing e-mail;

> f) failing to provide a framework for escalation of suspicious events; and

> g) failing to adequately update their data security practices and procedures even though those practices and procedures had been demonstrated to be inadequate by 2014 because of previous security breaches.

391.    Defendants breached their duty to Affected Individuals to implement processes that would detect a breach of their data security systems in a timely manner in many ways, including, but not limited to:

> (a) failing to  aggregate, filter, and report on log and alert information in a unified manner,

---

[20] *See, e.g.*, Anthem Data Breach, Cal. Dept. of Ins., http://www.insurance.ca.gov/0400-news/0100-press-releases/anthemcyberattack.cfm (last visited Oct. 19, 2015).

116

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

(b) failing to turn on all of the "logging" function on their computer systems,



(f) failing to implement a reasonable capacity monitoring and alerting system

and

(g) failing to implement basic Information Technology monitoring systems that would

have detected the cyberattackers' activities, such as monitoring data usage on the

system, monitoring data extraction, or performance monitoring.

392.    Defendants breached their duty to Affected Individuals to act upon data security

warnings and alerts in a timely fashion by:

(a) failing to respond to multiple alerts of cyberattacker activity, including a month-long

alert;

(b) failing to aggregate, filter, and report on log and alert information in a unified

manner,

(c) failing to periodically review alert information; and

(d) failing to periodically review log information.

393.    Defendants breached their duty to Affected Individuals to disclose the material fact that

Anthem and Anthem Affiliates' computer systems and data security practices were inadequate to

safeguard Affected Individuals' Personal Information.  Had Defendants disclosed to Affected

Individuals that their computer systems and data security practices were inadequate to safeguard

Affected Individuals' highly sensitive Personal Information, Affected Individuals would not have

entrusted their Personal Information to Defendants and would not have enrolled in their insurance or

117

1  health care plans.

2      394.    Anthem and Anthem Affiliates breached their duty to Affected Individuals to disclose

3  in a timely and accurate manner that the Anthem Data breach had occurred. Anthem and Anthem

4  Affiliates failed to notify potentially affected customers for several weeks, and in some cases months,

5  after they claim they discovered the breach. Indeed, several states joined together to write to Anthem

6  to urge it to notify Affected Individuals in a more timely manner.21 As a result, the Affected

7  Individuals were not notified of the Anthem Data Breach until in or about March 2015. Additionally,

8  further discovery will be needed to determine whether Anthem and Anthem Affiliates discovered the

9  breach earlier.22

10      395.    Anthem and Anthem Affiliates' failure to notify Affected Individuals of the Anthem

11  Data Breach in a timely and accurate manner allowed the cyberattackers to begin to use Affected

12  Individuals' Personal Information before Affected Individuals had an opportunity to take steps to

13  protect themselves. For example, many Affected Individuals had fraudulent 2015 tax returns filed in

14  their names. While Anthem and Anthem Affiliates became aware of the Anthem Data Breach near the

15  beginning of the federal tax filing period, they failed to notify the Affected Individuals until near the

16  end of the federal tax filing period. This deprived Affected Individuals of the opportunity to take steps

17  to avoid fraudulent tax filings.

18  **G.    Defendants Breached Their Contracts To Protect Personal Information**

19      **1.    Anthem's Breach of Specific Contract Promises**

20      396.    The Anthem Data Breach was the direct result of, and itself constituted, a breach of

21  Anthem and its Affiliates' contractual promises and commitments regarding the security of Plaintiffs'

22  and Affected Individuals' Personal Information.

23

24      [21] Jim Finkle, *U.S. states say Anthem too slow to inform customers of breach*, REUTERS (Feb.

25  11, 2015, 11:18 AM), http://www.reuters.com/article/2015/02/11/us-anthem-cybersecurity-states-idUSKBN0LE2QP20150211.

26      [22] There are reports that Anthem's website dedicated to the security breach –

27  www.anthemfacts.com – was registered on December 13, 2014. *See* e.g., Dan Goodin, *String of big data breaches continues with hack on health insurer Anthem,* ARSTECHNICA (Feb. 5, 2015, 11:01 AM), http://arstechnica.com/security/2015/02/string-of-big-data-breaches-continues-with-hack-on-

28  health-insurer-anthem. / (accessed Feb. 8, 2015).

397.    As set forth above at ¶¶174-249, all of the contracts between Plaintiffs and Affected Individuals and Anthem and its Affiliates, as well as Anthem and its Affiliates' Group and Administrative Services Agreements for which Plaintiffs and Affected Individuals are intended beneficiaries, included as contract terms the commitments and promises with respect to maintaining and protecting the confidentiality of personal information set forth by Anthem and its Affiliates' in their then-current privacy policies, including but not limited to Anthem's Personal Information (Including Social Security Number) Privacy Protection Policy and the commitments and guarantees as set forth in Anthem's Privacy Notices.

398.    The Anthem Data Breach revealed that Anthem and its Affiliates had breached their contractual promises to Plaintiffs and Affected Individuals, as set forth in those policies.

399.    Anthem and its Affiliates breached their specific commitment in the Personal Information (Including Social Security Number) Privacy Protection Policy and Privacy Notices to "protect the confidentiality" of Members' personal information acquired and compiled by Anthem in the course of doing business, as set forth in ¶¶347-395.

400.    Anthem and its Affiliates breached their specific commitment in the Personal Information (Including Social Security Number) Privacy Protection Policy to impose "standards" to: 1) "guard the confidentiality of Social Security numbers and other personal information;" 2) "prohibit the unlawful disclosure of Social Security numbers;" and 3) "limit access to Social Security numbers" by failing to impose such standards, including industry standards for protecting and limiting access to this information, as set forth in ¶¶347-395.

401.    Anthem and its Affiliates breached their specific commitment in the Personal Information (Including Social Security Number) Privacy Protection Policy that they would not "use or share Social Security numbers or personal information with anyone outside the company except when permitted or required by federal and state law." The Anthem Data Breach resulted from the affirmative actions of Anthem's employees, as set forth in ¶347-395, resulting in Plaintiff and Affected Individuals' Personal information, including Social Security Numbers being shared with unauthorized third parties.

402.    Anthem and its Affiliates breached the following specific commitment in the Personal

119

Information (Including Social Security Number) Privacy Protection Policy by allowing Anthem and

Anthem Affiliate Associates to access Social Security numbers or other personal information when not

required by their job duties, and failing to impose minimally necessary policies and practices to ensure

that employees/associates would only access or use Social Security numbers or personal information

to complete a specific task, as set forth in ¶¶347-395:

> Anthem Blue Cross and Blue Shield Associates must only access Social Security numbers or
> personal information as required by their job duties. Anthem Blue Cross and Blue Shield has
> in place a minimum necessary policy which states that associates may only access, use or
> disclose Social Security numbers or personal information to complete a specific task and as
> allowed by law.

403.    Anthem's commitment to limit access to personal information was likewise set forth in

Anthem's and Affiliates' Privacy Notices: "We require our employees to protect PHI through written

policies and procedures. These policies limit access to PHI to only those employees who need the data

to do their job." Anthem and its Affiliates did not limit access to Plaintiff and Affected Individuals'

information maintained in the Anthem Data Base to only those individuals who needed the data to do

their job.

404.    Anthem and its Affiliates breached the following specific commitment in the Personal

Information (Including Social Security Number) Privacy Protection Policy to "safeguard[] Social

Security numbers and other personal information by having physical, technical, and administrative

safeguards in place" by failing, prior to the Anthem Data Breach, to have reasonable technical or

administrative safeguards in place, resulting in the Anthem Data Breach.

405.    Anthem's and its Affiliates' commitment to use technical and procedural safeguards

was likewise set forth in Anthem's Privacy Notices, which were also breached by the failure to

implement electronic and procedural means to protect Member's information: "We keep your oral,

written and electronic PHI safe using physical, electronic, and procedural means." Anthem and its

Affiliates breached this promise by failing to use reasonable technical and procedural safeguards,

including those recognized as industry standard.

406.    Anthem and its Affiliates breached their Privacy Policies by failing to comply with

their stated practices for implementing the HIPAA Privacy Rule, 45 C.F.R. Parts 160 and 164(A), (E),

with respect to Members' personal information as set forth in the Privacy Notices.

407.    Anthem and its Affiliates breached their Privacy Policies by failing to comply with their stated practices for implementing the HIPAA Security Rule, 45 C.F.R. Parts 160 and 164(A), (C), with respect to Members' personal information as set forth in the Privacy Notices.

408.    Anthem and its Affiliates breached their specific commitment set forth in their Privacy Notices to "take reasonable safety measures to protect the PI we have about you" by failing to take such reasonable safety measures, as set forth in ¶¶347-395.

409.    Anthem and its Affiliates breached their specific commitment set forth in their Privacy Notices that the mechanisms by which they would protect the confidentiality of Members' Personal Information would use "safeguards [that] follow federal and state laws," by failing to use safeguards that complied with the HIPAA Privacy and Security rules and other laws, as set forth in ¶¶347-395.

410.    Anthem also violated the Gramm-Leach-Bliley Act by failing to protect the security and confidentiality of those customers' "nonpublic personal information." 15 U.S.C. § 6801.

411.    Anthem also violated the Federal Trade Commission Act by engaging in the "unfair practice" of failing to maintain reasonable and appropriate data security for consumers' sensitive Personal Information.

**2.    The Non-Anthem BCBS Defendants' Breach of Their Specific Contract Promises**

412.    As set forth above in ¶¶266-306, each of the Non-Anthem Defendants expressly agreed to protect the confidentiality of its members' Personal Information, to require third parties to whom it provided its members' Personal Information to protect its confidentiality, and to follow its contractual obligations when their Members used the BlueCard Program.

413.    All of the Non-Anthem Defendants provided Anthem with Personal Information regarding their members who are Plaintiffs and Affected Individuals when those members used the BlueCard Program.  That Personal Information was maintained by Anthem in an unprotected Database, and was disclosed in the Data Breach as a result of the lack of data security.

414.    Each of the Non-Anthem Defendants therefore breached its contractual obligations (as set forth in ¶¶266-306) to Plaintiffs and Affected Individuals to maintain the confidentiality of their Personal Information, and to not permit the unauthorized disclosure of that information to third parties,

121

contractual obligations that the Non-Anthem Defendants extended to the BlueCard program, when Plaintiffs' and Affected Individuals Personal Information was disclosed in the Anthem Data Breach.

415.    Each of the Non-Anthem Defendants also breached its contractual obligations (as set forth in ¶¶266-306) to Plaintiffs and Affected Individuals by providing Plaintiffs and Affected Individuals' Personal Information to Anthem and failing to take reasonable measures to determine or ensure that Anthem, with which they conducted business and coordinated on the processing of insurance claims as part of the BlueCard program, had sufficient data security to protect the confidentiality of the Non-Anthem Defendants' Members' Personal Information.

### 3.    BCBSA and Anthem and Non-Anthem Defendants' Breach of the Federal Contract

416.    As set forth above, BCBSA, acting as agent for Anthem and its BCBS Affiliates and the Non-Anthem BCBS Defendants, entered into the Federal BCBSA Contract with OPM that included as contract terms specific requirements to maintain the confidentiality of Enrollees' Personal Information.

417.    BCBSA provided Anthem with the confidential Personal Information regarding all of the federal Plaintiffs and Affected Individuals who enrolled in the Federal BCBSA Plan that was stored in the unprotected Anthem Data Base, and was disclosed in the Anthem Data Breach as a result of the lack of data security.

418.    BCBSA, acting as agent for Anthem and its BCBS Affiliates and the Non-Anthem BCBS Defendants, along with Anthem, Anthem's BCBS Affiliates, and the Non-Anthem BCBS, all breached their contractual obligations to Plaintiffs and Affected Individuals (as set forth in ¶¶307-320) by failing to maintain the confidentiality of Plaintiffs' Personal Information, including by:

- Failing to limit the uses of Personal Information to those specifically allowed
- Failing to limit access to Personal Information to those on a "need-to-know" basis;
- Failing to allocate the resources necessary to maintaining the confidentiality of this information;
- Failing to comply with applicable federal laws regarding data security and privacy including HIPAA
- Failing to conduct audits or otherwise employ best practices to prevent or halt the unauthorized access to Personal Information
- Failing to allow OIG to perform configuration compliance audits

122

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

- Failing to use technical and and procedural safeguards adequate to protect Personal Information.

## H.    Affected Individuals Were Grievously Harmed By the Anthem Data Breach

419.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." [23]   The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." [24]

420.    Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit. [25]

421.    With access to an individual's Personal Information, criminals can do more than just empty a victim's bank account—they can also commit various types of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the victim's name and Social Security Number to obtain government benefits; or, filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security Number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. Further, loss of private and personal health information can expose the victim to loss of reputation, loss of employment, blackmail and other negative effects.

422.    Personal Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

423.    A study by Experian found that the "average total cost" of medical identity theft is

---

[23] 17 C.F.R. § 248.201 (2013).

[24] *Id.*

[25] *Guide for Assisting Identity Theft Victims*, Federal Trade Commission, 4 (September 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf  (last visited Oct. 19, 2015)

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

"about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[26] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third saw their insurance premiums rise, and forty percent were never able to resolve their identity theft at all.[27]

424.    Indeed, data breaches and identity theft have a crippling effect on individuals and detrimentally impact the entire economy as a whole.

425.    The injuries suffered by the Affected Individuals are a direct and proximate result of the Anthem Data Breach and include but are not limited to:

a) theft of their valuable personal and financial information;

b) loss or delay of tax refunds as a result of fraudulently filed tax returns, including but not limited to the deprivation of the time value of their money due to delay in receiving refunds and the requirement that in the future they file paper returns or use special PIN codes, thus insuring that future tax refunds will also be delayed;

c) costs associated with the detection and prevention of identity theft and unauthorized use of their Personal Information and financial, business, banking, and other accounts;

d) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Anthem Data Breach, including finding fraudulent charges, cancelling credit cards, purchasing credit monitoring and identity theft protection services, placing fraud alerts on their accounts, the imposition of withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with all issues resulting from the Anthem Data Breach, including additional phishing emails and phone scams;

e) the imminent and certain impending injury flowing from fraud and identify theft

---

[26]  *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010, 5:00 AM), http://news.cnet.com/8301-27080_3-10460902-245.html.

[27]  *Id.*

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

posed by their Personal Information being placed in the hands of hackers;

f)  damages to and diminution in value of their Personal Information entrusted to Defendants for the sole purpose of obtaining health insurance or health care services from Anthem, Anthem Affiliates, BCBSA and Non-Anthem BCBS with the mutual understanding that Defendants would safeguard Affected Individuals' data against theft and not allow access to or misuse of their data by third parties;

g) money paid to Defendants for health insurance or health care services during the period of the Anthem Data Breach because Plaintiffs and Class Members would not have obtained health insurance or health care services from Defendants had Defendants disclosed that they lacked adequate systems and procedures to reasonably safeguard customers' Personal Information.

h) loss of the benefit of the bargain with Defendants to provide adequate and reasonable data security – i.e. the difference in value between what Plaintiffs should have received from Defendants when they enrolled in and/or purchased insurance from Defendants that Defendants represented, contractually and otherwise, would be protected by reasonable data security, and Defendants' partial, defective, and deficient performance by failing to provide reasonable and adequate data security and failing to protect Plaintiffs' Personal Information from theft.

i)  unjust profits retained by Defendants for health insurance or health care services purchased, in that a portion of the price for insurance paid by Affected Individuals to Defendants was intended for the Defendants to take reasonable and adequate security measures to protect Affected Individuals' Personal Information, which Defendants failed to do;

j)  damages caused by Defendants' failure to notify Affected Individuals about the Anthem Data Breach in a timely and accurate fashion; and

k) continued risk to Affected Individuals' Personal Information, which remains in the possession of Defendants and which is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect the Personal

125

1      Information that Affected Individuals entrusted to Defendants.

2      426.    Anthem itself acknowledges the harm caused by the Anthem Data Breach because it

3   offered Affected Individuals twenty-four months of identity theft repair and credit monitoring services.

4   Two years of identity theft repair and credit monitoring is woefully inadequate to protect Affected

5   Individuals from a virtual lifetime of identity theft risk and does nothing to reimburse Plaintiffs and

6   Class Members for the injuries they have already suffered.  Indeed, Plaintiffs and other Affected

7   Individuals are continuing to experience fraud and identity theft over a year after the Anthem Data

8   Breach.  Credit monitoring services do nothing to detect potential tax fraud, fraudulent business or

9   payday loans, or many other forms of identity theft and fraud currently being experienced by Plaintiffs

10  and other Affected Individuals.

11     427.    Anthem publicly stated that any identity theft repair or credit monitoring services

12  potentially offered beyond twenty-four months will be embedded in Anthem's pricing.  To the extent

13  Anthem now offers credit monitoring to its members, they are paying for that credit monitoring as part

14  of their premiums, and they lose that protection when they choose a different insurance or health

15  benefits company.  Anthem also stated it will not reimburse individuals that purchase identity theft

16  repair or credit monitoring services.[28]

## V.    CLASS ALLEGATIONS

**A.    Statewide Classes**

18     428.    Pursuant to Fed. R. Civ. P. 23(b)(1), (b)(2), (b)(3), and (c)(4), Plaintiffs assert common

20  law claims for negligence (Count I), negligence per se (Count II), negligent misrepresentation (Count

21  VII), unjust enrichment (Count VIII), as well as statutory claims under state consumer protection

22  statutes (Count IX), state data breach notification statutes (Count X), state unfair insurance practice

23  statutes (Count XI), state insurance privacy statutes (Count XII), and state medical privacy statutes

24  (Count XIII), on behalf of separate statewide classes for each of the 50 states, the District of

25  Columbia, Puerto Rico, and the Virgin Islands, defined as follows:

26     **Statewide [name of State] Class:** All individuals subject to the law of [name of State] whose

---

[28] https://www.anthemfacts.com/faq

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

Personal Information was maintained on the Anthem Database and was compromised as a result of the breach announced by Anthem on or around February 5, 2015.

429.    Excluded from the Classes are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns.  Also excluded from the Classes is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

**B.     Anthem Contract Classes**

430.    Pursuant to Fed. R. Civ. P. 23(b)(1), (b)(2), (b)(3), and (c)(4), Plaintiffs assert common law claims for breach of contract (Count III), and breach of the implied covenant of good faith and fair dealing (Count V), on behalf of separate classes as against Anthem and its Affiliates, defined as follows:

> **Anthem [name of State] Contract Class:**  All individuals who were enrolled in an insurance and/or health benefits plan with Anthem and its Affiliates that is subject to the contract law of [name of State], whose Personal Information was maintained on the Anthem Database and was compromised as a result of the breach announced by Anthem on or around February 5, 2015.

431.    Excluded from these Classes are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns.  Also excluded from the Classes is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

**C.     Non-Anthem Defendant Contract Classes**

432.    Pursuant to Fed. R. Civ. P. 23(b)(1), (b)(2), (b)(3), and (c)(4), Plaintiffs assert common law claims for breach of contract (Count IV), and breach of the implied covenant of good faith and fair dealing (Count V), on behalf of separate classes as against the Non-Anthem Defendants, defined as follows:

> **[Non-Anthem Defendant] Contract Class:**  All individuals who were enrolled in an insurance and/or health benefits plan with [Non-Anthem Defendant name], whose Personal Information was maintained on the Anthem Database and was compromised as a result of the breach announced by Anthem on or around February 5, 2015.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

433.     Excluded from these Classes are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns.  Also excluded from the Classes is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

**D.     Federal Employee Class**

434.     Pursuant to Fed. R. Civ. P. 23(b)(1), (b)(2), (b)(3), and (c)(4), Plaintiffs assert a breach of contract claim on behalf of a federal employee class, defined as follows:

> **Federal Employee Class:**  All enrollees in the Federal Employee Health Benefits Plan whose Personal Information was maintained on the Anthem Database and was compromised as a result of the breach announced by Anthem on or around February 5, 2015.

435.     Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns.  Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

**C.     Certification of the Proposed Classes is Appropriate**

436.     Each of the proposed Classes meets the requirements of Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and (c)(4).

437.     Numerosity: There are approximately 79 million individuals in all of the Classes combined.  According to Defendants' records, there are thousands, if not millions, of individuals in each putative class, making joinder of each individual member impracticable.

438.     For example, according to Defendants' records, at minimum, the number of Affected Individuals residing in each state (as well as the District of Columbia, Puerto Rico, and the Virgin Islands) is as follows: At least 33,419 Affected Individuals are residents of Alaska. At least 359,360 Affected Individuals are residents of Alabama. At least 190,174 Affected Individuals are residents of Arkansas. At least 418,640 Affected Individuals are residents of Arizona. At least 13,507,433 Affected Individuals are residents of California. At least 1,552,987 Affected Individuals are residents of Colorado. At least 1,716,436 Affected Individuals are residents of Connecticut. At least 102,796 Affected Individuals are residents of District of Columbia. At least 62,051 Affected Individuals are

1    residents of Delaware. At least 1,428,349 Affected Individuals are residents of Florida. At least

2    3,726,249 Affected Individuals are residents of Georgia. At least 43,830 Affected Individuals are

3    residents of Hawaii. At least 172,727 Affected Individuals are residents of Iowa. At least 100,686

4    Affected Individuals are residents of Idaho. At least 1,705,470 Affected Individuals are residents of

5    Illinois. At least 4,558,354 Affected Individuals are residents of Indiana. At least 389,432 Affected

6    Individuals are residents of Kansas. At least 2,305,612 Affected Individuals are residents of

7    Kentucky. At least 277,022 Affected Individuals are residents of Louisiana. At least 967,604 Affected

8    Individuals are residents of Massachusetts. At least 672,102 Affected Individuals are residents of

9    Maryland. At least 531,717 Affected Individuals are residents of Maine. At least 636,075 Affected

10   Individuals are residents of Michigan. At least 313,637 Affected Individuals are residents of

11   Minnesota. At least 2,041,985 Affected Individuals are residents of Missouri. At least 164,216

12   Affected Individuals are residents of Mississippi. At least 48,217 Affected Individuals are residents of

13   Montana. At least 775,606 Affected Individuals are residents of North Carolina. At least 27,012

14   Affected Individuals are residents of North Dakota. At least 104,795 Affected Individuals are

15   residents of Nebraska. At least 667,866 Affected Individuals are residents of New Hampshire. At

16   least 1,152,283 Affected Individuals are residents of New Jersey. At least 102,610 Affected

17   Individuals are residents of New Mexico. At least 764,039 Affected Individuals are residents of

18   Nevada. At least 4,656,207 Affected Individuals are residents of New York. At least 5,201,576

19   Affected Individuals are residents of Ohio. At least 244,312 Affected Individuals are residents of

20   Oklahoma. At least 197,206 Affected Individuals are residents of Oregon. At least 751,931 Affected

21   Individuals are residents of Pennsylvania. At least 15,682 Affected Individuals are residents of Puerto

22   Rico. At least 79,599 Affected Individuals are residents of Rhode Island. At least 461,769 Affected

23   Individuals are residents of South Carolina. At least 44,689 Affected Individuals are residents of

24   South Dakota. At least 773,763 Affected Individuals are residents of Tennessee. At least 2,643,626

25   Affected Individuals are residents of Texas. At least 181,103 Affected Individuals are residents of

26   Utah. At least 3,777,806 Affected Individuals are residents of Virginia. At least 3,660 Affected

27   Individuals are residents of the Virgin Islands. At least 72,165 Affected Individuals are residents of

28   Vermont. At least 445,932 Affected Individuals are residents of Washington. At least 1,744,732

Affected Individuals are residents of Wisconsin. At least 383,599 Affected Individuals are residents of West Virginia. At least 53,292 Affected Individuals are residents of Wyoming.  In addition, the total numbers of Affected Individuals with respect to each Non-Anthem Defendant are set forth in ¶¶252-265.

439.   Commonality and Predominance: There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include:

a)  Whether Defendants failed to adequately safeguard Plaintiffs' and the Classes' Personal Information;

b)  Whether Defendants failed to protect Plaintiffs' and the Classes' Personal Information, as promised;

c)  Whether Defendants' computer system systems and data security practices used to protect Plaintiffs' and the Classes' Personal Information violated HIPAA, federal, state and local laws, or Defendants' duties;

d)  Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiffs' and the Classes' Personal Information properly and/or as promised;

e)  Whether Defendants violated the consumer protection statutes, data breach notification statutes, state unfair insurance practice statutes, state insurance privacy statutes, and state medical privacy statutes applicable to Plaintiffs and each of the Classes;

f)  Whether Defendants failed to notify Plaintiffs and members of the Classes about the Anthem Data Breach as soon as practical and without delay after the Anthem Data Breach was discovered;

130

g) Whether Defendants acted negligently in failing to safeguard Plaintiffs' and the Classes' Personal Information;

h) Whether Defendants entered into contracts with Plaintiffs and the members of the each of the Classes that included contract terms requiring Defendants to protect the confidentiality of Plaintiff's Personal Information and have reasonable security measures;

i) Whether Defendants' conduct described herein constitutes a breach of their contracts with Plaintiffs and the members of each of the Classes;

j) Whether Defendants should retain the money paid by Plaintiffs and members of each of the Classes to protect their Personal Information;

k) Whether Plaintiffs and the members of the Classes are entitled to damages as a result of Defendants' wrongful conduct;

l) Whether Plaintiffs and the members of the Classes are entitled to restitution as a result of Defendants' wrongful conduct;

m) What equitable relief is appropriate to redress Defendants' wrongful conduct; and

n) What injunctive relief is appropriate to redress the imminent and currently ongoing harm faced by members of the Classes.

440.   Typicality: Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and the members of the Classes sustained damages as a result of Defendants' uniform wrongful conduct during transactions with them.

441.   Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Classes, and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Classes, and there are no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the members of the proposed Classes, and have the financial resources to do so. Neither

1    Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes.

2    442.    Risks of Prosecuting Separate Actions: This case is appropriate for certification

3    because prosecution of separate actions would risk either inconsistent adjudications which would

4    establish incompatible standards of conduct for the Defendants or would be dispositive of the

5    interests of members of the proposed Classes. Furthermore, the Anthem Database still exists, and is

6    still vulnerable to future attacks – one standard of conduct is needed to ensure the future safety of the

7    Anthem Database.

8    443.    Policies Generally Applicable to the Classes: This case is appropriate for certification

9    because Defendants have acted or refused to act on grounds generally applicable to the Plaintiffs and

10   proposed Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure

11   compatible standards of conduct towards members of the Classes, and making final injunctive relief

12   appropriate with respect to the proposed Classes as a whole. Defendants' practices challenged herein

13   apply to and affect the members of the Classes uniformly, and Plaintiffs' challenge to those practices

14   hinges on Defendants' conduct with respect to the proposed Classes as a whole, not on individual

15   facts or law applicable only to Plaintiffs.

16   444.    Superiority: This case is also appropriate for certification because class proceedings

17   are superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs

18   and the members of the Classes. The injuries suffered by each individual member of the Classes are

19   relatively small in comparison to the burden and expense of individual prosecution of the litigation

20   necessitated by Defendants' conduct. Absent a class action, it would be virtually impossible for

21   individual members of the Classes to obtain effective relief from Defendants. Even if members of the

22   Classes could sustain individual litigation, it would not be preferable to a class action because

23   individual litigation would increase the delay and expense to all parties, including the Court, and

24   would require duplicative consideration of the common legal and factual issues presented here. By

25   contrast, a class action presents far fewer management difficulties and provides the benefits of single

26   adjudication, economies of scale, and comprehensive supervision by a single Court.

27

28

## VI.    CAUSES OF ACTION

132

**COUNT I – NEGLIGENCE**
**BROUGHT BY 53 STATEWIDE CLASSES AGAINST ALL DEFENDANTS EXCEPT FOR BCBSA[29]**

445.    Plaintiffs incorporate the above allegations by reference.

446.    Defendants required Plaintiffs and Statewide Class Members to submit Personal Information in order to obtain insurance coverage and/or to receive health care services.

447.    Defendants knew, or should have known, of the risks inherent in collecting and storing the Personal Information of Plaintiffs and Statewide Class Members.

448.    As described above, Anthem owed duties of care to Plaintiffs and Statewide Class Members whose Personal Information had been entrusted with Anthem. Anthem Affiliates owed duties of care to Plaintiffs and Statewide Class Members whose information was placed in the Anthem Database due to their dealings with Anthem Affiliates. Non-Anthem BCBS owed duties of care to Plaintiffs and Statewide Class Members whose information was placed in the Anthem Database due to their dealings with non-Anthem BCBS.

449.    Defendants breached their duties to Plaintiffs and Statewide Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' Personal Information.

450.    Defendants acted with wanton disregard for the security of Plaintiffs and State Class Members' Personal Information. Defendants knew or should have known that Anthem had inadequate computer systems and data security practices to safeguard such information, and Defendants knew or should have known that hackers were attempting to access the Personal Information in health care databases, such as Anthem's.

451.    A "special relationship" exists between Defendants and the Plaintiffs and Statewide Class Members. Anthem Affiliates entered into a "special relationship" with the Plaintiffs and State Class Members whose Personal Information was requested, collected, and received by Anthem Affiliates.  A "special relationship" also exists between Anthem Affiliates and Plaintiffs and the State

---

[29] Plaintiffs acknowledge that the Court dismissed Plaintiffs' Indiana negligence claim.  While Count I encompasses negligence claims in numerous relevant states, to the extent Count I relates to an Indiana negligence claim, it is re-alleged here solely to preserve the claim for appeal.

133

1    Class Members because Anthem Affiliates are insurers and providers of health plan services and thus

2    stand in a fiduciary or quasi-fiduciary relationship with Plaintiffs and State Class Members.

3    Similarly, non-Anthem BCBS entered a "special relationship" with Plaintiffs and State Class

4    Members whose Personal Information they requested, received, or collected. A "special relationship"

5    also exists between non-Anthem BCBS and Plaintiffs and the State Class Members because non-

6    Anthem BCBS are insurers and providers of health plan services and thus stand in a fiduciary or

7    quasi-fiduciary relationship with Plaintiffs and State Class Members.  Anthem entered into a "special

8    relationship" with all Plaintiffs and Class Members by placing their Personal Information in the

9    Anthem Database – information that Plaintiffs and State Class Members had been required to provide

10   to Anthem Affiliates or non-Anthem BCBS.  Furthermore, Anthem also created a "special

11   relationship" with Plaintiffs and Statewide Class Members who provided their information to Anthem

12   Affiliates by playing a large in role in creating and maintaining centralized computer systems and

13   data security practices that were used for storage of all of Anthem Affiliates' customers' Personal

14   Information. Finally, Anthem also created a "special relationship" with Plaintiffs and Statewide Class

15   Members whose Personal Information was placed in the Anthem Database due to their dealings with

16   non-Anthem BCBS. Those Plaintiffs and Statewide Class Members' Personal Information was placed

17   in the Anthem Database so that they could receive access to providers and discounts in areas where

18   Anthem serves as the BCBS licensee.

19          452.    But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs

20   and Statewide Class Members, Plaintiffs and Statewide Class Members would not have been injured.

21          453.    The injury and harm suffered by Plaintiffs and Statewide Class Members was the

22   reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have

23   known that they were failing to meet their duties, and that Defendants' breach would cause Plaintiffs

24   and Statewide Class Members to experience the foreseeable harms associated with the exposure of

25   their Personal Information.

26          454.    As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class

27   Members have suffered injury and are entitled to damages in an amount to be proven at trial.

28                              **COUNT II – NEGLIGENCE PER SE**

**BROUGHT BY 53 STATEWIDE CLASSES AGAINST ALL DEFENDANTS EXCEPT FOR BCBSA**

455.    Plaintiffs incorporate the above allegations by reference.

456.    Pursuant to the Federal Trade Commission Act (15 U.S.C. §45), Defendants Anthem, Anthem Affiliates, and non-Anthem BCBS had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Personal Information.

457.    Pursuant to HIPAA (42 U.S.C. §1302d et. seq.), Defendants had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Personal Information.

458.    Pursuant to the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), Defendants had a duty to protect the security and confidentiality of Plaintiffs' and Class Members' Personal Information.

459.    Pursuant to state laws in the following 12 states, Anthem and all other Defendants operating in those states had a duty to those respective states' Class Members to implement and maintain reasonable security procedures and practices to safeguard Plaintiffs' and Class Members' Personal Information:

    a) Arkansas: Ark. Code § 4-110-104

    b) California: Cal Civ. Code § 1798.81.5

    c) Connecticut: Conn. Gen. Stat. § 42-471

    d) Florida: Fla. Stat. § 501.171(2)

    e) Indiana: Ind. Code § 24-4.9-3.5

    f) Maryland: Md. Code. Comm. Law § 14-5303

    g) Massachusetts: Mass. Gen Laws Ch. 93H, § 3(a)

    h) Nevada: Nev. Rev. Stat. § 603A.210

    i) Oregon: Ore. Rev. Stat. § 646A.622(1)

    j) Rhode Island: R.I. Gen Laws § 11-49.2-2(2)

    k) Texas: Tex. Bus. & Com. Code § 521.052(a)

    l) Utah: Utah Code § 14-44-201(1)(a)

135

460.    Defendants breached their duties to Plaintiffs and Statewide Class Members under the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d et. seq.), Gramm-Leach-Bliley Act (15 U.S.C. § 6801), and the state reasonable data security statutes by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Personal Information.

461.    Defendants' failure to comply with applicable laws and regulations constitutes negligence per se.

462.    But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs and Statewide Class Members, Plaintiffs and Statewide Class Members would not have been injured.

463.    The injury and harm suffered by Plaintiffs and Statewide Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties, and that Defendants' breach would cause Plaintiffs and Statewide Class Members to experience the foreseeable harms associated with the exposure of their Personal Information.

464.    As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

## COUNT III – BREACH OF CONTRACT BROUGHT BY ANTHEM CONTRACT CLASSES[30] AGAINST ANTHEM AND ANTHEM AFFILIATES

465.    Plaintiffs incorporate the above allegations by reference.

466.    As forth above in ¶¶196-249, Plaintiffs and those Class Members who purchased individual insurance policies from Anthem and its Affiliates or who enrolled pursuant to the terms of a group contract with Anthem and its Affiliates entered into binding and enforceable contracts with Anthem and its Affiliates.

467.    As set forth above in ¶¶196-249, the contracts between Plaintiffs and Class Members

---

[30] Plaintiffs acknowledge that the Court dismissed with prejudice certain Plaintiffs' California contract claims against the Anthem Defendants.  To the extent Count III includes those Plaintiffs' contract claims, it is re-alleged here solely to preserve the claims for appeal.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

and Anthem and its Affiliates were supported by consideration in many forms including the payment of premiums, contributions or fees by all Plaintiffs and Class Members (and/or their employers on their behalf) to Anthem and its Affiliates, and Plaintiff and Class Members' other performance under these contracts, including by providing the Personal Information to Anthem and its Affiliates required by the contracts.

468.    To the extent that group contracts with Anthem and its Affiliates in which Plaintiffs and Class Members enrolled are also contracts with an employer, fund or group, Plaintiffs and Class Members are intended beneficiaries of those group contracts, including the provisions incorporating Anthem's privacy policies and otherwise pertaining to the confidentiality of Personal Information of Members provided to Anthem, as described above at ¶¶196-249.    Plaintiffs and Class Members sue in the alternative for breach of contract as third-party beneficiaries.

469.    As set forth above in ¶¶196-249, Anthem also entered into binding and enforceable Administrative Services Agreements for Self-Funded Plans in which some Plaintiffs and Class Members were enrolled.  Plaintiffs and Class Members are intended beneficiaries of those Administrative Services Agreements, including the provisions incorporating Anthem's privacy policies and otherwise pertaining to the confidentiality of Personal Information of Members provided to Anthem, as described above at ¶¶196-249.  The Plaintiffs and Class Members who enrolled in Self-Funded Plans for whom Anthem provided only administrative services sue as third-party beneficiaries of those contracts.

470.    With respect to contracts between employers and Anthem and/or Anthem affiliates, the applicable contract is not the ERISA plan instrument described in 29 U.S.C. §1102(a)(1).

471.    All contracts between Anthem and its Affiliates and Plaintiffs and Class Members (and/or their employers or other groups) were entered into prior to the Anthem Data Breach, as described above at ¶¶196-249.

472.    Plaintiffs and Class Members (and/or their employers or other groups) performed pursuant to these contracts, including by paying premiums, contributions or fees to Anthem, and by providing Anthem and its Affiliates with the personal, confidential information required by these contracts.  Plaintiffs and Class Members (and/or their employers or other groups) fully performed

1  their obligations under their contracts with Anthem and Anthem Affiliates and satisfied all

2  conditions, covenants, obligations, and promises of these agreements.

3      473.    As set forth above in ¶¶196-249, all Plaintiffs and Class Members who purchased

4  individual policies from Anthem and its Affiliates entered into contracts with Anthem and its

5  Affiliates that incorporated, either by express provision or attachment, or incorporation by reference,

6  Anthem's then-current privacy policies pertaining to personal and health-related information,

7  including but not limited to the Personal Information (Including Social Security Number) Privacy

8  Protection Policy, and the Privacy Notices set forth at all times on Anthem's Privacy webpages.  The

9  documents comprising those contracts, and the terms pertaining to privacy and confidentiality of

10  information, are described at ¶¶201-217.

11      474.    As set forth above in ¶¶196-249 all Plaintiffs and Class Members who enrolled in

12  group plans from Anthem and its Affiliates entered into contracts with Anthem and its Affiliates upon

13  enrollment that incorporated either by express provision or attachment, or incorporation by reference,

14  Anthem's then-current privacy policies pertaining to personal and health-related information,

15  including but not limited to the Personal Information (Including Social Security Number) Privacy

16  Protection Policy, and the Privacy Notices set forth at all times on Anthem's Privacy webpages.  The

17  Group contracts for which Plaintiffs and Affected Individuals were beneficiaries likewise

18  incorporated these policies and notices.  The documents comprising those contracts, and the terms

19  pertaining to privacy and confidentiality of information, are described at ¶¶218-237.

20      475.    As set forth above in ¶¶196-249, all Anthem and Anthem Affiliates Administrative

21  Services Agreements for which Plaintiffs and Class Members were the intended beneficiaries

22  incorporated either by express provision or attachment, or incorporation by reference, Anthem's then-

23  current privacy policies pertaining to personal and health-related information, including but not

24  limited to the Personal Information (Including Social Security Number) Privacy Protection Policy,

25  and the information set forth at all times on Anthem's Privacy webpages.  The documents comprising

26  those contracts, and the terms pertaining to privacy and confidentiality of information, are described

27  at ¶¶238-249.

28      476.    As set forth in ¶¶396-411, Anthem and its Affiliates materially breached the terms of

their contracts with Plaintiffs and Class Members, and the contract terms intended to benefit Plaintiffs and Class Members, by violating their commitment to maintain the confidentiality and security of Personal Information compiled by Anthem and their Affiliates in the Anthem Data Base; and by failing to comply with their own policies and applicable laws, regulations and industry standards for data security and protecting the confidentiality of Personal Information.

477.   As a result of Anthem and its Affiliates' breach of contract, Plaintiffs and Class Members did not receive the full benefit of the bargain, and instead received health insurance and/or health care services that were less valuable than described in their contracts.  Plaintiffs and Class Members, therefore, were damaged in an amount at least equal to the difference in value between that which was promised and Anthem and its Affiliates' partial, deficient and/or defective performance.

478.   Also as a result of Anthem and its Affiliates' breach of contract, Plaintiffs and Class Members have suffered actual damages resulting from the theft of their Personal Information and remain at imminent risk of suffering additional damages in the future.

479.   Also as a result of Anthem and its Affiliates' breach of contract, Plaintiffs and Class Members have suffered actual damages resulting from their attempt to ameliorate the effect of the breach of contract and subsequent Anthem Data Breach, including but not limited to purchasing credit monitoring services or taking other steps to protect themselves from the loss of their Personal Information.

480.   Accordingly, Plaintiffs and Statewide Class Members have been injured as a result of Anthem and Anthem Affiliates' breach of contract and are entitled to damages and/or restitution in an amount to be proven at trial.

**COUNT IV – BREACH OF CONTRACT BROUGHT BY NON-ANTHEM DEFENDANT CONTRACT CLASSES[31] AGAINST NON-ANTHEM BCBS**

[31] Plaintiffs acknowledge that the Court dismissed with prejudice the New Jersey breach of contract claim against Non-Anthem Defendants solely with respect to benefit of the bargain damages. To the extent Count IV includes that claim, it is re-alleged here solely to preserve the claim for appeal.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

481. Plaintiffs incorporate the above allegations by reference.

482. As forth above in ¶¶266-306, Plaintiffs and those Class Members who purchased individual insurance policies from the Non-Anthem Defendants or enrolled pursuant to the terms of a group contract with the Non-Anthem Defendants entered into binding and enforceable contracts with the Non-Anthem Defendants.

483. The contracts between Plaintiffs and Class Members and the Non-Anthem Defendants were supported by consideration in many forms including the payment of premiums, contributions or fees by Plaintiffs and Class Members and/or their employers on their behalf and Plaintiff and Class Members' performance under these contracts, including by providing the Personal Information to the Non-Anthem Defendants required by the contracts.

484. To the extent that group contracts with the Non-Anthem Defendants in which Plaintiffs and Class Members enrolled are also contracts with an employer, fund or group, Plaintiffs and Class Members are intended beneficiaries of those group contracts, including the provisions incorporating the Non-Anthem Defendants' privacy policies and otherwise pertaining to the confidentiality of Personal Information of Members provided to the Non-Anthem Defendants, as described above at ¶¶266-306.  Plaintiffs and Class Members sue in the alternative for breach of contract as third-party beneficiaries.

485. As set forth above in ¶¶266-306, the Non-Anthem Defendants also entered into binding and enforceable Administrative Services Agreements for Self-Funded Plans in which some Plaintiffs and Class Members were enrolled. Plaintiffs and Class Members are intended beneficiaries of those Administrative Services Agreements, including the provisions incorporating the Non-Anthem Defendants' privacy policies and otherwise pertaining to the confidentiality of Personal Information of Members provided to Anthem as a result of the BlueCard program, as described above at ¶¶250-265. The Plaintiffs and Class Members who enrolled in Self-Funded Plans for whom Non-Anthem Defendants provided only administrative services sue as third-party beneficiaries of those contracts.

486. With respect to contracts between employers and Non-Anthem Defendants, the applicable contract is not the ERISA plan instrument described in 29 U.S.C. §1102(a)(1).

140

487.     All contracts between the Non-Anthem Defendants and Plaintiffs and Class Members (and/or their employers or other groups) were entered into prior to the Anthem Data Breach, as described above at ¶¶266-306.

488.     Plaintiffs and Class Members and/or their employers on their behalf, performed pursuant to these contracts, including by paying premiums, contributions or fees to the Non-Anthem Defendants, and by providing the Non-Anthem Defendants with the personal, confidential information required by these contracts.  Plaintiffs and Class Members and/or their employers on their behalf, fully performed their obligations under their contracts with the Non-Anthem Defendants and satisfied all conditions, covenants, obligations, and promises of these agreements.

489.     As set forth above in ¶¶266-306, all Plaintiffs and Class Members who purchased individual or group policies from Non-Anthem Defendants (and/or their employers or other groups) entered into contracts with Non-Anthem Defendants that incorporated, either by express provision by reference, the Non-Anthem Defendants' then-current privacy policies pertaining to personal and health-related information, and the specific privacy-related provisions set forth in those contract documents.

490.     As set forth above in ¶¶266-306, those contracts with Non-Anthem Defendants all expressly committed the Non-Anthem Defendant to assume all contractual obligations when their Members used the BlueCard program to access care in another geographic area.  They also expressly committed the Non-Anthem Defendant to insure that "business associates" (such as Anthem) to whom they provided confidential information would maintain the confidentiality of that information.

491.     As set forth above, Non-Anthem Defendants provided to Anthem the Personal Information of Plaintiffs and Affected Individuals with contracts with Non-Anthem Defendants when Plaintiffs and other Affected Individuals used the BlueCard system.

492.     As set forth above at ¶¶412-415, the Non-Anthem Defendants materially breached their contractual obligation to maintain and protect the confidentiality of Plaintiffs' and Affected Individuals' Personal Information from unauthorized disclosure by failing to ensure that Anthem had adequate data security to protect Plaintiffs' and Affected Individuals' information, and by failing to ensure that the Non-Anthem Defendants' contractual obligations, including protecting the

141

confidentiality of information, were met when Plaintiffs and other Affected Individuals used the BlueCard system.  The Non-Anthem Defendants also materially breached their contractual obligation to ensure their business associates, including Anthem, had adequate data security to protect their Members' Personal Information from unauthorized disclosure.

493.    As a result of Non-Anthem Defendants' breach of contract, Plaintiffs and Class Members did not receive the full benefit of the bargain, and instead received health insurance and/or health care services that were less valuable than described in their contracts.  Plaintiffs and Class Members, therefore, were damaged in an amount at least equal to the difference in value between that which was promised and Non-Anthem Defendants' partial, deficient and/or defective performance.

494.    Also as a result of the Non-Anthem Defendants' breach of contract, Plaintiffs and Class Members have suffered actual damages resulting from the theft of their Personal Information and remain at imminent risk of suffering additional damages in the future.

495.    Also as a result of Non-Anthem Defendants' breach of contract, Plaintiffs and Class Members have suffered actual damages resulting from their attempt to ameliorate the effect of the breach of contract and subsequent Anthem Data Breach, including but not limited to purchasing credit monitoring services or taking other steps to protect themselves from the loss of their Personal Information.

496.    Accordingly, Plaintiffs and Statewide Class Members have been injured as a result of non-Anthem BCBS' breach of contract and are entitled to damages and/or restitution in an amount to be proven at trial.

**COUNT V – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING BROUGHT BY ANTHEM AND NON-ANTHEM DEFENDANT CONTRACT CLASSES AGAINST ALL DEFENDANTS EXCEPT BCBSA**

**A.     Anthem Defendants**

497.    Plaintiffs incorporate the above allegations by reference.

498.    Plaintiffs and Class Members entered into and/or were the beneficiaries of contracts with Anthem and its Affiliates, as alleged above.

499.    These contracts were subject to implied covenants of good faith and fair dealing that

all parties would act in good faith and with reasonable efforts to perform their contractual obligations (both explicit and fairly implied) and would not impair the rights of the other parties to receive their rights, benefits, and reasonable expectations under the contracts. These included the covenants that Anthem and its Affiliates would act fairly, reasonably, and in good faith in carrying out their contractual obligations to protect the confidentiality of Plaintiffs' and Class Members' Personal Information and to comply with industry standards and federal and state laws and regulations for the security of this information.

500.    "Special relationships" exist between Anthem and its Affiliates and the Plaintiffs and Class Members. Anthem and its Affiliates each entered into a "special relationship" with those Plaintiffs and Class Members who purchased insurance plans from them and/or enrolled in health services plans with them and who entrusted their confidential Personal Information to Anthem and its Affiliates.

501.    As set forth above in the breach of contract claim, Anthem and its Affiliates promised to take specific measures to protect Plaintiffs' and Class Members' Personal Information.  Even if Anthem is held not to have breached any express promise in these contracts, Anthem and its Affiliates breached the covenant of good faith and fair dealing by failing to take adequate measures to protect the confidentiality of Plaintiffs' and Class Members' Personal Information, resulting in the Anthem Data Breach.  Anthem and its Affiliates unreasonably interfered with the contract benefits owed to Plaintiff and Class Members by: compiling and storing Plaintiff and Class Members' data for in one massive unprotected Database; by failing to implement reasonable and adequate security measures consistent with industry standards to protect and limit access to the Personal Information in the Anthem Database; by permitting unrestricted access to all the Personal information in this Database; and by failing to implement reasonable auditing procedures to detect and halt the unauthorized extraction of data.

502.    Plaintiffs and Class Members performed all conditions, covenants, obligations, and promises owed to Anthem and its Affiliates, including paying Anthem and its Affiliates premiums for their insurance and health benefits contracts and providing Anthem and its Affiliates the confidential information required by the contracts.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

503.     As a result of Anthem and its Affiliates' breach of the implied covenant, Plaintiffs and Class Members did not receive the full benefit of their bargain, and instead received health insurance and/or health care services and related services that were less valuable than what they paid for and less valuable than their reasonable expectations under the contracts.  Plaintiffs and Class Members were damaged in an amount at least equal to the difference in value between that which they reasonably expected under the contracts and Anthem and its Affiliates' partial, deficient and/or defective performance.

504.     Also as a result of Anthem and its Affiliates' breach of the covenant of good faith and fair dealing, Plaintiffs and Class Members have suffered actual damages resulting from the theft of their Personal Information and remain at imminent risk of suffering additional damages in the future.

505.     Also as a result of Anthem and its Affiliates' breach of the covenant of good faith and fair dealing, Plaintiffs and Class Members have suffered actual damages resulting from their attempt to ameliorate the effect of the breach and the subsequent Anthem Data Breach, including but not limited to purchasing credit monitoring services or taking other steps to protect themselves from the loss of their Personal Information.

506.     Accordingly, Plaintiffs and Class Members have been injured as a result of Anthem and its Affiliates' breaches of the covenant of good faith and fair dealing and are entitled to damages and/or restitution in an amount to be proven at trial.

**B.      Non-Anthem Defendants**

507.     Plaintiffs incorporate the above allegations by reference.

508.     Plaintiffs and Class Members entered into and/or were the beneficiaries of contracts with Non-Anthem Defendants for insurance or health benefits, as alleged above.

509.     These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual obligations (both explicit and fairly implied) and would not impair the rights of the other parties to receive the rights, benefits, and reasonable expectations under the contracts. These included the covenants that Non-Anthem Defendants would act fairly, reasonably, and in good faith in carrying out their contractual obligations to protect the confidentiality of Plaintiffs' and Class Members' Personal

144

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1   Information and to comply with industry standards and federal and state laws and regulations for the

2   security of this information.

3      510.    "Special relationships" exist between the Non-Anthem Defendants and the Plaintiffs

4   and Class Members. The Non-Anthem Defendants each entered into a "special relationship" with

5   those Plaintiffs and Class Members who purchased insurance plans from them and/or enrolled in

6   health services plans with them and who entrusted their confidential Personal Information to the Non-

7   Anthem Defendants.

8      511.    As set forth above in the breach of contract claim, the Non-Anthem Defendants

9   promised to take specific measures to protect this Personal Information, and specifically committed to

10   complying with their contractual obligations when Plaintiffs used the BlueCard program.  Even if the

11   Non-Anthem Defendants are held not to have breached any express promise in these contracts, the

12   Non-Anthem Defendants breached the covenant of good faith and fair dealing by failing to take

13   adequate measures to protect the confidentiality of Plaintiffs' and Class Members' Personal

14   Information.  The Non-Anthem Defendants unreasonably interfered with the contract benefits owed

15   to Plaintiff and Class Members by providing Plaintiffs' and Class Members' Personal information to

16   Anthem knowing that Anthem compiled and stored that Personal Information in one massive

17   Database; by failing to investigate, inspect, or otherwise take any action to ensure that Anthem had

18   implemented reasonable and adequate security measures consistent with industry standards to protect

19   and limit access to the Personal Information regarding Non-Anthem Defendants' customers that was

20   in the Anthem Database by virtue of the BlueCard program; by failing to investigate, inspect, or

21   otherwise take any action to ensure that Anthem did not permit unrestricted access to the Personal

22   Information regarding Non-Anthem Defendants' customers that was in the Anthem Database by

23   virtue of the BlueCard program; by failing to investigate, inspect or otherwise take any action to

24   ensure that Anthem used reasonable audit procedures to detect or halt any unauthorized access to the

25   Personal Information regarding Non-Anthem Defendants' customers that was in the Anthem

26   Database by virtue of the BlueCard program.

27      512.    Plaintiffs and Class Members performed all conditions, covenants, obligations, and

28   promises owed to the Non-Anthem Defendants, including paying the Non-Anthem Defendants

premiums for their insurance and health benefits contracts and providing the Non-Anthem

Defendants the confidential information required by the contracts.

513.    As a result of Non-Anthem Defendants' breach of the implied covenant, Plaintiffs and Class Members did not receive the full benefit of their bargain, and instead received health insurance and/or health care services and related services that were less valuable than what they paid for and less valuable than their reasonable expectations under the contracts.  Plaintiffs and Class Members were damaged in an amount at least equal to the difference in value between that which they reasonably expected under the contracts and Non-Anthems' partial, deficient and/or defective performance.

514.    Also as a result of Non-Anthem Defendants' breach of the covenant of good faith and fair dealing, Plaintiffs and Class Members have suffered actual damages resulting from the theft of their Personal Information and remain at imminent risk of suffering additional damages in the future.

515.    Also as a result of Non-Anthem Defendants' breach of the covenant of good faith and fair dealing, Plaintiffs and Class Members have suffered actual damages resulting from their attempt to ameliorate the effect of the breach and the subsequent Anthem Data Breach, including but not limited to purchasing credit monitoring services or taking other steps to protect themselves from the loss of their Personal Information.

516.    Accordingly, Plaintiffs and Class Members have been injured as a result of the Non-Anthem Defendants' breaches of the covenant of good faith and fair dealing and are entitled to damages and/or restitution in an amount to be proven at trial.

**COUNT VI – THIRD-PARTY BENEFICIARY CLAIM FOR BREACH OF CONTRACT UNDER FEDERAL LAW**
**BROUGHT BY FEDERAL EMPLOYEE CLASS AGAINST ALL DEFENDANTS EXCEPT ANTHEM NON-BCBS AFFILIATES**

517.    Plaintiffs incorporate the above allegations by reference.

518.    BCBSA, acting as agent for, and on behalf of, the Anthem BCBS Affiliates and non-Anthem BCBS, had a valid, binding, and enforceable express contract with OPM to provide insurance and other benefits to those Plaintiffs who received health insurance and related benefits under the Federal BCBSA Plan ("Federal Employee Plaintiffs") and the Federal Employee Class

146

1  Members.  Under the express terms of the Federal BCBSA Contract, federal law applies to breach of

2  contract claims.

3      519.   OPM paid money to BCBSA and provided BCBSA with Federal Employee Plaintiffs'

4  and Federal Employee Class Members' Personal Information.  In exchange, BCBSA, on behalf of the

5  Anthem BCBS Affiliates and non-Anthem BCBS, promised, among other things:  (1) to perform all

6  of the services set forth in the Federal BCBSA contract, including Appendix A, which sets forth the

7  Statement of Benefits that is reflected in the FEHB Brochure, (2) to take reasonable measures to

8  protect the security and confidentiality of Federal Employee Plaintiffs' and Federal Employee Class

9  Members' Personal Information, including through the measures described in the Notice of Privacy

10  Practices for the Blue Cross and Blue Shield Service Benefit Plan; and (3) to protect Federal

11  Employees' Personal Information in compliance with federal and state laws and regulations,

12  including HIPAA, and industry standards.

13      520.   BCBSA's promises to take reasonable measures to protect the security and

14  confidentiality of Federal Employee Plaintiffs' and Federal Employee Class Members' Personal

15  Information appear in multiple provisions of the BCBSA contract, including but not limited to terms

16  in the "General Provisions" of the Federal BCBSA Contract, in the attached Plan Brochures

17  incorporated into the Federal BCBSA Contract, and in BCBSA's Notice of Privacy Practices for the

18  Blue Cross and Blue Shield Service Benefit Plan incorporated by reference in the Brochures, as set

19  forth in detail in ¶¶307-320, above.

20      521.   OPM and BCBSA, on behalf of the Anthem BCBS Affiliates and non-Anthem BCBS,

21  intended for the Federal BCBSA Contract to directly benefit and create enforceable rights for Federal

22  Employee Plaintiffs and Federal Employee Class Members.

23      522.   The terms of the Federal BCBSA Contract that concern the protection of Federal

24  Employee Plaintiffs' Personal Information were material terms of the Federal BCBSA Contract.

25      523.   BCBSA, the Anthem BCBS Affiliates, and non-Anthem BCBS did not satisfy their

26  promises and obligations to OPM under the Federal BCBSA Contract, in that they did not take

27  reasonable and contractually-required measures to keep Federal Employee Plaintiffs' and Class

28  Members' Personal Information secure and confidential and did not comply with the applicable

147

1    federal and state laws, regulations, and industry standards for data security.

2        524.    BCBSA, the Anthem BCBS Affiliates, and non-Anthem BCBS materially breached

3    their contract with OPM by failing to implement the security measures required by the Federal

4    BCBSA Contract.  Instead, Federal Employee Plaintiffs' and Class Members' Personal Information

5    was stored in the inadequately-secured Anthem Database and accessed and exfiltrated in the Anthem

6    Data Breach.  To the extent BCBSA outsourced the collection, storage, use, and protection of Federal

7    Employee Plaintiffs' and Class Members' Personal Information to other entities, BCBSA remains

8    liable for those entities' failure to protect the Personal Information.

9        525.    OPM fully performed its obligations under the Federal BCBSA Contract and satisfied

10   all conditions, covenants, obligations, and promises of the agreement.

11       526.    BCBSA, Anthem BCBS Affiliates, and non-Anthem BCBS's failure to satisfy their

12   promises and obligations led directly to the Anthem Data Breach, in which Anthem and Anthem

13   Affiliates let unauthorized parties access and exfiltrate Federal Employee Plaintiffs and Class

14   Members' Personal Information.

15       527.    Federal Employee Plaintiffs and Class Members are clearly intended third-party

16   beneficiaries of the data security provisions in the contract between BCBSA (on behalf of Anthem

17   BCBS Affiliates and non-Anthem BCBS) and OPM, and are entitled to directly enforce its terms.

18   The benefits that Federal Employee Plaintiffs and Class Members receive under the Federal BCBSA

19   Contract are not incidental to the purpose of the agreement.  Instead, the purpose of the Federal

20   BCBSA Contract is to define the terms and conditions under which BCBSA, the Anthem BCBS

21   Affiliates, and the non-Anthem BCBS would provide health insurance and/or related health care

22   services to Federal Employee Plaintiffs.  The provisions of the agreement that pertain to data security

23   are intended to protect the Personal Information of Federal Employee Plaintiffs and Class Members.

24   Among other things, the Federal BCBSA Contract's confidentiality provisions explicitly refer to

25   "subscribers," and the Plan Brochure's confidentiality provision refers to keeping "your medical and

26   claims information confidential" where "your" is defined to include "the enrollee," who is "the

27   contract holder" eligible for coverage.  Federal Employee Plaintiffs and Class Members are

28   subscribers and enrollees within the meaning to the Federal BCBSA Contract and are covered by the

Federal BCBSA Plans governed by the contract.

528.    As a result of BCBSA, Anthem BCBS Affiliates, and non-Anthem BCBS's failure to implement the security measures required by the Federal BCBSA Contract, OPM did not receive the full benefit of its bargain, and instead Federal Employee Plaintiffs and Class Members received health insurance and/or related health care services that were less valuable than what OPM had bargained for.

529.    Also as a result of BCBSA, Anthem BCBS Affiliates, and non-Anthem BCBS's failure to implement the security measures required by the Federal BCBSA Contract, Federal Employee Plaintiffs and Class Members have suffered actual damages resulting from the theft of their Personal Information and remain at imminent risk of suffering additional damages in the future.

530.    Also as a result of BCBSA, Anthem BCBS Affiliates, and non-Anthem BCBS's failure to implement the security measures required by the Federal BCBSA Contract, Federal Employee Plaintiffs and Class Members have suffered actual damages resulting from their attempt to ameliorate the effect of the breach of contract and subsequent Anthem Data Breach, including but not limited to purchasing credit monitoring services or taking other steps to protect themselves from the loss of their Personal Information.

531.    Federal Employee Plaintiffs and Class Members also were damaged in an amount at least equal to the difference in value between that which was promised and BCBSA's, Anthem's, and Non-Anthem Defendants' partial, deficient and/or defective performance.

532.    Accordingly, Federal Employee Plaintiffs and Class Members have been injured as a result of Defendants' breach of contract and are entitled to damages and/or restitution in an amount to be proven at trial. Moreover, Federal Employee Plaintiffs and Class Members are additionally entitled to specific performance of the contract, including OPM's right to audit Anthem, which, as discussed above, Anthem has refused and continues to refuse to allow.

533.    Accordingly, Federal Employee Plaintiffs and Class Members have been injured as a result of Defendants' breach of contract and are entitled to damages and/or restitution in an amount to be proven at trial. Moreover, Federal Employee Plaintiffs and Class Members are additionally entitled to specific performance of the contract, including OPM's right to audit Anthem, which, as discussed

149

1  above, Anthem has refused and continues to refuse to allow.

2  **COUNT VII – NEGLIGENT MISREPRESENTATION**
3  **BROUGHT BY 53 STATEWIDE CLASSES AGAINST ALL DEFENDANTS EXCEPT BCBSA**

4  534.    Plaintiffs incorporate the above allegations by reference.

5  535.    Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS negligently and

6  recklessly misrepresented material facts, pertaining to the sale of insurance and health benefits

7  services, to Plaintiffs and Statewide Class Members by representing that they would maintain

8  adequate data privacy and security practices and procedures to safeguard Plaintiffs and Statewide

9  Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft.

10  536.    Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS negligently and

11  recklessly misrepresented material facts, pertaining to the sale of insurance and health benefits

12  services, to Plaintiffs and Statewide Class Members by representing that they did and would comply

13  with the requirements of relevant federal and state laws pertaining to the privacy and security of

14  Plaintiffs and Statewide Class Members' Personal Information.

15  537.    Because of multiple warnings about the inadequacy of their data privacy and security

16  practices, Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS either knew or should

17  have known that their representations were not true.

18  538.    In reliance upon these misrepresentations, Plaintiffs and Statewide Class Members

19  purchased insurance or health benefits services from Defendants.

20  539.    Had Plaintiffs and Statewide Class Members, as reasonable persons, known of

21  Defendants' inadequate data privacy and security practices, or that Defendants were failing to comply

22  with the requirements of federal and state laws pertaining to the privacy and security of Class

23  Members' Personal Information, they would not have purchased insurance or health benefits services

24  from Defendants, and would not have entrusted their Personal Information to Defendants.

25  540.    As direct and proximate consequence of Defendants' negligent misrepresentations,

26  Plaintiffs and Class Members have suffered the injuries alleged above.

27  **COUNT VIII – UNJUST ENRICHMENT**
28  **BROUGHT BY 53 STATEWIDE CLASS AGAINST ALL DEFENDANTS EXCEPT FOR BCBSA**

150

541.    Plaintiffs incorporate the above allegations by reference.

542.    In the alternative, Plaintiffs allege that they have no adequate remedy at law and bring this unjust enrichment claim on behalf of the 53 statewide classes.

543.    Plaintiffs and Class Members conferred a monetary benefit on Defendants Anthem, Anthem Affiliates, and non-Anthem BCBS in the form of premiums paid for the purchase of health insurance and health benefits services. Plaintiffs and Class Members also provided their Personal Information to Anthem, Anthem Affiliates, and non-Anthem BCBS.

544.    Anthem, Anthem Affiliates, and non-Anthem BCBS appreciated or had knowledge of the benefits conferred upon them by Plaintiffs and Class Members.

545.    The premiums for health insurance and health benefits services that Plaintiffs and Class Members  paid (directly or indirectly) to Defendants should have been used by Defendants, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

546.    As a result of Anthem, Anthem Affiliates, and non-Anthem BCBS' conduct, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in value between health insurance and health benefit services with the reasonable data privacy and security practices and procedures that Plaintiffs and Class Members paid for, and the inadequate health insurance and health benefits services without reasonable data privacy and security practices and procedures that they received.

547.    Under principals of equity and good conscience, Defendants Anthem, Anthem Affiliates, and non-Anthem BCBS should not be permitted to retain the money belonging to Plaintiffs and Class Members because Defendant failed to implement (or adequately implement) the data privacy and security practices and procedures that Plaintiffs and Class Members paid for and that were otherwise mandated by HIPAA regulations, federal, state and local laws, and industry standards.

548.    Anthem, Anthem Affiliates, and non-Anthem BCBS should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds received by Anthem, Anthem Affiliates, and non-Anthem BCBS.

549.    A constructive trust should be imposed upon all unlawful or inequitable sums received

151

by Anthem, Anthem Affiliates, and non-Anthem BCBS traceable to Plaintiffs and Class Members.

## COUNT IX – STATE CONSUMER PROTECTION LAWS
## BROUGHT BY THE STATEWIDE CLASSES BELOW

### Arizona
### ARIZONA CONSUMER FRAUD ACT,
### A.R.S. § 44-1521, *et seq.*
### (BROUGHT BY ARIZONA CLASS AGAINST ANTHEM AND ALL OTHER DEFENDANTS OPERATING IN ARIZONA EXCEPT FOR BCBSA)

550.    Plaintiffs incorporate the above allegations by reference.

551.    Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in Arizona engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of "merchandise" (as defined in the Arizona Consumer Fraud Act, A.R.S. §44-1521(5))  in violation of A.R.S. §44-1522(A), including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts to the Arizona Class, in connection with the sale of insurance and health benefits services, by representing that they would maintain adequate data privacy and security practices and procedures to safeguard Arizona Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts to the Arizona Class, in connection with sale of insurance and health benefits services, by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Arizona Class Members' Personal Information;

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Arizona Class Members' Personal Information, with the intent that others rely on the omission, suppression, and concealment;

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair acts and practices, in connection with the sale of insurance and health benefits services

152

by failing to maintain the privacy and security of Arizona Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d et. seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), and the Arizona Insurance Information and Privacy Protection Act (A.R.S. §20-2113).

e) Defendants Anthem and Anthem Affiliates engaged in unfair acts and practices in connection with the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to Arizona Class Members in a timely and accurate manner, in violation of Ariz. Rev. Stat. § 44-7501.

f) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Arizona Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

552.   The above unfair and deceptive practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

553.   Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Arizona Class Members' Personal Information and that risk of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Arizona Class.

554.   As a direct and proximate result of Defendants' unlawful practices, Arizona Class Members suffered injury and/or damages.

555.   Arizona Class Members seek relief under A.R.S. § 4421, et. seq., including, but not

153

1    limited to, compensatory damages, punitive damages, injunctive relief, and/or attorneys' fees and

2    costs.

3                                           **California**
                                  **CALIFORNIA UNFAIR COMPETITION LAW,**
4                                **CAL. BUS. & PROF. CODE § 17200, *et seq.***
                        **(BROUGHT BY CALIFORNIA CLASS AGAINST ANTHEM AND ALL OTHER**
5                          **DEFENDANTS OPERATING IN CALIFORNIA EXCEPT BCBSA)**

6        556.   Plaintiffs incorporate the above allegations by reference.

7        557.   Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in

8    California have violated Cal. Business and Professions Code §17200 et seq. by engaging in unlawful,

9    unfair or fraudulent business acts and practices and unfair, deceptive, untrue or misleading

10   advertising that constitute acts of "unfair competition" as defined in Cal. Bus. Prof. Code §17200

11   with respect to the insurance and health benefits services provided to the California Class, including

12   but not limited to the following:

13                    a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in

14                    deceptive acts and practices with regard to the insurance and health benefits services

15                    provided to the California Class by representing and advertising that they would

16                    maintain adequate data privacy and security practices and procedures to safeguard

17                    California Class Members' Personal Information from unauthorized disclosure,

18                    release, data breaches, and theft; and representing and advertising that they did and

19                    would comply with the requirements of relevant federal and state laws pertaining to

20                    the privacy and security of California Class Members' Personal Information.[32]

21                    b) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in

22                    deceptive acts and practices with regard to the insurance and health benefit services

23                    provided to the California Class by omitting, suppressing, and concealing the material

24                    fact of the inadequacy of the privacy and security protections for California Class

25                    Members' Personal Information.  At the time that California Class members were

26

27        [32] Plaintiffs recognize that the Court dismissed without prejudice their California Business and
     Professions Code §17200 claim as it relates to a fraudulent misrepresentation theory of liability.
28   Plaintiffs re-allege the claim here solely to preserve the issue for appeal.

                                                   154
                       THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
                                      CASE NO. 15-md-02617-LHK

enrolling in insurance and health benefit services, Defendants failed to disclose to California Class Members that the Anthem and Anthem Affiliates' data security systems failed to meet legal and industry standards for the protection of their Personal Information.  Plaintiffs would not have enrolled in Defendants' insurance and health benefit services if they had known about Defendants' substandard data security practices.

c) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair acts and practices with respect to the insurance and health benefits services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Plaintiffs' and California Class Members' Personal Information with knowledge that the information would not be adequately protected; and by storing Plaintiffs' and California Class Members' Personal Information in an unsecure electronic environment.  These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and California Class Members.  Defendant's practice was also contrary to legislatively declared and public policies that seek to protect consumer data and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws like the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d et. seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), California's Confidentiality of Medical Information Act (Civil Code §56 et seq.), California's unfair insurance practices statutes (Ins. Code §790 et seq.), California's Insurance Information and Privacy Protection Act (Ins. Code §791 et seq.), and California's data breach statute, Cal. Civ. Code § 1798.81.5.  The harm these practices caused to Plaintiffs and the California Class Members outweighed their utility, if any.

d) Defendants Anthem and Anthem Affiliates engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to California Class Members in a timely and accurate

155

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82.  These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and California Class Members.  The harm these practices caused to Plaintiffs and the California Class Members outweighed their utility, if any.

e) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unfair acts and practices with respect to the provision of insurance and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect California Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.  These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and California Class Members.  The harm these practices caused to Plaintiffs and the California Class Members outweighed their utility, if any.

f)  Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unlawful business practices by violating the privacy and security requirements of HIPAA (42 U.S.C. § 1302d et. seq.).

g) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unlawful business practices by violating California's Confidentiality of Medical Information Act (Civil Code §56 et seq.) with respect to California Class members participating in health services plans regulated by the Knox-Keene Act, and with respect to employees.[33]

h) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unlawful business practices by violating California's unfair insurance practices statutes

---

[33] Plaintiffs recognize that the Court dismissed, with prejudice, their California Business and Professions Code §17200 claim as to the unlawful prong as it relates to the California Insurance Information and Privacy Protection Act, the California Confidentiality of Medical Information Act, and Cal. Civ. Code § 1798.82.  To the extent these claims are re-alleged here, Plaintiffs assert them solely to preserve the issue for appeal.

156

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

(Ins. Code §790 et seq.), and California's Insurance Information and Privacy Protection Act (Ins. Code §791 et seq., "CIIPA") with respect to California Class Members with health insurance.  With respect to CIIPA, Defendants are "insurance institutions" that "collected or received" "personal or privileged information" pertaining to members of the California Class "in connection with an insurance transaction" and, as a result of the Anthem Data Breach, failed to maintain the confidentiality and privacy of and disclosed this personal information without authorization, thereby violating CIIPA;

i)  Defendants Anthem and Anthem Affiliates engaged in unlawful business practices by violating Cal. Civ. Code § 1798.82.

558.    As a direct and proximate result of Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS's acts of unfair and unlawful practices and acts, the Plaintiffs were injured and lost money or property, including but not limited to the premiums and/or price received by Defendants for the insurance and health benefits services, the loss of their legally protected interest in the confidentiality and privacy of their Personal Information, and additional losses described above.

559.    Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS knew or should have known that their computer systems and data security practices were inadequate to safeguard California Class Members' Personal Information and that the risk of a data breach or theft was highly likely. Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the California Class.

560.    California Class Members seek relief under Cal. Bus. & Prof. Code § 17200, et. seq., including, but not limited to, restitution to Plaintiffs and Class Members of money or property that the Defendants may have acquired by means of Defendants' deceptive, unlawful, and unfair business practices, restitutionary disgorgement of all profits accruing to Defendants because of their unlawful and unfair business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civil Pro. §1021.5), and injunctive or other equitable relief.

**Colorado**

157

**COLORADO CONSUMER PROTECTION ACT,**
**COLO. REV. STAT. § 6-1-101,** *et. seq.*
**(BROUGHT BY COLORADO CLASS AGAINST ANTHEM AND ALL OTHER**
**DEFENDANTS OPERATING IN COLORADO EXCEPT FOR BCBSA)**

561.    Plaintiffs incorporate the above allegations by reference.

562.    Colorado Class Members are actual or potential consumers of insurance and health benefits services offered by Defendants.

563.    Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices in the course of Defendants' business, vocation, or occupation, in violation of C.R.S. §6-1-105, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS knowingly misrepresented and fraudulently advertised material facts pertaining to the insurance and health benefits services to the Colorado Class by representing and advertising that they would maintain adequate data privacy and security practices and procedures to safeguard Colorado Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft, in violation of Colo. Rev. Stat. §6-1-105(e), (g) (i) and (u);

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS knowingly misrepresented material facts pertaining to insurance and health benefits services to the Colorado Class by representing and advertising that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Colorado Class Members' Personal Information, in violation of Colo. Rev. Stat. §6-1-105(e), (g) (i) and (u);

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS knowingly omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Colorado Class Members' Personal Information (intending to induce others to enter into a transaction), in violation of Colo. Rev. Stat. §6-1-105(1)(e), (g) (i) and (u);

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in

158

deceptive, unfair, and unlawful trade acts or practices, in violation of C.R.S. §6-1-105(3), by failing to maintain the privacy and security of Colorado Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d et. seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), Colorado Insurance Regulations (3 CCR 702-6:6-4-1, Sections 11 and 24), Colorado Unfair Insurance Practices Act (C.R.S .§10-3-1104), and Colorado's HMO Privacy Law (C.R.S. §10-16-423);

e) Defendants Anthem and Anthem Affiliates engaged in deceptive, unfair, and unlawful trade acts or practices, in violation of C.R.S. §6-1-105(3), by failing to disclose the Anthem Data Breach to Colorado Class Members in a timely and accurate manner, contrary to the duties imposed by Colo. Rev. Stat. Ann. § 6-1-716(2).

f)  Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices, in violation of C.R.S. §6-1-105(3), by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Colorado Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

564.    Defendants engaged in the above unfair or deceptive acts or practices in the course of their business.

565.    As a direct and proximate result of Defendants' deceptive trade practices, Colorado Class Members suffered injuries to legally protected interests, including their legally protected interest in the confidentiality and privacy of their Personal Information.

566.    The above unfair and deceptive practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

567.     Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Colorado Class Members' Personal Information and that risk of a data breach or theft was highly likely. Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Colorado Class.

568.     Colorado Class Members seek relief under Colo. Rev. Stat. § 6-1-101, et. seq., including, not limited to, compensatory damages, statutory damages, restitution, penalties, injunctive relief, and/or attorneys' fees and costs.

**Connecticut**
**CONNECTICUT UNFAIR TRADE PRACTICES ACT,**
**C.G.S. § 42-110a** *et seq.***,**
**(BROUGHT BY CONNECTICUT CLASS AGAINST ANTHEM AND ALL OTHER**
**DEFENDANTS OPERATING IN CONNECTICUT EXCEPT FOR BCBSA)**

569.     Plaintiffs incorporate the above allegations by reference.

570.     Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of C.G.S. § 42-110b, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented and fraudulently advertised material facts pertaining to the insurance and health benefits services to the Connecticut Class by representing and advertising that they would maintain adequate data privacy and security practices and procedures to safeguard Connecticut Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to insurance and health benefits services to the Connecticut Class by representing and advertising that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Connecticut Class Members' Personal Information;

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and

160

security protections for Connecticut Class Members' Personal Information;

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices by failing to maintain the privacy and security of Connecticut Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d et. seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), the Connecticut Insurance Information and Privacy Protection Act (C.G.S. 38a-988), and the Connecticut data breach statute (C.G.S. § 42-471).

e) Defendants Anthem and Anthem Affiliates engaged in deceptive, unfair, and unlawful trade acts or practices by failing to disclose the Anthem Data Breach to Connecticut Class Members in a timely and accurate manner, contrary to the duties imposed by C.G.S. § 36a-701b.

f) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Connecticut Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

571.     The above unfair and deceptive practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS also violated Connecticut's Unfair Insurance Practices Act, Conn. Gen. Stat. §38a-815,816.

572.     As a direct and proximate result of Defendants' deceptive trade practices, Connecticut Class Members suffered an ascertainable loss of money or property, real or personal, as described above, including the loss of their legally protected interest in the confidentiality and privacy of their Personal Information.

573.     The above unfair and deceptive practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts

161

1   caused substantial injury to consumers that these consumers could not reasonably avoid; this

2   substantial injury outweighed any benefits to consumers or to competition.

3          574.    Defendants knew or should have known that their computer systems and data security

4   practices were inadequate to safeguard Connecticut Class Members' Personal Information and that

5   risk of a data breach or theft was highly likely. Defendants' actions in engaging in the above-named

6   unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless

7   with respect to the rights of members of the Connecticut Class.

8          575.    Connecticut Class Members seek relief under C.G.S. § 42-110a et seq., including, but

9   not limited to, damages, statutory damages, restitution, penalties, injunctive relief, and/or attorneys'

10  fees and costs.

11                                    **District of Columbia**
                   **DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT,**
12                                **D.C. CODE § 28-3904,** *et seq.*
                   **(BROUGHT BY D.C. CLASS AGAINST ANTHEM AND ALL OTHER DEFENDANTS**
13                        **OPERATING IN D.C. EXCEPT FOR BCBSA)**

14         576.    Plaintiffs incorporate the above allegations by reference.

15         577.    Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-

16  Anthem BCBS operating in the District of Columbia ("D.C.") on behalf of the D.C. Class.

17         578.    As defined by D.C. Code § 28-3901, D.C. Class Members are "consumers" who

18  purchased or received goods or services, in the form of insurance and benefits services, for personal,

19  household, or family purposes.

20         579.    Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in D.C.

21  engaged in unlawful trade practices, misrepresentations, and the concealment, suppression, and

22  omission of material facts with respect to the sale and advertisement of insurance and health benefit

23  services in violation of D.C. Code § 28-3904, including but not limited to the following:

24                 a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented

25                 material facts, pertaining to the sale of insurance and health benefits services, to the

26                 D.C. Class by representing that they would maintain adequate data privacy and security

27                 practices and procedures to safeguard D.C. Class Members' Personal Information from

28                 unauthorized disclosure, release, data breaches, and theft in violation of D.C. Code §

                                              162

28-3904(a), (d), (e), (f), (h), and/or (u);

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the D.C. Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of D.C. Class Members' Personal Information in violation of D.C. Code § 28-3904(a), (d), (e), (f), (h), and/or (u);

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for D.C. Class Members' Personal Information in violation of D.C. Code § 28-3904(a), (d), (e), (f), (h), and/or (u);

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to maintain the privacy and security of D.C. Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d et. seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), and the D.C. Unfair Insurance Trade Practices Act (D.C. Code §§ 31-2231.03 and 31-2231.04).

e) Defendants Anthem and Anthem Affiliates engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to D.C. Class Members in a timely and accurate manner, in violation of D.C. Code § 28-3852(a);

f)  Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect D.C. Class Members' Personal Information

163

1      from further unauthorized disclosure, release, data breaches, and theft.

2      580.     The above unfair and deceptive practices and acts by Defendants Anthem, Anthem

3 Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts

4 caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial

5 injury outweighed any benefits to consumers or to competition.

6      581.     Defendants knew or should have known that their computer systems and data security

7 practices were inadequate to safeguard D.C. Class Members' Personal Information and that risk of a

8 data breach or theft was highly likely.  Defendants' actions in engaging in the above-named unfair

9 practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with

10 respect to the rights of members of the D.C. Class.

11      582.     As a direct and proximate result of Defendants' unlawful practices, D.C. Class

12 Members suffered injury and/or damages.

13      583.     D.C. Class Members seek relief under D.C. Code § 28-3905(k), including, but not

14 limited to, restitution, injunctive relief, punitive damages, attorneys' fees and costs, and treble

15 damages or $1500 per violation, whichever is greater.

16 **Hawaii**
**HAWAII UNFAIR PRACTICES AND UNFAIR COMPETITION STATUTE,**
17 **HAW. REV. STAT. § 480-1,** *et seq.*
**(BROUGHT BY HAWAII CLASS AGAINST ANTHEM AND ALL OTHER DEFENDANTS**
18 **OPERATING IN HAWAII EXCEPT FOR BCBSA)**

19      584.     Plaintiffs incorporate the above allegations by reference.

20      585.     Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-

21 Anthem BCBS operating in Hawaii on behalf of the Hawaii Class.

22      586.     Hawaii Class Members are "consumers" as meant by Haw. Rev. Stat. § 480-1.

23      587.     Hawaii Class Members purchased "goods and services" from Defendants as meant by

24 Haw. Rev. Stat. § 480-1.

25      588.     Hawaii Class Members' purchases of insurance and health benefits services from

26 Defendants were for personal, family, and/or household purposes, as meant by Haw. Rev. Stat. § 480-

27 1.

28      589.     Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in Hawaii

164

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

engaged in unfair methods of competition, unfair or deceptive acts or practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the services purchased by the Hawaii Class in violation of Haw. Rev. Stat. § 480-2(a), including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the Hawaii Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard Hawaii Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the Hawaii Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Hawaii Class Members' Personal Information;

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Hawaii Class Members' Personal Information;

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to maintain the privacy and security of Hawaii Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d et. seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), Hawaii's Privacy of Consumer Financial Information statute (Haw. Rev. Stat. § 431:3A-101, et seq.), Hawaii's Health Maintenance Organization Act - Confidentiality of Medical Information (Haw. Rev. Stat. § 432D-21), Hawaii's Patients' Bill of Rights and Responsibilities Act (Haw.

Rev. Stat. § 432E-10(b)(5)), and Hawaii's Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance Act (Haw. Rev. Stat. § 431:13-103(a)(1) and (a)(2)).

e) Defendants Anthem and Anthem Affiliates engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to Hawaii Class Members in a timely and accurate manner, in violation of Haw, Rev. Stat. § 487N-2(a);

f) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Hawaii Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

590.    The above unfair and deceptive practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

591.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Hawaii Class Members' Personal Information and that risk of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Hawaii Class.

592.    As a direct and proximate result of Defendants' unlawful practices, Hawaii Class Members suffered injury and/or damages.

593.    Hawaii Class Members seek relief under Haw. Rev. Stat. § 480-13, including, but not limited to, damages, injunctive relief, attorneys' fees and costs, and treble damages.

**Illinois**
**ILLINOIS CONSUMER FRAUD ACT,**
**815 Ill. COMP. STAT. 505/1** *et seq.*
**(BROUGHT BY ILLINOIS CLASS AGAINST ANTHEM AND ALL OTHER DEFENDANTS OPERATING IN ILLINOIS EXCEPT FOR BCBSA)**

166

594. Plaintiffs incorporate the above allegations by reference.

595. Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of 815 Ill. Comp. Stat. 505/2, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented and fraudulently advertised material facts pertaining to the insurance and health benefits services to the Illinois Class by representing and advertising that they would maintain adequate data privacy and security practices and procedures to safeguard Illinois Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to insurance and health benefits services to the Illinois Class by representing and advertising that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Illinois Class Members' Personal Information;

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Illinois Class Members' Personal Information with the intent that others rely on the omission, suppression, and concealment;

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices by failing to maintain the privacy and security of Illinois Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach. These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d et. seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), the Illinois Insurance Information and Privacy Protection Act (215 Ill. Comp. Stat 5/1014), Illinois laws regulating the use and disclosure of Social Security Numbers

167

(815 Ill. Comp. Stat 505/2RR), and the Illinois Uniform Deceptive Trade Practices Act(815 Ill. Comp. Stat. 510/2(a));

e) Defendants Anthem and Anthem Affiliates engaged in deceptive, unfair, and unlawful trade acts or practices by failing to disclose the Anthem Data Breach to Illinois Class Members in a timely and accurate manner, contrary to the duties imposed by 815 Ill. Comp. Stat. § 530/10(a);

f) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Illinois Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

596.    As a direct and proximate result of Defendants' deceptive trade practices, Illinois Class Members suffered injuries, including the loss of their legally protected interest in the confidentiality and privacy of their Personal Information, and damages, as described above.

597.    The above unfair and deceptive practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

598.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Illinois Class Members' Personal Information and that risk of a data breach or theft was highly likely. Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Illinois Class.

599.    Illinois Class Members seek relief under 815 Ill. Comp. Stat. 505/10a, including, but not limited to, damages, restitution, punitive damages, injunctive relief, and/or attorneys' fees and costs.

**ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT,
815 Ill. COMP. STAT. § 510/2(a)** *et. seq.*
**(BROUGHT BY ILLINOIS CLASS AGAINST ANTHEM AND ALL OTHER DEFENDANTS OPERATING IN ILLINOIS EXCEPT FOR BCBSA)**

168

600.     Plaintiffs incorporate the above allegations by reference.

601.     While in the course of their businesses, Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive trade practices by making false representations, including their representations that they had adequate computer systems and data security practices to protect Personal Information, when their computer systems and data security practices were inadequate, in violation of 815 Ill. Comp. Stat. 510/2(a)(5),(7).

602.     Defendants knew or should have known that their computer systems and data security practices were inadequate and engaged in negligent, knowing, and/or willful acts of deception.

603.     Illinois Class Members are likely to be damaged by the Defendants' deceptive trade practices.

604.     Illinois Class Members seek relief under 815 Ill. Comp. Stat. 510, including, but not limited to, injunctive relief and attorney's fees.

### Indiana
### INDIANA DECEPTIVE CONSUMER SALES ACT,
### IND. CODE § 24-5-0.5-3
### (BROUGHT BY INDIANA CLASS AGAINST ANTHEM AND ALL OTHER DEFENDANTS OPERATING IN INDIANA EXCEPT FOR BCBSA)

605.     Plaintiffs incorporate the above allegations by reference.

606.     Members of the Indiana Class enrolled in and purchased health services from health maintenance organizations ("HMOs") operated by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS in Indiana for personal, family, and/or household purposes.

607.     A "Health maintenance organization" for purposes of Indiana law means "a person that undertakes to provide or arrange for the delivery of health care services to enrollees on a prepaid basis, except for enrollee responsibility for copayments or deductibles."  Ind. Code §27-13-1-19.  The purchase of health care services from an HMO is not "insurance" under Indiana law, and a contract for payment for health services from an HMO, as defined in Ind. Code §27-13-1-10, is not a "contract of insurance."

608.     Members of the Indiana Class received health care services from self-insured entities (generally their employers or unions) that contracted with Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS in Indiana to provide administrative services.  These class members received

169

1    services from Defendants that are primarily for personal, family, and/or household purposes.

2        609.    "Contracts of insurance" are exempt from the Indiana Deceptive Consumer Sales Act,

3    but the pre-paid health benefits sold by HMOs and the administrative services provided by

4    Defendants to self-insured entities are "consumer transactions" within the coverage of that Act, and

5    Defendants selling HMO and administrative services are "suppliers."  Ind. Code § 24-5-0.5-2(a)(1),

6    (3), (4).

7        610.    Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS are "suppliers" who

8    engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of "consumer

9    transactions" pertaining to the purchase and sale of administrative services to self-insured

10    employers/unions and HMO services, in violation of Ind. Code § 24-5-0.5-3, including but not

11    limited to the following:

12           a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented

13           and fraudulently advertised material facts pertaining to the HMO and administrative

14           services to the Indiana Class by representing and advertising that they would maintain

15           adequate data privacy and security practices and procedures to safeguard Indiana Class

16           Members' Personal Information from unauthorized disclosure, release, data breaches,

17           and theft;

18           b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented

19           material facts pertaining to HMO and administrative services to the Indiana Class by

20           representing and advertising that they did and would comply with the requirements of

21           relevant federal and state laws pertaining to the privacy and security of Indiana Class

22           Members' Personal Information;

23           c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted,

24           suppressed, and concealed the material fact of the inadequacy of the privacy and

25           security protections for Indiana Class Members' Personal Information;

26           d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in

27           deceptive, unfair, and unlawful trade acts or practices by failing to maintain the

28           privacy and security of Indiana Class Members' Personal Information, in violation of

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d et. seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), Indiana's HMO Confidentiality law (Ind. Code §27-13-31-1), and Indiana's data breach statute (§ 24-4.9-3.5);

e) Defendants Anthem and Anthem Affiliates engaged in deceptive, unfair, and unlawful trade acts or practices by failing to disclose the Anthem Data Breach to Indiana Class Members in a timely and accurate manner, contrary to the duties imposed by Ind. Code § 24-4.9-3.3;

f)  Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Indiana Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

611.    As a direct and proximate result of Defendants' deceptive trade practices, Indiana Class Members suffered injuries, including the loss of their legally protected interest in the confidentiality and privacy of their Personal Information, and damages.

612.    The above unfair and deceptive practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

613.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Indiana Class Members' Personal Information and that risk of a data breach or theft was highly likely. Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Indiana Class.

614.    Indiana Class Members seek relief under Ind. Code §24-5-0.5-4, including, not limited

171

to damages, restitution, penalties, injunctive relief, and/or attorneys' fees and costs.  Senior Members of the Indiana Class injured by Defendants' unfair and deceptive trade practices also seek treble damages, pursuant to § Ind. Code §24-5-0.5-4(i).

**Kentucky**
### KENTUCKY CONSUMER PROTECTION ACT, KY REV. STAT. § 367.110, *et. seq.*[34]
### (BROUGHT BY KENTUCKY CLASS AGAINST ANTHEM AND ALL OTHER DEFENDANTS OPERATING IN KENTUCKY EXCEPT FOR BCBSA)

615.    Plaintiffs incorporate the above allegations by reference.

616.    Kentucky Class Members purchased insurance and health benefits services for personal, family, and/or household purposes from Defendants.

617.    Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of Ky. Rev. Stat. § 367.170, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented and fraudulently advertised material facts pertaining to the insurance and health benefits services to the Kentucky Class by representing and advertising that they would maintain adequate data privacy and security practices and procedures to safeguard Kentucky Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to insurance and health benefits services to the Kentucky Class by representing and advertising that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Kentucky Class Members' Personal Information;

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and

---

[34] Plaintiffs recognize that the Court dismissed their class claims under the KCPA.  Plaintiffs re-allege the claim here solely to preserve the issue for appeal.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

security protections for Kentucky Class Members' Personal Information;

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices by failing to maintain the privacy and security of Kentucky Class Members Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach. These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d et. seq.), and the Gramm-Leach-Bliley Act (15 U.S.C. § 6801);

e) Defendants Anthem and Anthem Affiliates engaged in deceptive, unfair, and unlawful trade acts or practices by failing to disclose the Anthem Data Breach to Kentucky Class Members in a timely and accurate manner, contrary to the duties imposed by Ky. Rev. Stat. Ann. § 365.732(2).

f) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Kentucky Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

618. The above unfair and deceptive practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS also violated Kentucky's Unfair Insurance Practices Act, Ky. Rev. Stat. §304.12-010.

619. As a direct and proximate result of Defendants' deceptive trade practices, Kentucky Class Members suffered an ascertainable loss of money or property, real or personal, as described above, including the loss of their legally protected interest in the confidentiality and privacy of their Personal Information.

620. The above unfair and deceptive practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that these consumers could not reasonably avoid; this

substantial injury outweighed any benefits to consumers or to competition.

621.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Kentucky Class Members' Personal Information and that risk of a data breach or theft was highly likely. Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Kentucky Class.

622.    Kentucky Class Members seek relief under Ky. Rev. Stat. §367.220, including, not limited to, damages, punitive damages, restitution and/or other equitable relief, injunctive relief, and/or attorneys' fees and costs.

<div align="center">

**Maine**
**MAINE UNFAIR TRADE PRACTICES ACT,**
**5 ME. REV. STAT. §205**
**(BROUGHT BY MAINE CLASS AGAINST ANTHEM AND BCBS OF MAINE)**

</div>

623.    Plaintiffs incorporate the above allegations by reference.

624.    Maine Class Members purchased insurance and health benefits services for personal, family, and/or household purposes from Defendants.

625.    On November 2, 2015, Plaintiffs Gary Bellegarde, Mark Hatcher, and Robin Wilkey sent a demand for relief to Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine on behalf of the Maine Class.

626.    On November 4, 2015, Plaintiffs Gary Bellegarde, Mark Hatcher, and Robin Wilkey sent a demand for relief to Anthem, Inc. on behalf of the Maine Class.

627.    Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of 5 Me. Rev. Stat. §207, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented and fraudulently advertised material facts pertaining to the insurance and health benefits services to the Maine Class by representing and advertising that they would maintain adequate data privacy and security practices and procedures to safeguard Maine Class Members' Personal Information from unauthorized disclosure, release,

<div align="center">

174

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

</div>

data breaches, and theft;

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to insurance and health benefits services to the Maine Class by representing and advertising that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Maine Class Members' Personal Information;

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Maine Class Members' Personal Information;

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices by failing to maintain the privacy and security of Maine Class Members Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d et. seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), and the Maine Insurance Information and Privacy Protection Act (Me. Rev. Stat. 24-A, § 2215(1).

e) Defendants Anthem and Anthem Affiliates engaged in deceptive, unfair, and unlawful trade acts or practices by failing to disclose the Anthem Data Breach to Maine Class Members in a timely and accurate manner, contrary to the duties imposed by 10 Me. Rev. Stat. § 1348(1);

f) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Maine Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

628.    As a direct and proximate result of Defendants' deceptive trade practices, Maine Class

175

Members suffered an ascertainable loss of money or property, real or personal, as described above, including the loss of their legally protected interest in the confidentiality and privacy of their Personal Information.

629.    The above unfair and deceptive practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

630.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Maine Class Members' Personal Information and that risk of a data breach or theft was highly likely. Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Maine Class.

631.    Maine Class Members seek relief under 5 Me. Rev. Stat. §213, including, not limited to, damages, restitution, injunctive relief, and/or attorneys' fees and costs.

<div align="center">

**MAINE UNIFORM DECEPTIVE TRADE PRACTICES ACT,**
**10 ME. REV. STAT. § 1212, *et. seq.***
**(BROUGHT BY MAINE CLASS AGAINST ANTHEM AND ALL OTHER DEFENDANTS**
**OPERATING IN MAINE EXCEPT FOR BCBSA)**

</div>

632.    Plaintiffs incorporate the above allegations by reference.

633.    While in the course of their businesses, Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in deceptive trade practices by making false representations, including their representations that they had adequate computer systems and data security practices to protect Personal Information, when their computer systems and data security practices were inadequate, in violation of 10 Me. Rev. Stat. §1212(E),(G).

634.    Defendants knew or should have known that their computer systems and data security practices were inadequate and engaged in negligent, knowing, and/or willful acts of deception.

635.    Maine Class Members are likely to be damaged by the Defendants' deceptive trade practices.

636.    Maine Class Members seek relief under 10 Me. Rev. Stat. §1213, including, but not

<div align="center">

176

</div>

1    limited to, injunctive relief and attorney's fees.

2    **Maryland**
     **MARYLAND CONSUMER PROTECTION ACT,**
3    **MD CODE COMMERCIAL LAW, § 13-301, *et. seq.***
     **(BROUGHT BY MARYLAND CLASS AGAINST ANTHEM AND ALL OTHER**
4    **DEFENDANTS OPERATING IN MARYLAND EXCEPT FOR BCBSA)**

5        637.    Plaintiffs incorporate the above allegations by reference.

6        638.    Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-
7    Anthem BCBS operating in the Maryland on behalf of the Maryland Class.

8        639.    Maryland Class Members are "consumers" as meant by Md. Code Ann., Com. Law §
9    13-101.

10       640.    Insurance and health benefits services are "consumer goods" and/or "consumer
11   services" as meant by Md. Code Ann., Com. Law § 13-101.

12       641.    The unlawful trade practices, misrepresentations, and omissions described herein did
13   not constitute "professional services" on the part of Defendants.

14       642.    Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in
15   Maryland engaged in unlawful trade practices, misrepresentations, and the concealment, suppression,
16   and omission of material facts with respect to the sale and advertisement of the services in violation
17   of Md. Code Ann., Com. Law § 13-301, including but not limited to the following:

18           a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented
19           material facts, pertaining to the sale of insurance and health benefits services, to the
20           Maryland Class by representing that they would maintain adequate data privacy and
21           security practices and procedures to safeguard Maryland Class Members' Personal
22           Information from unauthorized disclosure, release, data breaches, and theft in violation
23           of Md. Code Ann., Com. Law § 13-301(1), (2)(i), (2)(iv), (3), (5)(i), (9)(i), (9)(iii), and
24           14(xxi);

25           b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented
26           material facts, pertaining to the sale of insurance and health benefits services, to the
27           Maryland Class by representing that they did and would comply with the requirements
28           of relevant federal and state laws pertaining to the privacy and security of Maryland

177

Members' Personal Information in violation of Md. Code Ann., Com. Law § 13-301(1), (2)(i), (2)(iv), (3), (5)(i), (9)(i), (9)(iii), and 14(xxi);

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Maryland Class Members' Personal Information in violation of Md. Code Ann., Com. Law § 13-301(1), (2)(i), (2)(iv), (3), (5)(i), (9)(i), (9)(iii), and 14(xxi);

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to maintain the privacy and security of Maryland Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d et. seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), Maryland's Confidentiality of Medical Records Act (Md. Code Ann., Health-Gen. §§ 4-302; 4-303(a)); Maryland's Disclosure Requirements for Insurers statute (Md. Code, Ins. § 4-403); Maryland's Disclosure Requirements for Nonprofit Health Service Plans statute (Md. Code, Ins. § 14-138); Maryland's Privacy of Consumer Financial and Health Information regulations (Md. Code Regs. 31.16.08.01, et seq.); Maryland's data breach statute (Md. Code Ann. Com. Law § 14-3503), and Maryland's Social Security Number Privacy Act (Md. Code Ann., Com. Law § 14-3401, et seq.);

e) Defendants Anthem and Anthem Affiliates engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to Maryland Class Members in a timely and accurate manner, in violation of Md. Code Com. Law § 14-3504(b)(3);

f) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by

failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Maryland Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

643. The above unfair and deceptive practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

644. Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Maryland Class Members' Personal Information and that risk of a data breach or theft was highly likely. Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Maryland Class.

645. As a direct and proximate result of Defendants' unlawful practices, Maryland Class Members suffered injury and/or damages.

646. Maryland Class Members seek relief under Md. Code Ann., Com. Law § 13-408, including, but not limited to, damages, injunctive relief, and attorneys' fees and costs.

**Massachusetts**
**MASSACHUSETTS CONSUMER PROTECTION ACT,**
**MASS. GEN. LAWS ANN. CH. 93A, § 1, *et. seq.***
**(BROUGHT BY MASSACHUSETTS CLASS AGAINST ANTHEM, BLUE CROSS BLUE SHIELD OF MASSACHUSETTS, EMPIRE BLUE CROSS AND BLUE SHIELD, UNICARE LIFE AND HEALTH INSURANCE COMPANY)**

647. Plaintiffs incorporate the above allegations by reference.

648. Plaintiffs bring this claim against Defendant Anthem on behalf of the Massachusetts Class.

649. Plaintiff Lisa Daniels sent a demand for relief to Anthem, on behalf of the Massachusetts Class, on February 27, 2015.

650. Plaintiffs Darrell Hunter, Carrie Ramos, Lisa Daniels, and Fari Zand sent a demand for relief to Defendant Blue Cross Blue Shield of Massachusetts, Inc., on behalf of the Massachusetts Class, on November 2, 2015.

651.    Plaintiff Claudia Cass sent a demand for relief to Defendant Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield, on behalf of the Massachusetts Class, on November 2, 2015.

652.    Plaintiff Robert Roy sent a demand for relief to Defendant Unicare Life & Health Insurance Company on behalf of the Massachusetts Class, on November 2, 2015.

653.    Defendant Anthem operates in "trade or commerce" as meant by Mass. Gen. Laws Ann. ch. 93A, § 1.

654.    Defendant Anthem engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of services in violation of Mass. Gen. Laws Ann. ch. 93A, § 2(a), including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the Massachusetts Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard Massachusetts Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the Massachusetts Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Massachusetts Class Members' Personal Information;

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Massachusetts Class Members' Personal Information;

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to maintain the privacy and security of Massachusetts Class Members' Personal Information, in violation of duties imposed by and public policies reflected in

180

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair

acts and practices violated duties imposed by laws including the Federal Trade

Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d et. seq.), the Gramm-

Leach-Bliley Act (15 U.S.C. § 6801), the Massachusetts Insurance Information and

Privacy Protection Act (Mass. Gen. Laws ch. 175I, § 13), the Massachusetts Unfair

Methods of Competition and Unfair and Deceptive Acts and Practices in the Business

of Insurance statute (Mass. Gen. Laws Ann. ch. 176D, §§ 3(1)(a) and 3(2)); the

Massachusetts Right of Privacy statute (Mass. Gen. Laws Ann. ch. 214, § 1B), and the

Massachusetts data breach statute (Mass. Gen. Laws Ann. ch. 93H § 3(a));

e) Defendants Anthem and Anthem Affiliates engaged in unfair acts and practices

with respect to the sale of insurance and health benefits services by failing to disclose

the Anthem Data Breach to Massachusetts Class Members in a timely and accurate

manner, in violation of Mass. Gen. Laws Ann. ch. 93H, § 3(a);

f)  Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unfair

acts and practices with respect to the sale of insurance and health benefits services by

failing to take proper action following the Anthem Data Breach to enact adequate

privacy and security measures and protect Massachusetts Class Members' Personal

Information from further unauthorized disclosure, release, data breaches, and theft.

655.    The above unfair and deceptive practices and acts by Defendant Anthem were

immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers

that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to

consumers or to competition. These acts were within the penumbra of common law, statutory, or

other established concepts of unfairness.

656.    Anthem knew or should have known that their computer systems and data security

practices were inadequate to safeguard Massachusetts Class Members' Personal Information and that

risk of a data breach or theft was highly likely.  Anthem's actions in engaging in the above-named

unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless

with respect to the rights of members of the Massachusetts Class.

181

657. As a direct and proximate result of Anthem's unlawful practices, Massachusetts Class Members suffered injury and/or damages.

658. Massachusetts Class Members seek relief under Mass. Gen. Laws Ann. ch. 93A, § 9, including, but not limited to, actual damages, double or treble damages, injunctive and/or other equitable relief, and/or attorneys' fees and costs.

<u>Minnesota</u>
**MINNESOTA CONSUMER FRAUD ACT,
MINN. STAT. § 325F.68, et. seq. AND MINN. STAT. §8.31, et. seq.
(BROUGHT BY MINNESOTA CLASS AGAINST ANTHEM AND ALL OTHER
DEFENDANTS OPERATING IN MINNESOTA EXCEPT FOR BCBSA)**

659. Plaintiffs incorporate the above allegations by reference.

660. Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS operating in Minnesota on behalf of the Minnesota Class.

661. Insurance and health benefits services are "merchandise" as defined by Minn. Stat. § 325F.68.

662. Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in Minnesota engaged in unlawful practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of  services in violation of Minn. Stat. Ann. § 325F.69, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the Minnesota Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard Minnesota Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the Minnesota Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Minnesota Class Members' Personal Information;

182

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Minnesota Class Members' Personal Information;

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to maintain the privacy and security of Minnesota Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d, et seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), the Minnesota Insurance Fair Information Reporting Act (Minn. Stat. § 72A.49, et seq.), the Minnesota Health Records Act (Minn. Stat. § 144.291, et seq.), and the Minnesota Unfair Claims Practices Act (Minn. Stat. § 72A.17, et seq.);

e) Defendants Anthem and Anthem Affiliates engaged in unlawful and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to Minnesota Class Members in a timely and accurate manner, in violation of Minn. Stat. Ann. § 325E.61(1)(a);

f)  Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unlawful and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Minnesota Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

663.    The above unlawful and deceptive acts and practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

183

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

664.   Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Minnesota Class Members' Personal Information and that risk of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Minnesota Class.

665.   As a direct and proximate result of Defendants' unlawful practices, Minnesota Class Members suffered injury and/or damages.

666.   Minnesota Class Members seek relief under Minn. Stat. Ann. § 8.31, including, but not limited to, damages, injunctive and/or other equitable relief, and attorneys' fees and costs.

### MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT, MINN. STAT. § 325D.43, *et. seq.* (BROUGHT BY MINNESOTA CLASS AGAINST ANTHEM AND ALL OTHER DEFENDANTS OPERATING IN MINNESOTA EXCEPT FOR BCBSA)

667.   Plaintiffs incorporate the above allegations by reference.

668.   Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS operating in Minnesota on behalf of the Minnesota Class.

669.   Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in Minnesota engaged in deceptive practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the insurance and health benefits services in violation of Minn. Stat. § 325D.44, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the Minnesota Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard Minnesota Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft in violation of Minn. Stat. § 325D.44(5), (7), (9), and (13);

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the Minnesota Class by representing that they did and would comply with the

184

requirements of relevant federal and state laws pertaining to the privacy and security of Minnesota Class Members' Personal Information in violation of Minn. Stat. § 325D.44(5), (7), (9), and (13);

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Minnesota Class Members' Personal Information in violation of Minn. Stat. § 325D.44(5), (7), (9), and (13);

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to maintain the privacy and security of Minnesota Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d, et seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), the Minnesota Insurance Fair Information Reporting Act (Minn. Stat. § 72A.49, et seq.), the Minnesota Health Records Act (Minn. Stat. § 144.291, et seq.), and the Minnesota Unfair Claims Practices Act (Minn. Stat. § 72A.17, et seq.);

e) Defendants Anthem and Anthem Affiliates engaged in unlawful and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to Minnesota Class Members in a timely and accurate manner, in violation of Minn. Stat. Ann. § 325E.61(1)(a);

f)  Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unlawful and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Minnesota Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

670.    The above unlawful and deceptive acts and practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

671.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Minnesota Class Members' Personal Information and that risk of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Minnesota Class.

672.    As a direct and proximate result of Defendants' unlawful and deceptive trade practices, the Anthem Data Breach affected thousands of Minnesotans.  Even beyond these Minnesotans, the impact on the public is widespread, including the long-term impairment of credit scores, fraudulent tax filings, and national security implications.

673.    As a direct and proximate result of Defendants' unlawful practices, Minnesota Class Members suffered injury and/or damages.

674.    Minnesota Class Members seek relief under Minn. Stat. § 325D.45, including, but not limited to, injunctive relief and attorneys' fees and costs, and also seek relief under Minn. Stat. Ann. § 8.31, including, but not limited to, damages.

**Missouri**
**MISSOURI MERCHANDISING PRACTICES ACT,**
**MO. STAT. § 407.010, *et seq.***
**(BROUGHT BY MISSOURI CLASS AGAINST ANTHEM AND ALL OTHER**
**DEFENDANTS OPERATING IN MISSOURI EXCEPT FOR BCBSA.)**

675.    Plaintiffs incorporate the above allegations by reference.

676.    Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS operating in Missouri on behalf of the Missouri Class.

677.    Missouri Class Members purchased "merchandise" in "trade" or "commerce" as meant by Mo. Stat. § 407.010 when they purchased insurance and health benefits services for personal, family, and/or household purposes.

678.    Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in

186

1   Missouri engaged in unlawful, unfair, and deceptive acts and practices, misrepresentation, and the

2   concealment, suppression, and omission of material facts with respect to the sale and advertisement

3   of the services in violation of Mo. Stat. § 407.020(1), including but not limited to the following:

4       a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented

5       material facts, pertaining to the sale of insurance and health benefits services, to the

6       Missouri Class by representing that they would maintain adequate data privacy and

7       security practices and procedures to safeguard Missouri Class Members' Personal

8       Information from unauthorized disclosure, release, data breaches, and theft;

9       b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented

10      material facts, pertaining to the sale of insurance and health benefits services, to the

11      Missouri Class by representing that they did and would comply with the requirements

12      of relevant federal and state laws pertaining to the privacy and security of Missouri

13      Class Members' Personal Information;

14      c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted,

15      suppressed, and concealed the material fact of the inadequacy of the privacy and

16      security protections for Missouri Class Members' Personal Information;

17      d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair

18      acts and practices with respect to the sale of insurance and health benefits services by

19      failing to maintain the privacy and security of Missouri Class Members' Personal

20      Information, in violation of duties imposed by and public policies reflected in

21      applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair

22      acts and practices violated duties imposed by laws including the Federal Trade

23      Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d, et seq.), the Gramm-

24      Leach-Bliley Act (15 U.S.C. § 6801), the Missouri Unfair Trade Practice Act (Mo.

25      Stat. § 375.936(4) and (6)(a)), and Missouri Statute § 354-525;

26      e) Defendants Anthem and Anthem Affiliates engaged in unlawful and deceptive acts

27      and practices with respect to the sale of insurance and health benefits services by

28      failing to disclose the Anthem Data Breach to Missouri Class Members in a timely and

187

accurate manner, in violation of MO. Rev. Stat. § 407.1500(2)(1)(a);

f)  Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unlawful and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Missouri Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

679.    The above unlawful and deceptive acts and practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

680.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Missouri Class Members' Personal Information and that risk of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Missouri Class.

681.    As a direct and proximate result of Defendants' unlawful practices, Missouri Class Members suffered an ascertainable loss of money or property, real or personal, as described above, including the loss of their legally protected interest in the confidentiality and privacy of their Personal Information.

682.    Missouri Class Members seek relief under Mo. Ann. Stat. § 407.025, including, but not limited to, injunctive relief, actual damages, punitive damages, and attorneys' fees and costs.

### Montana
### MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT, MCA § 30-14-101, *et seq.*
### (BROUGHT BY MONTANA CLASS AGAINST ANTHEM AND ALL OTHER DEFENDANTS OPERATING IN MONTANA EXCEPT FOR BCBSA

683.    Plaintiffs incorporate the above allegations by reference.

684.    Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS operating in Montana on behalf of the Montana Class.

188

1   685.   The Montana Class Members are "consumers" as meant by Mont. Code § 30-14-102.

2   686.   The Montana Class Members purchased insurance and health benefits services from

3   Defendants in "trade" and "commerce," as meant by Mont. Code § 30-14-102, for personal, family,

4   and/or household purposes.

5   687.   Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in

6   Montana engaged in unlawful, unfair, and deceptive acts and practices, misrepresentation, and the

7   concealment, suppression, and omission of material facts with respect to the sale and advertisement

8   of the services purchased by the Montana Class in violation Mont. Code § 30-14-103, including but

9   not limited to the following:

10          a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented

11          material facts, pertaining to the sale of insurance and health benefits services, to the

12          Montana Class by representing that they would maintain adequate data privacy and

13          security practices and procedures to safeguard Montana Class Members' Personal

14          Information from unauthorized disclosure, release, data breaches, and theft;

15          b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented

16          material facts, pertaining to the sale of insurance and health benefits services, to the

17          Montana Class by representing that they did and would comply with the requirements

18          of relevant federal and state laws pertaining to the privacy and security of Montana

19          Class Members' Personal Information;

20          c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted,

21          suppressed, and concealed the material fact of the inadequacy of the privacy and

22          security protections for Montana Class Members' Personal Information;

23          d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair,

24          unlawful, and deceptive acts and practices with respect to the sale of insurance and

25          health benefits services by failing to maintain the privacy and security of Montana

26          Class Members' Personal Information, in violation of duties imposed by and public

27          policies reflected in applicable federal and state laws, resulting in the Anthem Data

28          Breach.  These unfair, unlawful, and deceptive acts and practices violated duties

189

imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45),
HIPAA (42 U.S.C. § 1302d, et seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801),
the Montana Insurance Information and Privacy Protection Act (Mont. Code Ann. §
33-19-306); and the Montana Unfair Claim Settlement Practices Act (Mont. Code
Ann. § 33-18-201(1));

e) Defendants Anthem and Anthem Affiliates engaged in unlawful, unfair, and
deceptive acts and practices with respect to the sale of insurance and health benefits
services by failing to disclose the Anthem Data Breach to Montana Class Members in
a timely and accurate manner, in violation of Mont. Code Ann.§ 30-14-1704(1);

f) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in
unlawful, unfair, and deceptive acts and practices with respect to the sale of insurance
and health benefits services by failing to take proper action following the Anthem Data
Breach to enact adequate privacy and security measures and protect Montana Class
Members' Personal Information from further unauthorized disclosure, release, data
breaches, and theft.

688.   The above unlawful, unfair, and deceptive acts and practices by Defendants Anthem,
Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous.
These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this
substantial injury outweighed any benefits to consumers or to competition.

689.   Defendants knew or should have known that their computer systems and data security
practices were inadequate to safeguard Montana Class Members' Personal Information and that risk
of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named
deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with
respect to the rights of members of the Montana Class.

690.   As a direct and proximate result of Defendants' deceptive acts and practices, the
Montana Class Members suffered an ascertainable loss of money or property, real or personal, as
described above, including the loss of their legally protected interest in the confidentiality and privacy
of their Personal Information.

691.    Montana Class Members seek relief under Mont. Code § 30-14-133, including, but not limited to, injunctive relief, other equitable relief, actual damages or $500 per Class Member, whichever is greater, treble damages, and attorneys' fees and costs.

<div align="center">

**Nebraska**
**NEBRASKA CONSUMER PROTECTION ACT,**
**NEB. REV. STAT. § 59-1601,** *et. seq.*
**(BROUGHT BY NEBRASKA CLASS AGAINST ANTHEM AND ALL OTHER**
**DEFENDANTS OPERATING IN NEBRASKA EXCEPT FOR BCBSA)**

</div>

692.    Plaintiffs incorporate the above allegations by reference.

693.    Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS operating in Nebraska on behalf of the Nebraska Class.

694.    Defendants engage in "trade and commerce," as meant by Neb. Rev. Stat. § 59-1601, by selling health insurance and health benefits services."

695.    Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in Nebraska engaged in unfair and deceptive acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the services in violation of Neb. Rev. Stat. § 59-1602, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the Nebraska Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard Nebraska Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the Nebraska Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Nebraska Class Members' Personal Information;

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Nebraska Class Members' Personal Information;

<div align="center">

191

**THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**
**CASE NO. 15-md-02617-LHK**

</div>

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to maintain the privacy and security of Nebraska Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d, et seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), the Nebraska Privacy of Insurance Consumer Information Act (Neb. Rev. Stat. §§ 44-910, 44-916), and the Nebraska Unfair Insurance Trade Practices Act (Neb. Rev. Stat. §§ 44-1524, 44-1425);

e) Defendants Anthem and Anthem Affiliates engaged in unlawful and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to Nebraska Class Members in a timely and accurate manner, in violation of Neb. Rev. Stat. Ann. § 87-803(1);

f)  Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unlawful and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Nebraska Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

696.    The above unlawful and deceptive acts and practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

697.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Nebraska Class Members' Personal Information and that risk of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless

192

1    with respect to the rights of members of the Nebraska Class.

2        698.    As a direct and proximate result of Defendants' unlawful practices, Nebraska Class

3    Members suffered injury and/or damages.

4        699.    Nebraska Class Members seek relief under Neb. Rev. Stat. § 59-1609, including, but

5    not limited to, injunctive relief, actual damages, and attorneys' fees and costs.

6                    **NEBRASKA UNIFORM DECEPTIVE TRADE PRACTICES ACT,**
                         **NEB. REV. STAT. § 87-301,** *et. seq.*
7            **(BROUGHT BY NEBRASKA CLASS AGAINST ANTHEM AND ALL OTHER**
                 **DEFENDANTS OPERATING IN NEBRASKA EXCEPT FOR BCBSA)**
8
         700.    Plaintiffs incorporate the above allegations by reference.
9
         701.    Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-
10
     Anthem BCBS operating in Nebraska on behalf of the Nebraska Class.
11
         702.    Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in
12
     Nebraska engaged in deceptive trade practices, misrepresentation, and the concealment, suppression,
13
     and omission of material facts with respect to the sale and advertisement of health insurance and
14
     benefits services purchased by the Nebraska Class in violation of Neb. Rev. Stat. § 87-302, including
15
     but not limited to the following:
16
                    a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented
17
                    material facts, pertaining to the sale of insurance and health benefits services, to the
18
                    Nebraska Class by representing that they would maintain adequate data privacy and
19
                    security practices and procedures to safeguard Nebraska Class Members' Personal
20
                    Information from unauthorized disclosure, release, data breaches, and theft in violation
21
                    of Neb. Rev. Stat. § 87-302(5), (7), (9), (14), and (15);
22
                    b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented
23
                    material facts, pertaining to the sale of insurance and health benefits services, to the
24
                    Nebraska Class by representing that they did and would comply with the requirements
25
                    of relevant federal and state laws pertaining to the privacy and security of Nebraska
26
                    Class Members' Personal Information in violation of Neb. Rev. Stat. § 87-302(5), (7),
27
                    (9), (14), and (15);
28

                                                    193
                    THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
                              CASE NO. 15-md-02617-LHK

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Nebraska Class Members' Personal Information in violation of Neb. Rev. Stat. § 87-302(5), (7), (9), (14), and (15);

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in deceptive trade practices with respect to the sale of insurance and health benefits services by failing to maintain the privacy and security of Nebraska Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These deceptive trade practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d, et seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), the Nebraska Privacy of Insurance Consumer Information Act (Neb. Rev. Stat. §§ 44-910, 44-916), and the Nebraska Unfair Insurance Trade Practices Act (Neb. Rev. Stat. §§ 44-1524, 44-1425);

e) Defendants Anthem and Anthem Affiliates engaged in deceptive trade practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to Nebraska Class Members in a timely and accurate manner, in violation of Neb. Rev. Stat. Ann. § 87-803(1);

f)  Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive trade practices with respect to the sale of insurance and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Nebraska Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

703.    The above deceptive trade practices by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

194

704.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Nebraska Class Members' Personal Information and that risk of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Nebraska Class.

705.    As a direct and proximate result of Defendants' unlawful practices, Nebraska Class Members suffered injury and/or damages.

706.    Nebraska Class Members seek relief under Neb. Rev. Stat. § 87-303, including, but not limited to, injunctive relief, other equitable relief, and attorneys' fees and costs.

**Nevada**
**NEVADA DECEPTIVE TRADE PRACTICES ACT,**
**NEV. REV. STAT. § 598.0915, *et. seq.*; NEV. REV. STAT. § 41.600, *et. seq.***
**(BROUGHT BY NEVADA CLASS AGAINST ANTHEM AND ALL OTHER DEFENDANTS**
**OPERATING IN NEVADA EXCEPT FOR BCBSA)**

707.    Plaintiffs incorporate the above allegations by reference.

708.    Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS operating in Nevada on behalf of the Nevada Class.

709.    In the course of their businesses, Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in Nevada engaged in deceptive acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of health insurance and health benefits services in violation of Nev. Rev. Stat. § 598.0915, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the Nebraska Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard Nevada Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft, in violation of Nev. Rev. Stat. § 598.0915(5), (7), (9), and (15);

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the

195

Nevada Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Nebraska Class Members' Personal Information, in violation of Nev. Rev. Stat. § 598.0915(5), (7), (9), and (15);

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Nevada Class Members' Personal Information, in violation of Nev. Rev. Stat. § 598.0915(5), (7), (9), and (15);

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in deceptive trade practices with respect to the sale of insurance and health benefits services by failing to maintain the privacy and security of Nevada Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d, et seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), the Nevada Confidentiality and Disclosure of Information statute (Nev. Rev. Stat. § 695F.410), the Nevada data breach statute (Nev. Rev. Stat. Ann. § 603A.210),  and the Nevada Trade Practices and Frauds in Insurance statute (Nev. Rev. Stat. Ann. §§  686A.025, 686A.030(1), and 686A.040);

e) Defendants Anthem and Anthem Affiliates engaged in deceptive trade practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to Nevada Class Members in a timely and accurate manner, in violation of Nev. Rev. Stat. Ann. §  603A.220(1);

f)  Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive trade practices with respect to the sale of insurance and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Nevada Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

196

710.    The above unlawful and deceptive acts and practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

711.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Nevada Class Members' Personal Information and that risk of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Nevada Class.

712.    As a direct and proximate result of Defendants' deceptive practices, Nevada Class Members suffered injury and/or damages.

713.    Nevada Class Members seek relief under Nev. Rev. Stat. Ann. § 41.600, including, but not limited to, injunctive relief, other equitable relief, actual damages, and attorneys' fees and costs.

**New Jersey**
**NEW JERSEY CONSUMER FRAUD ACT,**
**N.J. STAT. ANN. § 56:8-1,** *et. seq.*
**(BROUGHT BY NEW JERSEY CLASS AGAINST ANTHEM AND ALL OTHER**
**DEFENDANTS OPERATING IN NEW JERSEY EXCEPT FOR BCBSA)**

714.    Plaintiffs incorporate the above allegations by reference.

715.    Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS operating in New Jersey on behalf of the New Jersey Class.

716.    Defendants sell "merchandise," as meant by N.J. Stat. Ann. § 56:8-1, by offering health insurance and health benefits services to the public.

717.    Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in New Jersey engaged in unconscionable and deceptive acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of health insurance and health benefits services in violation of N.J. Stat. Ann. § 56:8-2, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the

New Jersey Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard New Jersey Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the New Jersey Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of New Jersey Class Members' Personal Information;

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS knowingly omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for New Jersey Class Members' Personal Information with the intent that others rely on the omission, suppression, and concealment;

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unconscionable and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to maintain the privacy and security of New Jersey Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d, et seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), the New Jersey Insurance Information Practices Act (N.J. Stat. § 17:23A-1, et seq.); and the New Jersey Insurance Trade Practices Act (N.J. Stat. §§ 17:29B-4(1) and (2));

e) Defendants Anthem and Anthem Affiliates engaged in unconscionable and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to New Jersey Class Members in a timely and accurate manner, in violation of N.J. Stat. Ann. § 56:8-163(a);

f) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unconscionable and deceptive acts and practices with respect to the sale of insurance

198

and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect New Jersey Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

718.   The above unlawful and deceptive acts and practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

719.   Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard New Jersey Class Members' Personal Information and that risk of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the New Jersey Class.

720.   As a direct and proximate result of Defendants' unconscionable or deceptive acts and practices, New Jersey Class Members suffered an ascertainable loss in moneys or property, real or personal, as described above, including the loss of their legally protected interest in the confidentiality and privacy of their Personal Information.

721.   New Jersey Class Members seek relief under N.J. Stat. Ann. § 56:8-19, including, but not limited to, injunctive relief, other equitable relief, actual damages, treble damages, and attorneys' fees and costs.

**New Mexico**
**NEW MEXICO UNFAIR PRACTICES ACT,**
**N.M. STAT. ANN. § 57-12-1, *et. seq.***
**(BROUGHT BY NEW MEXICO CLASS AGAINST ANTHEM AND ALL OTHER**
**DEFENDANTS OPERATING IN NEW MEXICO EXCEPT FOR BCBSA)**

722.   Plaintiffs incorporate the above allegations by reference.

723.   Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS operating in New Mexico on behalf of the New Mexico Class.

724.   Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in New Mexico engaged in unconscionable, unfair, and deceptive acts and practices, misrepresentation, and

199

the concealment, suppression, and omission of material facts with respect to the sale and advertisement of health insurance and health benefits services in violation of N.M. Stat. Ann. § 57-12-3, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS knowingly misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the New Mexico Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard New Mexico Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS knowingly misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the New Mexico Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of New Mexico Class Members' Personal Information;

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS knowingly omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for New Mexico Class Members' Personal Information;

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair, unconscionable, and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to maintain the privacy and security of New Mexico Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair, unconscionable, and deceptive acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d, et seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), the New Mexico Confidentiality of Medical Information statute (N.M. Stat. Ann. § 59A-46-27), the New Mexico Privacy of Nonpublic Personal Information regulation (N.M. Admin. Code 13.1.3); and the New Mexico Trade Practices and Frauds in

1    Insurance statute (N.M. Stat. Ann. §§ 59A-16-4(A), 59A-16-5);

2    e) Defendants Anthem and Anthem Affiliates engaged in unfair, unconscionable, and

3    deceptive acts and practices with respect to the sale of insurance and health benefits

4    services by failing to disclose the Anthem Data Breach to New Mexico Class

5    Members in a timely and accurate manner;

6    f) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unfair,

7    unconscionable, and deceptive acts and practices with respect to the sale of insurance

8    and health benefits services by failing to take proper action following the Anthem Data

9    Breach to enact adequate privacy and security measures and protect New Mexico

10   Class Members' Personal Information from further unauthorized disclosure, release,

11   data breaches, and theft.

12   725.   The above unfair, unconscionable, and deceptive acts and practices and acts by

13   Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive,

14   and unscrupulous. These acts caused substantial injury to consumers that the consumers could not

15   reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

16   726.   Defendants knew or should have known that their computer systems and data security

17   practices were inadequate to safeguard New Mexico Class Members' Personal Information and that

18   risk of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named

19   unfair, unconscionable, and deceptive acts and practices were negligent, knowing and willful, and/or

20   wanton and reckless with respect to the rights of members of the New Mexico Class.

21   727.   As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive

22   acts and practices, New Mexico Class Members suffered a loss in money or property, real or

23   personal, as described above, including the loss of their legally protected interest in the

24   confidentiality and privacy of their Personal Information.

25   728.   New Mexico Class Members seek relief under N.M. Stat. Ann. § 57-12-10, including,

26   but not limited to, injunctive relief, actual damages, and attorneys' fees and costs, as well as treble

27   damages or $300, whichever is greater, to the Plaintiffs.

28   **New York**

201

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

**NEW YORK GENERAL BUSINESS LAW,**
**N.Y. GEN. BUS. LAW § 349, *et. seq.***
**(BROUGHT BY NEW YORK CLASS AGAINST ANTHEM AND ALL OTHER**
**DEFENDANTS OPERATING IN NEW YORK EXCEPT FOR BCBSA)**

729.    Plaintiffs incorporate the above allegations by reference.

730.    Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce and furnishing of services, in violation of N.Y. Gen. Bus. Law § 349(a), including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented and fraudulently advertised material facts, pertaining to the sale and/or furnishing of insurance and health benefits services, to the New York Class by representing and advertising that they would maintain adequate data privacy and security practices and procedures to safeguard New York Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to sale and/or furnishing of insurance and health benefits services, to the New York Class by representing and advertising that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of New York Class Members' Personal Information;

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of their privacy and security protections for New York Class Members' Personal Information;

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices by failing to maintain the privacy and security of New York Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d et. seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801),

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

and New York's Protection Mechanisms for Insurance Payment Information (N.Y. Soc. Serv. §367-a (2)(b));

e) Defendants Anthem and Anthem Affiliates engaged in deceptive, unfair, and unlawful trade acts or practices by failing to disclose the Anthem Data Breach to New York Class Members in a timely and accurate manner, contrary to the duties imposed by N.Y. Gen Bus. Law § 899-aa(2);

f) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect New York Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

731.    As a direct and proximate result of Defendants' deceptive trade practices, New York Class Members suffered injury and/or damages, including the loss of their legally protected interest in the confidentiality and privacy of their Personal Information, and the loss of the benefit of their bargain.

732.    The above unfair and deceptive practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

733.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard New York Class Members' Personal Information and that risk of a data breach or theft was highly likely. Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the New York Class.

734.    Plaintiffs and New York Class Members seek relief under N.Y. Gen. Bus. Law § 349(h), including, but not limited to, actual damages, treble damages, statutory damages, injunctive relief, and/or attorney's fees and costs.

## North Carolina

203

**NORTH CAROLINA UNFAIR TRADE PRACTICES ACT,**
**N.C. GEN. STAT. ANN. § 75-1.1,** *et. seq.*
**(BROUGHT BY NORTH CAROLINA CLASS AGAINST ANTHEM AND ALL OTHER**
**DEFENDANTS OPERATING IN NORTH CAROLINA EXCEPT FOR BCBSA)**

735.    Plaintiffs incorporate the above allegations by reference.

736.    Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS operating in North Carolina on behalf of the North Carolina Class.

737.    Defendants' sale, advertising, and marketing of insurance and health benefits affected commerce, as meant by N.C. Gen. Stat. § 75-1.1.

738.    Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in North Carolina engaged in unlawful, unfair, and deceptive acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of health insurance and health benefits services in violation of N.C. Gen. Stat. § 75-1.1, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the North Carolina Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard North Carolina Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the North Carolina Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of North Carolina Class Members' Personal Information;

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for North Carolina Class Members' Personal Information;

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair, unlawful, and deceptive acts and practices with respect to the sale of insurance and

204

health benefits services by failing to maintain the privacy and security of North Carolina Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair, unlawful, and deceptive acts and practices violated duties imposed by laws including Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d, et seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), the North Carolina Consumer and Customer Information Privacy Act (N.C. Gen. Stat. § 58-39-1, et seq.), and the North Carolina Unfair Trade Practices N.C. Gen. Stat. § 58-63-15(1) and (2));

e) Defendants Anthem and Anthem Affiliates engaged in unfair, unlawful, and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to North Carolina Class Members in a timely and accurate manner, in violation of N.C. Gen. Stat. Ann. § 76-65(a);

f)  Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unfair, unlawful, and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect North Carolina Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

739.    The above unfair, unlawful, and deceptive acts and practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

740.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard North Carolina Class Members' Personal Information and that risk of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named unfair, unconscionable, and deceptive acts and practices were negligent, knowing and willful, and/or

205

wanton and reckless with respect to the rights of members of the North Carolina Class.

741.    As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, North Class Members suffered injury and/or damages.

742.    North Carolina Class Members seek relief under N.C. Gen. Stat. §§ 75-16 and 75-16.1 including, but not limited to, injunctive relief, actual damages, treble damages, and attorneys' fees and costs.

**North Dakota**
**NORTH DAKOTA UNLAWFUL SALES OR ADVERTISING ACT,**
**N.D. CENT. CODE §§ 51-10-01, *et. seq.***
**(BROUGHT BY NORTH DAKOTA CLASS AGAINST ANTHEM AND ALL OTHER DEFENDANTS OPERATING IN NORTH DAKOTA EXCEPT FOR BCBSA)**

743.    Plaintiffs incorporate the above allegations by reference.

744.    Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS operating in North Dakota on behalf of the North Dakota Class.

745.    Defendants sell and advertise "merchandise," as meant by N.D. Cent. Code § 51-15-01, in the form of insurance and health benefits services.

746.    Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in North Dakota engaged in deceptive acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts with in connection to the sale and advertisement of insurance and health benefits services in violation of N.D. Cent. Code § 51-15-01, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts (intending for others to rely upon the misrepresentations), pertaining to the sale of insurance and health benefits services, to the North Dakota Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard North Dakota Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts (intending for others to rely upon the misrepresentations), pertaining to the sale of insurance and health benefits services, to the North Dakota Class by

206

representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of North Dakota Class Members' Personal Information;

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for North Dakota Class Members' Personal Information, with the intent that others rely on the omission, suppression, and concealment;

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to maintain the privacy and security of North Dakota Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach. These unfair, unlawful, and deceptive acts and practices violated duties imposed by laws including Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d, et seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), the North Dakota Confidentiality of Medical Information statute (N.D. Cent. Code Ann. § 26.1-36-12.4); the North Dakota Privacy of Consumer Financial and Health Information rule (N.D. Admin. Code 45-14-01-01, et seq.); and the North Dakota Prohibited Practices in Insurance Business statute (N.D. Cent. Code Ann. § 26.1-04-03(1) and (2));

e) Defendants Anthem and Anthem Affiliates engaged in deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to North Dakota Class Members in a timely and accurate manner, in violation of N.D. Cent. Code Ann. § 51-30-02;

f) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect North Dakota Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and

207

theft.

747.     The above deceptive acts and practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

748.     Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard North Dakota Class Members' Personal Information and that risk of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the North Dakota Class.

749.     As a direct and proximate result of Defendants' deceptive acts and practices, Defendant acquired money or property from North Dakota Class Members.

750.     North Carolina Class Members seek relief under N.D. Cent. Code Ann. § 51-15-09 including, but not limited to, injunctive relief, damages, restitution, treble damages, and attorneys' fees and costs.

### Oklahoma
### OKLAHOMA CONSUMER PROTECTION ACT,
### 15 OKL. STAT. ANN. § 751, *et. seq.*
### (BROUGHT BY OKLAHOMA CLASS AGAINST ANTHEM AND ALL DEFENDANTS OPERATING IN OKLAHOMA EXCEPT FOR BCBSA)

751.     Plaintiffs incorporate the above allegations by reference.

752.     Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS operating in Oklahoma on behalf of the Oklahoma Class.

753.     The Oklahoma Class Members purchased "merchandise," as meant by Okla. Stat. tit. 15, § 752, in the form of insurance and health benefits services.

754.     The Oklahoma Class Members' purchases of insurance and health benefits services from Defendants constituted "consumer transactions" as meant by Okla. Stat. tit. 15, § 752.

755.     Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in Oklahoma engaged in unlawful, unfair, and deceptive trade practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement

208

of the services purchased by the Oklahoma Class in violation of Okla. Stat. tit. 15, § 753, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS knowingly, or with reason to know, misrepresented material facts pertaining to the sale of insurance and health benefits services to the Oklahoma Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard Oklahoma Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft in violation of Okla. Stat. tit. 15, § 753(5) and (8);

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS knowingly, or with reason to know, misrepresented material facts pertaining to the sale of insurance and health benefits services to the Oklahoma Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Oklahoma Class Members' Personal Information in violation of Okla. Stat. tit. 15, § 753(5) and (8);

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Oklahoma Class Members' Personal Information in violation of Okla. Stat. tit. 15, § 753(5) and (8);

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair, unlawful, and deceptive trade practices with respect to the sale of insurance and health benefits services by failing to maintain the privacy and security of Oklahoma Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach. These unfair, unlawful, and deceptive acts and practices violated duties imposed by laws including Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d, et seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), the Oklahoma Privacy of Consumer Financial and Health Information regulation (Okla. Admin. Code §§ 365:35-1-40, 365:35-1-20); and the Oklahoma Unfair Practices and Fraud in

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

Insurance statute (Okla. Stat. Ann. tit. 36, § 1204(1) and (2));

e) Defendants Anthem and Anthem Affiliates engaged in unlawful, unfair, and deceptive trade practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to Oklahoma Class Members in a timely and accurate manner, in violation of 24 Okla. Sta. Ann. § 163(A);

f) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unlawful, unfair, and deceptive trade practices with respect to the sale of insurance and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Oklahoma Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

756.   The above unlawful, unfair, and deceptive trade practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

757.   Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Oklahoma Class Members' Personal Information and that risk of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Oklahoma Class.

758.   As a direct and proximate result of Defendants' deceptive acts and practices, the Oklahoma Class Members suffered injury and/or damages.

759.   Oklahoma Class Members seek relief under Okla. Stat. Ann. tit. 15, § 761.1 including, but not limited to, injunctive relief, actual damages, and attorneys' fees and costs.

### Pennsylvania
### PENNSYLVANIA UNFAIR TRADE PRACTICES,
### 73 PA STAT. ANN. § 201-1, *et. seq.*
### (BROUGHT BY PENNSYLVANIA CLASS AGAINST ANTHEM AND ALL OTHER
### DEFENDANTS OPERATING IN PENNSYLVANIA EXCEPT FOR BCBSA)

760.   Plaintiffs incorporate the above allegations by reference.

210

761.     Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS operating in Pennsylvania on behalf of the Pennsylvania Class.

762.     The Pennsylvania Class Members purchased insurance and health benefits services from Defendants in "trade" and "commerce," as meant by 73 Pa. Cons. Stat. § 201-2, for personal, family, and/or household purposes.

763.     Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in Pennsylvania engaged in unlawful, unfair, and deceptive acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the services purchased by the Pennsylvania Class in violation of 73 Pa. Cons. Stat. Ann. § 201-3, including but not limited to the following:

> a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to the sale of insurance and health benefits services to the Pennsylvania Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard Pennsylvania Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft in violation of 73 Pa. Cons. Stat. Ann. § 201-3(4)(v), (ix), and (xxi);

> b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to the sale of insurance and health benefits services to the Pennsylvania Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Pennsylvania Class Members' Personal Information in violation of 73 Pa. Cons. Stat. Ann. § 201-3(4)(v), (ix), and (xxi);

> c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Pennsylvania Class Members' Personal Information in violation of in violation of 73 Pa. Cons. Stat. Ann. § 201-3(4)(v), (ix), and (xxi);

> d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair, unlawful, and deceptive acts and practices with respect to the sale of insurance and

211

health benefits services by failing to maintain the privacy and security of Pennsylvania Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair, unlawful, and deceptive acts and practices violated duties imposed by laws including Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d, et seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), the Pennsylvania Quality Healthcare Accountability and Protection statute (40 Pa. Cons. Stat. Ann. § 991.2131); and the Pennsylvania Unfair Insurance Practices Act (40 Pa. Cons. Stat. Ann. § 1171.1(a)(1)(i) and (a)(2));

e) Defendants Anthem and Anthem Affiliates engaged in unlawful, unfair, and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to Pennsylvania Class Members in a timely and accurate manner, in violation of 73 Pa. Stat. § 2303(a);

f)  Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unlawful, unfair, and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Pennsylvania Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

764.    The above unlawful, unfair, and deceptive acts and practices by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

765.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Pennsylvania Class Members' Personal Information and that risk of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Pennsylvania Class.

766.   As a direct and proximate result of Defendants' deceptive acts and practices, the Pennsylvania Class Members suffered an ascertainable loss of money or property, real or personal, as described above, including the loss of their legally protected interest in the confidentiality and privacy of their Personal Information.

767.   Pennsylvania Class Members seek relief under 73 Pa. Cons. Stat. § 201-9.2, including, but not limited to, injunctive relief, actual damages or $100 per Class Member, whichever is greater, treble damages, and attorneys' fees and costs.

**Rhode Island**
**RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT,**
**R.I. GEN. LAWS § 6-13.1,** *et. seq.*
**(BROUGHT BY RHODE ISLAND CLASS AGAINST ANTHEM, INC. EXCEPT FOR BCBSA)**

768.   Plaintiffs incorporate the above allegations by reference.

769.   Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS operating in Rhode Island on behalf of the Rhode Island Class.

770.   The Rhode Island Class Members purchased insurance and health benefits services from Defendants in "trade" and "commerce," as meant by R.I. Gen. Laws § 6-13.1-1, for personal, family, and/or household purposes.

771.   Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in Rhode Island engaged in unlawful, unfair, and deceptive acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the services purchased by the Rhode Island Class in violation of R.I. Gen. Laws Ann. § 6-13.1-2, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to the sale of insurance and health benefits services to the Rhode Island Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard Rhode Island Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft in violation of R.I. Gen. Laws Ann. § 6-13.1-1(6)(v), (vii), (ix), (xii), (xiii), and (xiv);

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented

213

material facts pertaining to the sale of insurance and health benefits services to the Rhode Island Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Rhode Island Class Members' Personal Information in violation of R.I. Gen. Laws Ann. § 6-13.1-1(6)(v), (vii), (ix), (xii), (xiii), and (xiv);

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Rhode Island Class Members' Personal Information in violation of in violation of R.I. Gen. Laws Ann. § 6-13.1-1(6)(v), (vii), (ix), (xii), (xiii), and (xiv);

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair, unlawful, and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to maintain the privacy and security of Rhode Island Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair, unlawful, and deceptive acts and practices violated duties imposed by laws including Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d, et seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), the Rhode Island Confidentiality of Health Care Information Act (R.I. Gen. Laws § 5-37.3-4); the Rhode Island data breach statute (R.I. Gen. Laws § 11-49.2-2(2), and the Rhode Island Unfair Competition and Practices in Insurance statute (R.I. Gen. Laws § 27-29-4(1) and (2));

e) Defendants Anthem and Anthem Affiliates engaged in unlawful, unfair, and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to Rhode Island Class Members in a timely and accurate manner, in violation of R.I. Gen. Laws Ann. § 11-49.2-3(a);

f)  Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in

unlawful, unfair, and deceptive acts and practices with respect to the sale of insurance

and health benefits services by failing to take proper action following the Anthem Data

Breach to enact adequate privacy and security measures and protect Rhode Island

Class Members' Personal Information from further unauthorized disclosure, release,

data breaches, and theft.

772.    The above unlawful, unfair, and deceptive acts and practices by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

773.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Rhode Island Class Members' Personal Information and that risk of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Rhode Island Class.

774.    As a direct and proximate result of Defendants' deceptive acts and practices, the Rhode Island Class Members suffered an ascertainable loss of money or property, real or personal, as described above, including the loss of their legally protected interest in the confidentiality and privacy of their Personal Information.

775.    Rhode Island Class Members seek relief under R.I. Gen. Laws § 6-13.1-5.2, including, but not limited to, injunctive relief, other equitable relief, actual damages or $200 per Class Member, whichever is greater, punitive damages, and attorneys' fees and costs.

**South Dakota**
**SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT,**
**S.D. CODIFIED LAWS § 37-24-1, *et. seq.***
**(BROUGHT BY SOUTH DAKOTA CLASS AGAINST ANTHEM AND ALL OTHER DEFENDANTS OPERATING IN SOUTH DAKOTA EXCEPT FOR BCBSA)**

776.    Plaintiffs incorporate the above allegations by reference.

777.    Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS operating in South Dakota on behalf of the South Dakota Class.

215

778.     Defendants advertise and sell "goods or services" and/or "merchandise" in "trade" and "commerce," as meant by S.D. Codified Laws § 37-24-1, in the form of insurance and health benefits services.

779.     Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in South Dakota engaged in deceptive acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of health insurance and health benefits services in violation of S.D. Codified Laws § 37-24-6, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS knowingly and intentionally misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the South Dakota Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard South Dakota Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft in violation of S.D. Codified Laws § 37-24-6(1);

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS knowingly and intentionally misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the South Dakota Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of South Dakota Class Members' Personal Information in violation of S.D. Codified Laws § 37-24-6(1);

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS knowingly and intentionally omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for South Dakota Class Members' Personal Information in violation of in violation of S.D. Codified Laws § 37-24-6(1);

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to maintain the privacy and security of South Dakota Class Members' Personal Information, in violation of duties imposed by and public policies

216

reflected in applicable federal and state laws, resulting in the Anthem Data Breach. These unfair, unlawful, and deceptive acts and practices violated duties imposed by laws including Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d, et seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), and the Unfair Trade Practices in Insurance statute (S.D. Codified Laws §§ 58-33-5, 58-33-6).

e) Defendants Anthem and Anthem Affiliates knowingly and intentionally engaged in deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to South Dakota Class Members in a timely and accurate manner;

f) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect South Dakota Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

780.    The above deceptive acts and practices by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

781.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard South Dakota Class Members' Personal Information and that risk of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the South Dakota Class.

782.    As a direct and proximate result of Defendants' deceptive acts and practices, the South Dakota Class Members were adversely affected, injured, and/or damaged.

783.    South Dakota Class Members seek relief under S.D. Codified Laws § 37-24-31, including, but not limited to, actual damages.

**Tennessee**
**TENNESSEE CONSUMER PROTECTION ACT,**
**TENN. CODE ANN. §§ 47-18-101,** *et. seq.*
**(BROUGHT BY TENNESSEE CLASS AGAINST ANTHEM AND ALL OTHER**
**DEFENDANTS OPERATING IN TENNESSEE EXCEPT FOR BCBSA)**

784.     Plaintiffs incorporate the above allegations by reference.

785.     Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS operating in Tennessee on behalf of the Tennessee Class.

786.     Defendants advertised and sold "goods" or "services" in "trade" and "commerce," as meant by Tenn. Code § 47-18-103, in the form of insurance and health benefits services from Defendants.

787.     Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in Tennessee engaged in unlawful, unfair, and deceptive acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of insurance and health benefits services in violation Tenn. Code § 47-18-104, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the Tennessee Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard Tennessee Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft in violation of Tenn. Code § 47-18-104(b)(5) and (9);

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the Tennessee Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Tennessee Class Members' Personal Information in violation of Tenn. Code § 47-18-104(b)(5) and (9);

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted,

218

suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Tennessee Class Members' Personal Information in violation of Tenn. Code § 47-18-104(b)(5) and (9);

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair, unlawful, and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to maintain the privacy and security of Tennessee Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair, unlawful, and deceptive acts and practices violated duties imposed by laws including Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d, et seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), the Tennessee Health Maintenance Organization Act (Tenn. Code § 56-32-125); the Tennessee Prepaid Limited Health Service Organization Act of 2000 (Tenn. Code § 56-51-150); and the Tennessee Unfair Trade Practices and Unfair Claims Settlement Act of 2009 (Tenn. Code Ann. § 56-8-104(1)(A) and (2)).

e) Defendants Anthem and Anthem Affiliates engaged in unlawful, unfair, and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to Tennessee Class Members in a timely and accurate manner, in violation of Tenn. Code. Ann. § 47-18-2107(b);

f)  Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unlawful, unfair, and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Tennessee Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

788.    The above unlawful, unfair, and deceptive acts and practices by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this

219

substantial injury outweighed any benefits to consumers or to competition.

789.     Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Tennessee Class Members' Personal Information and that risk of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Tennessee Class.

790.     As a direct and proximate result of Defendants' deceptive acts and practices, the Tennessee Class Members suffered an ascertainable loss of money or property, real or personal, as described above, including the loss of their legally protected interest in the confidentiality and privacy of their Personal Information.

791.     Tennessee Class Members seek relief under Tenn. Code Ann. § 47-18-109, including, but not limited to, injunctive relief, actual damages, treble damages for each willful or knowing violation,  and attorneys' fees and costs.

**Texas**
**TEXAS DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT,**
**TEX. BUS. & COM. CODE § 17.41,** *et. seq.*
**(BROUGHT BY TEXAS CLASS AGAINST ANTHEM AND BCBS OF TEXAS)**

792.     Plaintiffs incorporate the above allegations by reference.

793.     Plaintiff Lane Wagner sent a demand for relief to Anthem, Inc. on behalf of the Texas Class on November 2, 2015.

794.     Plaintiff Lane Wagner sent a demand for relief to Blue Cross Blue Shield of Texas on behalf of the Texas Class on November 2, 2015.

795.     Plaintiffs and Texas Class Members are consumers, as defined in Tex. Bus. & Com. Code § 17.45(4), who sought or acquired insurance and health benefits services.

796.     Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of Tex. Bus. & Com. Code § 17.46, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented and fraudulently advertised material facts, pertaining to the sale or advertisement of

220

insurance and health benefits services, to the Texas Class by representing and advertising that they would maintain adequate data privacy and security practices and procedures to safeguard Texas Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft, in violation of Tex. Bus. & Com. §17.46(b)(5),(7),(9), and (24), and §17.50(d) (incorporating violations of the Texas Unfair and Deceptive Insurance Practice Act, (Tex. Ins. Code §§ 541.003, 541.051, 541.052, 541.061, and 541.151);

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale or advertisement of insurance and health benefits services, to the Texas Class by representing and advertising that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Texas Class Members' Personal Information in violation of Tex. Bus. & Com. §17.46(b)(5),(7),(9), and (24) and §17.50(d) (incorporating violations of the Texas Unfair and Deceptive Insurance Practice Act, (Tex. Ins. Code §§ 541.003, 541.051, 541.052, 541.061, and 541.151);

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Texas Class Members' Personal Information, in violation of Tex. Bus. & Com. §17.46(b)(5),(7),(9), and (24) and §17.50(d) (incorporating violations of the Texas Unfair and Deceptive Insurance Practice Act, (Tex. Ins. Code §§ 541.003, 541.051, 541.052, 541.061, and 541.151);

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unconscionable trade acts or practices in violation of Tex. Bus. & Com. §17.50(a)(3) and §17.50(d) failing to maintain the privacy and security of Texas Class Members Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair acts and practices violated duties imposed by laws including Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d et. seq.), the Gramm-

221

Leach-Bliley Act (15 U.S.C. § 6801), the Texas Medical Records Privacy Act (Tex. Health & Safety Code §181.154), the Texas data breach statute (Tex. Bus. & Com. Code Ann. § 521.052(a), and the Texas Insurance Privacy statute (Tex. Ins. Code §601.002).

e) Defendants Anthem and Anthem Affiliates engaged in unconscionable trade acts or practices in violation of Tex. Bus. & Com. §17.50(a)(3) and §17.50(d) by failing to disclose the Anthem Data Breach to Texas Class Members in a timely and accurate manner, contrary to the duties imposed by Tex. Bus. & Com. Code Ann. § 521.053(b);

f) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unconscionable trade acts or practices in violation of Tex. Bus. & Com. §17.50(a)(3) and §17.50(d) by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Connecticut Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

797.    As a direct and proximate result of Defendants' deceptive trade practices, Texas Class Members suffered an ascertainable loss of money or property, real or personal, as described above, including the loss of their legally protected interest in the confidentiality and privacy of their Personal Information.

798.    The above unfair and deceptive practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

799.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Texas Class Members' Personal Information and that risk of a data breach or theft was highly likely. Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Texas Class.

800.    Texas Class Members seek relief under Tex. Bus. & Com. §17.50, including, but not

222

1   limited to, economic damages, damages for mental anguish, treble damages, injunctive relief,

2   restitution, and attorneys' fees and costs.

**Vermont**
### VERMONT CONSUMER FRAUD ACT,
### 9 VT. STAT. ANN. §§ 2451, *et. seq.*
### (BROUGHT BY VERMONT CLASS AGAINST ANTHEM AND ALL OTHER
### DEFENDANTS OPERATING IN VERMONT EXCEPT FOR BCBSA)

801.   Plaintiffs incorporate the above allegations by reference.

802.   Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS operating in Vermont on behalf of the Vermont Class.

803.   The Vermont Class Members are "consumers" as meant by Vt. Stat. Ann. tit. 9, § 2451a.

804.   The Vermont Class Members purchased "goods" or "services," as meant by Vt. Stat. Ann. tit. 9, § 2451a., in the form of insurance and health benefits services for personal, family, and/or household purposes.

805.   Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in Vermont engaged in unlawful, unfair, and deceptive acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of insurance and health benefits services in violation of Vt. Stat. Ann. tit. 9, § 2453, including but not limited to the following:

> a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to the sale of insurance and health benefits services to the Vermont Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard Vermont Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

> b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to the sale of insurance and health benefits services to the Vermont Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Vermont Class Members' Personal Information;

223

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Vermont Class Members' Personal Information;

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair, unlawful, and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to maintain the privacy and security of Vermont Class Members' Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair, unlawful, and deceptive acts and practices violated duties imposed by laws including Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d, et seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), and the Vermont Insurance Trade Practices Act (Vt. Stat. Ann. tit. 8, § 4724).

e) Defendants Anthem and Anthem Affiliates engaged in unlawful, unfair, and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to Vermont Class Members in a timely and accurate manner, in violation of 9 Vt. Stat. Ann. § 2435(b)(1);

f)  Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unlawful, unfair, and deceptive acts and practices with respect to the sale of insurance and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Vermont Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

806.    The above unlawful, unfair, and deceptive acts and practices by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

807.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Vermont Class Members' Personal Information and that risk

of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Vermont Class.

808.   As a direct and proximate result of Defendants' deceptive acts and practices, the Vermont Class Members suffered injury and/or damages.

809.   Vermont Class Members seek relief under Vt. Stat. Ann. tit. 9, § 2461, including, but not limited to, injunctive relief, restitution, actual damages, disgorgement of profits, exemplary damages, and attorneys' fees and costs.

**Washington**
**WASHINGTON CONSUMER PROTECTION ACT,**
**WASH. REV. CODE § 19.86.020, *et. seq.***
**(BROUGHT BY WASHINGTON CLASS AGAINST ANTHEM AND ALL OTHER**
**DEFENDANTS OPERATING IN WASHINGTON EXCEPT FOR BCBSA)**

810.   Plaintiffs incorporate the above allegations by reference.

811.   Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of Wash. Rev. Code §19.86.020, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented and fraudulently advertised material facts pertaining to the insurance and health benefits services to the Washington Class by representing and advertising that they would maintain adequate data privacy and security practices and procedures to safeguard Washington Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to insurance and health benefits services to the Washington Class by representing and advertising that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Washington Class Members' Personal Information;

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and

225

security protections for Washington Class Members' Personal Information;

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices by failing to maintain the privacy and security of Washington Class Members Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair acts and practices violated duties imposed by laws including Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d et. seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), and the Washington regulations pertaining to Privacy of Consumer Financial and Health Information (Wash. ADC 284-04-300).

e) Defendants Anthem and Anthem Affiliates engaged in deceptive, unfair, and unlawful trade acts or practices by failing to disclose the Anthem Data Breach to Washington Class Members in a timely and accurate manner, contrary to the duties imposed by § 19.255.010(1);

f) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in deceptive, unfair, and unlawful trade acts or practices by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Washington Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

812. The above unfair and deceptive practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS also violated Washington's Unfair Insurance Practices Act, Wash. Rev. Code §48.30.010.

813. As a direct and proximate result of Defendants' deceptive trade practices, Washington Class Members suffered injury and/or damages.

814. The above unfair and deceptive practices and acts by Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

226

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

815.    Defendants knew or should have known that their computer systems and data security practices were inadequate to safeguard Washington Class Members' Personal Information and that risk of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Washington Class.

816.    Washington Class Members seek relief under Wash. Rev. Code § 19.86.090, including, but not limited to, actual damages, treble damages, injunctive relief, and attorneys' fees and costs.

**West Virginia**
**WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT,**
**W. VA. CODE § 46A-6-101, *et. seq.***
**(BROUGHT BY WEST VIRGINIA CLASS AGAINST ANTHEM)**

817.    Plaintiffs incorporate the above allegations by reference.

818.    Plaintiffs bring this claim against Anthem on behalf of the West Virginia Class.

819.    Plaintiff Lisa Shiltz sent a demand for relief to Anthem on behalf of the West Virginia Class on November 2, 2015.

820.    Plaintiff Lisa Shiltz sent a demand for relief to Highmark West Virginia, Inc. d/b/a Highmark Blue Cross Blue Shield Shield West Virginia on behalf of the West Virginia Class on November 2, 2015.

821.    The West Virginia Class Members purchased insurance and health benefits services in "trade" or "commerce," as meant by W. Va. Code Ann. § 46A-6-102, for personal, family, and/or household purposes.

822.    Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in West Virginia engaged in unlawful, unfair, and deceptive acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the services purchased by the West Virginia Class in violation of W. Va. Code Ann. § 46A-6-104, including but not limited to the following:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts, pertaining to the sale of insurance and health benefits services, to the West Virginia Class by representing that they would maintain adequate data privacy

227

and security practices and procedures to safeguard West Virginia Class Members'

Personal Information from unauthorized disclosure, release, data breaches, and theft in

violation of W. Va. Code Ann. § 46A-6-102(7)(E), (I), (L), (M), and (N);

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented

material facts, pertaining to the sale of insurance and health benefits services, to the

West Virginia Class by representing that they did and would comply with the

requirements of relevant federal and state laws pertaining to the privacy and security

of West Virginia Class Members' Personal Information in violation of W. Va. Code

Ann. § 46A-6-102(7)(E), (I), (L), (M), and (N);

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted,

suppressed, and concealed the material fact of the inadequacy of the privacy and

security protections for West Virginia Class Members' Personal Information in

violation of W. Va. Code Ann. § 46A-6-102(7)(E), (I), (L), (M), and (N);

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair,

unlawful, and deceptive acts and practices with respect to the sale of insurance and

health benefits services by failing to maintain the privacy and security of West

Virginia Class Members' Personal Information, in violation of duties imposed by and

public policies reflected in applicable federal and state laws, resulting in the Anthem

Data Breach.  These unfair, unlawful, and deceptive acts and practices violated duties

imposed by laws including Federal Trade Commission Act (15 U.S.C. § 45), HIPAA

(42 U.S.C. § 1302d, et seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), the

West Virginia Prepaid Limited Health Organization Act (W. Va. Code § 33-25D-28);

the West Virginia Health Maintenance Organization Act (W. Va. Code § 33-25A-26);

and the West Virginia Unfair Trade Practices in Insurance Act (W. Va. Code Ann. §

33-11-4(1), (2), and (12)).

e) Defendants Anthem and Anthem Affiliates engaged in unlawful, unfair, and

deceptive acts and practices with respect to the sale of insurance and health benefits

services by failing to disclose the Anthem Data Breach to West Virginia Class

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1    Members in a timely and accurate manner, in violation of W.V. Code § 46A-2A-

2        102(a);

3        f)  Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in

4        unlawful, unfair, and deceptive acts and practices with respect to the sale of insurance

5        and health benefits services by failing to take proper action following the Anthem Data

6        Breach to enact adequate privacy and security measures and protect West Virginia

7        Class Members' Personal Information from further unauthorized disclosure, release,

8        data breaches, and theft.

9        823.   The above unlawful, unfair, and deceptive acts and practices by Defendants Anthem,

10   Anthem Affiliates and Non-Anthem BCBS were immoral, unethical, oppressive, and unscrupulous.

11   These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this

12   substantial injury outweighed any benefits to consumers or to competition.

13       824.   Defendants knew or should have known that their computer systems and data security

14   practices were inadequate to safeguard West Virginia Class Members' Personal Information and that

15   risk of a data breach or theft was highly likely.  Defendants' actions in engaging in the above-named

16   deceptive acts and practices were negligent, knowing and willful, and/or wanton and reckless with

17   respect to the rights of members of the West Virginia Class.

18       825.   As a direct and proximate result of Defendants' deceptive acts and practices, the West

19   Virginia Class Members suffered an ascertainable loss of money or property, real or personal, as

20   described above, including the loss of their legally protected interest in the confidentiality and privacy

21   of their Personal Information.

22       826.   West Virginia Class Members seek relief under W. Va. Code § 46A-6-106 and 46A-5-

23   104, including, but not limited to, injunctive relief, actual damages or $200, whichever is greater, and

24   attorneys' fees and costs.

25                    **COUNT X – DATA BREACH STATUTES**
                    **BROUGHT BY THE STATEWIDE CLASSES BELOW**
26

27                               **California**
                    **CALIFORNIA CUSTOMER RECORDS ACT,**
                    **CAL. CIV. CODE § 1798.80, *et. seq.***
28       **(BROUGHT BY CALIFORNIA CLASS AGAINST ANTHEM AND ALL OTHER**

                                   229

**DEFENDANTS OPERATING IN CALIFORNIA EXCEPT FOR BCBSA)**

827.   Plaintiffs incorporate the above allegations by reference.

828.   "[T]o ensure that personal information about California residents is protected," the California legislature enacted Civil Code section 1798.81.5, which requires that any business that "owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

829.   Defendants are businesses that own, maintain, and license personal information, within the meaning of 1798.81.5, about Plaintiffs and Class Members.

830.   Defendants, to the extent they assert they are not "a provider of health care, health care service plan, or contractor regulated by the Confidentiality of Medical Information Act,"   violated Civil Code section 1798.81.5 by failing to implement reasonable measures to protect Class Members' Personal Information.

831.   Businesses that own or license computerized data that includes personal information, including Social Security numbers, are required to notify California residents when their Personal Information has been acquired (or has reasonably believed to have been acquired) by unauthorized persons in a data security breach "in the most expedient time possible and without unreasonable delay." Cal. Civ. Code § 1798.82. Among other requirements, the security breach notification must include "the types of personal information that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

832.   Defendants are businesses that own or license computerized data that includes personal information as defined by Cal. Civ. Code § 1798.82.

833.   Plaintiffs and Class Members' Personal Information (e.g., Social Security numbers) includes personal information as covered by Cal. Civ. Code § 1798.82.

834.   Because Anthem and Anthem Affiliates reasonably believed that Plaintiffs Personal was acquired by unauthorized persons during the Anthem Data Breach, Anthem and Anthem Affiliates had an obligation to disclose the data breach in a timely and accurate fashion as mandated

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1  by Cal. Civ. Code § 1798.82.

2      835.    Thus, by failing to disclose the Anthem Data Breach in a timely and accurate manner,

3  Anthem and Anthem Affiliates violated Cal. Civ. Code § 1798.82.

4      836.    As a direct and proximate result of Defendants' violations of the Cal. Civ. Code §§

5  1798.81.5; 1798.82, Plaintiffs and Class Members suffered damages, as described above.

6      837.    Plaintiffs and California Class Members seek relief under Cal. Civ. Code § 1798.84,

7  including, but not limited to, actual damages and injunctive relief.

8                         **Colorado**
          **COLO. REV. STAT. ANN. § 6-1-716(2),** *et. seq.*

9  **(BROUGHT BY COLORADO CLASS AGAINST ANTHEM AND ALL ANTHEM**
**AFFILIATES OPERATING IN COLORADO EXCEPT FOR BCBSA)**

10      838.    Plaintiffs incorporate the above allegations by reference.

11      839.    Anthem and Anthem Affiliates are required to accurately notify Plaintiffs and Class

12  Members if Anthem and Anthem Affiliates become aware of a breach of their data security system in

13  the most expedient time possible and without unreasonable delay under Colo. Rev. Stat. Ann. § 6-1-

14  716(2).

15      840.    Defendants are businesses that own or license computerized data that includes

16  personal information as defined by Colo. Rev. Stat. Ann. § 6-1-716(1),(2).

17      841.    Plaintiffs and Class Members' Personal Information (e.g., Social Security numbers)

18  includes personal information as covered by Colo. Rev. Stat. Ann. § 6-1-716(1),(2).

19      842.    Because Anthem and Anthem Affiliates were aware of a breach of their security

20  system, Anthem and Anthem Affiliates had an obligation to disclose the data breach in a timely and

21  accurate fashion as mandated by Colo. Rev. Stat. Ann. § 6-1-716 (2).

22      843.    Thus, by failing to disclose the Anthem Data Breach in a timely and accurate manner,

23  Anthem and Anthem Affiliates violated Colo. Rev. Stat. Ann. § 6-1-716 (2).

24      844.    As a direct and proximate result of Anthem and Anthem Affiliates' violations of Colo.

25  Rev. Stat. Ann. § 6-1-716(2), Plaintiffs and Class Members suffered damages, as described above.

26      845.    Plaintiffs and Class Members seek relief under Colo. Rev. Stat. Ann. § 6-1-716(4),

27  including, but not limited to, actual damages and equitable relief.

28

**Delaware**
**DEL. CODE ANN. TIT. 6 § 12B-102(a),** *et seq.*
**(BROUGHT BY DELAWARE CLASS AGAINST ANTHEM AND ALL ANTHEM AFFILIATES OPERATING IN DELAWARE EXCEPT FOR BCBSA)**

846.    Plaintiffs incorporate the above allegations by reference.

847.    Anthem and Anthem Affiliates are required to accurately notify Plaintiffs and Class Members if Anthem and Anthem Affiliates become aware of a breach of their data security system (which is reasonably likely to result in the misuse of a Delaware resident's personal information) in the most expedient time possible and without unreasonable delay under 6 Del. Code Ann. § 12B-102(a).

848.    Defendants are businesses that own or license computerized data that includes personal information as defined by 6 Del. Code Ann. § 12B-102(a).

849.    Plaintiffs and Class Members' Personal Information (e.g., Social Security numbers) includes personal information as covered under 6 Del. Code Ann. § 12B-101(4).

850.    Because Anthem and Anthem Affiliates were aware of a breach of their security system (which is reasonably likely to result in a misuse Delaware residents' personal information), Anthem and Anthem Affiliates had an obligation to disclose the data breach in a timely and accurate fashion as mandated by 6 Del. Code Ann. § 12B-102(a).

851.    Thus, by failing to disclose the Anthem Data Breach in a timely and accurate manner, Anthem and Anthem Affiliates violated  6 Del. Code Ann. § 12B-102(a).

852.    As a direct and proximate result of Anthem and Anthem Affiliates' violations of 6 Del. Code Ann. § 12B-102(a), Plaintiffs and Class Members suffered damages, as described above.

853.    Plaintiffs and Class Members seek relief under 6 Del. Code Ann. § 12B-104, including, but not limited to, actual damages and broad equitable relief.

**District of Columbia**
**D.C. CODE § 28-3852(a),** *et. seq.*
**(BROUGHT BY DISTRICT OF COLUMBIA CLASS AGAINST ANTHEM AND ALL ANTHEM AFFILIATES OPERATING IN THE DISTRICT OF COLUMBIA EXCEPT FOR BCBSA)**

854.    Plaintiffs incorporate the above allegations by reference.

855.    Anthem and Anthem Affiliates are required to accurately notify Plaintiffs and Class

232

1  Members if Anthem and Anthem Affiliates become aware of a breach of their data security system in

2  the most expedient time possible and without unreasonable delay under D.C. Code § 28-3852(a).

3      856.    Defendants are businesses that own or license computerized data that includes

4  personal information as defined by D.C. Code § 28-3852(a).

5      857.    Plaintiffs and Class Members' Personal Information (e.g., Social Security numbers)

6  includes personal information as covered under D.C. Code § 28-3851(3).

7      858.    Because Anthem and Anthem Affiliates were aware of a breach of their security

8  system, Anthem and Anthem Affiliates had an obligation to disclose the data breach in a timely and

9  accurate fashion as mandated by D.C. Code § 28-3852(a).

10      859.    Thus, by failing to disclose the Anthem Data Breach in a timely and accurate manner,

11  Anthem and Anthem Affiliates violated  D.C. Code § 28-3852(a).

12      860.    As a direct and proximate result of Anthem and Anthem Affiliates' violations of D.C.

13  Code § 28-3852(a), Plaintiffs and Class Members suffered damages, as described above.

14      861.    Plaintiffs and Class Members seek relief under D.C. Code § 28-3853(a), including, but

15  not limited to, actual damages.

16  **Georgia**

17  **GA. CODE ANN. § 10-1-912(a),** *et. seq.*
**(BROUGHT BY GEORGIA CLASS AGAINST ANTHEM AND ALL ANTHEM AFFILIATES OPERATING IN GEORGIA EXCEPT FOR BCBSA**

18  862.    Plaintiffs incorporate the above allegations by reference.

19  863.    Anthem and Anthem Affiliates are required to accurately notify Plaintiffs and Class

20  Members if Anthem and Anthem Affiliates become aware of a breach of their data security system

21  (that was reasonably likely to have caused unauthorized persons to acquire Plaintiffs and Class

22  Members' Personal Information) in the most expedient time possible and without unreasonable delay

23  under Ga. Code Ann. § 10-1-912(a).

24  864.    Defendants are businesses that own or license computerized data that includes

25  personal information as defined by Ga. Code Ann. § 10-1-912(a).

26  865.    Plaintiffs and Class Members' Personal Information (e.g., Social Security numbers)

27  includes personal information as covered under Ga. Code Ann. § 10-1-912(a).

28

866.   Because Anthem and Anthem Affiliates were aware of a breach of their security system (that was reasonably likely to have caused unauthorized persons to acquire Plaintiffs and Class Members' Personal Information), Anthem and Anthem Affiliates had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Ga. Code Ann. § 10-1-912(a).

867.   Thus, by failing to disclose the Anthem Data Breach in a timely and accurate manner, Anthem and Anthem Affiliates violated  Ga. Code Ann. § 10-1-912(a).

868.   As a direct and proximate result of Anthem and Anthem Affiliates' violations of Ga. Code Ann. § 10-1-912(a), Plaintiffs and Class Members suffered damages, as described above.

869.   Plaintiffs and Class Members seek relief under Ga. Code Ann. § 10-1-912 including, but not limited to, actual damages and injunctive relief.

## Hawaii
### HAW. REV. STAT. § 487N-2(a), *et. seq.*
### (BROUGHT BY HAWAII CLASS AGAINST ANTHEM AND ALL ANTHEM AFFILIATES OPERATING IN HAWAII EXCEPT FOR BCBSA)

870.   Plaintiffs incorporate the above allegations by reference.

871.   Anthem and Anthem Affiliates are required to accurately notify Plaintiffs and Class Members if Anthem and Anthem Affiliates become aware of a breach of their data security system without unreasonable delay under Haw. Rev. Stat. § 487N-2(a).

872.   Defendants are businesses that own or license computerized data that includes personal information as defined by Haw. Rev. Stat. § 487N-2(a).

873.   Plaintiffs and Class Members' Personal Information (e.g., Social Security numbers) includes personal information as covered under Haw. Rev. Stat. § 487N-2(a).

874.   Because Anthem and Anthem Affiliates were aware of a breach of their security system, Anthem and Anthem Affiliates had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Haw. Rev. Stat. § 487N-2(a).

875.   Thus, by failing to disclose the Anthem Data Breach in a timely and accurate manner, Anthem and Anthem Affiliates violated Haw. Rev. Stat. § 487N-2(a).

876.   As a direct and proximate result of Anthem and Anthem Affiliates' violations of Haw. Rev. Stat. § 487N-2(a), Plaintiffs and Class Members suffered damages, as described above.

877.     Plaintiffs and Class Members seek relief under Haw. Rev. Stat. § 487N-3(b), including, but not limited to, actual damages.

## Iowa
### IOWA CODE ANN. § 715C.2(1), *et. seq.*
### (BROUGHT BY IOWA CLASS AGAINST ANTHEM AND ALL ANTHEM AFFILIATES OPERATING IN IOWA EXCEPT FOR BCBSA)

878.     Plaintiffs incorporate the above allegations by reference.

879.     Anthem and Anthem Affiliates are required to accurately notify Plaintiffs and Class Members if Anthem and Anthem Affiliates become aware of a breach of their data security system in the most expeditious time possible and without unreasonable delay under Iowa Code Ann. § 715C.2(1).

880.     Defendants are businesses that own or license computerized data that includes personal information as defined by Iowa Code Ann. § 715C.2(1).

881.     Plaintiffs and Class Members' Personal Information (e.g., Social Security numbers) includes personal information as covered under Iowa Code Ann. § 715C.2(1).

882.     Because Anthem and Anthem Affiliates were aware of a breach of their security system, Anthem and Anthem Affiliates had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Iowa Code Ann. § 715C.2(1).

883.     Thus, by failing to disclose the Anthem Data Breach in a timely and accurate manner, Anthem and Anthem Affiliates violated  Iowa Code Ann. § 715C.2(1).

884.     As a direct and proximate result of Anthem and Anthem Affiliates' violations of Iowa Code Ann. § 715C.2(1), Plaintiffs and Class Members suffered damages, as above.

885.     Plaintiffs and Class Members seek relief under Iowa Code Ann. § 714.16(7), including, but not limited to, actual damages and injunctive relief.

## Kansas
### KAN. STAT. ANN. § 50-7a02(a), *et. seq.*
### (BROUGHT BY KANSAS CLASS AGAINST ANTHEM AND ALL ANTHEM AFFILIATES OPERATING IN KANSAS EXCEPT FOR BCBSA)

886.     Plaintiffs incorporate the above allegations by reference.

887.     Anthem and Anthem Affiliates are required to accurately notify Plaintiffs and Class Members if Anthem and Anthem Affiliates become aware of a breach of their data security system

(that was reasonably likely to have caused misuse Plaintiffs and Class Members' Personal Information) in the most expedient time possible and without unreasonable delay under Kan. Stat. Ann. § 50-7a02(a).

888.    Defendants are businesses that own or license computerized data that includes personal information as defined by Kan. Stat. Ann. § 50-7a02(a).

889.    Plaintiffs and Class Members' Personal Information (e.g., Social Security numbers) includes personal information as covered under Kan. Stat. Ann. § 50-7a02(a).

890.    Because Anthem and Anthem Affiliates were aware of a breach of their security system (that was reasonably likely to have caused misuse Plaintiffs and Class Members' Personal Information), Anthem and Anthem Affiliates had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Kan. Stat. Ann. § 50-7a02(a).

891.    Thus, by failing to disclose the Anthem Data Breach in a timely and accurate manner, Anthem and Anthem Affiliates violated  Kan. Stat. Ann. § 50-7a02(a).

892.    As a direct and proximate result of Anthem and Anthem Affiliates' violations of Kan. Stat. Ann. § 50-7a02(a), Plaintiffs and Class Members suffered damages, as described above.

893.    Plaintiffs and Class Members seek relief under Kan. Stat. Ann. § 50-7a02(g), including, but not limited to, broad equitable relief.

**Louisiana**
**LA. REV. STAT. ANN. § 51:3074(A),** *et. seq.*
**(BROUGHT BY LOUISIANA CLASS AGAINST ANTHEM AND ALL ANTHEM**
**AFFILIATES OPERATING IN LOUISIANA EXCEPT FOR BCBSA)**

894.    Plaintiffs incorporate the above allegations by reference.

895.    Anthem and Anthem Affiliates are required to accurately notify Plaintiffs and Class Members if Anthem and Anthem Affiliates become aware of a breach of their data security system (that was reasonably likely to have caused unauthorized persons to acquire Plaintiffs and Class Members' Personal Information) in the most expedient time possible and without unreasonable delay under La. Rev. Stat. Ann. § 51:3074(C).

896.    Defendants are businesses that own or license computerized data that includes personal information as defined by La. Rev. Stat. Ann. § 51:3074(C).

236

897.     Plaintiffs and Class Members' Personal Information (e.g., Social Security numbers) includes personal information as covered under La. Rev. Stat. Ann. § 51:3074(C).

898.     Because Anthem and Anthem Affiliates were aware of a breach of their security system (was reasonably likely to have caused unauthorized persons to acquire Plaintiffs and Class Members' Personal Information), Anthem and Anthem Affiliates had an obligation to disclose the data breach in a timely and accurate fashion as mandated by La. Rev. Stat. Ann. § 51:3074(C).

899.     As a direct and proximate result of Anthem and Anthem Affiliates' violations of La. Rev. Stat. Ann. § 51:3074(C), Plaintiffs and Class Members suffered damages, as described above.

900.     Plaintiffs and Class Members seek relief under La. Rev. Stat. Ann. § 51:3075, including, but not limited to, actual damages.

**Michigan**
### MICH. COMP. LAWS ANN. § 445.72(1), *et. seq.*
### (BROUGHT BY MICHIGAN CLASS AGAINST ANTHEM AND ALL ANTHEM AFFILIATES OPERATING IN MICHIGAN EXCEPT FOR BCBSA)

901.     Plaintiffs incorporate the above allegations by reference.

902.     Anthem and Anthem Affiliates are required to accurately notify Plaintiffs and Class Members if they discover a security breach, or receive notice of a security breach (where unencrypted and unredacted Personal Information was accessed or acquired by unauthorized persons), without unreasonable delay under Mich. Comp. Laws Ann. § 445.72(1).

903.     Defendants are businesses that own or license computerized data that includes personal information as defined by Mich. Comp. Laws Ann. § 445.72(1).

904.     Plaintiffs and Class Members' Personal Information (e.g. Social Security numbers) includes personal information as covered under Mich. Comp. Laws Ann. § 445.72(1).

905.     Because Anthem and Anthem Affiliates discovered a security breach and had notice of a security breach (where unencrypted and unredacted Personal Information was accessed or acquired by unauthorized persons), Anthem and Anthem Affiliates had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Mich. Comp. Laws Ann. § 445.72(4).

906.     As a direct and proximate result of Anthem and Anthem Affiliates' violations of Mich. Comp. Laws Ann. § 445.72(4), Plaintiffs and Class Members suffered damages, as above.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

907.    Plaintiffs and Class Members seek relief under Mich. Comp. Laws Ann. § 445.72(13), including, but not limited to, a civil fine.

### New Hampshire
### N.H. REV. STAT. ANN. § 359-C:20(I)(a), *et. seq.*
### (BROUGHT BY NEW HAMPSHIRE CLASS AGAINST ANTHEM AND ALL ANTHEM AFFILIATES OPERATING IN NEW HAMPSHIRE EXCEPT FOR BCBSA)

908.    Plaintiffs incorporate the above allegations by reference.

909.    Anthem and Anthem Affiliates are required to accurately notify Plaintiffs and Class Members if Anthem and Anthem Affiliates become aware of a breach of their data security system (in which misuse of Personal Information has occurred or is reasonably likely to occur) as soon as possible under N.H. Rev. Stat. Ann. § 359-C:20(I)(a).

910.    Defendants are businesses that own or license computerized data that includes personal information as defined by N.H. Rev. Stat. Ann. § 359-C:20(I)(a).

911.    Plaintiffs and Class Members' Personal Information (e.g., Social Security numbers) includes personal information as covered under N.H. Rev. Stat. Ann. § 359-C:20(I)(a).

912.    Because Anthem and Anthem Affiliates were aware of a security breach (in which misuse of Personal Information has occurred or is reasonably likely to occur), Anthem and Anthem Affiliates had an obligation to disclose the data breach in a timely and accurate fashion as mandated by N.H. Rev. Stat. Ann. § 359-C:20(I)(a).

913.    As a direct and proximate result of Anthem and Anthem Affiliates' violations of N.H. Rev. Stat. Ann. § 359-C:20(I)(a), Plaintiffs and Class Members suffered damages, as described above.

914.    Plaintiffs and Class Members seek relief under N.H. Rev. Stat. Ann. § 359-C:21(I), including, but not limited to, actual damages and injunctive relief.

### Oregon
### OR. REV. STAT. ANN. § 646A.604(1), *et. seq.*
### (BROUGHT BY OREGON CLASS AGAINST ANTHEM AND ALL OTHER DEFENDANTS OPERATING IN OREGON EXCEPT FOR BCBSA)

915.    Plaintiffs incorporate the above allegations by reference.

916.    Pursuant to Or. Rev. Stat. Ann. § 646A.622(1), a business "that maintains records which contain personal information" of a Oregon resident "shall implement and maintain reasonable

238

security measures to protect those records from unauthorized access, acquisition, destruction, use, modification or disclosure."

917. Defendants are businesses that maintain records which contain personal information, within the meaning of Or. Rev. Stat. Ann. § 646A.622(1), about Plaintiffs and Class Members.

918. Defendants violated Or. Rev. Stat. Ann. § 646A.622(1) by failing to implement reasonable measures to protect Class Members' Personal Information,

919. Anthem and Anthem Affiliates are required to accurately notify Plaintiffs and Class Members if Anthem and Anthem Affiliates become aware of a breach of their data security system in the most expeditious time possible and without unreasonable delay under Or. Rev. Stat. Ann. § 646A.604(1).

920. Defendants are businesses that own, maintain, or otherwise possess data that includes consumers personal information as defined by Or. Rev. Stat. Ann. § 646A.604(1).

921. Plaintiffs and Class Members' Personal Information (e.g., Social Security numbers) includes personal information as covered under Or. Rev. Stat. Ann. § 646A.604(1).

922. Because Anthem and Anthem Affiliates discovered a breach of their security system, Anthem and Anthem Affiliates had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Or. Rev. Stat. Ann. § 646A.604(1).

923. As a direct and proximate result of Defendants' violations of Or. Rev. Stat. Ann. §§ 646A.604(1) and 646A.622(1), Plaintiffs and Class Members suffered damages, as described above.

924. Plaintiffs and Class Members seek relief under Or. Rev. Stat. § 646A.624(3), including, but not limited to, actual damages and injunctive relief.

<u>South Carolina</u>
**S.C. CODE ANN. § 39-1-90(A),** *et. seq.*
**(BROUGHT BY SOUTH CAROLINA CLASS AGAINST ANTHEM AND ALL ANTHEM AFFILIATES OPERATING IN SOUTH CAROLINA EXCEPT FOR BCBSA)**

925. Plaintiffs incorporate the above allegations by reference.

926. Anthem and Anthem Affiliates are required to accurately notify Plaintiffs and Class Members following discovery or notification of a breach of their data security system (if personal information that was not rendered unusable through encryption, redaction, or other methods was, or

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

was reasonably believed to have been, acquired by an unauthorized person, creating a material risk of harm) in the most expedient time possible and without unreasonable delay under S.C. Code Ann. § 39-1-90(A).

927.   Defendants are businesses that own or license computerized data or other data that includes personal identifying information as defined by S.C. Code Ann. § 39-1-90(A).

928.   Plaintiffs and Class Members' Personal Information (e.g., Social Security numbers) includes personal identifying information as covered under S.C. Code Ann. § 39-1-90(D)(3).

929.   Because Anthem and Anthem Affiliates discovered a breach of its data security system (in which personal information that was not rendered unusable through encryption, redaction, or other methods was, or was reasonably believed to have been, acquired by an unauthorized person, creating a material risk of harm), Anthem and Anthem Affiliates had an obligation to disclose the data breach in a timely and accurate fashion as mandated by S.C. Code Ann. § 39-1-90(A).

930.   As a direct and proximate result of Anthem and Anthem Affiliates' violations of S.C. Code Ann. § 39-1-90(A), Plaintiffs and Class Members suffered damages, as described above.

931.   Plaintiffs and Class Members seek relief under S.C. Code Ann. § 39-1-90(G), including, but not limited to, actual damages and injunctive relief.

**Tennessee**
**TENN. CODE ANN. § 47-18-2107(b),** *et. seq.*
**(BROUGHT BY TENNESSEE CLASS AGAINST ANTHEM AND ALL ANTHEM AFFILIATES OPERATING IN TENNESSEE EXCEPT FOR BCBSA)**

932.   Plaintiffs incorporate the above allegations by reference.

933.   Anthem and Anthem Affiliates are required to accurately notify Plaintiffs and Class Members following discovery or notification of a breach of their data security system (in which unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person) in the most expedient time possible and without unreasonable delay under Tenn. Code Ann. § 47-18-2107(b).

934.   Defendants are businesses that own or license computerized data that includes personal information as defined by Tenn. Code Ann. § 47-18-2107(a)(2).

935.   Plaintiffs and Class Members' Personal Information (e.g., Social Security numbers)

1   includes personal information as covered under Tenn. Code Ann. § 47-18-2107(a)(3)(A).

2        936.    Because Anthem and Anthem Affiliates discovered a breach of their security system

3   (in which unencrypted personal information was, or is reasonably believed to have been, acquired by

4   an unauthorized person), Anthem and Anthem Affiliates had an obligation to disclose the data breach

5   in a timely and accurate fashion as mandated by Tenn. Code Ann. § 47-18-2107(b).

6        937.    As a direct and proximate result of Anthem and Anthem Affiliates' violations of Tenn.

7   Code Ann. § 47-18-2107(b), Plaintiffs and Class Members suffered damages, as described above.

8        938.    Plaintiffs and Class Members seek relief under Tenn. Code Ann. §§ 47-18-2107(h),

9   47-18-2104(d), 47-18-2104(f), including, but not limited to, actual damages, injunctive relief and

10  treble damages.

**Virginia**
**VA. CODE ANN. § 18.2-186.6(B),** *et. seq.*
11  **(BROUGHT BY VIRGINIA CLASS AGAINST ANTHEM AND ALL ANTHEM**
12  **AFFILIATES OPERATING IN VIRGINIA EXCEPT FOR BCBSA)**

13       939.    Plaintiffs incorporate the above allegations by reference.

14       940.    Anthem and Anthem Affiliates are required to accurately notify Plaintiffs and Class

15  Members following discovery or notification of a breach of their data security system (if unencrypted

16  or unredacted personal information was or is reasonably believed to have been accessed and acquired

17  by an unauthorized person who will, or it is reasonably believed who will, engage in identify theft or

18  another fraud) without unreasonable delay under Va. Code Ann. § 18.2-186.6(B).

19       941.    Defendants are entities that own or license computerized data that includes personal

20  information as defined by Va. Code Ann. § 18.2-186.6(B).

21       942.    Plaintiffs and Class Members' Personal Information (e.g., Social Security numbers)

22  includes personal information as covered under Va. Code Ann. § 18.2-186.6(A).

23       943.    Because Anthem and Anthem Affiliates discovered a breach of their security system

24  (in which unencrypted or unredacted personal information was or is reasonably believed to have been

25  accessed and acquired by an unauthorized person, who will, or it is reasonably believed who will,

26  engage in identify theft or another fraud), Anthem and Anthem Affiliates had an obligation to

27  disclose the data breach in a timely and accurate fashion as mandated by Va. Code Ann. § 18.2-

28  186.6(B).

944. As a direct and proximate result of Anthem and Anthem Affiliates' violations of Va. Code Ann. § 18.2-186.6(B), Plaintiffs and Class Members suffered damages, as described above.

945. Plaintiffs and Class Members seek relief under Va. Code Ann. § 18.2-186.6(I), including, but not limited to, actual damages.

### Washington
### WASH. REV. CODE ANN. § 19.255.010(1), *et. seq.*
### (BROUGHT BY WASHINGTON CLASS AGAINST ANTHEM AND ALL ANTHEM AFFILIATES OPERATING IN WASHINGTON EXCEPT FOR BCBSA)

946. Plaintiffs incorporate the above allegations by reference.

947. Anthem and Anthem Affiliates are required to accurately notify Plaintiffs and Class Members following discovery or notification of the breach of their data security system (if personal information was, or is reasonably believed to have been, acquired by an unauthorized person and the personal information was not secured) in the most expedient time possible and without unreasonable delay under Wash. Rev. Code Ann. § 19.255.010(1).

948. Defendants are businesses that own or license computerized data that includes personal information as defined by Wash. Rev. Code Ann. § 19.255.010(1).

949. Plaintiffs and Class Members' Personal Information (e.g., Social Security numbers) includes personal information as covered under Wash. Rev. Code Ann. § 19.255.010(5).

950. Because Anthem and Anthem Affiliates discovered a breach of its security system (in which personal information was, or is reasonably believed to have been, acquired by an unauthorized person and the personal information was not secured), Anthem and Anthem Affiliates had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Wash. Rev. Code Ann. § 19.255.010(1).

951. As a direct and proximate result of Anthem and Anthem Affiliates' violations of Wash. Rev. Code Ann. § 19.255.010(1), Plaintiffs and Class Members suffered damages, as described above.

952. Plaintiffs and Class Members seek relief under Wash. Rev. Code Ann. §§ 19.255.010(10)(a), 19.255.010(10)(b) including, but not limited to, actual damages and injunctive relief.

### Wisconsin

242

**WIS. STAT. ANN. § 134.98(2),** *et. seq.*
**(BROUGHT BY WISCONSIN CLASS AGAINST ANTHEM AND ALL ANTHEM
AFFILIATES OPERATING IN WISCONSIN EXCEPT FOR BCBSA)**

953.     Plaintiffs incorporate the above allegations by reference.

954.     Anthem and Anthem Affiliates are required to accurately notify Plaintiffs and Class Members if they know that personal information in its possession has been acquired by a person whom it has not authorized to acquire the personal information within a reasonable time under Wis. Stat. Ann. §§ 134.98(2)-(3)(a).

955.     Defendants are businesses that maintain or license personal information as defined by Wis. Stat. Ann. § 134.98(2).

956.     Plaintiffs and Class Members' Personal Information (e.g., Social Security numbers) includes personal information as covered under Wis. Stat. Ann. § 134.98(1)(b).

957.     Because Anthem and Anthem Affiliates knew that personal information in its possession had been acquired by a person whom it has not authorized to acquire the personal information, Anthem and Anthem Affiliates had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Wis. Stat. Ann. § 134.98(2).

958.     As a direct and proximate result of Anthem and Anthem Affiliates' violations of Wis. Stat. Ann. § 134.98(3)(a), Plaintiffs and Class Members suffered damages, as described above.

959.     Plaintiffs and Class Members seek relief under Wis. Stat. Ann. § 134.98, including, but not limited to, actual damages and injunctive relief.

**Wyoming**
**WYO. STAT. ANN. § 40-12-502(a),** *et. seq.*
**(BROUGHT BY WYOMING CLASS AGAINST ANTHEM AND ALL ANTHEM
AFFILIATES OPERATING IN WYOMING EXCEPT FOR BCBSA)**

960.     Plaintiffs incorporate the above allegations by reference.

961.     Anthem and Anthem Affiliates are required to accurately notify Plaintiffs and Class Members when they become aware of a breach of its data security system (if the misuse of personal identifying information has occurred or is reasonably likely to occur) in the most expedient time possible and without unreasonable delay under Wyo. Stat. Ann. § 40-12-502(a).

962.     Defendants are businesses that own or license computerized data that includes

243

1   personal information as defined by Wyo. Stat. Ann. § 40-12-502(a).

2        963.   Plaintiffs and Class Members' Personal Information (e.g., Social Security numbers)

3   includes personal information as covered under Wyo. Stat. Ann. § 40-12-502(a).

4        964.   Because Anthem and Anthem Affiliates were aware of a breach of their data security

5   system (in which the misuse of personal identifying information has occurred or is reasonably likely

6   to occur), Anthem and Anthem Affiliates had an obligation to disclose the data breach in a timely and

7   accurate fashion as mandated by Wyo. Stat. Ann. § 40-12-502(a).

8        965.   As a direct and proximate result of Anthem and Anthem Affiliates' violations of Wyo.

9   Stat. Ann. § 40-12-502(a), Plaintiffs and Class Members suffered damages, as described above.

10       966.   Plaintiffs and Class Members seek relief under Wyo. Stat. Ann. § 40-12-502(f),

11  including, but not limited to, actual damages and broad equitable relief.

12  **COUNT XI – STATE UNFAIR INSURANCE PRACTICE STATUTES**
**BROUGHT BY THE STATEWIDE CLASSES BELOW**

13

14  **Arizona**
**ARIZONA UNFAIR INSURANCE PRACTICES STATUTE,**
**(A.R.S. § 20-442, 443, 444) AGAINST ALL DEFENDANTS OPERATING IN ARIZONA**
**EXCEPT FOR BCBSA**

15

16       967.   Plaintiffs incorporate the preceding allegations by reference.

17       968.   Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates, and Non-

18  Anthem BCBS operating in Arizona on behalf of the Arizona Class whose personal information was

19  compromised as a result of the Anthem Data Breach.

20       969.   Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in Arizona

21  engaged in an unfair methods of competition or an unfair or deceptive acts or practices in the business

22  of insurance in violation of A.R.S. §40-442, 443, and 444, including but not limited to:

23         a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented

24           material facts pertaining to the sale of insurance and health benefits services to the

25           Arizona Class by representing that they would maintain adequate data privacy and

26           security practices and procedures to safeguard Arizona Class Members' Personal

27           Information from unauthorized disclosure, release, data breaches, and theft;

28         b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented

material facts pertaining to the sale of insurance and health benefits services to the Arizona Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Arizona Class Members' Personal Information;

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Arizona Class Members' Personal Information;

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to maintain the privacy and security of Arizona Class Members Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d et. seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), and the Arizona Insurance Information and Privacy Protection Act (A.R.S. §20-2113).

e) Defendants Anthem and Anthem Affiliates engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to Arizona Class Members in a timely and accurate manner, in violation of Ariz. Rev. Stat. § 44-7501.

f) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect Arizona Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

970.   The Arizona Class have suffered damages from Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS' unfair methods of competition and unfair or deceptive acts and practices in the business of insurance in violation of A.R.S. §40-442, 443, and 444.

245

971.    The Arizona Class seek relief including but not limited to actual damages, nominal damages, injunctive relief, and/or attorneys' fees and costs.

**Massachusetts**
**UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS AND PRACTICES IN THE BUSINESS OF INSURANCE,**
**(MASS. GEN. LAWS ANN. CH. 176D, § 1, et seq.) AGAINST ALL DEFENDANTS OPERATING IN MASSACHUSETTS EXCEPT BCBSA**

972.    Plaintiffs incorporate the above allegations by reference.

973.    Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in Massachusetts on behalf of the Massachusetts Class whose personal information was compromised as a result of the Anthem Data Breach.

974.    Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair methods of competition or unfair or deceptive acts or practices in the business of insurance, in violation of Mass. Gen. Laws Ann. ch. 176D, §§ 3(1)(a) & 3(2), including, but not limited to:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to the sale of insurance and health benefits services to the Massachusetts Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard Massachusetts Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to the sale of insurance and health benefits services to the Massachusetts Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Massachusetts Class Members' Personal Information;

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Massachusetts Class Members' Personal Information;

975.    The Massachusetts Class Members have suffered injury resulting from Defendants' illegal disclosures and failures to maintain the confidentiality of their personal, financial, and/or health information.

246

976.   The Massachusetts Class seeks relief including but not limited to damages, injunctive relief, and/or attorneys' fees and costs.

## New Mexico
### TRADE PRACTICES AND FRAUDS IN INSURANCE BUSINESS,
### (N.M. STAT. ANN. § 59A-16-1, *et seq.*) AGAINST ALL DEFENDANTS OPERATING IN NEW MEXICO EXCEPT BCBSA

977.   Plaintiffs incorporate the above allegations by reference.

978.   Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in New Mexico on behalf of the New Mexico Class whose personal information was compromised as a result of the Anthem Data Breach.

979.   Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair methods of competition or unfair or deceptive acts or practices in the business of insurance, in violation of N.M. Stat. Ann. § 59A-16-4 and N.M. Stat. Ann. § 59A-16-5, including, but not limited to:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to the sale of insurance and health benefits services to the New Mexico Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard New Mexico Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to the sale of insurance and health benefits services to the New Mexico Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of New Mexico Class Members' Personal Information;

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for New Mexico Class Members' Personal Information;

980.   The New Mexico Class Members have suffered injury resulting from Defendant Anthem's illegal disclosure and failure to maintain the confidentiality of their personal, financial,

247

and/or health information.

981.    The New Mexico Class seeks relief including but not limited to actual damages, injunctive relief, and/or attorneys' fees and costs.

### North Dakota
### PROHIBITED PRACTICES IN INSURANCE BUSINESS,
### (N.D. CENT. CODE § 26.1-04-01, *et seq.*) AGAINST ALL DEFENDANTS OPERATING IN NORTH DAKOTA EXCEPT BCBSA

982.    Plaintiffs incorporate the above allegations by reference.

983.    Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in North Dakota on behalf of the North Dakota Class whose personal information was compromised as a result of the Anthem Data Breach.

984.    Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair methods of competition or unfair or deceptive acts or practices in the business of insurance, in violation of N.D. Cent. Code Ann. § 26.1-04-03(1) and N.D. Cent. Code Ann. § 26.1-04-03(2), including, but not limited to:

   a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to the sale of insurance and health benefits services to the North Dakota Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard North Dakota Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

   b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to the sale of insurance and health benefits services to the North Dakota Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of North Dakota Class Members' Personal Information;

   c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for North Dakota Class Members' Personal Information;

985.    The North Dakota Class Members have suffered injury resulting from Defendants'

illegal disclosures and failures to maintain the confidentiality of their personal, financial, and/or health information.

986.     The North Dakota Class seeks relief including but not limited to damages, injunctive relief, and/or attorneys' fees and costs.

**Texas**
**TEXAS UNFAIR AND DECEPTIVE INSURANCE PRACTICE LAWS,**
**(TEX. INS. CODE §§ 541.003, 541.051, 541.052, 541.061, 541.151) AGAINST ALL**
**DEFENDANTS OPERATING IN TEXAS EXCEPT BCBSA**

987.     Plaintiffs incorporate the above allegations by reference.

988.     Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in Texas on behalf of the Texas Class whose personal information was compromised as a result of the Anthem Data Breach.

989.     Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair methods of competition or unfair or deceptive acts or practices in the business of insurance, in violation of Tex. Ins. Code §§ 541.003, 541.051, 541.052, and 541.061 including, but not limited to:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to the sale of insurance and health benefits services to the Texas Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard Texas Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to the sale of insurance and health benefits services to the Texas Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Texas Class Members' Personal Information;

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for Texas Class Members' Personal Information;

990.     The Texas Class Members have suffered injury resulting from Defendants' illegal

249

disclosures and failures to maintain the confidentiality of their personal, financial, and/or health information.

991.  The Texas Class seeks relief including but not limited to damages, injunctive relief, and/or attorneys' fees and costs.

**West Virginia**
**UNFAIR TRADE PRACTICES IN THE BUSINESS OF INSURANCE,**
**(W. VA. CODE § 33-11-1, *et seq*.) AGAINST ALL DEFENDANTS OPERATING IN WEST**
**VIRGINIA EXCEPT BCBSA**

992.  Plaintiffs incorporate the above allegations by reference.

993.  Plaintiffs bring this claim against Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS operating in West Virginia on behalf of the West Virginia Class whose personal information was compromised as a result of the Anthem Data Breach.

994.  Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair methods of competition or unfair or deceptive acts or practices in the business of insurance, in violation of W. Va. Code Ann. §§ 33-11-4(1),  33-11-4(2), and 33-11-4(12), including, but not limited to:

a) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to the sale of insurance and health benefits services to the West Virginia Class by representing that they would maintain adequate data privacy and security practices and procedures to safeguard West Virginia Class Members' Personal Information from unauthorized disclosure, release, data breaches, and theft;

b) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS misrepresented material facts pertaining to the sale of insurance and health benefits services to the West Virginia Class by representing that they did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of West Virginia Class Members' Personal Information;

c) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for West Virginia Class Members' Personal Information;

250

d) Defendants Anthem, Anthem Affiliates, and Non-Anthem BCBS engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to maintain the privacy and security of West Virginia Class Members Personal Information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Anthem Data Breach.  These unfair acts and practices violated duties imposed by laws including Federal Trade Commission Act (15 U.S.C. § 45), HIPAA (42 U.S.C. § 1302d et. seq.), the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), West Virginia's Prepaid Limited Health Service Organization Act (W. Va. Code Ann. § 33-25D-28), and West Virginia's Health Maintenance Organization Act (W. Va. Code Ann. § 33-25A-2).

e) Defendants Anthem and Anthem Affiliates engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to disclose the Anthem Data Breach to West Virginia Class Members in a timely and accurate manner, in violation of W.V. Code § 46A.2A 102(a)

f) Defendants Anthem, Anthem Affiliates and Non-Anthem BCBS engaged in unfair acts and practices with respect to the sale of insurance and health benefits services by failing to take proper action following the Anthem Data Breach to enact adequate privacy and security measures and protect West Virginia Class Members' Personal Information from further unauthorized disclosure, release, data breaches, and theft.

995.   The West Virginia Class Members have suffered injury resulting from Defendants' illegal disclosures and failures to maintain the confidentiality of their personal, financial, and/or health information.

996.   The West Virginia Class seeks relief including but not limited to damages, injunctive relief, and/or attorneys' fees and costs.

**COUNT XII:  STATE INSURANCE PERSONAL INFORMATION PRIVACY STATUTES BROUGHT BY THE STATEWIDE CLASSES BELOW**

**Arizona**
**ARIZONA INSURANCE INFORMATION AND PRIVACY PROTECTION ACT, (A.R.S. §20-2113, § 20-2118(b)) AGAINST ANTHEM AND ANTHEM AFFILIATES OPERATING IN ARIZONA**

251

997.   Plaintiffs incorporate the above allegations by reference.

998.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating in Arizona on behalf of the Arizona Class whose personal information was compromised as a result of the Anthem Data Breach.

999.   Defendants Anthem and Anthem Affiliates are "insurance institution[s]" for purposes of the Arizona Insurance Information and Privacy Protection Act, A.R.S. §20-2102.

1000.   Defendants Anthem and Anthem Affiliates collected and received individually-identifiable personal information regarding members of the Arizona Class during insurance transactions.

1001.   Defendants Anthem and Anthem Affiliates disclosed individually-identifiable personal information regarding members of the Arizona Class that was collected or received in connection with an insurance transaction without their authorization, in violation of A.R.S. §20-2113.  The disclosure of personal information to unauthorized individuals in the Anthem Data Breach resulted from the affirmative actions of Anthem employees. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Thus, Anthem actively and affirmatively allowed the cyberattackers to see and obtain individually-identifiable personal information regarding members of the Arizona Class.

1002.   The Anthem Data Breach compromised the Personal Information and violated the rights of members of the Arizona Class.

1003.   The Arizona Class has suffered damages from Defendants Anthem and Anthem Affiliates' illegal disclosure and failure to maintain the confidentiality of their personal information.

1004.   The Arizona Class seeks relief under A.R.S. §20-2118(b)) including but not limited to actual damages, nominal damages, injunctive relief, and/or attorneys' fees and costs.

**Connecticut**

**CONNECTICUT INSURANCE INFORMATION AND PRIVACY PROTECTION ACT, (CONN. GEN. STAT. §38a-988, 995, 999) AGAINST ANTHEM AND ANTHEM AFFILIATES OPERATING IN CONNECTICUT**

1005.   Plaintiffs incorporate the above allegations by reference.

1006.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating in Connecticut on behalf of the Connecticut Class whose personal information was compromised as a result of the Anthem Data Breach.

1007.   Defendants Anthem and Anthem Affiliates are "insurance institution[s]" for purposes of the Connecticut Insurance Information and Privacy Protection Act, C.G.S.§38a-976(12).

1008.   Defendants Anthem and Anthem Affiliates collected and received individually-identifiable personal information regarding members of the Connecticut Class during insurance transactions.

1009.   Defendants Anthem and Anthem Affiliates disclosed individually-identifiable personal information regarding members of the Connecticut Class that was collected or received in connection with an insurance transaction without their authorization, in violation of C.G.S. §38a-988.  The disclosure of personal information to unauthorized individuals in the Anthem Data Breach resulted from the affirmative actions of Anthem employees. ████████████████████████████ Thus, Anthem actively and affirmatively allowed the cyberattackers to see and obtain individually-identifiable personal information regarding members of the Connecticut Class.

1010.   Defendants Anthem and Anthem Affiliates failed to create and implement the standards and procedures for the management, transfer and security of personal information, including medical record information, required by C.G.S §38a-999, including standards and procedures to guard against the unauthorized access to and collection of, use or disclosure of this information, and thereby violated C.G.S §38a-999.

253

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1011.   The Anthem Data Breach compromised Personal Information, including medical record information, and violated the rights of members of the Connecticut Class.

1012.   The Connecticut Class has suffered damages from Defendants Anthem and Anthem Affiliates' illegal disclosure and failure to maintain the confidentiality of their personal information, including medical record information.

1013.   The Connecticut Class seeks relief under C.G.S §38a-995 including but not limited to actual damages, nominal damages, injunctive relief, and/or attorneys' fees and costs.

## Georgia
### GEORGIA INSURANCE INFORMATION AND PRIVACY PROTECTION ACT, (GA. CODE §33-39-14, 21(b)) AGAINST ANTHEM AND ANTHEM AFFILIATES OPERATING IN GEORGIA[35]

1014.   Plaintiffs incorporate the above allegations by reference.

1015.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating in Georgia on behalf of the Georgia Class whose personal information was compromised as a result of the Anthem Data Breach.

1016.   Defendants Anthem and Anthem Affiliates are "insurance institution[s]" for purposes of the Georgia Insurance Information and Privacy Protection Act, Ga. Code §33-39-14.

1017.   Defendants Anthem and Anthem Affiliates collected and received individually-identifiable personal information regarding members of the Georgia Class during insurance transactions.

1018.   Defendants Anthem and Anthem Affiliates disclosed individually-identifiable personal information regarding members of the Georgia Class that was collected or received in connection with an insurance transaction without their authorization, in violation of Ga. Code §33-39-14. The disclosure of personal information to unauthorized individuals in the Anthem Data Breach resulted from the affirmative actions of Anthem employees. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[35] Plaintiffs acknowledge that the Court dismissed with prejudice Plaintiffs' Georgia IIPA claim. Plaintiffs re-allege this claim here solely to preserve it for appeal.

254

1

2

3 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Thus, Anthem actively and affirmatively allowed the

4 cyberattackers to see and obtain individually-identifiable personal information regarding members of

5 the Georgia Class.  The Anthem Data Breach compromised Personal Information, including medical

6 record information, and violated the rights of members of the Georgia Class.

7    1019. The Georgia Class has suffered damages from Defendants Anthem and Anthem

8 Affiliates' illegal disclosure and failure to maintain the confidentiality of their personal information.

9    1020. The Georgia Class seeks relief under Ga. Code §33-39-21(b), including but not limited

10 to actual damages, nominal damages, injunctive relief, and/or attorneys' fees and costs.

11 **<u>Illinois</u>**
**ILLINOIS INSURANCE INFORMATION AND PRIVACY PROTECTION ACT,**

12 **(215 ILCS 5/1014, 1021) AGAINST ANTHEM AND ANTHEM AFFILIATES OPERATING**
**IN ILLINOIS**

13

14    1021. Plaintiffs incorporate the above allegations by reference.

15    1022. Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating

16 in Illinois on behalf of the Illinois Class whose personal information was compromised as a result of

17 the Anthem Data Breach.

18    1023. Defendants Anthem and Anthem Affiliates are "insurance institution[s]" for purposes

19 of the Illinois Insurance Information and Privacy Protection Act, 215 ILCS 5/1014.

20    1024. Defendants Anthem and Anthem Affiliates collected and received individually-

21 identifiable personal information regarding members of the Illinois Class during insurance

22 transactions.

23    1025. Defendants Anthem and Anthem Affiliates disclosed individually-identifiable personal

24 information regarding members of the Illinois Class that was collected or received in connection with

25 an insurance transaction without their authorization, in violation of 215 ILCS 5/1014.  The disclosure

26 of personal information to unauthorized individuals in the Anthem Data Breach resulted from the

27 affirmative actions of Anthem employees.

28

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1

2

3

4 �altered▲ Thus, Anthem actively and affirmatively allowed the

5 cyberattackers to see and obtain individually-identifiable personal information regarding members of

6 the Illinois Class.

7    1026.   The Anthem Data Breach compromised Personal Information, including medical

8 record information, and violated the rights of members of the Illinois Class.

9    1027.   The Illinois Class has suffered damages from Defendants Anthem and Anthem

10 Affiliates' illegal disclosure and failure to maintain the confidentiality of their personal information in

11 violation of 215 ILCS 5/1014.

12    1028.   The Illinois Class seeks relief under 215 ILCS 5/1021, including but not limited to

13 actual damages, nominal damages, injunctive relief, and/or attorneys' fees and costs.

14 <u>**Maine**</u>
**MAINE INSURANCE INFORMATION AND PRIVACY PROTECTION ACT,**

15 **(ME. REV. STAT. 24-A, § 2215(1), 24-A, § 2217(2)) AGAINST ANTHEM AND ANTHEM**
**AFFILIATES OPERATING IN MAINE**

16

17    1029.   Plaintiffs incorporate the above allegations by reference.

18    1030.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating

19 in Maine on behalf of the Maine Class whose personal information was compromised as a result of

20 the Anthem Data Breach.

21    1031.   Defendants Anthem and Anthem Affiliates are entities licensed to engage in the

22 business of insurance in Maine and collect, maintain or distribute personal information arising out of

23 insurance transactions.

24    1032.   Defendants Anthem and Anthem Affiliates collected, maintained and/or distributed

25 personal information arising out of insurance transactions regarding the Maine Class, and that

26 information was compromised as a result of the Anthem Data Breach.

27    1033.   Defendants Anthem and Anthem Affiliates disclosed individually-identifiable personal

28 information regarding members of the Maine Class without their authorization, in violation of Me.

**THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**
**CASE NO. 15-md-02617-LHK**

Rev. Stat. 24-A, § 2215(1). The disclosure of personal information to unauthorized individuals in the Anthem Data Breach resulted from the affirmative actions of Anthem employees. ████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████████████████████████████████ Thus, Anthem actively and affirmatively allowed the cyberattackers to see and obtain individually-identifiable personal information regarding members of the Maine Class.

1034.   Members of the Maine Class were injured and have suffered damages as a result of Defendants Anthem and Anthem Affiliates' illegal disclosure and failure to maintain the confidentiality of their personal information in violation of Me. Rev. Stat. 24-A, § 2215(1).

1035.   The Maine Class seeks relief under Me. Rev. Stat. 24-A, § 2217, including but not limited to actual damages, nominal damages, injunctive relief, and/or attorneys' fees and costs.

**Massachusetts**
**MASSACHUSETTS INSURANCE INFORMATION AND PRIVACY PROTECTION ACT, (MASS. GEN. LAWS CH. 175I, § 1, *et seq.*) AGAINST ANTHEM AND ANTHEM AFFILIATES OPERATING IN MASSACHUSETTS**

1036.   Plaintiffs incorporate the above allegations by reference.

1037.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating in Massachusetts on behalf of the Massachusetts Class whose personal information was compromised as a result of the Anthem Data Breach.

1038.   Defendants Anthem and Anthem Affiliates are "insurance institution[s]" as defined by the Massachusetts Insurance Information and Privacy Protection Act, Mass. Gen. Laws ch. 175I, § 2.

1039.   Defendants Anthem and Anthem Affiliates collected and received "personal information," as defined by the Massachusetts Insurance Information and Privacy Protection Act, Mass. Gen. Laws ch. 175I, § 2, regarding members of the Massachusetts Class in connection with insurance transactions.

1040.   Defendants Anthem and Anthem Affiliates disclosed personal information regarding

1  members of the Massachusetts Class that was collected or received in connection with an insurance

2  transactions without the Massachusetts Class Members' written authorization, in violation of Mass.

3  Gen. Laws ch. 175I, § 13.  The disclosure of personal information to unauthorized individuals in the

4  Anthem Data Breach resulted from the affirmative actions of Anthem employees. ██████████

5  ████████████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████  Thus,

10  Anthem actively and affirmatively allowed the cyberattackers to see and obtain individually-

11  identifiable personal information regarding members of the Massachusetts Class.

12      1041.   The Anthem Data Breach compromised Personal Information and violated the rights

13  of members of the Massachusetts Class.

14      1042.   The Massachusetts Class suffered injury from Defendants Anthem and Anthem

15  Affiliates' illegal disclosure and failure to maintain the confidentiality of their personal information.

16      1043.   The Massachusetts Class seek relief under Mass. Gen. Laws ch. 175I, § 20 including

17  but not limited to special damages, compensatory damages, nominal damages, injunctive relief,

18  and/or attorneys' fees and costs.

19                                  **Minnesota**
                  **MINNESOTA INSURANCE FAIR INFORMATION REPORTING ACT,**
20  **(MINN. STAT. § 72A.49, *et seq*.) AGAINST ANTHEM AND ANTHEM AFFILIATES**
                              **OPERATING IN MINNESOTA**
21
22      1044.   Plaintiffs incorporate the above allegations by reference.

23      1045.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating

24  in Minnesota on behalf of the Minnesota Class whose personal information was compromised as a

25  result of the Anthem Data Breach.

26      1046.   Defendants Anthem and Anthem Affiliates are "insurer[s]" as defined by the Minnesota

27  Insurance Fair Information Reporting Act, Minn. Stat. § 72A.491.

28      1047.   Defendants Anthem and Anthem Affiliates collected and received "personal

information," as defined by the Minnesota Insurance Fair Information Reporting Act, Minn. Stat. § 72A.491, regarding members of the Minnesota Class in connection with insurance transactions.

1048.   Defendants Anthem and Anthem Affiliates disclosed personal information regarding members of the Minnesota Class that was collected or received in connection with an insurance transactions without the Minnesota Class Members' authorization, in violation of Minn. Stat. § 72A.502.  The disclosure of personal information to unauthorized individuals in the Anthem Data Breach resulted from the affirmative actions of Anthem employees. ██████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ Thus, Anthem actively and affirmatively allowed the cyberattackers to see and obtain individually-identifiable personal information regarding members of the Minnesota Class.

1049.   The Anthem Data Breach compromised Personal Information and violated the rights of members of the Minnesota Class.

1050.   The Minnesota Class suffered injury from Defendants Anthem and Anthem Affiliates' illegal disclosure and failure to maintain the confidentiality of their personal information.

1051.   The Minnesota Class seek relief under Minn. Stat. § 72A.503 and Minn. Stat. § 13.08 including but not limited to actual damages, injunctive relief, declaratory relief, and any other equitable relief, as well as exemplary damages of not less than $1,000 and not more than $15,000 for each willful violation.

### Montana
### MONTANA INSURANCE INFORMATION AND PRIVACY PROTECTION ACT, (MONT. CODE § 33-19-101, *et seq*.) AGAINST ANTHEM AND ANTHEM AFFILIATES OPERATING IN MONTANA

1052.   Plaintiffs incorporate the above allegations by reference.

1053.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating in Montana on behalf of the Montana Class whose personal information was compromised as a result

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1    of the Anthem Data Breach.

2        1054.   Defendants Anthem and Anthem Affiliates are "insurance institution[s]" as defined by

3    the Montana Insurance Information and Privacy Protection Act, Mont. Code § 33-19-104.

4        1055.   Defendants Anthem and Anthem Affiliates collected and received "personal

5    information," as defined by the Montana Insurance Information and Privacy Protection Act, Mont.

6    Code § 33-19-104, regarding members of the Montana Class in connection with insurance

7    transactions.

8        1056.   Defendants Anthem and Anthem Affiliates disclosed personal information regarding

9    members of the Montana Class that was collected or received in connection with an insurance

10   transactions without the Montana Class Members' written authorization, in violation of Mont. Code

11   Ann. § 33-19-306.  The disclosure of personal information to unauthorized individuals in the Anthem

12   Data Breach resulted from the affirmative actions of Anthem employees. ████████████████

13   ████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████

17   ████████████████████████████████ Thus, Anthem actively and

18   affirmatively allowed the cyberattackers to see and obtain individually-identifiable personal

19   information regarding members of the Montana Class.

20       1057.   The Anthem Data Breach compromised Personal Information and violated the rights of

21   members of the Montana Class.

22       1058.   The Montana Class suffered injury from Defendants Anthem and Anthem Affiliates'

23   illegal disclosure and failure to maintain the confidentiality of their personal information.

24       1059.   The Montana Class seeks relief under Mont. Code Ann. § 33-19-407 including but not

25   limited to actual damages, nominal damages, injunctive relief, and/or attorneys' fees and costs.

26                    **New Jersey**
     **NEW JERSEY INSURANCE INFORMATION PRACTICES ACT,**
27   **(N.J. STAT. § 17:23A-1, *et seq*.) AGAINST ANTHEM AND ANTHEM AFFILIATES**
                    **OPERATING IN NEW JERSEY**
28

                              260

1060.   Plaintiffs incorporate the above allegations by reference.

1061.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating in New Jersey on behalf of the New Jersey Class whose personal information was compromised as a result of the Anthem Data Breach.

1062.   Defendants Anthem and Anthem Affiliates are "insurance institution[s]" as defined by the New Jersey Insurance Information Practices Act, N.J. Stat. § 17:23A-2.

1063.   Defendants Anthem and Anthem Affiliates collected and received "personal information," as defined by the New Jersey Insurance Information Practices Act, N.J. Stat. § 17:23A-2, regarding members of the New Jersey Class in connection with insurance transactions.

1064.   Defendants Anthem and Anthem Affiliates disclosed personal information regarding members of the New Jersey Class that was collected or received in connection with an insurance transactions without the New Jersey Class Members' written authorization, in violation of N.J. Stat. § 17:23A-13.  The disclosure of personal information to unauthorized individuals in the Anthem Data Breach resulted from the affirmative actions of Anthem employees.  Thus, Anthem actively and affirmatively allowed the cyberattackers to see and obtain individually-identifiable personal information regarding members of the New Jersey Class.

1065.   The Anthem Data Breach compromised Personal Information and violated the rights of members of the New Jersey Class.

1066.   The New Jersey Class suffered injury from Defendants Anthem and Anthem Affiliates' illegal disclosure and failure to maintain the confidentiality of their personal information.

1067.   The New Jersey Class seeks relief under N.J. Stat. § 17:23A-20 including but not limited to actual damages, nominal damages, injunctive relief, and/or attorneys' fees and costs.

**North Carolina**

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

**NORTH CAROLINA CONSUMER AND CUSTOMER INFORMATION PRIVACY ACT, (N.C. GEN. STAT. § 58-39-1, *et seq*.) AGAINST ANTHEM AND ANTHEM AFFILIATES OPERATING IN NORTH CAROLINA**

1068.   Plaintiffs incorporate the above allegations by reference.

1069.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating in North Carolina on behalf of the North Carolina Class whose personal information was compromised as a result of the Anthem Data Breach.

1070.   Defendants Anthem and Anthem Affiliates are "insurance institution[s]" as defined by the North Carolina Consumer and Customer Information Privacy Act, N.C. Gen. Stat. § 58-39-15.

1071.   Defendants Anthem and Anthem Affiliates collected and received "personal information," as defined by the North Carolina Consumer and Customer Information Privacy Act, N.C. Gen. Stat. § 58-39-15, regarding members of the North Carolina Class in connection with insurance transactions.

1072.   Defendants Anthem and Anthem Affiliates disclosed personal information regarding members of the North Carolina Class that was collected or received in connection with an insurance transactions without the North Carolina Class Members' written authorization, in violation of N.C. Gen. Stat. § 58-39-75.  The disclosure of personal information to unauthorized individuals in the Anthem Data Breach resulted from the affirmative actions of Anthem employees. █████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████ Thus, Anthem actively and affirmatively allowed the cyberattackers to see and obtain individually-identifiable personal information regarding members of the North Carolina Class.

1073.   The Anthem Data Breach compromised Personal Information and violated the rights of members of the North Carolina Class.

1074.   The North Carolina Class suffered injury from Defendants Anthem and Anthem Affiliates' illegal disclosure and failure to maintain the confidentiality of their personal information.

262

1075.   The North Carolina Class seek relief under N.C. Gen. Stat. § 58-39-105 including but not limited to actual damages, nominal damages, injunctive relief, and/or attorneys' fees and costs.

**Ohio**
**OHIO INSURANCE TRANSACTION INFORMATION STANDARDS LAW,**
**(OHIO REV. CODE § 3904.13, §3904.21(b) AGAINST ANTHEM AND ANTHEM**
**AFFILIATES OPERATING IN OHIO**

1076.   Plaintiffs incorporate the above allegations by reference.

1077.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating in Ohio on behalf of the Ohio Class whose personal information was compromised as a result of the Anthem Data Breach.

1078.   Defendants Anthem and Anthem Affiliates are "insurance institution[s]" for purposes of the Insurance Transaction Information Standards Law, Ohio Rev. Code § 3904.13.

1079.   Defendants Anthem and Anthem Affiliates collected and received individually-identifiable personal information regarding members of the Ohio Class during insurance transactions.

1080.   Defendants Anthem and Anthem Affiliates disclosed individually-identifiable personal information regarding members of the Ohio Class that was collected or received in connection with an insurance transaction without their authorization, in violation of Ohio Rev. Code § 3904.13.  The disclosure of personal information to unauthorized individuals in the Anthem Data Breach resulted from the affirmative actions of Anthem employees. ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████.  Thus, Anthem actively and affirmatively allowed the cyberattackers to see and obtain individually-identifiable personal information regarding members of the Ohio Class.

1081.   The Anthem Data Breach compromised Personal Information, including medical record information, and violated the rights of members of the Ohio Class.

1082.   The Ohio Class have suffered damages from Defendants Anthem and Anthem

263

Affiliates' illegal disclosure and failure to maintain the confidentiality of their personal information in violation of Ohio Rev. Code § 3904.13.

1083.   The Illinois Class seek relief under Ohio Rev. Code §3904.21, including but not limited to actual damages, nominal damages, injunctive relief, and/or attorneys' fees and costs.

<u>**Oregon**</u>
**OREGON USE AND DISCLOSURE OF INSURANCE INFORMATION,**
**(OR. REV. STAT. § 746.600, *et seq.*) AGAINST ANTHEM AND ANTHEM AFFILIATES**
**OPERATING IN OREGON**

1084.   Plaintiffs incorporate the above allegations by reference.

1085.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating in Oregon on behalf of the Oregon Class whose personal information was compromised as a result of the Anthem Data Breach.

1086.   Defendants Anthem and Anthem Affiliates are "licensee[s]" as defined by the Oregon Use and Disclosure of Insurance Information Statute, Or. Rev. Stat. § 746.600.

1087.   Defendants Anthem and Anthem Affiliates are "health insurer[s]" as defined by the Oregon Use and Disclosure of Insurance Information Statute, Or. Rev. Stat. § 746.600.

1088.   Defendants Anthem and Anthem Affiliates collected and received "personal information," as defined by the Oregon Use and Disclosure of Insurance Information Statute, Or. Rev. Stat. § 746.600, regarding members of the Oregon Class in connection with insurance transactions.

1089.   Defendants Anthem and Anthem Affiliates disclosed personal information regarding members of the Oregon Class that was collected or received in connection with an insurance transactions without the Oregon Class Members' written authorization, in violation of Or. Rev. Stat. § 746.665.  The disclosure of personal information to unauthorized individuals in the Anthem Data Breach resulted from the affirmative actions of Anthem employees.

. Thus, Anthem actively and

264

1    affirmatively allowed the cyberattackers to see and obtain individually-identifiable personal

2    information regarding members of the Oregon Class.

3        1090.   Defendants Anthem and Anthem Affiliates used or disclosed personal information

4    regarding members of the Oregon Class that was collected or received in connection with an

5    insurance transactions without obtaining the Oregon Class Members' authorization, in violation of

6    Or. Rev. Stat. § 746.607(2).

7        1091.   The Anthem Data Breach compromised Personal Information and violated the rights

8    of members of the Oregon Class.

9        1092.   The Oregon Class suffered injury from Defendants Anthem and Anthem Affiliates'

10   illegal disclosure and failure to maintain the confidentiality of their personal information.

11       1093.   The Oregon Class seeks relief under Or. Rev. Stat. § 746.680 including but not limited

12   to actual damages, nominal damages, injunctive relief, and/or attorneys' fees and costs.

13   **COUNT XIII:  STATE MEDICAL AND HEALTH INFORMATION PRIVACY STATUTES**
14   **BROUGHT BY THE STATEWIDE CLASSES BELOW**

         **California**
15   **CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT,**
     **(CIVIL CODE §56 *et seq.*) AGAINST ANTHEM AND ANTHEM AFFILIATES OPERATING**
16   **IN CALIFORNIA**

17       1094.   Plaintiffs incorporate the above allegations by reference.

18       1095.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating

19   in California on behalf of the California Class whose personal information was compromised as a

20   result of the Anthem Data Breach.

21       1096.   Defendants Anthem and Anthem Affiliates provide "health care service plans," as

22   defined in Civil Code §§56.05(g), and are entities regulated pursuant to the Knox-Keene Health Care

23   Service Plan Act of 1975, and are therefore subject to the requirements of the California

24   Confidentiality of Medical Information Act.  Anthem's health care service plans in California

25   include, but are not limited to Anthem Blue Cross HMO (CaliforniaCare), described by Anthem as

26   "one of the largest HMOs in the country."

27       1097.   The California Class includes "patients," as defined by the Confidentiality of Medical

28   Information Act to whom "medical information" in the possession of Defendants Anthem and

265

Anthem Affiliates pertains, as defined in Civil Code §§56.05(j) and (k).

1098.   Defendants Anthem and Anthem Affiliates disclosed medical information pertaining to members of the proposed California Class to unauthorized persons without first obtaining consent, in violation of Civil Code §56.10(a).  The disclosure of information to unauthorized individuals in the Anthem Data Breach resulted from the affirmative actions of Anthem employees. ███████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████. Thus, Anthem actively and affirmatively allowed the cyberattackers to see and obtain information regarding members of the Cailfornia Class.

1099.   Defendants Anthem and Anthem Affiliates' negligence resulted in the release of individually-identifiable medical information pertaining to members of the California Class to unauthorized persons and the breach of the confidentiality of that information.  Defendants Anthem and Anthem Affiliates' negligent failure to maintain or preserve medical information pertaining to members of the California Class in a manner that preserved the confidentiality of the information contained therein violates Civil Code §56.101(a).

1100.   Defendants Anthem and Anthem Affiliates are also "employer[s]" that receive and maintain medical information pertaining to members of the California Class for purposes of Civil Code §56.20.

1101.   Defendants Anthem and Anthem Affiliates failed to establish appropriate procedures to ensure the confidentiality and protection from unauthorized use and disclosure of that medical information pertaining to members of the California Class, as required by Civil Code §56.20.

1102.   Defendants Anthem and Anthem Affiliates disclosed medical information pertaining to members of the California Class to unauthorized persons without first obtaining consent, in violation of Civil Code §56.20(c), and permitted the information to be used by unauthorized persons for purposes other than the administering and maintaining employee benefit plans, including health

care plans and plans providing short-term and long-term disability income, workers' compensation and for determining eligibility for paid and unpaid leave from work for medical reasons, in violation of Civil Code §56.20(d).

1103.   The California Class were injured and have suffered damages from Defendants Anthem and Anthem Affiliates' illegal disclosure and negligent release of their medical information in violation of Civil Code §§56.10, 56.20, and 56.101, and therefore seek relief under Civil Code §56.35 and §56.36 including but not limited to actual damages, nominal statutory damages of $1,000, civil penalties, injunctive relief, and/or attorneys' fees and costs.

**Maryland**
**MARYLAND DISCLOSURE REQUIREMENTS FOR INSURERS,**
**(MD. CODE, INS. § 4-403) AGAINST ANTHEM AND ANTHEM AFFILIATES OPERATING**
**IN MARYLAND**

1104.   Plaintiffs incorporate the above allegations by reference.

1105.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating in Maryland on behalf of the Maryland Class whose medical information was compromised as a result of the Anthem Data Breach.

1106.   Defendants Anthem and Anthem Affiliates are "insurer[s]" as meant by Md. Code, Ins. § 4-403.

1107.   Defendants Anthem and Anthem Affiliates disclosed medical information pertaining to members of the Maryland Class without their authorization and for no other reason permitted by Md. Code, Ins. § 4-403, and therefore violated Md. Code, Ins. § 4-403.   The disclosure of information to unauthorized individuals in the Anthem Data Breach resulted from the affirmative actions of Anthem employees. ███████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████. Thus, Anthem actively and affirmatively allowed the cyberattackers to see and obtain information regarding members of the Maryland Class.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1108.   The Anthem Data Breach compromised medical information and violated the rights of members of the Maryland Class.

1109.   The Maryland Class suffered injury from Defendants Anthem and Anthem Affiliates' illegal disclosure and failure to maintain the confidentiality of their medical information.

1110.   The Maryland Class seeks relief under Md. Code, Ins. § 4-403 including but not limited to declaratory relief, injunctive relief, attorneys' fees and costs, as well as actual damages for Defendants' knowing violation of Md. Code, Ins. § 4-403.

## MARYLAND DISCLOSURE REQUIREMENTS FOR NONPROFIT HEALTH SERVICE PLANS, (MD. CODE, INS. § 14-138) AGAINST ANTHEM AND ANTHEM AFFILIATES OPERATING IN MARYLAND

1111.   Plaintiffs incorporate the above allegations by reference.

1112.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating health services plans in Maryland on behalf of the Maryland Class whose medical information was compromised as a result of the Anthem Data Breach.

1113.   Defendants Anthem and Anthem Affiliates operate "nonprofit health service plans" and/or "Blue Cross or Blue Shield" plans in Maryland as meant by Md. Code, Ins. § 14-138.

1114.   Defendants Anthem and Anthem Affiliates disclosed medical information pertaining to members of the Maryland Class without their authorization and for no other reason permitted by Md. Code, Ins. § 14-138, and therefore violated Md. Code, Ins. § 14-138.  The disclosure of information to unauthorized individuals in the Anthem Data Breach resulted from the affirmative actions of Anthem employees. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████.  Thus, Anthem actively and affirmatively allowed the cyberattackers to see and obtain information regarding members of the Maryland Class.

1115.   The Anthem Data Breach compromised medical information and violated the rights of

268

1  members of the Maryland Class.

2      1116.   The Maryland Class suffered injury from Defendants Anthem and Anthem Affiliates'

3  illegal disclosure and failure to maintain the confidentiality of their medical information.

4      1117.   The Maryland Class seeks relief under Md. Code, Ins. § 14-138 including but not

5  limited to declaratory relief, injunctive relief, attorneys' fees and costs, as well as actual damages for

6  Defendants' knowing violation of Md. Code, Ins. § 14-138.

7      **MARYLAND CONFIDENTIALITY OF MEDICAL RECORDS ACT,**
**(MD. CODE, HEALTH-GEN. § 4-301, *et seq*.) AGAINST ANTHEM AND ANTHEM**
8  **AFFILIATES OPERATING IN MARYLAND**

9      1118.   Plaintiffs incorporate the above allegations by reference.

10     1119.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating

11  in Maryland on behalf of the Maryland Class whose medical records were compromised as a result of

12  the Anthem Data Breach.

13     1120.   Defendants Anthem and Anthem Affiliates operate as "health maintenance

14  organizations" as defined in Md. Code Ann., Health-Gen. § 19-301, and are therefore "health care

15  providers" as defined in Md. Code Ann., Health-Gen. § 4-301 subject to the requirements of the

16  Maryland Confidentiality of Medical Records Act.

17     1121.   Defendants Anthem and Anthem Affiliates are also a "person" to whom medical

18  records are disclosed as meant by Md. Code Ann., Health-Gen. § 4-302, and are therefore subject to

19  the requirements of the Maryland Confidentiality of Medical Records Act.

20     1122.   Defendants Anthem and Anthem Affiliates disclosed medical records pertaining to the

21  Maryland Class without their authorization and for no other reason permitted by Md. Code Ann.,

22  Health-Gen. § 4-302, and therefore violated Md. Code Ann., Health-Gen. § 4-302.  The disclosure of

23  information to unauthorized individuals in the Anthem Data Breach resulted from the affirmative

24  actions of Anthem employees.

269

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1    ████████████. Thus, Anthem actively and affirmatively allowed the cyberattackers to

2    see and obtain information regarding members of the Maryland Class.

3        1123.   Maryland Class Members were injured by Defendants Anthem and Anthem Affiliates'

4    disclosure of their medical records in violation Md. Code Ann., Health-Gen. § 4-302.

5        1124.   The Maryland Class seeks relief pursuant to Md. Code Ann., Health-Gen. § 4-309,

6    including but not limited to declaratory relief, injunctive relief, and attorneys' fees and costs, as well

7    as actual damages for Defendants' knowing violations of Md. Code Ann., Health-Gen. § 4-302.

8                                  **Minnesota**
                         **MINNESOTA HEALTH RECORDS ACT,**
9    **(MINN. STAT. § 144.291, *et seq*.) AGAINST ANTHEM AND ANTHEM AFFILIATES**
                              **OPERATING IN MINNESOTA**
10

11       1125.   Plaintiffs incorporate the above allegations by reference.

12       1126.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating

13   in Minnesota on behalf of the Minnesota Class whose health records were compromised as a result of

14   the Anthem Data Breach.

15       1127.   As a result of conducting the business of insurance and other health benefits services in

16   Minnesota, including but not limited to the processing of claims and third-party payments for health

17   care, Defendants Anthem and Anthem Affiliates received from health care providers health records

18   pertaining to members of the Minnesota Class.

19       1128.   Defendants Anthem and Anthem Affiliates negligently and/or intentionally released the

20   health records pertaining to the Minnesota Class without their signed and dated consent and for no

21   other reason permitted by Minn. Stat. Ann. § 144.293, and therefore violated Minn. Stat. Ann. §

22   144.293.  The release of information to unauthorized individuals in the Anthem Data Breach resulted

23   from the affirmative actions of Anthem employees. ████████████

24   ████████████████████████████

25   ████████████████████████

26   ██████████████████████████

27   ██████████████████████████

28   ████████████████Thus, Anthem actively and affirmatively allowed the

                                      270

cyberattackers to see and obtain information regarding members of the Minnesota Class.

1129.   Minnesota Class Members were injured by Defendants Anthem and Anthem Affiliates' negligent and/or intentional release of their health records in violation of Minn. Stat. Ann. § 144.293.

1130.   The Minnesota Class seeks relief for Defendants Anthem and Anthem Affiliates' violation of Minn. Stat. Ann. § 144.293, including but not limited to compensatory damages, nominal damages, injunctive relief, and/or attorneys' fees and costs.

### Rhode Island
### RHODE ISLAND CONFIDENTIALITY OF HEALTH CARE INFORMATION ACT, (R.I. GEN. LAWS § 5-37.3-1, *et seq.*) AGAINST ANTHEM AND ANTHEM AFFILIATES OPERATING IN RHODE ISLAND

1131.   Plaintiffs incorporate the above allegations by reference.

1132.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating in Rhode Island on behalf of the Rhode Island Class whose confidential health care information was compromised as a result of the Anthem Data Breach.

1133.   As a result of conducting the business of insurance and other health benefits services in Rhode Island, including but not limited to the processing of claims and third-party payments for health care, Defendants Anthem and Anthem Affiliates possessed confidential health care information pertaining to members of the Rhode Island Class.

1134.   Defendants Anthem and Anthem Affiliates released or transferred confidential health care information pertaining to the Rhode Island Class without their written consent and for no other reason permitted by R.I. Gen. Laws § 5-37.3-4, and therefore violated R.I. Gen. Laws § 5-37.3-4.  The release of information to unauthorized individuals in the Anthem Data Breach resulted from the affirmative actions of Anthem employees. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Thus, Anthem actively and affirmatively allowed the cyberattackers to see and obtain information regarding members of the Rhode Island Class.

271

1135.   Defendants Anthem and Anthem Affiliates failed to establish the security procedures in relation to confidential health care information as required by R.I. Gen. Laws § 5-37.3-4, and therefore violated R.I. Gen. Laws § 5-37.3-4.

1136.   Rhode Island Class Members were injured by Defendants Anthem and Anthem Affiliates' release or transfer of their confidential health care information and/or Defendants Anthem and Anthem Affiliates' failure to establish security procedures to protect their confidential healthcare information in violation of R.I. Gen. Laws § 5-37.3-4.

1137.   The Rhode Island Class seeks relief for Defendants Anthem and Anthem Affiliates' violation of R.I. Gen. Laws § 5-37.3-4, including but not limited to actual damages, punitive damages, declaratory relief, injunctive relief, and/or attorneys' fees and costs, as well as statutory damages of $5,000 for each knowing and intentional violation.

**Virginia**
**VIRGINIA INSURANCE INFORMATION AND PRIVACY PROTECTION ACT, (VA. CODE § 38.2-600, *et seq*.) AGAINST ANTHEM AND ANTHEM AFFILIATES OPERATING IN VIRGINIA**

1138.   Plaintiffs incorporate the above allegations by reference.

1139.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating in Virginia on behalf of the Virginia Class whose information was compromised as a result of the Anthem Data Breach.

1140.   Defendants Anthem and Anthem Affiliates are "insurance institutions" as defined by the Virginia Insurance Information and Privacy Protection Act, Va. Code § 38.2-602.

1141.   Defendants Anthem and Anthem Affiliates collected and received "medical-record information," as defined by the Virginia Insurance Information and Privacy Protection Act, Va. Code § 38.2-602, regarding members of the Virginia Class in connection with insurance transactions.

1142.   Defendants Anthem and Anthem Affiliates disclosed medical-record information regarding members of the Virginia Class that was collected or received in connection with an insurance transactions without the Virginia Class Members' written authorization, in violation of Va. Code § 38.2-613.  The disclosure of information to unauthorized individuals in the Anthem Data Breach resulted from the affirmative actions of Anthem employees.

272

1
2
3
4
5         Thus, Anthem actively and

6 affirmatively allowed the cyberattackers to see and obtain information regarding members of the

7 Virginia Class.

8      1143.  The Anthem Data Breach compromised medical-record information and violated the

9 rights of members of the Virginia Class.

10      1144.  The Virginia Class suffered injury from Defendants Anthem and Anthem Affiliates'

11 illegal disclosure and failure to maintain the confidentiality of their medical-record information.

12      1145.  The Virginia Class seek relief under Va. Code § 38.2-617 including but not limited to

13 actual damages, nominal damages, injunctive relief, and/or attorneys' fees and costs.

14 **VIRGINIA HEALTH RECORDS PRIVACY STATUTE, (VA. CODE § 32.1-127.1:03)**
**AGAINST ANTHEM AND ANTHEM AFFILIATES OPERATING IN VIRGINIA**
15

16      1146.  Plaintiffs incorporate the above allegations by reference.

17      1147.  Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating

18 in Virginia on behalf of the Virginia Class whose health records were compromised as a result of the

Anthem Data Breach.
19
     1148.  Virginia law recognizes an individual's right of privacy in the content of his or her
20
health records.  Va. Code § 32.1-127.1:03.
21
     1149.  As a result of conducting the business of insurance and other health benefits services
22
in Virginia, including but not limited to the processing of claims and third-party payments for health
23
care, Defendants Anthem and Anthem Affiliates possessed health records pertaining to members of
24
the Virginia Class.
25
     1150.  Defendants Anthem and Anthem Affiliates are "health care entit[ies]" as defined by
26
Va. Code Ann. § 32.1-127.1:03 and had a duty under Virginia law to not redisclose or otherwise
27
reveal any health records in its possession regarding the Virginia Class.  Va. Code § 32.1-
28

**THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**
**CASE NO. 15-md-02617-LHK**

127.1:03(3).

1151.   Defendants Anthem and Anthem Affiliates redisclosed or otherwise revealed the health records pertaining to the Virginia Class without their consent and for no other reason permitted by Va. Code § 32.1-127.1:03(3), and therefore violated Va. Code § 32.1-127.1:03(3).  The disclosure of information to unauthorized individuals in the Anthem Data Breach resulted from the affirmative actions of Anthem employees. ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████  Thus, Anthem actively and affirmatively allowed the cyberattackers to see and obtain information regarding members of the Virginia Class.

1152.   Virginia Class Members were injured by Defendants Anthem and Anthem Affiliates' illegal disclosure and negligent release of their health records in violation of Va. Code § 32.1-127.1:03(3).

1153.   The Virginia Class seeks relief for Defendants Anthem and Anthem Affiliates' violation of Va. Code § 32.1-127.1:03(3), including but not limited to actual damages, special damages, nominal damages, exemplary damages, injunctive relief, and/or attorneys' fees and costs.

**Washington**
**WASHINGTON UNIFORM HEALTH CARE INFORMATION ACT,
(WASH. REV. CODE §70.02.045, § 70.02.170) AGAINST ANTHEM AND ANTHEM
AFFILIATES OPERATING IN WASHINGTON**

1154.   Plaintiffs incorporate the above allegations by reference.

1155.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating in Washington on behalf of the Washington Class whose personal information was compromised as a result of the Anthem Data Breach.

1156.   As a result of conducting the business of insurance and other health benefits services, including but not limited to the processing of claims and third-party payments for health care, in Washington, Defendants Anthem and Anthem Affiliates possessed personal information including

274

1    personal health care information pertaining to members of the Washington Class.

2        1157.   Defendants Anthem and Anthem Affiliates released personal information, including

3    health care information, regarding members of the Washington Class without authorization in

4    violation of Wash. Rev. Code §70.02.045.  The release of information to unauthorized individuals in

5    the Anthem Data Breach resulted from the affirmative actions of Anthem employees.  ███████

6    ████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████ Thus,

11   Anthem actively and affirmatively allowed the cyberattackers to see and obtain information regarding

12   members of the Washington Class.

13       1158.   The Washington Class were injured and have suffered damages from Defendants

14   Anthem and Anthem Affiliates' illegal disclosure and negligent release of their personal information,

15   including health care information in violation of Wash. Rev. Code §70.02.045.

16       1159.   The Washington Class seek relief under Wash. Rev. Code §70.02.170, including but

17   not limited to actual damages, nominal damages, injunctive relief, and/or attorneys' fees and costs.

18   **Wisconsin**
**WISCONSIN INSURANCE MEDICAL INFORMATION PRIVACY STATUTE,**

19   **(WIS. STAT. § 610.70) AGAINST ANTHEM AND ANTHEM AFFILIATES OPERATING IN
WISCONSIN**

20       1160.   Plaintiffs incorporate the above allegations by reference.

21       1161.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating

22   in Wisconsin on behalf of the Wisconsin Class whose personal information was compromised as a

23   result of the Anthem Data Breach.

24       1162.   Defendants Anthem and Anthem Affiliates are "insurance institution[s]" for purposes

25   of Wis. Stat. § 610.70.

26       1163.   Defendants Anthem and Anthem Affiliates collected and received individually-

27   identifiable personal medical information regarding members of the Wisconsin Class during

28

insurance transactions.

1164.   Defendants Anthem and Anthem Affiliates disclosed individually-identifiable personal medical information regarding members of the Wisconsin Class that was collected or received in connection with an insurance transaction without their authorization, in violation of Wis. Stat. § 610.70.  The disclosure of information to unauthorized individuals in the Anthem Data Breach resulted from the affirmative actions of Anthem employees. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Thus, Anthem actively and affirmatively allowed the cyberattackers to see and obtain information regarding members of the Wisconsin Class.

1165.   The Anthem Data Breach compromised personal medical information and violated the rights of members of the Wisconsin Class.

1166.   The Wisconsin Class has suffered damages from Defendants Anthem and Anthem Affiliates' illegal disclosure and failure to maintain the confidentiality of their personal medical information in violation of Wis. Stat. § 610.70.

1167.    The Wisconsin Class seeks relief, including but not limited to actual damages, nominal damages, injunctive relief, and/or attorneys' fees and costs.

**WISCONSIN CONFIDENTIALITY OF HEATH RECORDS LAW,
(WIS. STAT. § 146.82(5), §142.84) AGAINST ANTHEM AND ANTHEM AFFILIATES
OPERATING IN WISCONSIN**

1168.   Plaintiffs incorporate the above allegations by reference.

1169.   Plaintiffs bring this claim against Defendants Anthem and Anthem Affiliates operating in Wisconsin on behalf of the Wisconsin Class whose personal information was compromised as a result of the Anthem Data Breach.

1170.   Wisconsin law requires that all health records remain confidential.  Wis. Stat. §146.82.

1171.   As a result of conducting the business of insurance and other health benefits services,

276

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

including but not limited to the processing of claims and third-party payments for health care, in Wisconsin, Defendants Anthem and Anthem Affiliates possessed health records pertaining to members of the Wisconsin Class.

1172.   Defendants Anthem and Anthem Affiliates are "covered entit[ies]" for purposes of Wis. Stat. §146.82(5) and had a duty not to re-disclose any health records in its possession regarding the Wisconsin Class under Wisconsin law.  Wis. Stat. §146.82(5).

1173.   Defendants Anthem and Anthem Affiliates re-disclosed health records pertaining to the Wisconsin Class without their consent and for no other reason permitted by either Wis. Stat. §146.82(5) or §610.70, and therefore violated Wis. Stat. §146.82(5).  The disclosure of information to unauthorized individuals in the Anthem Data Breach resulted from the affirmative actions of Anthem employees. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Thus, Anthem actively and affirmatively allowed the cyberattackers to see and obtain information regarding members of the Wisconsin Class.

1174.   Wisconsin Class  members were injured and have suffered damages from Defendants Anthem and Anthem Affiliates' illegal disclosure and negligent release of their health information in violation of Wis. Stat. §146.82(5).

1175.   The Wisconsin Class seek relief under Wis. Stat. § 146.81, including but not limited to actual damages, nominal damages, exemplary damages of up to $25,000 for knowing and willful violations and up to $1,000 for negligent violations, statutory penalties, injunctive relief, and/or attorneys' fees and costs.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, seek the following relief:

A.      An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1   Classes as requested herein, appointed the undersigned as Class counsel, and finding that Plaintiffs

2   are proper representatives of the Classes requested herein.

3        B.      Plaintiffs request injunctive relief.  Awarding injunctive and other equitable relief as is

4   necessary to protect the interests of the Classes, including (i) an order prohibiting Defendants from

5   engaging in the wrongful and unlawful acts described herein; (ii) requiring Defendants to protect all

6   data collected or received through the course of their business in accordance with HIPAA regulations,

7   the Gramm-Leach Bliley Act, other federal, state and local laws, and best practices under industry

8   standards; (iii) requiring Defendants to design, maintain, and test their computer systems to ensure

9   that Personal Information in their possession is adequately secured and protected; (iv) requiring

10  Defendants to disclose any future data breaches in a timely and accurate manner; (v) requiring

11  Defendants to engage third-party security auditors as well as internal security personnel to conduct

12  testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a

13  periodic basis and ordering them to promptly correct any problems or issues detected by these

14  auditors; (vi) requiring Defendants to audit, test, and train their security personnel to run automated

15  security monitoring, aggregating, filtering and reporting on log information in a unified manner; (vii)

16  requiring Defendants to implement multi-factor authentication requirements; (viii) requiring

17  Defendants' employees to change their passwords on a timely and regular basis, consistent with best

18  practices; (ix) requiring Defendants to encrypt all Personal Information; (x) requiring Defendants to

19  audit, test, and train its security personnel regarding any new or modified procedures; (xi) requiring

20  Anthem to segment data by, among other things, creating firewalls and access controls so that if one

21  area of the Anthem network is compromised, hackers cannot gain access to other portions of

22  Anthem's systems; (xii) requiring Defendants to purge, delete, and destroy in a reasonably secure and

23  timely manner Personal Information no longer necessary for their provision of services; (xiii)

24  requiring Defendants to conduct regular database scanning and securing checks; (xiv) requiring

25  Defendants to routinely and continually conduct internal training and education to inform internal

26  security personnel how to identify and contain a breach when it occurs and what to do in response to

27  a breach; (xv) requiring Defendants to provide lifetime credit monitoring and identity theft repair

28  services to members of the Classes; and (xvi) requiring Defendants to educate all class members

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1  about the threats they face as a result of the loss of their Personal Information to third parties, as well

2  as steps Class Members must take to protect themselves.

3        C.      Plaintiffs also request actual damages, punitive damages, treble damages, statutory

4  damages, exemplary damages, equitable relief, restitution,  disgorgement of profits, attorney's fees,

5  statutory costs, and such other and further relief as is just and proper. Plaintiffs seek attorneys' fees

6  under California Code of Civil Procedure 1021.5, and similar statutes under other state laws.

7  <div align="center">**VIII.   DEMAND FOR JURY TRIAL**</div>

8        Plaintiffs demand a trial by jury on all triable issues.

9

10                      **COHEN MILSTEIN SELLERS & TOLL PLLC**
                    ANDREW N. FRIEDMAN

11                      GEOFFREY GRABER
                    SALLY M. HANDMAKER

12                      ERIC KAFKA

13  Dated: July 11, 2016      By: /s/ Andrew N. Friedman

14

15                      **ALTSHULER BERZON LLP**
                    EVE H. CERVANTEZ

16                      JONATHAN WEISSGLASS
                    DANIELLE LEONARD

17                      MEREDITH JOHNSON

18  Dated:  July 11, 2016     By: /s/ Eve H. Cervantez

19                      *Lead Plaintiffs' Counsel*

20                      **LIEFF CABASER HEIMANN & BERNSTEIN, LLP**
                    MICHEL SOBOL

21

22                      **GIRARD GIBBS LLP**
                    ERIC GIBBS

23                      *Plaintiffs' Steering Committee*

24

25

26

27

28

<div align="center">279</div>
<div align="center">THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK</div>

1

2

**INDEX OF EXHIBITS TO**
**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

3

| Exhibit No. | Description of Exhibit |
|---|---|

4

5

1.    Anthem's Privacy webpage (https://www.anthem.com/health-insurance/about-
      us/privacy) (as it has appeared since January 2015)

6

7

2.    Anthem's Privacy webpage (https://www.anthem.com/health-insurance/about-
      us/privacy) (as it appeared from January 2014 until January 2015)

8

9

10

3.    Anthem Blue Cross California's Privacy webpage
      (https://www.anthem.com/ca/health-insurance/about-us/privacy) (as it has
      appeared since January 2015)

11

12

13

4.    Anthem's Blue Cross California's Privacy webpage
      (https://www.anthem.com/ca/health-insurance/about-us/privacy) (as it
      appeared from January 2014 until January 2015)

14

15

16

5.    Anthem's Privacy Notices available in 2014 and 2015 (available at:
      https://www.anthem.com/health-insurance/about-us/privacy) (dated 9/23/2013
      and 10/1/2014)

17

18

19

6.    Plaintiff Michael Bronzo
          Anthem California Blue Cross 2015 "Combined Evidence of Coverage and
          Disclosure Form" for Plaintiff Michael Bronzo (excerpts)

20

21

22

7.    Plaintiff Mary Carter
          7-1    Anthem California Blue Cross 2015 Combined Evidence of Coverage and
                 Disclosure Form for Plaintiff Mary Carter (excerpts)

23

24

          7-2    Anthem California Blue Cross 2015 Group Agreement for Plaintiff Mary
                 Carter's group (excerpts)

25

26

8.    Plaintiff Kenneth Coonce
          8-1    Anthem California Blue Cross Small Group PPO Plan Booklet for Plaintiff

27

          Kenneth Coonce applicable in 2014 and 2015 (excerpts)

28

280

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1    8-2    2014 Group agreement between Anthem Blue Cross California for Plaintiff
2           Kenneth Coonce's group (excerpts)
3    8-3    2015 Group agreement between Anthem Blue Cross California for Plaintiff
4           Kenneth Coonce's group (excerpts)
5 9.    Plaintiff Steve Kawai
6    9-1    CalPERS Administrative Services Agreement with Anthem Blue Cross for
7           2014-2018 (excerpts)
8 10.    Plaintiff Daniel Randrup
9    10-1    Administrative Services Agreement between Self-Insured Schools of
10           California and Anthem Blue Cross Life and Health of California (excerpts)
11           (filed under seal)
12 11.    Plaintiff Kenneth Solomon
13           Individual Anthem Blue Cross Life and Health Insurance Company PPO
14           policy for Plaintiff Kenneth Solomon (excerpts)
15 12.    Plaintiffs Daniel and Kelly Tharp
16    12-1    Administrative Services Agreement between Anthem California Blue Cross
17           and the Ironworkers' Employees Benefit Corporation (IEBC), effective 2011
18           through 2015 (redacted)
19 13.    Plaintiff Matthew Gates
20           Administrative Services Agreement between Anthem and Plaintiff Gates's
21           employer (excerpts)
22 14.    Plaintiff Elizabeth Ames
23    14-1    2014 Horizon Blue Cross Blue Shield New Jersey Benefits Booklet for
24           Plaintiff Elizabeth Ames (excerpts)
25    14-2    2015 Horizon Blue Cross Blue Shield New Jersey Benefits Booklet for
26           Plaintiff Elizabeth Ames (excerpts)
27    14-3    Horizon BCBSNJ Privacy Policies and Notices, as they have appeared on
28           Horizon's website since 2014

<center>281</center>

<center>THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK</center>

15.       Plaintiff Lillian Brisko

      15-1    California Blue Shield Combined Evidence of Coverage and Disclosure Form for Plaintiff Lillian Brisko, effective October 1, 2013 (excerpts)

      15-2    Blue Shield of California Privacy website, as it appeared since at least 2013

      15-3    Blue Shield of California Privacy Notice, available at all times on Blue Shield of California's website, as it has appeared since 2013

      15-4    Blue Shield of California Gramm-Leach Bliley Privacy Notice, available at all times on Blue Shield of California's website, as it has appeared since 2013

16.       Plaintiff Connie McDaniel

      16-1    2012 BCBS Alabama PPO Plan Booklet for Plaintiff Connie McDaniel, in effect during 2015 (excerpts)

      16-2    BCBS Alabama Privacy Notice, as it appeared since 2013

17.       Exemplar documents for BCBS Arkansas

      17-1    2011 BCBS Arkansas Enrollment application (excerpts, redacted for privacy)

      17-2    BCBS Arkansas Plan Booklet, in effect since 2012 (excerpts)

      17-3    BCBS Arkansas privacy websites, as they appeared since 2014 (BCBS Arkansas, Health Advantage, USAble Mutual Insurance)

      17-4    BCBS Arkansas's Health Advantage privacy webpages, as they appeared in 2011

18.       Plaintiff Charles Platt

      18-1    BCBS Florida Non-Group Contract for Plaintiff Platt, effective 1/8/2013 (excerpts, redacted for privacy)

      18-2    BCBS Florida Privacy Notice, as it appeared since 2013

19.       Plaintiff David Klemer

      19-1    Health Care Service Corporation d/b/a BCBS Illinois Certificate for the Blue Print Blue Advantage HMO for Plaintiff David Klemer (excerpts)

      19-2    BCBS Illinois privacy websites, as it has appeared since 2014

      19-3    BCBS Illinois Privacy Notice, as it has appeared since 2013

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

1                19-4    BCBS Illinois enrollment application

2  20.         Plaintiff Don West

3                20-1    CareFirst Blue Choice Advantage Plan Booklet for Plaintiff Don West,

4                            effective April 1, 2014 (excerpts)

5                20-2    CareFirst privacy website, as it has appeared since 2014

6                20-3    CareFirst Privacy Notice, as it has appeared since 2013

7  21.         Plaintiff Carrie Ramos

8                21-1    BCBS Massachusetts 2014 Preferred Blue PPO Subscriber Certificate for

9                            Plaintiff Carrie Ramos (excerpts)

10              21-2    BCBS Massachusetts Commitment to Confidentiality Privacy Notice, as it has

11                          appeared since 2014

12  22.      Plaintiff Michelle Kaseta-Collins

13        22-1 BCBS Michigan Plan Booklet for Plaintiff Michelle Kaseta-Collins (excerpts)

14        22-2 BCBS Michigan privacy website, as it has appeared since 2014

15        22-3 BCBS Michigan Privacy Notice, as it has appeared since 2013

16  23.         Plaintiff Lauren Roberts

17                23-1    BCBS Minnesota Privacy Notices, as they appeared on BCBS Minnesota's

18                          website since 2013

19              23-2    BCBS Minnesota group plan application/enrollment form

20  24.         Plaintiff Frank Nicosia

21                24-1    BCBS North Carolina Benefit Booklet for Plaintiff Frank Nicosia (excerpts)

22                24-2    BCBS North Carolina privacy webpage, as it has appeared since 2014

23                24-3    BCBS North Caroline Privacy Notice, as it has appeared since 2014

24  25.         Plaintiff Denise Masloski

25           Highmark Blue Shield Privacy Notices, as they have appeared on Highmark's website

26           since 2013

27  26.         Plaintiff Lance Wagner

28                26-1    Health Care Service Corporation d/b/a BCBS Texas BlueEdge Individual Plan

1   Booklet for Plaintiff Wagner (excerpts)

2           26-2   BCBS Texas Privacy Notice, as it has appeared since 2013

3           26-3   BCBS Texas privacy websites

4   27.        Plaintiff Jessica Holguin

5           27-1   2014 BCBS Vermont Plan Booklet ("Plan J Comprehensive Certificate") for

6                 Plaintiff Jessica Holguin (excerpts)

7           27-2   BCBS Vermont privacy website, as it has appeared since 2014

8           27-3   BCBS Vermont Privacy Notice, as it has appeared since 2014

9   28.        The Federal BCBSA Contract

10           28-1   2013 Contract CS 1039

11           28-2   2014 Amendment to Contract CS 1039

12           28 -3   2015 Amendment to Contract CS 1039

13   29.        2014 FEHB Brochure (excerpts)

14   30.        2015 FEHB Brochure (excerpts)

15   31.        Blue Cross and Blue Shield Service Benefit Plan Notice of Privacy Practice, available at

16           www.fepblue.org, as it appeared in 2014 and 2015

17   32.        The Rights and Responsibilities webpage of www.fepblue.org, as it appeared in 2015

18

19

20

21

22

23

24

25

26

27

28

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
CASE NO. 15-md-02617-LHK

# Exhibit C

A sophisticated cyber attack resulted in unauthorized access to one of our IT systems. Her...  Page 1 of 1

Case 1:16-mc-02210-APM   Document 1   Filed 10/29/16   Page 391 of 827



Share

  

## Statement regarding cyber attack against Anthem

Cyber attackers executed a very sophisticated attack to gain unauthorized access to one of our parent company's IT systems and have obtained personal information relating to consumers and Anthem Blue Cross and Blue Shield employees who are currently covered, or who have received coverage in the past. The information accessed includes names, birthdays, social security numbers, street addresses, email addresses and employment information, including income data. No credit card information was compromised, nor is there evidence at this time that medical information such as claims, test results, or diagnostic codes were targeted or obtained.

As soon as we learned about the attack, we immediately made every effort to close the security vulnerability, contacted the FBI and began fully cooperating with their investigation. Our parent company has also retained Mandiant, one of the world's leading cybersecurity firms, to evaluate our systems and identify solutions based on the evolving landscape.

Anthem Blue Cross and Blue Shield will individually notify current and former members whose information has been accessed.  Credit monitoring and identity protection services will be provided free of charge so that those who have been affected can have peace of mind.

The company has established a dedicated website (www.anthemfacts.com) where members can access information, including frequent questions and answers.

There is also a dedicated toll-free number that both current and former members can call if they have questions related to this incident. That number is: 877-263-7995.

We take consumers' privacy very seriously and are doing everything in our power to make our systems and security processes – and most importantly your data – more secure. In the meantime, as we learn more, we will continue to provide updates.

# # #

*Still have questions? Read the FAQ at www.anthemfacts.com/faq*

Media Contact:      Scott Larrivee
                    (262) 523-4746
                    scott.larrivee@anthem.com
                    Twitter: @AnthemPR_WI
                    Anthem Digital Newsroom on Tumblr

©2005 - 2014 copyright of Anthem Insurance Companies, Inc. Serving Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri (excluding 30 counties in the Kansa Virginia (excluding the Northern Virginia suburbs of Washington, D.C.), and Wisconsin.

Exhibit D



U.S. OFFICE OF PERSONNEL MANAGEMENT
OFFICE OF THE INSPECTOR GENERAL
OFFICE OF AUDITS

# Final Audit Report

**Subject:**

## AUDIT OF INFORMATION SYSTEMS GENERAL AND APPLICATION CONTROLS AT WELLPOINT INC.

**Report No. <u>1A-10-00-13-012</u>**

**Date:**   September 10, 2013

**--CAUTION--**

This audit report has been distributed to Federal officials who are responsible for the administration of the audited program. This audit report may contain proprietary data which is protected by Federal law (18 U.S.C. 1905). Therefore, while this audit report is available under the Freedom of Information Act and made available to the public on the OIG webpage, caution needs to be exercised before releasing the report to the general public as it may contain proprietary information that was redacted from the publicly distributed copy.

# Audit Report

## FEDERAL EMPLOYEES HEALTH BENEFITS PROGRAM
## CONTRACT CS 1039
## WELLPOINT INC.
## PLAN CODES 10 / 11
## ROANOKE, VIRGINIA

### Report No. <u>1A-10-00-13-012</u>

**Date:**    September 10, 2013

Michael R. Esser
**Assistant Inspector General**
**for Audits**

**--CAUTION--**

This audit report has been distributed to Federal officials who are responsible for the administration of the audited program. This audit report may contain proprietary data which is protected by Federal law (18 U.S.C. 1905). Therefore, while this audit report is available under the Freedom of Information Act and made available to the public on the OIG webpage, caution needs to be exercised before releasing the report to the general public as it may contain proprietary information that was redacted from the publicly distributed copy.

# Executive Summary

<div style="border:1px solid">

## FEDERAL EMPLOYEES HEALTH BENEFITS PROGRAM
## CONTRACT CS 1039
## WELLPOINT INC.
## PLAN CODES 10 / 11
## ROANOKE, VIRGINIA

</div>

### Report No. <u>1A-10-00-13-012</u>

**Date:**  September 10, 2013

This final report discusses the results of our audit of general and application controls over the information systems at WellPoint Inc. (WellPoint or Plan).

Our audit focused on the claims processing applications used to adjudicate Federal Employees Health Benefits Program (FEHBP) claims for WellPoint, as well as the various processes and information technology (IT) systems used to support these applications. We documented controls in place and opportunities for improvement in each of the areas below.

<u>Security Management</u>

WellPoint has established a series of IT policies and procedures to create an awareness of IT security at the Plan. We also verified that WellPoint has adequate human resources policies related to the security aspects of hiring, training, transferring, and terminating employees.

<u>Access Controls</u>

WellPoint has implemented numerous controls to grant and remove physical access to its data center, as well as logical controls to protect sensitive information. However, the physical access controls to one specific facility visited by auditors could be improved. We also noted weaknesses in WellPoint's implementation of segregation of duties and privileged user monitoring.

Network Security

WellPoint has implemented a thorough incident response and network security program. However, we noted several opportunities for improvement related to WellPoint's network security controls. WellPoint has not implemented technical controls to prevent rogue devices from connecting to its network. Also, several specific servers containing Federal data are not subject to routine vulnerability scanning, and we could not obtain evidence indicating that these servers have ever been subject to a vulnerability scan. In addition, WellPoint limited our ability to perform adequate testing in this area of the audit. As a result of this scope limitation and WellPoint's inability to provide additional supporting documentation, we are unable to independently attest that WellPoint's computer servers maintain a secure configuration.

Configuration Management

WellPoint has developed formal policies and procedures that provide guidance to ensure that system software is appropriately configured and updated, as well as for controlling system software configuration changes. However, we noted that WellPoint's mainframe password settings are not in compliance with its own corporate standards.

Contingency Planning

We reviewed WellPoint's business continuity plans and concluded that they contained the key elements suggested by relevant guidance and publications. We also determined that these documents are reviewed and updated on a periodic basis.

Claims Adjudication

WellPoint has implemented many controls in its claims adjudication process to ensure that FEHBP claims are processed accurately. However, we noted several weaknesses in WellPoint's claims application controls. Additionally, there is no auditing to ensure the manual process for debarring providers is done appropriately.

Health Insurance Portability and Accountability Act (HIPAA)

Nothing came to our attention that caused us to believe that WellPoint is not in compliance with the HIPAA security, privacy, and national provider identifier regulations.

# **Contents**

                                                                                            Page

Executive Summary ............................................................................................................ i

I. Introduction ................................................................................................................... 1

   Background ...................................................................................................................... 1

   Objectives........................................................................................................................ 1

   Scope ............................................................................................................................... 1

   Methodology ................................................................................................................... 2

   Compliance with Laws and Regulations ....................................................................... 3

II. Audit Findings and Recommendations ........................................................................ 4

   A.  Security Management ............................................................................................... 4

   B.  Access Controls ....................................................................................................... 4

   C.  Network Security ..................................................................................................... 7

   D.  Configuration Management.................................................................................... 11

   E.  Contingency Planning ............................................................................................ 12

   F.  Claims Adjudication............................................................................................... 12

   G.  Health Insurance Portability and Accountability Act............................................ 15

III. Major Contributors to This Report ............................................................................ 17

   Appendix: WellPoint's June 14, 2013 response to the draft audit report issued April 10, 2013.

# I. **Introduction**

This final report details the findings, conclusions, and recommendations resulting from the audit of general and application controls over the information systems responsible for processing Federal Employees Health Benefits Program (FEHBP) claims by WellPoint Inc. (WellPoint or Plan).

The audit was conducted pursuant to FEHBP contract CS 1039; 5 U.S.C. Chapter 89; and 5 Code of Federal Regulations (CFR) Chapter 1, Part 890.  The audit was performed by the U.S. Office of Personnel Management's (OPM) Office of the Inspector General (OIG), as established by the Inspector General Act of 1978, as amended.

## Background

The FEHBP was established by the Federal Employees Health Benefits Act (the Act), enacted on September 28, 1959.  The FEHBP was created to provide health insurance benefits for federal employees, annuitants, and qualified dependents.  The provisions of the Act are implemented by OPM through regulations codified in Title 5, Chapter 1, Part 890 of the CFR.  Health insurance coverage is made available through contracts with various carriers that provide service benefits, indemnity benefits, or comprehensive medical services.

This was our second audit of WellPoint's general and application controls.  The first audit was conducted in 2006, and all recommendations from that audit were closed prior to the start of the current audit.  We also reviewed WellPoint's compliance with the Health Insurance Portability and Accountability Act (HIPAA).

## Objectives

The objectives of this audit were to evaluate controls over the confidentiality, integrity, and availability of FEHBP data processed and maintained in WellPoint's IT environment.
We accomplished these objectives by reviewing the following areas:

- Security management;
- Access controls;
- Network security;
- Configuration management;
- Segregation of duties;
- Contingency planning;
- Application controls specific to WellPoint's claims processing systems; and
- HIPAA compliance.

## Scope

We obtained an understanding of WellPoint's internal controls through interviews and observations, as well as inspection of various documents, including information technology and other related organizational policies and procedures.  This understanding of WellPoint's internal controls was used in planning the audit by determining the extent of compliance testing and other

auditing procedures necessary to verify that the internal controls were properly designed, placed in operation, and effective.

The scope of this audit centered on the information systems used by WellPoint to process medical insurance claims for FEHBP members in the following states: Virginia, Connecticut, New Hampshire, Maine, Ohio, Kentucky, Indiana, Missouri, Wisconsin, Nevada, Colorado, and California (institutional only).  The business processes reviewed are primarily located in WellPoint's facilities in Virginia.  We also toured WellPoint's primary data center located in Missouri.

The on-site portion of this audit was performed in January and February of 2013.  We completed additional audit work before and after the on-site visit at our office in Washington, D.C.  The findings, recommendations, and conclusions outlined in this report are based on the status of information system general and application controls in place at WellPoint as of March 2013.

This performance audit was conducted in accordance with generally accepted government auditing standards (GAS) issued by the Comptroller General of the United States, except for specific applicable requirements that were not followed.  There was one element of our audit in which WellPoint applied external interference with the application of audit procedures, resulting in our inability to fully comply with the GAS requirement of independence.

We routinely use our own automated tools to evaluate the configuration of a sample of computer servers.  When we requested to conduct this test at WellPoint, we were informed that a corporate policy prohibited external entities from connecting to the WellPoint network.  In an effort to meet our audit objective, we attempted to obtain additional information from WellPoint, but the Plan was unable to provide satisfactory evidence that it has ever had a program in place to routinely monitor the configuration of its servers (see the "Configuration Compliance Auditing" section on page 9 for additional details.)

As a result of the scope limitation on our audit work and WellPoint's inability to provide additional supporting documentation, we are unable to independently attest that WellPoint's computer servers maintain a secure configuration.

In conducting our audit, we relied to varying degrees on computer-generated data provided by WellPoint.  Due to time constraints, we did not verify the reliability of the data used to complete some of our audit steps but we determined that it was adequate to achieve our audit objectives. However, when our objective was to assess computer-generated data, we completed audit steps necessary to obtain evidence that the data was valid and reliable.

## Methodology

In conducting this review we:

- Gathered documentation and conducted interviews;
- Reviewed WellPoint's business structure and environment;
- Performed a risk assessment of WellPoint's information systems environment and applications, and prepared an audit program based on the assessment and the Government

Accountability Office's (GAO) Federal Information System Controls Audit Manual (FISCAM); and

- Conducted various compliance tests to determine the extent to which established controls and procedures are functioning as intended. As appropriate, we used judgmental sampling in completing our compliance testing.

Various laws, regulations, and industry standards were used as a guide to evaluate WellPoint's control structure. These criteria include, but are not limited to, the following publications:

- Office of Management and Budget (OMB) Circular A-130, Appendix III;
- OMB Memorandum 07-16, Safeguarding Against and Responding to the Breach of Personally Identifiable Information;
- Information Technology Governance Institute's CobiT: Control Objectives for Information and Related Technology;
- GAO's FISCAM;
- National Institute of Standards and Technology's Special Publication (NIST SP) 800-12, Introduction to Computer Security;
- NIST SP 800-14, Generally Accepted Principles and Practices for Securing Information Technology Systems;
- NIST SP 800-30 Revision 1, Risk Management Guide for Information Technology Systems;
- NIST SP 800-34 Revision 1, Contingency Planning Guide for Federal Information Systems;
- NIST SP 800-41, Guidelines on Firewalls and Firewall Policy;
- NIST SP 800-53 Revision 3, Recommended Security Controls for Federal Information Systems and Organizations;
- NIST SP 800-61, Computer Security Incident Handling Guide;
- NIST SP 800-66 Revision 1, An Introductory Resource Guide for Implementing the HIPAA Security Rule; and
- HIPAA Act of 1996.

## Compliance with Laws and Regulations

In conducting the audit, we performed tests to determine whether WellPoint's practices were consistent with applicable standards. While generally compliant, with respect to the items tested, WellPoint was not in complete compliance with all standards as described in the "Audit Findings and Recommendations" section of this report.

3

# II. Audit Findings and Recommendations

## A. Security Management

The security management component of this audit involved the examination of the policies and procedures that are the foundation of WellPoint's overall IT security controls. We evaluated WellPoint's ability to develop security policies, manage risk, assign security-related responsibility, and monitor the effectiveness of various system-related controls.

WellPoint has implemented a series of formal policies and procedures that comprise its security management program. WellPoint's Chief Information Security Officer owns the Information Security Program and is responsible for developing, implementing, and enforcing the program's standards. WellPoint has also developed a thorough risk management methodology, and has procedures to document, track, and mitigate or accept identified risks. We also reviewed WellPoint's human resources policies and procedures related to hiring, training, transferring, and terminating employees.

Nothing came to our attention to indicate that WellPoint does not have an adequate security management program.

## B. Access Controls

Access controls are the policies, procedures, and techniques used to prevent or detect unauthorized physical or logical access to sensitive resources.

We examined the physical access controls of WellPoint's facilities in St. Louis, Missouri and Roanoke, Virginia. We also examined the logical access controls protecting sensitive data on WellPoint's network environment and claims processing related applications.

The access controls observed during this audit include, but are not limited to:

- Procedures for appropriately granting physical access to facilities and data centers;
- Procedures for revoking access to data centers for terminated employees;
- Procedures for removing Windows/network access for terminated employees; and
- Controls to monitor and filter email and Internet activity.

The following sections document several opportunities for improvement related to WellPoint's physical and logical access controls.

### 1. Privileged User Monitoring

WellPoint has configured its servers to record the activity of privileged users (i.e., system administrators). However, the event logs generated by these servers are only reviewed retroactively if a problem has been reported or detected.

NIST SP 800-53 Revision 3 requires that an organization "Reviews and analyzes information system audit records . . . for indications of inappropriate or unusual activity, and reports findings to designated organizational officials...."

4

Failure to routinely review elevated user activity increases the risk that malicious activity could go undetected and sensitive information could be compromised.

## Recommendation 1

We recommend that WellPoint implement a process to routinely review elevated user (administrator) activity.

### *WellPoint Response:*

*"The Plan stated that Management is in the process of implementing an automated monitoring program for privileged user access. The workflow process includes:*

- *Automated 24X7 protected logging of 'events of interest' for the WellPoint mainframe, Unix and Intel environments;*

- *Monitoring of WellPoint's environment to audit and validate events that are triggered by HIPAA-compliant auditing and logging (monitoring) criteria;*

- *Integrating and leveraging of IBM's Security Intelligence portfolio, QRadar, within the e-SIEM workflow, and WellPoint's change management system; and*

- *Implementation of the monitoring tools will be implemented by year-end 2013, with auditing and validation processes fully implemented by September 30, 2014."*

## OIG Reply:

As part of the audit resolution process, we recommend that WellPoint provide OPM's Healthcare and Insurance office (HIO) with evidence that a process to routinely review elevated user activity has been implemented.

2. **Segregation of Duties**

WellPoint does not have a documented process to ensure proper segregation of duties in its Streamline claims adjudication application.

WellPoint uses role-based access control to grant access to Streamline, and many employees are granted multiple roles as they gain experience in their job function. However, there is no documented policy or procedure to indicate which roles would create a conflict (i.e., too much control over the claims adjudication process) if granted to the same individual.

FISCAM states that "Work responsibilities should be segregated so that one individual does not control critical stages of a process." FISCAM also states that "Management should have analyzed operations and identified incompatible duties that are then segregated through policies and organizational divisions."

Failure to enforce adequate segregation of duties in the claims processing application increases the risk that erroneous or fraudulent claims could be processed.

### Recommendation 2

We recommend that WellPoint implement a process for ensuring Streamline application access is granted with proper segregation of duties.

#### *WellPoint Response:*

*"The Plan stated that job titles are utilized for granting security for associates. The three Attachments... include the matrix and procedures for granting security access that demonstrates the changes made to enhance this process."*

### OIG Reply:

The evidence provided by WellPoint in response to the draft audit report indicates that the Plan has implemented a process to ensure access to Streamline is granted with proper segregation of duties; no further action is required.

3. **Facility Physical Access Controls**

The physical access controls at one of WellPoint's facilities in Virginia could be improved.

The facility uses an electronic card reader to control access to the building. However, we observed numerous occasions when the door was propped open for deliveries and people walked through the door without badging in or being checked by the security guard(s) stationed nearby.

In addition, WellPoint does not have physical access controls in place to prevent employees from piggybacking into secure areas (one person using an electronic access card to open a door, then holding that door open while others enter). FISCAM states that "Physical controls at entrances and exits vary, but may include[:] manual door locks or cipher key locks, magnetic door locks that require the use of electronic keycards, biometrics authentication, security guards, photo IDs, entry logs, and electronic and visual surveillance systems."

In addition, NIST SP 800-53 provides guidance for adequately controlling physical access to information systems containing sensitive data (see control PE-3, Physical Access Control).

Failure to implement adequate physical access controls increases the risk that unauthorized individuals can gain access to WellPoint facilities and the sensitive IT resources and confidential data they contain.

### Recommendation 3

We recommend that WellPoint reassess the physical access controls at its Roanoke, Virginia facility, and implement controls that will ensure proper physical security. At a minimum, WellPoint should add an alarm to the facility entrances that will detect a door left propped open.

*WellPoint Response:*

*"The Plan stated that the facility currently has an access control system in place that alerts security officers when a door is being held open.  This system and functionality has been in place for several years.  The facility is undergoing a security upgrade and will have a new system that will not only alert the onsite security officers of a door held open, but will also notify corporate security officers at the security command center located in the corporate headquarters building. This installation will be completed by June 30, 2013. Upon completion of the system upgrade, the site will meet the risk and threat based standards developed for all sites across the enterprise."*

## OIG Reply:

As part of the audit resolution process, we recommend that WellPoint provide OPM's HIO with evidence that the physical access security upgrades described in WellPoint's response to the draft audit report have been implemented.

# C. Network Security

Network security includes the policies and controls used to prevent or monitor unauthorized access, misuse, modification, or denial of a computer network and network-accessible resources.

WellPoint has implemented a thorough incident response and network security program. However, we noted several opportunities for improvement related to WellPoint's network security controls.

## 1. Preventing Rogue Devices

WellPoint has not implemented technical controls to prevent rogue devices (laptops, workstations, or routers not issued by or approved by the company) from connecting to its network.

NIST SP 800-53 Revision 3 states that information systems should uniquely identify and authenticate devices before establishing a connection.  Failure to implement technical controls to detect rogue devices could allow anyone with physical access to WellPoint facilities to connect an unauthorized device to WellPoint's network.  This risk is magnified by the relatively weak physical access controls observed at WellPoint's Roanoke, VA facility.

## Recommendation 4

We recommend that WellPoint implement technical controls to prevent rogue devices from connecting to its network.

*WellPoint Response:*

*"The Plan stated that Management believes that the associated risk is adequately mitigated based upon the following controls:*

- *Authentication is required for all applications on our network.*

7

- *Direct wireless connectivity to the WellPoint network is prohibited.*

- *Policies:*
    - o *Require training for all users, including annual employee certification.*
    - o *State who is/isn't authorized to physically be on WellPoint premises to help protect both physical PHI (such as printed materials) and electronic PHI. Also, devices that can/can't be connected to the WellPoint network are defined.*
    - o *State that a visitor must be escorted throughout the facility. Visitors coming to our buildings are escorted while on the premises and WellPoint associates are responsible for monitoring the activities of their visitors.*

- *Controls are in place to enforce the physical security of our buildings, including guards, badge readers, cameras, etc. to help prevent unauthorized individuals from connecting rogue or unauthorized devices to the WellPoint network.*

- *See physical access changes being implemented for the Roanoke, Virginia building (Recommendation #3 response).*

*WellPoint's focus is on protecting the data. As outlined in the mitigating controls above, along with our robust security event monitoring and network security program, we believe that the risk has been adequately addressed. We continually monitor security exposures and have built layers of defense to protect data, and will continue to implement programs that have been proven effective."*

## OIG Reply:

The controls described in WellPoint's response to the draft audit report could prevent someone <u>without</u> authorized physical access to a WellPoint facility from connecting a device to the network. However, none of the controls would prevent someone <u>with</u> authorized access (e.g., employees, contractors, or guests) from connecting a personal device to the WellPoint network. Therefore, we continue to recommend that WellPoint implement technical controls to prevent rogue devices from connecting to its network.

2. **Full Scope Vulnerability Scanning**

We conducted an extensive review of WellPoint's computer server vulnerability management program to determine if adequate controls were in place to detect, track, and remediate vulnerabilities. We determined that WellPoint has a mature vulnerability management program and that the vast majority of devices are scanned on a routine basis. All detected vulnerabilities are analyzed, prioritized, and tracked to remediation.

However, during our review we discovered that several specific servers containing Federal data are not subject to routine vulnerability scanning, and we could not obtain evidence indicating that these servers have ever been subject to a vulnerability scan. NIST SP 800-53 Revision 3 states that the organization should scan "for vulnerabilities in the information system and hosted applications...."

Failure to perform full scope vulnerability scanning increases the risk that WellPoint's systems are compromised and sensitive data stolen or destroyed.

### Recommendation 5

We recommend that WellPoint ensure that vulnerability scanning is conducted on all servers, specifically the servers housing Federal data that are not currently part of WellPoint's vulnerability management program.

#### *WellPoint Response:*

*"The Plan stated that the only devices identified during the review that were not being scanned were desktop devices that:*

- *Do not contain FEP data, and are only used for additional computing power for tasks that are generally performed on user desktops.*

- *The Desktop Devices are being retired within the next 60 days. The Plan believes that it has demonstrated that it scans all servers that contain FEP data. WellPoint Information Security has processes in place to help ensure that newly provisioned servers are scanned and certified prior to production use, and are added to the scanning inventory that is used for conducting our periodic vulnerability scans. The Plan will continue to work to help ensure that our scanning inventory is kept up-to date and reflects the latest WellPoint server inventory."*

### OIG Reply:

The fact that a specific server does not contain FEP data has no bearing on the importance of keeping the device secure when it operates in the same environment as other devices that do process FEP data. Any server not subject to routine scanning may contain a vulnerability that an attacker could exploit to gain access to the WellPoint network. Once on the network, it is much easier for the attacker to gain unauthorized access to FEP data. Therefore, we continue to recommend that WellPoint conduct vulnerability scanning on all servers.

## 3. Configuration Compliance Auditing

Configuration compliance auditing refers to the process of routinely comparing the actual security configuration of computer servers to an approved baseline configuration. Our audit objective with regards to configuration compliance auditing is to determine whether the organization has a process in place to ensure that servers remain securely configured and up-to-date with security patches.

In order to evaluate an FEHBP carrier's configuration compliance auditing program, we typically use automated tools to document the actual configuration of a sample of servers. We then manually compare the results to the company's approved baseline configuration. When the actual settings generally match the approved baseline, we gain confidence that the company's servers are securely configured.

When we requested to conduct this test at WellPoint, we were informed that a corporate policy prohibited external entities from connecting to the WellPoint network. In an effort to meet our audit objective, we attempted to obtain additional information about WellPoint's configuration compliance auditing program. We were initially provided a description of what appeared to be a thorough configuration compliance auditing program at WellPoint. However, when we requested documentation to support this description, WellPoint was unable to provide any evidence that a configuration compliance auditing program had ever been in place at the company.

Failure to implement a thorough configuration compliance auditing program increases the risk that insecurely configured servers remain undetected, creating a potential gateway for malicious virus and hacking activity that could lead to data breaches.

As a result of the scope limitation on our audit work and WellPoint's inability to provide additional supporting documentation, we are unable to independently attest that WellPoint's computer servers maintain a secure configuration.

## Recommendation 6

We recommend that WellPoint implement a configuration compliance auditing program.

### WellPoint Response:

*"The Plan stated that its' Vulnerability Management Program includes ongoing patching. Security patches for high severity vulnerabilities are applied within 90 days on DMZ servers and 180 days on internal servers. For the configuration management compliance program, WellPoint is finalizing its transition to the Tivoli Endpoint Manager (TEM) tool from the Blade Logic tool. The tool transition is scheduled to be complete by June 30, 2013, with the configuration management compliance program targeted to be fully operational by October 31, 2013 for midrange and Intel servers.*

*The Plan's contract with its outsource IT partner requires ongoing compliance to WellPoint's technical configuration standards (TCS). Variances to a TCS parameter require a security exception to be formally approved. Governance over this outsourced arrangement is provided through WellPoint's configuration management compliance program."*

### OIG Reply:

During the fieldwork phase of the audit, WellPoint provided us with conflicting statements regarding its plans to transition to Tivoli Endpoint Manager (TEM). These conflicting statements along with WellPoint's inability to provide evidence that it performs configuration compliance scans ultimately led to us documenting a formal scope limitation. As part of the audit resolution process, we recommend that WellPoint provide OPM's HIO with evidence that the TEM tool has been fully implemented, and that it is routinely performing configuration compliance audits. OPM's HIO should carefully scrutinize any supporting documentation submitted by WellPoint related to this issue before considering closure of this recommendation.

## D. **Configuration Management**

We evaluated WellPoint's controls to securely configure its mainframe, databases, and servers that support the applications used to process FEHBP claims. We determined that the following controls are in place:

- Controls for securely managing changes to the operating platform and claims processing application;
- Detailed operating system configuration standards; and
- Thorough patch management procedures.

However, we discovered that WellPoint's mainframe password settings are not in compliance with its own corporate standards.

WellPoint has created Technical Configuration Standards (TCS) that outline approved configuration settings for server and mainframe security software. We reviewed the Technical Configuration Standards to determine if they conformed to industry best practices. We also compared the approved TCS settings to the actual settings of WellPoint's servers and mainframes. We determined that the TCS were created in accordance with best practices. However, we found several mainframe security settings that were not in compliance with the TCS.

Failure to configure password security settings in compliance with approved settings increases the risk that unauthorized users could gain access to sensitive resources.

### **Recommendation 7**

We recommend that WellPoint modify its mainframe password settings to comply with its corporate policy.

#### *WellPoint Response:*

*"The Plan stated that when Technical Configuration Standards (TCS) parameters are updated, a transition timeline is defined to comply with new or modified parameters for each LPAR. The audit team reviewed ACF TCS version 1.0 which reflected recent password setting updates to comply with HITRUST requirements, which the audit team noted as compliance gaps. Since the completion of the audit, the WellPoint security team has updated and published ACF TCS version 2.0.*

*As of April 26, 2013, the password settings have been updated to comply with ACF TCS version 2.0, which was published on April 23, 2013.  Procedures for the review process were documented…."*

#### **OIG Reply:**

The evidence provided by WellPoint in response to the draft audit report indicates that the Plan has made system modifications to align the mainframe password settings with its corporate policy; no further action is required.

11

### E. <u>Contingency Planning</u>

We reviewed the following elements of WellPoint's contingency planning program to determine whether controls were in place to prevent or minimize damage and interruptions to business operations when disastrous events occur:

- Business continuity plans for several business locations and data center operations;
- Disaster recovery plan for the claims processing system;
- Disaster recovery plan tests conducted in conjunction with the recovery site; and
- Emergency response procedures and training.

We determined that WellPoint's contingency planning documentation contained the critical elements suggested by NIST SP 800-34 Revision 1, "Contingency Planning Guide for Federal Information Systems." WellPoint has identified and prioritized the systems and resources that are critical to business operations, and has developed detailed procedures to recover those systems and resources.

Nothing came to our attention to indicate that WellPoint has not implemented adequate controls related to contingency planning.

### F. <u>Claims Adjudication</u>

The following sections detail our review of the applications and business processes supporting WellPoint's claims adjudication process.

#### 1. Application Configuration Management

We evaluated the policies and procedures governing application development and change control of WellPoint's claims processing systems.

WellPoint has implemented policies and procedures related to application configuration management, and has adopted a system development life cycle methodology that IT personnel follow during routine software modifications. We observed the following controls related to testing and approvals of software modifications:

- WellPoint has adopted practices that allow modifications to be tracked throughout the change process;
- Code, unit, system, and quality testing are all conducted in accordance with industry standards; and
- WellPoint uses a business unit independent from the software developers to move the code between development and production environments to ensure adequate segregation of duties.

Nothing came to our attention to indicate that WellPoint has not implemented adequate controls related to the application configuration management process.

12

2. **Claims Processing System**

We evaluated the input, processing, and output controls associated with WellPoint's claims processing system. We have determined the following controls are in place over WellPoint's claims adjudication system:

- Routine audits are conducted on WellPoint's front-end scanning vendor for incoming paper claims;
- Claims are monitored as they are processed through the systems with real time tracking of the system's performance; and
- Claims output files are fully reconciled.

Nothing came to our attention to indicate that WellPoint has not implemented adequate controls over the claims processing system.

3. **Debarment**

WellPoint has adequate procedures for updating its claims system with debarred provider information, but it does not routinely audit its debarment database for accuracy.

WellPoint receives the OPM OIG debarment list every month and compares the monthly changes to its internal provider file. Any debarred providers that appear in WellPoint's provider database are flagged to prevent claims submitted by that provider from being processed by the claims processing system.

However, this process is done manually, and WellPoint does not have an auditing process in place to ensure that all modifications are accurate and complete.

Failure to audit the accuracy of the debarment file increases the risk that claims are being paid to providers that are debarred.

**Recommendation 8**

We recommend that WellPoint implement a process to routinely audit the provider file to ensure that all debarment related modifications are complete and accurate.

***WellPoint Response:***

***"The Plan stated that based on the recommendation a new audit process was implemented effective June 1, 2013 to review the Debarred Provider Listings to ensure all debarment related modifications to the Provider Files are complete and accurate. Procedures for the review process were documented…."***

**OIG Reply:**

The evidence provided by WellPoint in response to the draft audit report indicates that the Plan has created a procedure to audit modifications to the debarment file; no further action is required.

4. **Application Controls Testing**

We conducted a test on WellPoint's claims adjudication application to validate the system's claims processing controls. The exercise involved processing test claims designed with inherent flaws and evaluating the manner in which WellPoint's system adjudicated the claims.

Our test results indicate that the system has controls and edits in place to identify the following scenarios:

- Invalid members and providers;
- Member eligibility;
- Gender;
- Timely filing; and
- Catastrophic maximum.

The sections below document opportunities for improvement related to WellPoint's claims application controls.

a. **Provider/Procedure Inconsistency**

Two test claims were processed where a provider was paid for services outside the scope of their license.

We entered a test claim for a ████████████████████████████████████ ████████████████. Both claims were performed by a ████████████████████ who was billing as a ████████████ Although a ████████ can act as an ████████████, their license does not allow them to provide services as ████ ████████ However, these test claims were processed by the system without encountering any edits.

Failure to detect provider/procedure inconsistencies increases the risk that fraudulent claims are paid or that providers are paid more than is allowed for the services rendered (i.e., ████████████ being paid the ████████████ rate when an ████████ rate would be appropriate).

**Recommendation 9**

We recommend that WellPoint ensure the appropriate system modifications are made to detect provider/procedure inconsistencies.

*WellPoint Response:*

*"The Plan stated that it made a request to pend claims with the specific instance identified in the audit and this change should be complete within 60 days. We have also requested from the FEP Director's Office a listing of providers and the specialties that are considered outside of their license. A request to pend claims with specific criteria will be set up to stop each situation that is identified. The request for this wider*

*net will be dependent upon the identification of providers and specialties. Once identified, the necessary changes will be added to the system within 60 days."*

**OIG Reply:**

As part of the audit resolution process, we recommend that WellPoint provide OPM's HIO with evidence that system modifications have been made to detect provider/procedure inconsistencies.

b. 

Two separate test claims were processed for the

Due to the potential fraudulent nature of this scenario, we expected the system to suspend these claims for further review; however no edit was generated by the system. Failure to detect ▮ increases the risk that fraudulent or erroneous claims are paid.

**Recommendation 10**

We recommend that WellPoint ensure the appropriate system modifications are made to prevent ▮ claims from processing without proper verification.

*WellPoint Response:*

*"The Plan stated that it has requested that Washington set up a deferral code that would capture only claims that are ▮. This would allow WellPoint Plans to capture the claims in one location. Streamline automation would then be created to deny these claims. FEP EOB information would provide a denial reason similar to* ▮

**OIG Reply:**

As part of the audit resolution process, we recommend that WellPoint provide OPM's HIO with evidence that system modifications have been made to prevent ▮ claims from being processed.

## G. Health Insurance Portability and Accountability Act

We reviewed WellPoint's efforts to maintain compliance with the security and privacy standards of HIPAA.

WellPoint has implemented a series of IT security policies and procedures to adequately address the requirements of the HIPAA security rule. WellPoint has also developed a series of privacy policies and procedures that directly addresses all requirements of the HIPAA privacy rule. WellPoint reviews its HIPAA privacy and security policies annually and updates when necessary. WellPoint's Privacy Office oversees all HIPAA activities, and helps develop.

15

publish, and maintain corporate policies. Each year, all employees must complete compliance training which encompasses HIPAA regulations as well as general compliance.

Nothing came to our attention to indicate that WellPoint is not in compliance with the various requirements of HIPAA regulations.

# III. Major Contributors to This Report

This audit report was prepared by the U.S. Office of Personnel Management, Office of Inspector General, Information Systems Audits Group.  The following individuals participated in the audit and the preparation of this report:

- ███████████, Deputy Assistant Inspector General for Audits
- ███████████, Senior Team Leader
- ███████████, Auditor-In-Charge
- ████████, Lead IT Auditor
- █████████, IT Auditor
- ████████████, IT Auditor

17

Appendix



**BlueCross BlueShield Association**

An Association of Independent
Blue Cross and Blue Shield Plans
Federal Employee Program
1310 G Street, N.W.
Washington, D.C. 20005
202.942.1000
Fax 202.942.1125

June 14, 2013

███████████, Lead
Information Systems Audits Group
Insurance Service Programs
Office of Personnel Management
1900 E Street, N.W., Room 6400
Washington, D.C. 20415

**Reference:   OPM DRAFT EDP AUDIT REPORT**
**WellPoint BlueCross BlueShield Plans**
**Audit Report Number 1A-10-00-13-012**
**Report Dated April 10, 2013 and Received April 10, 2013**

Dear ███████:

This report is in response to the above-referenced U.S. Office of Personnel Management (OPM) Draft Audit Report covering the Federal Employees Health Benefits Program (FEHBP) Audit of Information Systems General and Application Controls for the Plan's interface with the FEP claims processing system, access, and security controls. Our comments regarding the recommendations in this report are as follows:

## A. Access Controls

**1. Privileged User Monitoring**

### Recommendation 1

The OIG Auditors recommend that WellPoint implement a process to routinely review elevated user (administrator) activity.

### Response to Recommendation 1

The Plan stated that Management is in the process of implementing an automated monitoring program for privileged user access. The workflow process includes:

- Automated 24X7 protected logging of 'events of interest' for the WellPoint mainframe, Unix and Intel environments;

███████, Lead
June 14, 2013
Page 2

- Monitoring of WellPoint's environment to audit and validate events that are triggered by HIPAA-compliant auditing and logging (monitoring) criteria;

- Integrating and leveraging of IBM's Security Intelligence portfolio, QRadar, within the e-SIEM workflow, and WellPoint's change management system; and

- Implementation of the monitoring tools will be implemented by year-end 2013, with auditing and validation processes fully implemented by September 30, 2014.

2.  **Segregation of Duties**

**Recommendation 2**

The OIG Auditors recommend that WellPoint implement a process for ensuring Streamline application access is granted with proper segregation of duties.

**Response to Recommendation 2**

The Plan stated that job titles are utilized for granting security for associates.  The three Attachments (Rec 2 Attachment A; Rec 2 Attachment B; and Rec 2 Streamline Security should this be Attachment C) include the matrix and procedures for granting security access that demonstrates the changes made to enhance this process.

3.  **Facility Physical Access Controls- Greg Wurm/ Data Center**

**Recommendation 3**

The OIG Auditors recommend that WellPoint reassess the physical access controls at its Roanoke, Virginia facility, and implement controls that will ensure proper physical security.  At a minimum, WellPoint should add an alarm to the facility entrances that will detect a door left propped open.

**Response to Recommendation 3**

The Plan stated that the facility currently has an access control system in place that alerts security officers when a door is being held open.  This system and functionality has been in place for several years.

███████, Lead
June 14, 2013
Page 3

The facility is undergoing a security upgrade and will have a new system that will not only alert the onsite security officers of a door held open, but will also notify corporate security officers at the security command center located in the corporate headquarters building. This installation will be completed by June 30, 2013. Upon completion of the system upgrade, the site will meet the risk and threat based standards developed for all sites across the enterprise.

**B. Network Security**

**1. Detection of Rogue Devices**

**Recommendation 4**

The OIG Auditors recommend that WellPoint implement technical controls to prevent rogue devices from connecting to its network.

**Response to Recommendation 4**

The Plan stated that Management believes that the associated risk is adequately mitigated based upon the following controls:

- Authentication is required for all applications on our network.

- Direct wireless connectivity to the WellPoint network is prohibited.

- Policies:

  - Require training for all users, including annual employee certification.
  - State who is/isn't authorized to physically be on WellPoint premises to help protect both physical PHI (such as printed materials) and electronic PHI. Also, devices that can/can't be connected to the WellPoint network are defined.
  - State that a visitor must be escorted throughout the facility. Visitors coming to our buildings are escorted while on the premises and WellPoint associates are responsible for monitoring the activities of their visitors.

- Controls are in place to enforce the physical security of our buildings, including guards, badge readers, cameras, etc. to help prevent unauthorized individuals from connecting rogue or unauthorized devices to the WellPoint network.

███████, Lead
June 14, 2013
Page 4

- See physical access changes being implemented for the Roanoke, Virginia building (Recommendation #3 response).

WellPoint's focus is on protecting the data. As outlined in the mitigating controls above, along with our robust security event monitoring and network security program, we believe that the risk has been adequately addressed. We continually monitor security exposures and have built layers of defense to protect data, and will continue to implement programs that have been proven effective.

## 2. Vulnerability Scanning

### Recommendation 5

The OIG Auditors recommend that WellPoint ensure that vulnerability scanning is conducted on all servers, specifically the servers housing Federal data that are not currently part of WellPoint's vulnerability management program.

### Response to Recommendation 5

The Plan stated that the only devices identified during the review that were not being scanned were desktop devices that:

- Do not contain FEP data, and are only used for additional computing power for tasks that are generally performed on user desktops.

- The Desktop Devices are being retired within the next 60 days. The Plan believes that it has demonstrated that it scans all servers that contain FEP data. WellPoint Information Security has processes in place to help ensure that newly provisioned servers are scanned and certified prior to production use, and are added to the scanning inventory that is used for conducting our periodic vulnerability scans. The Plan will continue to work to help ensure that our scanning inventory is kept up-to-date and reflects the latest WellPoint server inventory.

## 3. Configuration Compliance Auditing

### Recommendation 6

The OIG Auditors recommend that WellPoint implement a configuration compliance auditing program.

▓▓▓▓▓▓▓ , Lead
June 14, 2013
Page 5

## Response to Recommendation 6

The Plan stated that its' Vulnerability Management Program includes ongoing patching. Security patches for high severity vulnerabilities are applied within 90 days on DMZ servers and 180 days on internal servers. For the configuration management compliance program, WellPoint is finalizing its transition to the Tivoli Endpoint Manager (TEM) tool from the Blade Logic tool. The tool transition is scheduled to be complete by June 30, 2013, with the configuration management compliance program targeted to be fully operational by October 31, 2013 for midrange and Intel servers.

The Plan's contract with its outsource IT partner requires ongoing compliance to WellPoint's technical configuration standards (TCS). Variances to a TCS parameter require a security exception to be formally approved. Governance over this outsourced arrangement is provided through WellPoint's configuration management compliance program.

## C. Configuration Management

### Recommendation 7

The OIG Auditors recommend that WellPoint modify its mainframe password settings to comply with its corporate policy.

### Response to Recommendation 7

The Plan stated that when Technical Configuration Standards (TCS) parameters are updated, a transition timeline is defined to comply with new or modified parameters for each LPAR. The audit team reviewed ACF TCS version 1.0 which reflected recent password setting updates to comply with HITRUST requirements, which the audit team noted as compliance gaps. Since the completion of the audit, the WellPoint security team has updated and published ACF TCS version 2.0.

As of April 26, 2013, the password settings have been updated to comply with ACF TCS version 2.0, which was published on April 23, 2013. Procedures for the review process were documented. See attachments Rec 7 IS-TCS-009 ACF2v2.0 and Rec 7 VA ACF2 Mainframe Co provide details of the changes made.

███████████, Lead
June 14, 2013
Page 6

## Claims Adjudication

### 1. Debarment

#### Recommendation 8

The OIG Auditors recommend that WellPoint implement a process to routinely audit the provider file to ensure that all debarment related modifications are complete and accurate.

#### Response to Recommendation 8

The Plan stated that based on the recommendation a new audit process was implemented effective June 1, 2013 to review the Debarred Provider Listings to ensure all debarment related modifications to the Provider Files are complete and accurate. Procedures for the review process were documented. See embedded attachment entitled Rec 8 Debarred Provider Audit.

### 2. Provider/Procedure Inconsistency

#### Recommendation 9

The OIG Auditors recommend that WellPoint ensure the appropriate system modifications are made to detect provider/procedure inconsistencies

#### Response to Recommendation 9

The Plan stated that it made a request to pend claims with the specific instance identified in the audit and this change should be complete within 60 days. We have also requested from the FEP Director's Office a listing of providers and the specialties that are considered 'outside of their license. ) A request to pend claims with specific criteria) will be set up to stop each situation that is identified. The request for this wider net will be dependent upon the identification of providers and specialties. Once identified, the necessary changes will be added to the system within 60 days.

███████████, Lead
June 14, 2013
Page 7

**3.** ██████████

### Recommendation 10

The OIG Auditors recommend that WellPoint ensure that the appropriate system modifications are made to prevent ██████████ claims from processing without proper verification.

### Response to Recommendation 10

The Plan stated that it has requested that Washington set up a deferral code that would capture only claims that are ████████████████ This would allow WellPoint Plans to capture the claims in one location. Streamline automation would then be created to deny these claims. FEP EOB information would provide a denial reason similar to "A██████████████████████████
███████████████████████████

We appreciate the opportunity to provide our response to this Draft Audit Report and request that our comments be included in their entirety as an amendment to the Final Audit Report.

Sincerely,

███████████████

███████████, CPA
Sr. Program Manager, Government Audit Resolution and Coordination
Program Assurance

████

Attachments (6)

cc:        ██████████, WellPoint BCBS
           ██████████, WellPoint BCBS
           ██████, WellPoint BCBS
           ████, OPM
           ████, OPM
           ███, FEP
           ███, FEP

# Exhibit E

(b) (6)

**From:** (b) (6)
**Sent:** Thursday, March 05, 2015 9:17 AM
**To:** (b) (6)
**Cc:** Cope, J David
**Subject:** RE: Hi (b) (6) we just spoke about Anthem

What we had attempted to schedule for the summer of 2015 was a sort of "partial audit" (we call it a "limited scope audit") that would have consisted only of the work we were prevented from conducting in 2013.  So this is the second time that Anthem has refused to permit us to perform our standard vulnerability scans and configuration compliance tests.

Does that get at your question?

**From:** (b) (6)
**Sent:** Thursday, March 05, 2015 9:13 AM
**To:** (b) (6)
**Cc:** Cope, J David
**Subject:** RE: Hi (b) (6) we just spoke about Anthem

Hi (b) (6): Hoping you can answer this one last question:  In ref. to Anthem refusing OPM OIG's request to conduct vulnerability scans in the summer of 2015 - will OPM OIG still conduct a partial IT security audit of Anthem (like the one in 2013) - or did Anthem refuse to allow that partial IT security audit by OPM OIG as well for 2015?  Thanks!

(b) (6)

Information Security Media Group

P: (b) (6)
Twitter: (b) (6)

The ISMG Network:
InfoRiskToday  |   DataBreachToday  |  CareersInfoSecurity  BankInfoSecurity  |  CUInfoSecurity  |  GovInfoSecurity  |  HealthcareInfoSecurity

-----Original Message-----
**From:** (b) (6)
**Sent:** Thursday, March 05, 2015 9:08 AM
**To:** (b) (6)
**Cc:** Cope, J David
**Subject:** RE: Hi (b) (6) we just spoke about Anthem

Hi (b) (6),

We saw the article went up - do you still need answers to those questions?

Thanks,
(b) (6)

From: (b) (6)
Sent: Wednesday, March 04, 2015 3:12 PM
To: (b) (6)
Cc: Cope, J David
Subject: RE: Hi (b) (6), we just spoke about Anthem

Thanks, (b) (6). One more question: In addition to IT security and claims audits that you said OPM OIG conducts on federal employee insurance plans/companies , there was one more type of audit. What was that last one?

(b) (6)

Information Security Media Group<http://www.ismgcorp.com/>

P: (b) (6)
Twitter: (b) (6)

The ISMG Network:
InfoRiskToday<http://www.inforisktoday.com/>  |  DataBreachToday<http://www.databreachtoday.com/>  |
CareersInfoSecurity<http://www.careersinfosecurity.com/>
BankInfoSecurity<http://www.bankinfosecurity.com/>  |  CUInfoSecurity<http://www.cuinfosecurity.com/>  |
GovInfoSecurity<http://www.govinfosecurity.com/>  |
HealthcareInfoSecurity<http://www.healthcareinfosecurity.com/>

From: (b) (6)
Sent: Wednesday, March 04, 2015 3:09 PM
To: (b) (6)
Cc: Cope, J David
Subject: RE: Hi (b) (6), we just spoke about Anthem

First, here are the links I mentioned:


-   Our Semiannual Reports to Congress:  http://www.opm.gov/news/reports-publications/inspector-general-semiannual-reports/

-   Audit reports: http://www.opm.gov/our-inspector-general/reports/

-   Investigative summaries: http://www.opm.gov/our-inspector-general/investigative-summaries/

-   Link to sign up for our listserv - you'll receive notifications for when we post reports or other documents.  (The link says the listserv is for "audit reports" but we use it to notify people when we post investigative summaries or other types of reports.)  http://apps.opm.gov/listserv_apps/list-sub.cfm?targetlist=AuditReports

I'll get you an answer to your questions as soon as possible - it'll probably be tomorrow morning sometime.

In the meantime, here is the statement I mentioned that we have on our Anthem audit, which can be found at: http://www.opm.gov/our-inspector-general/reports/2013/audit-of-information-systems-general-and-application-controls-at-wellpoint-inc-1a-10-00-13-012.pdf

Anthem Blue Cross and Blue Shield (previously named WellPoint Inc.) participates in the Federal Employees Health Benefits Program (FEHBP), which is administered by the U.S. Office of Personnel Management (OPM). As part of its oversight responsibilities, the OPM Office of the Inspector General (OIG) conducts audits of, among other entities, insurance carriers that participate in the FEHBP. This includes conducting information technology (IT) security audits.

In January of 2013, we initiated an IT security audit where Anthem imposed restrictions that prevented us from adequately testing whether it appropriately secured its computer information systems. One of our standard IT audit steps is to perform automated vulnerability scans and configuration compliance audits on a small sample of an organization's computer servers. These scans are designed to identify security vulnerabilities and mis-configurations that could be exploited in a malicious cyber-attack. From an audit perspective, our objective is not to identify every vulnerability that exists in a technical environment, but rather to form an opinion on the organization's overall process to securely configure its computers.

When we requested to perform this test at Anthem, we were informed that a corporate policy prohibited external entities from connecting to the Anthem network. In an effort to meet our audit objective, we attempted to obtain additional information about Anthem's own internal practices for performing this type of work. However, Anthem provided us with conflicting statements about its procedures, and ultimately was unable to provide satisfactory evidence that it has ever had a program in place to routinely monitor the configuration of its servers.

As a result of the scope limitation on our audit work and Anthem's inability to provide additional supporting documentation, our final audit report stated that we were unable to independently attest that Anthem's computer servers maintain a secure configuration (see pages 8-10 of the audit report).

After this audit, we contacted OPM about our concerns regarding OIG IT auditor access to OPM's attention. After discussions with our office, OPM amended the FEHBP contract to allow a certain degree of auditor access. Since that time, this provision has proven to be insufficient, and we are currently working with OPM to further amend the contract.

After the recent breach was announced, we attempted to schedule a new IT audit of Anthem for this summer. Anthem recently informed us that, once again, it will not permit our auditors to perform our standard vulnerability scans and configuration compliance tests. Again, the reason cited is "corporate policy."

We have conducted vulnerability scans and configuration compliance tests at numerous health insurance carriers without incident. We do not know why Anthem refuses to cooperate with the OIG.

My contact information is below if you have any other questions. I'll be back in touch with those answers.



(b) (6)  Office of the Inspector General | U.S. Office of Personnel Management
1900 E Street, NW, Room 6400 | Washington, DC 20415-1100
Direct: (b) (6)  | Mobile: (b) (6)  | Main: 202-606-1200
Email: (b) (6)

CONFIDENTIALITY NOTICE: This message, including any attachments, is intended for the use of the addressee(s) only, and it may contain information that is confidential, privileged or legally protected. Unauthorized review, distribution or copying of this message or of any accompanying attachments is prohibited. If you have received this message in error, please contact me by return email or by telephone, and permanently delete it and any accompanying attachments from your computer and/or any system on which they may be stored.

From: (b) (6)
Sent: Wednesday, March 04, 2015 3:03 PM
To: (b) (6)
Subject: Hi (b) (6), we just spoke about Anthem
Importance: High

Hi (b) (6): Nice speaking with you just now about Anthem's refusal of an IT security audit in 2013, and following the company's recent breach.

As we discussed, I'd like to know approx. how many health insurance/health plan companies provide coverage to federal employees, and also how many of those companies in the last few years have refused OPM OIG IT security audits. Also, how many of those companies have allowed the IT security audits.

Also, any links you can provide me to the OPM OIG reports and audits, as well as instructions for how I can sign up to receive OPM OIG reports and press releases, are also appreciated!

Thanks again!
Best,
(b) (6)

Information Security Media Group<http://www.ismgcorp.com/>

P: (b) (6)
Twitter: (b) (6)

The ISMG Network:
InfoRiskToday<http://www.inforisktoday.com/> | DataBreachToday<http://www.databreachtoday.com/> |
CareersInfoSecurity<http://www.careersinfosecurity.com/>
BankInfoSecurity<http://www.bankinfosecurity.com/> | CUInfoSecurity<http://www.cuinfosecurity.com/> |
GovInfoSecurity<http://www.govinfosecurity.com/> |
HealthcareInfoSecurity<http://www.healthcareinfosecurity.com/>

---

No virus found in this message.
Checked by AVG - www.avg.com<http://www.avg.com>
Version: 2015.0.5751 / Virus Database: 4299/9218 - Release Date: 03/03/15 _____

No virus found in this message.
Checked by AVG - www.avg.com<http://www.avg.com>
Version: 2015.0.5751 / Virus Database: 4299/9218 - Release Date: 03/03/15

# Exhibit F

**UNITED STATES JUDICIAL PANEL**
**on**
**MULTIDISTRICT LITIGATION**

IN RE: ANTHEM, INC., CUSTOMER DATA
SECURITY BREACH LITIGATION                                                MDL No. 2617

**TRANSFER ORDER**

**Before the Panel:**[*]  Plaintiff in an action pending in the Southern District of Indiana moves
under 28 U.S.C. § 1407 to centralize pretrial proceedings in this litigation in the Southern District
of Indiana.  This litigation consists of seventeen actions—seven actions pending in the Southern
District of Indiana, five actions in the Central District of California, and one action each in the
Northern District of Alabama, the Eastern District of California, the Northern District of California,
the Northern District of Georgia, and the Southern District of Ohio—as listed on Schedule A.[1]

     With one exception,[2] all responding parties agree that centralization is warranted, but
disagree about the most appropriate transferee district.  In addition to the movant, plaintiffs in
twenty-one actions and potential tag-along actions support centralization in the Southern District of
Indiana, as does common defendant Anthem, Inc. (Anthem) and numerous affiliated entities, each
of which is named in one or more of the actions or potential tag-alongs.[3]  Plaintiffs in eleven actions

---

     [*] Certain Panel members who could be members of the putative classes in this litigation have
renounced their participation in these classes and have participated in this decision.

     [1] The Panel has been notified of 89 related actions pending in 29 different districts.  These
and any other related actions are potential tag-along actions.  *See* Panel Rules 1.1(h), 7.1, and 7.2.

     [2] Plaintiff in a potential tag-along action pending in the Northern District of Illinois (*Ross*),
which involves allegations against a defendant class of Blue Cross Blue Shield entities that are not
affiliated with Anthem, opposes inclusion of *Ross* in this MDL.  Plaintiff's objections are premature.
The proper approach is for plaintiff to present her arguments by moving to vacate if we issue an
order conditionally transferring her action to the MDL.  *See* Rule 7.1.  Or plaintiff may request that
the transferee judge remand her action to the transferor court.  *See* Rule 10.1.

     [3] Each of the following Anthem-affiliated entities is named in one or more of the actions on
the motion and support centralization in the Southern District of Indiana:  The Anthem Companies,
Inc.; The Anthem Companies of California, Inc.; Anthem Blue Cross Life and Health Insurance
Company; Blue Cross of California, d/b/a Anthem Blue Cross; Blue Cross and Blue Shield of
Georgia, Inc.; Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield; Empire
Healthchoice Assurance d/b/a Empire Blue Cross and Blue Shield; Empire Healthchoice HMO, Inc.
                                                                                    (continued...)

-2-

and potential tag-along actions suggest instead that this litigation be centralized in the Northern District of California. Plaintiffs in another five actions and potential tag-along actions suggest centralization in the Central District of California, while plaintiffs in five potential tag-along actions advocate for centralization in the Southern District of California. The Eastern District of California and the District of Connecticut are each proposed as the transferee district by one potential tag-along plaintiff. Finally, several plaintiffs alternatively suggest the Central, Northern, or Southern Districts of California, respectively.

On the basis of the papers filed and the hearing session held, we find that these actions involve common questions of fact, and that centralization in the Northern District of California will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. These actions share factual questions arising from a data security breach that allegedly occurred sometime between December 10, 2014, and February 4, 2015, and resulted in the electronic theft of personally identifiable information and personal health information of, by one estimate, some 80 million current and former health insurance plan members and employees of Anthem or its affiliated health insurance companies. All of the actions are putative class actions, many of which are nationwide in scope. Centralization will eliminate duplicative discovery, prevent inconsistent pretrial rulings, particularly with respect to class certification, and conserve the resources of the parties, their counsel, and the judiciary.

We are presented with a number of potential transferee districts, as this litigation is nationwide in scope. After weighing all relevant factors, we select the Northern District of California as the transferee district for this litigation. Numerous plaintiffs support centralization in this district, both in the first instance and in the alternative. And, although headquartered in Indiana, Anthem has significant ties to California, where it is the largest for-profit health insurer and maintains several offices. Eleven of the more than one hundred actions are pending in the Northern District of California. This district thus presents a convenient and accessible forum with the necessary judicial resources and expertise to manage this litigation efficiently. By appointing the Honorable Lucy H. Koh to preside over this matter, we select a jurist with multidistrict litigation experience and the ability to steer this large and potentially complicated litigation on an efficient and prudent course.

---

[3](...continued)
d/b/a Empire Blue Cross and Blue Shield; Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield; Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield; Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield; Anthem Life Insurance Company; Anthem Health Plans, Inc. d/b/a Anthem Blue Cross Blue Shield; and Anthem Insurance Companies, Inc. Additional Anthem-affiliated entities are named in certain potential tag-along actions.

-3-

IT IS THEREFORE ORDERED that the actions listed on Schedule A and pending outside the Northern District of California are transferred to the Northern District of California and, with the consent of that court, assigned to the Honorable Lucy H. Koh for coordinated or consolidated pretrial proceedings.

PANEL ON MULTIDISTRICT LITIGATION

_Sarah Vance_
_____
Sarah S. Vance
Chair

| | |
|---|---|
| Marjorie O. Rendell | Charles R. Breyer |
| Lewis A. Kaplan | Ellen Segal Huvelle |
| R. David Proctor | Catherine D. Perry |

IN RE: ANTHEM, INC., CUSTOMER DATA
SECURITY BREACH LITIGATION                                    MDL No. 2617


## SCHEDULE A


Northern District of Alabama

JULIANO v. ANTHEM, INC., C.A. No. 2:15-00219

Central District of California

KIRBY v. ANTHEM, INC., ET AL., C.A. No. 2:15-00820
HOOD v. ANTHEM, INC., ET AL., C.A. No. 2:15-00918
DOE v. ANTHEM, INC., ET AL., C.A. No. 2:15-00934
MORRIS v. ANTHEM, INC., ET AL., C.A. No. 8:15-00196
LIU v. ANTHEM, INC., ET AL., C.A. No. 8:15-00215

Eastern District of California

POWELL, ET AL. v. ANTHEM, INC., ET AL., C.A. No. 2:15-00314

Northern District of California

GIOTTA v. ANTHEM, INC., ET AL., C.A. No. 5:15-00618

Northern District of Georgia

D'ANGELO, ET AL. v. ANTHEM, INC., ET AL., C.A. No. 1:15-00371

Southern District of Indiana

MEADOWS v. ANTHEM, INC., C.A. No. 1:15-00163
KEYSER v. ANTHEM, INC., C.A. No. 1:15-00178
GARSON v. ANTHEM, INC., ET AL., C.A. No. 1:15-00180
PANTUSO v. ANTHEM INSURANCE COMPANIES, INC., C.A. No. 1:15-00181
KASLOWITZ v. ANTHEM, INC., C.A. No. 1:15-00188
WEINBERGER v. ANTHEM, INC., ET AL., C.A. No. 1:15-00201
BRESCIA v. ANTHEM, INC., ET AL., C.A. No. 1:15-00203

Southern District of Ohio

MCKINLEY, ET AL. v. ANTHEM, INC., C.A. No. 1:15-00096

# Exhibit G

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| | Case No. 15-MD-02617-LHK (NC) |
| IN RE ANTHEM, INC. DATA BREACH LITIGATION | **STIPULATED PROTECTIVE ORDER FOR LITIGATION INVOLVING  HIGHLY SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS** |

1.    PURPOSES AND LIMITATIONS

Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted. Moreover, the information likely to be the subject of the disclosure and discovery activity in this action involves unique risks related to privacy, data security, data governance and data management that will likely be greater than in most cases. It may also contain confidential health information.  Accordingly, the Parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order. The Parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles. The Parties further acknowledge, as set forth in Section 13.4, below, that this Order does not entitle them to file confidential information under seal; Civil Local Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a Party seeks permission from the court to file material under seal.

2.    DEFINITIONS

2.1    Challenging Party: a Party or Non-Party that challenges the designation of information or items under this Order.

2.2    "CONFIDENTIAL" Information or Items: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c).

2.3    Counsel (without qualifier): Outside Counsel of Record and House Counsel (as well as their support staff).

2.4    Designating Party: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" or "CONFIDENTIAL HEALTH INFORMATION."

2.5    Disclosure or Discovery Material: all items or information, regardless of the medium or

manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.6     Expert: a person with specialized knowledge or experience in a matter pertinent to the litigation who (1) has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action, and (2) is not a past or current employee of Anthem or a past (since January 1, 2010) or current employee of another Party.

2.7     "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items: extremely sensitive "Confidential Information or Items," disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means, including but not limited to highly sensitive and competitive technical information related to a Party's information security and management.

2.8     "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items: extremely sensitive "Confidential Information or Items" representing computer code and associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs, disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.9     CONFIDENTIAL HEALTH INFORMATION: The Parties desire to ensure the privacy of patient/insured/member medical records, patient/insured member claims information, and other information that the Parties have determined might contain sensitive personal health information ("CONFIDENTIAL HEALTH INFORMATION"). CONFIDENTIAL HEALTH INFORMATION is intended to encompass any individual health information protected by state or federal law, including but not limited to Protected Health Information as defined below. CONFIDENTIAL HEALTH INFORMATION shall be subject to the terms of this Order.

(a)     Protected Health Information. Protected Health Information, as used herein, has the same scope and definition as set forth in 45 C.F.R. § 160.103. Without limiting the generality of the foregoing, Protected Health Information includes, but is not limited to, health information, including demographic information, relating to: the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the

2

provision of health care to an individual, which identifies or reasonably could be expected to identify the individual. It also includes, but is not limited to, medical bills, claims forms, charges sheets, medical records, medical charts, test results, notes, dictation, invoices, itemized billing statements, remittance advice forms, explanation of benefits, checks, notices, and requests, and includes all notes, summaries, compilations, extracts, abstracts, or oral communications that are based on or derived from Protected Health Information, regardless of form or format. Protected Health Information also includes information that contains the following identifiers of a patient/insured/member or of a relative, employer, or household member of a patient/insured/member, to the extent it is linked to Protected Health Information as defined in 45 C.F.R. § 160.103:

1.   names;

2.   all geographic subdivisions smaller than a State, including street address, city, county, precinct, and zip code;

3.   all elements of dates (except year) for dates directly related to an individual, including birth date, admission date, discharge date, age, and date of death;

4.   telephone numbers;

5.   fax numbers;

6.   electronic mail addresses;

7.   social security numbers;

8.   medical record numbers;

9.   health plan beneficiary numbers;

10.   account numbers;

11.   certificate/license numbers;

12.   vehicle identifiers and serial numbers, including license plate numbers;

13.   device identifiers and serial numbers;

14.   web universal resource locators ("URLs");

15.   internet protocol ("IP") address numbers;

16.   biometric identifiers, including finger and voice prints;

17.   full face photographic images and any comparable images;

3

18. any other unique identifying number, characteristic, or code; and

19. any other information that the producing Party knows could be used alone or in combination with other information to identify an individual who is subject of the information.

CONFIDENTIAL HEALTH INFORMATION does not include any document or information in which the Producing Party has redacted the identifiers listed above and does not have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is the subject of the information. A Producing Party may, but is not required to, perform such redactions before producing documents that originally contained CONFIDENTIAL HEALTH INFORMATION so long as the redactions do not result in prejudice to another Party. Any such redacted document or information may nevertheless be Protected Material under other terms of this Order.

(b) Safeguards for CONFIDENTIAL HEALTH INFORMATION. The Parties also seek to ensure that any person who receives and stores CONFIDENTIAL HEALTH INFORMATION in connection with this Proceeding will develop, implement, maintain, and use appropriate administrative, technical, and physical safeguards to preserve the privacy, integrity, and confidentiality of any CONFIDENTIAL HEALTH INFORMATION, and to prevent unpermitted use or disclosure of any CONFIDENTIAL HEALTH INFORMATION they may receive from any person in connection with this Proceeding. Accordingly, to the extent practicable within the time constraints for producing discovery, the Producing Party should inform the Receiving Party that it will be producing categories of documents that may contain CONFIDENTIAL HEALTH INFORMATION and the nature of that information in advance of the production, so that the Receiving Party can determine whether receipt of that CONFIDENTIAL HEALTH INFORMATION is necessary, and be prepared to receive it, and so that the Parties can meet and confer to discuss next steps as needed.  CONFIDENTIAL HEALTH INFORMATION will be securely returned or destroyed pursuant to the provisions of Section 14 below.

2.10    House Counsel: attorneys who are employees of a Party. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.11    Non-Party: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.12    Outside Counsel of Record: attorneys who are not employees of a Party but are retained to

represent or advise a Party and have appeared in this action on behalf of that Party or are affiliated with a law firm which has appeared on behalf of that Party.

2.13   Party: any party to this action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

2.14   Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this action.

2.15   Professional Vendors: persons or entities that provide litigation support services (e.g., document and ESI processing, hosting, review, and production, photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.16   Protected Material: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL," or as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or as "HIGHLY CONFIDENTIAL – SOURCE CODE" or as "CONFIDENTIAL HEALTH INFORMATION."

2.17   Receiving Party: a Party that receives Disclosure or Discovery Material from a Producing Party.

3.   SCOPE

The protections conferred by this Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all hard and electronic copies, excerpts, derivations, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party, excluding any information that came into the public domain as a result of a violation of law or of this Order, or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise, excluding any information that came into the public domain as a result of a violation of law or of this Order; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party.

5

Any use of Protected Material at trial shall be governed by a separate agreement or order.

4.     <u>DURATION</u>

Even after final disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

5.     <u>DESIGNATING PROTECTED MATERIAL</u>

5.1     <u>Exercise of Restraint and Care in Designating Material for Protection</u>. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. To the extent it is practical to do so, the Designating Party must designate for protection only those parts of material, documents, items, or oral or written communications that qualify – so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process or to impose unnecessary expenses and burdens on other Parties) expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection at all or do not qualify for the level of protection initially asserted, that Designating Party must promptly notify all other Parties that it is withdrawing the mistaken designation.

5.2     <u>Manner and Timing of Designations</u>. Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

6

(a) <u>for information in documentary form</u> (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" or "CONFIDENTIAL HEALTH INFORMATION" to each page that contains protected material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins) and must specify, for each portion, the level of protection being asserted.

A Party or Non-Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the appropriate legend ("CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" or "CONFIDENTIAL HEALTH INFORMATION") to each page that contains Protected Material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins) and must specify, for each portion, the level of protection being asserted.

(b) for testimony given in deposition or in other pretrial or trial proceedings, that the Designating Party identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony and specify the level of protection being asserted. When it is impractical to identify separately each portion of testimony that is entitled to protection and it appears that substantial portions of the testimony may qualify for protection, the Designating Party may invoke on the record (before the deposition, hearing, or other proceeding is concluded) a right to have up to 21 days to identify the specific portions of the testimony as to which protection is sought and to specify the level of protection being asserted. Only those portions of the testimony that are appropriately designated for protection within the 21 days shall be covered by the provisions of this Order. Alternatively, a Designating Party may specify, at the deposition or up to 21 days

afterwards if that period is properly invoked, that the entire transcript shall be treated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "CONFIDENTIAL HEALTH INFORMATION."

A Party shall give the other Parties notice if it reasonably expects a deposition, hearing or other proceeding to include Protected Material so that all Parties can ensure that only authorized individuals who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A) are present at those proceedings. The use of a document as an exhibit at a deposition shall not in any way affect its designation as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "CONFIDENTIAL HEALTH INFORMATION."

Transcripts containing Protected Material shall have an obvious legend on the title page that the transcript contains Protected Material, and the title page shall be followed by a list of all pages (including line numbers as appropriate) that have been designated as Protected Material and the level of protection being asserted by the Designating Party. The Designating Party shall inform the court reporter of these requirements. Any transcript that is prepared before the expiration of a 21-day period for designation shall be treated during that period as if it had been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" in its entirety unless otherwise agreed. After the expiration of that period, the transcript shall be treated only as actually designated.

(c) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" or "CONFIDENTIAL HEALTH INFORMATION."  If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s) and specify the level of protection being asserted.

5.3     Inadvertent Failures to Designate. If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this

8

Order.

6.      CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1      Timing of Challenges. Any Party or Non-Party may challenge a designation of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2      Meet and Confer. The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of this Order. The Parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) within 14 days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

6.3      Judicial Intervention. If the Parties cannot resolve a challenge without court intervention, the Designating Party shall file and serve a motion to retain confidentiality under Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable) within 21 days of the initial notice of challenge or within 14 days of the Parties agreeing that the meet and confer process will not resolve their dispute, whichever is earlier. Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed in the preceding paragraph. Failure by the Designating Party to make such a motion including the required declaration within 21 days (or 14 days, if applicable) shall automatically waive the confidentiality designation for each challenged designation. In addition, the Challenging Party may file a motion challenging a confidentiality designation at any time if

9

there is good cause for doing so, including a challenge to the designation of a deposition transcript or any portions thereof. Any motion brought pursuant to this provision must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed by the preceding paragraph.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other Parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived the confidentiality designation by failing to file a motion to retain confidentiality as described above, all Parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the court rules on the challenge.

7.      ACCESS TO AND USE OF PROTECTED MATERIAL

7.1      Basic Principles. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of section 14 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.2      Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A;

(b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

10

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the court and its personnel;

(e) court reporters and their staff, professional jury or trial consultants, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f) during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court**.** Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Order.

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

7.3     Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" and "HIGHLY CONFIDENTIAL – SOURCE CODE" and "CONFIDENTIAL HEALTH INFORMATION" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" or "CONFIDENTIAL HEALTH INFORMATION" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A;

(b) House Counsel of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) Experts of the Receiving Party (1) to whom disclosure is reasonably necessary for this litigation, (2) who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and (3) as to whom the

11

procedures set forth in paragraph 7.4(a), below, have been followed;

(d) the court and its personnel;

(e) court reporters and their staff and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A); and

(f) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

7.4 <u>Procedures for Approving or Objecting to Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" or "CONFIDENTIAL HEALTH INFORMATION" Information or Items to Experts.</u>

(a) Unless otherwise ordered by the court or agreed to in writing by the Designating Party, a Party that seeks to disclose to an Expert (as defined in this Order) any information or item that has been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" or "CONFIDENTIAL HEALTH INFORMATION" pursuant to paragraph 7.3(c) first must make a written request to the Designating Party that identifies the general categories of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" or "CONFIDENTIAL HEALTH INFORMATION" information that the Receiving Party seeks permission to disclose to the Expert.

(b) A Party that makes a request and provides the information specified in the preceding respective paragraphs may disclose the subject Protected Material to the Expert unless, within 10 days of delivering the request, the Party receives a written objection from the Designating Party. Any such objection must set forth in detail the grounds on which it is based.

(c) A Party that receives a timely written objection must meet and confer with the Designating Party (through direct voice to voice dialogue) to try to resolve the matter by agreement within 10 days of the written objection. If no agreement is reached, the Parties will file a 5-page joint statement of discovery dispute to Magistrate Judge Cousins setting forth each Party's respective position on the 14th day after impasse is reached (or earlier if mutually agreed). If no agreement is reached and no joint statement of discovery dispute is filed, the Receiving Party may disclose the Protected Material to the Expert as requested after the deadline for the joint statement of discovery dispute to be filed with the Court has passed.

In any such proceeding, the Party opposing disclosure to the Expert shall bear the burden of proving that the risk of harm that the disclosure would entail (under the safeguards proposed) outweighs the Receiving Party's need to disclose the Protected Material to its Expert.

8.    <u>SOURCE CODE</u>

(a)    To the extent production of source code becomes necessary in this case, a Producing Party may designate source code as "HIGHLY CONFIDENTIAL - SOURCE CODE" if it comprises or includes confidential, proprietary or trade secret source code.

(b)    Protected Material designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be subject to all of the protections afforded to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information, and may be disclosed only to the individuals to whom "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information may be disclosed, as set forth in Paragraphs 7.3 and 7.4.

(c)    Any source code produced in discovery shall be made available for inspection, in a format allowing it to be reasonably reviewed and searched, during normal business hours or at other mutually agreeable times, at an office of the Producing Party's counsel or another mutually agreed upon location. The source code shall be made available for inspection on a secured computer in a secured room without Internet access or network access to other computers, and the Receiving Party shall not copy, remove, or otherwise transfer any portion of the source code onto any recordable media or recordable device. The Producing Party may visually monitor the activities of the Receiving Party's representatives during any source code review, but only to ensure that there is no unauthorized recording, copying, or transmission of the source code.

(d)    The Receiving Party may request paper copies of limited portions of source code that are reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial, but shall not request paper copies for the purposes of reviewing the source code other than electronically as set forth in paragraph (c) in the first instance. The Producing Party shall provide all such source code in paper form including bates numbers and the label "HIGHLY CONFIDENTIAL - SOURCE CODE." The Producing Party may challenge the amount of source code requested in hard copy form pursuant to the dispute resolution procedure and timeframes set forth in Paragraph 6 whereby the Producing Party is the "Challenging Party" and the Receiving Party is the "Designating Party" for purposes of dispute resolution.

(e)    The Receiving Party shall maintain a record of any individual who has inspected any portion

13

of the source code in electronic or paper form. The Receiving Party shall maintain all paper copies of any printed portions of the source code in a secured, locked area. The Receiving Party shall not create any electronic or other images of the paper copies and shall not convert any of the information contained in the paper copies into any electronic format. The Receiving Party shall only make additional paper copies if such additional copies are (1) necessary to prepare court filings, pleadings, or other papers (including a testifying expert's expert report), (2) necessary for deposition, or (3) otherwise necessary for the preparation of its case. Any paper copies used during a deposition shall be retrieved by the Producing Party at the end of each day and must not be given to or left with a court reporter or any other unauthorized individual.

9.      PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY"  or "HIGHLY CONFIDENTIAL – SOURCE CODE" or "CONFIDENTIAL HEALTH INFORMATION" that Party must:

(a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the Party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Order. Such notification shall include a copy of this Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" or "CONFIDENTIAL HEALTH INFORMATION" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action

14

to disobey a lawful directive from another court.

10.   A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION

(a)   The terms of this Order are applicable to information produced by a Non-Party in this action and designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" or "CONFIDENTIAL HEALTH INFORMATION." Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b)   In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

1.   promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

2.   promptly provide the Non-Party with a copy of this Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

3.   make the information requested available for inspection by the Non-Party.

(c)   If the Non-Party fails to object or seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

11.   UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts

15

to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

12.    <u>INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL</u>

      When a Producing Party gives notice to Receiving Parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the Receiving Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review. Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the Parties reach an agreement on the effect of disclosure of a communication or information covered by the attorney-client privilege or work product protection, the Parties may incorporate their agreement in the stipulated protective order submitted to the court.

13.    <u>MISCELLANEOUS</u>

      13.1    <u>Right to Further Relief</u>. Nothing in this Order abridges the right of any person to seek its modification by the court in the future.

      13.2    <u>Right to Assert Other Objections</u>. By stipulating to the entry of this Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Order.

      13.3    <u>Export Control</u>. Disclosure of Protected Material shall be subject to all applicable laws and regulations relating to the export of technical data contained in such Protected Material, including the release of such technical data to foreign persons or nationals in the United States or elsewhere. The Producing Party shall be responsible for identifying any such controlled technical data, and the Receiving Party shall take measures necessary to ensure compliance.

      13.4    <u>Filing Protected Material</u>. Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material. A Party that seeks to file under seal any Protected Material must comply with Civil Local Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing

the sealing of the specific Protected Material at issue. Pursuant to Civil Local Rule 79-5, a sealing order will issue only upon a request establishing that the Protected Material at issue is privileged, protectable as a trade secret, or otherwise entitled to protection under the law. If a Receiving Party's request to file Protected Material under seal pursuant to Civil Local Rule 79-5(e) is denied by the court, then the Receiving Party may file the Protected Material in the public record pursuant to Civil Local Rule 79-5(e)(2) unless otherwise instructed by the court.

14.    <u>FINAL DISPOSITION</u>

Within 60 days after the final disposition of this action, as defined in paragraph 4, each Receiving Party must return all Protected Material to the Producing Party or securely destroy or delete such material with a written certification of such secure destruction or deletion of Protected Material. As used in this subdivision, "all Protected Material" includes all hard and electronic copies, abstracts, derivations, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed or deleted, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60-day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned, destroyed or deleted and (2) affirms that the Receiving Party has not retained any  hard and electronic copies, abstracts, derivations, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Order as set forth in Section 4 (DURATION).

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

**COHEN MILSTEIN SELLERS & TOLL PLLC**
ANDREW N. FRIEDMAN
DOUGLAS J. MCNAMARA
SALLY M. HANDMAKER

Dated:  September 18, 2015        By: /s/Andrew N. Friedman

**ALTSHULER BERZON LLP**
EVE H. CERVANTEZ
JONATHAN WEISSGLASS

Dated:  September 18, 2015        By: /s/ Eve H. Cervantez _____

*Lead Plaintiffs' Counsel*

**HOGAN LOVELLS US LLP**
CRAIG A. HOOVER
E. DESMOND HOGAN
PETER R. BISIO
ALLISON M. HOLT

Dated: September 18, 2015        By: Craig A. Hoover

Craig A. Hoover (SBN 113965)
craig.hoover@hoganlovells.com
E. Desmond Hogan (admitted pro hac vice)
desmond.hogan@hoganlovells.com
Peter R. Bisio (admitted pro hac vice)
peter.bisio@hoganlovells.com
Allison M. Holt (admitted pro hac vice)
allison.holt@hoganlovells.com
555 Thirteenth Street, NW
Washington, DC  20004-1109
Telephone:     (202) 637-5600
Facsimile:     (202) 637-5910

Michael Maddigan (SBN 163450)
michael.maddigan@hoganlovells.com
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA  90067
Telephone:     (310) 785-4600
Facsimile:     (310) 785-4601

Maren J. Clouse (SBN 228726)
maren.clouse@hoganlovells.com
4085 Campbell Ave., Suite 100
Menlo Park, CA  94025
Telephone:     (650) 463-4000
Facsimile:     (650) 463-4199

*Attorneys for Defendants Anthem, Inc., The Anthem Companies, Inc., The Anthem Companies of California, Inc., Anthem Blue Cross Life And Health Insurance Company, Blue Cross of California, doing business as Anthem Blue Cross, and their affiliates that have been*

18

named as defendants in the cases listed in the Table of
Related Cases (collectively, "Anthem") and Defendants
Horizon Healthcare Services, Inc., Blue Cross and Blue
Shield of Arizona, Inc., Highmark West Virginia, Inc.,
and Blue Cross Blue Shield of Michigan

**TROUTMAN SANDERS LLP**
CHAD R. FULLER

Dated: September 18, 2015        By: Chad R. Fuller _____

Chad R. Fuller (SBN 190830)
chad.fuller@troutmansanders.com
11682 El Camino Real, Suite 400
San Diego, CA 92130
Telephone:    (858) 509-6056
Facsimile:     (858) 509-6040

*Attorney for Anthem*

**NELSON MULLINS RILEY & SCARBOROUGH
LLP**
JOHN D. MARTIN
LUCILE H. COHEN

Dated: September 18, 2015        By: John D. Martin _____

John D. Martin (admitted pro hac vice)
john.martin@nelsonmullins.com
Lucile H. Cohen (admitted pro hac vice)
lucie.cohen@nelsonmullins.com
1320 Main Street, 17th Floor
Columbia, SC 29201
Telephone:    (803) 255-9241
Facsimile:     (858) 256-7500

*Attorneys for Anthem*

PURSUANT TO STIPULATION, IT IS SO ORDERED.

Dated: ___September 21, 2015_____        _____
                                                                            United States Magistrate Judge

STIPULATED PROTECTIVE ORDER
Case No. 15-MD-02617-LHK (NC)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit A

STIPULATED PROTECTIVE ORDER
Case No. 15-MD-02617-LHK (NC)

1   EXHIBIT A

2        ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

3        I, _____ [print or type full name], of _____ [print or type

4   full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated

5   Protective Order ("Order") that was issued by the United States District Court for the Northern District of

6   California on [date] in the case of *In re Anthem, Inc. Data Breach Litigation*, Case No. 15-MD-02617-LHK

7   (NC).

8        I agree to comply with and to be bound by all the terms of the Order and I understand and

9   acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of

10  contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to

11  the Order to any person or entity except in strict compliance with the provisions of the Order.

12       I will access and review Protected Material that may be provided to me solely for the purpose of my

13  role in assisting with prosecuting, defending, or attempting to settle this litigation or to comply with judicial

14  process or any applicable statute or regulation and for no other purpose whatsoever. I further agree not to

15  disclose any Protected Material except as allowed by the terms of the Order. I will only make such copies of

16  or notes concerning the Protected Material as are necessary to assist with prosecuting, defending, or

17  attempting to settle this litigation or to comply with judicial process or any applicable statute or regulation in

18  connection with this action. Upon final determination of this action, I shall promptly and securely destroy or

19  delete all Protected Material provided to me as well as any hard and electronic copies, abstracts, derivations,

20  compilations, summaries, and any other format reproducing or capturing any of the Protected Material. I

21  understand that my obligations pertaining to the Protected Material continue event after the conclusion of the

22  action.

23       I understand and agree that all CONFIDENTIAL HEALTH INFORMATION as defined in the Order,

24  is subject to state and federal statutory and regulatory privacy and security standards, including but not

25  limited to  the Health Insurance  Portability and Accountability Act of 1996 ("HIPAA"), the Health

26  Information Technology for Economic and Clinical Health Act of 2009 (the "HITECH Act"), and regulations

27  adopted thereunder by the U.S. Department of Health and Human Services, 45 C.F.R. Parts 160, 162, and 164

28  (the "HIPAA Rules").

1    By executing this Acknowledgement and Agreement to be Bound, I agree that I will only use or

2  disclose any Confidential Health Information in connection with this case only for prosecuting, defending, or

3  attempting to settle this litigation or to comply with judicial process or any applicable statute or regulation. I

4  also agree that I will develop, implement, maintain, and use appropriate administrative, technical and physical

5  safeguards to preserve the privacy, integrity, and confidentiality of any CONFIDENTIAL HEALTH

6  INFORMATION, and to prevent non-permitted use or disclosure of any CONFIDENTIAL HEALTH

7  INFORMATION I receive from any person in connection with this case.

8    I further agree to submit to the jurisdiction of the United States District Court for the Northern

9  District of California for the purpose of enforcing the terms of the Order, even if such enforcement

10  proceedings occur after termination of this action.

11    I hereby appoint _____ [print or type full name] of

12  _____ [print or type full address and telephone number] as my

13  California agent for service of process in connection with this action or any proceedings related to

14  enforcement of the Order.

15

16  Date:    _____

17  City and State where
18  sworn and signed:    _____

19  Printed name:    _____
                      [printed name]
20
   Signature:    _____
21                [signature]

22

23

24

25

26

27

28

STIPULATED PROTECTIVE ORDER
Case No. 15-MD-02617-LHK (NC)

# Exhibit H

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN JOSE DIVISION

11

12

Case No. 15-MD-02617-LHK

13

**ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO DISMISS**

14

IN RE ANTHEM, INC. DATA BREACH LITIGATION

15

16

17

Re: Dkt. No. 410, 413

18

19

Plaintiffs[1] bring this putative class action against Anthem, Inc., 28 Anthem affiliates,[2] Blue

20

---

21

[1] All named Plaintiffs are identified in paragraphs 12 through 108 of the Consolidated Amended Complaint. *See* ECF No. 334-6 ("CAC") ¶¶ 12–108.

[2] The Anthem affiliates are: Blue Cross and Blue Shield of Georgia; Blue Cross Blue Shield Healthcare Plan of Georgia; Anthem Blue Cross and Blue Shield of Indiana; Anthem Blue Cross of California; Anthem Blue Cross Life and Health Insurance Company; Anthem Blue Cross and Blue Shield of Colorado and Anthem Blue Cross and Blue Shield of Nevada; Anthem Blue Cross and Blue Shield of Connecticut; Anthem Blue Cross and Blue Shield of Kentucky; Anthem Blue Cross and Blue Shield of Maine; Anthem Blue Cross and Blue Shield of Missouri; Anthem Blue Cross and Blue Shield of Missouri (RightChoice Managed Care, Inc. & Healthy Alliance Life Insurance Company); Anthem Blue Cross and Blue Shield of New Hampshire; Empire Blue Cross and Blue Shield; Anthem Blue Cross and Blue Shield of Ohio; Anthem Blue Cross and Blue Shield of Virginia (Anthem Health Plans of Virginia & HMO HealthKeepers); Anthem Blue Cross and Blue Shield of Wisconsin (Blue Cross Blue Shield of Wisconsin & Compcare Health Services

22

23

24

25

26

27

1

28

United States District Court
Northern District of California

1    Cross Blue Shield Association, and 17 non-Anthem Blue Cross Blue Shield Companies.[3]  The

2    Court shall refer to Anthem, Inc. and the Anthem affiliates as the "Anthem Defendants," and shall

3    refer to Blue Cross Blue Shield Association and the non-Anthem Blue Cross Blue Shield

4    Companies as the "Non-Anthem Defendants."  The Court shall refer to the Anthem and Non-

5    Anthem Defendants collectively as "Defendants."

6         Before the Court are separate motions to dismiss Plaintiffs' consolidated amended

7    complaint ("CAC") filed by the Anthem and Non-Anthem Defendants.  *See* ECF No. 334-6

8    ("CAC"); ECF No. 410 ("Anthem Mot."); ECF No. 413 ("Non-Anthem Mot.").  Having

9    considered the parties' submissions, the relevant law, and the record in this case, the Court hereby

10   GRANTS in part and DENIES in part the Anthem Defendants' motion to dismiss and GRANTS in

11   part and DENIES in part the Non-Anthem Defendants' motion to dismiss.

12   **I.       BACKGROUND**

13        **A. Factual Background**

14        Defendant Anthem, Inc. ("Anthem") is one of the largest health benefits and health

15   insurance companies in the United States.  CAC ¶ 109.  Anthem serves its members through

16   various Blue Cross Blue Shield ("BCBS") licensee affiliates and other non-BCBS affiliates.  *Id.* ¶

17   155.  Anthem also cooperates with the Blue Cross Blue Shield Association ("BCBSA") and

18   several independent BCBS licensees via the BlueCard program.  *Id.* ¶ 156.  "Under the BlueCard

19   program, members of one BCBS licensee may access another BCBS licensee's provider networks

20

21   ────────────────────────────────

22   Insurance Corporation); Amerigroup Services; HealthLink; Unicare Life & Health Insurance
     Company; CareMore Health Plan; the Anthem Companies; the Anthem Companies of California;
     Amerigroup Corporation; and the Amerigroup Kansas, Inc.

23   [3] The non-Anthem BCBS Companies are: Blue Cross and Blue Shield of Alabama; Blue Cross
     Blue Shield of Arizona; Arkansas Blue Cross and Blue Shield; Blue Shield of California; Blue

24   Cross and Blue Shield of Illinois; Blue Cross and Blue Shield of Florida; CareFirst BlueCross
     BlueShield; Blue Cross and Blue Shield of Massachusetts; Blue Cross and Blue Shield of

25   Michigan; Blue Cross and Blue Shield of Minnesota; Horizon Blue Cross and Blue Shield of New
     Jersey; Blue Cross and Blue Shield of North Carolina; Highmark Blue Shield; Highmark Blue

26   Cross Blue Shield West Virginia; BlueCross BlueShield of Tennessee; Blue Cross and Blue Shield
     of Texas; and Blue Cross and Blue Shield of Vermont.

27

     Case No. 15-MD-02617-LHK

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

and discounts when the members are out of state." *Id.*

In order to provide certain member services, the Anthem and Non-Anthem Defendants "collect, receive, and access their customers' and members' extensive individually identifiable health record information." *Id.* ¶ 157. "These records include personal information (such as names, dates of birth, Social Security numbers, health care ID numbers, home addresses, email addresses, and employment information, including income data) and individually-identifiable health information (pertaining to the individual claims process, medical history, diagnosis codes, payment and billing records, test records, dates of service, and all other health information that an insurance company has or needs to have to process claims)." *Id.* The Court shall refer to members' personal and health information as Personal Identification Information, or "PII."

Anthem maintains a common computer database which contains the PII of current and former members of Anthem, Anthem's affiliates, BCBSA, and independent BCBS licensees. *Id.* ¶ 158. In total, Anthem's database contains the PII of approximately 80 million individuals. *Id.* ¶ 204. According to Plaintiffs, both the Anthem and Non-Anthem Defendants promised their members that their PII would be protected. Blue Cross of California, for instance, mailed the following privacy notice to its members:

> We keep your oral, written and electronic [PII] safe using physical, electronic, and procedural means. These safeguards follow federal and state laws. Some of the ways we keep your [PII] safe include securing offices that hold [PII], password-protecting computers, and locking storage areas and filing cabinets. We require our employees to protect [PII] through written policies and procedures. . . . Also, where required by law, our affiliates and nonaffiliates must protect the privacy of data we share in the normal course of business. They are not allowed to give [PII] to others without your written OK, except as allowed by law and outlined in this notice.

*Id.* ¶ 163 (emphasis removed). In February 2015, Anthem announced to the public that "cyberattackers had breached the Anthem Database, and [had] accessed [the PII of] individuals in the Anthem Database." *Id.* ¶ 203. This was not the first time that Anthem had experienced problems with data security. In late 2009, approximately 600,000 customers of Wellpoint

3

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

1   (Anthem's former trade name) "had their personal information and protected healthcare

2   information compromised due to a data breach." *Id.* ¶ 194.  In addition, in 2013, the U.S.

3   Department of Health and Human Services fined Anthem $1.7 million for various HIPAA

4   violations related to data security.  *Id.* ¶ 195.  Finally, in 2014, the federal government informed

5   Anthem and other healthcare companies of the possibility of future cyberattacks, and advised these

6   companies to take appropriate measures, such as data encryption and enhanced password

7   protection.  *Id.* ¶¶ 200–01.

8        Plaintiffs allege that Defendants did not sufficiently heed these warnings, which allowed

9   cyberattackers to extract massive amounts of data from Anthem's database between December

10   2014 and January 2015.  *Id.* ¶ 226.  After Anthem discovered the extent of this data breach, it

11   proceeded to implement various containment measures.  *Id.* ¶ 232.  The cyberattacks ceased by

12   January 31, 2015.  *Id.*  In addition, after learning of the cyberattacks, Anthem proceeded to retain

13   Mandiant, a cybersecurity company, "to assist in assessing and responding to the Anthem Data

14   Breach and to assist in developing security protocols for Anthem."  *Id.* ¶ 207.  Mandiant's work

15   culminated in the production of an Intrusion Investigation Report ("Mandiant Report"), which

16   Mandiant provided to Anthem in July 2015.  *Id.*

17        According to Plaintiffs, the Mandiant Report found that "Anthem and [its] Affiliates

18   [had] failed to take reasonable measures to secure the [PII] in their possession."  *Id.* ¶ 236.

19   Likewise, Plaintiffs allege that "Anthem and Anthem Affiliates [] lacked reasonable encryption

20   policies."  *Id.* ¶ 237.  Additionally, "BCBSA and non-Anthem BCBS allowed the [PII] that their

21   current and former customers and members had entrusted with them to be placed into the Anthem

22   Database even though there were multiple public indications and warnings that the Anthem and

23   Anthem Affiliates' computer systems and data security practices were inadequate."  *Id.* ¶ 243.

24   Plaintiffs further aver that although Anthem publicly disclosed the data breach in February 2015,

25   many affected customers were not personally informed until March 2015, if at all.  *Id.* ¶ 250.

26   Finally, Plaintiffs contend that Anthem still has not disclosed whether it has made any changes to

27                                             4

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

1    its security practices to prevent a future cyberattack.

2    **B. Procedural History**

3         A number of lawsuits were filed against the Anthem and Non-Anthem Defendants in the

4    wake of the Anthem data breach.  In general, these lawsuits bring putative class action claims

5    alleging (1) failure to adequately protect Anthem's data systems, (2) failure to disclose to

6    customers that Anthem did not have adequate security practices, and (3) failure to timely notify

7    customers of the data breach.

8         In spring 2015, Plaintiffs in several lawsuits moved to centralize pretrial proceedings in a

9    single judicial district.  *See* 28 U.S.C. § 1407(a) ("When civil actions involving one or more

10   common questions of fact are pending in different districts, such actions may be transferred to any

11   district for coordinated or consolidated pretrial proceedings.").  On June 12, 2015, the Judicial

12   Panel on Multidistrict Litigation ("JPML") issued a transfer order selecting the undersigned judge

13   as the transferee court for "coordinated or consolidated pretrial proceedings" in the multidistrict

14   litigation ("MDL") arising out of the Anthem data breach.  *See* ECF No. 1 at 1–3.[4]

15        On September 10, 2015, the Court held a hearing to appoint Lead Plaintiffs' counsel.

16   Following this hearing, the Court issued an order appointing Co-Lead Plaintiffs' counsel and

17   requesting that counsel file a single consolidated amended complaint by October 19, 2015.  ECF

18   No. 284 at 2.  On October 19, 2015, Plaintiffs filed their consolidated amended complaint, which

19   organized Plaintiffs' causes of action into thirteen different counts, with claims pursuant to various

20   state and federal laws asserted under each count.  The complaint's prayer for relief included

21   requests for class certification, injunctive relief, and damages.

22        On this final form of relief, Plaintiffs seek damages arising from four separate economic

23   losses.  First, Plaintiffs allege that they "paid Anthem money for services that should have

24

25   _____

26   [4] As of February 14, 2016, after remand or dismissal of 9 cases, this MDL is comprised of 114
     active individual cases.  ECF No. 451-1 at 4.  An additional case is pending conditional transfer to
     this MDL.

27                                                    5

     Case No. 15-MD-02617-LHK

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

1  included protecting their [PII] from unauthorized disclosure"; Plaintiffs refer to these losses as

2  "Benefit of the Bargain" losses.  ECF No. 424 at 3.  Second, Plaintiffs seek recovery for "the theft

3  of Plaintiffs' [PII]," which Plaintiffs refer to as the "Loss of Value of PII."  *Id.*  Third, Plaintiffs

4  allege that many class members "incurred out-of-pocket losses, including delayed tax returns, and

5  the time and costs of credit monitoring."  Plaintiffs refer to these losses as "Out of Pocket" costs.

6  *Id.*  Finally, Plaintiffs allege that all class members "are at significant risk of imminent identity

7  theft . . . as a result of the exfiltration of their [PII]," which Plaintiffs refer to as the "Imminent

8  Risk of Further Costs."  *Id.*

9          At the October 25, 2015 case management conference, the Court determined that the

10  Anthem Defendants and Non-Anthem Defendants would file separate motions to dismiss.  Both

11  motions would be "limited to a combined total of 10 claims, with 5 claims selected by Plaintiffs, 3

12  claims selected by the Anthem Defendants, and 2 claims selected by the [Non-Anthem

13  Defendants]."  ECF No. 326 at 2–3.  At the November 10, 2015 case management conference, the

14  parties informed the Court of the 10 claims that would be addressed in Defendants' motions to

15  dismiss.  ECF No. 366 at 2.

16          On November 23, 2015, the Anthem Defendants and Non-Anthem Defendants filed their

17  respective motions to dismiss.  ECF No. 410 ("Anthem Mot."); ECF No. 413 ("Non-Anthem

18  Mot.").  Plaintiffs filed their oppositions on December 21, 2015, and the Anthem Defendants and

19  Non-Anthem Defendants filed their replies on January 19, 2016.  ECF No. 424 ("Anthem

20  Opp'n"); ECF No. 425 ("Non-Anthem Opp'n"); ECF No. 432 ("Anthem Reply"); ECF No. 433

21  ("Non-Anthem Reply").

22  **II.      LEGAL STANDARD**

23      **A.  Motion to Dismiss**

24          Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an

25  action for failure to allege "enough facts to state a claim to relief that is plausible on its face."  *Bell*

26  *Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the

6

27

28  ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

*United States District Court*
*Northern District of California*

1    plaintiff pleads factual content that allows the court to draw the reasonable inference that the

2    defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a

3    'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

4    unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).  For

5    purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the

6    complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving

7    party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

8         Nonetheless, the Court is not required to "'assume the truth of legal conclusions merely

9    because they are cast in the form of factual allegations.'" *Fayer v. Vaughn*, 649 F.3d 1061, 1064

10   (9th Cir. 2011) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)).  Mere

11   "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to

12   dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *accord Iqbal*, 556 U.S. at 678.

13   Furthermore, "'a plaintiff may plead [him]self out of court'" if he "plead[s] facts which establish

14   that he cannot prevail on his . . . claim." *Weisbuch v. Cnty. of L.A.*, 119 F.3d 778, 783 n.1 (9th Cir.

15   1997) (quoting *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir. 1995)).

16        For purposes of motions to dismiss, as with virtually all motions touching upon substantive

17   legal matters, the general rule "is that the  MDL transferee court is generally bound by the same

18   substantive legal standards, if not always the same interpretation of them, as would have applied in

19   the transferor court." *In re Korean Air Lines Co., Ltd.*, 642 F.3d 685, 699 (9th Cir. 2011).

20   **B.  Leave to Amend**

21        Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely

22   granted when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate

23   decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d

24   1122, 1127 (9th Cir. 2000) (en banc) (ellipses omitted).  Generally, leave to amend shall be denied

25   only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be

26   futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512

27

28   Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

1  F.3d 522, 532 (9th Cir. 2008).

2  **III.   DISCUSSION**

3    **A. Standing**

4         Before addressing any of the specific claims at issue, the Court turns first to the three

5  arguments that the Non-Anthem Defendants have raised regarding standing.  First, "not one of the

6  98 named plaintiffs in the CAC alleges that he or she was insured by or had *any* connection with .

7  . . Blue Cross and Blue Shield of Arizona, Inc., BlueCross BlueShield of Tennessee, Inc., and

8  Highmark West Virginia, Inc."  Non-Anthem Mot. at 2 (emphasis added).  Thus, the Non-Anthem

9  Defendants request that these three Non-Anthem Defendants be dismissed from this action in its

10  entirety.

11         Second, the consolidated amended complaint fails "to allege any facts regarding ten Non-

12  Anthem Defendants with respect to" the selected claims at issue in the instant motions to dismiss.

13  Non-Anthem Mot. at 1 (emphasis removed).[5]  Accordingly, the Non-Anthem Defendants request

14  that the selected "claims . . . be dismissed as to those ten Non-Anthem Defendants."  Non-Anthem

15  Reply at 3.

16         Third, the consolidated amended complaint fails to allege any specific facts as to Plaintiffs'

17  Indiana negligence, Kentucky Consumer Protection Act, New Jersey breach of contract, New

18  York unjust enrichment, New York General Business Law § 349, and California Unfair

19  Competition Law claims against 16 of the 17 Non-Anthem Defendants.  Specifically, the

20  consolidated amended complaint identifies a New Jersey Plaintiff—Elizabeth Ames—who was

21  enrolled in a plan managed by Non-Anthem Defendant Horizon Blue Cross Blue Shield of New

22  Jersey.  *See* CAC ¶ 146; Non-Anthem Mot. at 3.  Plaintiffs have thus properly asserted a New

23

24  ───────────────

25  [5] These ten Non-Anthem Defendants are: Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of Arizona, Inc.; CareFirst of Maryland, Inc.; Blue Cross and Blue Shield of Michigan; Blue Cross and Blue Shield of North Carolina, Inc.; Highmark Health Services; Highmark West Virginia, Inc.; BlueCross BlueShield of Tennessee, Inc.; Blue Cross and Blue Shield of Vermont; and Blue Cross and Blue Shield of Illinois.  Non-Anthem Mot. at 1.

26

27                                                                      8

28  Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

Jersey breach of contract claim against Horizon Blue Cross Blue Shield of New Jersey, but have not alleged any specific facts as to the remaining 16 Non-Anthem Defendants.  The Non-Anthem Defendants therefore request dismissal of those Non-Anthem Defendants who have not had any specific facts alleged against them as to Plaintiffs' Indiana negligence, Kentucky Consumer Protection Act, New Jersey breach of contract, New York unjust enrichment, New York General Business Law § 349, and California Unfair Competition Law claims.

All three of these arguments implicate the same thorny legal question: when, in the context of a nationwide consumer class action, should a federal court address issues of standing?  Indeed, "[a]lthough standing is a 'threshold issue' usually considered at the outset of the case," two U.S. Supreme Court decisions—*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999)—"make clear that there are situations in which a court may defer that issue to later in the case." *In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1160 (D. Minn. 2014).  As the *In re Target* court summarized, both *Amchem* and *Ortiz* involved "global settlements of [consumer] class actions" where the district court "was simultaneously presented with class certification issues and Article III issues." *Id.* at 1159–60.  In both *Amchem* and *Ortiz*, the U.S. Supreme Court determined that the district court could defer standing questions until after class certification.  In the instant case, Plaintiffs request that the Court adopt the same approach.

Neither *Amchem* nor *Windsor*, however, created a blanket exception for standing in the consumer class action context.  Rather, the U.S. Supreme Court "in both cases stated that class certification questions could be addressed first [because] they were 'logically antecedent' to the standing questions." *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1071 (N.D. Cal. 2015) (quoting *Ortiz*, 527 U.S. at 831; *Amchem*, 521 U.S. at 612).  The scope and applicability of this "logically antecedent" exception has, in the aftermath of *Amchem* and *Windsor*, confounded both courts and commentators alike.  *See, e.g.*, *In re Target*, 66 F. Supp. 3d at 1160 ("Although some courts [have] interpreted [*Amchem* and *Windsor*] to require deferral of the Article III standing determination

9

United States District Court
Northern District of California

until after class certification, [others courts have] found more persuasive the decisions that interpreted the Supreme Court precedent to allow consideration of the named plaintiff's Article III standing at an earlier stage, thus requiring a named plaintiff to establish standing for each claim set forth in a class action when the issue is presented prior to class certification.") (internal quotation marks omitted); Linda S. Mullenix, *Standing and Other Dispositive Motions After* Amchem *and* Ortiz*: The Problem of "Logically Antecedent" Inquiries*, 2004 Mich. St. L. Rev. 703. Even district courts within the Northern District of California have split ways on when (and how) *Amchem* and *Ortiz* should apply in the consumer class action context. *See generally In re Carrier IQ*, 78 F. Supp. 3d at 1068–75 (reviewing cases that have considered standing before and after class certification).

On this particular question, the Court finds instructive the reasoning in *In re Carrier IQ*. In *In re Carrier IQ*, the district court undertook a comprehensive analysis of U.S. Supreme Court and Ninth Circuit precedent, decisions from various federal district courts, and pertinent legal scholarship. *See id.* After surveying these sources in detail, the *In re Carrier IQ* court concluded "that it ha[d] the discretion to defer questions of standing until after class certification"—which it could decide to exercise on a case by case (or even an issue by issue) basis. *Id.* at 1074. In exercising this discretion, the *In re Carrier IQ* court noted that a district court might consider factors such as the cost and burden of discovery, "the breadth of the proposed class and the number of state law claims asserted on behalf of the class," and whether a named plaintiff's "claim is typical of those individuals whose claims arise under the laws of . . . other states." *Id.* at 1072–75. Following *In re Carrier IQ*, the Court finds that it has discretion to decide in the instant action when to consider issues of standing, and shall exercise this discretion as follows.

### 1. All Claims as to Three Non-Anthem Defendants

As to Blue Cross and Blue Shield of Arizona, Inc., BlueCross BlueShield of Tennessee, Inc., and Highmark West Virginia, Inc., "not one of the 98 named plaintiffs in the CAC alleges that he or she was insured by or had *any* connection with" these entities. Non-Anthem Mot. at 2.

10

1    The Non-Anthem Defendants request that these three entities be dismissed from this action in its

2    entirety.  The Court finds the Non-Anthem Defendants' contentions well taken, for the reasons

3    stated below.

4           First, each of the factors described in *In re Carrier IQ* weigh in favor of the Court

5    addressing standing questions at the outset of this litigation, rather than deferring such questions

6    until class certification.  As to the cost and burden of discovery, for instance, the Court observes

7    that the parties must litigate the selected claims "through two motions to dismiss, through class

8    cert[ification], [and] through summary judgment."  ECF No. 359 at 60.  The parties expect

9    discovery to be expensive and time-consuming.  As this action moves forward, Plaintiffs may not

10   be able to find a single class member who can assert any claim with specific factual allegations

11   against Blue Cross and Blue Shield of Arizona, Inc., BlueCross BlueShield of Tennessee, Inc., and

12   Highmark West Virginia, Inc.  Under such circumstances, it would make little sense to require

13   these three Non-Anthem Defendants to be subject to extensive discovery and motions practice.

14          In addition, there are nearly 80 million potential class members, with each class member

15   asserting a variety of state and federal law claims.  Deferring questions of standing until class

16   certification would only make the Court's class certification decision all the more unwieldy, and

17   would not be in the interest of promoting efficient litigation.  *See In re Carrier IQ*, 78 F. Supp. 3d

18   at 1074–75 ("Moreover, given the breadth of the proposed class and the number of state law

19   claims asserted on behalf of the class, there is a meaningful risk that the requirements of class

20   certification under Rule 23 may not be met or, if they are, subclasses may have to be created

21   which would engender delay.").

22          Furthermore, as the parties acknowledge, there are subtle but significant differences in the

23   various state and federal law claims at issue.  Plaintiffs might, for instance, be able to move

24   forward with a breach of contract claim under California law but not a breach of contract claim

25   under the law of a different state.  Under such circumstances, grouping all Non-Anthem

26   Defendants together—particularly those who have had no specific factual allegations asserted

27                                                    11

Case No. 15-MD-02617-LHK

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

1    against them—makes little sense.  *See id.* at 1072 (holding that deferring issues of standing until

2    after class certification may be appropriate where a claim brought by an individual with standing

3    "is typical of those individuals whose claims arise under the laws of the other states.").

4            In addition to the specific *In re IQ Carrier* factors discussed above, Plaintiffs acknowledge

5    that "named Plaintiffs from a particular state do not bring their individual state law claims against

6    Non-Anthem Defendants with whom they did not have a relationship."  Non-Anthem Opp'n at 5;

7    *see also Armstrong v. Davis*, 275 F.3d 849, 860 (9th Cir. 2001), *recognized as abrogated on other*

8    *grounds by Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014) ("In order to assert claims on

9    behalf of a class, a named plaintiff must have personally sustained or be in immediate danger of

10   sustaining some direct injury as a result of the challenged statute or official conduct.").  Thus,

11   under Plaintiffs' own theory of the case, there is little reason to keep certain Non-Anthem

12   Defendants in this action when no specific factual allegations have been asserted against them

13   with respect to any of the claims in the consolidated amended complaint.

14           As a final point, in this particular instance, case law appears to tilt in the Non-Anthem

15   Defendants' favor.  In *In re Carrier IQ*, for instance, the district court addressed standing prior to

16   class certification and "require[d] the [p]laintiffs to present a named class member who possesses

17   individual standing to assert each state law's claims against Defendants."  78 F. Supp. 3d at 1074.

18   As in the instant case, the *In re Carrier IQ* court cited both "the expense and burden of nationwide

19   discovery" and "the breadth of the proposed class" in reaching this determination.  *Id.*  Likewise,

20   in *Pardini v. Unilever United States, Inc.*, 961 F. Supp. 2d 1048, 1061 (N.D. Cal. 2013), the

21   district court observed that "there is only one named plaintiff and she has not alleged that she

22   purchased [defendant's product] outside of California."  Thus, "[p]laintiff does not have standing

23   to assert a claim under the consumer protection laws of the other states named in the Complaint."

24   *Id.*; *accord Harris v. CVS Pharmacy, Inc.*, 2015 WL 4694047, *4 (C.D. Cal. Aug. 6, 2015)

25   (finding that, "[a]s the party advocating for the application of Rhode Island law, [p]laintiff must

26   make at least [a] *prima facie* showing that the RIDTPA applies to him such that he would have

27                                                    12

28   Case No. 15-MD-02617-LHK
     ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

1  standing to bring that claim.").

2      Plaintiffs' attempt to distinguish this line of cases by relying on *In re Target* is unavailing.

3  Although the *In re Target* court did defer issues of standing until after class certification, the

4  district court reasoned that, "[a]s Target undoubtedly knows, there are consumers in Delaware,

5  Maine, Rhode Island, Wyoming, and the District of Columbia whose personal financial

6  information was stolen in the 2013 breach." 66 F. Supp. 3d at 1160. Accordingly, even though no

7  named plaintiffs hailed from these specific jurisdictions at the time Target filed its motion to

8  dismiss, residents from these jurisdictions were almost certainly affected by the data breach and

9  could almost certainly be identified at some later point in the litigation.

10      This same principle does not apply with equal force in the instant case. Here, unlike in *In*

11  *re Target*, Plaintiffs do not bring their claims against a single nationwide entity. Instead, Plaintiffs

12  have brought suit against Anthem, 28 Anthem affiliates, and 17 Non-Anthem Defendants. The

13  Non-Anthem Defendants do not dispute that the Anthem data breach affected upwards of 80

14  million individuals, and that these individuals have standing to bring their claims against at least

15  *some* Defendants. The Non-Anthem Defendants, however, contest whether three specific Non-

16  Anthem Defendants should remain in this action when not a single named Plaintiff has been able

17  to assert any specific factual allegations against these three Non-Anthem Defendants. Unless and

18  until Plaintiffs demonstrate otherwise, the Court finds that there is little use in keeping these three

19  Non-Anthem Defendants in this action.

20      Accordingly, the Court DISMISSES Blue Cross and Blue Shield of Arizona, Inc.,

21  BlueCross BlueShield of Tennessee, Inc., and Highmark West Virginia, Inc. from this action in its

22  entirety. Plaintiffs, however, shall have leave to amend. It is possible that Plaintiffs may be able

23  to assert specific factual allegations against the three Non-Anthem Defendants listed above by, for

24  instance, adding a new named Plaintiff. *See Lopez*, 203 F.3d at 1127 (holding that "a district court

25  should grant leave to amend . . . unless it determines that the pleading could not possibly be cured

26  by the allegation of other facts."). The Court therefore GRANTS with leave to amend the Non-

27                                                        13

28  Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

1   Anthem Defendants' motion to dismiss Blue Cross and Blue Shield of Arizona, Inc., BlueCross

2   BlueShield of Tennessee, Inc., and Highmark West Virginia, Inc. from this action in its entirety.

3   **2.  All Selected Claims as to Ten Non-Anthem Defendants**

4   For substantially the same reasons, the Court also GRANTS with leave to amend the Non-

5   Anthem Defendants' motion to dismiss the ten selected claims at issue in the instant motion to

6   dismiss against Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of Arizona,

7   Inc.; CareFirst of Maryland, Inc.; Blue Cross and Blue Shield of Michigan; Blue Cross and Blue

8   Shield of North Carolina, Inc.; Highmark Health Services; Highmark West Virginia, Inc.;

9   BlueCross BlueShield of Tennessee, Inc.; Blue Cross and Blue Shield of Vermont; and Blue Cross

10  and Blue Shield of Illinois.

11  As noted above, the consolidated amended complaint fails to allege any specific facts

12  regarding these ten Non-Anthem Defendants with respect to the selected claims at issue in the

13  instant motions to dismiss.  Non-Anthem Mot. at 1.  Requiring these particular Non-Anthem

14  Defendants to undergo extensive discovery and motions practice in this action is both costly and

15  unnecessary.  Moreover, dismissing these ten Non-Anthem Defendants from the ten selected

16  claims at issue does not altogether absolve these Defendants from liability.  By requiring the

17  parties to focus on a set of selected claims, the Court sought to narrow the issues presented in

18  order to move forward with this MDL in a timely and cost-effective manner.  The Court's decision

19  to adopt such a streamlined approach, however, does not result in dismissal of the many

20  remaining, non-selected claims against these ten Non-Anthem Defendants asserted in the

21  consolidated amended complaint.

22  **3.  Selected Claims as to Most Non-Anthem Defendants**

23  Finally, the Non-Anthem Defendants request that the Court dismiss Plaintiffs' Indiana

24  negligence, Kentucky Consumer Protection Act, New Jersey breach of contract, California Unfair

25  Competition Law ("UCL"), New York unjust enrichment, and New York General Business Law

26  ("GBL") § 349 claims against all Non-Anthem Defendants about whom the consolidated amended

27                                              14

28

*United States District Court*
*Northern District of California*

1    complaint makes no factual allegations.

2         As an initial matter, this argument is moot with respect to Plaintiffs' Indiana negligence

3    and Kentucky Consumer Protection Act claims.  As discussed in greater detail below, Plaintiffs

4    can not maintain these claims as a matter of law.  These claims will therefore be dismissed with

5    prejudice.

6         That leaves the Court with the following four claims: New Jersey breach of contract,

7    California Unfair Competition Law ("UCL"), New York unjust enrichment, and New York

8    General Business Law ("GBL") § 349.  Although the Non-Anthem Defendants acknowledge that

9    Plaintiffs have properly brought these claims against at least *one* Anthem or Non-Anthem

10   Defendant, the Non-Anthem Defendants contend that there is little point in keeping *all* Non-

11   Anthem Defendants in this litigation with respect to these particular claims.  The Court agrees.

12        Consistent with its reasoning throughout this section, the Court finds that it would be

13   improvident to require all 17 non-Anthem Blue Cross Blue Shield Defendants to answer for a

14   claim when Plaintiffs assert factual allegations against only a handful of these 17 Defendants.  The

15   breadth and complexity of this action make streamlining this litigation all the more important.

16   Thus, the Court GRANTS the Non-Anthem Defendants' motion to dismiss Plaintiffs' Indiana

17   negligence, Kentucky Consumer Protection Act, New Jersey breach of contract, California Unfair

18   Competition Law ("UCL"), New York unjust enrichment, and New York General Business Law

19   ("GBL") § 349 claims against all Non-Anthem Defendants about whom the consolidated amended

20   complaint makes no factual allegations.  As above, Plaintiffs shall have leave to amend.[6]

21        **B.  Indiana Negligence (against Anthem and Non-Anthem Defendants)**

22        "The elements of a negligence claim under Indiana law are: (1) a duty owed to plaintiff by

23   defendant, (2) breach of duty by allowing conduct to fall below the applicable standard of care,

24

25   ───────────────
     [6] In the same vein, Plaintiffs must specifically and accurately identify the health plan of each
     named Plaintiff.  For example, although the consolidated amended complaint alleges that
26   California Plaintiff Michael Bronzo was enrolled in a "Blue Cross Blue Shield of California health
     plan," Non-Anthem Defendants allege that no such entity exists.  Non-Anthem Mot. at 10 n.2.
27                                              15

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

1    and (3) a compensable injury proximately caused by defendant's breach of duty."  *Pisciotta v. Old*

2    *Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007) (internal quotation marks omitted).  Here,

3    Plaintiffs allege that the Anthem and Non-Anthem Defendants "violated the duty of care owed

4    Indiana Plaintiffs and Class Members by collecting and storing their [PII] without adequate data

5    security."  Anthem Opp'n at 3.

6          Defendants contend that Plaintiffs' negligence claim fails for three reasons.  First,

7    Defendants assert "that Indiana law does not allow a cause of action in tort against a database

8    owner for failing to protect adequately personal information."  Anthem Mot. at 2.  Second,

9    Defendants argue that the economic loss doctrine bars recovery for Defendants' alleged

10   negligence.  *Id.* at 3.  Third, Defendants contend that the allegations in the consolidated amended

11   complaint fail to establish proximate causation.  Non-Anthem Mot. at 8.

12         As to whether Indiana law provides Plaintiffs a private cause of action, the parties

13   acknowledge that no Indiana court has yet ruled on this question.  The Court therefore looks to the

14   law of the Seventh Circuit, of which Indiana is a part.  On this point, the Court finds instructive

15   the Seventh Circuit's decision in *Pisciotta v. Old National Bancorp.*  In *Pisciotta*, Old National

16   Bancorp ("ONB") maintained a website containing the personal information of potential

17   customers.  In 2005, ONB learned that its website had been hacked, and ONB subsequently

18   informed affected potential customers of this breach.  Upon receiving this information, Luciano

19   Pisciotta ("Pisciotta") and Daniel Mills ("Mills") proceeded to file a putative class action

20   complaint against ONB.  As in the instant case, the *Pisciotta* complaint asserted a negligence

21   claim under Indiana law.  The District Court for the Southern District of Indiana determined that

22   Pisciotta and Mills could not bring such a claim as a matter of law, and granted ONB's motion for

23   judgment on the pleadings.  499 F.3d at 632–33 (reciting procedural history).  The Seventh Circuit

24   upheld the district court's decision on appeal.

25         In reaching this conclusion, the Seventh Circuit first observed that "[n]either the parties'

26   efforts nor our own have identified any Indiana precedent addressing" whether "Indiana would

27                                           16

Case No. 15-MD-02617-LHK

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

consider that the harm caused by identity information exposure, coupled with the attendant costs to guard against identity theft, constitutes an existing *compensable injury and consequent damages* required to state a claim for negligence." *Id.* at 635. Accordingly, "[w]ithout state authority to guide us, '[w]hen given a choice between an interpretation of [state] law which reasonably restricts liability, and one which greatly expands liability, we should"—as a general matter— "choose the narrower and more reasonable path (at least until the [state] Supreme Court tells us differently).'" *Id.* at 635–36 (quoting *Todd v. Societe Bic, S.A..* 21 F.3d 1402, 1412 (7th Cir. 1994) (en banc)) (alterations in original).

With this general canon of interpretation in mind, the Seventh Circuit further observed that "the Indiana authority most closely addressed to the issue"—a series of statutes enacted by the Indiana legislature in 2006—weighed against finding that Pisciotta and Mills could assert a private right of action against ONB. *Id.* at 636–37. The statutory provisions "applicable to private entities storing personal information require only that a database owner disclose a security breach to potentially affected consumers; they do not require the database owner to take any other affirmative act in the wake of a breach." *Id.* at 637. Moreover, "[i]f the database owner fails to comply with the only affirmative duty imposed by the statute—the duty to disclose—the statute provides for enforcement *only* by the Attorney General of Indiana. It creates no private right of action against the database owner." *Id.* Thus, disclosure to those affected is the only duty imposed upon the database owners by Indiana's data breach statutes, and these statutes only allow for enforcement by the Indiana Attorney General.

The Seventh Circuit went on to reject the view "that the statute is evidence that the Indiana legislature believes that an individual has suffered a compensable injury at the moment his personal information is exposed because of a security breach." *Id.* Indeed, "given the novelty of the legal questions posed by information exposure and theft, it is unlikely that the legislature intended to sanction the development of common law tort remedies that would apply to the same factual circumstances addressed by the statute." *Id.*

17

United States District Court
Northern District of California

1    The Court finds *Pisciotta* persuasive for the following reasons.  First, this Court, as an

2    MDL court, "must apply the law of the transferor forum, that is, the law of the state in which the

3    action was filed."  *In re Vioxx Prods. Liab. Litig.*, 478 F. Supp. 2d 897, 903 (E.D. La. 2007); *see*

4    *also In re Korean Air*, 642 F.3d at 699 ("[T]he MDL transferee court is generally bound by the

5    same substantive legal standards . . .  as would have applied in the transferor court.").  This legal

6    principle means that, for a negligence claim brought under the laws of Indiana, the MDL court

7    should—as a general matter—follow the lead of the Seventh Circuit.

8    Second, although *Pisciotta* was decided in 2007, the parties have identified no subsequent

9    cases—state or federal—that have discussed Indiana's data breach statutes.  The Court has found

10   none in its own research.  Thus, *Pisciotta* continues to serve as the final word on how courts

11   should interpret Indiana's data breach statutes and, critically, whether individuals may maintain a

12   private cause of action for negligence.  499 F.3d at 637 ("Had the Indiana legislature intended that

13   a cause of action should be available against a database owner for failing to protect adequately

14   personal information, we believe that it would have made some more definite statement of that

15   intent.").

16   Third, the *Pisciotta* decision is consistent with the negligence law of other jurisdictions.  In

17   *Amburgy v. Express Scripts, Inc.*, 671 F. Supp. 2d 1046, 1054 (E.D. Mo. 2009), for instance,

18   plaintiff alleged "that defendant was negligent in its failure to properly secure its computerized

19   database system[,] thereby rendering the system vulnerable to a security breach and, further, was

20   negligent in its failure to timely disclose the alleged breach."  In rejecting plaintiff's claim, the

21   *Amburgy* court "note[d] that the Missouri legislature [had] recently enacted a data breach

22   notification law."  *Id.* at 1055.  That law, like Indiana's statutes, holds that the state "Attorney

23   General [is] to have exclusive authority in bringing claims against data handlers for a violation of

24   the notice requirements."  *Id.* The Missouri statute did not provide a private cause of action, and

25   the *Amburgy* court declined to create a cause of action "where one does not exist."  *Id.*

26   Similarly, in *Willingham v. Global Payments, Inc.*, 2013 WL 440702, *17 n.19 (N.D. Ga.

18

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Feb. 5, 2013), plaintiffs sought to assert a common law negligence claim against defendant.  In

2    arguing that defendant owed plaintiffs such a duty, plaintiffs cited data breach statutes from

3    Kansas and California.  *Id.*  After carefully reviewing these statutes, the *Willingham* court

4    concluded that the statutes "do not give [p]laintiffs a [private] cause of action for negligence."  *Id.*

5    As the district court explained, these statutes contain a notice provision which requires companies

6    to provide notice to affected customers of a data breach.  Like the statutes at issue in *Pisciotta* and

7    *Amburgy*, however, these statutes do not contain a private enforcement mechanism.

8        Third, and finally, Plaintiffs' attempts to distinguish *Pisciotta* are unavailing.  Plaintiffs,

9    for instance, point to the fact that the Indiana legislature amended Indiana's data breach statutes in

10    2009.  The statutes now require database owners to "maintain reasonable procedures . . . to protect

11    and safeguard from unlawful use or disclosure any personal information," a provision that did not

12    exist at the time *Pisciotta* was decided.  Anthem Opp'n at 4.  The amendments also exempt some

13    "database owners with security policies under HIPAA from some . . . [statutory] requirements."

14    Anthem Mot. at 2 n.3.  None of these amendments, however, address whether individual plaintiffs

15    may maintain a private cause of action in negligence.  Indiana's data breach statutes continue to

16    provide a single enforcement mechanism: an action brought by the state Attorney General.  Ind.

17    Code. Ann. § 24-4.9-4-2.  The Court thus fails to see how the 2009 amendments give support to

18    Plaintiffs' attempts to maintain a private cause of action.  *Pisciotta* was decided in 2007.  The

19    Indiana legislature, presumably aware of the *Pisciotta* decision, declined to provide plaintiffs a

20    private cause of action when given the opportunity to amend the state's data breach statutes in

21    2009.

22        Plaintiffs also contend that Indiana courts "frequently borrow from statutes that do not

23    contain a private right of action to impose common law duties."  Anthem Opp'n at 4.  Plaintiffs

24    cite *Kho v. Pennington*, 875 N.E.2d 208, 212 (Ind. 2007), where the Indiana Supreme Court

25    recognized a private right of action for statutory negligence "arising from the violation of the

26    identity confidentiality provision in Indiana Code § 34–18–8–7(a)(1)."

19

27

28    Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

1   There are two key flaws with Plaintiffs' reliance on *Kho*. First, the fact that Indiana courts

2   have recognized claims for statutory negligence in *some* cases does not suggest that this Court

3   should recognize a private cause of action in the instant case. This point is all the more

4   pronounced where, as here, the District Court for the Southern District of Indiana and the Seventh

5   Circuit—two federal courts that are significantly more familiar with Indiana law than this Court—

6   declined to recognize a private cause of action under nearly identical circumstances in *Pisciotta*.

7   *Cf. Butner v. United States*, 440 U.S. 48, 58 (1979) ("The federal judges who deal regularly with

8   questions of state law in their respective districts and circuits are in a better position than we to

9   determine how local courts would dispose of comparable issues.").

10   Second—and relatedly—all of the decisions cited in *Kho* are Indiana Supreme Court or

11   Indiana Court of Appeals decisions. None are federal court decisions, much less decisions by a

12   federal court sitting in a different state. This result is, in the Court's view, consistent with the

13   view of the Seventh Circuit, that "[w]hen [a federal court is] given a choice between an

14   interpretation of [state] law which reasonably restricts liability, and one which greatly expands

15   liability, [the federal court] should choose the narrower and more reasonable path." *Todd*, 21 F.3d

16   at 1412. In light of these circumstances, Plaintiffs can not pursue their Indiana negligence claim

17   against Defendants.

18   Because Plaintiffs can not pursue such a claim as a matter of law, the Court need not

19   address Defendants' arguments concerning the economic loss doctrine and proximate causation.

20   Accordingly, Defendants' motions to dismiss Plaintiffs' Indiana negligence claim is GRANTED.

21   Moreover, the Court finds that amendment would be futile. Case law and statutory

22   authority indicates that, in Indiana, data breach actions must be brought by the Indiana Attorney

23   General. Plaintiffs have identified no relevant authority that would allow private individuals to

24   bring an Indiana data breach action under a common law negligence theory. In the absence of

25   supporting authority for Plaintiffs' position, the Court finds that leave to amend would be futile,

26   and therefore denies leave to amend. *See Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995)

20

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

1    ("Futility of amendment can, by itself, justify the denial of a motion for leave to amend.").

2    Therefore, Plaintiffs' Indiana negligence claim is DISMISSED with prejudice.

3        **C. California Breach of Contract (against Anthem Defendants)**

4        The consolidated amended complaint asserts against the Anthem Defendants a breach of

5    contract claim under California law.  Specifically, Plaintiffs allege that "Anthem and Anthem

6    Affiliates did not satisfy their promises and obligations to Plaintiffs and Statewide Class Members

7    under the contracts in that they did not take reasonable measures to keep Plaintiffs' and Statewide

8    Class Members' [PII] secure and confidential and did not comply with the applicable laws,

9    regulations, and industry standards."  CAC ¶ 305.  In moving to dismiss Plaintiffs' claim, the

10   Anthem Defendants contend that "(a) the CAC fails to identify the contractual provisions that

11   allegedly were breached, (b) the CAC fails to allege facts showing any breach caused Plaintiffs to

12   suffer damages that are cognizable under California law, and (c) certain Plaintiffs' claims are

13   preempted by ERISA."  Anthem Mot. at 4.[7]

14       As to whether the consolidated amended complaint identifies the contractual provisions

15   that were breached, the Court observes that, "[u]nder California law, to state a claim for breach of

16   contract a plaintiff must plead the contract, plaintiffs' performance (or excuse for

17   nonperformance), defendant's breach, and damage to plaintiff therefrom."  *Low v. LinkedIn Corp.*,

18   900 F. Supp. 2d 1010, 1028 (N.D. Cal. 2012) (internal quotation marks omitted).  With respect to

19   this first requirement—the need to plead the contract—a plaintiff must, in actions involving breach

20   of a written contract, "allege the specific provisions in the contract creating the obligation the

21   defendant is said to have breached."  *Young v. Facebook, Inc.*, 790 F. Supp. 2d 1110, 1117 (N.D.

22   Cal. 2011); *see also Frances T. v. Vill. Green Owners Ass'n*, 723 P.2d 573, 586 (Cal. 1986)

23

24   ─────────────────
     [7] The Anthem Defendants also allege that three California Plaintiffs (Joseph Blanchard, Lillian
25   Brisko, and Alvin Lawson) do not have a contractual relationship with an Anthem Defendant.
     Anthem Mot. at 4.  Plaintiffs concede this point, and acknowledge that these three Plaintiffs "do
26   not bring [California] breach of contract claims against [the] Anthem Affiliates with whom they
     had no relationship."  Anthem Opp'n at 6–7 n.6.
27                                            21
     Case No. 15-MD-02617-LHK
28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

("Plaintiff's allegation that defendants breached that contract . . .  must fail because she does not allege that any provision in any of the writings imposed such an obligation on defendant."); *Murphy v. Hartford Accident & Indem. Co.*, 2 Cal. Rptr. 325, 328 (Ct. App. 1960) ("In order for an action to be based upon an instrument in writing, the writing must express the obligation sued upon.").

The Court finds that the consolidated amended complaint fails to satisfy this requirement, based on a review of (1) the language in the consolidated amended complaint, (2) the language on Anthem's public websites and in various privacy notices, (3) the exhibits submitted in connection with the consolidated amended complaint, and (4) relevant state and federal law.  The Court addresses these four areas in detail below.

### 1.  Language in Consolidated Amended Complaint

First, with respect to the language in the consolidated amended complaint, Plaintiffs allege that class members "who purchased individual insurance plans from Anthem Affiliates or who received health insurance . . . under a contract between an employer . . . and Anthem or Anthem Affiliates had valid, binding, and enforceable express, third party beneficiary, or implied contracts with Anthem and Anthem Affiliates."  CAC  ¶ 303.

However, under the section of the consolidated amended complaint titled "Breach of Contract," *id.* ¶¶ 302–311, Plaintiffs do not refer to any contractual language or any contractual provisions that the Anthem Defendants allegedly breached.  Instead, Plaintiffs state—without reference to an underlying contract or other documents—that class members provided "Anthem and/or Anthem Affiliates with their [PII]." *Id.* ¶ 303(a).  In exchange, the Anthem Defendants promised "to protect [class members' PII] in compliance with federal and state laws and regulations, including HIPAA, and industry standards." *Id.*  In the very next paragraph, Plaintiffs state that "[t]he terms of Plaintiffs' and Statewide Class Members' contracts with Anthem and Anthem Affiliates that concern the protection of Plaintiffs' [PII] [are] set forth above." *Id.* ¶ 304.  However, this paragraph does not refer specifically to any other part of the consolidated amended

22

United States District Court
Northern District of California

1   complaint.  The remaining paragraphs in this section do no better.  One paragraph addresses

2   Plaintiffs' implied contract theory, *id.* ¶ 303(c), another paragraph alleges that Plaintiffs "fully

3   performed their obligations under their contracts," *id.* ¶ 307, and several paragraphs address the

4   damages that Plaintiffs seek, *id.* ¶¶ 308–310.  Considered together, none of these paragraphs

5   identify a specific contractual provision that the Anthem Defendants breached.

6          These stray allegations mirror the facts in *Young v. Facebook*, where plaintiff stated in the

7   complaint that "Facebook did not perform in accordance with the terms of [the] agreement in their

8   Statement of Rights and Responsibilities contract by arbitrarily and impulsively handling

9   [plaintiff's] member account."  *Young*, 790 F. Supp. 2d at 1117 (internal quotation marks omitted).

10  However, as the district court pointed out, plaintiff's "complaint [did] not allege any provision of

11  the contract prohibiting Facebook from terminating an account in the manner alleged."  *Id.*

12  Because plaintiff had failed to identify a relevant contractual provision that was breached, the

13  *Young* court granted Facebook's motion to dismiss plaintiff's California breach of contract claim.

14  *Id.* (finding that plaintiff had failed to "allege the specific provisions in the contract creating the

15  obligation the defendant is said to have breached.").  As in *Young*, Plaintiffs' conclusory

16  statements in the "Breach of Contract" section of the consolidated amended complaint are

17  insufficient to survive a motion to dismiss.

18         **2.  Language on Public Websites and in Privacy Notices**

19         Plaintiffs, however, contend that the paragraphs discussed above constitute "only . . . the

20  summary language [of Plaintiffs'] breach of contract count."  Anthem Opp'n at 5.  Instead,

21  Plaintiffs note, "specific promises . . . regarding data security" are located in paragraphs 161

22  through 170.  *Id.* at 5–6.  These paragraphs include language from the public websites of the

23  Anthem Defendants and from statements made by the Anthem Defendants in various privacy

24  notices.  The website for every Anthem BCBS affiliate, for instance, states:

25         **[PII] (including Social Security Number) Privacy Protection Policy**
26         **[Name of Anthem BCBS Affiliate] maintains policies that protect the**
       **confidentiality of [PII], including Social Security numbers, obtained from its**

23

27  Case No. 15-MD-02617-LHK

28  ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
    AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
    DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

**members and associates in the course of its regular business functions.** [Name of Anthem BCBS Affiliate] is committed to protecting information about its customers and associates, especially the confidential nature of their [PII].

3

4

CAC ¶ 166 (second and fourth alterations in original).  Likewise, Blue Cross of California mailed the following privacy notice to customers:

5

6

7

8

9

10

11

**We keep your oral, written and electronic [PII] safe using physical, electronic, and procedural means. These safeguards follow federal and state laws**. Some of the ways we keep your [PII] safe include securing offices that hold [PII], **password-protecting computers**, and locking storage areas and filing cabinets. We require our employees to protect [PII] through written policies and procedures. **These policies limit access to [PII] to only those employees who need the data to do their job.** Employees are also required to wear ID badges to help keep people who do not belong out of areas where sensitive data is kept. **Also, where required by law, our affiliates and nonaffiliates must protect the privacy of data we share in the normal course of business.** They are not allowed to give [PII] to others without your written OK, except as allowed by law and outlined in this notice.

12

13

*Id.* ¶ 163.  Although this language is more specific than the conclusory paragraphs discussed above, this language still does not give rise to a viable California breach of contract claim.

14

15

16

17

First, the consolidated amended complaint provides no information on when the language at issue was posted onto the Anthem Defendants' websites and when the various privacy notices were sent to class members.  Clearly, such notices would be of little assistance to Plaintiffs' claim if Plaintiffs received these notices *after* the data breach at issue.

18

19

20

21

22

23

24

25

More importantly, the consolidated amended complaint makes no attempt to connect the language in paragraphs 161 through 170 with the terms of Plaintiffs' alleged contracts.  At no point in paragraphs 161 through 170 do Plaintiffs allege that the privacy notices or public website statements were part of or were incorporated by reference into Plaintiffs' contracts with the Anthem Defendants.  In fact, the word "contract" does not appear at all in paragraphs 161 through 170.  By this same token, under the section of the consolidated amended complaint titled "Breach of Contract," *id.* ¶¶ 302–311, Plaintiffs do not at any point refer to the privacy notices or public websites discussed in paragraphs 161 through 170.

26

27

Plaintiffs can not bring a breach of contract claim based on language from documents that

24

28

1  might have been issued after the alleged breach and based on language from documents that might

2  not even have been part of the alleged contract.  In reaching this conclusion, the Court returns to

3  the legal principle discussed above: that, "[i]n an action for breach of a written contract, a plaintiff

4  must allege the specific provisions in the contract creating the obligation the defendant is said to

5  have breached."  *Young*, 790 F. Supp. 2d at 1117; *see also Miron v. Herbalife Int'l, Inc.*, 11 F.

6  App'x 927, 929 (9th Cir. 2001) ("The district court's dismissal of the Mirons' breach of contract

7  claims was proper because the Mirons failed to allege any provision of the contract which supports

8  their claim.").  Plaintiffs have failed to identify any such contractual provision because Plaintiffs

9  have made no effort to connect the language in paragraphs 161 through 170 with the terms in

10  Plaintiffs' contracts with the Anthem Defendants.  On this basis alone, the Court finds that

11  dismissal of Plaintiffs' California breach of contract claim is warranted.  Below, the Court

12  addresses additional bases upon which Plaintiffs' California breach of contract claim is unavailing.

        **3. Exhibits Submitted in Connection With Consolidated Amended Complaint**

14        Plaintiffs have failed to submit any relevant exhibits, such as a copy of the contract

15  between an Anthem Defendant and a California Plaintiff, which might counsel against dismissal.

16  Although Plaintiffs are not required to submit such exhibits, these exhibits would certainly provide

17  clarity on the scope and nature of the Anthem Defendants' obligations.  Thus, in *Young*, plaintiff

18  included a copy of Facebook's Statement of Rights and Responsibility with the complaint.  790 F.

19  Supp. 2d at 1118.  Likewise, in *Zepeda v. PayPal, Inc.*, 777 F. Supp. 2d 1215, 1220 (N.D. Cal.

20  2011), plaintiff included Paypal's user agreement as an exhibit to accompany the complaint.  In

21  *Woods v. Google Inc.*, 2011 WL 3501403, *3–*4 (N.D. Cal. Aug. 10, 2011), plaintiff also filed a

22  copy of Google's advertising contract with the complaint.  In all of these cases—*Young*, *Zepeda*,

23  and *Woods*—the district court, after reviewing the allegations made in the complaint and the terms

24  of the pertinent agreement, determined that the plaintiff could not maintain a cause of action for

25  breach of contract under California law.  Here, on the other hand, there is nothing for the Court to

26  review as Plaintiffs have submitted no contracts or other materials for the Court to examine.

<div align="center">25</div>

1    In fact, the only possibly relevant exhibits filed were submitted by the Anthem Defendants,

2    not Plaintiffs. The Anthem Defendants, for instance, filed a copy of the Summary Plan

3    Description under which Plaintiffs Daniel and Kelly Tharp allegedly received coverage. *See* ECF

4    No. 411 at 1–2. This Plan Description includes a five page "Privacy Notice." *See* ECF No. 411-4

5    at 58–62. This Privacy Notice provides a list of specific circumstances where Anthem or an

6    Anthem affiliate might disclose a member's personal health information. *Id.* The Notice further

7    provides that "[o]ther than as stated above, the Health Plan will not disclose your health

8    information other than with your written authorization." *Id.* at 61. Moreover, "[t]he Health Plan

9    is required by law to maintain the privacy of your health information and to provide you with this

10   Notice of the Plan's legal duties and privacy practices with respect to your health information. If

11   you participate in an insured plan option, you will receive a notice directly from the Insurer." *Id.*

12   at 62. This final statement in the Summary Plan Description could plausibly be taken to

13   incorporate by reference future privacy notices sent to class members.

14   However, the problem with relying on this Summary Plan Description is that Plaintiffs

15   have, in the consolidated amended complaint, stated that such documents do not represent the

16   contract between class members and the Anthem Defendants. *See* CAC ¶ 303(b) ("With respect to

17   contracts between employers and Anthem and/or Anthem Affiliates, the applicable contract is the

18   services agreement between the employer and Anthem and/or Anthem Affiliates, not the employer

19   benefits plan document."). Plaintiffs repeat this assertion in opposing the Anthem Defendants'

20   motion to dismiss. *See* Anthem Opp'n at 25 (describing Summary Plan Description documents as

21   "non-enforceable"). Given Plaintiffs' position, the Court can not rely upon the Summary Plan

22   Description to save Plaintiffs' breach of contract of claim from dismissal.

23   **4. Incorporation of Applicable State and Federal Law**

24   As a final point, Plaintiffs state that, "[u]nder California law, Defendants' contracts

25   necessarily incorporate applicable laws even absent specific promises." Anthem Opp'n at 7

26   (citing *Edwards v. Arthur Andersen LLP*, 189 P.3d 285, 297 (Cal. 2008)). This contention alone,

26

27   Case No. 15-MD-02617-LHK

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

1    however, does not save Plaintiffs' breach of contract claim.

2         First, the consolidated amended complaint provides little guidance as to which "applicable

3    laws" were incorporated into the contract.  Instead, the consolidated amended complaint merely

4    alleges that the Anthem Defendants were required to comply with "federal and state laws and

5    regulations, including HIPAA, and industry standards."  CAC ¶ 303(a).  In other words, outside of

6    a single passing reference to HIPAA, Plaintiffs have provided little detail on what other laws,

7    regulations, or standards the Anthem Defendants might have violated.  As other district courts

8    have noted, "plaintiffs must . . . do something more to allege a breach of contract claim than

9    merely point to allegations of a statutory violation."  *Wiebe v. NDEX West, LLC*, 2010 WL

10   2035992, *3 (C.D. Cal. May 17, 2010) (quoting *Berger v. Home Depot U.S.A., Inc.*, 476 F. Supp.

11   2d 1174, 1177 (C.D. Cal. 2007)).  The consolidated amended complaint fails to meet this

12   requirement.

13        Second, Plaintiffs' breach of contract claim reaches beyond mere violation of "applicable

14   laws."  Plaintiffs, for instance, also allege that the Anthem Defendants' actions ran afoul of certain

15   "industry standards."  CAC ¶ 303(a).  Thus, simply stating that Defendants' contracts incorporate

16   applicable laws does not accurately reflect the nature of Plaintiffs' breach of contract claim.

17        In sum, after examining the consolidated amended complaint, the exhibits (or lack thereof)

18   filed in connection with the consolidated amended complaint, and relevant case law and statutory

19   authority, the Court finds that Plaintiffs have failed to identify the specific contractual provisions

20   that were breached, as Plaintiffs must do in order to bring a breach of written contract claim under

21   California law.

22        **5.  Breach of Implied Contract**

23        In addition to Plaintiffs' breach of express contract claim, Plaintiffs also state that "[b]y

24   demanding and accepting Plaintiffs' and Statewide Class Members' [PII], Anthem and Anthem

25   Affiliates entered into implied contracts with Plaintiffs and Statewide Class Members."  CAC ¶

26   303(c).  The consolidated amended complaint does not delve into additional detail on the terms

27                                                    27

28

United States District Court
Northern District of California

1    and scope of this alleged implied contract.  In moving to dismiss Plaintiffs' California breach of

2    contract claim, the Anthem Defendants contend that "[t]he CAC fails to allege any facts showing

3    that [any] implied contracts existed beyond vague, conclusory allegations."  Anthem Mot. at 6.

4    Relying upon both federal and state case law, the Anthem Defendants argue that Plaintiffs'

5    implied contract theory is not well taken.  *Id.*

6         Plaintiffs declined to respond to these arguments in Plaintiffs' opposition.  *See* Anthem

7    Opp'n at 6 n.7 ("The fact that Plaintiffs have pled theories of contract formation *in the alternative*

8    is no reason to dismiss Plaintiffs' breach of contract claims.  This Court need not resolve now the

9    merits of any challenge to these alternative theories of contract formation.") (citation omitted).  In

10   light of Plaintiffs' position, the Court finds Plaintiffs' implied contract theory unavailing.  If

11   Plaintiffs intend to pursue an implied contract theory in lieu of an express contract claim, Plaintiffs

12   must elaborate upon the nature and scope of the implied contract in the pleadings and must

13   respond to any specific arguments made by the Anthem Defendants.

14        **6. Conclusion**

15        The consolidated amended complaint fails to identify the contractual provisions that were

16   breached.  In addition, Plaintiffs' opposition fails to respond to the Anthem Defendants'

17   arguments concerning Plaintiffs' implied contract theory.  Accordingly, the Court finds that

18   Plaintiffs can not maintain a breach of contract claim under California law.  The Anthem

19   Defendants' motion to dismiss Plaintiffs' California breach of contract claim is therefore

20   GRANTED.  Pursuant to this decision, the Court need not address the Anthem Defendants'

21   arguments regarding contract damages and ERISA preemption.

22        However, Plaintiffs shall have leave to amend because the Court finds that amendment

23   would not be futile.  Plaintiffs may, for instance, be able to allege sufficient facts to show that the

24   privacy notices were incorporated by reference into Plaintiffs' contracts with the Anthem

25   Defendants.  Alternatively, Plaintiffs may be able to more specifically explain the scope and

26   nature of their implied contracts with the Anthem Defendants.   Plaintiffs' California breach of

27                                                    28

28   Case No. 15-MD-02617-LHK
     ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

1    contract claim is therefore DISMISSED with leave to amend.

2        **D.  New Jersey Breach of Contract (against Non-Anthem Defendants)**

3        Plaintiffs' have also asserted against the Non-Anthem Defendants a breach of contract

4    claim under New Jersey law.  Specifically, Plaintiffs allege that the Non-Anthem Defendants "did

5    not satisfy their promises and obligations to Plaintiffs . . . [because] they failed to ensure that

6    Plaintiffs' and Statewide Class Members' [PII] would be secured as required by the contracts.

7    Instead, Plaintiffs' and Statewide Class Members' [PII] was stored in the inadequately-secured

8    Anthem Database and accessed and exfiltrated in the Anthem Data Breach."  CAC ¶ 316.  In

9    response, the Non-Anthem Defendants contend that the CAC "fails to identify the contractual

10   provisions that allegedly were breached."  Non-Anthem Mot. at 4.

11       As the Non-Anthem Defendants acknowledge, this arguments essentially repeat the

12   Anthem Defendants' arguments concerning Plaintiffs' California breach of contract claim.  *Id.* at

13   4–6.  As with Plaintiffs' California breach of contract claim, the Court finds that the consolidated

14   amended complaint fails to identify the relevant contractual provisions that were breached.

15       Indeed, as with California breach of contract claims, parties seeking "[t]o prevail on a

16   breach of contract claim under New Jersey law" must "identify the specific contract or provision

17   that was allegedly breached."  *CIBC Inc. v. Grande Vill., LLC*, 2015 WL 5723135, *5 (D.N.J.

18   Sept. 29, 2015); *see also Skypala v. Mortg. Elec. Registration Sys., Inc.*, 655 F. Supp. 2d 451, 460

19   (D.N.J. 2009) (same).  The consolidated amended complaint fails to meet this requirement—no

20   New Jersey contracts are attached, no specific provisions are referred to, and no contractual

21   language is discussed.

22       Moreover, although the Non-Anthem Defendants filed a copy of the policy provided to

23   purchasers of the Horizon Blue Cross Blue Shield of New Jersey health plan, *see* ECF Nos. 414-1

24   & 414-2, which includes a section regarding privacy practices, Plaintiffs dispute that this exhibit

25   constitutes a true and accurate copy of the policy agreement between Plaintiffs and the Non-

26   Anthem Defendants, *see* Non-Anthem Opp'n at 8.

29

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Accordingly, consistent with the Court's determination as to Plaintiffs' California breach

2   of contract claim, the Non-Anthem Defendants' motion to dismiss Plaintiffs' New Jersey breach

3   of contract claim is GRANTED, and Plaintiffs' New Jersey breach of contract claim is thus

4   DISMISSED with leave to amend.

5   **E.  New York Unjust Enrichment (against Anthem and Non-Anthem Defendants)**

6   Plaintiffs assert an unjust enrichment claim under New York law against the Anthem and

7   Non-Anthem Defendants.  *See, e.g.*, CAC ¶¶ 350–58.  Specifically, Plaintiffs argue that

8   Defendants "should not be permitted to retain the money belonging to Plaintiffs and Class

9   Members because Defendant[s] failed to implement (or adequately implement) the data security

10  and security practices and procedures that Plaintiffs and Class Members paid for."  *Id.* ¶ 355.

11  Defendants contend that this claim "should be dismissed because" such claims can not be brought

12  "where there exists an enforceable express contract."  Anthem Mot. at 11.  According to

13  Defendants, Plaintiffs must, pursuant to New York law, bring their claim against Defendants as a

14  breach of contract claim, and not as an unjust enrichment claim.  *See, e.g.*, *Goldman v. Metro. Life*

15  *Ins. Co.*, 841 N.E.2d 742, 746–47 (N.Y. 2005) ("Given that the disputed terms and conditions fall

16  entirely within the insurance contract, there is no valid claim for unjust enrichment.").

17  As the parties acknowledge, the viability of Plaintiffs' New York unjust enrichment claim

18  depends largely upon the viability of Plaintiffs' breach of contract claims.  *See* Anthem Mot. at 11;

19  Anthem Opp'n at 11.  As Plaintiffs point out, parties are barred from bringing unjust enrichment

20  claims in New York where "there is a 'valid written agreement, the existence of which is

21  undisputed, and the scope of *which clearly covers the dispute between the parties*.'"  Anthem

22  Opp'n at 11 (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y.

23  1987)).  Here, there is significant uncertainty over the nature and scope of Plaintiffs' contracts

24  with Defendants, as Plaintiffs have failed to identify the specific contractual provisions that were

25  breached.  Based on this reason, the Court dismissed Plaintiffs' California and New Jersey breach

26  of contract claims.

27  30

1    Because Plaintiffs' New York unjust enrichment claim depends upon Plaintiffs' breach of

2    contract claims, the Court DISMISSES Plaintiffs' New York unjust enrichment claim.  However,

3    consistent with the Court's ruling regarding Plaintiffs' breach of contract claims, Plaintiffs shall

4    have leave to amend their New York unjust enrichment claim.

5    **F.  California Unfair Competition Law (against Anthem and Non-Anthem Defendants)**

6         California's Unfair Competition Law ("UCL") provides a cause of action for business

7    practices that are (1) unlawful, (2) unfair, or (3) fraudulent.  Cal. Bus & Prof. Code § 17200, *et*

8    *seq.*  "The UCL's coverage is sweeping, and its standard for wrongful business conduct

9    intentionally broad."  *Moore v. Apple, Inc.*, 73 F. Supp. 3d 1191, 1204 (N.D. Cal. 2014) (internal

10   quotation marks omitted).  "Although the UCL targets a wide range of misconduct, its remedies

11   are limited because UCL actions are equitable in nature."  *Pom Wonderful LLC v. Welch Foods,*

12   *Inc.*, 2009 WL 5184422, *2 (C.D. Cal. Dec. 21, 2009).  "Remedies for private individuals bringing

13   suit under the UCL are limited to restitution and injunctive relief."  *Id.*

14        Each prong of the UCL provides a separate and distinct theory of liability, *Lozano v. AT&T*

15   *Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007), and Plaintiffs assert that Defendants'

16   conduct was unlawful, unfair, and fraudulent, *see* CAC ¶¶ 366.  Before addressing whether

17   Plaintiffs have sufficiently pleaded liability under these three prongs, however, the Court must

18   first determine whether Plaintiffs have standing to bring suit.  In order to establish standing under

19   the UCL, "a plaintiff must make a twofold showing: he or she must demonstrate injury in fact and

20   a loss of money or property caused by unfair competition."  *Susilo v. Wells Fargo Bank, N.A.*, 796

21   F. Supp. 2d 1177, 1195–96 (C.D. Cal. 2011) (internal quotation marks omitted).  The California

22   Supreme Court has referred to these elements as the "economic injury" and "caus[ation]"

23   requirement.  *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 885 (Cal. 2011).

24        **1.  Standing**

25             **a.  Economic Injury**

26        As to whether Plaintiffs have demonstrated "injury in fact" and "a loss of money or

27                                              31

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

property caused by unfair competition," *Susilo*, 796 F. Supp. 2d at 1195–96, the California Supreme Court has stated that "[t]here are innumerable ways in which economic injury from unfair competition may be shown," *Kwikset*, 246 P.3d at 885.  A plaintiff may, for instance,

> (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary

*Id.* at 885–86.  Here, Plaintiffs seek recovery under the UCL for three types of economic injury: "Loss of Benefit of the Bargain," "Out of Pocket Costs," and "Imminent Risk of Further Costs."[8] Plaintiffs' request for "Loss of Benefit of the Bargain" mirrors the California Supreme Court's determination in *Kwikset* that a plaintiff who has "surrender[ed] in a transaction more, or acquire[d] in a transaction less, than he or she otherwise would have" may bring a UCL claim. 246 P.3d at 885; *see also* CAC ¶ 309 ("As a result of Anthem and Anthem Affiliates' failure to implement the security measures required by the contracts, Plaintiffs and Statewide Class Members did not receive the full benefit of their bargain, and instead received health insurance and/or related health care services that were less valuable than what they paid for.").

Moreover, more recent case law within the data breach context confirms that benefit of the bargain damages represent economic injury for purposes of the UCL.  *See In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1224 (N.D. Cal. 2014) (finding standing under the UCL because "[f]our of the six [p]laintiffs allege they personally spent more on Adobe products than they would had they known Adobe was not providing the reasonable security Adobe represented it was providing."); *In re LinkedIn User Privacy Litig.*, 2014 WL 1323713, *4 (N.D. Cal. Mar. 28, 2014) (finding that benefit of the bargain losses are "sufficient to confer . . . statutory standing under the UCL.").  Taken together, *Kwikset*, *In re Adobe*, and *In re LinkedIn* demonstrate that

---

[8] The consolidated amended complaint also alleges economic injury in the form of the "Loss of Value of PII."  Plaintiffs, however, concede "that the loss of Value of PII does not "constitute[] economic injury for purposes of the UCL."  Anthem Opp'n at 14 n.16.

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO DISMISS

1  benefit of the bargain losses, as alleged in the consolidated amended complaint, constitute

2  economic injury cognizable under the UCL.

3          Incidentally, the fact that Plaintiffs have sufficiently pleaded benefit of the bargain losses

4  also establishes that Plaintiffs may seek restitution under the UCL.  "[I]n the context of the UCL,

5  'restitution' is limited to the return of property or funds in which the plaintiff has an ownership

6  interest (or is claiming through someone with an ownership interest)."  *Madrid v. Perot Sys.*

7  *Corp.*, 30 Cal. Rptr. 3d 210, 219 (Ct. App. 2005).  "Under the UCL, an individual may recover

8  profits unfairly obtained to the extent that these profits represent monies given to the defendant or

9  benefits in which the plaintiff has an ownership interest."  *Pom Wonderful*, 2009 WL 5184422, *2

10  (internal quotation marks omitted).  In requesting benefit of the bargain damages, Plaintiffs allege

11  (1) that Defendants promised to undertake reasonable data security measures in accordance with

12  the law, (2) that some portion of Plaintiffs' plan premiums went towards data security, and (3) that

13  Defendants failed to undertake the promised data security measures.  Plaintiffs therefore

14  "overpa[id]" for their health insurance.  CAC ¶ 309.  In other words, Defendants profited from

15  their lax security measures.  Because Plaintiffs seek to "recover profits unfairly obtained," *Pom*

16  *Wonderful*, 2009 WL 5184422, *2, Plaintiffs have sufficiently established that they may seek

17  restitution in the instant action.

18          Defendants' reliance on *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*

19  *("Sony I")*, 903 F. Supp. 2d 942 (S.D. Cal. 2012), to challenge this conclusion is misplaced.  In

20  *Sony I*, defendants provided users with access to the Playstation Network ("PSN") free of charge.

21  903 F. Supp. 2d at 966.  Because the *Sony I* plaintiffs "received the PSN services free of cost," the

22  district court concluded that "[p]laintiffs have not alleged 'lost money or profits,'" as required to

23  seek restitution under the UCL.  *Id.*  In contrast, in the instant action, Plaintiffs did pay Defendants

24  for their health benefits.  Moreover, Plaintiffs understood that some portion of this payment would

25  be directed "to protect Plaintiffs' and Statewide Class Members' [PII] in compliance with federal

26  and state laws and regulations."  CAC ¶ 303(a).  Based on these allegations, Plaintiffs have

27                                          33

28  ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
    AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
    DISMISS

United States District Court
Northern District of California

1    established that Defendants received money in exchange for protecting Plaintiffs' data and that

2    Plaintiffs now seek recovery of this money.

3          Because Plaintiffs have established economic injury and restitution under the UCL by

4    pleading benefit of the bargain losses, the Court need not address whether "Out of Pocket Costs"

5    and "Imminent Risk of Further Costs" constitute economic injury under the UCL.  The Court

6    recognizes, however, that the case law on these questions is still developing.  On the one hand,

7    some district courts have held that such costs are not actionable under the UCL.  *See, e.g.*, *Sony I*,

8    903 F. Supp. 2d at 966 ("Plaintiffs' allegations that the heightened risk of identity theft, time and

9    money spent on mitigation of that risk, and property value in one's information, do not suffice as

10   injury under the UCL."); *Ruiz v. Gap, Inc.*, 2009 WL 250481, *4 (N.D. Cal. Feb. 3, 2009) ("[I]t is

11   far from clear that the time and expenditure associated with monitoring one's credit is the kind of

12   loss of money or property necessary for standing to assert a claim under section 17200.").

13         Several other district courts, however, have found otherwise.  *See, e.g.*, *Corona v. Sony*

14   *Pictures Entm't, Inc.*, 2015 WL 3916744, *5 (C.D. Cal. June 15, 2015) ("[T]he Court finds that

15   [p]laintiffs adequately allege a cognizable injury by way of costs relating to credit monitoring,

16   identity theft protection, and penalties."); *Witriol v. LexisNexis Grp.*, 2006 WL 4725713, *6 (N.D.

17   Cal. Feb. 10, 2006) ("Plaintiff has expressly alleged that[] he and the Class Members have

18   incurred costs associated with monitoring and repairing credit impaired by the unauthorized

19   release of private information.  Thus, plaintiff has sufficiently alleged that he has suffered actual

20   injury and sustained monetary loss as a result of [d]efendants' actions.") (internal quotation marks

21   omitted).

22         Although *Kwikset* does contain language that appears to weigh in Plaintiffs' favor, *see,*

23   *e.g.*, 246 P.3d at 885–86 (economic injury includes instances where an individual is "required to

24   enter into a transaction, costing money or property, that would otherwise have been unnecessary"),

25   because Plaintiffs have already established economic injury under the UCL by pleading "Benefit

26   of the Bargain" losses, the Court need not resolve whether "Out of Pocket Costs" and "Imminent

                                                    34

27   Case No. 15-MD-02617-LHK

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

1    Risk of Further Costs" constitute economic injury under the UCL.

2            **b. Causation**

3            "Generally, to prove that a data breach caused identity theft, the pleadings must include

4    allegations of a nexus between the two instances beyond allegations of time and sequence."

5    *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1326 (11th Cir. 2012).  "[*P*]*urely* temporal connections are

6    often insufficient to establish causation."  *Stollenwerk v. Tri-West Health Care All.*, 254 F. App'x

7    664, 668 (9th Cir. 2009).  Instead, the "pleadings must indicate a logical connection between the

8    two incidents."  *Resnick*, 693 F.3d at 1327.

9            Here, the consolidated amended complaint sufficiently establishes a logical connection

10   between the Anthem data breach and the harm suffered by Plaintiffs.  Every Plaintiff was at one

11   point enrolled in a health plan administered by a Defendant.  *See* CAC ¶¶ 12–108.  As a condition

12   of this enrollment, each Plaintiff provided his or her PII to a Defendant, which was thereafter

13   inputted into Anthem's database.  Defendants do not contest that each Plaintiff had his or her PII

14   stolen as a result of the Anthem data breach.  Finally, many Plaintiffs allege that third parties used

15   Plaintiffs' PII in the wake of the data breach.  *See, e.g.*, *id.* ¶ 21 ("[T]he Tharps received a

16   confirmatory letter from the IRS informing them that someone may have attempted to impersonate

17   them by using their names and Social Security numbers to file a 2014 federal tax return.").  These

18   allegations—that each Plaintiff was enrolled in a health plan administered by a Defendant, that

19   each Plaintiff had his or her PII stolen, and that specific aspects of Plaintiff's PII were used for

20   illicit financial gain after the breach—establish the requisite logical and temporal connection

21   necessary to demonstrate causation.

22           Defendants' contentions to the contrary lack merit.  Defendants argue that Plaintiffs "rel[y]

23   . . . on tenuous temporal relationships that fail to connect the cyberattack and the alleged injuries,

24   rather than stating sufficient facts to show economic injury caused by the unfair business

25   practice."  Anthem Mot. at 16 (internal quotation marks and alteration omitted).  As the Court has

26   pointed out, however, Plaintiffs do more than simply allege a temporal relationship between their

27                                                     35

28   Case No. 15-MD-02617-LHK
     ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

1    economic injury and the data breach at issue.  Rather, Plaintiffs state that (1) they were enrolled in

2    a particular health plan administered by a Defendant, (2) that they provided their PII to Anthem,

3    (3) that their PII was compromised as a result of the data breach, and (4) that their PII was used for

4    illicit financial gain.  Taken together, these allegations "plausibly link Plaintiffs' purported injuries

5    to the Anthem cyberattack." *Id.* at 9.

6          On this particular point, the Court also observes that Defendants have argued that "[s]cores

7    of other cyber intrusions and data thefts have compromised the personal information of tens of

8    millions of individuals." *Id.* at 9 n.7.  In support of this argument, Defendants point to recent data

9    breaches at eBay, Target, Home Depot, Neiman Marcus, and various other entities. *Id.* This

10   contention fails for multiple reasons.  First, Defendants' argument relies upon facts taken from a

11   *Forbes* magazine article—an article not cited or referred to in the consolidated amended

12   complaint.  Defendants' argument thus represents little more than an end around the rule that, on a

13   motion to dismiss, the Court may generally "consider only the contents of the complaint." *Cooper*

14   *v. Pickett*, 137 F.3d 616, 622 (9th Cir. 1997).

15         Second, and more importantly, under Defendants' theory, a company affected by a data

16   breach could simply contest causation by pointing to the fact that data breaches occur all the time,

17   against various private and public entities.  This would, in turn, create a perverse incentive for

18   companies: so long as enough data breaches take place, individual companies will never be found

19   liable.  No part of the UCL, the relevant authority addressing causation, or the specific facts of this

20   case support such a legal theory.

21         As a final matter, Defendants focus on the allegations of Plaintiff Joseph Blanchard

22   ("Blanchard").  Blanchard alleges that he "spent over 60 hours addressing credit fraud, monitoring

23   his accounts, and addressing issues arising from the Anthem data breach."  CAC ¶ 22.  However,

24   according to Defendants, Blanchard never received notice that his PII had been "compromised in

25   the Anthem cyberattack."  Non-Anthem Mot. at 11.  "Rather, the CAC alleges that Plaintiff

26   Blanchard's wife—who is not a named Plaintiff—received notice that ***her*** [PII] may have been

27                                                    36

1   compromised." *Id.*

2   As with Defendants' other arguments concerning causation, the Court finds this argument

3   unavailing.  The consolidated amended complaint states that Blanchard "was enrolled in a Blue

4   Cross Blue Shield of Texas health plan," and that he provided his PII to Blue Cross Blue Shield of

5   Texas as a condition of his enrollment.  CAC ¶ 22.  The consolidated amended complaint further

6   states that Blanchard and his wife were enrolled in the same health plan.  Thus, the only apparent

7   difference between the two is that Blanchard's wife received notice of the data breach, but

8   Blanchard did not.  This difference in circumstances, however, does not excuse the Non-Anthem

9   Defendants from liability.  Again, Plaintiffs allege that *every* individual enrolled in a health plan

10   administered by an Anthem or Non-Anthem Defendant was affected by the data breach.  *Id.* ¶¶ 1,

11   3.  That means that Blanchard, after reviewing the notice sent to his wife, could have reasonably

12   concluded that his PII had also been compromised.

13   Additional allegations in the consolidated amended complaint lend further support to

14   Blanchard's decision to take action.  According to Blanchard, "[f]ollowing announcement of the

15   Anthem breach, at least 10 credit cards or credit accounts were opened or attempted to be opened

16   in Mr. Blanchard's name and using his [PII]."  *Id.* ¶ 22.  Although Blanchard spent significant

17   time contesting the new charges on his accounts, Blanchard's credit score nonetheless dropped by

18   approximately 130 points.  These events suggest that Blanchard's data was not only compromised,

19   but also that Blanchard suffered significant financial harm as a result of the Anthem data breach.

20   To summarize, the Court finds that Plaintiffs have sufficiently demonstrated both a logical

21   and temporal relationship necessary to establish causation.  Defendants' attempts to direct the

22   Court to the facts (1) that many other data breaches occurred during the relevant time period and

23   (2) that a named Plaintiff did not receive notice from an Anthem or Non-Anthem Defendant do not

24   negate this finding.  Thus, by demonstrating both causation and economic loss, Plaintiffs have

25   sufficiently established standing under the UCL.

26   **2. Unlawful**

27   37

28   Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

1    "The unlawful prong of the UCL prohibits anything that can properly be called a business

2    practice and that at the same time is forbidden by law." *In re Adobe*, 66 F. Supp. 3d at 1225

3    (internal quotation marks omitted).  "Generally, violation of almost any law may serve as a basis

4    for a UCL claim." *Antman v. Uber Technologies, Inc.*, 2015 WL 6123054, *6 (N.D. Cal. Oct. 19,

5    2015) (internal quotation marks omitted).  However, a UCL claim "must identify the particular

6    section of the statute that was violated, and must describe with reasonable particularity the facts

7    supporting the violation." *Baba v. Hewlett-Packard Co.*, 2010 WL 2486353, *6 (N.D. Cal. June

8    16, 2010) (internal quotation marks omitted).

9         Plaintiffs allege that, with respect to the UCL's unlawful prong, Defendants' actions

10   violated the Federal Trade Commission Act, HIPAA, the Gramm-Leach-Bliley Act, California's

11   Confidentiality of Medical Information Act, California's unfair insurance practices statutes,

12   California's Insurance Information and Privacy Protection Act, and California's data breach

13   statute.  CAC ¶ 366(b).  In support of this contention, the consolidated amended complaint

14   identifies specific provisions of HIPAA, *id.* ¶¶ 177–81, the Gramm-Leach-Bliley Act, *id.* ¶ 182,

15   the Federal Trade Commission Act, *id.* ¶ 183, and California's data breach statute, *id.* ¶ 366(b),

16   that were allegedly violated.  Such references directly rebut Defendants' claim that the

17   consolidated amended complaint "references . . . statutes only generally, and does not specify how

18   . . . Defendants supposedly violated them."  Anthem Mot. at 17.  Instead, a review of the

19   complaint demonstrates that Plaintiffs' allegations "identify the particular section of the statute

20   that was violated," and other allegations in the consolidated amended complaint "describe with

21   reasonable particularity the facts supporting the violation." *Baba*, 2010 WL 2486353, *6.

22   Accordingly, the Court finds that Plaintiffs' claim survives under the UCL's unlawful prong.

23        **3. Unfair**

24        "The 'unfair' prong of the UCL creates a cause of action for a business practice that is

25   unfair even if not proscribed by some other law." *In re Adobe*, 66 F. Supp. 3d at 1225.  "The UCL

26   does not define the term 'unfair.' . . . [And] the proper definition of 'unfair' conduct against

27                                                    38

28   Case No. 15-MD-02617-LHK
     ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

1    consumers 'is currently in flux' among California courts." *Id.*

2        Some California appellate courts apply a balancing approach, which requires courts to

3    "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim."

4    *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (internal quotation marks

5    omitted).  Other California appellate courts have held that "unfairness must be tethered to some

6    legislatively declared policy or proof of some actual or threatened impact on competition."

7    *Lozano*, 504 F.3d at 735.  Finally, at least one California appellate court has adopted and applied

8    the three-part test set forth in § 5 of the Federal Trade Commission Act: "(1) the consumer injury

9    must be substantial; (2) the injury must not be outweighed by any countervailing benefits to

10   consumers or competition; and (3) it must be an injury that consumers themselves could not

11   reasonably have avoided."  *Camacho v. Auto. Club of Southern California*, 48 Cal. Rptr. 3d 770,

12   777 (Ct. App. 2006).  The Court shall refer to these tests as the "balancing test," the "tethering

13   test," and the "FTC test," respectively.

14       In challenging whether Plaintiffs have sufficiently pleaded a UCL claim under the unfair

15   prong, Defendants argue that the consolidated amended complaint "does not allege facts that

16   support the conclusion that Defendants' failure to prevent the cyberattack resulted from *immoral,*

17   *unethical, oppressive, or unscrupulous* conduct on Defendants' part."  Anthem Mot. at 18.

18   Defendants' singular focus on whether their actions were immoral, unethical, oppressive, or

19   unscrupulous, however, is misplaced.

20       None of the three tests for unfairness require plaintiffs to plead that defendants acted in an

21   immoral, unethical, oppressive, or unscrupulous manner.  With respect to the balancing test, for

22   instance, the California Courts of Appeal have stated that "an unfair business practice occurs when

23   it offends an established public policy *or* when the practice is immoral, unethical, oppressive,

24   unscrupulous or substantially injurious to consumers."  *Bardin v. Daimlerchrysler Corp.*, 39 Cal.

25   Rptr. 3d 634, 638 (Ct. App. 2006) (internal quotation marks omitted) (emphasis added).  In other

26   words, parties may proceed with a UCL claim under the balancing test by either alleging immoral,

                                              39

27

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

1  unethical, oppressive, unscrupulous, or substantially injurious conduct by Defendants *or* by

2  demonstrating that Defendants' conduct violated an established public policy.  Similarly, with

3  respect to the tethering test, parties need not show immoral, unethical, oppressive, unscrupulous,

4  or substantially injurious conduct in order to move forward with a UCL claim.  The tethering test

5  only requires parties to show "that the public policy which is a predicate to a consumer unfair

6  competition action under the 'unfair' prong of the UCL [is] tethered to specific constitutional,

7  statutory, or regulatory provisions."  *In re Adobe*, 66 F. Supp. 3d at 1226.  Finally, the FTC test

8  also does not require parties to show immoral, unethical, oppressive, unscrupulous, or

9  substantially injurious conduct by Defendants.

10  In any event, the Court finds dismissal of Plaintiffs' UCL claim under the unfair prong

11  unwarranted.  In *In re Adobe*, this Court observed that various California statutes—including

12  several statutes upon which Plaintiffs rely here—reflect "California's public policy of protecting

13  customer data."  *Id.* at 1227 (internal quotation marks omitted).  Based on the allegations in the

14  consolidated amended complaint, Defendants' actions violated this public policy.  Whether

15  Defendants' public policy violation is outweighed by the utility of their conduct under the

16  balancing test is a question to be resolved at a later stage in this litigation.  Thus, based on the

17  balancing test alone, the Court DENIES Defendants' motion to dismiss Plaintiffs' UCL claim

18  under the unfair prong.

19  **4. Fraudulent**

20  "To state a claim under the 'fraud' prong of [the UCL], a plaintiff must allege facts

21  showing that members of the public are likely to be deceived by the alleged fraudulent business

22  practice."  *Antman*, 2015 WL 6123054, *6.  Claims stated under the fraud prong of the UCL are

23  subject to the particularity requirements of Federal Rule of Civil Procedure 9(b).  *Kearns v. Ford*

24  *Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).  Under this Rule, "[i]n alleging fraud or mistake,

25  a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ.

26  P. 9(b).  Plaintiffs must include "an account of the time, place, and specific content of the false

27  40

28  Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

1   representations" at issue.  *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (internal

2   quotation marks omitted).

3   The gravamen of Plaintiffs' fraud claim is that Defendants promised to carry out

4   reasonable security measures, but ultimately failed to carry through with this promise.  *See*

5   *generally* CAC ¶¶ 2–6.  At first blush, these allegations appear sufficient to state a claim under the

6   fraud prong of the UCL: Defendants represented to Plaintiffs that they would do one thing, but

7   ended up doing another.  In general, such allegations constitute a misrepresentation in the most

8   classic sense.  *See Northstar Fin. Advisors Inc. v. Schwab Invs.*, 2015 WL 5785549, *16 (N.D.

9   Cal. Oct. 5, 2015) ("[Defendant] represented . . . to shareholders that [defendant] would do one

10  thing, but ended up doing another.  That is a misrepresentation in the most classic sense.").

11  However, Plaintiffs' fraud claim suffers from one notable flaw: as with Plaintiffs' breach

12  of contract claims, Plaintiffs have not "include[d] an account of the *time* . . . of the false

13  representations" at issue.  *Swartz*, 476 F.3d at 764 (emphasis added).  Instead, Plaintiffs once

14  again direct the Court to review statements made by Defendants in various privacy notices and on

15  Defendants' public websites.  *See* Anthem Opp'n at 17 (citing CAC ¶¶ 161–76).  As the Court has

16  explained, the consolidated amended complaint does not specify when these privacy notices were

17  received or when certain statements were made on Defendants' websites.  In fact, for several of

18  the statements at issue, the only date identified in the consolidated amended complaint is October

19  19, 2015, the last day that Plaintiffs visited Defendants' websites.  That date postdates the Anthem

20  data breach and does not establish that Plaintiffs relied upon or were deceived by promises that

21  Defendants made to Plaintiffs prior to the data breach.

22  Consistent with the Court's reasoning with respect to Plaintiffs' breach of contract claims,

23  it is possible that Plaintiffs may amend the complaint to state with particularity the time that the

24  specific misrepresentations occurred.  Accordingly, the Court finds that Plaintiffs have not stated a

25  fraud claim under the UCL, but that Plaintiffs may be able to do so after amendment.  Thus,

26  Plaintiffs' fraud claim under the UCL is DISMISSED with leave to amend.  Plaintiffs, however,

27                                                              41

28

have sufficiently established standing under the UCL and have sufficiently stated a UCL claim to survive dismissal under the unlawful and unfair prongs.  Defendants' motion to dismiss Plaintiffs' UCL claim is therefore GRANTED in part and DENIED in part.

### G.  New York General Business Law § 349 (against Anthem and Non-Anthem Defendants)

New York General Business Law ("GBL") § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."  N.Y. Gen. Bus. § 349(a).  To successfully assert a claim under this section, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015).  In moving to dismiss Plaintiffs' GBL § 349 claim, Defendants contend, with respect to (1), that Plaintiffs' claim is based on a private contract dispute, and is therefore not the result of consumer-oriented conduct.  Anthem Mot. at 19–20. Defendants also argue, with respect to (3), that Plaintiffs have failed to demonstrate actual harm and causation.  The Court addresses these contentions in turn.

#### 1.  Consumer-Oriented Conduct

"To provide the basis for a Section 349 claim, a disputed private transaction must have 'ramifications for the public at large,' or be harmful to the general public interest."  *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 571 (E.D.N.Y. 2010).  "The conduct need not be repetitive or recurring but defendant's acts or practices must have a broad impact on consumers at large; private contract disputes *unique to the parties* would not fall within the ambit of the statute."  *Id.* (internal quotation marks omitted) (emphasis added).  Similarly, the New York Court of Appeals held, in *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995), that "[p]rivate contract disputes, unique to the parties . . . would not fall within the ambit of [GBL § 349]."  *See also id.* (finding that single shot transactions are not covered by section 349).  In general, New York courts have held that the consumer-oriented

42

United States District Court
Northern District of California

United States District Court
Northern District of California

1  requirement should be "construed liberally." *New York v. Feldman*, 210 F. Supp. 2d 294, 301
2  (S.D.N.Y. 2002).

3       In interpreting this requirement, courts have found consumer-oriented conduct where
4  banks operated a standard savings account policy for customers, *Oswego*, 647 N.E.2d at 745, and
5  where a mortgage company offered a standard lending policy to prospective borrowers, *M & T*
6  *Mortg. Corp.*, 736 F. Supp. 2d at 571.  On the other hand, courts have determined that the
7  consumer-oriented requirement was not met where an insurance company denied an individual's
8  claim for coverage, *Daniels v. Provident Life & Cas. Ins. Co.*, 2001 WL 877329, *8 (W.D.N.Y.
9  July 25, 2001), and where a party failed to fulfill a specific provision in an advertising contract,
10 *WorldHomeCenter.com, Inc. v. PLC Lighting, Inc.*, 851 F. Supp. 2d 494, 498 (S.D.N.Y. 2011).

11      Plaintiffs' claims satisfy the GBL's consumer-oriented requirement.  The instant case does
12 not involve a unique, single shot dispute over the nature or scope of an individual's insurance
13 coverage.  Instead, Plaintiffs seek to bring a putative class action on behalf of approximately 80
14 million individuals who were affected by the Anthem data breach.  The purpose of bringing this
15 litigation as a putative class action is to ensure that consumers who might not have the resources to
16 serve as named Plaintiffs can nonetheless recover for Defendants' alleged misconduct.  Moreover,
17 Plaintiffs aver that the instant breach is but the latest in a series of data security incidents.
18 Notably, Anthem's database was also breached in 2009.  In 2013, the Office of the Inspector
19 General found Anthem's information systems deficient in several respects.  *See* CAC ¶¶ 193–98.
20 Anthem's continued non-compliance with data security practices would therefore not only affect
21 the named Plaintiffs, but also "a broad group of individuals"—all 80 million individuals whose PII
22 is stored on Anthem's database.  *See Feldman*, 210 F. Supp. 2d at 301.  Accordingly, Plaintiffs
23 have sufficiently alleged that Defendants' conduct was consumer-oriented in nature.

24      **2. Actual Harm**

25      Parties seeking damages under the GBL must provide "proof that a material deceptive act
26 or practice caused actual, although not necessarily pecuniary, harm."  *Small v. Lorillard Tobacco*

27                                                          43
   Case No. 15-MD-02617-LHK
28 ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
   AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
   DISMISS

1    *Co., Inc.*, 720 N.E.2d 892, 897 (N.Y. 1999) (internal quotation marks and emphasis omitted).  As

2    with Plaintiffs' UCL claim, Plaintiffs allege the following forms of harm under the GBL: "Out of

3    Pocket Costs," "Imminent Risk of Further Costs," and "Loss of Benefit of the Bargain."  Plaintiffs

4    also allege harm in the form of "Loss of Value of PII."  Anthem Opp'n at 18.[9]

5             **a.  "Out of Pocket Costs" and "Imminent Risk of Further Costs"**

6         As to "Out of Pocket Costs" and "Imminent Risk of Further Costs," the Court finds

7    instructive the Southern District of New York's decision in *Shafran v. Harley-Davidson, Inc.*,

8    2008 WL 763177 (S.D.N.Y. Mar. 20, 2008).  In *Shafran*, plaintiff brought suit against defendants

9    "seeking monetary damages and injunctive relief for himself and on behalf of a putative class of

10   60,000 . . .  who were informed by [defendants] that a laptop computer containing members'

11   personal information had been lost."  *Id.* at *1.  As in the instant case, plaintiff in *Shafran* asserted

12   a claim under GBL § 349.  In reviewing defendants' motion to dismiss, the district court

13   summarized the question before it as follows: "whether, under New York law, the time and money

14   that could be spent to guard against identity theft constitutes an existing compensable injury."  *Id.*

15   at *2.  The *Shafran* court observed that "New York courts have not addressed the issue," but that

16   several other courts had considered and rejected such claims.  *Id.*  Consistent with these decisions,

17   the *Shafran* court determined that plaintiff's claim for credit monitoring damages failed as a matter

18   of law.  *Id.* at *3.

19         Several district courts within the Second Circuit have relied upon *Shafran* to find that "Out

20   of Pocket Costs" and "Imminent Risk of Further Costs" do not represent injuries cognizable under

21   GBL § 349.  *See, e.g.*, *Hammond v. The Bank of New York Mellon Corp.*, 2010 WL 2643307, *13

22   (S.D.N.Y. June 25, 2010) (citing *Shafran* and concluding that "[p]laintiffs cannot establish that

23   [d]efendant engaged in consumer-oriented fraud or other misconduct which caused actual

24   damages within the meaning of the laws of their respective states.");  *Willey v. J.P. Morgan Chase,*

---

[9] Plaintiffs did not seek recovery for this form of injury with respect to their UCL claim.

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

1   *N.A.*, 2009 WL 1938987, *10 (S.D.N.Y. July 7, 2009) ("Willey's claims for expenses related to

2   credit monitoring, anxiety, emotional distress, and loss of privacy all arise due to the probability

3   that his data might have been misused.  Because this does not rise to the level of actual damages,

4   the state law claims fail to allege actual damages and must be dismissed.").

5          Tellingly, Plaintiffs have not cited any cases interpreting GBL § 349 that have found to the

6   contrary.  Instead, Plaintiffs rely upon the First Circuit's decision in *Anderson v. Hannaford Bros.*

7   *Co.*, 659 F.3d 151 (1st Cir. 2011).  Plaintiffs' reliance on this case is misplaced.  In *Anderson*, the

8   First Circuit was charged with interpreting and applying Maine tort and contract law.  *Id.* at 162–

9   67.  The *Anderson* court did not interpret, apply, or consider whether "Out of Pocket Costs" and

10  "Imminent Risk of Further Costs" were recoverable under GBL § 349.  Thus, rather than rely

11  upon *Anderson*—which did not address the state statutory provision at issue here—the Court shall,

12  in the instant case, follow the lead of *Shafran*, *Hammond*, and *Willey* and find that "Out of Pocket

13  Costs" and "Imminent Risk of Further Costs" are not cognizable injuries under GBL § 349.

14          **b.  "Loss of Value of PII"**

15          As to the "Loss of Value of PII," the Court observes that no New York state courts have

16  yet ruled on this question.  Nor has the Second Circuit or any federal district court in the Second

17  Circuit provided guidance on whether such losses constitute cognizable injury under GBL § 349.

18  Instead, Defendants rely entirely upon the Southern District of California's decision in *In re Sony*

19  *Gaming Networks & Consumer Data Security Breach Litigation ("Sony II")*, 996 F. Supp. 2d 942,

20  1004–05 (S.D. Cal. 2014).  In *Sony II*, the district court held that "a loss of privacy and/or a loss in

21  value of [one's] Personal Information" does not constitute injury under GBL § 349.  In reaching

22  this decision, the *Sony II* court relied solely upon the three Southern District of New York

23  decisions discussed above (*Shafran*, *Hammond*, and *Willey*), as well as the Seventh Circuit's

24  decision in *Pisciotta*.

25          The Court finds *Sony II* inapposite.  First, *Shafran*, *Hammond*, and *Willey* did not address

26  whether "Loss of Value of PII" represented a cognizable injury under GBL § 349.  Instead, the

27  Case No. 15-MD-02617-LHK
28  ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

United States District Court
Northern District of California

*Shafran*, *Hammond*, and *Willey* courts examined whether "Out of Pocket Costs" and "Imminent Risk of Further Costs" represented a cognizable injury under GBL § 349.  *See, e.g.*, *Shafran*, 2008 WL 763177, *2 ("Thus, the question before the Court is whether, under New York law, the time and money that could be spent to guard against identity theft constitutes an existing compensable injury."); *Hammond*, 2010 WL 2643307, *13 (focusing on whether plaintiffs could recover for costs of credit monitoring);  *Willey*, 2009 WL 1938987, *10 (same).  Although these concepts are somewhat similar to one another, they are not the same.  Indeed, as this Court explained in *In re Adobe*, the "[i]ncreased risk of harm" to an individual's personal information that arises after a data breach and the money that an individual spends to mitigate a data breach are two different injuries.  *See, e.g.*, 66 F. Supp. 3d at 1217 ("[T]he Court finds that Plaintiffs have plausibly alleged that the substantial risk of harm [p]laintiffs face following the 2013 data breach constitutes a cognizable injury-in-fact.  The costs [certain] [p]laintiffs . . . incurred to mitigate this risk of harm constitute an *additional cognizable injury*.") (emphasis added).

In addition, in *Pisciotta*—the only other decision cited by the *Sony II* court—plaintiffs did not bring a GBL § 349 claim.  Instead, plaintiffs asserted an Indiana negligence claim, and the *Pisciotta* court examined whether plaintiffs could proceed under Indiana law with a "cause of action in tort against a database owner for failing to" adequately protect personal information. Anthem Mot. at 2.  Given the fact that *Pisciotta* interpreted a different cause of action from a different state, the Court declines to rely upon *Pisciotta* to find that "Loss of Value of PII" is not a cognizable injury under GBL § 349.

To summarize, none of the cases cited in *Sony II* addressed whether "Loss of Value of PII" constitutes a cognizable injury under GBL § 349.  Under such circumstances, the Court need not follow *Sony II*.  Instead, the Court finds more persuasive a set of more recent decisions, all published after *Sony II*, where courts have recognized that "Loss of Value of PII" does represent a cognizable economic harm.

In *In re Adobe*, for instance, this Court rejected defendant's argument that an "'increased

46

United States District Court
Northern District of California

1    risk [of future harm]' is not a cognizable injury for Article III standing purposes." 66 F. Supp. 3d

2    at 1211.  In reaching this conclusion, this Court held that "the risk that [p]laintiffs' personal data

3    will be misused by the hackers who breached Adobe's network is immediate and very real." *Id.* at

4    1214.  According to plaintiffs in *In re Adobe*, "hackers deliberately targeted Adobe's servers and

5    spent several weeks collecting names, usernames, passwords, email addresses, phone numbers,

6    mailing addresses, and credit card numbers and expiration dates." *Id.*  After the Adobe data

7    breach, hackers misused plaintiffs' personal information to decrypt credit card accounts and "to

8    discover vulnerabilities in Adobe's products." *Id.* at 1215–16.  Under these facts, this Court

9    concluded that "[p]laintiffs' allegations of a concrete and imminent threat of future harm suffice to

10   establish Article III injury-in-fact at the pleadings stage under both" prevailing Ninth Circuit and

11   U.S. Supreme Court precedent. *Id.* at 1216; *see also Corona*, 2015 WL 3916744, *3 (determining

12   that plaintiffs had sufficiently established injury under Article III by alleging "that the[ir] PII was

13   stolen and posted on file-sharing websites for identity thieves to download.").

14        Here, too, Plaintiffs allege that cyberattackers extracted Plaintiffs' PII from the Anthem

15   database over an extended time period, from December 2014 to January 2015.  Plaintiffs further

16   allege that these cyberattackers misused Plaintiffs' personal information.  A false tax return, for

17   instance, was allegedly filed on behalf of New York Plaintiff Juan Carlos Cerro.  CAC ¶ 87.

18   Thus, under the reasoning set forth in *In re Adobe*, Plaintiffs' "Loss of Value of PII" would

19   represent a cognizable injury under Article III.

20        Likewise, in *In re Facebook Privacy Litigation*, 572 F. App'x 494, 494 (9th Cir. 2014),

21   plaintiffs contended that "they were harmed both by the dissemination of their personal

22   information and by losing the sales value of that information."  The Ninth Circuit concluded that,

23   "[i]n the absence of any applicable contravening state law," such "allegations [were] sufficient to

24   show the element of damages for [plaintiffs'] breach of contract and fraud claims," and that "the

25   district court erred in dismissing these state law claims." *Id.*

26        Most recently, in *Svenson v. Google, Inc.*, 2015 WL 1503429, *5 (N.D. Cal. Apr. 1, 2015),

27                                                    47

28   Case No. 15-MD-02617-LHK
     ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

the district court, following *In re Facebook*, concluded that plaintiff's "allegations of diminution in value of her personal information are sufficient to show contract damages for pleading purposes."

The Court acknowledges that the *In re Adobe*, *Corona*, *In re Facebook*, and *Svenson* decisions are not perfectly analogous to the claim that is currently before the Court. Both *In re Adobe* and *Corona*, for instance, addressed the loss in value of an individual's PII in the standing context, and both *In re Facebook* and *Svenson* addressed the loss in value of an individual's PII in the context of a common law breach of contract claim. However, the consistent theme running through these decisions—all of which were, again, published after *Sony II*—is that "Loss of Value of PII" represents a cognizable form of economic injury. Absent any state law or Second Circuit precedent that holds to the contrary, the Court finds that it would be appropriate to apply this general principle to Plaintiffs' GBL § 349 claim. Accordingly, the Court finds that "Loss of Value of PII" constitutes a cognizable injury under GBL § 349.

### c. "Loss of Benefit of the Bargain"

Finally, the Court turns to consider harm in the form of "Loss of Benefit of the Bargain." On this point, the case law tips in Plaintiffs' favor. In *Orlander v. Staples, Inc.*, 802 F.3d 289, 301 (2d Cir. 2015), the Second Circuit determined that plaintiff had "sufficiently alleged an injury stemming from [a] misleading practice" by pleading that "he would not have purchased [a set of services] had he known that [d]efendant intended to decline to provide him any [such] services" during the first of year of his contract. The reasoning in *Orlander* directly governs Plaintiffs' claim here for "Benefit of the Bargain" losses: Plaintiffs allege that, "[h]ad Defendants disclosed to Affected Individuals that their computer systems and data security practices were inadequate to safeguard Affected Individuals' highly sensitive [PII], Affected Individuals would not have entrusted their [PII] to Defendants and would not have enrolled in their insurance or health care plans." CAC ¶ 249.

In challenging this finding, Defendants rely upon an earlier Second Circuit decision,

48

1    *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009).  Anthem Mot. at 20.  Defendants'

2    reliance on *Spagnola* is not well taken.  In fact, in *Orlander*, the Second Circuit discussed and

3    distinguished *Spagnola*.  Specifically, the Second Circuit observed that, in *Spagnola*, although

4    plaintiffs alleged "damages in the amount of the purchase price of their contracts," plaintiffs

5    "*failed to allege* that defendants had denied them the services for which they contracted."  802

6    F.3d at 302.  In *Orlander*, however, "[p]laintiff . . . alleged both [1] a monetary loss stemming

7    from the deceptive practice and [2] the [d]efendant's failure to deliver contracted-for services."

8    *Id.*  Similarly, in the instant case, Plaintiffs have alleged both (1) a monetary loss stemming from a

9    deceptive practice—"overpayment[] to Defendants for health insurance or health care services

10   purchased," CAC ¶ 267(h)—and (2) Defendants' failure to deliver to Plaintiffs certain services—

11   "reasonable and adequate security measures to protect Affected Individuals' [PII]," *id.*

12        In sum, although "Out of Pocket Costs" and "Fear of Imminent Further Costs" are not

13   cognizable injuries under GBL § 349, "Loss of Value of PII" and "Loss of Benefit of the Bargain"

14   are cognizable injuries under GBL § 349.  Accordingly, Plaintiffs have sufficiently pleaded injury

15   under GBL § 349.

16        **3. Causation**

17        Last, "[t]o properly allege causation, a plaintiff must state in his complaint that he has seen

18   the misleading statements of which he complains before he came into possession of the products

19   he purchased."  *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 480

20   (S.D.N.Y. 2014).  Unlike the UCL, "an action under § 349 is not subject to the pleading-with-

21   particularity requirements of Rule 9(b), but need only meet the bare-bones notice-pleading

22   requirements of Rule 8(a)."  *Pelman ex rel. Pelman v. McDonald's Corp*, 396 F.3d 508, 511 (2d

23   Cir. 2005) (citation omitted); *see also id.* ("[B]ecause § 349 extends well beyond common-law

24   fraud to cover a broad range of deceptive practices, . . . a private action under § 349 does not

25   require proof of the same essential elements (such as reliance) as common-law fraud.").

26        As the Court has explained, Plaintiffs aver that Defendants made various representations

27                                                                49

28   Case No. 15-MD-02617-LHK
     ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

that Plaintiffs' PII would be protected.  These representations came in the form of statements made on Defendants' websites and statements made in Defendants' privacy notices.   The Court finds that Plaintiffs have sufficiently alleged causation under GBL § 349 based on GBL § 349's pleading requirements and case law interpreting GBL § 349.

First, as the Court has pointed out, GBL § 349 is not subject to the more demanding pleading requirements of Federal Rule of Civil Procedure 9(b).  Thus, the New York Court of Appeals has held that Plaintiffs bringing claims under GBL § 349 must simply raise a reasonable inference of causation rather than demonstrating reliance.  *See, e.g.*, *Stutman v. Chem. Bank*, 731 N.E.2d 608, 612 (N.Y. 2000) ("Reliance and causation are twin concepts, but they are not identical."); *see also id.* at 612–13 (elaborating upon differences between reliance and causation).

Several recent federal district court decisions from the Eastern and Southern Districts of New York help illustrate the difference between causation and reliance.  In *Dash v. Seagate Technology (U.S.) Holdings, Inc.*, 27 F. Supp. 3d 357 (E.D.N.Y. 2014), for instance, the district court *denied* dismissal of plaintiff's deceptive practices claim under GBL § 349, but *granted* dismissal on plaintiff's common law fraud claim.  Although plaintiff did not specify when plaintiff saw the misrepresentations at issue, "[t]he reasonable inference to be drawn from [plaintiff's] allegations is that [plaintiff] saw the misleading statements and, as a result of such, purchased the [product] at issue." *Id.* at 361.  Accordingly, the *Dash* court found causation "sufficiently pled" for purposes of GBL § 349.  *Id.*  However, after reciting the applicable pleading requirements under Rule 9(b), the *Dash* court determined that, under these same facts, plaintiffs' "concluso[ry] alleg[ations]" were insufficient to state a claim for common law fraud.  *Id.* at 362–63.

Consistent with *Dash*, plaintiff in *Goldemberg v. Johnson & Johnson* "describe[d] in particular [detail] the allegedly misleading advertising and other statements." 8 F. Supp. 3d at 480.  Plaintiff "then allege[d] that '[defendant]'s false, misleading, and deceptive misrepresentations and omissions . . . deceived and misled [plaintiff].'" *Id.*  Although plaintiff did not specify when defendant made the "false, misleading, and deceptive misrepresentations" at

50

United States District Court
Northern District of California

issue, the district court concluded that "[t]he reasonable inference to be drawn from these allegations . . . is that [plaintiff] saw the [misrepresentations] described previously in the Complaint, and was thus deceived into purchasing the products in question." *Id.*

Finally, in *Belfiore v. Proctor & Gamble Co.*, 94 F. Supp. 3d 440, 446 (E.D.N.Y. 2015), the pleadings also failed to specify when plaintiff viewed the misrepresentation at issue. The district court, however, found this detail "not decisive" for purposes of plaintiff's GBL § 349 claim. *Id.* Consistent with *Goldemberg* and *Dash*, the district court stated that the reasonable inference to be drawn was that plaintiff first viewed the misrepresentation, and then went on to purchase the product at issue. *Id.*

In sum, after reviewing the allegations in the consolidated amended complaint, the different pleading requirements between GBL § 349 and Federal Rule of Civil Procedure 9(b), and case law addressing GBL § 349, the Court finds that Plaintiffs have sufficiently alleged causation for purposes of their GBL § 349 claim.

### 4. ERISA Preemption

As a final matter, the consolidated amended complaint includes four named New York Plaintiffs, all of whom assert a GBL § 349 claim on behalf of themselves and a putative statewide class. CAC ¶¶ 85–88. Defendants contend that New York Plaintiff Matthew Gates' ("Gates") GBL § 349 claim is preempted by ERISA. *See* Anthem Mot. at 22. Defendants, however, do not assert ERISA preemption against New York Plaintiffs Barbara Gold, Marne Onderdonk, and Juan Carlos Cerro. Thus, because Plaintiffs have demonstrated all of the required elements to plead a GBL § 349 claim, Plaintiffs' GBL § 349 claim survives whether or not Gates' claim is preempted. Defendants' motion to dismiss Plaintiffs' GBL § 349 claim is therefore DENIED.

Additionally, the Court denies without prejudice Defendants' motion to dismiss Gates' GBL § 349 claim as preempted by ERISA. As the Ninth Circuit has observed, "[t]here are two strands of ERISA preemption: (1) 'express' preemption under ERISA § 514(a), 29 U.S.C. § 1144(a); and (2) preemption due to a 'conflict' with ERISA's exclusive remedial scheme set forth

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO DISMISS

in [ERISA § 502(a),] 29 U.S.C. § 1132(a)."  *Fossen v. Blue Cross and Blue Shield of Mont., Inc.*,

660 F.3d 1102, 1107 (9th Cir. 2011).  "Under § 514(a), ERISA broadly preempts any and all State

laws insofar as they may now or hereafter *relate to* any covered employee benefit plan."  *Id.* at

1108 (internal quotation marks and alteration omitted) (emphasis added).  "A [state] law 'relates

to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or

reference to such a plan."  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983).  "[T]he words

'relate to,'" however, "cannot be taken too literally."  *Roach v. Mail Handlers Benefit Plan*, 298

F.3d 847, 849 (9th Cir. 2002).  "If 'relate to' were taken to extend to the furthest stretch of its

indeterminacy, then for all practical purposes pre-emption would never run its course, for 'really,

universally, relations stop nowhere.'""  *N.Y. State Conf. of Blue Cross & Blue Shield Plans v.

Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (alteration omitted).  Instead, "relates to" must be

"read in the context of the presumption that in fields of traditional state regulation the historic

police powers of the States are not to be superseded by a Federal Act unless that was the clear and

manifest purpose of Congress."  *Roach*, 298 F.3d at 850 (internal quotation marks and alteration

omitted).

> Under ERISA § 502(a), a civil enforcement action may be brought:
>
> (1) by a participant or beneficiary— . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a).  Pursuant to this provision, a "state-law cause of action that duplicates,

supplements, or supplants the ERISA civil enforcement remedy" is preempted because it

"conflicts with the clear congressional intent to make the ERISA remedy exclusive."  *Aetna

Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).

The primary points of disagreement between the parties is whether, for purposes of both

conflict and express preemption, (1) Defendants' promises to protect Plaintiffs' PII represents a

"benefit" under Plaintiffs' health plans, as defined by ERISA, and (2) whether state laws that

implicate Plaintiffs' data security "relate to" or conflict with ERISA.

52

1    There is insufficient information at this time to make a determination on either question.

2  As noted above, Plaintiffs have failed to produce a copy of their insurance contracts with

3  Defendants and have failed to identify which contractual provisions Defendants allegedly

4  breached.  In addition, although Defendants have submitted a copy of Gates' Summary Plan

5  Description, *see* ECF No. 412-1, Plaintiffs contend that Gates' contract and the Summary Plan

6  Description are different documents.  Anthem Opp'n at 25.  Defendants' obligations to protect

7  Gates' data, Plaintiffs argue, were memorialized in Gates' contract, and "[t]here is no preemption

8  when plaintiffs sue to enforce the terms of some contract other than the ERISA plan."  *Id.*  As a

9  final point, neither party has provided briefing on whether Congress necessarily intended for

10  ERISA to preempt state consumer protection laws such as New York's GBL § 349.

11    Given the disputed contentions made by the parties and the fact that the parties have not

12  produced a copy of Gates' contract, the Court can not decide whether Gates' GBL § 349 claim is

13  preempted by ERISA.  In reaching this conclusion, the Court finds instructive statements made by

14  U.S. Department of Labor ("DOL") staff at the 2010 Joint Committee of Employee Benefits

15  Technical Session, hosted by the American Bar Association.  Specifically, DOL staff were asked

16  the following:

17  
18    In an era of enhanced privacy protections, some participants have complained that
      personally identifiable information (PII) releases have occurred under State
      privacy laws . . .

19
20    Does the DOL agree that State privacy laws regarding PII releases are not
      applicable to plan administration communications from authorized third party
21    service providers?

22  *Questions and Proposed Answers for the Department of Labor Staff for the 2010 Joint Committee*

23  *of Employee Benefits Technical Section* at 20–21 (May 5, 2010), *available at*

24  http://tinyurl.com/jhp2hcp.  DOL staff declined to provide a definitive "answer [to] this question

25  due to insufficient information."  *Id.* at 21.  After citing and discussing ERISA § 514(a) and the

26  applicable legal standards behind this section, DOL "staff note[d] that without specific statutory

27                                                        53

language and a description of how the statute relates to [a specific] ERISA-covered employee benefit plan, [DOL] staff [could not] determine whether a particular state privacy statute is preempted by ERISA." *Id.* In sum, when confronted with a general inquiry as to whether state privacy laws were preempted by ERISA, DOL staff declined to provide a sweeping response, and instead requested additional information on the specific laws at issue.

The Court's decision to deny without prejudice is in line with DOL's position. Without specific information on the contours of Gates' health plan and the statutory purpose behind GBL § 349, the Court can not decide whether Gates' GBL § 349 claim is subject to ERISA preemption. Accordingly, the Court DENIES without prejudice Defendants' motion to dismiss Gates GBL § 349 claim as preempted by ERISA.

## H. Kentucky Consumer Protection Act (against Anthem and Non-Anthem Defendants)

Plaintiffs allege that the Anthem and Non-Anthem Defendants "engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce," in violation of the Kentucky Consumer Protection Act ("KCPA"), Ky. Rev. Stat. § 367.170, *et seq.* CAC ¶ 425. Defendants contend that Plaintiffs' KCPA claim fails "because the Act cannot be used to bring a class action." Anthem Mot. at 12. Moreover, Defendants assert that Plaintiffs do not have standing to bring a KCPA claim. *Id.* at 12–13.

With respect to the viability of class certification, the Court turns first to the Kentucky Circuit Court's decision in *Arnold v. Microsoft Corporation*, 2000 WL 36114007 (Ky. Cir. Ct. July 21, 2000). In *Arnold*, plaintiffs brought suit against Microsoft under the KCPA and under Kentucky's version of the Sherman Antitrust Act. *Id.* at *1. Plaintiffs sought damages and class certification. *Id.* In granting Microsoft's motion to dismiss, the Kentucky Circuit Court concluded that "[t]he Court does not believe that KRS 367.170 [the KCPA] is the correct statute to bring a claim based on monopolistic practices." *Id.* at *6. Moreover, "[t]he Court also does not believe that KRS 367.170 was meant to be a vehicle for Class Action suits and declines to open such a sweepingly vague statute for use as a blunt instrument in a Class Action suit." *Id.*; *see also*

54

1    *id.* at *8 ("Based on venue requirements and other language[,] . . . this Court . . . feels that KRS

2    367.170 was never meant to encompass class action litigants.").  The Kentucky Court of Appeals

3    affirmed the Circuit Court's judgment.  *Arnold v. Microsoft Corp.*, 2001 WL 1835377, *7–*8 (Ky.

4    Ct. App. Nov. 21, 2001).

5            A number of federal courts—including several in the MDL context—have relied upon

6    *Arnold* to find that plaintiffs can not bring a class action claim under the KCPA.  In *In re*

7    *Pharmaceutical Industry Average Wholesale Price Litigation*, 230 F.R.D. 61, 84 (D. Mass. 2005),

8    for instance, the district court relied upon *Arnold* to find that, "[u]nder the laws of . . . Kentucky .

9    . . there is no right to bring a class action to enforce the consumer protection statutes."  *Id.*  Thus,

10   the court concluded that "[c]onsumers in [Kentucky] may be excluded out of hand" in an MDL

11   brought against 42 pharmaceutical manufacturers.  *Id.*  Likewise, in *In re Grand Theft Auto Video*

12   *Game Consumer Litigation (No. II)*, 251 F.R.D. 139, 160 (S.D.N.Y. 2008), the district court,

13   citing *Arnold*, held that "Kentucky['s] consumer-fraud provision does not permit [a] class-action

14   suit." *Id.*  Finally, in *Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012), the

15   Ninth Circuit vacated the district court's decision to certify a nationwide class.  In reaching this

16   decision, the Ninth Circuit determined that nationwide class certification was inappropriate

17   because of differences amongst various state consumer protection laws.  *See id.* at 590–92.  In

18   dissent, Judge Dorothy Nelson disagreed with the majority's conclusion "that material differences

19   exist between California law and that of the 43 jurisdictions in which class members reside."  *Id.*

20   at 597 (Nelson, J., dissenting).  As Judge Nelson observed, "I find only one potentially material

21   difference: Louisiana, Georgia, Mississippi, Kentucky, Virginia and Alabama prohibit class

22   actions that allege unfair trade practices under state law."  *Id.* at 597–98; *see also id.* at 598 (citing

23   *Arnold*).  Thus, even though Judge Nelson disagreed with the majority's determination, she

24   nonetheless acknowledged that consumer protection laws in some states—including Kentucky—

25   bar private plaintiffs from bringing class action claims.

26           More recently, in *In re Target*, the District of Minnesota district court dismissed plaintiffs'

27                                                        55

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

KCPA claim upon finding that "[t]he consumer-protection statutes in eight states—Alabama, Georgia, Kentucky, Louisiana, Mississippi, Montana, South Carolina, and Tennessee—prohibit class-action treatment of claims under those statutes." 66 F. Supp. 3d at 1163. The *In re Target* court did not cite *Arnold*; instead, the *In re Target* court cited *Davenport v. Charter Communications, LLC*, 35 F. Supp. 3d 1040 (E.D. Mo. 2014). 66 F. Supp. 3d at 1165. As Plaintiffs note, the *Davenport* court was not presented with a KCPA claim. Anthem Opp'n at 12. Instead, the *Davenport* court was presented with a claim under Ky. Rev. Stat. § 337.385, a statute governing unpaid overtime. *See Davenport*, 35 F. Supp. 3d at 1051. The Court therefore finds the *In re Target* decision to be less instructive than the decisions in *In re Pharmaceutical* and *In re Grand Theft Auto*. Nonetheless, the common theme running through all of these cases is that, consistent with *Arnold*, courts have found that plaintiffs can not pursue a class action claim under the KCPA.

Plaintiffs have not cited any case law that would compel a different conclusion. Instead, Plaintiffs argue only that the KCPA "does not contain an express class action ban," and that some "courts have certified class actions under the KCPA, both before and after *Arnold*." Anthem Opp'n at 12. In support of this latter point, Plaintiffs rely upon two Western District of Kentucky decisions: *Brummett v. Skyline Corporation*, 1984 WL 262559 (W.D. Ky. Apr. 11, 1984), and *Clark v. BellSouth Telecommunications, Inc.*, 461 F. Supp. 2d 541 (W.D. Ky. 2006).

As Plaintiffs acknowledge, *Brummett* was decided sixteen years prior to *Arnold*. This fact alone renders Plaintiffs' reliance on *Brummett* unavailing. As the Sixth Circuit, of which Kentucky is a part, has noted, "[t]he function of [a federal court] is to apply the law of the state which governs the suit, not to take a position regarding the advisability or fairness of the rule applied." *San Francisco Real Estate Inv'rs v. J.A. Jones Real Estate Constr. Co.*, 703 F.2d 976, 977 n.2 (6th Cir. 1983); *see also In re Korean Air*, 642 F.3d at 699 ("[T]he MDL transferee court is generally bound by the same substantive legal standards . . . as would have applied in the transferor court."). Here, the federal district court for the Western District of Kentucky predicted

56

United States District Court
Northern District of California

1    that the KCPA would be interpreted one way in *Brummett*, and then the Kentucky Circuit Court

2    concluded in *Arnold* that the KCPA should be interpreted in a different way.  Under such

3    circumstances, *Arnold*—not *Brummett*—is more persuasive.  *See Goranson v. Kloeb*, 308 F.2d

4    655, 656–57 (6th Cir. 1962) ("We should not attempt to make new law for the state in conflict

5    with its existing decisions.").

6         In addition, the *Brummett* plaintiffs sought class certification on a number of different

7    claims.  *See Brummett*, 1984 WL 262559, *1 (asserting claims under the KCPA, the Kentucky

8    Uniform Commercial Code, the Kentucky Mobile Home Sales Act, Kentucky common law, and

9    various federal laws).  The parties did not assert and the district court did not conduct a separate

10   analysis of plaintiffs' KCPA claim.  Thus, in light of this procedural posture and intervening state

11   authority in *Arnold*, the Court finds *Brummett* insufficient to allow Plaintiffs to proceed with their

12   KCPA class action claim in the instant case.

13        Plaintiffs' reliance on *Clark v. BellSouth Telecommunications* is likewise unavailing.  As

14   in *Brummett*, plaintiffs in *Clark* asserted a number of claims under state and federal law.  With

15   respect to plaintiffs' KCPA claim, the *Clark* court found the parties' briefing incomplete.  461 F.

16   Supp. 2d at 549.  Consequently, the district court stated that it would "set a schedule for additional

17   briefing on" plaintiffs' KCPA claim.  *Id.*  Following this discussion of the KCPA claim, the *Clark*

18   court reviewed plaintiffs' motion for class certification, and found class certification appropriate.

19   The district court, however, described its certification decision as being "provision[al]" in nature,

20   *id.* at 550, a description which would comport with the court's decision to order additional briefing

21   on the KCPA claim.  Under these circumstances, the Court is not persuaded by Plaintiffs'

22   argument that the *Clark* court "certified [a] class action[] under the KCPA . . . after *Arnold*."

23   Anthem Opp'n at 12.

24        Outside of *Brummett* and *Clark*, Plaintiffs have not identified any cases where courts have

25   allowed parties to proceed with a class action claim under the KCPA.  The Court has found none

26   in its own research.  Instead, *Arnold* remains the most pertinent state authority on this issue, and

                                                          57

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

several courts have relied upon *Arnold* to hold that parties can not, as a matter of law, bring a

KCPA claim as a class action.  *See In re Pharm.*, 230 F.R.D. at 84; *In re Grand Theft Auto*, 251

F.R.D. at 160.  Consistent with the reasoning of *Arnold* and of these courts, the Court finds that

Plaintiffs can not maintain a putative class action claim under the KCPA.  In addition, because

Plaintiffs can not pursue such a claim as a matter of law, the Court need not address Defendants'

arguments regarding standing.  Accordingly, Defendants' motions to dismiss Plaintiffs' KCPA

claim is GRANTED.

Furthermore, in the absence of any authority for the position that a KCPA claim may be

brought as a class action, the Court finds that leave to amend would be futile, and thus denies

Plaintiffs leave to amend.  *See Bonin*, 59 F.3d at 845 ("Futility of amendment can, by itself, justify

the denial of a motion for leave to amend.").  Plaintiffs' KCPA claim is therefore dismissed with

prejudice.

## I. Kentucky Data Breach Act (against Anthem Defendants)

In opposing the instant motions to dismiss, Plaintiffs have moved to withdraw their cause

of action against the Anthem Defendants for violation of Kentucky's Data Breach Act.  Anthem

Opp'n at 11 n.13.  Accordingly, the Anthem Defendants' motion to dismiss Plaintiffs' Kentucky

data breach claim is GRANTED, and Plaintiffs' Kentucky data breach claim is DISMISSED with

prejudice.

## J. Georgia Insurance Information and Privacy Protection Act (against Anthem Defendants)

The Georgia Insurance Information and Privacy Protection Act ("IIPA") states that "[a]n

insurance institution, agent, or insurance-support organization shall not *disclose* any personal or

privileged information about an individual collected or received in connection with an insurance

transaction unless the *disclosure*" falls under a list of specifically enumerated exceptions.  Ga.

Code. Ann. § 33-39-14 (emphasis added).  In the consolidated amended complaint, Plaintiffs

allege that "Defendants Anthem and Anthem Affiliates disclosed individually-identifiable [PII]

58

United States District Court
Northern District of California

1    regarding members of the Georgia Class that was collected or received in connection with an

2    insurance transaction without their authorization, in violation of" the IIPA.  CAC ¶ 801.

3    In response, the Anthem Defendants contend that Plaintiffs' PII was never "disclosed."

4    *See, e.g.*, Anthem Reply at 12.  Rather, Plaintiffs' PII was "stole[n]" by "a third-party

5    cyberattacker."  *Id.*  The IIPA, the Anthem Defendants argue, protects only against disclosure, and

6    not against theft.  In addition, the Anthem Defendants contend that Plaintiffs have failed to allege

7    any actual damages.  *See id.* at 13.

8    As to the scope of the IIPA's disclosure requirement, the Court notes that neither party has

9    identified a case—state or federal—interpreting Ga. Code. Ann. § 33-39-14.  The Court has found

10   none in its own research.  Thus, this action presents an issue of first impression: whether the IIPA,

11   which proscribes the unlawful disclosure of personal information, also applies to the theft of one's

12   personal information.

13   In interpreting the IIPA, the Court must examine statutory rules of construction as applied

14   by courts in Georgia.   *See In re Korean Air*, 642 F.3d at 699 ("[T]he MDL transferee court is

15   generally bound by the same substantive legal standards . . .  as would have applied in the

16   transferor court.").  On this particular point, the Georgia Supreme Court has stated that, "[w]e

17   begin our analysis of the statute by recognizing that fundamental rules of statutory construction

18   require us to construe a statute according to its terms, to give words their plain and ordinary

19   meaning, and to look diligently for the intention of the General Assembly."  *Atlanta Indep. Sch.*

20   *Sys. v. Atlanta Neighborhood Charter Sch., Inc.*, 748 S.E.2d 884, 886 (Ga. 2013).  "Where the

21   plain language of a statute is clear and susceptible of only one reasonable construction, we must

22   construe the statute according to its terms."  Thus, following the Georgia Supreme Court, the

23   Court shall begin by reviewing the IIPA's text, before examining other pertinent canons of

24   statutory interpretation.

25        **1. Statutory Text**

26   As an initial point, the Court observes that the Georgia Code does not define the term

59

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

1    "disclose" or "disclosure" in the IIPA.  *See* Ga. Code. Ann. § 33-39-3 (providing list of

2    definitions).  Where a statute does not define a key term, the Court must "look to the ordinary

3    meaning of that word."  *Jackson v. State*, 709 S.E.2d 44, 46 (Ga. Ct. App. 2011).  With respect to

4    the ordinary meaning analysis, courts generally begin by examining dictionary definitions of the

5    term at issue.  *Id.*; *see also* Jacob Scott, *Codified Canons and the Common Law of Interpretation*,

6    98 Geo. L.J. 341, 357 (2010) (finding use of dictionary definitions to be the most commonly used

7    textual canon).

8         Black's Law Dictionary defines "disclosure" as "[t]he act or process of making known

9    something that was previously unknown; a revelation of facts."  Black's Law Dictionary 531 (9th

10   ed. 2009).  Black's Law Dictionary also defines "act" as "[s]omething done or performed, esp.

11   voluntarily."  *Id.* at 27.  The Oxford English Dictionary defines "disclose" as "[t]o uncover and

12   expose to view (anything material); to remove a covering from; to reveal, allow to be seen."

13   Oxford English Dictionary Online (3d ed. 2013), *available at* tinyurl.com/jlynyc8.  Taken

14   together, these definitions suggest that, in order to "disclose" something, the information holder

15   must commit some affirmative, voluntary act.

16        An analysis of the structure of the IIPA lends further support to this conclusion.  As noted

17   above, the IIPA states that "[a]n insurance institution, agent, or insurance-support organization

18   shall not disclose any personal or privileged information . . . unless the disclosure" falls under a

19   set of 18 exceptions.  These exceptions allow the insurance institution, agent, or insurance-support

20   organization to disclose an individual's personal information "[t]o a medical-care institution or

21   medical professional," Ga. Code Ann.  § 33-39-14(4), "[t]o an insurance regulatory authority," Ga.

22   Code Ann.  § 33-39-14(5), and "[t]o a law enforcement or other governmental authority," Ga.

23   Code Ann.  § 33-39-14(6), among other entities.  Indeed, for each of these 18 exceptions, the

24   insurance institution, agent, or insurance-support organization must affirmatively provide an

25   individual's personal information to a third party.  Thus, under the dictionary definition of

26   "disclosure" and under the structure of the IIPA, it is unlikely that the Georgia Legislature

27                                                            60

28   Case No. 15-MD-02617-LHK
     ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

intended for "disclosure" to encompass instances of third party cyberhacking and data breach.

**2. Additional Considerations**

In addition to the IIPA's text and structure, several other considerations lend support to this more narrow reading of the IIPA's scope. Indeed, in predicting how the Georgia Supreme Court would rule on this issue, the Court believes that the Georgia Supreme Court would review how the terms "disclose" or "disclosure" have been defined in other statutes and how these terms have been interpreted by other courts.

On this particular point, the Federal Privacy Act defines "disclosure" to "mean[] providing personal review of a record, or a copy thereof, to someone other than the data subject or the data subject's authorized representative." 5 C.F.R. § 297.102. Courts have restricted this definition to situations where information holders have willfully provided data to an unauthorized third party. In *Walia v. Chertoff*, 2008 WL 5246014, *6 (E.D.N.Y. Dec. 17, 2008), for instance, plaintiff's medical and legal records were allegedly placed in an unlocked credenza located in the office of plaintiff's supervisor. Other employees, including those not authorized to review plaintiff's medical and legal records, had access to this office. *Id.* Upon learning these facts, plaintiff brought suit against his employer. The *Walia* court rejected plaintiff's Federal Privacy Act claim and held that plaintiff's claim rested "on the accessibility of [plaintiff's] medical and legal records to individuals in the office." *Id.* at *11. Mere accessibility, however, is insufficient to constitute "willful or intentional disclosure by the agency, a required element of a [Federal Privacy Act] claim." *Id.* Here, as in *Walia*, Plaintiffs' IIPA claim pivots around the idea of access and accessibility, not willful and active disclosure. *See e.g.*, Anthem Opp'n at 21 ("[A]s Plaintiffs contend . . . unauthorized *access* resulted from Anthem's actions.") (emphasis added). Thus, at least as understood in the context of the Federal Privacy Act, Plaintiffs have failed to sufficiently allege that the Anthem Defendants "disclosed" Plaintiffs' PII to cyberattackers during the data breach.

In addition, in *Galaria v. Nationwide Mutual Insurance Co.*, 998 F. Supp. 2d 646, 650

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

1    (S.D. Ohio 2014), plaintiffs provided Nationwide Mutual Insurance ("Nationwide") their PII "in

2    the course of purchasing or seeking to purchase insurance products."  In November 2012,

3    plaintiffs "received a letter from [Nationwide] indicating that on October 23, 2012, thieves hacked

4    into a portion of [Nationwide's] computer network and that their PII was stolen and disseminated

5    as part of the theft."  *Id.*  In response, plaintiffs brought suit against Nationwide alleging, *inter*

6    *alia*, common law invasion of privacy.  *Id.* at 661.

7          The district court granted Nationwide's motion to dismiss.  In reaching this decision, the

8    district court observed that the common law tort of invasion of privacy requires publicity of a

9    private fact.  Publicity, in turn, "means that [a] matter is made public, by communicating it to the

10   public at large, or to so many persons that the matter must be regarded as substantially certain to

11   become one of public knowledge."  *Id.*  Plaintiffs had failed to satisfy this publicity requirement

12   because "there is no allegation in the Complaint that [Nationwide] *disclosed* Named Plaintiffs'

13   private affairs."  *Id.* at 662 (emphasis added).  Moreover, "[t]here are no factual allegations in the

14   Complaint to make plausible the allegation that [Nationwide] disseminated Named Plaintiffs' PII."

15   *Id.*  Rather, "the Complaint alleges the PII was *stolen* from [Nationwide], not that [Nationwide]

16   disseminated it to anyone."  *Id.*  In sum, when presented with a substantially similar set of facts,

17   the *Galaria* court clearly understood "disclosure" as requiring a party to commit some voluntary,

18   affirmative act.  The *Galaria* court, moreover, drew a distinction between when information is

19   "disclosed" and when information is "stolen."  Thus, although the questions presented in *Galaria*

20   were somewhat different than the questions presented in the instant case, this Court nevertheless

21   finds the *Galaria* court's understanding of "disclosure" informative.

22         The D.C. District Court's decision in *In re Science Applications International Corp.*

23   *(SAIC) Backup Tape Data Theft Litigation*, 45 F. Supp. 3d 14 (D.D.C. 2014), is similarly

24   illuminating.  In *In re SAIC*, as in *Galaria*, "[p]laintiffs . . . allege[d] that they ha[d] been injured

25   because their privacy [had been] invaded by [a] data breach."  *Id.* at 28.  In deciding to dismiss

26   plaintiffs' invasion of privacy claim, the district court held that "[f]or a person's privacy to be

27                                              62

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

1    invaded, their personal information must, at a minimum, *be disclosed to* a third party." *Id.*

2    (emphasis added).  The *In re SAIC* court proceeded to refer to a number of different sources

3    discussing disclosure.  The district court, for instance, cited a decision by the Eastern District of

4    Wisconsin, which defined disclosure as "the placing into the view of another information which

5    was previously unknown."  *Id.* (quoting *Schmidt v. Dep't of Veteran Affairs*, 218 F.R.D. 619, 630

6    (E.D. Wis. 2003)).  The district court also cited a decision by the District of South Carolina, which

7    defined disclosure as "the imparting of information which . . . was previously unknown to the

8    person to whom it was imparted."  *Id.* (quoting *Harper v. United States*, 423 F. Supp. 192, 197

9    (D.S.C. 1976)).  These definitions all conform to the Court's understanding of what disclosure

10   should mean in the context of the IIPA: an active, voluntary decision by the information holder to

11   provide data to an unauthorized third party.

12        In opposing the Anthem Defendants' motion to dismiss, Plaintiffs rely upon a statement in

13   *Shames-Yeakel v. Citizens Financial Bank*, 677 F. Supp. 2d 994, 1008 (N.D. Ill. 2009).

14   Specifically, in discussing the viability of an Indiana common law negligence claim, the *Shames-*

15   *Yeakel* court stated that "[i]f th[e] duty not to disclose customer information is to have any weight

16   in the age of online banking, then banks must certainly employ sufficient security measures to

17   protect their customers' online accounts."  *Id.*  Although this statement does appear to weigh in

18   Plaintiffs' favor, Plaintiffs' reliance on *Shames-Yeakel* is ultimately inapposite.

19        First, as discussed above, private plaintiffs can not, under *Pisciotta*, bring a cause of action

20   in Indiana for negligence for injuries arising out of a data breach.  The Northern District of

21   Illinois' decision in *Shames-Yeakel* is therefore, at the very least, in tension with the Seventh

22   Circuit's decision in *Pisciotta*.  Tellingly, in discussing the negligence claim in *Shames-Yeakel*,

23   the district court did not refer to *Pisciotta*.  The district court also acknowledged that "this court

24   could not find an Indiana case addressing the matter" of whether a bank has a "duty to sufficiently

25   secure its online banking system."  *Id.*  Thus, by allowing plaintiffs in *Shames-Yeakel* to move

26   forward with their Indiana negligence claim, the *Shames-Yeakel* court appeared to overlook both

27                                                   63

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

the specific and general precedent of its circuit court of appeals, the Seventh Circuit, that federal courts, sitting in diversity, should refrain from creating new causes of action under state law. *See, e.g.*, *Pisciotta*, 499 F.3d at 637 ("Had the Indiana legislature intended that a cause of action should be available against a database owner for failing to protect adequately personal information, we believe that it would have made some more definite statement of that intent."); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 607 (7th Cir. 2000) ("When confronted with a state law question that could go either way, the federal courts usually choose the narrower interpretation that restricts liability.").

Second, with respect to the specific statement quoted by Plaintiffs—that a bank's duty not to disclose must include a duty to protect customers' personal information—the *Shames-Yeakel* court did not discuss, refer to, or cite any supporting authority. In the nearly six and a half years since the *Shames-Yeakel* decision, no federal or state court has cited *Shames-Yeakel* for this proposition. In light of these circumstances, and in light of the fact that *Shames-Yeakel* appears to be in tension with prevailing Seventh Circuit precedent, the Court finds Plaintiffs' reliance on *Shames-Yeakel* not well taken.

To conclude, Plaintiffs have failed to persuade the Court that a broader construction of the IIPA is warranted. Under the facts alleged in the consolidated amended complaint, the Anthem Defendants did not "disclose" Plaintiffs data, as required under the IIPA. Pursuant to the Court's finding, the Court need not address the Anthem Defendants' arguments regarding whether Plaintiffs have sufficiently alleged damages for purposes of the IIPA. The Anthem Defendants' motion to dismiss Plaintiffs' IIPA claim is GRANTED.

Plaintiffs, however, shall have leave to amend because the Court finds that amendment would not be futile. Plaintiffs may be able to allege facts to demonstrate that the Anthem Defendants disclosed Plaintiffs' PII to a third party. *See Lopez*, 203 F.3d at 1127 (holding that "a district court should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts."). Plaintiffs' IIPA claim is therefore

64

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO DISMISS

1    DISMISSED with leave to amend.

2        **K.  Federal Law Third Party Beneficiary (against Non-Anthem Defendants)**

3        Finally, Plaintiffs assert a third party beneficiary claim for breach of contract under federal

4    law against the Non-Anthem Defendants.  CAC ¶ 331–42.  Specifically, Plaintiffs assert that Blue

5    Cross Blue Shield Association ("BCBSA") "had a valid, binding, and enforceable express contract

6    with OPM [the Office of Personnel Management] to provide insurance and other benefits to those

7    Plaintiffs who received health insurance and related benefits under the Federal BCBSA Plan."  *Id.*

8    ¶ 332.  Under this contract (hereinafter referred to as the "Federal BCBSA contract"), BCBSA

9    "promised to take reasonable measures to protect the security and confidentiality of Federal

10   Employee Plaintiffs' [PII]."  *Id.* ¶ 333.  Plaintiffs allege that the Federal Employee Plaintiffs were

11   "intended third-party beneficiaries of the data security provisions in the contract between BCBSA

12   . . . and OPM, and are entitled to directly enforce its terms."  *Id.* ¶ 339.

13       The Non-Anthem Defendants contend that Plaintiffs' third party beneficiary claim fails

14   because OPM is the *only* party that can seek relief under the Federal BCBSA contract.  Plaintiffs

15   can not, in other words, pursue a private cause of action against BCBSA.  The Non-Anthem

16   Defendants also argue that "the Federal Employee Plaintiffs' state law claims are preempted."

17   Non-Anthem Mot. at 19.

18       Given that adjudication of the instant claim involves a nuanced understanding of federal

19   law, administrative regulations, and various rules governing contract interpretation, the Court first

20   provides an overview of the background and statutory framework behind the Federal BCBSA

21   contract.  The Court shall then address the Non-Anthem Defendants' arguments in turn.

22       **1.  Background**

23       The Federal Employee Health Benefits Act ("FEHBA"), enacted in 1959, "established a

24   comprehensive program to provide federal employees and retirees with subsidized health care

25   benefits."  *Hayes v. Prudential Ins. Co. of Am.*, 819 F.2d 921, 922 (9th Cir. 1987).  "Under the

26   Act, the United States does not act as an insurer, but, through the Office of Personnel Management

27                                                          65

28   Case No. 15-MD-02617-LHK
     ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

United States District Court
Northern District of California

(OPM), contracts with various private carriers to develop health care plans with varying coverages and costs." *Id.* "After OPM negotiates changes with the carriers[,] all federal enrollees are permitted to switch enrollment from one plan to another, regardless of their state of health, during a period called 'open season.'" *Id.*

"Among the plans offered to federal employees is the Blue Cross Blue Shield Service Benefit Plan," which is governed by the Federal BCBSA contract (known internally as 2013 Contract No. CS 1039). CAC ¶ 172.[10]  The Federal BCBSA contract provides that "[a]ny inconsistency in this contract shall be resolved by giving precedent in the following descending order: the Act,[11] the regulations in part 890, title 5, Code of Federal Regulations, the regulations in chapters 1 and 16, title 48, Code of Federal Regulations, and this contract." Fed. BCBSA Contract § 1.3.  The Federal BCBSA contract also states that "[t]he Carrier [BCBSA] shall provide the benefits as described in the agreed upon" Statement of Benefits, which are attached as an addendum to the contract. *Id.* § 2.2(a).

The framework under which the Federal BCBSA contract operates is notable in three important respects.  First, Plaintiffs assert, and the Non-Anthem Defendants do not dispute, that the Federal Employee Plaintiffs are intended third party beneficiaries of the Federal BCBSA contract.  *See* CAC ¶ 339; Non-Anthem Mot. at 14; Non-Anthem Opp'n at 14; *see also Catholic Diocese of Biloxi Supplemental Med. Reimbursement Plan and Catholic Diocese of Biloxi v. Blue*

---

[10] Plaintiffs refer to Contract No. CS 1039 in the consolidated amended complaint, and the Non-Anthem Defendants have submitted a copy of this contract, the 2014 and 2015 amendments to the contract, and the contract's 2014 and 2015 Statement of Benefits.  *See* ECF No. 416-1 ("Fed. BCBSA Contract"); ECF No. 416-2 ("2014 Amendments"); ECF No. 416-3 ("2015 Amendments"); ECF No. 416-4 ("2014 Statement of Benefits"); ECF No. 416-5 ("2015 Statement of Benefits").  Unlike the Summary Plan Descriptions described above, Plaintiffs do not dispute that these documents are true and accurate copies of their contract with BCBSA and the accompanying statement of benefits.  Non-Anthem Opp'n at 13 n.9.  Accordingly, the Court takes judicial notice of these documents.  *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1141 n.5 (9th Cir. 2003) (stating that court "may consider documents on which the complaint necessarily relies and whose authenticity is not contested.") (internal quotation marks and ellipses omitted).
[11] The Federal BCBSA contract defines "Act" to mean "FEHBA."  Fed. BCBSA Contract § 1.1.

66

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO DISMISS

*Cross, Blue Shield of Tex.*, 960 F. Supp. 1145, 1146 (S.D. Miss. 1997) ("The federal employee does not enter into a separate contract with the carrier, but rather is a third-party beneficiary of the OPM-carrier contract."). As a result of this arrangement, "[a]ll *health benefits claims* [under the Federal BCBSA contract] must be submitted initially to the carrier of the covered individual's health benefits plan." 5 C.F.R. § 890.105(a)(1) (emphasis added). "If the carrier denies a [health benefits] claim (or a portion of a claim), the covered individual may ask the carrier to reconsider its denial." *Id.* "If the carrier affirms its denial or fails to respond . . . . , the covered individual may ask OPM to review the claim." *Id.* Notably, "[a] covered individual must exhaust both the carrier and OPM review processes specified in this section before seeking judicial review of [a] denied claim." *Id.* The administrative apparatus designed to handle health benefits claims is, in short, fairly comprehensive.

Second, the Federal BCBSA contract and various administrative regulations vest OPM with general management authority over the contract. As discussed, individuals filing health benefits claims must, prior to going to federal court, present their claims in an administrative proceeding before OPM. Outside of handling such health benefits claims, OPM "shall" also "notify [BCBSA] of [various] deficiencies" which relate to BCBSA's "financial resources, facilities, providers, staff and other necessary resources to meet [BCBSA's] obligations under this contract." Fed. BCBSA Contract § 1.12(a). Relatedly, BCBSA must "notify" OPM "of any Significant Event within ten (10) working days after [BCBSA] becomes aware of it." *Id.* § 1.10; *see also id.* (providing list of Significant Events). If BCBSA does not address a Significant Event in a satisfactory manner, OPM may suspend new enrollments, advise enrollees of the asserted deficiencies and provide enrollees an opportunity to transfer to another plan, withhold payment, and refuse to renew the contract. *Id*. On a more general level, federal law provides that OPM "may prescribe reasonable minimum standards for health benefits plans," 5 U.S.C. § 8902(e), and "may prescribe regulations necessary to carry out" FEHBA, 5 U.S.C. § 8913(a).

Third, and finally, the Federal BCBSA contract includes several provisions that address

67

United States District Court
Northern District of California

data privacy.  Section 1.30(a) states that BCBSA must "at a minimum, comply with equivalent privacy and security policies as are required of a 'covered entity' under the HIPAA Privacy and Security regulations."  *Id.* § 1.30(a).  The Federal BCBSA contract was specifically amended in 2014 so that BCBSA could be required to go beyond compliance with the minimum privacy standards required under federal law.  Section 1.30(d), for instance, now states that an OPM representative "may recommend that the Carrier adopt a best practice drawn from NIST Special Publication 800-53 (or its current equivalent)."  2014 Amendments § 1.30(d).  This document— NIST Special Publication 800-53—"provides a catalog of security and privacy controls for federal information systems and organizations and a process for selecting controls to protect organizational operations."  National Institute of Standards and Technology, *NIST Special Publication 800-53 (Revision 4): Security and Privacy Controls for Federal Information Systems and Organizations*, http://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r4.pdf (last updated Jan. 22, 2015).  Notably, many of the practices listed in NIST Special Publication 800-53 are recommendations that go above and beyond current requirements under federal law.  A third section of the Federal BCBSA contract, § 1.6(b), states that BCBSA "shall . . . hold all medical records, and information relating thereto, of Federal subscribers confidential."  Fed. BCBSA Contract § 1.6(b).  Neither the Federal BCBSA contract nor federal law specifies who may seek a remedy for breach of these data privacy obligations.

### 2. Enforcement of Federal BCBSA Contract

#### a. "Health Benefits Claim"

The Non-Anthem Defendants first contend that Plaintiffs' third party beneficiary claims constitute health benefits claims.  Thus, pursuant to the Federal BCBSA contract, Plaintiffs must exhaust the administrative apparatus described above before bringing their claims into federal court.  The Court finds this contention unavailing.

The administrative apparatus to which Non-Anthem Defendants refer applies to "health benefits claims."  Federal regulations define "claim" to mean a "request for (i) payment of a

68

1   health-related bill; or (ii) provision of a health-related service or supply." 5 C.F.R. § 890.101.

2   The Federal BCBSA contract, in turn, defines "[b]enefits" as "[c]overed services or payment for

3   covered services set forth in [the Statement of Benefits], to which Members are entitled to the

4   extent provided by this contract." Fed. BCBSA Contract § 1.1. The Statement of Benefits

5   accompanying the Federal BCBSA contract does not define "benefit." *See* 2015 Statement of

6   Benefits at 145 (providing list of definitions). However, the Statement of Benefits does list the

7   following as "Benefits": "Preventative care," "Allergy care," and "Prescription drug benefits." *Id.*

8   at 32. In short, "benefits"—at least as understood in the context of the Federal BCBSA contract

9   and the Statement of Benefits—appears to refer only to the provision of medical-related coverage.

10  Tellingly, neither patient privacy nor data security is listed as a "benefit" in the Statement of

11  Benefits. Indeed, there is but one reference to patient privacy in the Statement of Benefits,

12  confined to a single sentence in the 160 page document: "We [BCBSA] will keep your medical

13  and claims information confidential." *Id.* at 14. There is, in sum, little to suggest that "health

14  benefits claims" were meant to encompass claims regarding data privacy.

15      In further support of this conclusion, the Court observes that, in *Roach v. Mail Handlers*

16  *Benefits Plan*, the Ninth Circuit construed "benefits" under FEHBA narrowly. Specifically, the

17  Ninth Circuit noted that, in interpreting the scope of FEHBA, several "courts have created a divide

18  between claims based on a denial of benefits, which are preempted, and claims based on medical

19  malpractice, which are not." *Roach*, 298 F.3d at 850. Upon examining these decisions, the Ninth

20  Circuit determined that such a "division protects the federal interest in uniformity of FEHBA plan

21  interpretation" while also "preserv[ing] the traditional state interest in the quality of medical care."

22  *Id.* In sum, the Ninth Circuit distinguished "denial of benefit claims," which "are preempted by . .

23  . FEHBA," from "malpractice claims," which "are not" preempted by FEHBA. *Id.* Under this

24  narrow construction, claims related to one's data privacy—which do not concern health benefits or

25  payment for health benefits—would seem to fall outside the purview of a "denial of benefit"

26  claim.

27                                                69

28  ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
    AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
    DISMISS

United States District Court
Northern District of California

1       To summarize, the Federal BCBSA contract, the Statement of Benefits, and Ninth Circuit

2   precedent all counsel in favor of finding that Plaintiffs here have not asserted a claim that should

3   have first gone through an established administrative review apparatus.

4       The Non-Anthem Defendants have not cited any authority to support their arguments to the

5   contrary.  Instead, the Non-Anthem Defendants point to the allegations in the consolidated

6   amended complaint, which state that "[a]s a result of BCBSA, Anthem BCBS Affiliates, and non-

7   Anthem BCBS's failure to implement the security measures required by the Federal BCBSA

8   contract, OPM did not receive the full *benefit* of its bargain."  CAC ¶ 340 (emphasis added).  This

9   argument lacks merit.  In seeking benefit of the bargain damages, Plaintiffs state that they received

10  "services that were less valuable than what OPM bargained for."  *Id.*  This understanding of

11  "benefit" differs significantly from the term of art referenced in FEHBA and employed in the

12  Federal BCBSA contract.  Accordingly, the Court finds that Plaintiffs' third party beneficiary

13  claim is not a "health benefits claim."

14                          **b. Exclusive Enforcement Authority**

15      In the alternative, the Non-Anthem Defendants argue that even "[i]f the Federal Employee

16  Plaintiffs are suing for something other than benefits, their claims are no less barred because

17  FEHBA's scheme gives OPM exclusive authority over all aspects of the contractual relationship,

18  not just over benefits."  Non-Anthem Mot. at 17.  The gist of this contention is that "FEHBA

19  leaves no room for" Plaintiffs to seek a remedy as a third party beneficiary.  *Bridges v. Blue Cross*

20  *and Blue Shield Ass'n*, 935 F. Supp. 37, 41 (D.D.C. 1996).  Instead, "the broad enforcement and

21  oversight powers of the OPM established in the statute indicate that the exclusive remedy for an

22  action cognizable under . . . FEHBA" lies with OPM.  *Id.*

23      The Court disagrees with this argument.  As an initial matter, the Court notes that, "[w]hen

24  interpreting contracts under federal law, courts look to general common law on contracts."

25  *Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 932 (11th Cir. 2013).  "One

26  such general principle is that only a party to a contract or an intended third-party beneficiary may

                                        70

27

28  ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

1    sue to enforce the terms of a contract or obtain an appropriate remedy for breach." *GECCMC*

2    *2005-C1 Plummer St. Office Ltd. P'ship v. JPMorgan Chase Bank, Nat'l Ass'n*, 671 F.3d 1027,

3    1033 (9th Cir. 2012). "This [rule] distinguishes intended beneficiaries to a contract whose rights

4    are judicially enforceable from incidental beneficiaries whose rights are not judicially

5    enforceable." *Id.* In the instant case, Plaintiffs assert—and, more importantly, Defendants do not

6    challenge—the fact that Plaintiffs are intended third party beneficiaries under the Federal BCBSA

7    contract. *See, e.g.*, CAC ¶ 339 ("Federal Employee Plaintiffs and Class Members are intended

8    third-party beneficiaries of the data security provisions in the contract between BCBSA . . . and

9    OPM, and are entitled to directly enforce its terms."). Thus, at least for purposes of the instant

10    motions to dismiss, Plaintiffs have cleared the first hurdle by demonstrating intended third party

11    beneficiary status.

12        Assuming that Plaintiffs are intended third party beneficiaries of the Federal BCBSA

13    contract, it is—as a general matter—"no objection to an action by the third party that the

14    contracting party (here the government) could also sue upon the contract for the same breach."

15    *Shell v. Schmidt*, 272 P.2d 82, 89 (Cal. Ct. App. 1954); *see also Malone v. Crescent City M & T*

16    *Co.*, 18 P. 858, 860 (Cal. 1888) ("[I]t is no objection to the maintenance of a suit by him for whose

17    benefit the promise is made that an action might be brought also against the one to whom the

18    promise was made."); *id.* (citing supporting case law from New York, Kansas, Wisconsin, and

19    Alabama). To emphasize: as a matter of general contract law, both an intended third party

20    beneficiary and a party to the contract may sue for breach. *See generally Zigas v. Superior Court*,

21    174 Cal. Rptr. 806, 811 (Ct. App. 1981) (reaffirming holding in *Shell*).

22        The Restatement of Contracts is in accord with this conclusion. Section 145, which

23    addresses "Beneficiaries Under Promises to the United States," states that:

24        A promisor bound to the United States . . . by contract to . . . render a service to
25        some or all of the members of the public, is subject to no duty under the contract
26        to such members to give compensation for the injurious consequences of
         performing or attempting to perform it, or of failing to do so, *unless*, . . . an

27                                                    71

1    intention is manifested in the contract, as interpreted in the light of the
     circumstances surrounding its formation.

2  Restatement (First) of Contracts § 145 (emphasis added).  In other words, under the Restatement,

3  promisors such as BCBSA have duties to the Federal Employee Plaintiffs because these Plaintiffs

4  are intended third party beneficiaries.

5       In addition, the U.S. Supreme Court's decision in *Astra USA, Inc. v. Santa Clara County,*

6  *California*, 563 U.S. 110 (2011), is not inconsistent with this conclusion.  In *Astra*, the U.S.

7  Supreme Court determined that plaintiffs did not have standing to sue as third party beneficiaries

8  where plaintiffs merely sought to enforce certain statutory obligations memorialized in a federal

9  contract.  *See, e.g.*, *id.* at 118 ("The absence of a private right to enforce the statutory ceiling price

10 obligations would be rendered meaningless if 340B entities could overcome that obstacle by suing

11 to enforce the contract's ceiling price obligations instead.  The statutory and contractual

12 obligations, in short, are one and the same.").  The *Astra* Court emphasized that "[t]he form

13 agreements, composed by HHS, contain no negotiable terms."  *Id.*

14      On the other hand, as the Court has noted, the Federal BCBSA contract here was

15 specifically amended in 2014 such that BCBSA could be held to privacy standards above and

16 beyond the standards required under federal law.  *See* 2014 Amendments § 1.3(d).  In addition, in

17 direct contrast to the contract in *Astra*, where the agreement contained "no negotiable terms," the

18 2014 Amendments include three full paragraphs that allow BCBSA to negotiate with OPM over

19 which best practices BCBSA should implement.  *See id.* § 1.3(d)(2) ("In a written response to such

20 a recommendation, [BCBSA] shall (i) agree to adopt the recommendation, (ii) explain that it is

21 already in compliance with the recommendation, or (iii) explain why maintaining its current

22 practice . . . is equally, if not more, appropriate for its business purposes than the recommended

23 best practice.").  As a final point, the consolidated amended complaint alleges that BCBSA

24 breached the contract by failing to comply with various laws, regulations, and—most

25 importantly—"industry standards for data security."  CAC ¶ 335.  Thus, Plaintiffs' claim clearly

26 reaches beyond the mere statutory violations that were at issue in *Astra*.

72

27 Case No. 15-MD-02617-LHK

28 ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

1      In sum, under general principles of contract law, as reflected in the Restatement, U.S.

2 Supreme Court precedent, and relevant state court case law, the mere fact that OPM could also

3 bring suit against BCBSA does not bar Plaintiffs from bringing suit as a third party beneficiary.

4      The Non-Anthem Defendants, however, contend that the Federal BCBSA contract does not

5 comport with these general contract law principles.  Rather, the Non-Anthem Defendants contend

6 that the Federal BCBSA contract is unique because it is governed by FEHBA, which gives

7 exclusive enforcement authority to OPM.  In support of this contention, the Non-Anthem

8 Defendants point to both the structure of the Federal BCBSA contract and case law interpreting

9 FEHBA.

10      The Court is not persuaded by either of these points.  With respect to the structure of the

11 Federal BCBSA contract, the Court has already noted that the Federal BCBSA contract provides

12 an extensive administrative review process for "health benefits claims," but that Plaintiffs' claims

13 are not "health benefits claims."  The Court also observes that, under § 1.10 of the Federal

14 BCBSA contract, BCBSA must notify OPM within ten days if BCBSA becomes aware of the

15 occurrence of a "Significant Event."  Fed. BCBSA Contract § 1.10(a).  BCBSA and OPM must

16 then work together to address the Significant Event.  *Id.* § 1.10(b).  The Federal BCBSA contract

17 provides a list of 13 Significant Events.  None of these Significant Events mention or relate to data

18 security.  Thus, under a plausible reading of this section, BCBSA might not even have been

19 required to notify OPM of the Anthem data breach, and OPM would not necessarily have needed

20 to take corrective action.

21      Taken together, the extensive administrative review process and the "Significant Event"

22 provisions appear to delineate some of the contours of OPM's authority.  On a conceptual level, it

23 might be helpful to consider OPM, the BCBSA, and Plaintiffs as being three separate but related

24 actors.  Here, OPM contracts with BCBSA, and Plaintiffs serve as an intended third party

25 beneficiary.  The instant contract, however, is unique in two ways.  First, if Plaintiffs have a health

26 benefits claim, Plaintiffs must go to OPM first.  Second, if BCBSA experiences a Significant

73

United States District Court
Northern District of California

1  Event, such as the "[d]isposal of major assets" or a loss of more than 15% of its membership, *id.* §

2  1.10(b)(1) & § 1.10(b)(2), then BCBSA must go to OPM.  The contract is silent as to all

3  remaining matters, including matters of data security.  Given this contractual structure, the Court

4  finds that it would be equally (if not more) plausible to find that general contract law principles

5  govern matters where the Federal BCBSA contract is silent, rather than the Non-Anthem

6  Defendants' exclusive enforcement theory.

7         The Court also finds unavailing the Non-Anthem Defendants' reliance on *Miscellaneous*

8  *Service Workers v. Philco-Ford Corp.*, 661 F.2d 776 (9th Cir. 1981), and *Bridges v. Blue Cross*

9  *and Blue Shield Association*, 935 F. Supp. 37 (D.D.C. 1996).  *Miscellaneous Service Workers*

10  addressed OPM's exclusive enforcement authority under the Service Contract Act, an altogether

11  different act than FEHBA.  661 F.2d at 777.  Given the complicated interplay here between

12  specific contractual provisions, specific federal laws, and specific federal regulations, the Court

13  declines to rely on a case interpreting a different contractual provision in the context of a different

14  federal law.

15         *Bridges* appears to be more on point.  In *Bridges*, plaintiffs "allege[d] that BCBSA's

16  licensee entities, with BCBSA's knowledge and approval, secretly negotiated discounts on the

17  cost of services of member facilities and physicians, and then failed to apply those discounts to the

18  enrollees' coinsurance payments."  935 F. Supp. at 39 (internal quotation marks omitted).

19  Plaintiffs thereafter brought suit against BCBSA and OPM, with plaintiffs asserting violations of

20  breach of contract and the Racketeer Influenced and Corrupt Organizations Act ("RICO").  *Id.* at

21  40.  Plaintiffs did not bring a third party beneficiary claim.  With respect to plaintiffs' breach of

22  contract claim, the *Bridges* court observed that plaintiffs had "failed to exhaust . . . [the]

23  administrative remedies under . . . FEHBA before filing suit against the carrier."  *Id.* at 44.  With

24  respect to plaintiffs' RICO claims, the *Bridges* court stated that "nothing in . . . FEHBA, nor in its

25  implementing language or legislative history, indicates that the legislature had any intent to allow

26  a civil RICO action to spring out of a violation of . . . FEHBA."  *Id.* at 42.  The district court also

27                                                        74

28

United States District Court
Northern District of California

1   noted that plaintiffs had failed to exhaust plaintiffs' breach of contract and RICO claims through

2   the administrative review process.  Finally, the district court observed that plaintiffs had failed "to

3   allege injury resulting from BCBSA's investment of racketeering income into its business," a

4   substantive pleading requirement specific to RICO.  *Id.* at 43; *see also* 18 U.S.C. § 1962(a)

5   (specifying RICO pleading requirements).

6        The Court finds *Bridges* distinguishable for three reasons.  First, the *Bridges* court did not

7   rely only on an "exclusive enforcement" theory.  Instead, the district court determined that

8   plaintiffs had also failed to sufficiently allege a RICO violation as a substantive matter.

9        Second, the Court believes the RICO claim in *Bridges* is at least somewhat analogous to a

10  "health benefits claim."  Indeed, the *only* way that plaintiffs in *Bridges* could have been

11  overcharged for a coinsurance payment is if plaintiffs actually decided to exercise their health

12  benefits.  In the Statement of Benefits, for instance, the "Benefits Description" section provides a

13  statement of what benefits are covered, followed by a discussion of the coinsurance payment that

14  the insured must incur in exchange for a particular benefit.  *See, e.g.*, 2014 Statement of Benefits

15  at 37–118.  On the other hand, the Statement of Benefits includes but a single sentence on data

16  privacy, and a class member's data privacy could have been compromised even if that class

17  member did not decide to exercise any health benefits.

18       Similarly, under the "Disputed Claims Process" section of the Statement of Benefits, an

19  insured can readily dispute a coinsurance payment by including "copies of documents that support

20  your claim, such as . . . bills . . . and explanation of benefits (EOB) forms."  *Id.* at 130.  There is no

21  clear parallel provision for recovery for a personal data breach.

22       Third, and finally, it is not clear that the Court should follow *Bridges*.  *Bridges* was

23  decided by the D.C. District Court in 1996.  Since that time, more recent federal court precedent

24  has appeared to take a more narrow understanding of OPM's enforcement authority.  As this Court

25  has noted, for instance, the Ninth Circuit allowed plaintiff in *Roach*, who was covered by a

26  FEHBA plan, to proceed with a state medical malpractice claim against her health insurance

27                                                                 75

28  ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
    AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
    DISMISS

1    carrier after finding that such a claim fell outside of OPM's purview.  298 F.3d at 850–51.  In

2    reaching this decision, the Ninth Circuit relied upon supporting decisions from the Third, Fifth,

3    and Tenth Circuits.  *Id.*

4              To conclude, neither the structure of the Federal BCBSA contract nor the case law cited by

5    the Non-Anthem Defendants compels the Court to find, as a matter of law, that OPM has

6    exclusive enforcement authority over the Anthem data breach as it applies to the Federal

7    Employee Plaintiffs.  Instead, under general principles of contract law and after a careful review of

8    the interaction between relevant laws, regulations, and contractual provisions, the Court finds that

9    Plaintiffs may proceed with their third party beneficiary claim.  The Non-Anthem Defendants'

10   motion to dismiss Plaintiffs' third party beneficiary claim is therefore DENIED.

11            **3.  Preemption of State Law Claims**

12            In addition to arguments concerning OPM's enforcement of the Federal BCBSA contract,

13   the Non-Anthem Defendants contend that the Federal Employee Plaintiffs' state law claims are

14   preempted.  This contention applies to two Plaintiffs in particular: Stella Williams ("Williams"), a

15   resident of Indiana, and Alvin Lawson ("Lawson"), a resident of California.[12]

16            The Court need not address whether Williams' Indiana state law claims are preempted.

17   Only one of the ten causes of action selected by the parties is based on Indiana law—the Indiana

18   negligence claim.  As the Court has already determined, Plaintiffs can not proceed with this claim

19   as a matter of law.

20            With respect to Lawson, two of the ten causes of action selected by the parties are based on

21   California law—the California breach of contract claim and the California UCL claim. The Court

22   finds Lawson's California breach of contract claim preempted, for two reasons.  First, Plaintiffs do

23   not contest that this claim is preempted.  *See, e.g.*, Non-Anthem Opp'n at 15 (contesting Lawson's

24

25   _____
     [12] The remaining Federal Employee Plaintiffs are residents of Connecticut and Nevada.  The
26   instant motions to dismiss do not address claims brought under Connecticut and Nevada law.
     Non-Anthem Opp'n at 15 n.10; Non-Anthem Mot. at 19.

                                                76
27   Case No. 15-MD-02617-LHK
28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
     AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
     DISMISS

California UCL claim and Williams' Indiana negligence claim, but making no mention of Lawson's California breach of contract claim). Second, the Federal BCBSA contract expressly provides that "United States law will apply to resolve any claim of breach of this contract." Fed. BCBSA Contract § 5.62; CAC ¶ 332 ("Under the . . . Federal BCBSA Contract, federal law applies to breach of contract claims.").

On the other hand, whether or not Lawson's UCL claim is preempted is a more difficult question. The U.S. Supreme Court "has identified three types of preemption: express preemption, field preemption, and implied conflict preemption." *Deweese v. Nat'l R.R. Passenger Corp. (Amtrak)*, 590 F.3d 239, 245 (3d Cir. 2009). Express preemption "exists when Congress includes in a statute explicit language stating an intent to preempt conflicting state law." *Id.* Field preemption "occurs when a state law impinges upon a field reserved for federal regulation." *Id.* (internal quotation marks omitted). Finally, implied conflict preemption exists "when compliance with both federal and state regulations is a physical impossibility, or when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1141 (9th Cir. 2015) (internal quotation marks omitted). Here, the Non-Anthem Defendants contend that Lawson's UCL claim is subject to both express and implied conflict preemption.[13] The Court addresses these contentions in turn.

### a. Express Preemption

On the issue of express preemption, FEHBA contains the following express preemption provision:

> The terms of any contract under this chapter which *relate to* the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued

---

[13] The Non-Anthem Defendants also assert that "the Federal Employee Plaintiffs' state law claims are displaced by federal common law." Non-Anthem Reply at 9. Consistent with the approach taken by other federal courts, the Court addresses this displacement theory in its conflict preemption discussion. *See Helfrich v. Blue Cross and Blue Shield Ass'n*, 804 F.3d 1090, 1097 (10th Cir. 2015) ("On the other hand, no conflict, no displacement.").

77

United States District Court
Northern District of California

thereunder, which relates to health insurance or plans.

5 U.S.C. § 8902(m)(1) (emphasis added).  Because this preemption provision mirrors ERISA's express preemption provision, *see* ERISA § 514, 29 U.S.C. § 1144(a), the Ninth Circuit has referred to U.S. Supreme Court decisions interpreting ERISA's "relate to" requirement in examining cases brought under FEHBA.  *Botsford v. Blue Cross and Blue Shield of Mont., Inc.*, 314 F.3d 390, 393–94 (9th Cir. 2002).  Specifically, the Ninth Circuit has stated that FEHBA's "relate to" requirement must, as with ERISA's "relate to" requirement, not "be taken too literally." *Roach*, 298 F.3d at 849.  "If relate to were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for really, universally, relations stop nowhere." *Id.* at 849–50 (internal quotation marks omitted).

With this principle in mind, the Ninth Circuit has "held that FEHBA preempts disputes over a "'denial of benefits' and 'the nature or extent of coverage for benefits.'" *Botsford*, 314 F.3d at 395.  Indeed, "[t]he application of different state standards would disrupt the nationally uniform administration of *benefits* which FEHBA provides." *Id.* (emphasis added).  To further underscore this point, the Ninth Circuit has characterized "[a] dispute over benefits" as "precisely the kind of dispute that FEHBA preempts." *Id.*  Thus, in *Botsford*, the Ninth Circuit determined that a dispute over the amount of reimbursement of a particular claim constituted a dispute over benefits. Accordingly, plaintiff in *Botsford* could not pursue such a claim under Montana's Unfair Trade Practices Act.

In like manner, the Tenth Circuit recently observed that a number of federal courts have concluded that "FEHBA preempts state laws limiting subrogation and reimbursement." *Helfrich*, 804 F.3d at 1107.  Such state laws directly implicate how an insured's benefits are processed and how much an insured can receive after filing a health benefits claim.  Thus, consistent with the decisions of these other federal courts, the *Helfrich* court determined that FEHBA preempted a "Kansas insurance regulation prohibiting subrogation and reimbursement clauses in insurance contracts." *Id.* at 1092.

78

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

1    In contrast, as noted above, the Ninth Circuit has determined that state medical malpractice

2    claims are not necessarily preempted by FEHBA.  *Roach*, 298 F.3d at 850.  In reaching this

3    decision, the Ninth Circuit relied upon supporting case law from a number of other federal circuit

4    courts, *see id.* (citing decisions from the Third, Fifth, and Tenth Circuits), and determined that

5    state medical malpractice laws did not jeopardize "the federal interest in uniformity of FEHBA

6    plan interpretation," *id.*

7        After carefully reviewing these decisions, the Court concludes that Lawson's UCL claim

8    does not represent a claim for benefits. The understanding of "benefits," as elucidated in *Roach*,

9    *Helfrich*, and *Botsford*, is that benefits pertain to an individual's medical coverage and payments

10   related to such medical coverage.  Benefits do not, however, pertain to claims related to data

11   privacy.  Accordingly, the Court finds that Lawson's UCL claim is not expressly preempted under

12   FEHBA's express preemption provision, 5 U.S.C. § 8902(m)(1).

### b. Conflict Preemption

14       Turning to the issue of conflict preemption, the Court notes that conflict preemption

15   applies when compliance with federal and state law is physically impossible (hereinafter referred

16   to as "impossibility preemption") or where the state law is an obstacle to the purposes and

17   objectives of the federal law (hereinafter referred to as "obstacle preemption").  "Courts will find

18   impossibility preemption where it is impossible for a private party to comply with both state and

19   federal requirements." *Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578, 584 (6th Cir. 2013) (internal

20   quotation marks omitted).  Lawson's UCL claim is not subject to impossibility preemption.  It

21   would not be "impossible" for BCBSA to comply with both federal and state law.  All BCBSA

22   must do is take affirmative and reasonable measures to protect Plaintiffs' PII.  According to

23   Plaintiffs, Defendants' collective failure to take such steps resulted in the approximately 120

24   individual complaints filed against them.

25       Lawson's UCL claim is also not subject to obstacle preemption.  The Non-Anthem

26   Defendants' primary argument in this regard is that "the state law claims interfere with OPM's

27

79

28

1  exclusive authority to police FEHBA carriers." Non-Anthem Reply at 9. According to the Non-

2  Anthem Defendants, the Federal BCBSA contract implicates uniquely federal interests, which thus

3  preempts parties from asserting state law claims. *Id.* at 10. These arguments largely repeat the

4  Non-Anthem Defendants' contentions concerning Plaintiffs' third party beneficiary claims. As

5  with those claims, the Court finds that OPM's exclusive authority does not apply to claims over an

6  individual's data privacy.

7      A review of the Congressional purpose behind FEHBA lends additional support to this

8  finding. A report from the House of Representatives, for instance, "expressed fear that the

9  imposition of state-law requirements on FEHBA contracts would result in . . . a lack of uniformity

10 of *benefits* for enrollees in the same plan." *Helfrich*, 804 F.3d at 1106 (quoting H.R. Rep. No. 95-

11 282 at 4 (1977)) (alteration omitted) (emphasis added). Additional reports from the House and

12 Senate further confirm the importance of FEHBA in the administration of benefits and medical

13 coverage. *See id.* at 1106–07 (citing additional reports). In other words, health benefits—rather

14 than promises concerning data privacy—represent the unique federal interests protected by

15 FEHBA. Accordingly, because data privacy is not a "benefit" under FEHBA and is not, therefore,

16 a uniquely federal interest, Lawson's UCL claim is not obstacle preempted.

17      In sum, the Court need not address whether Williams' Indiana negligence claim is

18 preempted because Plaintiffs can not proceed with this claim as a matter of law. In addition, the

19 Court finds that, as Plaintiffs concede, Lawson's California breach of contract claim is preempted.

20 Lawson's California breach of contract claim is therefore DISMISSED with prejudice. Finally,

21 the Court finds that Lawson's UCL claim is not preempted. Therefore, the Non-Anthem

22 Defendants' motion to dismiss Lawson's UCL claim is DENIED.

23 **IV.    CONCLUSION**

24      To conclude:

25      1.  The Court GRANTS with leave to amend the Non-Anthem Defendants' motion to

26          dismiss Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of

27                                          80

United States District Court
Northern District of California

1   Arizona, Inc.; CareFirst of Maryland, Inc.; Blue Cross and Blue Shield of Michigan;

2   Blue Cross and Blue Shield of North Carolina, Inc.; Highmark Health Services;

3   Highmark West Virginia, Inc.; BlueCross BlueShield of Tennessee, Inc.; Blue Cross

4   and Blue Shield of Vermont; and Blue Cross and Blue Shield of Illinois, with respect

5   to the selected claims at issue in the instant motions to dismiss.

6   2.  The Court GRANTS with leave to amend the Non-Anthem Defendants' motion to

7   dismiss Blue Cross and Blue Shield of Arizona, Inc.; BlueCross BlueShield of

8   Tennessee, Inc.; and Highmark West Virginia, Inc. from this action in its entirety.

9   3.  The Court GRANTS with leave to amend the Non-Anthem Defendants' motion to

10   dismiss all Non-Anthem Defendants against whom no specific factual allegations were

11   made with respect to Plaintiffs' New Jersey breach of contract, New York unjust

12   enrichment, New York General Business Law § 349, and California Unfair

13   Competition Law claims.

14   4.  The Court GRANTS with leave to amend Defendants' motions to dismiss Plaintiffs'

15   California breach of contract, New Jersey breach of contract, New York unjust

16   enrichment, and Georgia Information and Privacy Protection Act claims.  In addition,

17   the Court GRANTS with leave to amend Defendants' motion to dismiss Plaintiffs'

18   fraud claim under California's Unfair Competition Law.

19   5.  The Court GRANTS with prejudice Defendants' motions to dismiss Plaintiffs' Indiana

20   negligence, Kentucky Consumer Protection Act, Kentucky Data Breach Act, and

21   Plaintiff Lawson's California breach of contract claim.

22   6.  The Anthem and Non-Anthem Defendants' motions to dismiss are otherwise DENIED.

23   Should Plaintiffs elect to file an amended complaint curing the deficiencies identified

24   herein, Plaintiffs shall do so within 30 days of the date of this Order.  Failure to meet the 30 day

25   deadline to file an amended complaint or failure to cure the deficiencies identified in this Order

26   will result in a dismissal with prejudice.  Plaintiffs may not add new causes of actions or parties

81

1   without leave of the Court or stipulation of the parties pursuant to Federal Rule of Civil Procedure

2   15.

3   **IT IS SO ORDERED.**

4   Dated:  February 14, 2016

5   _Lucy H. Koh_

6   LUCY H. KOH
United States District Judge

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' MOTION TO DISMISS
AND ORDER GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' MOTION TO
DISMISS

United States District Court
Northern District of California

# Exhibit I

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

Case No. 15-MD-02617-LHK

**ORDER GRANTING IN PART AND
DENYING IN PART ANTHEM
DEFENDANTS' SECOND MOTION TO
DISMISS, GRANTING IN PART AND
DENYING IN PART NON-ANTHEM
DEFENDANTS' SECOND MOTION TO
DISMISS, AND DENYING MOTION
FOR CLARIFICATION
[PUBLIC VERSION]**

Re: Dkt. No. 483, 490, 496

IN RE ANTHEM, INC. DATA BREACH
LITIGATION

Plaintiffs[1] bring this putative class action against Anthem, Inc., 27 Anthem affiliates,[2] Blue

---

[1] All named Plaintiffs are identified in paragraphs 12 through 112 of the Second Consolidated Amended Complaint.  *See* ECF No. 473-3 ("SAC") ¶¶ 12–112.

[2] The Anthem affiliates are: Blue Cross and Blue Shield of Georgia; Blue Cross Blue Shield Healthcare Plan of Georgia; Anthem Blue Cross and Blue Shield of Indiana; Anthem Blue Cross of California; Anthem Blue Cross Life and Health Insurance Company; Anthem Blue Cross and Blue Shield of Colorado and Anthem Blue Cross and Blue Shield of Nevada; Anthem Blue Cross and Blue Shield of Connecticut; Anthem Blue Cross and Blue Shield of Kentucky; Anthem Blue Cross and Blue Shield of Maine; Anthem Blue Cross and Blue Shield of Missouri (HMO Missouri, Inc., RightChoice Managed Care, Inc. & Healthy Alliance Life Insurance Company); Anthem Blue Cross and Blue Shield of New Hampshire; Empire Blue Cross and Blue Shield; Anthem Blue Cross and Blue Shield of Ohio; Anthem Blue Cross and Blue Shield of Virginia (Anthem Health Plans of Virginia & HMO HealthKeepers); Anthem Blue Cross and Blue Shield of Wisconsin (Blue Cross Blue Shield of Wisconsin & Compcare Health Services Insurance Corporation); Amerigroup Services; HealthLink; Unicare Life & Health Insurance Company; CareMore Health Plan; the Anthem Companies; the Anthem Companies of California;

1

United States District Court
Northern District of California

United States District Court
Northern District of California

1 Cross Blue Shield Association, and 14 non-Anthem Blue Cross Blue Shield Companies.[3]  The

2 Court refers to Anthem, Inc. and the Anthem affiliates as the "Anthem Defendants," and Blue

3 Cross Blue Shield Association and the non-Anthem Blue Cross Blue Shield Companies as the

4 "Non-Anthem Defendants."  The Court refers to the Anthem and Non-Anthem Defendants

5 collectively as "Defendants."  The Court refers to Plaintiffs generally as "Plaintiffs," unless

6 referring to Plaintiffs from a specific jurisdiction, such as California Plaintiffs or New York

7 Plaintiffs.

8      The Anthem Defendants filed one consolidated motion to dismiss the second consolidated

9 amended complaint ("SAC").  *See* ECF No. 473-3 ("SAC"); ECF No. 496 ("Anthem Mot.").  The

10 Non-Anthem Defendants also filed one consolidated motion to dismiss the SAC.  ECF No. 490

11 ("Non-Anthem Mot.").  The Non-Anthem Defendants have also filed a motion for clarification of

12 the Court's First Motion to Dismiss Order.  ECF No. 483.  Having considered the parties'

13 submissions, the relevant law, and the record in this case, the Court GRANTS in part and DENIES

14 in part the Anthem Defendants' motion to dismiss; GRANTS in part and DENIES in part the Non-

15 Anthem Defendants' motion to dismiss; and DENIES the Non-Anthem Defendants' motion for

16 clarification.

17 **I.       BACKGROUND**

18    **A.  Factual Background**

19      Anthem, Inc. ("Anthem") is one of the largest health benefits and health insurance

20 companies in the United States.  SAC ¶ 158.  Anthem serves its members through various Blue

21 Cross Blue Shield ("BCBS") licensee affiliates and other non-BCBS affiliates.  *Id.*  Anthem also

22

23 Amerigroup Corporation; and the Amerigroup Kansas, Inc.
[3] The non-Anthem BCBS Companies are: Blue Cross and Blue Shield of Alabama; Arkansas Blue

24 Cross and Blue Shield; Blue Shield of California; Blue Cross and Blue Shield of Illinois; Blue
Cross and Blue Shield of Florida; CareFirst BlueCross BlueShield; Blue Cross and Blue Shield of

25 Massachusetts; Blue Cross and Blue Shield of Michigan; Blue Cross and Blue Shield of
Minnesota; Horizon Blue Cross and Blue Shield of New Jersey; Blue Cross and Blue Shield of

26 North Carolina; Highmark Blue Shield; Blue Cross and Blue Shield of Texas; and Blue Cross and
Blue Shield of Vermont.

27
Case No. 15-MD-02617-LHK

28 ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

cooperates with the Blue Cross Blue Shield Association ("BCBSA") and independent BCBS licensees via the BlueCard program. *Id.* ¶ 159. "Under the BlueCard program, members of one BCBS licensee may access another BCBS licensee's provider networks and discounts when the members are out of state." *Id.*

In order to provide certain member services, the Anthem and Non-Anthem Defendants "collect, receive, and access their customers' and members' extensive individually identifiable health record information." *Id.* ¶ 160. "These records include personal information (such as names, dates of birth, Social Security numbers, health care ID numbers, home addresses, email addresses, and employment information, including income data) and individually-identifiable health information (pertaining to the individual claims process, medical history, diagnosis codes, payment and billing records, test records, dates of service, and all other health information that an insurance company has or needs to have to process claims)." *Id.* The Court shall refer to members' personal and health information as Personal Identification Information, or "PII."

Anthem maintains a common computer database which contains the PII of current and former members of Anthem, Anthem's affiliates, BCBSA, and independent BCBS licensees. *Id.* ¶ 161. This database contains "information from former customers or members going back to 2004." *Id.* ¶ 162. In total, Anthem's database contains the PII of approximately 80 million individuals. *Id.* ¶ 338. According to Plaintiffs, both the Anthem and Non-Anthem Defendants promised their members that their PII would be protected through privacy notices, online website representations, and other advertising. Plaintiffs aver, for instance, that all Defendants were subject to Anthem's privacy policy, which states the following:

> Anthem Blue Cross and Blue Shield maintains policies that protect the confidentiality of personal information, including Social Security numbers, obtained from its members and associates in the course of its regular business functions. Anthem Blue Cross and Blue Shield is committed to protecting information about its customers and associates, especially the confidential nature of their personal information.

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

* * *

> Anthem Blue Cross and Blue Shield has in place a minimum necessary policy which states that associates may only access, use or disclose Social Security numbers or personal information to complete a specific task and as allowed by law.

> Anthem Blue Cross and Blue Shield safeguards Social Security numbers and other personal information by having physical, technical, and administrative safeguards in place.

*Id.* ¶ 165 (emphasis removed).  Many Anthem-affiliated websites further refer to Defendants' privacy obligations under the Health Insurance Portability and Accountability Act ("HIPAA") as well as other federal and state privacy laws.  *Id.*

In February 2015, Anthem publicly announced that "cyberattackers had breached the Anthem Database, and [had] accessed [the PII of] individuals in the Anthem Database."  *Id.* ¶ 337.  This was not the first time that Anthem had experienced problems with data security.  In late 2009, approximately 600,000 customers of Wellpoint (Anthem's former trade name) "had their personal information and protected healthcare information compromised due to a data breach."  *Id.* ¶ 328.  In addition, in 2013, the U.S. Department of Health and Human Services fined Anthem $1.7 million for various HIPAA violations relating to data security.  *Id.* ¶ 329.  Finally, in 2014, the federal government informed Anthem and other healthcare companies of the possibility of cyberattacks, and advised these companies to take appropriate measures, such as data encryption and enhanced password protection.  *Id.* ¶¶ 334–35.

Plaintiffs allege that Defendants did not sufficiently heed these warnings, which allowed cyberattackers to extract massive amounts of data from Anthem's database between December 2014 and January 2015.  *Id.* ¶ 360.  After Anthem discovered the extent of this data breach, it proceeded to implement various containment measures.  *Id.* ¶ 365–66 .  The cyberattacks ceased by January 31, 2015.  *Id.*  In addition, after learning of the cyberattacks, Anthem retained Mandiant, a cybersecurity company, "to assist in assessing and responding to the Anthem Data Breach and to assist in developing security protocols for Anthem."  *Id.* ¶ 341.  Mandiant's work

4

United States District Court
Northern District of California

culminated in the production of an Intrusion Investigation Report ("Mandiant Report"), which Mandiant provided to Anthem in July 2015.  *Id.*

According to Plaintiffs, the Mandiant Report found that "Anthem and [its] Affiliates [had] failed to implement basic industry-accepted data security tools to prevent cyberattackers from accessing the Anthem Database."  *Id.* ¶ 343.  Moreover, "[e]ven if the cyberattackers gained access to the Anthem Database, Anthem could have and should have, but failed to, discover the data breach before any data was exfiltrated."  *Id.* ¶ 345.

Additionally, "BCBSA and [the] non-Anthem BCBS [companies] allowed the [PII] that their current and former customers and members had entrusted with them to be placed into the Anthem Database even though there were multiple public indications and warnings that the Anthem and Anthem Affiliates' computer systems and data security practices were inadequate." *Id.* ¶ 377.  Plaintiffs further aver that although Anthem publicly disclosed the data breach in February 2015, many affected customers were not personally informed until March 2015.  Finally, Plaintiffs contend that Anthem still has not disclosed whether it has made any changes to its security practices to prevent a future cyberattack.

### B.  Procedural History

A number of lawsuits were filed against Defendants in the wake of the Anthem data breach.  In general, these lawsuits bring putative class action claims alleging (1) failure to adequately protect Anthem's data systems, (2) failure to disclose to customers that Anthem did not have adequate security practices, and (3) failure to timely notify customers of the data breach.

In spring 2015, Plaintiffs in several lawsuits moved to centralize pretrial proceedings in a single judicial district.  *See* 28 U.S.C. § 1407(a) ("When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings.").  On June 12, 2015, the Judicial Panel on Multidistrict Litigation ("JPML") issued a transfer order selecting the undersigned judge as the transferee court for "coordinated or consolidated pretrial proceedings" in the multidistrict

5

litigation ("MDL") arising out of the Anthem data breach. *See* ECF No. 1 at 1–3.[4]

On September 10, 2015, the Court held a hearing to appoint Lead Plaintiffs counsel. Following this hearing, the Court issued an order appointing Co-Lead Plaintiffs counsel and requesting that counsel file a single consolidated amended complaint by October 19, 2015. ECF No. 284 at 2. On October 19, 2015, Plaintiffs filed their consolidated amended complaint, which organized Plaintiffs' causes of action into thirteen different counts, with claims asserted pursuant to various state and federal laws under each count. ECF No. 334-6 ("CAC").

At the October 25, 2015 case management conference, the Court determined that the Anthem and Non-Anthem Defendants would file separate motions to dismiss. Both motions would be "limited to a combined total of 10 claims, with 5 claims selected by Plaintiffs, 3 claims selected by the Anthem Defendants, and 2 claims selected by the [Non-Anthem Defendants]." ECF No. 326 at 2–3. At the November 10, 2015 case management conference, the parties identified the 10 claims that would be addressed in Defendants' motions to dismiss.

On November 23, 2015, the Anthem Defendants and Non-Anthem Defendants filed their first round motions to dismiss. On February 14, 2016, the Court granted in part and denied in part the first round motions to dismiss. ECF No. 468 ("First MTD Order."). Specifically, the Court granted with prejudice Defendants' motions to dismiss Plaintiffs' Indiana negligence, Kentucky Consumer Protection Act, and Kentucky Data Breach Act claims. *Id.* at 81. The Court granted with leave to amend Defendants' motions to dismiss Plaintiffs' California breach of contract, New Jersey breach of contract, New York unjust enrichment, and Georgia Information and Privacy Protection Act claims. *Id.* The Court denied Defendants' motions to dismiss Plaintiffs' California Unfair Competition Law, New York General Business Law § 349, and federal law third party beneficiary claims. *Id.* The Court also addressed standing and ERISA preemption in the First Motion to Dismiss Order.

---

[4] As of May 19, 2016, this MDL is comprised of 127 individual cases. ECF No. 514-1 at 5.

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

1    In accordance with the Court's First Motion to Dismiss Order, Plaintiffs filed the SAC on

2    March 11, 2016.  The Anthem and Non-Anthem Defendants filed their second round motions to

3    dismiss on April 5, 2016.  Plaintiffs filed their oppositions on April 26, 2016, and the Anthem

4    Defendants and Non-Anthem Defendants filed their replies on May 10, 2016.  ECF No. 508

5    ("Anthem Opp'n"); ECF No. 507 ("Non-Anthem Opp'n"); ECF No. 511 ("Anthem Reply"); ECF

6    No. 512 ("Non-Anthem Reply").  In addition, on March 28, 2016, the Non-Anthem Defendants

7    filed a motion for clarification regarding the First Motion to Dismiss Order.  ECF No. 483.

8    Plaintiffs filed a response on March 31, 2016, ECF No. 486, and the Non-Anthem Defendants

9    filed a reply on April 4, 2016, ECF No. 488.

## II.      LEGAL STANDARD

### A.  Motion to Dismiss

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an

action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).  For

purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the

complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving

party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

Nonetheless, the Court is not required to "'assume the truth of legal conclusions merely

because they are cast in the form of factual allegations.'" *Fayer v. Vaughn*, 649 F.3d 1061, 1064

(9th Cir. 2011) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)).  Mere

"conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to

dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *accord Iqbal*, 556 U.S. at 678.

7

United States District Court
Northern District of California

1    Furthermore, "'a plaintiff may plead [him]self out of court'" if he "plead[s] facts which establish

2    that he cannot prevail on his . . . claim." *Weisbuch v. Cnty. of L.A.*, 119 F.3d 778, 783 n.1 (9th Cir.

3    1997) (quoting *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir. 1995)).

4         For purposes of motions to dismiss, as with virtually all motions touching upon substantive

5    legal matters, the general rule "is that the  MDL transferee court is generally bound by the same

6    substantive legal standards, if not always the same interpretation of them, as would have applied in

7    the transferor court." *In re Korean Air Lines Co., Ltd.*, 642 F.3d 685, 699 (9th Cir. 2011).

8         **B.  Leave to Amend**

9         Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely

10    granted when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate

11    decision on the merits, rather than on the pleadings or technicalities."  *Lopez v. Smith*, 203 F.3d

12    1122, 1127 (9th Cir. 2000) (en banc) (ellipses omitted).  Generally, leave to amend shall be denied

13    only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be

14    futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512

15    F.3d 522, 532 (9th Cir. 2008).

16    **III.     DISCUSSION**

17         **A.  Standing and Discovery**

18         Before addressing the specific claims at issue, the Court examines the Non-Anthem

19    Defendants' arguments regarding standing.  These arguments also relate to the issues raised in the

20    Non-Anthem Defendants' motion for clarification.

21         In the First Motion to Dismiss Order, the Court observed that there were ten Non-Anthem

22    Defendants against whom the CAC "fails to allege any specific facts" regarding the selected

23    claims at issue.  First MTD Order at 8.  Those Non-Anthem Defendants were: Blue Cross and

24    Blue Shield of Alabama; Blue Cross and Blue Shield of Arizona, Inc.; CareFirst of Maryland, Inc.;

25    Blue Cross and Blue Shield of Michigan; Blue Cross and Blue Shield of North Carolina, Inc.;

26    Highmark Health Services; Highmark West Virginia, Inc.; BlueCross BlueShield of Tennessee,

8

27    Case No. 15-MD-02617-LHK

28    ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
      DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
      MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

1    Inc.; Blue Cross and Blue Shield of Vermont; and Blue Cross and Blue Shield of Illinois.  Because

2    no factual allegations were made against these Non-Anthem Defendants as to the selected claims,

3    the Court dismissed the selected claims against these Non-Anthem Defendants on standing

4    grounds.

5          In reaching this decision, the Court found instructive the reasoning in *In re Carrier IQ*, 78

6    F. Supp. 3d 1051 (N.D. Cal. 2015), where the district court, after examining U.S. Supreme Court

7    precedent in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard*

8    *Corp.*, 527 U.S. 815 (1999), concluded that courts have discretion on when to address standing in

9    a nationwide class action—whether at the outset of litigation or at class certification.  In exercising

10   such discretion, a court should consider factors such as the cost and burden of discovery, the

11   breadth of the proposed class, and whether a named plaintiff's claim is typical of individuals

12   whose claims arise under the laws of other states.  First MTD Order at 10.

13         With these factors in mind, the Court expressed concern that some Non-Anthem

14   Defendants would remain in this case even though Plaintiffs might not, as a matter of law, be able

15   to pursue the selected claims against these Defendants.  There were, for instance, no allegations in

16   the CAC to suggest that any Blue Cross and Blue Shield of Illinois customers resided in California

17   or New York.  As such, it would make little sense to ask Blue Cross and Blue Shield of Illinois to

18   defend itself against Plaintiffs' California Unfair Competition Law or New York General Business

19   Law § 349 claims.

20         The Court went on to distinguish the posture of this case from that in *In re Target Corp.*

21   *Data Security Breach Litigation*, 66 F. Supp. 3d 1154 (D. Minn. 2014).  In *In re Target*, there

22   were "114 named Plaintiffs who reside[d] in every state in the union save four and the District of

23   Columbia."  *Id.* at 1160.  "As Target undoubtedly knows, there are consumers in Delaware,

24   Maine, Rhode Island, Wyoming, and the District of Columbia whose personal financial

25   information was stolen in [a] 2013 [data] breach."  *Id.*  "To force [p]laintiffs' attorneys to search

26   out those individuals at [the motion to dismiss] stage serves no useful purpose."  *Id.*  Here, on the

9

United States District Court
Northern District of California

United States District Court
Northern District of California

1  other hand, there was no indication from the CAC that Plaintiffs would be able to find an

2  individual to plead specific facts concerning the selected claims against ten Non-Anthem

3  Defendants.

4     The Non-Anthem Defendants' first motion to dismiss was, however, granted with leave to

5  amend.  In the second round motion to dismiss, the Non-Anthem Defendants once again argue for

6  dismissal of the selected claims against ten Non-Anthem Defendants.  The list of Defendants has

7  changed somewhat since the Court's First Motion to Dismiss Order.  These changes reflect the

8  fact that Plaintiffs omitted three Non-Anthem Defendants from the SAC and that Non-Anthem

9  Defendants identified three additional Non-Anthem Defendants in the SAC against whom the

10 named Plaintiffs make no specific factual allegations as to the selected claims.  Non-Anthem Mot.

11 at 2–3 n.2.  The updated list of ten Non-Anthem Defendants is: Blue Cross and Blue Shield of

12 Alabama; CareFirst of Maryland, Inc.; Blue Cross and Blue Shield of Michigan; Blue Cross and

13 Blue Shield of North Carolina, Inc.; Highmark Health Services; Blue Cross and Blue Shield of

14 Vermont; Blue Cross Blue Shield of Massachusetts; Arkansas Blue Cross and Blue Shield; Blue

15 Cross and Blue Shield of Minnesota; and Blue Cross and Blue Shield of Illinois.  In addition, Non-

16 Anthem Defendants also request that the Court "dismiss every non-selected claim against every . .

17 . Defendant to the extent the named Plaintiff(s) asserting the claim does not allege he or she was

18 insured by . . . th[at] . . . Defendant."  *Id.* at 4 (emphasis removed).  The Court addresses these

19 arguments in turn.

20     **1.  Selected Claims**

21     The easiest way for Plaintiffs to have avoided dismissal would have been to find a named

22 Plaintiff to assert one of the seven remaining selected claims against the ten Non-Anthem

23 Defendants at issue.  Plaintiffs have not done so.  Instead of identifying new named Plaintiffs,

24 however, the SAC includes enrollment data on each Non-Anthem Defendant.  This data "set[]

25 forth the number of residents of each state that were . . . enrolled" in "a health insurance of health

26 benefits plan" by each Non-Anthem Defendant.  SAC ¶¶ 242–55.  From the Court's review of this

10

27 Case No. 15-MD-02617-LHK

28 ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

1   data, it appears that *every* Non-Anthem Defendant at issue enrolled residents from nearly *every*

2   state.[5]

3       The Court finds that this alternative method also addresses the Court's concerns regarding

4   standing.  Indeed, there was previously no indication that Blue Cross and Blue Shield of Illinois

5   enrolled any California or New York residents.  Now, however, the SAC states that 208,945

6   California residents and 82,404 New York residents were enrolled in a Blue Cross and Blue Shield

7   of Illinois plan.  Taken together, the number of California and New York residents enrolled in a

8   Blue Cross and Blue Shield of Illinois plan (291,349) actually exceeds the number of Illinois

9   residents enrolled in a Blue Cross and Blue Shield of Illinois plan (265,801).  *Id.* ¶ 245.  Thus,

10  208,945 individuals could bring a California Unfair Competition Law claim against Blue Cross

11  and Blue Shield of Illinois, and 82,404 individuals could bring a New York General Business Law

12  § 349 claim against Blue Cross and Blue Shield of Illinois.

13      Under such circumstances, Plaintiffs' allegations are now more analogous to the facts in *In*

14  *re Target*.  As in *In re Target*, the SAC shows that every Non-Anthem Defendant provided health

15  insurance or health benefits services to residents of nearly every state.  The Court's concerns

16  regarding whether any individuals could assert the selected claims against certain Defendants have

17  thus been sufficiently addressed.  At this point in the litigation, "forc[ing] Plaintiffs' [counsel] to

18  search out . . . individuals [to add as named Plaintiffs] at this stage serves no useful purpose."  *In*

19  *re Target*, 66 F. Supp. 3d at 1160.  Moreover, dismissing the selected claims against the ten

20  Defendants at issue could prematurely preclude many individuals—such as the 208,945 Blue

21  Cross and Blue Shield of Illinois enrollees in California—from pursuing viable claims.

22      Accordingly, the Court, in its discretion, declines to dismiss the selected claims against the

23  ten Non-Anthem Defendants at issue.  The Non-Anthem Defendants' motion to dismiss on

24

25  [5] There are exceptions.  Blue Cross and Blue Shield of Vermont, for example, did not enroll any
26  Delaware, Hawaii, or North Dakota residents.  SAC ¶ 255.  The selected claims, however, do not
    concern laws from these states.

27                                          11

28  ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
    DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
    MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

standing grounds is therefore DENIED.

The Court cautions that today's decision is not meant to give Plaintiffs a free pass on standing.  Although standing questions may be deferred until class certification in cases like this, "[t]he question of standing is not subject to waiver."  *United States v. Hays*, 515 U.S. 737, 742 (1995).  "This is no less true with respect to class actions than with respect to other suits."  *Lewis v. Casey*, 518 U.S. 343, 357 (1996).  "That a suit may be a class action adds nothing to the question of standing," *id.* (ellipses omitted), and if standing concerns remain at class certification, the Non-Anthem Defendants are invited to re-raise them before this Court.

### 2.  Non-Selected Claims

For substantially similar reasons, the Non-Anthem Defendants' request to dismiss the non-selected claims against every Non-Anthem Defendant is also DENIED.  As outlined above, Plaintiffs have presented sufficient allegations to establish that every Non-Anthem Defendant offered health insurance or health benefits services to residents of every state.

### 3.  Motion for Clarification

Finally, the above analysis also answers the Non-Anthem Defendants' motion for clarification.  The gist of this motion is that, based on the First Motion to Dismiss Order, ten Non-Anthem "Defendants should be relieved of the burden of discovery until resolution of the selected claims."  ECF No. 483 at 3.  As dismissal of the selected claims against these ten Non-Anthem Defendants on the basis of standing is unwarranted, the Non-Anthem Defendants' request for a pause in discovery against these ten Non-Anthem Defendants is also DENIED.

### B.  California Breach of Contract (against Anthem Defendants)[6]

"Under California law, to state a claim for breach of contract a plaintiff must plead [1] the contract, [2] plaintiffs' performance (or excuse for nonperformance), [3] defendant's breach, and

---

[6] Defendants also assert that ERISA preemption applies to some (but not all) of the named Plaintiffs as to their California breach of contract, New York unjust enrichment, California Unfair Competition Law, and New York General Business Law § 349 claims.  All ERISA preemption arguments are addressed at Section III.I.

12

United States District Court
Northern District of California

[4] damage to plaintiff therefrom." *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1028 (N.D. Cal. 2012) (internal quotation marks omitted). Here, California Plaintiffs allege that "Plaintiffs and Class Members . . . entered into contracts with Anthem and its Affiliates that incorporated, either by express provision or attachment, or incorporation by reference, Anthem's . . . privacy policies pertaining to personal and health-related information." SAC ¶ 458. California Plaintiffs further contend that, by allowing cyberattackers to access the Anthem Database, the Anthem Defendants breached these contractual obligations. In moving to dismiss, the Anthem Defendants assert that the SAC "fails to identify [the] contractual provisions that were breached" and "fails to show that any breach caused contractual damages." Anthem Mot. at 6, 11.

There are three specific types of contracts at issue, with each type operating somewhat differently. First, "many Plaintiffs . . . purchased individual insurance or health benefits policies [directly] from Anthem and its Affiliates." SAC ¶ 191. These individuals "entered into contracts with Anthem and its Affiliates when they applied and paid for insurance and Anthem issued them a policy." *Id.* The Court refers to such contracts as "individual plan" contracts.

Second, some Plaintiffs entered into "group insurance policies" where Anthem "act[ed] as the insurer of risk." *Id.* ¶ 214. Under such contracts, a group—usually an employer—purchases insurance from a regulated insurance company. "Typically, the employer pays a per-employee premium to an insurance company, and the insurance company assumes the risk of providing health coverage for insured events." *Mich. Catholic Conf. and Catholic Family Servs. v. Burwell*, 807 F.3d 738, 742 (6th Cir. 2015) (internal quotation marks omitted). Similar to individual plan contracts, under these group insurance policies, the Anthem Defendants act as the insurer and bear any risks associated with insurance coverage. The Court refers to these plans as "fully-insured group plan" contracts.

Third, many Plaintiffs were part of self-insured group plans. SAC ¶ 214. Under such plans, the group "contract[s] with an insurance company . . . to administer the plan, but the [group] bears the risk associated with offering health benefits." *Mich. Catholic Conf.*, 807 F.3d at 743.

13

United States District Court
Northern District of California

Unlike an individual plan or a fully-insured group plan, the Anthem Defendants act under these contracts as an administrator rather than as an insurer.  The Anthem Defendants do not bear the risks associated with insurance coverage.  The Court refers to these contracts as "administrative services only" agreements or "ASO" agreements.

The SAC identifies eleven California Plaintiffs, eight of whom assert a breach of contract claim against the Anthem Defendants.  SAC ¶¶ 15–23.  The remaining California Plaintiffs are covered by a Non-Anthem Defendant.  The situation of the eight California Plaintiffs asserting a California breach of contract claim against an Anthem Defendant is documented below.

| Name | Insurer/Administrator | Contract Type |
|---|---|---|
| Michael Bronzo | Anthem Blue Cross of California | Individual Plan |
| Kenneth Solomon | Anthem Blue Cross Life and Health Insurance Company | Individual Plan |
| Mary Ella Carter | Anthem Blue Cross of California | Fully-Insured Group Plan |
| Kenneth Coonce | Anthem Blue Cross of California | Fully-Insured Group Plan |
| Daniel Randrup | Anthem Blue Cross of California | ASO Agreement |
| Steve Kawai | Anthem Blue Cross of California | ASO Agreement |
| Daniel Tharp | Anthem Blue Cross of California | ASO Agreement |
| Kelly Tharp | Anthem Blue Cross of California | ASO Agreement |

Because the legal architecture behind individual and fully-insured group plans (where the Anthem Defendants act as the insurer) differs from the legal architecture behind ASO agreements (where the Anthem Defendants act as the administrator), the Court addresses the Anthem Defendants' arguments regarding these plans separately.

**1.  Individual and Fully-Insured Group Plans**

For California Plaintiffs covered by an individual or fully-insured group plan, the Anthem

14

1   Defendants contend that, although "[t]he SAC asserts that various privacy notices and policies

2   became enforceable provisions of Plaintiffs' health plan contracts," the SAC "fails to allege facts

3   to support th[is] assertion." Anthem Mot. at 6. California Plaintiffs, in response, assert that these

4   privacy provisions were part of their underlying contracts via incorporation by reference or

5   through express attachment.

6                           **a.  Incorporation by Reference**

7          As to incorporation by reference, California law provides that "[a] contract may validly

8   include the provisions of a document not physically a part of the basic contract." *Shaw v. Regents*

9   *of Univ. of Cal.*, 67 Cal. Rptr. 2d 850, 856 (Ct. App. 1997). "It is, of course, the law that the

10  parties may incorporate by reference into their contract the terms of some other document." *Id.*

11  "For the terms of another document to be incorporated into the document executed by the parties

12  [1] the reference must be clear and unequivocal, [2] the reference must be called to the attention of

13  the other party and he must consent thereto, and [3] the terms of the incorporated document must

14  be known or easily available to the contracting parties." *Id.* "The contract need not recite that it

15  incorporates another document, so long as it guides the reader to the incorporated document." *Id.*

16  (internal quotation marks and alteration omitted).

17         With these principles in mind, the California Court of Appeal determined, in *Shaw v.*

18  *Regents of the University of California*, that a college professor's contract had incorporated by

19  reference the university's patent policy. *Id.* at 852. As the court explained, "when [plaintiff]

20  signed the agreement, the parties intended it to incorporate the [University's] Patent Policy." *Id.* at

21  856. Specifically, "[plaintiff's contract] (1) direct[ed] [plaintiff] to 'Please read the Patent Policy .

22  . . ,' and (2) state[d] that, in signing the patent agreement, [plaintiff was] 'not waiving any rights to

23  a percentage of royalty payments received by University, as set forth in [the] University Policy

24  Regarding Patents.'" *Id.* (emphasis removed).

25         Following *Shaw*, the California Court of Appeal also determined that an arbitration clause

26  was sufficiently incorporated by reference in *Wolschlager v. Fidelity National Title Insurance*

27                                          15

28  ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
    DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
    MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

United States District Court
Northern District of California

*Company*, 4 Cal. Rptr. 3d 179 (Ct. App. 2003).  In *Wolschlager*, plaintiff received a preliminary report from defendant, a title insurance company.  *Id.* at 181.  This report did not state that the insurance policy was subject to an arbitration clause; indeed, the report did not even mention an arbitration clause.   Instead, the report included two sentences which stated that "[Complete] [c]opies of the [entire insurance] policy . . . should be read.  They are available from the office which issued this Report."  *Id.* at 181–82.  The full policy, which plaintiff later received after agreeing to purchase insurance from defendant, contained an arbitration clause.  *Id.* at 182.

The *Wolschlager* court acknowledged that defendant, by moving to enforce the arbitration clause, sought to incorporate by reference "documents which were not attached" and "not presented" to plaintiff "at the time" that plaintiff reviewed the preliminary report and signed the underlying contract.  *Id.*  Indeed, "[t]here was no substantive dispute that plaintiff did not actually know about the arbitration clause."  *Id.* at 185.  Nonetheless, the California Court of Appeal found in defendant's favor, with the court noting that "the Preliminary Report specifically identifies the document incorporated as the policy, lists the form which is contemplated and tells the recipient where they can find the policy."  *Id.* at 184–85.  "This incorporation was both clear and unequivocal."  *Id.* at 185.  Moreover, "even if plaintiff did not know about the arbitration clause, the [p]olicy with the clause was easily available to him.  The preliminary report identified the [p]olicy by name and directed . . . plaintiff to where he could inspect it."  *Id.*  "Nothing further," the California Court of Appeal observed, "was needed."  *Id.*

Under *Shaw* and *Wolschlager*, the contracts entered into by Michael Bronzo ("Bronzo"), Kenneth Solomon ("Solomon"), Mary Ella Carter ("Carter"), and Kenneth Coonce ("Coonce") sufficiently incorporate by reference the Anthem Defendants' promises to protect individual privacy.  First, on whether the references were clear and unequivocal, *Shaw*, 67 Cal. Rptr. at 856, each contract includes several specific references to Anthem's privacy policies.  Bronzo's contract, for instance, states that "You have the right to receive a copy of the Notice of Privacy Practices.  You may obtain a copy by calling our customer service department . . . or by accessing

16

our website." ECF No. 473-5 at 28. At another point, Bronzo's contract provides that Anthem's right to "receive from any Provider of service information about You" is "subject to all applicable confidentiality requirements." *Id.* at 29. Further, the next paragraph reads, in all caps, that "A STATEMENT DESCRIBING OUR POLICIES AND PROCEDURES FOR PRESERVING THE CONFIDENTIALITY OF MEDICAL RECORDS IS AVAILABLE AND WILL BE FURNISHED TO YOU UPON REQUEST." *Id.* The paragraph concludes by advising Bronzo to contact Anthem's customer service department for "a copy of our policies and procedures for preserving Your medical record confidentiality." *Id.* Thus, the Anthem Defendants, on multiple instances, made clear and unequivocal references to Anthem's privacy policies in Bronzo's contract.

The Anthem Defendants made similar representations to Solomon, Carter, and Coonce. Solomon's contract, for instance, states: "You . . . have the right to receive a copy of the Notice of Privacy Practices. You may obtain a copy by calling our customer service department . . . or by accessing our web site." ECF No. 473-7 at 22. Similarly, Carter's plan booklet states that the Anthem Defendants "will make every effort and take care to keep your medical data secret." ECF No. 473-5 at 40. "Medical data about you can only be given to others if you agree to it in writing or if required by law." *Id.* "A statement describing our policies and procedures for preserving the confidentiality of medical records is available and will be furnished to you upon request." *Id.* Coonce's plan booklet also directs Coonce to obtain a copy of Anthem's "Notice of Privacy Practices" either by calling Anthem's customer service department or by accessing Anthem's website. ECF No. 473-6 at 6.

Second, "the references were called to the attention of" Bronzo, Solomon, Carter, and Coonce. *Shaw*, 67 Cal. Rptr. at 856. As noted above, each governing contract or group plan booklet called attention to the Anthem Defendants' privacy policies and gave instructions on how consumers could review these policies in greater detail.

Third, "the terms of the incorporated document [were] known or easily available to the

17

1  contracting parties." *Id.*  The SAC states that Anthem's privacy obligations were codified in at

2  least three sets of documents: a "Personal Information (Including Social Security Number) Privacy

3  Policy," ("PIPP") which was posted on "the Anthem website and the website for every Anthem

4  BCBS Affiliate and . . . other Anthem Affilate[]," SAC ¶¶ 165–66; an Annual Notice of Privacy

5  Practices ("Annual Privacy Notice"), *id.* ¶ 169; and in other statements on Anthem's website, *id.* ¶

6  168.  The core message from these documents is the same: to take reasonable security measures to

7  protect customer PII.  *See* ECF No. 473-5 at 2 (PIPP); ECF No. 473-5 at 16 (Annual Privacy

8  Notice).  All of these documents, moreover, were "easily available," *Shaw*, 67 Cal. Rptr. at 856,

9  either via a physical copy or online.

10      The references at issue in the instant case in fact go several steps further than the

11  references in *Wolschlager*.  In *Wolschlager*, plaintiff was simply advised that "[c]omplete [c]opies

12  of the [insurance] policy . . . should be read," without making *any* reference to the arbitration

13  clause that was later disputed.  4 Cal. Rptr. 3d at 181.  Here, on the other hand, the governing

14  documents all discussed Anthem's obligation to protect privacy.  In addition, these documents

15  specifically direct California Plaintiffs to review Anthem's privacy policies in greater detail by

16  either calling Anthem's customer service department or by visiting Anthem's public website.

17  Under such circumstances, the Court finds that the Anthem Defendants' privacy policies were

18  sufficiently incorporated by reference into the contracts of Bronzo, Solomon, Carter, and Coonce.

19      In response to *Shaw* and *Wolschlager*, the Anthem Defendants argue (1) that *Amtower v.*

20  *Photon Dynamics, Inc.*, 71 Cal. Rptr. 3d 361 (Ct. App. 2008), compels a contrary result, (2) that

21  the integration clause in California Plaintiffs' contracts precludes incorporation by reference of

22  Anthem's privacy policies, and (3) that Anthem's privacy policies only codify preexisting legal

23  duties and do not create independent contractual obligations.

24      The Anthem Defendants' reliance upon *Amtower* is misguided.  *Amtower* involved two

25  separate contracts governing two different sets of parties.  The first contract, known as the

26  "Merger Agreement," negotiated the process by which CR Technology, Inc. ("CRT") would

18

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

merge with Photon Dynamics Inc. ("Photon"). *Id.* at 367–68.  The only parties to the Merger

Agreement were CRT and Photon.  Notably, the Merger Agreement included an attorney's fees

provision.  The second contract, known as the "Affiliate Agreement," negotiated the rights of CRT

shareholders to "sell the Photon stock [that] they acquired through the [CRT and Photon] merger."

*Id.* at 368.  The parties to the Affiliate Agreement were CRT's shareholders, which included

plaintiff, and Photon.  The Affiliate Agreement did not include an attorney's fees provision.

Plaintiff subsequently brought suit against Photon and Photon's officers, "complaining that

he had been misled about the transferability of Photon stock" under the Affiliate Agreement.  *Id.* at

369.  Photon prevailed at trial and sought recovery of attorney's fees.  The crux of Photon's

argument was that, although the Affiliate Agreement did not include an attorney's fees provision,

the Affiliate Agreement did mention the Merger Agreement, which meant that the Merger

Agreement's attorney's fees provision was incorporated by reference into the Affiliate Agreement.

*See id.* at 382–83.  The California Court of Appeal rejected this argument.

As the California Court of Appeal observed, "[t]he parties to the Merger Agreement were

Photon and CRT."  *Id.* at 382.  On the other hand, "[t]he parties to the Affiliate Agreement were

Photon and plaintiff."  *Id.*  Thus, "unlike the facts in either *Shaw* or *Wolschlager*, the Merger

Agreement [was] a separate contract that plaintiff did not solicit and to which he was not a party."

*Id.* at 385.  "The Merger Agreement was not attached to the Affiliate Agreement and the Affiliate

Agreement did not refer to it as providing any rights or remedies to plaintiff."  *Id.*  In other words,

the *Amtower* defendant sought to incorporate and enforce provisions from *another* contract to

which plaintiff was not a party.

These differences distinguish *Amtower* from the instant case.  The agreements at issue here

all involve the same parties: Plaintiffs and the Anthem Defendants.  Unlike in *Amtower*, there are

no other parties at issue: the Anthem Defendants agreed to provide health insurance to Plaintiffs,

and also agreed to protect Plaintiffs' PII.

The Anthem Defendants' reliance upon the contracts' integration clause is similarly

19

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

1    inapposite.  As the Anthem Defendants point out, for Coonce's policy, for instance, one provision

2    states that "the entire Agreement consists of" the "Group Insurance Policy," the "Combined

3    Evidence of Coverage and Disclosure Forms including any amendments, the group application,

4    the eligible persons' individual applications, and the premium charge rate schedule."  ECF No.

5    473-6 at 17; Anthem Mot. at 7.  This integration clause, the Anthem Defendants argue, does not

6    mention the Anthem Defendants' privacy policies.  Consequently, these privacy policies are not

7    part of Coonce's contract.  *Id.*

8        Generally, an integration clause "prohibits the introduction of any extrinsic evidence,

9    whether oral or written, to vary, alter or add to the terms of an integrated written instrument."

10   *Casa Herrera, Inc. v. Beydoun*, 83 P.3d 497, 502 (Cal. 2004).  However, "[t]he rule does not . . .

11   prohibit the introduction of extrinsic evidence to explain the meaning of a written contract if the

12   meaning urged is one to which the written contract terms are reasonably susceptible."  *Id.* (internal

13   quotation marks, ellipses, and alteration omitted).

14       Here, the Anthem Defendants' reliance upon the integration clause overlooks a critical

15   fact: Coonce's Combined Evidence of Coverage and Disclosure Form—which the Anthem

16   Defendants acknowledge is part of the "entire Agreement"—incorporates by reference Anthem's

17   privacy policies.  Coonce's Combined Evidence of Coverage and Disclosure Form, for instance,

18   states that "[y]ou . . . have the right to receive a copy of the Member Rights and Responsibilities

19   Statement and/or the Notice of Privacy Practices."  ECF No. 473-6 at 6.  The form also directs

20   Coonce to contact the Anthem Defendants in order to obtain "[a] statement describing our policies

21   and procedures regarding the confidentiality of medical records."  *Id.* at 10.

22       The California Court of Appeal addressed an analogous situation in *King v. Larsen Realty,*

23   *Inc.*, 175 Cal. Rptr. 226 (Ct. App. 1981).  In *King*, the membership application for a local realtor

24   board required members "to abide by the constitution, bylaws, rules and regulations of the local

25   board and the state association."  *Id.* at 229.  The bylaws, in turn, "impose[d] upon members the

26   duty to arbitrate on the terms set forth in the California Association of Realtors Arbitration

27                                                            20

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
     DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
     MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

Manual." *Id.* at 229–30. "Hence," the California Court of Appeal concluded, "the entire scheme of interboard arbitration [in the California Association of Realtors Arbitration Manual] was incorporated into the bylaws of the [local realtor board]." *Id.* at 230.

In like manner, in *Ruffu v. California Physicians Service*, 2002 WL 1352449 (Cal. Ct. App. June 20, 2002), the California Court of Appeal rejected plaintiff's argument that the integration clause in a health insurance contract precluded the court from considering a Summary of Benefits document. As the *Ruffu* court noted, the insurance contract incorporated the insurance application; this application, in turn, referred to the Summary of Benefits document. "Thus, the Summary of Benefits is incorporated by reference into the application, which in turn is incorporated into the Agreement." *Id.* at *4. The privacy policies here do the same thing: the integration clause incorporates the Combined Evidence of Coverage and Disclosure Form, which in turn incorporates by reference Anthem's privacy policies.

Finally, the Anthem Defendants argue that "[n]otices required by law that detail preexisting legal obligations do not give rise to contractual rights." Anthem Mot. at 8 (internal quotation marks omitted). As noted in the First Motion to Dismiss Order, however, "Plaintiffs' breach of contract claim reaches beyond mere violation of applicable laws." MTD Order at 27. Rather, the SAC, like the CAC, avers that the Anthem Defendants "violat[ed] their commitment to maintain the confidentiality and security of [PII] compiled by Anthem and their Affiliates in the Anthem Data Base; and by failing to comply with their own policies and applicable laws, regulations and industry standards for data security and protecting the confidentiality of [PII]." SAC ¶ 461.

Both the PIPP and the Annual Privacy Notice corroborate this allegation. The PIPP states that "Anthem Blue Cross's Privacy Policy imposes a number of standards to prohibit the unlawful disclosure of Social Security number, *and* [to] guard the confidentiality of . . . other personal information." ECF No. 473-5 at 13 (emphasis added). Further, "Anthem Blue Cross safeguards Social Security numbers and other personal information by having physical, technical, and

21

ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

administrative safeguards in place." *Id.* Similarly, the Annual Privacy Notice states that "[w]e are dedicated to protecting your P[II], and have set up a number of policies and practices to help make sure your P[II] is kept secure.  We have to keep your P[II] private.  If we believe your P[II] has been breached, we must let you know."  ECF No. 473-5 at 18.  These commitments do not refer to any laws or preexisting legal obligations.  Thus, consistent with the SAC, such statements could be read to reflect a commitment by Anthem to implement privacy policies that complement (or go beyond) Anthem's preexisting legal duties.

In sum, Bronzo, Solomon, Carter, and Coonce have sufficiently alleged that the Anthem Defendants' privacy policies were incorporated by reference into their contracts.  As such, the Court need not address California Plaintiffs' express attachment theory.

### b. Damages

The Court turns next to whether these California Plaintiffs have sufficiently pleaded contractual damages.  "To establish contractual damages, a [p]laintiff must establish 'appreciable and actual damage.'" *Low*, 900 F. Supp. 2d at 1028.  "Nominal damages, speculative harm, or threat of future harm do not suffice to show legally cognizable injury." *Id.*

California Plaintiffs assert three damages theories.  First, California Plaintiffs request Benefit of the Bargain Losses.  The SAC describes these losses as "the difference in value between what Plaintiffs should have received from Defendants when they enrolled in and/or purchased insurance from Defendants that Defendants represented, contractually and otherwise, would be protected by reasonable data security, and Defendants' partial, defective, and deficient performance by failing to provide reasonable and adequate data security."  SAC ¶ 415.  Second, California Plaintiffs seek Loss of Value of PII, which Plaintiffs describe as "damages to and diminution in value of their [PII] entrusted to Defendants." *Id.*  Third, California Plaintiffs request Consequential Out of Pocket Expenses, which are "damages resulting from [Plaintiffs'] attempt to ameliorate the effect of the breach of contract and subsequent Anthem Data Breach, including but not limited to purchasing credit monitoring services or taking other steps to protect themselves

22

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

1  from the loss of their" PII.  *Id.* ¶ 464.

2  ### i. Benefit of the Bargain Losses

3      On Benefit of the Bargain Losses, the California Supreme Court has held that "[d]amages

4  are awarded in an action for breach of contract to give the injured party the benefit of his bargain

5  and insofar as possible to place him in the same position he would have been in had the promisor

6  performed the contract."  *Coughlin v. Blair*, 262 P.2d 305, 314 (Cal. 1953).  Likewise, in *New*

7  *West Charter Middle School v. Los Angeles Unified School District*, 114 Cal. Rptr. 3d 504, 515

8  (Ct. App. 2010), the California Court of Appeal noted that "[c]ontract damages compensate a

9  plaintiff for its lost expectation interest."  "This," the court observed, "is described as the benefit

10  of the bargain that full performance would have brought."  *Id.*  When a "lessor fail[s] to deliver the

11  promised premises," for example, "the proper measure of damages is the difference between the

12  agreed rent and the rental value of the premises during the term of the lease."  *Id.* (internal

13  quotation marks omitted).  Thus, both *Coughlin* and *New West* point in favor of Plaintiffs' attempt

14  to recover Benefit of the Bargain Losses.

15      More recently, several federal courts have specifically upheld California breach of contract

16  claims for Benefit of the Bargain Losses in the privacy context.  In *Svenson v. Google Inc.*, 2015

17  WL 1503429, *4 (N.D. Cal. Apr. 1, 2015), plaintiff had signed a contract with Google under the

18  following terms: plaintiff "was to receive a payment processing service that would facilitate her

19  [App] purchase while keeping her private information confidential in all but specific

20  circumstances under which disclosure was authorized; and Google . . . was to retain a percentage

21  of the App's purchase price."  "Google did obtain [plaintiff's] personal information and did retain

22  a percentage of the purchase price of the . . . App," but Google also, without plaintiff's permission,

23  disclosed plaintiff's personal information to a third party vendor.  *Id.*  On damages, the *Svenson*

24  court, citing *New West*, concluded that plaintiff had "alleged facts sufficient to show contract

25  damages under a benefit of the bargain theory."

26      In an analogous context, this Court concluded that plaintiffs in *In re Adobe Systems, Inc.*

27  <div align="center">23</div>

28  Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

1    *Privacy Litigation*, 66 F. Supp. 3d 1197, 1224 (N.D. Cal. 2014), had established economic injury

2    sufficient to defeat defendant's motion to dismiss.  As this Court observed, "Plaintiffs allege they

3    personally spent more on [defendant's] products than they would had they known [defendant] was

4    not providing the reasonable security [defendant] represented it was providing." *Id.*  It is

5    "plausible that a company's reasonable security practices reduce the risk of theft of customer's

6    personal data and thus that a company's security practices have economic value." *Id.*

7    Accordingly, plaintiffs had "plausibly pleaded" that "they [had] personally lost money or property

8    as a result" of defendant's actions.  *Id.* at 1223–24 (internal quotation marks omitted).

9           In response to the line of decisions discussed above, the Anthem Defendants contend that

10   Plaintiffs' "benefit of the bargain theory . . . fails because they do not allege facts showing that any

11   alleged payments were earmarked for data security.  Anthem Mot. at 11.  Moreover, the Anthem

12   Defendants cite several out of circuit cases where courts have declined to award benefit of the

13   bargain damages.  Both arguments are unavailing.

14          First, the Anthem Defendants have identified no California or Ninth Circuit authority to

15   suggest that an entity must precisely "earmark" what portion of Plaintiffs' premiums went towards

16   protecting Plaintiffs' data privacy.  Indeed, California courts have consistently rejected such

17   arguments.  In *Lewis Jorge Construction Management, Inc. v. Pomona Unified School District*,

18   102 P.3d 257, 266 (Cal. 2004), for instance, the California Supreme Court held that, although

19   contract "damages [must] be pled with [some degree of] particularity," they need not be "proven .

20   . . with 'mathematical precision.'"  As such, "[w]here the *fact* of damages is certain, the amount of

21   damages need not be calculated with absolute certainty.  The law requires only that some

22   reasonable basis of computation of damages be used, and the damages may be computed even [i]f

23   the result reached is an approximation." *Sargon Enterprises, Inc. v. Univ. of S. Cal.*, 288 P.3d

24   1237, 1254 (Cal. 2012) (internal quotation marks and citation omitted).  "This is especially true

25   where it is the wrongful acts of the defendant that have created the difficulty in proving the

26   amount of loss." *Id.* (ellipses omitted).

United States District Court
Northern District of California

24

United States District Court
Northern District of California

1  Consistent with the reasoning in *Lewis Jorge* and *Sargon*, in the instant case, it is the

2  alleged wrongful acts of the Anthem Defendants—their inability to fulfill their privacy obligations

3  *and* their inability to set out the expected cost and value of these privacy obligations—which

4  forms the basis of Plaintiffs' request for Benefit of the Bargain Losses.  Put another way, the

5  Anthem Defendants can not evade liability because the Anthem Defendants did not provide, in

6  advance, a breakdown on how much of Plaintiffs' premiums the Anthem Defendants allocated (or

7  should have allocated) to protecting Plaintiffs' PII.

8  Second, the Court finds unavailing the Anthem Defendants' reliance upon *In re Science*

9  *Applications International Corp. (SAIC) Backup Tape Data Theft Litigation*, 45 F. Supp. 3d 14

10  (D.D.C. 2014), and *Carlsen v. GameStop*, 2015 WL 3538906 (D. Minn. June 4, 2015).  Neither

11  case addressed a California breach of contract claim.  In fact, in *In re SAIC*, the district court

12  limited its discussion only to jurisdictional issues and did not even examine any substantive

13  claims.  Instead, in a single sentence without citation, the district court concluded that, "[t]o the

14  extent that [p]laintiffs claim that some indeterminate part of their premiums went toward paying

15  for security measures, such a claim is too flimsy to support standing."  45 F. Supp. 3d at 30.

16  The *Carlsen* court likewise did not examine a California breach of contract claim.

17  Moreover, defendant in *Carlsen* allowed users to sign up to receive either paid or free content;

18  defendant's "Privacy Policy" applied to paying and non-paying users alike.  2015 WL 3538906,

19  *5.  As the *Carlsen* court observed, "because non-paying and paying users received the same

20  Privacy Policy in this case, [p]laintiff cannot establish that the Privacy Policy has intrinsic

21  monetary value attributed to it that was paid for and not received."  *Id.*  In contrast to *Carlsen*,

22  Plaintiffs here have all paid premiums to the Anthem Defendants.  There are no "non-paying"

23  customers.  Thus, Plaintiffs may be able to recover Benefit of the Bargain Losses in accordance

24  with their premium payments.

25  **ii.  Loss of Value of PII**

26  Plaintiffs have also sufficiently pleaded damages for Loss of Value of PII.  As the Court

27  25

28  Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

1    explained in the First Motion to Dismiss Order, the Ninth Circuit and a number of district courts

2    have approved such damages theories.  In *In re Facebook Privacy Litigation*, 572 F. App'x 494,

3    494 (9th Cir. 2014), for instance, "[p]laintiffs allege[d] that the information disclosed by

4    [defendant could] be used to obtain personal information about plaintiffs, and that they were

5    harmed both by the dissemination of their personal information and by losing the sales value of

6    that information."  These allegations, the Ninth Circuit determined, were "sufficient to show the

7    element of damages for [plaintiffs'] breach of contract and fraud claims."  *Id.*

8          In like manner, both this Court in *In re Adobe* and the district court in *Corona v. Sony*

9    *Pictures Entertainment, Inc.*, 2015 WL 3916744 (N.D. Cal. June 15, 2015), concluded that

10   plaintiffs had sufficiently pleaded economic injury by claiming "that the[ir] PII was stolen and

11   posted on file-sharing websites for identity thieves to download."  *Corona*, 2015 WL 3916744, *3;

12   *see also In re Adobe*, 66 F. Supp. 3d at 1214 ("[T]he risk that [p]laintiffs' personal data will be

13   misused by the hackers who breached [defendant's] network is immediate and very real.").

14   Finally, in *Svenson*, the district court found that plaintiff's "allegations of diminution in value of

15   her personal information are sufficient to show contract damages [under California law] for

16   pleading purposes."  2015 WL 1503429, *5.

17         The Anthem Defendants, however, read these cases to effectively impose two pleading

18   requirements upon Plaintiffs: to plead "both that there was a 'robust' market for [Plaintiffs' PII]

19   *and* that [P]laintiffs had been financially harmed by [the data breach by] usurping their ability to

20   sell that information themselves."  Anthem Mot. at 5 (quoting *In re Google, Inc. Privacy Policy*

21   *Litig.*, 2015 WL 4317479, *4 (N.D. Cal. July 15, 2015)) (emphasis added).  The Court declines to

22   adopt such an interpretation.

23         Indeed, even if both of these requirements were to apply, the SAC does aver that Plaintiffs'

24   PII "is such a valuable commodity to identity thieves that once the information has been

25   compromised, criminals often trade the information on the cyber black-market for years."  SAC ¶

26   412.  Relatedly, "[w]ith access to an individual's [PII], criminals can do more than just empty a

27                                          26

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
     DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
     MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

victim's bank account—they can also commit various types of fraud . . . [they] may obtain a job using the victim's Social Security Number.  *Id* ¶ 411.  These allegations could be read to infer that an economic market existed for Plaintiffs' PII, and that the value of Plaintiffs' PII decreased as a result of the Anthem data breach.  Indeed, in another data breach case, the Seventh Circuit remarked: "Presumably, the purpose of [a] hack is, sooner or later, to make fraudulent charges or assume those consumers' identities."  *Remijas v. Neiman Marcus Gp., LLC*, 794 F.3d 688, 693 (7th Cir. 2015).  "Why else would hackers break into a store's database and steal consumers' private information?"  *Id.*

Moreover, setting aside the above allegations, the Court also finds that Plaintiffs are not required to plead that there was a market for their PII *and* that they somehow also intended to sell their own PII.  Not even the authority that the Anthem Defendants cite supports this proposition.  In *In re Google*, the district court observed that "[p]laintiffs do not allege economic injury from any dissemination . . . *or* any injury in the form of loss of the [p]laintiffs' ability to sell their own information or its market value."  2015 WL 4317479, *5 (emphasis added); *see also id.* ("Plaintiffs plead *neither* the existence of a market for their email addresses and names *nor* any impairment of their ability to participate in that market.") (emphasis added).  These statements appear to require a plaintiff to allege that there was either an economic market for their PII *or* that it would be harder to sell their own PII, not both.

In sum, *In re Facebook*, *Corona*, *Svenson*, or *In re Google* do not support the two part requirement that the Anthem Defendants advocate.  Accordingly, Plaintiffs have sufficiently alleged Loss of Value of PII.

### iii.  Consequential Out of Pocket Expenses

Finally, the Anthem Defendants contend that Plaintiffs can not recover "Consequential Out of Pocket Expenses" because "[t]here is an obvious alternative explanation for the injuries Plaintiffs allege."  Anthem Mot. at 2 (internal quotation marks omitted).  Namely, "[d]ozens of major American businesses and the federal government have been the victims of cyberattacks in

27

United States District Court
Northern District of California

1    recent years aimed at stealing millions of Americans' PII." *Id.*  These data breaches have

2    "result[ed] in Americans becoming the victims of identity theft each year." *Id.* at 2–3.

3         The Court found this argument meritless in the First Motion to Dismiss Order.  It remains

4    meritless.  As the Court has explained, "under Defendants' theory, a company affected by a data

5    breach could simply contest causation by pointing to the fact that data breaches occur all the time,

6    against various private and public entities."  First MTD Order at 36.  "This would, in turn, create a

7    perverse incentive for companies: so long as enough data breaches take place, individual

8    companies will never be found liable.  No [California law], the relevant authority addressing

9    causation, or the specific facts of this case support such a legal theory." *Id.*

10        On the instant motions to dismiss, the Court once again emphasizes: *no* court has ever

11   accepted the Anthem Defendants' argument in the data breach context.  In fact, defendant in

12   *Remijas* made this exact same argument: "[Defendant] argues that these plaintiffs cannot show

13   that their injuries are traceable to the data incursion at the company rather than to one of several

14   other large-scale breaches that took place around the same time."  794 F.3d at 696.  In response,

15   the Seventh Circuit explained that "[t]he fact that . . . some other store *might* have caused . . .

16   plaintiffs' private information to be exposed does nothing to negate . . . plaintiffs' standing to

17   sue." *Id.*  "If there are multiple companies that could have exposed . . . plaintiffs' private

18   information to the hackers, then the common law of torts has long shifted the burden of proof to

19   defendants to prove that their negligent actions were not the but-for cause of . . . plaintiff's injury."

20   *Id.* (internal quotation marks omitted).  "It is enough at this stage of the litigation that [defendant]

21   admitted that 350,000 cards might have been exposed and that it contacted members of the class to

22   tell them they were at risk.  Those admissions and actions by the store adequately raise the

23   plaintiffs' right to relief above the speculative level." *Id.*

24        *Remijas* is consistent with Ninth Circuit precedent.  In *Starr v. Baca*, 652 F.3d 1202, 1216

25   (9th Cir. 2011), the Ninth Circuit held that, "[i]f there are two alternative explanations, one

26   advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's

28

27

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
     DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
     MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

*United States District Court*
*Northern District of California*

1    complaint survives a motion to dismiss under Rule 12(b)(6)."  The *Starr* court further held that a

2    plaintiff's complaint "may be dismissed only when defendant's plausible alternative explanation is

3    so convincing that plaintiff's explanation is *im*plausible."  *Id.*

4         Despite multiple rounds of briefing, the Anthem Defendants have failed to demonstrate

5    why the reasoning in *Remijas* and *Starr* should not govern the instant case.  The Anthem

6    Defendants have never challenged the fact that (1) the Anthem Database was breached, (2) that

7    this breach exposed the PII of approximately 80 million individuals, and (3) that the Anthem

8    Database contained the PII of every single putative class member in the instant action.  That is

9    sufficient for purposes of pleading consequential injury at this point in litigation.

10        As a final matter, the Anthem Defendants have also cited no binding precedent to suggest

11   that Plaintiffs are precluded from recovering for specific types of Consequential Out of Pocket

12   Expenses, such as credit monitoring, under California contract law.  The Court has found none in

13   its own research.  In fact, some courts have suggested that an individual may recover "actual

14   damages" that were incurred in order "to mitigate" costs associated with being a "victim of

15   identity theft."  *Ruiz v. Gap, Inc.*, 622 F. Supp. 2d 908, 918 (N.D. Cal. 2009).  Plaintiffs have

16   sufficiently alleged such a relationship here.  Coonce, for instance, alleges that he received a

17   notice from Anthem in March 2015 informing him that his PII had been compromised.  Five

18   months later, Coonce "was notified . . . that his debit card number had been stolen and used for

19   unauthorized charges."  SAC ¶ 18.  Consequently, Coonce spent $312 on identity theft and credit

20   monitoring services.  *Id.*  Thus, Coonce was notified that his PII had been stolen, Coonce later

21   learned that his financial information had been compromised, and, as a result, Coonce took actions

22   to prevent further financial damage.

23        In sum, the Court finds that Bronzo, Carter, Coonce, and Solomon, who had individual or

24   fully-insured group plan contracts with the Anthem Defendants, have sufficiently alleged a breach

25   of contract claim under California law.

26        **2. ASO Agreements**

27
                                                         29

28   Case No. 15-MD-02617-LHK
     ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
     DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
     MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

1    The Court turns next to California Plaintiffs Daniel Randrup, Steve Kawai, Kelly Tharp,

2    and Daniel Tharp, who were enrolled in ASO agreements.  Because the Anthem Defendants do

3    not act as the insurer in these agreements and because these agreements are between an employer

4    and an Anthem Defendant, Plaintiffs assert their California breach of contract claim as third party

5    beneficiaries.  *See* SAC ¶ 454 ("The Plaintiffs and Class Members who enrolled in Self-Funded

6    Plans for whom Anthem provided only administrative services sue as third-party beneficiaries.").

7    In California, "[a] third party beneficiary may enforce a contract made expressly for his or

8    her benefit." *Kaiser Eng'rs, Inc. v. Grinnell Fire Protection Sys. Co.*, 219 Cal. Rptr. 626, 629 (Ct.

9    App. 1985).  "The intent of the contracting parties to benefit expressly that third party must appear

10   from the terms of the contract." *Id.*  Over time, the term "expressly" has come to mean "merely

11   the negative of 'incidentally.'" *Id.*  "[T]he third person need not be named or identified

12   individually to be an express beneficiary.  A third party may enforce a contract if it can be shown

13   that he or she is a member of the class for whose express benefit the contract was made." *Id.*

14   "Generally, it is a question of fact whether a particular third person is an intended beneficiary of a

15   contract." *Prouty v. Gores Tech. Gp.*, 18 Cal. Rptr. 3d 178, 184 (Ct. App. 2004).  With these

16   principles in mind, the Court addresses Randrup, Kawai, and the Tharps' claims in turn.

17               **a. Randrup**

18   Randrup has failed to sufficiently allege a third party beneficiary claim, for two reasons.

19   First, Randrup's ASO, on the first page, states that "[n]either SISC III [Randrup's employer] nor

20   Anthem Blue Cross Life and Health intends this Agreement to confer any benefit on any persons

21   who are not parties to this Agreement."  ECF No. 473-7 at 6.  The following page defines

22   "Parties" as "SISC III and Anthem Blue Cross Life and Health." *Id.* at 7.  Read together, these

23   provisions suggest that SISC III and Anthem Blue Cross Life and Health did not intend to confer

24   third party beneficiary status to Randrup.  Indeed, in similar contexts, courts have read such

25   clauses to preclude litigants from asserting third party beneficiary claims. *See, e.g.*, *Balsam v.*

26   *Tucows Inc.*, 2009 WL 3463923, *3–*4 (N.D. Cal. Oct. 23, 2009) (finding that party could not

30

1    bring claim where agreement included term that read: "This Agreement shall not be construed to

2    create any obligation by either ICANN or Registrar to any non-party to this Agreement.").

3          Second, although Plaintiffs contend that Randrup's contract "incorporated privacy policies

4    that Anthem violated," Anthem Opp'n at 7, the agreement between SISC III and Anthem Blue

5    Cross Life and Health does not support this contention.  Unlike the contracts described above,

6    Randrup's ASO agreement does not mention the PIPP or the Annual Privacy Notice.  In fact, in

7    their briefing, Plaintiffs do not even point to a single instance in Randrup's ASO agreement where

8    the Anthem Defendants promised to protect Randrup's PII.  *Id.*

9          After the Court's own review of the agreement at issue, the Court has found only one

10   provision that could be taken to refer to the Anthem Defendants' privacy obligations: "Anthem

11   Blue Cross Life and Health . . . agrees that all individually identifiable information regarding

12   persons covered under the Plan . . . is confidential and shall be (i) used only in order to carry out

13   the provisions of this Agreement . . . and (ii) disclosed only as otherwise provided in this

14   Agreement or as required by law."  ECF No. 473-7 at 10.  This statement differs markedly from

15   the statements made in the contracts of California Plaintiffs under individual and fully-insured

16   group plans.  At no point in this statement do the parties refer to Anthem's specific privacy

17   obligations.  Nor does this statement direct Randrup to visit Anthem's public website or contact

18   Anthem's customer service department for a copy of Anthem's privacy policies.  Thus, the content

19   of this single statement, read together with the above statements disclaiming any third party rights,

20   demonstrate that Randrup may not pursue a breach of contract claim.

21         *Prouty v. Gores Technology Group* and *Milmoe v. Gevity HR, Inc.*, 2006 WL 2691393

22   (N.D. Cal. Sept. 20, 2006), do not compel a contrary finding.  Both *Prouty* and *Milmoe* addressed

23   whether an employee could assert a third party beneficiary claim in the context of a contract

24   between two companies that acted as co-employers.  As other courts have noted, *Prouty* and

25   *Milmoe* created a limited exception to the general rule regarding contractual clauses that disclaim

26   third party beneficiary claims.  *Balsam*, 2009 WL 3463923, *4.  "[I]n *Prouty*, the 'specific' clause

27                                              31

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
     DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
     MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

*United States District Court*
*Northern District of California*

1  that the third parties sought to enforce was an amendment to an agreement." *Id.* "That the

2  amendment was added after the general no third party beneficiary statement was included in the

3  agreement was strong evidence of the parties' intent to modify the original terms of the

4  agreement." *Id.* Moreover, "the clause protecting the employees in *Prouty* was aimed at

5  protecting a narrow, specifically-identified class of people, namely employees of one party's

6  subsidiary." *Id.* Likewise, in *Milmoe*, "the plaintiff's work and wages were the [express] subject

7  of the contract, thus making it entirely plausible that parts of the contract were intended for the

8  express benefit of the plaintiff." *Id.* at *5.

9         Such circumstances are not at play here.  Although Plaintiffs contend that "under

10  California law, a general 'no third party beneficiary' clause may be trumped by more specific

11  contract provisions that create benefits for a specific group," Plaintiffs have identified no such

12  specific provisions here.  Anthem Opp'n at 7.  As such, unlike *Prouty* and *Milmoe*, there is no

13  indication that the parties intended to allow Randrup to pursue a California breach of contract

14  claim against the Anthem Defendants.  Accordingly, the Court finds that Randrup can not proceed

15  with his breach of contract claim against the Anthem Defendants.

16         Additionally, the Court denies Plaintiffs' leave to amend Randrup's claim.  The Court may

17  grant leave to amend unless doing so would unduly prejudice the opposing party, cause undue

18  delay, or be futile, or if the moving party has acted in bad faith.  These factors, however, are "not

19  given equal weight."  *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).  "Futility of

20  amendment can, by itself, justify the denial of a motion for leave to amend."  *Id.*  Amendment here

21  would be futile.  Randrup's ASO agreement expressly disclaims third party beneficiary claims and

22  includes only a single provision that discusses the Anthem Defendants' privacy obligations.  At no

23  point in Randrup's agreement are the PIPP or Annual Privacy Notice mentioned.  Furthermore, "a

24  district court has broad discretion to grant or deny leave to amend, particularly where the court has

25  already given a plaintiff one or more opportunities to amend his complaint."  *Mir v. Forsburg*, 646

26  F.2d 342, 347 (9th Cir. 1980).  Plaintiffs have now had two opportunities to amend the complaint.

27                                                 32

28

1    The SAC addresses the deficiencies identified in the First Motion to Dismiss Order for several

2    California Plaintiffs, but not for Randrup.

3         Turning briefly to the other relevant leave to amend factors, the Court finds that providing

4    leave to amend would also result in undue delay and could prejudice the Anthem Defendants.  The

5    parties are proceeding apace with the case schedule, with fact discovery set to close on October

6    17, 2016 and expert discovery set to close on January 23, 2017.  Providing Plaintiffs with leave to

7    amend, thus triggering another motion to dismiss, would delay the case schedule and prevent this

8    action from efficient resolution.

9         **b.  Kawai**

10        Kawai was employed by the State of California and was enrolled in a CalPERS health plan

11   administered by Anthem Blue Cross of California.  SAC ¶ 19.  The ASO agreement between

12   CalPERS and Anthem Blue Cross of California states that "[t]he California Legislature and

13   CalPERS have established an organized program for the provision of health benefits to State of

14   California Employees."  ECF No. 473-6 at 35.  Unlike Randrup's ASO agreement, Kawai's ASO

15   agreement does not include a provision that expressly disclaims third beneficiary status.

16        Moreover, also unlike Randrup's ASO agreement, Kawai's ASO agreement includes 11

17   pages that describe the Anthem Defendants' commitment to protect individual privacy.  *See id.* at

18   39–42; 48–54.  These obligations include a promise to "take all reasonable and necessary steps to

19   prevent the unauthorized disclosure, modification or destruction of the Disclosing Party's

20   Information Assets."  *Id.* at 40.  Anthem Blue Cross of California "must, at a minimum, use the

21   same degree of care to protect the Disclosing Party's Information Assets that it uses to protect its

22   own Information Assets."  *Id.*  Kawai's ASO agreement further provides that Anthem Blue Cross

23   "will maintain the confidentiality of all information and documents relating to *Members* and will

24   ensure all *Member* information is kept strictly confidential, and, as applicable, in accordance with

25   federal and state law.  All such information will be treated as sensitive and propriety in accordance

26   with CalPERS confidentiality laws, Contractor's confidentiality policies and procedures,

27                                             33

1  applicable physician code of ethics, constitutional right of privacy, all applicable federal and state

2  law and requirements of all applicable accrediting bodies." *Id.* at 41–42 (emphasis added).  Taken

3  together, these statements appear to sufficiently incorporate by reference Anthem's privacy

4  policies, such as its PIPP and Annual Privacy Notice.

5      Finally, Kawai's ASO agreement includes, as an attachment, a Business Associate

6  Agreement, formed between CalPERS, the Plan Sponsor, and Anthem Blue Cross of California,

7  the Business Associate.  "In order to share P[I]I with third parties, . . . HIPAA requires health care

8  plans and providers to enter into business associate agreements, [which are] contracts obligating

9  the third parties to abide by HIPAA's restrictions on P[I]I disclosures."  *Monarch Fire Prot. Dist.*

10  *of St. Louis Cnty, Mo. v. Freedom Consulting & Auditing Servs., Inc.*, 678 F. Supp. 2d 927, 932

11  (E.D. Mo. 2009); *see* 45 C.F.R. § 164.502(e)(1)(i) ("A covered entity may disclose protected

12  health information to a business associate and may allow a business associate to create, receive,

13  maintain, or transmit protected health information on its behalf.").  Kawai's Business Associate

14  Agreement sets forth detailed privacy provisions, which include a provision that Anthem Blue

15  Cross of California "implement administrative, physical, and technical safeguards (including

16  written policies and procedures) that reasonably and appropriately protect the confidentiality,

17  integrity, and availability of" PII.  ECF No. 473-6 at 49.

18      In sum, the provisions in the main ASO agreement and the Business Associate Agreement

19  provide evidence that (1) Kawai was an intended third party beneficiary between CalPERS and

20  Anthem Blue Cross of California and that (2) provisions in the ASO agreement could be read to

21  allow Kawai to pursue a third party beneficiary claim.

22      The Anthem Defendants sole argument in response to this conclusion is that the purpose of

23  the Business Associate Agreement is to "implement safeguards to protect electronic health

24  information as required by the HIPAA Security Rule."  Anthem Mot. at 10.  Consequently, the

25  Business Associate Agreement only memorializes certain preexisting legal obligations, which

26  "do[] not create contractual rights."  *Id.*

27  34

28  Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

This contention is flawed in two respects.  First, as outlined above, the attached Business Associate Agreement does not contain all of Anthem Blue Cross of California's privacy obligations.  Several obligations are included in the main ASO agreement, such as a promise to "maintain the confidentiality of all information and documents relating to *Members* and will ensure all *Member* information is kept strictly confidential."  ECF No. 473-6 at 41 (emphasis added).  Thus, even if the Court were to set the Business Associate Agreement aside, the Court would nevertheless find that Kawai could maintain a third party beneficiary claim.

Second, very few courts have considered whether Business Associate Agreements create independent contractual rights.  There is at least some regulatory language and case law, however, to suggest that they do.  The regulations governing Business Associate Agreements state that "[a] business associate may use or disclose protected health information only as permitted *or* required by its business associate contract *or* other arrangement pursuant to [45 C.F.R.] § 164.504(e) *or* as required by law."  45 C.F.R. § 164.502(a)(3) (emphasis added).  The prevalent use of the word "or" suggests that Business Associate Agreements may be implemented such that they cover more ground than what would be required by federal law.

This interpretation is consistent with the understanding adopted by the Eastern District of Missouri in *Monarch Fire Protection*.  In that case, plaintiff asked an auditing firm, Freedom Consulting & Auditing Services ("Freedom"), to review whether an individual had "use[d] [plaintiff's health] Plan for procedures that should not have been covered."  678 F. Supp. 2d at 932.  Plaintiff subsequently filed suit for breach of contract "because Freedom breached a number of provisions of the [Business Associate Agreement] by, among other things, failing to immediately remove P[I]I from documentation received for purposes of the audit, disclosing P[I]I to [unauthorized third parties], and retaining P[I]I after completing the audit."  *Id.* at 935.  After reviewing the terms of the Business Associate Agreement, the *Monarch Fire Protection* court concluded that plaintiff was "entitled to summary judgment that Freedom breached the [Business Associate Agreement] by divulging P[I]I received in the audit process."  *Id.* at 938.  The Eighth

35

1   Circuit affirmed. *Monarch Fire Prot. Dist. of St. Louis Cnty, Mo. v. Freedom Consulting &*

2   *Auditing Servs., Inc.*, 644 F.3d 633 (8th Cir. 2011).  Plaintiff in *Monarch Fire Department* was

3   therefore able to prevail on a breach of contract claim based upon privacy obligations set forth in a

4   Business Associate Agreement.  There is no reason why Kawai should not be able to do the same.

5          Thus, having concluded that Kawai has sufficiently alleged a third party beneficiary claim,

6   the Court turns finally to the Anthem Defendants' remaining argument: whether Kawai may

7   recover damages.  Here, the Anthem Defendants argue that damages are not recoverable because

8   "Plaintiffs' employers, and not Plaintiffs, . . . made payments to the Anthem Defendants."

9   Anthem Mot. at 12.  Kawai, however, alleges that he paid premiums to CalPERS, which then used

10  these premiums to pay for services offered by the Anthem Defendants.  Under California law,

11  "when a plaintiff seeks to secure benefits under a contract as to which he is a third-party

12  beneficiary, he must take that contract as he finds it."  *Marina Tenants Ass'n v. Deauville Marina*

13  *Dev't Co.*, 226 Cal. Rptr. 321, 327 (Ct. App. 1986) (internal quotation marks and alterations

14  omitted).  Applying this principle to the instant case, the Anthem Defendants do not contest that

15  CalPERS would be able to recover Benefit of the Bargain Losses, Loss of Value of PII, or

16  Consequential Out of Pocket Expenses.  By asserting a third party beneficiary claim, Kawai seeks

17  to step into the shoes of CalPERS and recover the same damages that CalPERS would be able to

18  recover.  Kawai has thus "take[n] th[e] contract as he finds it," and has asserted rights

19  commensurate to what CalPERS could assert.  *Id.*  Accordingly, Kawai's attempt to recover

20  contract damages does not warrant dismissal.

21                      **c.  Daniel and Kelly Tharp**

22          The Tharps' ASO agreement is more analogous to Randrup's than to Kawai's.  Indeed,

23  although the Tharps' ASO agreement does not contain a clause that specifically disclaims third

24  party beneficiary claims, the agreement does include a No Assignment Clause: "Unless it has first

25  obtained the written consent of the other Party, neither Party may assign this Agreement to any

26  other person."  ECF No. 473-9 at 6.  Although California courts have, in some instances, allowed

                                        36

28  ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
    DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
    MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

*United States District Court*
*Northern District of California*

1    third parties to pursue a claim notwithstanding a no assignment clause, the general view is that

2    such a clause does not point in the Tharps' favor.  *See Schauer v. Mandarin Gems of Cal., Inc.*, 23

3    Cal. Rptr. 3d 233, 237–40 (Ct. App. 2005).

4        More importantly, the Tharps' ASO agreement barely mentions the Anthem Defendants'

5    privacy obligations.  The agreement does not mention the PIPP or Annual Privacy Notice, nor

6    does it discuss any security measures that the Anthem Defendants must undertake.  One specific

7    section states that the Anthem Defendants must comply with the legal requirements set forth under

8    HIPAA.  ECF No. 473-8 at 15. Another section makes a vague commitment to comply with

9    Anthem's standard policies and procedures, but does not mention whether these standard policies

10   include Anthem's privacy obligations.  *Id.* at 8.

11       Although Plaintiffs appear to acknowledge these deficiencies, Plaintiffs nonetheless

12   contend that the Tharps' ASO agreement "expressly committed to comply with HIPAA," which,

13   Plaintiffs argue, provides the basis for a breach of contract claim.  Anthem Opp'n at 7.  The Court

14   disagrees.  As noted in the First Motion to Dismiss Order, "plaintiffs must . . . do something more

15   to allege a breach of contract claim than merely point to allegations of a statutory violation."

16   *Wiebe v. NDEX West, LLC*, 2010 WL 2035992, *3 (C.D. Cal. May 17, 2010) (quoting *Berger v.*

17   *Home Depot U.S.A., Inc.*, 476 F. Supp. 2d 1174, 1177 (C.D. Cal. 2007)).  A breach of contract

18   claim based *solely* upon a pre-existing legal obligation to comply with HIPAA can not survive

19   dismissal.

20       Having determined that the Tharps have not stated a viable third party beneficiary claim,

21   the Court also denies Plaintiffs' leave to amend.  As with Randrup, providing leave to amend

22   would be futile, would result in undue delay, and could prejudice the opposing party.  Moreover,

23   Plaintiffs have already produced the Tharps' ASO agreement, and the Court has determined, after

24   reviewing this agreement in detail, that it does not contain the provisions necessary to plead a third

25   party beneficiary claim.

26       In sum, the Anthem Defendants' motion to dismiss Daniel Randrup, Kelly Tharp, and

27                                              37

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
     DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
     MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

1    Daniel Tharp's breach of contract claim is GRANTED with prejudice.  The Anthem Defendants'

2    motion to dismiss the breach of contract claims of the remaining California Plaintiffs is DENIED.

3        **C. New Jersey Breach of Contract (against Non-Anthem Defendants)**

4        In order to state a claim for breach of contract under New Jersey law, Plaintiffs "must

5    allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing

6    therefrom; and (4) that the party stating the claim performed its own contractual obligations."

7    *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007).  In moving to dismiss Plaintiffs' New

8    Jersey breach of contract claim, the Non-Anthem Defendants contend that the SAC "fails to allege

9    facts identifying a contractual provision that allegedly was breached," that Plaintiffs did not

10   "suffer[] any injury as a result of any alleged breach," and that Plaintiffs' "benefit of the bargain

11   theory of injury" is barred by the filed rate doctrine.  Non-Anthem Mot. at 6 (internal quotation

12   marks omitted).  These contentions are discussed in turn.

13       **1. Contractual Provisions**

14       Because there is only one New Jersey Plaintiff, Elizabeth Ames ("Ames"), there is only

15   one set of contracts at issue.  Ames avers that she "was enrolled in a Horizon Blue Cross Blue

16   Shield of New Jersey health plan," and "was previously enrolled in a Blue Cross Blue Shield of

17   Florida health plan."  SAC ¶ 85.  Ames was insured by Horizon Blue Cross Blue Shield of New

18   Jersey under an individual health plan and by Horizon Blue Cross Blue Shield of Florida under an

19   ASO agreement.

20       Horizon Blue Cross Blue Shield of Florida does not challenge whether Ames's contract

21   included certain privacy provisions.  Non-Anthem Mot. at 6 n.6.  Horizon Blue Cross Blue Shield

22   of Florida is only challenging whether Ames can recover contractual damages.  *Id.*

23       On the other hand, Horizon Blue Cross Blue Shield of New Jersey challenges whether

24   Ames's contract included any privacy obligations.  Plaintiffs assert that Anthem's privacy policies

25   were part of Ames's contract with Horizon Blue Cross Blue Shield of New Jersey either via

26   express attachment or via incorporation by reference.  On express attachment, the parties agree

United States District Court
Northern District of California

27                                        38
     Case No. 15-MD-02617-LHK

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
     DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
     MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

1   that the Court's analysis should begin with the Benefits booklet that Horizon Blue Cross Blue

2   Shield of New Jersey provided to Ames.  This booklet contains eight sections.  Two are of

3   particular importance here: Section 7, "Important Notices," and Section 8, "Your Policy."  ECF

4   No. 491-1 at 7.

5       In Section 7, Horizon Blue Cross Blue Shield of New Jersey outlines its "Notice of

6   information privacy practices."  *Id.* at 17.  This Notice states that Horizon Blue Cross Blue Shield

7   of New Jersey "will abide by the statements made in this Notice," and "want[s]" you to know that

8   [it] recognize[s] [its] obligation to keep information about you secure and confidential."  *Id.*  The

9   Notice further provides that "[w]e also maintain appropriate administrative, technical and physical

10  safeguards to reasonably protect your [PII]."  *Id.*; *see also id.* ("Our employees get training

11  regarding the need to maintain your [PII] in the strictest confidence.").  The entirety of this Notice

12  is reproduced on Horizon Blue Cross Blue Shield of New Jersey's website, and Ames' Booklet

13  expressly directs Ames to "[g]o online" for further information on the Non-Anthem Defendants'

14  policies.  *See* ECF No. 491-1 at 8; ECF No. 473-11 at 26–31.

15      Section 8, the "Your Policy" section, contains information on premiums, specialty case

16  management, and coordination of benefits.  ECF No. 491-1 at 21–22.  A provision of the "Your

17  Policy" section also contains a clause which states that "[t]his Policy, including the endorsements

18  and the attached papers, if any, constitutes the entire contract of insurance."  *Id.* at 24.

19      The core dispute is whether this clause excludes consideration of the privacy obligations

20  set forth in Section 7.  According to the Non-Anthem Defendants, this integration clause restricts

21  Ames' contract to include only those provisions in Section 8, the "Your Policy" section.  Non-

22  Anthem Reply at 4.  Plaintiffs, on the other hand, contend that the integration clause's language—

23  "This Policy, including the endorsements *and the attached papers*, if any, constitutes the . . .

24  contract of insurance"—incorporates the privacy obligations in Section 7.  As Plaintiffs note, "[i]t

25  defies logic and the plain meaning of 'attached papers' for Defendants to argue that this privacy

26  notice, which is physically 'attached' to the Policy in the preceding chapter of the *same booklet*, is

27                                                    39

1    not included in this contract." Non-Anthem Opp'n at 8.

2         Under New Jersey law, "[w]hen the meaning of an integrated contract is ambiguous, the

3    surrounding circumstances may be introduced for the purpose of elucidation." *Driscoll Const.*

4    *Co., Inc. v. State, Dep't of Transp.*, 853 A.2d 270, 278 (N.J. Super. Ct. App. Div. 2004).

5    However, "[e]ven when the contract on its face is free from ambiguity, evidence of the situation of

6    the parties and the surrounding circumstances and conditions is admissible in aid of

7    interpretation." *Id.* Thus, "whether the clause under consideration is regarded as clear and certain,

8    or ambiguous and uncertain, if the intention of the parties is not to be gleaned from a reading of

9    the instrument as a whole, the plaintiff should have had the opportunity of presenting evidence of

10   the facts and circumstances surrounding the execution of the [contract]." *Id.*

11        With this in mind, the Court finds more persuasive Plaintiffs' reading of the integration

12   clause in Ames' contract. What other meaning could "attached papers" have if not one that

13   includes papers that are literally attached to the Policy? The interpretation advocated by the Non-

14   Anthem Defendants would essentially render superfluous the "attached papers" provision. Such a

15   reading would contravene the New Jersey precedent discussed above, as well as run afoul of the

16   general rule that courts are to "give effect to all parts of the [contract], and an interpretation which

17   gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of

18   the writing useless or inexplicable." *Maryland Cas. Co. v. Hansen-Jensen, Inc.*, 83 A.2d 1, 4 (N.J.

19   Super Ct. App. Div. 1951).

20        Plaintiffs have thus sufficiently alleged that Ames' contract expressly attached Horizon

21   Blue Cross Blue Shield of New Jersey's privacy obligations, as contained in Section 7 of Ames'

22   booklet. Having determined that these obligations were expressly attached, the Court need not

23   examine whether these obligations were also incorporated by reference.

24        **2. Damages**

25             **a. Benefit of the Bargain Losses**

26        Ames seeks damages in the form of Benefit of the Bargain Losses, Loss of Value of PII,

27                                                     40

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
     DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
     MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

United States District Court
Northern District of California

1  and Consequential Out of Pocket Expenses.  As to Benefit of the Bargain Losses, the Non-Anthem

2  Defendants' primary contention is that such damages are barred by the filed rate doctrine.  The

3  Non-Anthem Defendants state that this doctrine applies because Plaintiffs' request for Benefit of

4  the Bargain Losses would require the Court to recalculate insurance premium rates and determine

5  what a reasonable rate would have been.

6          "The filed rate doctrine forbids a regulated entity [from] charg[ing] rates for its services

7  other than those properly filed with the appropriate federal [or state] regulatory authority."

8  *Weinberg v. Sprint Corp.*, 801 A.2d 281, 286 (N.J. 2002) (internal quotation marks omitted).  "The

9  two core policy goals of the doctrine are (1) the non-discrimination strand, or the prevention of

10  price discrimination by carriers as among ratepayers; and (2) the non-justiciability strand, or the

11  preservation of the role of regulatory agencies in approving reasonable rates and the exclusion of

12  the courts from the rate-making process."  *Clark v. Prudential Ins. Co. of Am.*, 736 F. Supp. 2d

13  902, 913 (D.N.J. 2010).  The doctrine "is a product of the deference which courts give to the

14  ratemaking and regulatory processes of administrative bodies."  *Richardson v. Standard Guar. Ins.*

15  *Co.*, 853 A.2d 955, 961 (N.J. Super. Ct. App. Div. 2004).

16          As construed by the New Jersey Supreme Court, "the filed rate doctrine bars money

17  damages from [regulated entities] where the damage claims are premised on state contract

18  principles, consumer fraud, or other bases on which plaintiffs seek to enforce a rate other than the

19  filed rate."  *Weinberg*, 801 A.2d at 287.  "[T]here is no fraud exception to the filed rate doctrine."

20  *AT & T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 535 (3d Cir. 2006).  Consequently, "*any*

21  remedy requiring a refund of a portion of the filed rate is barred by application of the filed rate

22  doctrine."  *Smith v. SBC Commc'ns*, 839 A.2d 850, 860 (N.J. 2004) (emphasis added).

23          The filed rate doctrine applies to the instant case.  As an initial matter, although Plaintiffs

24  correctly assert that the filed rate doctrine was originally "grounded in federal preemption

25  principles," both state and federal courts in New Jersey have determined that the doctrine also now

26  applies to industries subject to state regulation.  *See, e.g., Richardson¸* 853 A.2d at 963 ("[W]e

41

United States District Court
Northern District of California

1  reject plaintiff's argument that the doctrine does not apply to state ratemaking."); *Clark*, 736 F.

2  Supp. 2d at 914 ("[T]he Court finds that the filed rate doctrine may be applied to rate-making by a

3  New Jersey regulatory agency.").

4       Notably, in *Clark*, the district court applied the filed rate doctrine to bar various state law

5  claims asserted against a health insurer.  Plaintiffs in *Clark* asserted causes of action under the

6  New Jersey Consumer Fraud Act and common law fraudulent misrepresentation, fraudulent

7  omission, and breach of the duty of good faith and fair dealing.  *Id.* at 912.  Specifically, plaintiffs

8  alleged that defendant, a health insurer, had "affirmatively misrepresented the reason[] for . . .

9  escalating premiums."  *Id.* at 909.  According to plaintiffs, defendant had apparently stated that the

10  rising premiums were the result of general increases in medical costs rather than disclosing

11  defendant's decision to prevent new policyholders from joining the insurance plan.  *Id.* at 908.

12  "With [the insurance plan] closed to new entrants, and an insufficient percentage of healthy

13  policyholders remaining to subsidize the costs of unhealthy policyholders," defendant's actions

14  caused the insurance plan to enter into an economically unsustainable "death spiral."  *Id.*

15  Defendant in *Clark* did not challenge the allegations of affirmative misrepresentation.  Instead,

16  defendant focused on the fact that plaintiffs effectively sought "a refund of all moneys acquired by

17  means of unlawful practices"—a form of relief that defendant argued was barred by the filed rate

18  doctrine.  *Id.* at 919.

19       The *Clark* court agreed.  In reaching this decision, the district court rejected plaintiffs'

20  argument that the filed rate doctrine did not apply to health insurers.  Relying upon the New Jersey

21  Superior Court Appellate Division's *Richardson* decision, the *Clark* court noted that "(1) many

22  other jurisdictions ha[ve] applied the doctrine to insurance industry rate-making; (2) the insurance

23  industry in New Jersey is heavily regulated; and (3) the statutory framework governing rate-

24  making for [health] insurance in New Jersey is meaningful and extensive."  *Id.* at 915.  Notably,

25  all health insurance premiums in New Jersey must be "submitted and approved by the New Jersey

26  Department of Banking and Insurance (DOBI), the state agency specifically authorized by New

27

42

28  Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

1    Jersey law to regulate insurance rates." *Id.*

2         Both *Richardson* and *Clark* apply here.  Indeed, as in both cases, the Non-Anthem

3 Defendants "filed with [DOBI]" the "rates applicable to Ames health plan . . . as required by state

4 law."  Non-Anthem Opp'n at 10.  Moreover, Plaintiffs' request for Benefit of the Bargain Losses

5 constitutes an attempt to "enforce a rate other than the filed rate."  *Weinberg*, 801 A.2d at 287.  As

6 the New Jersey Supreme Court has stated, "*any* remedy requiring a refund of a portion of the filed

7 rate is barred by application of the filed rate doctrine."  *Smith*, 839 A.2d at 860 (emphasis added).

8 Here, Plaintiffs' request for Benefit of the Bargain Losses naturally represents a refund for the

9 portion of Plaintiffs' premiums that should have, but did not, go towards data security.  In

10 opposing the instant motion, Plaintiffs in fact acknowledge that their request for such losses

11 "could involve a refund of some portion of premiums to compensate Plaintiffs for data security

12 that was promised but not delivered."  Non-Anthem Opp'n at 15.

13         In an attempt to distinguish *Clark* and *Richardson*, Plaintiffs argue that they are not

14 "challeng[ing] the intrinsic reasonableness of the rates Non-Anthem Defendants charged for health

15 insurance."  *Id.*  Instead, "Plaintiffs contend that . . . they should be compensated for Defendants'

16 failure to provide what was promised."  *Id.*

17         This argument, however, has already been considered and rejected.  As the *Clark* court

18 explained, such a request "would [inevitably] require the Court to determine what rate would have

19 been reasonable and thereby interfere with DOBI's rate-making process."  736 F. Supp. 2d at 919.

20 "[C]laims for compensatory damages or refund based on insurance premiums [plaintiff] paid in

21 previous years are barred by the filed rate doctrine."  *Id.*  Similarly, in *Richardson*, the Appellate

22 Division of the New Jersey Superior Court has held that the filed rate "doctrine precludes a claim

23 for damages which would *indirectly* cause the application of rates different from the filed rates."

24 853 A.2d at 967 (emphasis added).  That is exactly what would happen here: by asking for an

25 across-the-board premium refund to putative class members, Plaintiffs would "*indirectly* cause the

26 application of rates different from the filed rates."  *Id.*  Finally, in *JMC Telecom*, the Third Circuit,

27 <div align="center">43</div>

28 ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

1   of which New Jersey is a part, has determined that "the filed rate doctrine has been expanded to

2   exclude claims of insufficient and poor-quality service." 470 F.3d at 532.  In the instant case,

3   Plaintiffs' basic contention is that Defendants provided poor quality data security rather than

4   reasonable data security, as Defendants promised to do.

5         To be fair, the filed rate doctrine is not without criticism.  The U.S. Supreme Court has

6   called the doctrine "harsh," a sentiment shared by the Third Circuit.  *Am. Tel. and Tel. Co. v. Cent.*

7   *Ofc. Tel., Inc.*, 524 U.S. 214, 223 (1998) (stating that "the filed rate doctrine may seem harsh in

8   some circumstances," but nonetheless applying doctrine to reverse Ninth Circuit decision); *JMC*

9   *Telecom*, 470 F.3d at 533 n.11 ("Although the filed rate doctrine produces harsh results in this

10  case as alleged, such equitable concerns have been rejected by the Supreme Court. . . .  This is true

11  regardless of [a defendant's] ulterior motives.").  Likewise, various New Jersey judges have

12  described the doctrine as "controversial" and "a legal fiction whose days . . . are numbered."

13  *Richardson*, 853 A.2d at 962 (quoting *Weinberg*, 801 A.2d at 294 (Verniero, J., dissenting)).

14  However, an MDL transferee court is "bound by the same substantive legal standards . . . as would

15  have applied in the transferor court."  *In re Korean Air*, 642 F.3d at 699.  Those standards, as

16  stated by state and federal courts in New Jersey, provide a clear answer to the issue at hand.

17  Accordingly, the Court finds that Plaintiffs' can not recover Benefit of the Bargain Losses under

18  their New Jersey breach of contract claim.

19        In addition, the Court denies Plaintiffs' leave to amend, as amendment would be futile.

20  The rules governing the filed rate doctrine have been set forth by federal and state courts in New

21  Jersey.  These principles demonstrate that Plaintiffs' request for Benefit of the Bargain Losses

22  inextricably implicates the filed rate doctrine.  Plaintiffs are barred from recovering such damages,

23  and amendment would not change this holding.

24                          **b.  Loss of Value of PII**

25        As to Loss of Value of PII, neither party has identified any authority addressing whether a

26  party may recover for such damages in New Jersey.  The Court has found none in its own

27                                          44

28  Case No. 15-MD-02617-LHK
    ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
    DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
    MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

1    research.  In the absence of such authority, the Court finds dismissal of Plaintiffs' claim for Loss

2    of Value of PII unwarranted.

3           Two reasons counsel in favor of this finding.  First, courts have noted that "California and

4    New Jersey [contract] law are substantially similar" to one another.  *N.J. Best Phone Cards, Corp.*

5    *v. NobelTel, LLC*, 2013 WL 5937422, *3 (D.N.J. Nov. 4, 2013).  As noted above, California

6    Plaintiffs may recover for Loss of Value of PII, and there is no reason why this holding should not

7    also apply to the New Jersey breach of contract claim.

8           Second, there is at least some case law to suggest that New Jersey courts would be

9    receptive to Loss of Value of PII damages.  In *Canessa v. J.I. Kislak, Inc.*, 235 A.2d 62 (N.J.

10   Super. Ct. Law. Div. 1967), plaintiff had his family's picture taken for a local news story by

11   defendant, a local real estate company.  After the news story was published, defendant began

12   reprinting and distributing the family's picture without plaintiff's permission.  *Id.* at 65.  Plaintiff

13   objected, and sued for invasion of privacy.  Defendant argued that plaintiff could not recover

14   damages.  *Id.*

15          The New Jersey Superior Court disagreed.  As the court outlined, plaintiff's "names and

16   likenesses belong to them.  As such they are property.  They are things of value.  Defendant has

17   made them so, for it has taken them for its own commercial benefit."  *Id.* at 76.  The *Canessa*

18   court continued, "New Jersey has always enjoined the use of plaintiff's likeness and name on the

19   specific basis that it was a protected property right. . . .  If it is sufficiently a right of 'property' to

20   prevent its use, why should it not also be such a right when damages are sought?  For the latter

21   wrong there should likewise be a remedy, i.e., damages."  *Id.* (citation omitted).  Here, as in

22   *Canessa*, Plaintiffs allege that their PII had economic value, which was diminished because the

23   Non-Anthem Defendants did not take the necessary steps to protect Plaintiffs' PII.

24                          **c.  Consequential Out of Pocket Expenses**

25          As to Consequential Out of Pocket Expenses, the SAC states that "Ames has spent

26   numerous hours addressing issues arising from the Anthem data breach."  SAC ¶ 85.  That

27                                               45

Case No. 15-MD-02617-LHK

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
     DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
     MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

1    allegation, the Non-Anthem Defendants argue, is "not enough to state a breach of contract claim."

2    Non-Anthem Mot. at 9.  No New Jersey state courts have ruled on the issue of whether such costs

3    are recoverable.  Nor has the Third Circuit or a district court in the Third Circuit provided any

4    guidance.

5         There are, however, a growing number of courts that have recognized that damages

6    associated with time spent monitoring one's PII are recoverable.  First, in *Lewert v. P.F. Chang's*

7    *China Bistro, Inc.*, 2016 WL 1459226, *1 (7th Cir. Apr. 14, 2016), plaintiff alleged that, "after

8    [defendant] initially announced [a data] breach in June 2014," plaintiff "spent time and effort

9    monitoring his card statements and his credit report to ensure that no fraudulent charges had been

10   made on that card and that no fraudulent accounts had been opened in his name."  Like Ames, the

11   *Lewert* plaintiff did not actually spend money on credit monitoring services.  Moreover, at the

12   time that defendant in *Lewert* announced the data breach, the parties "did not know how many

13   consumers were affected, whether the breach was general or limited to specific locations, or how

14   long the breach lasted."  *Id.*  Further investigation revealed that plaintiff in *Lewert* had not even

15   dined at "[t]he only affected restaurant" in plaintiff's state.  Thus, there was *no* risk that plaintiff's

16   personal information would be compromised as a result of the data breach.  Nevertheless, the

17   Seventh Circuit concluded that "the time and effort" the plaintiff had spent "monitoring both his

18   card statements and his other financial information" was "sufficient" to "support standing based

19   on [plaintiff's] injuries."  *Id.* at *1, *3; *see also id.* (finding "time and money customers spent

20   protecting against future identity theft or fraudulent charges" constitute "injuries sufficient for

21   standing").

22        *Lewert* relied significantly upon the Seventh Circuit's decision in *Remijas*, a case discussed

23   above.  On Consequential Out of Pocket Expenses, the *Remijas* court specifically concluded that

24   "[m]itigation expenses . . . qualify as [an] actual injur[y]" because the harm was imminent:

25   defendant's data had been breached, and this event "made the risk of identity theft and fraudulent

26   charges sufficiently immediate to justify mitigation efforts."  *Remijas*, 794 F.3d at 694.

27
                                            46
     Case No. 15-MD-02617-LHK
28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
     DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
     MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

1      Consistent with *Lewert* and *Remijas*, the Middle District of Alabama recently denied a

2   motion to dismiss in *Smith v. Triad of Alabama, LLC*, 2015 WL 5793318 (M.D. Ala. Sept. 29,

3   2015), another data breach case.  As the district court summarized, plaintiffs "aver that because of

4   the data breach, they will be required to spend money and time mitigating its effects." *Id.* at *8.

5   The district court rejected defendant's argument that, "in order to establish standing, [p]laintiffs

6   must allege . . . that they suffered some un-reimbursed or out of pocket expense." *Id.*  After

7   canvassing relevant Eleventh Circuit precedent, the district court concluded that "[t]here is no

8   precedent binding on this court stating that for standing purposes, a victim of identity

9   theft *must* allege that he or she suffered economic damages or that he/she suffered an un-

10  reimbursed or out-of-pocket expense, and this court will not so hold." *Id.* at *9.

11      Finally, this Court's *In re Adobe* decision also supports Plaintiffs' position.  As in *Lewert*,

12  *Remijas*, and *Smith*, this Court held that a data breach creates a "threatened harm" that is

13  "sufficiently concrete and imminent to satisfy" standing.  *In re Adobe*, 66 F. Supp. 3d at 1214.

14  Here, Plaintiffs attempts to respond to this imminent threat—whether by paying out of pocket for

15  credit monitoring or by using their own time for credit monitoring—resulted in damages that may

16  be recoverable.

17      The Non-Anthem Defendants' reliance upon *Holmes v. Countrywide Financial Corp.*,

18  2012 WL 2873892 (W.D. Ky. July 12, 2012), is unpersuasive.  Plaintiffs in *Holmes* did assert a

19  New Jersey breach of contract claim arising out of a data breach.  Plaintiffs also argued that the

20  time spent "monitoring their credit, researching identity theft, and learning about this case" may

21  "form the foundation for a compensable injury." *Id.* at *11.  The *Holmes* court disagreed.  The

22  *Holmes* court, however, found no relevant New Jersey state court or Third Circuit decision on

23  point.  Instead, the *Holmes* court relied entirely upon four federal district court opinions, and

24  provided no independent reasoning outside of a citation to these decisions.  *Holmes*—and all the

25  decisions upon which *Holmes* relies—predate the Seventh Circuit's decisions in *Lewert* and

26  *Remijas*, the Middle District of Alabama's decision in *Smith*, and this Court's decision in *In re*

47

Case No. 15-MD-02617-LHK

ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

1   *Adobe*.  As such, *Holmes* does not reflect the growing recognition amongst courts of Loss of

2   Value of PII damages.  In light of such circumstances, the Court finds *Lewert*, *Remijas*, *Smith*, and

3   *In re Adobe* more instructive, and thus declines to follow *Holmes*.

4        In sum, the Non-Anthem Defendants' motion to dismiss the request for Benefit of the

5   Bargain Losses as to Plaintiffs' New Jersey breach of contract claim is GRANTED with prejudice.

6   The Non-Anthem Defendants' motion to dismiss Plaintiffs' New Jersey breach of contract claim is

7   otherwise DENIED.

8        **D.  New York Unjust Enrichment (against Anthem and Non-Anthem Defendants)**

9        The SAC asserts against all Defendants an unjust enrichment claim, brought under New

10  York law.  SAC ¶¶ 526–34.  According to the SAC, Plaintiffs "conferred a monetary benefit on"

11  Defendants, Defendants "appreciated or had knowledge of the benefits conferred upon them by

12  Plaintiffs," and "[u]nder principals [sic] of equity and good conscience, Defendants . . . should not

13  be permitted to retain the money belonging to Plaintiffs . . . because Defendant[s] failed to

14  implement (or adequately implement) the data privacy and security practices and procedures that

15  Plaintiffs . . . paid for."  *Id.* ¶¶ 528, 529, 532.

16       Defendants seek dismissal of Plaintiffs' New York unjust enrichment claim on two

17  grounds.  First, Defendants contend that "[t]here can be no unjust enrichment claim under New

18  York law where an express contract governs the same subject manner."  Anthem Mot. at 13.

19  Second, Plaintiffs' claim "fails because the SAC does not allege facts showing the New York

20  Plaintiffs conferred a benefit on the Anthem Defendants such that they could have been unjustly

21  enriched."  *Id.* at 14.  These arguments are addressed in turn.

22       **1.  Overlap with Express Contract**

23       On the issue of Plaintiffs' express contracts with Defendants, the New York Court of

24  Appeals has noted, "[a] 'quasi contract' *only* applies in the absence of an express agreement, and

25  is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's

26  unjust enrichment."  *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y.

27                                                    48

28

1  1987) (emphasis added). "It is impermissible . . . to seek damages in an action sounding in quasi

2  contract where the suing party has fully performed on a valid written agreement, the existence of

3  which is undisputed, and the scope of which clearly covers the dispute between the parties." *Id.*;

4  *accord Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012) ("An unjust enrichment

5  claim is not available where it simply duplicates, or replaces, a conventional contract . . . claim.").

6     Consistent with *Clark-Fitzpatrick* and *Corsello*, the parties agree that Plaintiffs' New York

7  unjust enrichment claim is duplicative of Plaintiffs' New York breach of contract claim. Anthem

8  Mot. at 13; Anthem Opp'n at 12. In other words, if New York Plaintiffs can obtain relief via

9  contract, then New York Plaintiffs may not seek relief via unjust enrichment.

10     However, the parties have not designated a New York breach of contract claim as one of

11  the selected claims, and there has been no briefing as to the scope and breadth of New York

12  Plaintiffs' contracts. As a result, the parties did not include the New York Plaintiffs' contracts in

13  the record.

14     The parties have, however, selected a California breach of contract claim. Several courts

15  have held that California and New York contract law are similar to one another. *See, e.g.*, *Be In,*

16  *Inc. v. Google, Inc.*¸ 2013 WL 5568706, *6 (N.D. Cal. Oct. 9, 2013) ("[T]he Court agrees that the

17  contract formation law of both California and New York is substantively similar."); *Berkson v.*

18  *Gogo LLC*, 97 F. Supp. 3d 359, 388 (E.D.N.Y. 2015) ("In the instant case, the substantive

19  contractual laws of New York, California, and Illinois are at issue. These states laws are

20  substantively similar with respect to the issue of contract formation."); *cf. First Hill Partners, LLC*

21  *v. BlueCrest Capital Mgmt. Ltd.*, 52 F. Supp. 3d 625, 634 (S.D.N.Y. 2014) ("[T]here is no actual

22  conflict between the law governing unjust enrichment claims in New York and in California.

23  Under both New York and California law, an unjust enrichment claim is precluded if a valid

24  contract covers the subject matter of the dispute.") (citations and footnote omitted).

25     As discussed above, on Plaintiffs' California breach of contract claim, the parties disagree

26  over whether Defendants' privacy policies were incorporated into Plaintiffs' contracts. The Court

27                                                          49

United States District Court
Northern District of California

1    agreed with the Anthem Defendants on the claims brought by California Plaintiffs Daniel

2    Randrup, Kelly Tharp, and Daniel Tharp, but agreed with Plaintiffs as to the remaining California

3    Plaintiffs.  Without an opportunity to review the specific contracts at issue for New York

4    Plaintiffs, it is uncertain whether Defendants' privacy obligations were also sufficiently

5    incorporated by reference into New York Plaintiffs' contracts.

6        Under similar factual circumstances, New York courts have denied motions to dismiss

7    unjust enrichment claims.  In *Joseph Sternberg, Inc. v. Walber 36th St. Assocs.*, 187 A.D.2d 225,

8    228 (N.Y. App. Div. 1993), the New York Supreme Court Appellate Division noted that "where

9    there is a bona fide dispute as to the existence of a contract or where the contract does not cover

10   the dispute in issue, plaintiff may proceed upon a theory of quantum meruit and will not be

11   required to elect his or her remedies."  The court subsequently determined that the contract at issue

12   was ambiguous, and that, at the motion to dismiss stage, dismissal was unwarranted.

13        The Southern District of New York also denied defendant's motion to dismiss in *Union*

14   *Bank, N.A. v. CBS Corp.*, 2009 WL 1675087 (S.D.N.Y. June 10, 2009).  Akin to the instant case,

15   plaintiff in *Union Bank* asserted a breach of contract and an unjust enrichment claim.  After

16   examining the evidence, the district court concluded that it could not "determine as a matter of law

17   and at the inception of this litigation that this dispute will be resolved through application of the

18   [parties' written contracts]."  *Id.* at *8.  Citing *Joseph Sternberg*, the *Union Bank* court thus

19   decided that plaintiff's unjust enrichment claim should not be dismissed.  *Id.* at *9.

20        Following *Sternberg* and *Union Bank*, the Court finds that, it is unclear whether New York

21   Plaintiffs' contract claim is duplicative of, and thus precludes, New York Plaintiffs' unjust

22   enrichment claim.  Thus, the Court denies Defendants' motions to dismiss based on their

23   contention that Plaintiffs' New York unjust enrichment claim overlaps with Plaintiffs' New York

24   contract claim.

25      **2.  Conferral of Benefit**

26        As to Defendants' other contention—that Plaintiffs did not confer a monetary benefit on

United States District Court
Northern District of California

50

United States District Court
Northern District of California

1   Defendants—the Court finds instructive *Georgia Malone & Co., Inc. v. Rieder*, 973 N.E.2d 743,

2   746 (N.Y. 2012).  In *Georgia Malone*, the New York Court of Appeals stated that, for purposes of

3   an unjust enrichment claim, "[a] plaintiff must allege that (1) the other party was enriched, (2) at

4   that party's expense, and (3) that it is against equity and good conscience to permit the other party

5   to retain what is sought to be recovered."  *Id.* (internal quotation marks omitted).  "[A] plaintiff

6   need not be in privity with the defendant to state a claim for unjust enrichment."  *Id*.  There must

7   only "exist a relationship or connection between the parties that is not too attenuated."  *Id.*

8   (internal quotation marks omitted).  At first blush, the SAC appears to meet all three of these

9   requirements: Plaintiffs aver (1) that they paid premiums or fees that went to Defendants, (2) that

10  Defendants knew of these payments, and (3) that Defendants should return a portion of what was

11  paid.  SAC ¶¶ 528, 529, 532.

12      Defendants, however, contend that Plaintiffs do not "allege any facts showing [that] their

13  premiums were in fact paid to Anthem."  Anthem Mot. at 15.  According to Defendants, all New

14  York Plaintiffs were covered under ASO agreements; as such, Plaintiffs' employers, and not

15  Plaintiffs, paid Defendants.

16      The Court disagrees with Defendants as to New York Plaintiffs Barbara Gold ("Gold"),

17  Matthew Gates ("Gates"), and Juan Carlos Cerro ("Cerro").  Gold, Gates, and Cerro all state that

18  they paid health insurance premiums on a regular basis.  SAC ¶¶ 87–89.  These premiums were

19  aggregated by their respective employers, who then paid Defendants.  Thus, Defendants knew or

20  should have known that some portion of Gold, Gates, and Cerro's insurance expenses had been

21  paid by the premiums that Gold, Gates, and Cerro paid.  That is all that Gold, Gates, and Cerro

22  need to plead to avoid dismissal.

23      *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104 (N.Y. 2011), does not hold to the

24  contrary.  In that case, the New York Court of Appeals again emphasized that "privity is not

25  required for an unjust enrichment claim."  *Id.* at 1111.  The court, however, dismissed the unjust

26  enrichment claim at issue because there were no allegations of even "an awareness by [defendant]

27                                                  51

United States District Court
Northern District of California

of [plaintiff's] existence." *Id.* Such circumstances do not apply here. By virtue of collecting Plaintiffs' PII, maintaining a nationwide database of Plaintiffs' PII, and providing administrative services to Plaintiffs, Defendants were aware of Gold, Gates, and Cerro's existence. The relationship between Gold, Gates, and Cerro and Defendants is thus "not too attenuated" to state a New York unjust enrichment claim. *Rieder*, 973 N.E. 2d at 746; *Mandarin Trading*, 944 N.E. 2d at 1111. Defendants' motions to dismiss the New York unjust enrichment claims of Gold, Gates, and Cerro are therefore DENIED.

The Court, however, finds Defendants' arguments more relevant as to New York Plaintiff Marne Onderdonk ("Onderdonk"). The SAC states that "Onderdonk was enrolled in the New York State Health Insurance Program (NYSHIP) for Government Employees." SAC ¶ 90. Empire BlueCross Blue Shield provided administrative services to NYSHIP. *Id.* The SAC, however, does not state that Onderdonk paid premiums, rates, or any other fees to NYSHIP or Empire BlueCross Blue Shield. Indeed, based on the SAC, it is unclear whether there is *any* economic relationship between Onderdonk, NYSHIP, and Empire BlueCross Blue Shield. Such allegations do not pass muster under *Mandarin Trading*. Accordingly, Defendants' motion to dismiss Onderdonk's New York unjust enrichment claim is GRANTED. However, Plaintiffs shall have leave to amend Onderdonk's claim. It is possible that, after amendment, Plaintiffs will be able to plead a sufficiently close economic relationship between Onderdonk and Empire BlueCross Blue Shield. Amendment therefore may not be futile.

**E.  California Unfair Competition Law (against Anthem and Non-Anthem Defendants)**

California's Unfair Competition Law ("UCL") provides a cause of action for business practices that are (1) unlawful, (2) unfair, or (3) fraudulent. Cal. Bus & Prof. Code § 17200, *et seq.* "The UCL's coverage is sweeping, and its standard for wrongful business conduct intentionally broad." *Moore v. Apple, Inc.*, 73 F. Supp. 3d 1191, 1204 (N.D. Cal. 2014) (internal quotation marks omitted). "Although the UCL targets a wide range of misconduct, its remedies are limited because UCL actions are equitable in nature." *Pom Wonderful LLC v. Welch Foods,*

52

1    *Inc.*, 2009 WL 5184422, *2 (C.D. Cal. Dec. 21, 2009).  "Remedies for private individuals bringing

2    suit under the UCL are limited to restitution and injunctive relief."  *Id.*

3           Each prong of the UCL provides a separate and distinct theory of liability, *Lozano v. AT&T*

4    *Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007), and Plaintiffs assert that Defendants'

5    conduct was unlawful, unfair, and fraudulent, *see* SAC ¶ 542.  Before addressing whether

6    Plaintiffs have sufficiently pleaded liability under these prongs, however, the Court must

7    determine whether Plaintiffs have standing to bring suit.  In order to establish standing under the

8    UCL, "a plaintiff must make a twofold showing: he or she must demonstrate injury in fact and a

9    loss of money or property caused by unfair competition."  *Susilo v. Wells Fargo Bank, N.A.*, 796

10   F. Supp. 2d 1177, 1195–96 (C.D. Cal. 2011) (internal quotation marks omitted).

11          **1.  Standing**

12          As to whether Plaintiffs have demonstrated "injury in fact" and "a loss of money or

13   property caused by unfair competition," *id.*, the California Supreme Court has stated that "[t]here

14   are innumerable ways in which economic injury from unfair competition may be shown," *Kwikset*

15   *Corp. v. Superior Court*, 246 P.3d 877, 885 (Cal. 2011).  A plaintiff may, for instance,

16          (1) surrender in a transaction more, or acquire in a transaction less, than he or she
17          otherwise would have; (2) have a present or future property interest diminished;
         (3) be deprived of money or property to which he or she has a cognizable claim;
18          or (4) be required to enter into a transaction, costing money or property, that
         would otherwise have been unnecessary

19   *Id.* at 885–86.  Here, Plaintiffs seek recovery under the UCL for two forms of economic injury:

20   Benefit of the Bargain Losses and Consequential Out of Pocket Expenses.[7]

21          The Court has already determined that California Plaintiffs Michael Bronzo, Mary Ella

22   Carter, Kenneth Coonce, Steve Kawai, and Kenneth Solomon may recover Benefit of the Bargain

23   Losses under their California breach of contract claim.  As Defendants acknowledge, that finding

24   also means that those California Plaintiffs' have sufficiently alleged economic injury for purposes

25

26   ───────────────────────
     [7] Plaintiffs do not seek Loss of Value of PII under the UCL.  ECF No. 424 at 14 n.16.

27                                                     53
28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
     DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
     MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

1    of the UCL.  Anthem Mot. at 15.  Whether the remaining California Plaintiffs—Daniel Randrup,

2    Kelly Tharp, Daniel Tharp, Joseph Blanchard, Lillian Brisko, and Alvin Lawson—have

3    sufficiently alleged UCL standing is a closer call.  Answering this question requires the Court to

4    examine (a) the differences between Article III standing and UCL standing, and (b) the differences

5    between California contract law and the UCL.

### a.  Relationship Between Article III Standing and UCL Standing

7        "Although the requirements of federal standing under Article III and the requirements of

8    standing under California's consumer protection statutes overlap, there are important differences."

9    *In re Sony Gaming Networks and Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 965

10   (S.D. Cal. 2012) (citing *Troyk v. Farmers Grp., Inc.*, 90 Cal. Rptr. 3d 589, 625 n.31 (Ct. App.

11   2009)).  "For example, under Article III a plaintiff must allege: (1) an injury in fact; (2) causation;

12   and (3) likelihood that the injury will be redressed by a favorable decision."  *Id.*  On the other

13   hand, for purposes of the UCL, a plaintiff need meet only "the first element (i.e., an injury in

14   fact)."  *Id.* (internal quotation marks omitted).

15       However, under the UCL, a party must show that he has lost money or property in order to

16   satisfy this injury in fact requirement.  *Ehret v. Uber Technologies, Inc.*, 68 F. Supp. 3d 1121,

17   1132 (N.D. Cal. 2014) ("Whereas a federal plaintiff's injury in fact may be intangible and need

18   not involve lost money or property, . . . a UCL plaintiff's injury in fact [must] specifically involve

19   lost money or property.") (internal quotation marks omitted).

20       This "lost money or property" requirement may, in some circumstances, impose a more

21   stringent standard for standing under the UCL as compared to Article III.  *Id.*  Nevertheless,

22   California Plaintiffs have met this more stringent standard.  Each California Plaintiff states that

23   they paid money for health insurance premiums, which were used to pay for services offered by

24   Defendants.  *See, e.g.*, SAC ¶ 16 ("Plaintiff Daniel Randrup . . . was enrolled in a health plan . . .

25   that was administered by . . . Anthem Blue Cross of California, and [Randrup] paid premiums on a

26   regular basis.").  Thus, each California Plaintiff has "lost money or property," as required under

27                                             54

Case No. 15-MD-02617-LHK
28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

1   the UCL.

2   **b. Relationship Between Contract Law and UCL**

3   There are also a number of important distinctions between California contract law and the

4   UCL.  In general, the UCL sweeps more broadly.  *See, e.g.*, *Hale v. Sharp Healthcare*, 108 Cal.

5   Rptr. 3d 669, 675–81 (Ct. App. 2010) (upholding UCL claim but dismissing breach of contract

6   claim); *Ehret*, 68 F. Supp. 3d at 1139–41 (same).  Two particular differences help explain the

7   UCL's broader scope, and are of relevance to the instant motions.

8   First, under the UCL, a plaintiff may bring suit against a third party even if the plaintiff is

9   not an intended third party beneficiary.  *Compare Bus. to Bus. Mkts., Inc. v. Zurich Specialties*, 37

10   Cal. Rptr. 3d 295, 298 (Ct. App. 2005) (stating, in a breach of contract case, that a party owes

11   duties to intended, but not incidental, third party beneficiaries), *with Ferrington v. McAfee, Inc.*,

12   2010 WL 3910169, *8 (N.D. Cal. Oct. 5, 2010) ("[T]he UCL permits restitution from a defendant

13   whose unfair business practices caused plaintiff to pay money to a third party, as long as it is

14   reasonable to infer that the defendant indirectly received that money from the third party.").

15   On this point, Defendants make much of the California Supreme Court's statement in

16   *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 947 (Cal. 2003), that "[a]ny award that

17   plaintiff would recover from defendants [under the UCL] would not be restitutionary as it would

18   not replace any money or property that defendants took directly from plaintiff."  Non-Anthem

19   Mot. at 12; Anthem Mot. at 10 n.15.  This statement, Defendants argue, demonstrates that

20   Plaintiffs can not seek restitution under the UCL *if* a Plaintiff is covered by an ASO agreement, as

21   such Plaintiffs did not pay Defendants directly.  Applied here, this argument would, in practice, set

22   a higher bar for UCL standing than under a conventional breach of contract claim, as *no* Plaintiff

23   under an ASO agreement could bring a UCL claim.

24   California courts, however, have rejected the reading of *Korea Supply* that Defendants

25   have advocated.  In *Shersher v. Superior Court*, 65 Cal. Rptr. 3d 634, 636 (Ct. App. 2007),

26   defendant Microsoft Corporation ("Microsoft") argued that plaintiff could not seek restitution

27   55

28   Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

1    because plaintiff "purchased Microsoft's product from a retailer."  Thus, plaintiff did not "pa[y]

2    money *directly* to" Microsoft.  *Id.*  The California Court of Appeal rejected this argument and

3    found Microsoft's reliance upon *Korea Supply* misplaced.  After reviewing the facts in *Korea*

4    *Supply*, the California Court of Appeal concluded that the case's holding was "a narrow one":

5    namely, "the holding of *Korea Supply* on the issue of restitution is that the remedy the plaintiff

6    seeks must be truly 'restitutionary in nature'—that is, it must represent the return of money or

7    property the defendant acquired through its unfair practices."  *Id.* at 639.  Importantly, "[*n*]*othing*

8    in the language of *Korea Supply* suggests that the [California] Supreme Court intended to preclude

9    consumers from seeking the return of money they paid for a product that turned out to be not as

10   represented."  *Id.* (emphasis added).

11       In *Troyk*, a case decided after *Shersher*, the California Court of Appeal once again

12   reiterated that "*Korea Supply* [was] inapposite . . . and does *not* hold that a plaintiff who paid a

13   third party money (i.e., money in which the plaintiff had a vested interest) may not seek UCL

14   restitution from a defendant whose unlawful business practice caused the plaintiff to pay that

15   money." *Troyk*, 90 Cal. Rptr. 3d at 616; *see People v. Sarpas*, 172 Cal. Rptr. 3d 25, 43–48 (Ct.

16   App. 2014) (canvassing decisions that have criticized *Korea Supply*).

17       Following *Shersher* and *Troyk*, federal courts—including this Court—have generally

18   declined to adopt Defendants' reading of *Korea Supply*.  *See, e.g.*, *Lopez v. United Parcel Serv.,*

19   *Inc.*, 2010 WL 728205, *10 (N.D. Cal. 2010) (rejecting reliance upon direct payment argument

20   and stating that "UPS's suggestion that *Korea Supply* is in any way apposite to the present case is

21   flatly wrong."); *McAfee*, 2010 WL 3910169, *7 ("[A]s the California Court of Appeals has noted,

22   [the holding in *Korea Supply*] was directed to the particular facts of [the case], which involved

23   plaintiffs who never had an ownership interest in the money allegedly obtained through

24   defendant's unfair business practices.").

25       In accord with this line of cases, the Court does not adopt Defendants' reading of *Korea*

26   *Supply* here.  Although California Plaintiffs might not have paid Defendants directly, they

27                                                        56

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
     DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
     MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

1     nonetheless paid premiums which were then used to pay Defendants.  Defendants' alleged failure

2     to provide certain services led Plaintiffs, via the UCL, to seek "the return of money or property

3     [that Defendants] acquired through its unfair practices."  *Shersher*, 65 Cal. Rptr. 3d at 639.

4             A second notable difference between contract law and the UCL is that the UCL provides

5     for liability under three separate prongs: the unlawful, the unfair, and the fraudulent prong.  As

6     explained by the district court in *Ehret*, a "UCL claim . . . is [thus] not limited to the structures of

7     the alleged contractual terms."  *Ehret*, 68 F. Supp. 3d at 1141.  The UCL's "prescriptions are

8     aimed at unlawful or unfair [or fraudulent] business practices (wherein a violation may be found

9     even if conduct violates no specific law [or contract])."  *Id.*

10            This distinction is critical to understanding why all California Plaintiffs have alleged

11    economic injury sufficient to establish UCL standing.  California Plaintiffs, for instance, claim

12    that Defendants engaged in unlawful business practices by violating HIPAA, the Gramm-Leach-

13    Bliley Act, the Federal Trade Commission Act ("FTC Act"), California's Unfair Insurance

14    Practice Statutes, California's Insurance Information and Privacy Protection Act ("CIIPA"),

15    California's Confidentiality of Medical Information Act ("CMIA"), and Cal. Civ. Code § 1798.2.

16    SAC ¶ 316, 317, 542.  Defendants do not contest that the contracts or agreements for California

17    Plaintiffs included provisions agreeing to comply with some (or all) of these laws.

18            As the Court has noted, for purposes of bringing a breach of contract claim, California

19    Plaintiffs "must . . . do something more . . . than merely point to allegations of a statutory

20    violation."  *Berger*, 476 F. Supp. 2d at 1177.  Plaintiffs need not, though, do anything more to

21    allege an unlawful claim under the UCL.  "By proscribing any unlawful business practice," the

22    UCL "borrows violations of other laws and treats them as unlawful practices that the UCL makes

23    independently actionable."  *Rose v. Bank of Am., N.A.*, 304 P.3d 181, 185 (Cal. 2013) (internal

24    quotation marks and alteration omitted).  In other words, the UCL's unlawful prong creates causes

25    of action for statutory violations that might not otherwise be actionable via private contract.

26            Taken together, the three features discussed above—that a plaintiff must show lost money

27                                                          57

28    ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
      DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
      MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

or property, that a plaintiff need not be an intended third party beneficiary to bring a UCL claim, and that UCL liability is often broader than contract liability—provide an answer to the standing inquiry here.  All California Plaintiffs paid premiums, which were in turn used to pay for services by Defendants.  As part of these services, Defendants were, at minimum, required to comply with certain privacy laws, which Defendants allegedly did not do.  California Plaintiffs have thus established economic injury because they have "surrender[ed] in a transaction more, or acquire[d] in a transaction less, than he or she otherwise would have," *Kwikset*, 246 P.3d at 885, because of Defendants' unlawful, unfair, or fraudulent conduct.

## 2. Unlawful

As discussed above, Plaintiffs allege that Defendants violated seven statutes: HIPAA, the Gramm-Leach-Bliley Act, the FTC Act, California's Unfair Insurance Practice Statutes, CIIPA, CMIA, and Cal. Civ. Code § 1798.82.  Defendants contend that Plaintiffs have failed to state a claim under three statutes: CMIA, CIIPA, and Cal. Civ. Code § 1798.82.  Defendants do not challenge Plaintiffs' allegations as to the remaining statutes.  Thus, even if the Court were to grant Defendants' motion, Plaintiffs' UCL claim under the unlawful prong would still survive.

This is effectively the position Plaintiffs have taken in their own briefing.  Instead of developing specific arguments to challenge Defendants' contentions, Plaintiffs urge the Court to defer ruling on Defendants' arguments, as Plaintiffs would have a viable claim under the unlawful prong in any event.  As Defendants point out, however, a decision from the Court now could help "determine the scope of this case going forward," particularly as to the breadth of fact and expert discovery and the issues to be decided at summary judgment.  Anthem Reply at 10.

Accordingly, because Plaintiffs have not challenged Defendants' arguments as to the CMIA, CIIPA, and Cal. Civ. Code § 1798.82, Defendants' motion to dismiss these statutes under the UCL's unlawful prong is GRANTED with prejudice.[8]

---

[8] The Court emphasizes that its decision is based upon the parties' respective positions and is not a substantive ruling on whether Defendants violated the statutes at issue.  In fact, Defendants'

58

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

1

### 3.  Unfair

2      "The 'unfair' prong of the UCL creates a cause of action for a business practice that is

3 unfair even if not proscribed by some other law."  *In re Adobe*, 66 F. Supp. 3d at 1226.  "The UCL

4 does not define the term 'unfair.' . . .  [And] the proper definition of 'unfair' conduct against

5 consumers 'is currently in flux' among California courts."  *Id.*

6      Some California courts apply a balancing approach, which requires courts to "weigh the

7 utility of the defendant's conduct against the gravity of the harm to the alleged victim."  *Davis v.*

8 *HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (internal quotation marks

9 omitted).  Other California courts have held that "unfairness must be tethered to some legislatively

10 declared policy or proof of some actual or threatened impact on competition."  *Lozano*, 504 F.3d

11 at 735 (internal quotation marks omitted).  Finally, one California court has adopted the three-part

12 test set forth in § 5 of the Federal Trade Commission Act: "(1) the consumer injury must be

13 substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or

14 competition; and (3) it must be an injury that consumers themselves could not reasonably have

15 avoided."  *Camacho v. Auto. Club of Southern California*, 48 Cal. Rptr. 3d 770, 777 (Ct. App.

16 2006).  The Court refers to these tests as the "balancing test," the "tethering test," and the "FTC

17 test," respectively.

18      In the First Motion to Dismiss Order, the Court concluded that "dismissal of Plaintiffs'

19 UCL claim under the unfair prong [was] unwarranted."  First MTD Order at 40.  "In *In re Adobe*,

20 this Court observed that various California statutes—including several statutes upon which

21 Plaintiffs rely here—reflect California's public policy of protecting customer data."  *Id.* (internal

22 quotation marks omitted).  "Whether Defendants' public policy violation is outweighed by the

23

24 claims that the SAC does not allege the theft of medical information and that the CMIA protects
   only medical information are incorrect.  Anthem Mot. at 17.  For example, the SAC alleges the

25 theft of the following information, among others, from the Anthem Database: dates of birth, Social
   Security numbers, and confidential medical records.  SAC ¶¶ 3, 360.  Moreover, the CMIA

26 protects the privacy of "medical information" and defines that term to include individually
   identifiable information.  Cal. Civ. Code § 56.05(j).

59

27 Case No. 15-MD-02617-LHK

28 ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
   DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
   MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

1    utility of their conduct under the balancing test is a question to be resolved at a later stage in this

2    litigation." *Id.* Thus, "*based on the balancing test alone*," Defendants' first round motions to

3    dismiss were denied. *Id.* (emphasis added).

4         In the instant motions, Defendants request that the Court find that several statutes listed in

5    the SAC do not support an unfair claim. Anthem Mot. at 18. These statutes include the ones

6    discussed above (CMIA, CIIPA, and Cal. Civ. Code §1798.82), as well as the Gramm-Leach-

7    Bliley Act and the California Data Breach Statute. *Id.* Defendants argue that Plaintiffs can not

8    prove that Defendants violated these statutes. *Id.* Thus, Defendants argue, dismissal is warranted

9    because an unfair prong claim must be based upon a public policy that is "'tethered' to specific

10   constitutional, statutory, or regulatory provisions." Anthem Reply at 11 (quoting *Gregory v.*

11   *Albertson's Inc.*, 128 Cal. Rptr. 2d 389, 395 (Ct. App. 2002)).

12        These arguments are misdirected. Whether or not Plaintiffs can establish that Defendants

13   violated a particular statute concerns the UCL's unlawful prong, not the unfair prong. *Compare*

14   *Aleksick v. 7-Eleven, Inc.*, 140 Cal. Rptr. 3d 796, 801 (Ct. App. 2012) (discussing a UCL claim

15   brought under the unlawful prong and holding that "[w]hen a statutory claim fails, a derivative

16   UCL claim also fails."), *with Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d

17   527, 561 (Cal. 1999) ("It would be impossible to draft in advance detailed plans and specifications

18   of all acts and conduct to be prohibited, since unfair . . . business practices [under the UCL] may

19   run the gamut of human ingenuity and chicanery.") (citation and alteration omitted). Put another

20   way, whether Defendants' violated a particular statute does not necessarily mean that the statute

21   does not reflect a public policy to protect consumer privacy.

22        More importantly, Defendants' arguments regarding the unfair prong, as Defendants note,

23   address the tethering test. However, in the First Motion to Dismiss Order, the Court concluded

24   that Plaintiffs had sufficiently alleged an unfair prong violation *based on the balancing test alone*.

25   First MTD Order at 40. Defendants' briefing does not mention, much less discuss, the balancing

26   test—the basis of the Court's original decision. Accordingly, Defendants' motion to dismiss

27   <center>60</center>

     Case No. 15-MD-02617-LHK

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
     DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
     MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

1    Plaintiffs' UCL claim under the unfair prong is DENIED.

2        **4. Fraud**

3        "To state a claim under the 'fraud' prong of [the UCL], a plaintiff must allege facts

4    showing that members of the public are likely to be deceived by the alleged fraudulent business

5    practice." *Antman v. Uber Technologies, Inc.*, 2015 WL 6123054, *6 (N.D. Cal. Oct. 19, 2015).

6    Claims under the fraud prong of the UCL are subject to the particularity requirements of Federal

7    Rule of Civil Procedure 9(b). *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).

8    Under this Rule, "[i]n alleging fraud or mistake, a party must state with particularity the

9    circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Plaintiffs must include "an

10   account of the time, place, and specific content of the false representations" at issue. *Swartz v.*

11   *KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted). Additionally,

12   "a plaintiff stating a claim under the 'fraud' prong must plead actual reliance." *In re Carrer IQ,*

13   *Inc.*, 78 F. Supp. 3d at 1111.

14       In the First Motion to Dismiss Order, the Court dismissed Plaintiffs' UCL claim under the

15   fraud prong. The Court observed that although Defendants allegedly "promised to carry out

16   reasonable security measures, but ultimately failed to carry through with this promise," Plaintiffs

17   had not included the time that any misrepresentations or omissions had been made, as required by

18   Rule 9(b). First MTD Order at 41.

19       The SAC seeks to cure this particular deficiency. The SAC, for instance, includes copies

20   of the 2014 Annual Privacy Notice, which was made available prior to the Anthem data breach.

21   *See* ECF No. 473-5 at 16–22 (copy of 2014 Annual Privacy Notice). Plaintiffs also allege that

22   Anthem's Personal Information (Including Social Security Number) Privacy Protection Policy has

23   not changed since 2010, and has been publicly available on Anthem's website since that time.

24   SAC ¶ 165. Finally, Plaintiffs allege that Defendants violated the UCL's fraud prong under both

25   an affirmative misrepresentation and fraudulent omission theory of liability. *Id.* ¶ 542. Under

26   either liability theory, Plaintiffs state that they "would not have enrolled in Defendants' insurance

61

United States District Court
Northern District of California

1   and health benefit services . . . had [they] known about Defendants' substandard data security

2   practices." *Id.*

3       In response, Defendants claim that "[n]o Plaintiff [has] allege[d] that he or she reviewed or

4   relied on any Anthem data security practices at the time he or she enrolled or re-enrolled in an

5   Anthem plan." Anthem Mot. at 16.  Plaintiffs' apparent failure to comply with this actual reliance

6   requirement, Defendants argue, is fatal to their UCL claim.  Because the actual reliance

7   requirement operates somewhat differently for omission and misrepresentation claims, the Court

8   considers these claims separately.

9           **a. Fraudulent Omission**

10      In most cases, "a plaintiff in a fraud by omission suit will not be able to specify the time,

11  place, and specific content of an omission as precisely as would a plaintiff in a false representation

12  claim." *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1098–99 (N.D. Cal. 2007); *see also*

13  *Gold v. Lumber Liquidators, Inc.*, 2015 WL 7888906, *10 (N.D. Cal. Nov. 30, 2015) (same).

14  Accordingly, "a fraud by omission or fraud by concealment claim can succeed without the same

15  level of specificity required by a normal fraud claim." *Baggett v. Hewlett-Packard Co.*, 582 F.

16  Supp. 2d 1261, 1267 (C.D. Cal. 2007) (internal quotation marks omitted); *accord MacDonald v.*

17  *Ford Motor Co.*, 37 F. Supp. 3d 1087, 1096 (N.D. Cal. 2014) ("[C]laims based on an omission can

18  succeed without the same level of specificity required by a normal fraud claim[,] . . . [b]ecause the

19  plaintiffs are alleging a failure to act instead of an affirmative act.") (internal quotation marks and

20  alteration omitted); *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 451 (D.N.J. 2012) ("[The]

21  heightened [pleading] standard [under Rule 9(b)] is somewhat relaxed in a case based on a

22  fraudulent omission.").

23      The natural consequence of such reasoning is, as the California Court of Appeal has stated,

24  that "[r]eliance can be prove[n] in a fraudulent omission case by establishing that had the omitted

25  information been disclosed, the plaintiff would have been aware of it and behaved differently."

26  *Hoffman v. 162 North Wolfe LLC*, 175 Cal. Rptr. 3d 820, 833–34 (Ct. App. 2014).  In *In re*

Case No. 15-MD-02617-LHK

ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

United States District Court
Northern District of California

*Carrier IQ*, a consumer class action involving an omission of "a material fact exclusively in [d]efendant's knowledge," the district court determined that the actual reliance test, as stated in *Hoffman*, could be met based on two factors.  78 F. Supp. 3d at 1114.

First, "[p]laintiffs have alleged that had they been aware of the [material fact], they would not have purchased [their] affected mobile devices."  *Id.*; *see also Elias v. Hewlett-Packard Co.*, 2014 WL 493034, *6 (N.D. Cal. Feb. 5, 2014) ("Plaintiff has adequately pleaded materiality by alleging that he would have acted differently by not purchasing the computer as ordered had he known about the insufficiency.").  Second, the *In re Carrier IQ* complaint "contain[ed] extensive allegations regarding the public outcry regarding the [material fact] once its existence became public knowledge—including media reports and Senator Franken sending letters of inquiry to mobile carriers.  The intensity of their outcry underscores the materiality of the alleged omission." 78 F. Supp. 3d at 1114.

Both of these factors are also at play in the instant case.  Here, the SAC alleges that "Plaintiffs would not have enrolled in Defendants' insurance and health benefit services if they had known about Defendants' substandard data security practices."  SAC ¶ 542; *see also id.* ¶ 185 (same).  Moreover, the public response following the Anthem data breach has been as extensive as the response in *In re Carrier IQ*.  Approximately 80 million Americans have been affected by the breach, at least 130 individual cases have been brought in state and federal court, and several state attorneys general have written letters to Anthem requesting that Anthem take more immediate measures to address the fallout from the breach.  SAC ¶ 384 n.21.

Thus, under the reasoning of *Hoffman* and *In re Carrier IQ*, the Court finds that Plaintiffs have sufficiently pleaded actual reliance for purposes of stating a UCL violation based on Defendants' alleged fraudulent omissions.[9]

---

[9] Some courts have suggested that the actual reliance requirement also applies to unlawful and unfair claims "to the extent [that] the predicate unlawful [or unfair] conduct is based on misrepresentations."  *Doe v. SuccessfulMatch.Com*, 70 F. Supp. 3d 1066, 1075–76 (N.D. Cal. 2014) (internal quotation marks omitted).  Although the California Supreme Court has not yet

63

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

### b. Affirmative Misrepresentation

Determining whether Plaintiffs' have sufficiently alleged actual reliance for purposes of affirmative misrepresentation liability is a harder question—and one that has caused significant disagreement amongst courts in this district. *Compare, e.g.*, *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 978 (N.D. Cal. 2015) ("If a plaintiff sufficiently alleges exposure to a long-term advertising campaign [for purposes of a misrepresentation claim], she need not plead specific reliance on an individual representation."), *with Yastrab v. Apple Inc.*¸ 2016 WL 1169424, *6 (N.D. Cal. Mar. 25, 2016) ("[T]he court disagrees with *Opperman* to the extent it holds that a . . . plaintiff is . . . excused from complying with Rule 9(b) when pleading a long-term advertising campaign.").

The heart of this disagreement lies in how the California Supreme Court's opinion in *In re Tobacco II Cases* should be interpreted. In *In re Tobacco II*, 207 P.3d 20, 28 (Cal. 2009), plaintiffs sought to represent a class comprised of all "people [who] smoked in California one or more cigarettes during the applicable class period and were exposed to Defendants' marketing and advertising activities in California." While the *In re Tobacco II* case was pending in trial court, California voters enacted Proposition 64, which imposed "an actual reliance requirement on plaintiffs prosecuting a private enforcement action under the UCL's fraud prong." *Id.* at 39.

In interpreting this requirement in the affirmative misrepresentation context, the California Supreme Court noted that, "[w]hile a plaintiff must show that the misrepresentation was an immediate cause of the injury-producing conduct" for purposes of actual reliance, "the plaintiff need not demonstrate [that] it was the only cause." *Id.* "It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision." *Id.* Moreover, a plaintiff does not necessarily "need to demonstrate individualized reliance on specific

---

addressed this issue, because Plaintiffs have sufficiently alleged actual reliance for purposes of fraudulent omissions liability, Plaintiffs have also sufficiently alleged actual reliance under the unfair and unlawful prongs.

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

1    misrepresentations to satisfy the reliance requirement." *Id.* at 40.  Instead, "where, as here, a

2    plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead

3    with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or

4    statements." *Id.*  The *In re Tobacco II* court summarized its conclusions thusly: "a plaintiff must

5    plead and prove actual reliance to satisfy the standing requirement of [the UCL] but, consistent

6    with the principles set forth above, is not required to necessarily plead and prove individualized

7    reliance on specific misrepresentations or false statements where . . . those misrepresentations and

8    false statements were part of an extensive and long-term advertising campaign." *Id.* at 40–41.

9        Although *In re Tobacco II* appeared to relax Rule 9(b)'s requirements when a defendant's

10   misrepresentations are "extensive and long-term," there has been considerable uncertainty over the

11   scope of this exception.  In *Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581, 595–96 (9th

12   Cir. 2012), for example, the Ninth Circuit held that a series of "product brochures and TV

13   commercials" fell "short of the extensive and long-term fraudulent advertising campaign at issue

14   in *Tobacco II*." *Id.* at 596 (internal quotation marks and alteration omitted).

15       In an attempt to bring clarity to *In re Tobacco II*, U.S. District Judge Jon Tigar, in

16   *Opperman v. Path*, "identified six factors from the prior case law that bear on whether a plaintiff

17   has pleaded an advertising campaign in accordance with *Tobacco II*." 84 F. Supp. 3d at 976.

18   Those factors are as follows:

19           First, a plaintiff must allege that she actually saw or heard the defendant's
20       advertising campaign.  Second, the advertising campaign must be sufficiently
         lengthy in duration, and widespread in dissemination, that it would be unrealistic
21       to require the plaintiff to plead each misrepresentation she saw and relied upon.
         Third, the plaintiff must describe in the complaint, and preferably attach to it, a
22       representative sample of the advertisements at issue so as to adequately notify the
         defendant of the precise nature of the misrepresentation claim—what, in
23       particular, defendant is alleged to have said, and how it was misleading.  Fourth,
         the plaintiff must allege, and the court must evaluate, the degree to which the
24       alleged misrepresentations contained within the advertising campaign are similar
         to each other.  Fifth, each plaintiff must plead with particularity, and separately,
25       when and how they were exposed to the advertising campaign, so as to ensure the
26       advertisements were representations consumers were likely to have viewed, rather

27                                                      65
28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
     DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
     MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

than representations that were isolated or more narrowly disseminated.  And finally, sixth, the court must be able to determine when a plaintiff made his or her purchase or otherwise relied on defendant's advertising campaign, so as to determine which portion of that campaign is relevant.

*Id.* at 976–77.  Other courts, including this Court, have followed the *Opperman* test in whole or in part.  *See, e.g.*, *Phillips v. Apple Inc.*, 2016 WL 1579693, *7 (N.D. Cal. Apr. 19, 2016) (citing *Opperman* for the principle that a misrepresentation "claim requires plaintiffs to plead reliance on at least some misleading partial representations.") (alteration omitted); *People for the Ethical Treatment of Animals v. Whole Foods Mkt. Cal., Inc.*, 2016 WL 362229, *5 (N.D. Cal. Jan. 29, 2016) (applying *Opperman*).  On the other hand, some courts, as noted above, have found the *Opperman* analysis to be in conflict with the more demanding pleading requirements of Rule 9(b).  *See, e.g.*, *Yastrab*, 2016 WL 1169424, *5–*6 (citing cases).

In any event, the Court need not decide whether the six factor test in *Opperman* applies here because, even if it did, the SAC's allegations would be unable to sufficiently establish actual reliance as to Plaintiffs' affirmative misrepresentation claim.  Indeed, Plaintiffs have failed to satisfy the first *Opperman* factor: "a plaintiff must allege that she actually saw or heard the defendant's advertising campaign."  84 F. Supp. 3d at 976.  There are eleven California Plaintiffs.  None allege that they saw, read, or—for that matter—even knew about Anthem's privacy policies prior to the data breach.  After examining the nearly 300 pages in the SAC, the Court has identified a single sentence that refers to reliance: "In reliance upon [Defendants' negligent] misrepresentations, Plaintiffs . . . purchased insurance or health benefits services from Defendants."  SAC ¶ 523.  This is the sort of sentence that even the *Opperman* court found insufficient for purposes of UCL liability.  84 F. Supp. 3d at 978 (stating that the "single and bare allegation that [p]laintiffs viewed Apple's website, saw in-store advertisements, and/or were aware of Apple's representations regarding the safety and security of the iDevices prior to purchasing their own iDevices" does not satisfy *In re Tobacco II*) (internal quotation marks omitted).

Consequently, Defendants' motions to dismiss Plaintiffs' UCL claim under the fraud prong as it relates to a misrepresentation theory of liability is GRANTED.  Plaintiffs, though, shall have

66

1    leave to amend.  It is possible that, after amendment, California Plaintiffs will be able to allege

2    that they viewed, heard, or read Defendants' privacy policies, and thus relied upon these policies

3    to purchase insurance or health benefits services.  Amendment would thus not be futile.

4    **F.  New York General Business Law § 349 (against Anthem and Non-Anthem Defendants)**

5    New York General Business Law ("GBL") § 349 prohibits "[d]eceptive acts or practices in

6    the conduct of any business, trade or commerce or in the furnishing of any service."  N.Y. Gen.

7    Bus. § 349(a).  To successfully assert a claim under this section, "a plaintiff must allege that a

8    defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that

9    (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *Orlander v.*

10   *Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015).  In moving to dismiss Plaintiffs' GBL § 349 claim,

11   Defendants contend, as to (3), that Plaintiffs have failed to "state with particularity the time that

12   the specific misrepresentations [at issue] occurred," and that Plaintiffs have "not alleged any actual

13   harm," Anthem Mot. at 18, 20.  The Court addresses these arguments in turn.

14       **1.  Rule 9(b) and GBL § 349**

15   As to whether Plaintiffs have pleaded their GBL § 349 claim with sufficient particularity,

16   Defendants' contention rests upon the fact that the Court should have, in the First Motion to

17   Dismiss Order, applied Rule 9(b) to Plaintiffs' GBL § 349 claim.

18   This argument is problematic in two respects.  First, GBL § 349 is a New York state law,

19   and New York is in the Second Circuit.  The Second Circuit has expressly held that Rule 9(b) does

20   *not* apply to GBL § 349 claims.  *Pelman ex rel. Pelman v. McDonald's Corp*, 396 F.3d 508, 511

21   (2d Cir. 2005) ("[A]n action under § 349 is not subject to the pleading-with-particularity

22   requirements of Rule 9(b), but need only meet the bare-bones notice-pleading requirements of

23   Rule 8(a).") (citation omitted).  This Court, as the MDL transferee court, "is generally bound by

24   the same substantive legal standards . . .  as would have applied in the transferor court."  *In re*

25   *Korean Air*, 642 F.3d at 699.  Thus, had this suit stayed in or been transferred to New York,

67

United States District Court
Northern District of California

Defendants do not dispute that the New York federal district court would not have applied Rule 9(b) to Plaintiffs' GBL § 349 claim. Second, the Ninth Circuit has never held that Rule 9(b) should apply to GBL § 349. The only courts to have done so are district courts in the Central and Northern Districts of California, and these courts did so with little analysis or review of pertinent New York or Second Circuit precedent.

In any event, the Court need not decide whether Rule 9(b) applies to Plaintiffs' GBL § 349 claim. As Defendants acknowledge, Plaintiffs' GBL § 349 claim rises and falls with Plaintiffs' UCL claim brought under the fraud prong. Anthem Mot. at 19 ("The Court's Rule 9(b) analysis under the UCL . . . applies here [to Plaintiffs' GBL § 349 claim] with equal force.") (internal quotation marks omitted). Because the Court has determined that Plaintiffs' UCL fraud claim under a fraudulent omissions theory satisfies the requirements of Rule 9(b), Plaintiffs' GBL § 349 claim also survives dismissal.

### 2. Damages

Next, Defendants contend that Plaintiffs can not seek Loss of Value of PII and that the Court misread the Second Circuit's decision in *Orlander v. Staples* in finding, in the First Motion to Dismiss Order, that Plaintiffs could seek Benefit of the Bargain Losses. Anthem Mot. at 20.

Both arguments lack merit. As outlined above, Plaintiffs may recover damages for Loss of Value of PII as to their California breach of contract and New Jersey breach of contract claims. Defendants have identified no authority as to why this holding should not also apply to Plaintiffs' GBL § 349 claim. In addition, the Court did not misread *Orlander*. In *Orlander*, the Second Circuit determined that plaintiff had "sufficiently alleged an injury stemming from [a] misleading practice" by stating that "he would not have purchased [a set of services] had he known that [d]efendant intended to decline to provide him any [such] services" during the first year of his contract. 802 F.3d at 301. That reasoning, the Court determined, "directly govern[ed] Plaintiffs' claim" for Benefit of the Bargain Losses. First MTD Order at 48. This conclusion regarding *Orlander* continues to apply: Defendants promised to implement certain security measures,

68

Defendants allegedly failed to implement such measures, and Plaintiffs would not have entrusted their PII to Defendants had Defendants disclosed Defendants' alleged failure to implement such measures.

However, as noted above, New York Plaintiff Marne Onderdonk has not alleged that she paid premiums or fees for health services.  Thus, based on the allegations in the SAC, Onderdonk can not recover Benefit of the Bargain Losses.  Consistent with the Court's ruling on Onderdonk's unjust enrichment claim, Plaintiffs shall have leave to amend Onderdonk's GBL § 349 claim, as amendment may not be futile.  The Court thus GRANTS with leave to amend Defendants' motions to dismiss Onderdonk's claim for Benefit of the Bargain Losses under GBL § 349. Defendants' motions to dismiss Plaintiffs' GBL § 349 claim are otherwise DENIED.

## G. Georgia Insurance Information and Privacy Protection Act (against Anthem Defendants)

The Georgia Insurance Information and Privacy Protection Act ("IIPA") states that "[a]n insurance institution, agent, or insurance-support organization shall not disclose any personal or privileged information about an individual collected or received in connection with an insurance transaction" unless the disclosure falls under a set of specific exceptions.  Ga. Code Ann. § 33-39-14.

In the First Motion to Dismiss Order, the Court dismissed Plaintiffs' IIPA claim with leave to amend.  The Court determined that the parties had presented "an issue of first impression: whether the IIPA, which proscribes the unlawful disclosure of personal information, also applies to the theft of one's personal information."  First MTD Order at 59.  After examining the statutory text, case law, and other canons of statutory interpretation, the Court answered this question in the negative.  *Id.* at 59–65.  As the Court noted, disclosure under the IIPA means "an active, voluntary decision by the information holder to provide data to an unauthorized third party."  *Id.* at 63.  That is not what happened here: Plaintiffs' PII was stolen by a group of cyberattackers.

In the SAC, Plaintiffs now assert that "███████████████████████

69

United States District Court
Northern District of California

1

2 ████████████████████████████ ”  SAC ¶ 1002.  The parties dispute whether this new allegation

3 sufficiently satisfies the IIPA's disclosure requirement.  Additionally, the Anthem Defendants

4 argue that, even if Plaintiffs' PII was affirmatively disclosed, Plaintiffs' claim "fails because the

5 SAC does not allege facts showing the Georgia Plaintiffs incurred any actual damages."  Anthem

6 Mot. at 21.  The Court need not address this damages argument because, after again examining the

7 IIPA's text and pertinent case law, the Court finds that Plaintiffs' new allegations fail to state a

8 claim for relief.

9 **1. Statutory Text**

10 As to the statutory text, the IIPA states that "[a]n insurance institution, agent, or insurance-

11 support organization shall not disclose any personal or privileged information . . . unless the

12 disclosure" falls under a set of 18 exceptions.  These exceptions allow the insurance institution,

13 agent, or insurance-support organization to disclose an individual's personal information "[t]o a

14 medical-care institution or medical professional," **Ga. Code Ann.** § 33-39-14(4), "[t]o an insurance

15 regulatory authority," **Ga. Code Ann.** § 33-39-14(5), and "[t]o a law enforcement or other

16 governmental authority," **Ga. Code Ann.** § 33-39-14(6), among other entities.  The apparent

17 principle behind these exceptions is that the insurance institution, agent, or insurance-support

18 organization must intentionally provide an individual's personal information to a third party:

19 disclosure, in other words, is meant to be intentional, not unintentional or unknowing.

20 Two other IIPA provisions lend support to this reading.  First, Ga. Code Ann. § 33-39-22

21 states that "[n]o cause of action in the nature of . . . *negligence* shall arise against any person for

22 disclosing personal or privileged information in accordance with this chapter."  Ga. Code Ann. §

23 33-39-22 (emphasis added).  However, Ga. Code Ann. § 33-39-22 goes on to note that "this Code

24 section shall provide no immunity for disclosing or furnishing false information *with malice or*

25 *willful intent* to injure any person."  *Id.* (emphasis added).  Thus, Ga. Code Ann. § 33-39-22

26 clearly draws a distinction between negligent, unintentional acts and willful, intentional acts.  The

27 <div align="center">70</div>

28
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

United States District Court
Northern District of California

1   IIPA does not punish negligent, unintentional conduct; it punishes willful, intentional conduct.

2   Second, Ga. Code Ann. § 33-39-19, a section entitled "Monetary Penalties," states: "[i]n

3   any case where a hearing . . . results in the finding of a *knowing* violation of this chapter, the

4   Commissioner [of Insurance of the State of Georgia] may . . . order payment of a monetary penalty

5   of not more than $500.00 for each violation but not to exceed $10,000.00 in the aggregate for

6   multiple violations." Ga. Code Ann. § 33-39-19 (emphasis added). Again, consistent with Ga.

7   Code Ann. § 33-39-22, Ga. Code Ann. § 33-39-19 seeks to penalize knowing conduct, not

8   unknowing conduct.

9   Considered together, Ga. Code Ann. § 33-39-14, Ga. Code Ann. § 33-39-22, and Ga. Code

10  Ann. § 33-39-19 evince an intent by the Georgia Legislature to prevent willful and knowing

11  disclosure. The allegations in the SAC simply do not rise to this level. As the SAC states, "

12  ██████████████████████████████████████████████

13  ██████████████████████████████████

14  ██████████████████████████████████████████

15  ██████████████████" SAC ¶ 349. Nowhere in these allegations do Plaintiffs

16  aver that the Amerigroup employee knowingly or intentionally sought to disclose Plaintiffs' PII.

17  Indeed, the SAC's next paragraph states that "[t]he ██████ attack occurred *because* Anthem

18  and Anthem Affiliates did not . . . ████████████████████████████

19  ████████████████████████." *Id.* ¶ 350 (emphasis added).

20  Plaintiffs also analogize the Anthem Defendants' actions as being akin to "a company *negligently*

21  le[aving] the 'bank vault' open"—the exact sort of negligent conduct that the IIPA does not look

22  to punish. *Id.* ¶ 6; Ga. Code Ann. § 33-39-22.

23  The reasonable inference to draw from these allegations is that the employee in question

24  did not know that the ████████████ would allow cyberattackers to access the Anthem

25  Database because Defendants did not provide ████████████ due to Defendants' negligence.

26  Thus, based on the statutory text, the SAC fails to state a claim under the IIPA.

27                                                      71

2. **Case Law**

Case law lends additional weight to this conclusion.  As the Court noted in its First Motion to Dismiss Order, the Federal Privacy Act defines "disclosure" to "mean[] providing personal review of a record, or a copy thereof, to someone other than the data subject or the data subject's authorized representative." 5 C.F.R. § 297.102.  First MTD Order at 61.  The First Motion to Dismiss Order went on to observe that courts have restricted this definition to situations where information holders have willfully provided data to an unauthorized third party.

In *Walia v. Chertoff*, 2008 WL 5246014, *6 (E.D.N.Y. Dec. 17, 2008), for instance, plaintiff's medical and legal records were placed in an unlocked credenza located in the office of plaintiff's supervisor.  Other employees, including those not authorized to review plaintiff's medical and legal records, had access to this office.  Upon learning these facts, plaintiff brought suit against his employer.  The *Walia* court rejected plaintiff's Federal Privacy Act claim and held that plaintiff's claim rested on "the accessibility of [plaintiff's] medical and legal records to individuals in the office." *Id.* at *11.  Mere accessibility, however, is insufficient to constitute "willful or intentional disclosure by the agency, a required element of a [Federal Privacy Act] claim." *Id.*  As in *Walia*, Plaintiffs' IIPA claim continues to pivot around the idea of access and accessibility, and not willful and active disclosure.  *See* SAC ¶ 1002 ("Anthem . . . allowed the cyberattackers to see and obtain individually-identifiable [PII].").

*In re SAIC*, another case that the Court discussed in its First Motion to Dismiss Order, also suggests that disclosure requires some sort of knowledge or intent.  *See, e.g.*, 45 F. Supp. 3d at 29 (describing disclosure as the "imparting of information which . . . was previously unknown to the person to whom it was imparted.").

Finally, in the First Motion to Dismiss Order, the Court found inapposite Plaintiffs' reliance upon *Shames-Yeakel v. Citizens Financial Bank*, 677 F. Supp. 2d 994, 1008 (N.D. Ill. 2009).  In *Shames-Yeakel*, the district court stated that "[i]f th[e] duty not to disclose customer information is to have any weight in the age of online banking, then banks must certainly employ

72

United States District Court
Northern District of California

sufficient security measures to protect their customers' online accounts." *Id.* This holding, however, was problematic in two ways.  First, the decision was, "at the very least, in tension with" binding Seventh Circuit precedent.  First MTD Order at 63.  The *Shames-Yeakel* court did not discuss or refer to the Seventh Circuit's opinion in *Pisciotta v. Old National Bancorp*, 499 F.3d 629 (7th Cir. 2007), which would have precluded plaintiffs in *Shames-Yeakel* from proceeding with their claims as a matter of law.  Second, and of importance to the instant motion, "with respect to the specific statement quoted by Plaintiffs—that a bank's duty not to disclose must include a duty to protect customers' personal information—the *Shames-Yeakel* court did not discuss, refer to, or cite any supporting authority."  First MTD Order at 64.  "In the nearly six and a half years since the *Shames-Yeakel* decision, no federal or state court has cited *Shames-Yeakel* for this proposition." *Id.*  That fact remains unchanged since the First Motion to Dismiss Order was issued on February 14, 2016.

As alleged in the SAC, Plaintiffs' IIPA claim is little more than an attempt to have the Court adopt *Shames-Yeakel* in substance if not in name.  Indeed, as Plaintiffs state, "[t]he ▮▮▮▮▮▮▮ attack occurred *because* Anthem and Anthem Affiliates did not use [data security] practices consistent with industry standards."  SAC ¶ 350 (emphasis added).  What the Anthem Defendants should have done, according to Plaintiffs, is "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." *Id.*  That request for relief is no different from the finding in *Shames-Yeakel* that the "duty to disclose" requires banks to "employ sufficient security measures to protect their customers' online accounts."  677 F. Supp. 2d at 1008.  The Court declined to follow *Shames-Yeakel* in the First Motion to Dismiss Order, and declines now to adopt a reading of the IIPA that would essentially adopt *Shames-Yeakel* in substance.  *Walia* and *In re SAIC* remain more persuasive, and argue against Plaintiffs' reading of the IIPA.

Accordingly, the Court GRANTS Anthem Defendants' motion to dismiss Plaintiffs' IIPA claim.  In addition, the Court declines to provide Plaintiffs leave to amend, as amendment would

73

United States District Court
Northern District of California

United States District Court
Northern District of California

be futile.  The Court has already provided Plaintiffs an opportunity to amend.  However, Plaintiffs

have not—in either the CAC or the SAC—alleged that the Anthem Defendants intentionally or

knowingly allowed cyberattackers to access the Anthem Database.  Rather, the gist of Plaintiffs'

case is that "Defendants failed to implement basic industry-accepted data security tools to prevent

cyberattackers from accessing the Anthem Database."  SAC ¶ 5.  In fact, according to Plaintiffs,

Defendants' data security was so lacking that Defendants did not even know that the Anthem

Database had been breached until January 27, 2015—more than two months after cyberattackers

connected to the Anthem Database.  *Id.* ¶¶ 355, 366.  In sum, Plaintiffs' case does not provide for

IIPA liability.  The Anthem Defendants' motion to dismiss Plaintiffs' IIPA claim is therefore

GRANTED with prejudice.

## H. Federal Law Third Party Beneficiary (against Non-Anthem Defendants)

The Court turns next to Plaintiffs' third party beneficiary claim for breach of contract

under federal law.  On this claim, Plaintiffs assert that Blue Cross Blue Shield Association

("BCBSA") "had a valid, binding, and enforceable express contract with OPM [the Office of

Personnel Management] to provide insurance and other benefits to those [Federal Employee]

Plaintiffs who received health insurance and related benefits under the Federal BCBSA Plan."

SAC ¶ 503.  This contract is hereinafter referred to as the "Federal BCBSA contract."

The Court denied the Non-Anthem Defendants' motion to dismiss this claim in the First

Motion to Dismiss Order.  *See* First MTD Order 65–80.  In reaching this determination, the Court

found that the Federal Employee Plaintiffs were "intended third party beneficiaries of the Federal

BCBSA contract," *id.* at 66; that the Federal Employee Plaintiffs' claim was not a claim for

"health benefits," *id.* at 70; and that OPM did not have exclusive enforcement authority over a

breach of the Federal BCBSA contract, *id.* at 72–76.

The Non-Anthem Defendants do not challenge any of these conclusions.  Instead, the Non-

Anthem Defendants' arguments largely repeat those addressed in earlier portions of the instant

Order: (1) that Plaintiffs can not recover Benefit of the Bargain Losses because OPM—and not

74

1   Plaintiffs—"paid money to BCBSA," (2) that Plaintiffs can not recover for Loss of Value of PII,

2   (3) and that time spent "addressing issues arising from the Anthem data breach" is "insufficient to

3   show cognizable contract damages." Non-Anthem Mot. at 13–14. For the reasons stated below,

4   the Court finds these arguments are unavailing.

5       "When the United States enters into contract relations, its rights and duties therein are

6   governed generally by the law applicable to contracts between private individuals." *Mobil Oil*

7   *Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 607 (2000); *see also Interface Kanner,*

8   *LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 932 (11th Cir. 2013) ("When interpreting

9   contracts under federal law, courts look to general common law on contracts."). In determining

10  the nature of the general common law on contracts, the U.S. Supreme Court has previously looked

11  to the Restatement of Contracts. *Mobil Oil*, 530 U.S. at 608 ("The Restatement of Contracts

12  reflects many of the principles of contract law that are applicable to this action.").

13      On damages, the Restatement allows parties to recover expectation, reliance, and

14  restitution damages. Restatement (Second) of Contracts § 344. The Restatement defines

15  expectation damages as a party's "interest in having the benefit of his bargain by being put in as

16  good a position as he would have been in had the contract been performed." *Id.* Reliance

17  damages are a party's "interest in being reimbursed for loss caused by reliance on the contract by

18  being put in as good a position as he would have been in had the contract not been made." *Id.*

19  Finally, restitution damages "restore[] to [a party] any benefit that he has conferred on the other

20  party." *Id.* Where possible, "contract damages" should "protect an injured party's 'expectation

21  interest'—that is, the interest in having the benefit of the bargain." *ATACS Corp. v. Trans World*

22  *Commc'ns, Inc.*, 155 F.3d 659, 669 (3d Cir. 1998). However, "other theories of damages provide

23  alternative avenues for contract enforcement" where the expectation interest may be uncertain. *Id.*

24  **1. Benefit of the Bargain Losses**

25      Plaintiffs' request for Benefit of the Bargain Losses plainly constitutes a request for

26  expectation damages. Such damages, as noted above, are the preferred basis for contract recovery.

75

27  Case No. 15-MD-02617-LHK

28  ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

The Non-Anthem Defendants do not contest this point.  Instead, the Non-Anthem Defendants argue only that OPM bargained with BCBSA, and that therefore only OPM can recover for Benefit of the Bargain Losses.

General contract law principles, however, do not support this contention.  As the Court has previously determined, the Federal Employee Plaintiffs are intended third party beneficiaries who may assert against BCBSA a breach of contract claim.  In the context of such third party beneficiary claims, courts have repeatedly held that the beneficiary may seek to enforce rights and recover damages that were available to the contracting party.  *See, e.g.*, *Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 286 (D.C. Cir. 1993) ("[I]t is a fundamental principle of contract law that parties to a contract may create enforceable contract rights in a third party beneficiary."); *Gen. Ins. Co. of Am. v. Interstate Serv. Co.*, 701 A.2d 1213, 1218 (Md. Ct. Spec. App. 1997) (holding that "the third party beneficiary rule followed by the majority of jurisdictions in this country" allows "third party beneficiary[] rights [that] are [as] extensive [as] those rights provided by the express terms of the contract") (alteration omitted); Restatement (Second) of Contracts § 304 ("A promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty.").  Thus, under these principles, Plaintiffs may, as intended third party beneficiaries, recover Benefit of the Bargain Losses.

The Non-Anthem Defendants' attempt to obscure the financial relationship between Plaintiffs and BCBSA is inapposite.  Specifically, the Non-Anthem Defendants state that BCBSA "do[es] not receive premiums as they are paid into [the Employees Health Benefits] Fund."  Non-Anthem Reply at 10.  Instead, all "premiums are placed in a special letter of credit account."  *Id.* BCBSA then "draw[s] directly from the letter of credit account to pay for benefit claims and . . . administrative expenses."  *Id.*  This sort of arrangement does nothing to change the financial relationship between Plaintiffs and BCBSA.  Plaintiffs paid premiums, which were placed in an account, from which BCBSA drew to pay expenses.  The fundamental relationship stays the same: Plaintiffs paid the Non-Anthem Defendants for services, and Plaintiffs now allege that the Non-

76

United States District Court
Northern District of California

1   Anthem Defendants did not perform these services as promised.  Plaintiffs may recover Benefit of

2   the Bargain Losses for the alleged breach by bringing suit as an intended third party beneficiary.

3       **2.  Loss of Value of PII**

4       Next, as to Loss of Value of PII, such damages implicate the reliance interest, defined as a

5   party's "interest in being reimbursed for loss[es] caused by reliance on the contract by being put in

6   as good a position as he would have been in had the contract not been made."  Restatement

7   (Second) of Contracts § 344.  Reliance damages are recoverable where the expectation interest is

8   difficult to ascertain.  *See, e.g.*, *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380–

9   1383 (Fed. Cir. 2001) (awarding reliance damages after concluding that expectation interest would

10  be too difficult to quantify).  Here, it remains unclear whether Plaintiffs will be able to sufficiently

11  calculate their expectation or Benefit of the Bargain damages.  Furthermore, a growing number of

12  federal courts have now recognized Loss of Value of PII as a viable damages theory, perhaps

13  indirectly acknowledging the difficulty in calculating Benefit of the Bargain Losses.  *See, e.g.*, *In

14  re Facebook*, 572 F. App'x at 494.  Accordingly, given the uncertainty in this case as to Plaintiffs'

15  Benefit of the Bargain Losses and the trend towards recognizing Loss of Value of PII, Plaintiffs'

16  request for Loss of Value of PII does not warrant dismissal.

17      **3.  Consequential Out of Pocket Expenses**

18      Lastly, Plaintiffs' request for Consequential Out of Pocket Expenses also implicates the

19  reliance interest.  *See Boulevard Assocs. v. Sovereign Hotels, Inc.*, 861 F. Supp. 1132 (D. Conn.

20  1994) (stating that consequential damages are reliance damages).  As with Plaintiffs' request for

21  Loss of Value of PII, a growing number of courts now recognize that individuals may be able to

22  recover Consequential Out of Pocket Expenses that are incurred because of a data breach,

23  including for time spent reviewing one's credit accounts.  *See, e.g.*, *Lewert*, 2016 WL 1459226,

24  *3.  The Court found these authorities persuasive as to Plaintiffs' California and New Jersey

25  breach of contract claims, and does the same here.  Accordingly, the Non-Anthem Defendants'

26  motion to dismiss Plaintiffs' third party beneficiary claim under federal law is DENIED.

27                                      77

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### I.   ERISA Preemption (against Anthem and Non-Anthem Defendants)

Finally, Defendants contend that some (but not all) of the claims brought by certain

Plaintiffs are subject to ERISA preemption.  Anthem Mot. at 23–25; Non-Anthem Mot. at 11–12.

The specific claims at issue are detailed below.

| Named Plaintiff | Claims at Issue |
|---|---|
| Kenneth Coonce | California UCL<br>California Breach of Contract |
| Joseph Blanchard | California UCL |
| Daniel Tharp | California UCL |
| Kelly Tharp | California UCL |
| Lillian Brisko | California UCL |
| Matthew Gates | New York GBL § 349<br>New York Unjust Enrichment |

The Court finds Defendants' contentions unavailing, because (1) Defendants are precluded

from asserting an ERISA preemption defense as to Plaintiffs' UCL claims, (2) the presumption

against preemption applies, (3) Defendants' privacy obligations are not "benefits" for purposes of

ERISA express or complete preemption, and (4) even if Defendants' privacy obligations were

considered "benefits," there is a genuine dispute concerning whether Plaintiffs' ERISA employee

benefit plan incorporated these obligations.  These reasons are discussed in detail below.

### 1.  Waiver

In the first round motions to dismiss, Defendants asserted ERISA preemption as to the

California breach of contract claims of Kenneth Coonce, Daniel Tharp, and Kelly Tharp.

Defendants also asserted ERISA preemption as to the New York unjust enrichment and GBL §

349 claims of Matthew Gates.  ECF No. 410 at 11–12; 22.  Defendants did not, however, assert

ERISA preemption as to Plaintiffs' UCL claim.

Federal Rule of Civil Procedure 12(g)(2) states that "[e]xcept as provided in Rule 12(h)(2)

or (3), a party that makes a motion under this rule must not make another motion under this rule

raising a defense or objection that was available to the party but omitted from its earlier motion."

Federal Rule of Civil Procedure 12(h)(2), in turn, provides that arguments which pertain to a

78

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

plaintiff's "[f]ailure to state a claim upon which relief can be granted . . . may be raised: (A) in any pleading allowed or ordered under Rule 7(a); (B) by a motion under Rule 12(c); or (C) at trial."[10] To summarize, under Rule 12(g)(2) and Rule 12(h)(2), a party that seeks to assert a defense that was available but omitted from an earlier Rule 12 motion can only do so in a pleading, a Rule 12(c) motion, or at trial.

Here, Defendants have asserted, for the first time, an ERISA preemption defense as to Plaintiffs' UCL claim, which Defendants did not assert in their first round motions to dismiss. Defendants have not asserted this defense in a pleading, a Rule 12(c) motion, or at trial—the only exceptions listed under Rule 12(g)(2). Instead, Defendants have asserted this defense in a second round motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants are foreclosed from doing so because of Rule 12(g)(2) and Rule 12(h)(2).

Indeed, despite two rounds of briefing, Defendants have not explained why they did not assert ERISA preemption as to Plaintiffs' UCL claim in their first round motions to dismiss. Like the SAC, the CAC included enrollment information on the health insurance or health services plans for each California Plaintiff. *See, e.g.*, ECF No. 334-6 ¶¶ 15–24. Moreover, the fact that Defendants asserted ERISA preemption as to the California breach of contract claims of Kenneth Coonce, Daniel Tharp, and Kelly Tharp suggests that Defendants knew which Plaintiffs were enrolled in ERISA plans.

A number of cases lend additional support to the Court's application of waiver here. First, in *Herron v. Best Buy Stores*, *LP*, 2013 WL 4432019, *4 (E.D. Cal. Aug. 16, 2013), defendant Toshiba had "failed to squarely raise [an] argument in its initial dismissal motion, even though the argument was available to Toshiba when it originally sought to dismiss Plaintiff's complaint." Accordingly, "this portion of Toshiba's dismissal motion [was] not considered." *Id.* Similarly, in

---

[10] Rule 12(h)(3), another exception to Rule 12(g)(2), does not apply to the instant claims. Rule 12(h)(3) allows parties to challenge subject matter jurisdiction at any point in litigation. Fed. R. Civ. P. 12(h)(3). Subject matter jurisdiction is not at dispute here.

79

United States District Court
Northern District of California

1   *Federal Agricultural Mortgage Corp. v. It's A Jungle Out There, Inc.*, 2005 WL 3325051, *5

2   (N.D. Cal. Dec. 7, 2005), the district court stated that, "[a]lthough the Ninth Circuit has not had

3   occasion to apply this principle, the weight of authority outside this circuit holds that where the

4   complaint is amended after the defendant has filed a Rule 12(b) motion, the defendant may not

5   thereafter file a second Rule 12(b) motion asserting objections or defenses that could have been

6   asserted in the first motion." *See also* Wright & Miller, 5C *Federal Practice & Procedure* § 1388,

7   491–95 (3d ed. 2004) (citing cases applying Rule 12(g)(2) and Rule 12(h)(2)).

8        Finally, this Court recently applied Rule 12(g)(2) and Rule 12(h)(2) in a substantially

9   similar situation in *Northstar Financial Advisors Inc. v. Schwab Investments*, 135 F. Supp. 3d

10   1059 (N.D. Cal. 2015).  In *Northstar*, defendants had asserted a preemption defense based on the

11   Securities Litigation and Uniform Securities Act ("SLUSA") in moving to dismiss the second

12   amended complaint.  Defendants did not assert SLUSA preclusion in moving to dismiss the third

13   amended complaint.  Later, in moving to dismiss the fourth amended complaint, defendants once

14   again sought to assert SLUSA preclusion.  As in the instant action, defendants did not provide an

15   explanation as to why they had previously abandoned their SLUSA preclusion defense.  *Id.* at

16   1071–72.  This Court concluded that defendants in *Northstar* could not assert SLUSA preclusion

17   in moving to dismiss the fourth amended complaint.  *Id.* at 1072.  Several courts have cited this

18   holding from *Northstar* with approval.  *See, e.g.*, *Jaeger v. Howmedica Osteonics Corp.*, 2016 WL

19   520985, *4–*6 (N.D. Cal. Feb. 10, 2016); *Johnson v. Serenity Transp., Inc.*, 2016 WL 270952, *7

20   (N.D. Cal. Jan. 22, 2016).

21        Accordingly, based on the authority above, the Court finds that Defendants are precluded

22   from asserting ERISA preemption as to Plaintiffs' UCL claim.

23        **2.  Governing Principles Regarding ERISA Preemption**

24        Defendants asserted ERISA preemption as to Coonce's California breach of contract and

25   Gates' New York unjust enrichment and GBL § 349 claims in their first round motions to dismiss.

26   In the First Motion to Dismiss Order, the Court dismissed with leave to amend Plaintiffs'

27                             80

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

1 California breach of contract and New York unjust enrichment claims without reaching the

2 question of ERISA preemption, and requested additional briefing from the parties on whether

3 ERISA preemption apples to Gates' GBL § 349 claim.

4     With this background in mind, the Court begins its ERISA preemption analysis on

5 Coonce's California breach of contract and Gates' New York unjust enrichment and GBL § 349

6 claims by taking note of two important considerations: the presumption against preemption and

7 the two forms of ERISA preemption.[11]

8         **a. Presumption Against Preemption**

9     First, the U.S. Supreme Court has repeatedly emphasized that there is a presumption

10 against federal preemption of state laws. *See generally Wyeth v. Levine*, 555 U.S. 555, 565 (2009)

11 ("In all pre-emption cases . . . we start with the assumption that the historic police powers of the

12 States were not to be superseded by the Federal Act unless that was the clear and manifest purpose

13 of Congress.") (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). As discussed at

14 greater length below, that presumption applies with equal force to cases involving ERISA

15 preemption. *See, e.g.*, *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins.*

16 *Co.*, 514 U.S. 645, 654 (1995) (applying presumption against preemption in ERISA case). Indeed,

17 in *De Buono v. NYSA-ILA Med. and Clinical Services Fund*, 520 U.S. 806, 813–14 (1997), the

18 U.S. Supreme Court went so far as to remark that, "[i]n order to evaluate whether the normal

19 presumption against pre-emption has been overcome in a particular [ERISA] case," a court "must

20 go beyond the unhelpful text [of ERISA] . . . and look instead to the objectives of the ERISA

21 statute as a guide to the scope of the state law that Congress understood would [or would not]

22 survive."

23         **b. Express and Complete Preemption**

24

25     [11] Although Rule 12(g)(2) and Rule 12(h)(2) apply to Defendants' arguments as to the UCL, the

26 Court finds that the following reasons apply with equal force to Defendants' ERISA preemption arguments as to the UCL.

27

Case No. 15-MD-02617-LHK

28 ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

1    Next, "[t]here are two strands of ERISA preemption: (1) 'express' preemption under

2    ERISA § 514(a), 29 U.S.C. § 1144(a); and (2) preemption due to a 'conflict' with ERISA's

3    exclusive remedial scheme set forth in [ERISA § 502(a),] 29 U.S.C. § 1132(a)."   *Fossen v. Blue*

4    *Cross & Blue Shield of Mont., Inc.*, 660 F.3d 1102, 1107 (9th Cir. 2011).   Most courts refer to this

5    latter form of preemption as "complete preemption."   *Marin Gen. Hosp. v. Modesto & Empire*

6    *Traction Co.*, 581 F.3d 941, 944 (9th Cir. 2009); *Wurtz v. Rawlings Co.*, 761 F.3d 232, 241 (2nd

7    Cir. 2014).   The Court has also referred to ERISA § 502(a) preemption as "complete preemption"

8    in prior Orders, and does the same in the instant Order.   *See, e.g.*, *In re Anthem, Inc. Data Breach*

9    *Litig.*, 2015 WL 7443779, *3 (N.D. Cal. Nov. 24, 2015).

10    "Under § 514(a), ERISA broadly preempts any and all State laws insofar as they may now

11    or hereafter *relate to* any covered employee benefit plan."   *Fossen*, 660 F.3d at 1108 (internal

12    quotation marks and alteration omitted) (emphasis added).   "[T]he words 'relate to,'" however,

13    "cannot be taken too literally."   *Roach v. Mail Handlers Benefit Plan*, 298 F.3d 847, 849 (9th Cir.

14    2002).   "If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all

15    practical purposes pre-emption would never run its course, for 'really, universally, relations stop

16    nowhere.'"   *Travelers*, 514 U.S. at 655 (alteration omitted).   Instead, "relates to" must be "read in

17    the context of the presumption that in fields of traditional state regulation the historic police

18    powers of the States are not to be superseded by a Federal Act unless that was the clear and

19    manifest purpose of Congress."   *Roach*, 298 F.3d at 850 (internal quotation marks and alterations

20    omitted).

21    Under ERISA § 502(a), on the other hand, a civil enforcement action may be brought:

22    (1) by a participant or beneficiary— . . . (B) to recover benefits due to him under
      the terms of his plan, to enforce his rights under the terms of the plan, or to clarify
23    his rights to future benefits under the terms of the plan.

24    29 U.S.C. § 1132(a).   Pursuant to this provision, a "state-law cause of action that duplicates,

25    supplements, or supplants the ERISA civil enforcement remedy" is preempted because it

26    "conflicts with the clear congressional intent to make the ERISA remedy exclusive."   *Aetna*

27                                                         82

28

*Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).

Under U.S. Supreme Court precedent, both forms of ERISA preemption are subject to the presumption against preemption. *See Travelers*, 514 U.S. at 655–56 (applying presumption to ERISA express preemption); *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 377–80, 387 (2002) (reviewing ERISA complete preemption precedent and concluding that "in the field of health care, a subject of traditional state regulation, there is no ERISA preemption without clear manifestation of congressional purpose.") (alteration omitted).  Both the Second and Ninth Circuits, the circuits where Gates and Coonce respectively reside, are in accord. *See, e.g.*, *Stevenson v. Bank of N.Y. Co., Inc.*, 609 F.3d 56, 59 (2nd Cir. 2010) ("This circuit has previously held that the analysis of ERISA preemption must start with the presumption that Congress does not intend to supplant state law.") (internal quotation marks omitted); *Wurtz*, 761 F.3d at 237–38 (same).  Indeed, as the Ninth Circuit observed in *Dishman v. Unum Life Insurance Co. of America*, 269 F.3d 974, 984 (9th Cir. 2001), "[w]e are certain that the objective of Congress in crafting [ERISA § 514(a)] was not to provide ERISA administrators with blanket immunity from garden variety torts which only peripherally impact daily plan administration."

With the foregoing framework in mind, the Court notes also that *no* circuit court has ever applied ERISA preemption—express or complete—to preclude a plaintiff from moving forward with state law claims arising out of a data breach.  Thus, by asking the Court to find Plaintiffs' claims to be both expressly *and* completely preempted, Defendants have essentially requested that the Court break new ground to find that the presumption against preemption is overcome in a field where it has never been applied before.  For the reasons that follow, the Court finds that Defendants have failed to carry this burden.

### 3.  Data Privacy and ERISA Express or Complete Preemption

#### a.  Complete Preemption

ERISA § 502(a) completely preempts actions based upon state law "[1] to recover benefits due to him under the terms of his plan, [2] to enforce his rights under the terms of the plan, or [3]

83

United States District Court
Northern District of California

1   to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a).

2   　　　The parties have not cited any case law interpreting the meaning of [2], "to enforce his

3   rights under the terms of the plan," and the Court has not found any Second or Ninth Circuit case

4   law on point.  In fact, based on the Court's review, the most pertinent discussion of this provision

5   appears to have been by the en banc Fifth Circuit in *Arana v. Ochsner Health Plan*, 338 F.3d 433

6   (5th Cir. 2003) (en banc).  In *Arana*, the Fifth Circuit noted that, "one could [also] say that

7   [plaintiff] seeks to enforce his rights under the terms of the plan, for he seeks to determine his

8   entitlement to retain the benefits based on the terms of the plan."  *Id.* at 438.

9   　　　With *Arana* in mind, the key inquiry here is thus whether Coonce and Gates's claims are

10  for ERISA benefits, as all three parts of ERISA § 502(a) refer to benefits: recovering benefits

11  owed, enforcing rights to retain benefits, and clarifying terms of future benefits.  29 U.S.C.

12  § 1132(a), *Arana*, 338 F.3d at 438.  To put it another way, ERISA complete preemption applies

13  where ERISA benefits are at issue, and does not apply when ERISA benefits are not at issue.

14  　　　ERISA's statutory text does not define the term "benefit."  However, several statutory

15  subsections suggest that benefits must concern payments for healthcare-related services. Under 29

16  U.S.C. § 1191b, for instance, a subsection addressing rules governing group health plans, the

17  subsection lists some examples of benefits, such as "[c]overage for on-site medical clinics,"

18  "dental or vision benefits," and "[h]ospital indemnity or other fixed indemnity insurance."  29

19  U.S.C. § 1191b.  Likewise, 29 U.S.C. § 1133, the subsection that addresses claims processing,

20  requires all ERISA plans to "provide adequate notice in writing to any participant or beneficiary

21  whose claim for benefits under the plan has been denied" and to "afford a reasonable opportunity

22  [to be heard] to any participant whose claim for benefits has been denied."  29 U.S.C. § 1133.

23  Notably, of the numerous mentions of the term "benefit" in ERISA, *none* suggest that protecting

24  customer PII should be considered an ERISA benefit.

25  　　　Both the Second and Ninth Circuits have adopted a similar understanding.  In *Stevenson*,

26  for example, the Second Circuit described ERISA's "central" purpose as concerning "the

27  　　　　　　　　　　　　　　　　　　　　　　84

28  ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
    DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
    MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

determination of eligibility for benefits, amounts of benefits, or means of securing unpaid benefits." 609 F.3d at 59. Laws that "tend to control or supersede" this central purpose "have typically been found to be preempted." *Id.* Similarly, in *Wurtz*, the Second Circuit determined that tort damages that a plaintiff receives from an automobile accident, which may in fact overlap or supplement the medical benefits that a plaintiff receives, should not be considered "benefits" for purposes of ERISA § 502. 761 F.3d at 242–43. The Second Circuit counseled courts to read "benefits" narrowly, and expressly disapproved of the district court's "expansive interpretation of complete preemption." *Id.* at 242.

In reaching its decision, the *Wurtz* court cited the Ninth Circuit's decision in *Marin General Hospital* with approval. *Id.* at 244. In that case, the Ninth Circuit also read "benefits" in a limited manner, and found that not even a medical reimbursement claim was subject to ERISA complete preemption. 581 F.3d at 950. The *Marin General Hospital* court, moreover, stated that "[i]t is not enough for complete preemption that the contract and tort claims 'relate to' the underlying ERISA plan, or that ERISA § 502(a)(1)(B) may provide a similar remedy." *Id.* at 950. Thus, Defendants' point in the instant motions that individuals may obtain partial premium refunds as a remedy under ERISA § 502(a) does *not*, standing by itself, mean that ERISA complete preemption applies.

Although plaintiffs' claims in *Stevenson*, *Wurtz*, and *Marin General Hospital* did appear to relate to plaintiffs' healthcare expenses (e.g., claims for medical reimbursement, tort damages arising from medical injuries), the circuit courts in these cases nonetheless declined to apply ERISA complete preemption. Instead, all three courts emphasized the importance of construing ERISA benefits in a narrow manner. Here, unlike in *Stevenson*, *Wurtz*, and *Marin General Hospital*, Plaintiffs' claims do not even implicate medical or healthcare expenses. Plaintiffs instead bring suit because Defendants failed to comply with certain privacy obligations—a legal area where ERISA is silent.

As a final matter, in *Marin General Hospital*, the Ninth Circuit drew upon its reasoning in

85

1    *Cedars-Sinai Medical Center v. National League of Postmasters of the United States*, 497 F.3d

2    972 (9th Cir. 2007).  *See* 581 F.3d at 950.  In *Cedars-Sinai*, the Ninth Circuit declined to find that

3    a claim for "breach of contract and negligent misrepresentation in connection with partial

4    reimbursement of claims for medical treatment" was preempted by the Federal Employee Health

5    Benefits Act ("FEHBA").  *Id.*  Although the *Marin General Hospital* court acknowledged that

6    "FEHBA and ERISA are different federal statutes," *id.*, it noted that "their preemption provisions

7    are analytically similar," and are often interpreted together.  *Id.*

8          This discussion of the interplay between FEHBA and ERISA provides yet another reason

9    to support the Court's finding that Plaintiffs' claims are not claims for ERISA benefits.  In the

10   First Motion to Dismiss Order, the Court examined whether "Plaintiffs' third party beneficiary

11   claims [under FEHBA] constitute[d] health benefits claims" for purposes of the Federal BCBSA

12   contract.  First MTD Order at 68.  After examining federal regulations, case law, and the Federal

13   BCBSA contract's text, the Court determined that "Plaintiffs' third party beneficiary claim [was]

14   not a 'health benefits claim.'"  *Id.* at 70.  Health benefits claims are expenses that concern one's

15   medical care or health coverage, not one's data privacy.  Defendants have not challenged the

16   Court's interpretation of FEHBA.  Given the similarity between FEHBA and ERISA preemption,

17   it would make little sense for the Court to adopt a different understanding of the term "benefit" for

18   purposes of ERISA preemption.

19         Accordingly, for the reasons stated above, the Court finds that Coonce and Gates's claims

20   are not completely preempted by ERISA.

21                    **b.  Express Preemption**

22         On express preemption, the Court must determine whether Coonce and Gates's claims

23   "relate to" their ERISA benefit plans.  29 U.S.C. § 1144(a).  As noted above, the U.S. Supreme

24   Court has emphasized that this term can not be read literally: "[i]f 'relate to' were taken to extend

25   to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never

26   run its course, for really, universally, relations stop nowhere."  *Travelers*, 514 U.S. at 655

27                                                                      86

28   Case No. 15-MD-02617-LHK
     ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
     DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
     MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

1    (alteration and internal quotation marks omitted).  Such an interpretation would "read the

2    presumption against pre-emption out of the law," *id.* and is "a result [that] no sensible person

3    could have intended," *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 943 (2016) (internal

4    quotation marks omitted).

5         As such, U.S. Supreme Court precedent "to date has described two categories of state laws

6    that ERISA [expressly] pre-empts."  *Id.*  "First, ERISA pre-empts a state law if it has a 'reference

7    to' ERISA plans.  To be more precise, where a State's law acts immediately and exclusively upon

8    ERISA plans or where the existence of ERISA plans is essential to the law's operation, that

9    'reference' will result in pre-emption."  *Id.* (internal quotation marks, citation, ellipses, and

10   alterations omitted).  "Second, ERISA pre-empts a state law that has an impermissible 'connection

11   with' ERISA plans, meaning a state law that governs a central matter of plan administration or

12   interferes with nationally uniform plan administration."  *Id.* (internal quotation marks and ellipses

13   omitted).

14        The claims at issue do not fall under either of these categories.  The "reference to" prong

15   analysis is straightforward.  In *Liberty Mutual Insurance Co. v. Donegan*, 746 F.3d 497, 500 (2d

16   Cir. 2014), the Second Circuit was presented with a Vermont law that required all state health

17   insurers, health care providers, health care facilities, and governmental agencies to file certain

18   reports with the Vermont government.  On the "reference to" prong, the Second Circuit concluded

19   that "[t]he Vermont statute and regulation lack reference to an ERISA plan because they apply to

20   all health care payers and do not act exclusively upon ERISA plans."  *Id.* at 508 n.9 (internal

21   quotation marks omitted).   Here, too, California contract law, New York unjust enrichment law,

22   and GBL § 349 do not "act exclusively upon ERISA plans," *id.*, nor are "the existence of ERISA

23   plans . . . essential to the [their] operation," *Gobeille*, 136 S. Ct. at 943.  These laws are laws of

24   general application, and do not focus exclusively (or, for that matter, even primarily) upon ERISA

25   plan administration.

26        The analysis of the "connection with" prong is more demanding, but the result remains the

27                                          87

28   ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO
     DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND
     MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

same.  On this prong, the U.S. Supreme Court has advised courts to consider "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive and the nature of the effect of the state law on ERISA plans."  *Gobeille*, 136 S. Ct. at 943 (internal quotation marks and citation omitted).  A number of cases have discussed "the objectives of the ERISA statute" in some detail.  *Id.*  In *Travelers*, for instance, the U.S. Supreme Court stated that in enacting ERISA's express preemption provision, "Congress intended to ensure that plans and plan sponsors would be subject to a uniform body of *benefits* law."  514 U.S. at 656 (internal quotation marks omitted) (emphasis added).  Citing *Travelers*, the Ninth Circuit held in *Dishman* that "ERISA preempts state laws that mandate employee *benefit* structures or their administration."  269 F.3d at 981 (internal quotation marks and alteration omitted) (emphasis added).  Thus, if a "statute governs the payment of benefits, a central matter of plan administration," it will be found to be expressly preempted.  *Id.* at 982 (internal quotation marks omitted).  Finally, in *Gerosa v. Savasta & Co.*, 329 F.3d 317, 324 (2nd Cir. 2003), the Second Circuit observed that "state laws that . . . tend to control or supersede central ERISA functions— such as state laws affecting the determination of eligibility for benefits, amounts of benefits, or means of securing unpaid benefits—have typically been found to be preempted."  Even in *Wise v. Verizon Communications Inc.*, 600 F.3d 1180, 1190 (9th Cir. 2010), a case upon which Defendants rely, the Ninth Circuit determined that plaintiff's claim was expressly preempted because it was a "claim for recovery of past and future benefits."  Namely, plaintiff sought to recover lost disability insurance benefits, not damages related to a data breach.

The general thrust of *Travelers*, *Dishman*, *Gerosa*, and *Wise* is that laws that implicate the administration of ERISA benefits are subject to express preemption, and laws that do not are not preempted.  *See Dishman*, 269 F.3d at 984 (finding that invasion of privacy claim not subject to ERISA preemption).  As noted above, the claims here do not implicate ERISA "benefits."  Consequently, Coonce and Gates's claims are not expressly preempted.

Case No. 15-MD-02617-LHK
ORDER GRANTING IN PART AND DENYING IN PART ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART NON-ANTHEM DEFENDANTS' SECOND MOTION TO DISMISS, AND DENYING MOTION FOR CLARIFICATION

United States District Court
Northern District of California

1    **4.  Dispute Regarding Scope of ERISA Plans**

2        As a final matter, the Court notes the parties' disagreement as to whether Coonce and

3    Gates's contracts also constitute the "written ERISA plan instrument."  Anthem Opp'n at 25.  The

4    crux of Plaintiffs' argument is that the official ERISA plan documents and the written contracts

5    are not the same documents, and that further discovery is needed to determine what documents

6    form the set of official ERISA plan documents.  Defendants challenge this argument.  Such a

7    dispute again highlights why dismissal as a matter of law is inappropriate at this time: further

8    discovery is necessary to determine which documents constitute the ERISA plan documents.

9        For all the reasons stated above, Defendants' motions to dismiss certain claims as

10   preempted by ERISA are DENIED.

11   **IV.    CONCLUSION**

12       To conclude:

13       1.  The Court GRANTS with prejudice the Anthem Defendants' motion to dismiss the

14           California breach of contract claim as to Plaintiffs Daniel Randrup, Kelly Tharp, and

15           Daniel Tharp.

16       3.  The Court GRANTS with prejudice the Non-Anthem Defendants' motion to dismiss

17           Plaintiffs' request for Benefit of the Bargain Losses under the New Jersey breach of

18           contract claim.

19       4.  The Court GRANTS with leave to amend Defendants' motions to dismiss the New

20           York unjust enrichment claim as to Plaintiff Marne Onderdonk.

21       5.  The Court GRANTS with prejudice Defendants' motions to dismiss the California

22           Unfair Competition Law claim as to the unlawful prong as that prong relates to the

23           California Insurance Information and Privacy Protection Act, the California

24           Confidentiality of Medical Information Act, and Cal. Civ. Code § 1798.82.

25       6.  The Court GRANTS with leave to amend Defendants' motions to dismiss the California

26           Unfair Competition Law claim as to the fraud prong as that prong relates to a

27                                            89

28

*United States District Court*
*Northern District of California*

1      misrepresentation theory of liability.

2      7.  The Court GRANTS with leave to amend Defendants' motions to dismiss the New

3          York General Business Law § 349 as to Plaintiff Marne Onderdonk.

4      8.  The Court GRANTS with prejudice the Anthem Defendants' motion to dismiss the

5          Georgia Information and Privacy Protect Act claim.

6      The second round motions to dismiss are otherwise DENIED.  Should Plaintiffs elect to

7   file an amended complaint curing the deficiencies identified herein, Plaintiffs shall do so by July

8   11, 2016, the deadline to which the parties have stipulated for the addition of parties.  Failure to

9   meet the July 11, 2016 deadline to file an amended complaint or failure to cure the deficiencies

10  identified in this Order will result in a dismissal with prejudice of the deficient claims or theories.

11  Plaintiffs may not add new causes of actions or parties without leave of the Court or stipulation of

12  the parties pursuant to Federal Rule of Civil Procedure 15.

13  **IT IS SO ORDERED.**

14  Dated:  May 27, 2016

15                                          _Lucy H. Koh_____

16                                          LUCY H. KOH
                                            United States District Judge
17

18

19

20

21

22

23

24

25

26

27                                          90

United States District Court
Northern District of California

# Exhibit J

Craig A. Hoover, SBN 113965
E. Desmond Hogan (admitted *pro hac vice*)
Peter R. Bisio (admitted *pro hac vice*)
Allison M. Holt (admitted *pro hac vice*)
**HOGAN LOVELLS US LLP**
555 Thirteenth Street, NW
Washington, DC 20004
Tel:  (202) 637-5600
Fax:  (202) 637-5910
craig.hoover@hoganlovells.com
desmond.hogan@hoganlovells.com
peter.bisio@hoganlovells.com
allison.holt@hoganlovells.com

Michael M. Maddigan,  SBN 163450
**HOGAN LOVELLS US LLP**
1999 Avenue of the Stars,  Suite 1400
Los Angeles, CA 90067
Tel: (310) 785-4600
Fax: (310) 785-4601
michael.maddigan@hoganlovells.com

*Attorneys for Defendants Anthem, Inc. and related parties*
Additional Defendants and Defendants' Counsel Listed on
Signature Page

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE ANTHEM, INC. DATA BREACH LITIGATION | Case No.  5:15-MD-02617-LHK |
| | The Honorable Lucy H. Koh |
| | **CLASS ACTION** |
| | **THE ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT
Case No. 15-MD-02617-LHK

Subject to their affirmative defenses set forth below, and without waiver of any rights,

privileges, or defenses, Defendant Anthem, Inc. ("Anthem") and Defendants Blue Cross and Blue

Shield of Georgia, Inc., Blue Cross Blue Shield Healthcare Plan of Georgia, Inc., Anthem

Insurance Companies, Inc., Blue Cross of California, Anthem Blue Cross Life and Health

Insurance Company, Rocky Mountain Hospital and Medical Service, Inc., Anthem Health Plans,

Inc., Anthem Health Plans of Kentucky, Inc., Anthem Health Plans of Maine, Inc., HMO

Missouri, Inc., RightCHOICE Managed Care, Inc., Healthy Alliance Life Insurance Company,

Anthem Health Plans of New Hampshire, Inc., Empire HealthChoice Assurance, Inc.,

Community Insurance Company, Anthem Health Plans of Virginia, Inc., HealthKeepers, Inc.,

Blue Cross Blue Shield of Wisconsin, Compcare Health Services Insurance Corporation,

Amerigroup Corporation, Amerigroup Services, Inc., Amerigroup Kansas, Inc., HealthLink, Inc.,

UniCare Life & Health Insurance Company, Caremore Health Plan, The Anthem Companies,

Inc., and The Anthem Companies of California, Inc. (collectively, with Anthem, the "Anthem

Defendants"), through counsel, hereby submit their Answer to Plaintiffs' Third Consolidated

Amended Class Action Complaint ("TAC" or the "Complaint").

Each numbered response in this Answer is made subject to the following limitations as if

fully set forth therein.

*First*, pursuant to the Court's Case Management Orders (Dkt. Nos. 326, 366) the Anthem

Defendants' ability to file Rule 12 motions challenging the sufficiency of the complaint was

restricted to ten causes of action (the "Selected Claims"): (1) the negligence claim on behalf of

the Indiana Statewide Class; (2) the breach of contract claim against Anthem and Anthem

affiliates on behalf of the California Statewide Class; (3) the California Unfair Competition Law

(Cal. Bus. & Prof. Code § 17200, et seq.); (4) New York's consumer protection law (N.Y. Gen.

Bus. Law §349); (5) the Georgia Insurance Information and Privacy Protection Act (Ga. Code

§33-39-14, 21(b (6) the Kentucky Consumer Protection Act (KY. Rev. Stat. § 367.110, *et. seq*);

(7) the Kentucky Data Breach Statute (KY. Rev. Stat. § 365.732(2), *et. seq*); (8) the unjust

enrichment claim on behalf of the New York Statewide Class; (9) the Third Party Beneficiary

Claim for Breach of Contract under Federal Law on behalf of the federal employee class; and

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT
Case No. 15-MD-02617-LHK

1   (10) the breach of contract claim against Non-Anthem Defendants on behalf of the New Jersey

2   Statewide Class.  The Anthem Defendants' time to respond to the remaining causes of action

3   asserted in the complaint has been deferred by the Court.   Accordingly, the Anthem Defendants

4   have no obligation to answer or otherwise respond to allegations in the Complaint that only relate

5   to non-Selected Claims.  The Anthem Defendants reserve all of their rights with respect to the

6   non-Selected Claims, and nothing in this Answer, including the Affirmative Defenses asserted

7   herein, shall be construed as a waiver of the Anthem Defendants' rights with respect to such

8   claims.

9          *Second*, this Answer is made subject to the Court's Order(s) Granting in Part and Denying

10  in Part Anthem Defendants' Motion(s) to Dismiss.  *See* Dkt. No. 468 (February 14, 2016); *see*

11  *also* Dkt. No. 524 (May 27, 2016).  To the extent the Complaint contains allegations regarding

12  claims, theories, or facts that have been dismissed, mooted, or otherwise rendered immaterial by

13  the Order or any other orders issued by the Court, no response is required to such allegations.

14  Moreover, any responses in this Answer do not constitute acknowledgment or admission of the

15  validity or relevance of such allegations.

16         *Third*, this Answer, including the Affirmative Defenses asserted herein, shall not be

17  construed as a waiver of the Anthem Defendants' right to pursue counterclaims against absent

18  class members in any forum.  Any construction to the contrary would violate the Anthem

19  Defendants' due process rights.

20         *Fourth*, any responses in this Answer relating to subsidiaries or affiliates of Anthem, Inc.

21  do not constitute acknowledgment or admission that Anthem, Inc.  or any of the entities named in

22  the underlying actions may be held liable for the acts and/or omissions of such subsidiaries or

23  affiliates.

24         *Fifth*, the Table of Contents on pages i-ix of the Complaint, and the corresponding section

25  headings and subheadings (including the footnotes relating to those headings and subheadings)

26  throughout the Complaint, contain characterizations of the Complaint to which no response is

27  required.  To the extent a response is deemed required, the Anthem Defendants deny any

28  allegations in the Table of Contents and the section headings and subheadings in the Complaint.

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

- 2 -
ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

Further, the section headings in this Answer exist for purposes of convenience only and are not admissions.

*Sixth,* where the Anthem Defendants state that they lack knowledge or information sufficient to form a belief about the truth of a certain allegation, the Anthem Defendants reserve the right to argue that the allegation is true or false based on the evidence.  The Anthem Defendants lack sufficient knowledge or information to form a belief about the facts alleged concerning individuals who were not named as Plaintiffs in the Second Consolidated Amended Class Action Complaint because the Anthem Defendants have not completed their review of their records, if any, concerning such individuals.

*Seventh*, where the Anthem Defendants deny a certain allegation on the basis that the allegation pertains to claims, theories, or facts that have been dismissed, mooted, or otherwise rendered immaterial by Court's Order(s) Granting in Part and Denying in Part Defendants' Motion(s) to Dismiss, [*see* Dkt. No. 468 (February 14, 2016); *see also* Dkt. No. 524 (May 27, 2016)],  the Anthem Defendants reserve the right to argue that the allegation is true or false based on the evidence.

*Eighth*, to the extent the Complaint attempts to characterize certain alleged facts (*e.g.*, by describing conduct as "wrongful acts"), the Anthem Defendants respond generally that such allegations constitute mere pejoratives or conclusions of law and do not constitute allegations of fact requiring a response; but to the extent such allegations may be construed as allegations of fact, the Anthem Defendants object to and deny each and every such allegation, and incorporate by reference this response in each paragraph below as if fully set forth therein.

*Ninth*, to the extent the Complaint attempts to characterize the content of documents, the Anthem Defendants respond generally that such documents speak for themselves and on that basis the Anthem Defendants object to and deny each and every such allegation, and incorporate by reference this response in each paragraph below as if fully set forth therein

*Tenth*, to the extent that the allegations in the Complaint include undefined terms subject to multiple potential meanings and interpretations, the Anthem Defendants object to and deny

Hogan Lovells US
LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

each and every such allegation, and incorporate by reference this response in each paragraph below as if fully set forth therein.

*Eleventh*, except as may be expressly and specifically admitted herein, the Anthem Defendants deny each and every allegation alleged in the Complaint and further deny that Plaintiffs have suffered any damages by reason of any act, omission, or conduct on the part of the Anthem Defendants and further deny that Plaintiffs are entitled to the relief sought in the Complaint, or to any relief at all, from the Anthem Defendants. In response to the numbered paragraphs of the Complaint, the Anthem Defendants further respond as follows:

### **INTRODUCTION**

1.     Paragraph 1 contains Plaintiffs' characterization of this action, which requires no response. To the extent Paragraph 1 contains allegations requiring a response, the Anthem Defendants admit that on February 4, 2015, Anthem announced that it had been the victim of a criminal cyberattack and that the cyberattack began in 2014. Anthem further admits that the criminal cyberattack Anthem suffered involved some information for approximately 78.8 million people. Anthem denies the remaining allegations in Paragraph 1.

2.     Paragraph 2 contains Plaintiffs' characterization of the Anthem Defendants' alleged conduct, which requires no response. To the extent Paragraph 2 contains allegations requiring a response, the Anthem Defendants deny them

3.     In response to Paragraph 3, the Anthem Defendants admit that Anthem maintains information about current and former members in its information systems. All other allegations in Paragraph 3 constitute either Plaintiffs' characterization of this action or legal conclusions, which require no response. To the extent all other allegations in Paragraph 3 require a response, the Anthem Defendants deny them.

4.     In response to Paragraph 4, the Anthem Defendants admit that they have privacy policies. The Anthem Defendants deny the allegations in Paragraph 4 regarding those privacy policies and the other documents referenced in Paragraph 4 on the grounds that such documents speak for themselves. All other allegations in Paragraph 4 constitute Plaintiffs' characterization of this action, which require no response. To the extent all other allegations in Paragraph 4

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

require a response, the Anthem Defendants deny them.

5.     Paragraph 5 contains Plaintiffs' characterization of this action and the Anthem Defendants' alleged conduct, which requires no response.  To the extent Paragraph 5 contains allegations requiring a response, the Anthem Defendants deny them.

6.     Paragraph 6 contains Plaintiffs' characterization of this action and the Anthem Defendants' alleged conduct, which requires no response.  To the extent Paragraph 6 contains allegations requiring a response, the Anthem Defendants deny them.

7.     In response to Paragraph 7, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in this Paragraph and, on that basis, deny them.

8.     Paragraph 8 contains Plaintiffs' characterization of this action and the Anthem Defendants' alleged conduct, which requires no response.  To the extent Paragraph 8 contains allegations requiring a response, the Anthem Defendants deny them.

## JURISDICTION AND VENUE

9.     Paragraph 9 sets forth legal conclusions that require no response.  To the extent a response is required, the Anthem Defendants do not dispute the jurisdiction of the Court to hear this matter.

10.     Paragraph 10 sets forth legal conclusions that require no response.   To the extent a response is required, the Anthem Defendants do not dispute the Court's exercise of personal jurisdiction over the Anthem Defendants in this matter based on the transfer order of the Judicial Panel on Multidistrict Litigation or with respect to the actions originally filed in this Court pursuant to 28 U.S.C. § 1391(b).

11.     Paragraph 11 sets forth legal conclusions that require no response.  To the extent a response is required, the Anthem Defendants do not dispute venue in this judicial district based on the transfer order of the Judicial Panel on Multidistrict Litigation or with respect to the actions originally filed in this Court pursuant to 28 U.S.C. § 1391(b).

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

**PARTIES**

A.    **Plaintiffs**

**Alabama**

12.    In response to Paragraph 12, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations contained in this Paragraph and, on that basis, deny them.

**Arizona**

13.    In response to Paragraph 13, the Anthem Defendants admit that their records indicate that Plaintiff Pearl Bruno was enrolled in a group-sponsored health plan from 2009 until 2014 for which Blue Cross and Blue Shield of Georgia provided third party claims administration services.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems; that the Anthem Defendants mailed a notification letter to Plaintiff Bruno regarding the Anthem Cyberattack; and that Plaintiff Bruno produced a notification letter addressed to her in the course of discovery in this action.  The Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of all other allegations in this Paragraph and, on that basis, deny them.

**California**

14.    Because Plaintiff Michael Bronzo purports to have dismissed his claims, no response is required to Paragraph 14.  To the extent a response is required, the Anthem Defendants admit that their records indicate that Plaintiff Bronzo was enrolled in a Blue Cross of California d/b/a Anthem Blue Cross health plan.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems.  The Anthem Defendants deny the allegations in the third sentence of Paragraph 14.  In response to all other allegations in Paragraph 14, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

15.    In response to Paragraph 15, the Anthem Defendants admit that their records indicate that Plaintiff Daniel Randrup was enrolled in a group-sponsored health plan through Self-Insured Schools of California for which Anthem Blue Cross Life and Health Insurance Company

1    and Blue Cross of California, Inc. d/b/a Anthem Blue Cross provided third party claims

2    administration services.  The Anthem Defendants further admit that they maintained information

3    about this individual in Anthem's information systems; that the Anthem Defendants mailed a

4    notification letter to Plaintiff Randrup regarding the Anthem Cyberattack; and that Plaintiff

5    Randrup produced a notification letter addressed to him in the course of discovery in this action.

6    In response to all other allegations in Paragraph 15, the Anthem Defendants are without sufficient

7    knowledge or information to form a belief as to the truth of those allegations and, on that basis,

8    deny them.

9          16.    In response to Paragraph 16, the Anthem Defendants admit that their records

10   indicate that Plaintiff Mary Ella Carter was enrolled in a Blue Cross of California, Inc. d/b/a

11   Anthem Blue Cross health plan and that premiums were paid.  The Anthem Defendants further

12   admit that they maintained information about Plaintiff Carter in Anthem's information systems,

13   but deny the remaining allegations in the third sentence of Paragraph 16.   In response to all other

14   allegations in Paragraph 16, the Anthem Defendants are without sufficient knowledge or

15   information to form a belief as to the truth of those allegations and, on that basis, deny them.

16         17.    In response to Paragraph 17, the Anthem Defendants admit that their records

17   indicate that Plaintiff Kenneth Coonce was enrolled in a Blue Cross of California, Inc. d/b/a

18   Anthem Blue Cross health plan and that premiums were paid.  The Anthem Defendants further

19   admit that they maintained information about this individual in Anthem's information systems;

20   that the Anthem Defendants mailed a notification letter to Plaintiff Coonce regarding the Anthem

21   Cyberattack; and that Plaintiff Coonce produced a notification letter addressed to him in the

22   course of discovery in this action.  In response to all other allegations in Paragraph 17, the

23   Anthem Defendants are without sufficient knowledge or information to form a belief as to the

24   truth of those allegations and, on that basis, deny them.

25         18.    In response to Paragraph 18, the Anthem Defendants admit that their records

26   indicate that Plaintiff Steve Kawai was enrolled in a CALPERS health plan administered by

27   Anthem Blue Cross Life and Health Insurance Company and Blue Cross of California, Inc. d/b/a

28   Anthem Blue Cross.  The Anthem Defendants further admit that they maintained information

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

- 7 -

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1   about this individual in Anthem's information systems; that the Anthem Defendants mailed a

2   notification letter to Plaintiff Kawai regarding the Anthem Cyberattack; and that Plaintiff Kawai

3   produced a notification letter addressed to him in the course of discovery in this action.  In

4   response to all other allegations in Paragraph 18, the Anthem Defendants are without sufficient

5   knowledge or information to form a belief as to the truth of those allegations and, on that basis,

6   deny them.

7         19.    In response to Paragraph 19, the Anthem Defendants admit that their records

8   indicate that Plaintiff Kenneth Solomon was enrolled in an Anthem Blue Cross Life and Health

9   Insurance Company Individual PPO from 2002 until 2009. The Anthem Defendants further admit

10  that they maintained information about this individual in Anthem's information systems; that the

11  Anthem Defendants mailed a notification letter to Plaintiff Solomon regarding the Anthem

12  Cyberattack; and that Plaintiff Solomon produced a notification letter addressed to him in the

13  course of discovery in this action.  In response to all other allegations in Paragraph 19, the

14  Anthem Defendants are without sufficient knowledge or information to form a belief as to the

15  truth of those allegations and, on that basis, deny them.

16        20.    Because Plaintiffs Daniel and Kelly Tharp purport to have dismissed their claims, no

17  response to Paragraph 20 is required.  To the extent a response is required, the Anthem

18  Defendants admit that their records indicate that Plaintiffs Daniel and Kelly Tharp were enrolled

19  in a group health plan offered by the Ironworkers' Employees Benefit Corporation (IBEC)

20  serviced by Anthem Blue Cross Life and Health Insurance Company and Blue Cross of

21  California, Inc., d/b/a Anthem Blue Cross.  The Anthem Defendants further admit that they

22  maintained information about this individual in Anthem's information systems.  In response to all

23  other allegations in Paragraph 20, the Anthem Defendants are without sufficient knowledge or

24  information to form a belief as to the truth of those allegations and, on that basis, deny them.

25        21.    In response to Paragraph 21, the Anthem Defendants are without sufficient

26  knowledge or information to form a belief regarding the truth of the allegations in this Paragraph

27  and, on that basis, deny them.

28

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

- 8 -

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

22.    In response to Paragraph 22, the Anthem Defendants admit that they maintained information about Plaintiff Lillian Brisko in Anthem's information systems and that they mailed a notification letter to Plaintiff Brisko regarding the Anthem Cyberattack.  In response to all other allegations in Paragraph 22, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

23.    In response to Paragraph 23, the Anthem Defendants admit that their records indicate that Plaintiff Alvin Lawson was enrolled in the Federal BCBSA Plan.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems, and that they mailed a notification letter to Plaintiff Lawson regarding the Anthem Cyberattack.  In response to all other allegations in Paragraph 23, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

### Colorado

24.    In response to Paragraph 24, the Anthem Defendants admit that their records indicate that Plaintiff James Schatzman was enrolled in group-sponsored health plan from 2009 until 2013 for which Anthem Blue Cross Life and Health Insurance Company provided third party claims administration services.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems.  In response to all other allegations in Paragraph 24, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

### Connecticut

25.    In response to Paragraph 25, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

26.    In response to Paragraph 26, the Anthem Defendants admit that Plaintiff Kimberly Kos-Williams was enrolled in an Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield health plan.  The Anthem Defendants further admit that they maintained information about

- 9 -

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

this individual in Anthem's information systems; that the Anthem Defendants mailed a notification letter to Plaintiff Kos-Williams regarding the Anthem Cyberattack; and that Plaintiff Kos-Williams produced a notification letter addressed to him in the course of discovery in this action. In response to all other allegations in Paragraph 26, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

27. In response to Paragraph 27, the Anthem Defendants admit that their records indicate that Plaintiff Gary Lasneski was enrolled in an Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield health plan. The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems and that they mailed a notification letter to Plaintiff Lasneski regarding the Anthem Cyberattack. In response to all other allegations in Paragraph 27, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

28. In response to Paragraph 28, the Anthem Defendants admit that their records indicate that Plaintiff Ralph Staffieri obtained health coverage under the Federal BCBSA Plan. The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems and that they mailed a notification letter to Plaintiff Staffieri regarding the Anthem Cyberattack. In response to all other allegations in Paragraph 28, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

29. In response to Paragraph 29, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

### Delaware

30. In response to Paragraph 30, the Anthem Defendants admit that their records indicate that Plaintiff Danielle DiFonzo was enrolled in an Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield health plan from 2014 to 2015. The Anthem Defendants further admit that they maintained information about this individual in Anthem's information

systems.  In response to all other allegations in Paragraph 30, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

### Florida

31.    In response to Paragraph 31, the Anthem Defendants admit that their records indicate that Plaintiff Glenn Kahn was enrolled in an Anthem Blue Cross Life and Health Insurance Company.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems.  The Anthem Defendants deny the allegations in the fourth sentence of Paragraph 31.  In response to all other allegations in Paragraph 31, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

32.    In response to Paragraph 32, the Anthem Defendants admit that their records indicate that Plaintiff Gerald Keaton was enrolled in a Blue Cross and Blue Shield of Georgia, Inc. d/b/a Anthem Blue Cross and Blue Shield.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems; that the Anthem Defendants mailed a notification letter to Plaintiff Keaton regarding the Anthem Cyberattack; and that Plaintiff Keaton produced a notification letter addressed to him in the course of discovery in this action.  In response to all other allegations in Paragraph 32, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

33.    In response to Paragraph 33, the Anthem Defendants admit that their records indicate that Plaintiff John McAffry was enrolled in a group-sponsored health plan through City of Cincinnati Retirees for which Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield provided third party claims administration services.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems. In response to all other allegations in Paragraph 33, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

34.   In response to Paragraph 34, the Anthem Defendants admit that they maintained information about Plaintiff Charles Platt in Anthem's information systems and that they mailed a notification letter to Plaintiff Platt regarding the Anthem Cyberattack.  In response to all other allegations in Paragraph 34, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations and, on that basis, deny them.

## Georgia

35.   In response to Paragraph 35, the Anthem Defendants admit that their records indicate that Plaintiff John Thomas, II was enrolled in a group-sponsored health plan for which Blue Cross and Blue Shield of Georgia, Inc. d/b/a Anthem Blue Cross and Blue Shield provided third party claims administration services.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems.  In response to all other allegations in Paragraph 35, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

36.   In response to Paragraph 36, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

37.   In response to Paragraph 37, the Anthem Defendants admit that their records indicate that Plaintiff Karen Coppedge was enrolled in a health plan administered by Anthem Blue Cross Life and Health Insurance Company and Blue Cross of California, Inc. d/b/a Anthem Blue Cross and that premiums were paid.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems and that they mailed a notification letter to Plaintiff Coppedge regarding the Anthem Cyberattack.  In response to all other allegations in Paragraph 37, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

38.   In response to Paragraph 38, the Anthem Defendants admit that their records indicate that Plaintiff Allison Swank was enrolled in a group-sponsored health plan for which Blue Cross and Blue Shield of Georgia, Inc. and Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. provided third party claims administration services.  The Anthem Defendants

Hogan Lovells US
LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1   further admit that they maintained information about this individual in Anthem's information

2   systems.  In response to the allegations in the fourth sentence of Paragraph 38, the Anthem

3   Defendants admit that Plaintiff Swank produced a form email regarding the Anthem Cyberattack

4   in the course of discovery in this action, but deny the remaining allegations.  In response to all

5   other allegations in Paragraph 38, the Anthem Defendants are without sufficient knowledge or

6   information to form a belief as to the truth of those allegations and, on that basis, deny them.

7         39.   In response to Paragraph 39, the Anthem Defendants admit that their records

8   indicate that Plaintiff Kevin Donnelly was enrolled in a group-sponsored health plan for which

9   Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield provided third party

10  claims administration services.  The Anthem Defendants further admit that they maintained

11  information about this individual in Anthem's information systems.  In response to the allegations

12  in the fourth sentence of Paragraph 39, the Anthem Defendants admit that Plaintiff Donnelly

13  produced a notification letter in the course of discovery in this action, but deny all remaining

14  allegations.   In response to all other allegations in Paragraph 39, the Anthem Defendants are

15  without sufficient knowledge or information to form a belief as to the truth of those allegations

16  and, on that basis, deny them.

17        40.   In response to Paragraph 40, the Anthem Defendants admit that their records

18  indicate that Plaintiff Harold Lott was enrolled in a Blue Cross and Blue Shield of Georgia, Inc.

19  d/b/a Anthem Blue Cross and Blue Shield health plan.  The Anthem Defendants further admit that

20  they maintained information about this individual in Anthem's information systems.  In response

21  to all other allegations in Paragraph 40, the Anthem Defendants are without sufficient knowledge

22  or information to form a belief as to the truth of those allegations and, on that basis, deny them.

23        41.   In response to Paragraph 41, the Anthem Defendants are without sufficient

24  knowledge or information to form a belief regarding the truth of the allegations in this Paragraph

25  and, on that basis, deny them.

26                                             **Idaho**

27        42.   In response to Paragraph 42, the Anthem Defendants admit that their records

28  indicate that Plaintiff Cynthia Kelley was enrolled in a group-sponsored health plan through the

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

Motion Picture Industry Pension & Health Plans for which Anthem Blue Cross Life and Health Insurance Company provided third party claims administration services. In response to all other allegations in Paragraph 42, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

## Illinois

43.     In response to Paragraph 43, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

44.     In response to Paragraph 44, the Anthem Defendants admit that their records indicate that Plaintiff David Klemer was enrolled in a Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield health plan from 2004 until 2007.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems and that they mailed a notification letter to Plaintiff Klemer regarding the Anthem Cyberattack.  In response to the remaining allegations in Paragraph 44, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

45.     In response to Paragraph 45, the Anthem Defendants admit that their records indicate that Plaintiff Nadine Foster was enrolled in a UniCare Life & Health Insurance Company health plan from 2003 until 2005.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems.  In response to the allegations in the fourth sentence of Paragraph 45, the Anthem Defendants admit that Plaintiff Foster produced notification letters addressed to "J. Forseter" and "A. Forseter" in the course of discovery in this action, but deny all remaining allegations contained therein.  In response to all other allegations in Paragraph 45, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

46.     In response to Paragraph 46, the Anthem Defendants admit that their records indicate that Plaintiff Cynthia Reichrath was enrolled in a group-sponsored health plan through the State of Illinois for which HealthLink, Inc. provided third party claims administration

Hogan Lovells US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

services.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems; that they mailed a notification letter to Plaintiff Reichrath regarding the Anthem Cyberattack; and that Plaintiff Reichrath produced a notification letter addressed to her in the course of discovery in this action.  In response to all other allegations in Paragraph 46, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

47.    In response to Paragraph 47, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

**Indiana**

48.    In response to Paragraph 48, the Anthem Defendants admit that their records indicate that Plaintiff Brent Harris was enrolled in an Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana/Bronze Pathway X HMO health plan.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems.  The Anthem Defendants deny all allegations in the fourth sentence of Paragraph 48.  In response to all other allegations in Paragraph 48, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

49.    In response to Paragraph 49, the Anthem Defendants admit that their records indicate that Plaintiff Steven Quinnette was enrolled in group-sponsored health plan through the Archdiocese of Indianapolis for which Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield provided third party claims administration services.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems and that they mailed Plaintiff Quinnette a notification letter regarding the Anthem Cyberattack.  In response to all other allegations in Paragraph 49, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

50.     In response to Paragraph 50, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

51.     In response to Paragraph 51, the Anthem Defendants admit that their records indicate that Plaintiff Cheryl Grissom was enrolled in an Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield individual health plan from 2013 until 2014.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems; that the Anthem Defendants mailed a notification letter to Plaintiff Grissom regarding the Anthem Cyberattack; and that Plaintiff Grissom produced a notification letter addressed to her in the course of discovery in this action.  In response to all other allegations in Paragraph 51, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

52.     In response to Paragraph 52, the Anthem Defendants admit that their records indicate that Plaintiff Miranda Lambert was enrolled in an Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana PPO health plan.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems.  In response to the allegations in fourth sentence of Paragraph 52, the Anthem Defendants admit that they sent a notification letter to Plaintiff Lambert regarding the Anthem Cyberattack, but are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations and, on that basis, deny them.  In response to all other allegations in Paragraph 52, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

53.     In response to Paragraph 53, the Anthem Defendants deny that their records indicate that Plaintiff Amy Whittaker was enrolled in an Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield health plan.  In response to all other allegations in Paragraph 53, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations and, on that basis, deny them.

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

54. In response to Paragraph 54, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

### Iowa

55. In response to Paragraph 55, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

### Kansas

56. In response to Paragraph 56, the Anthem Defendants admit that their records indicate that Plaintiff Jason Jenkins was enrolled in a group-sponsored health plan for which Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield provided third party claims administration services. The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems; that the Anthem Defendants mailed a notification letter to Plaintiff Jenkins regarding the Anthem Cyberattack; and that Plaintiff Jenkins produced a notification letter addressed to him in the course of discovery in this action. In response to all other allegations in Paragraph 56, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

57. In response to Paragraph 57, the Anthem Defendants admit that their records indicate that Plaintiff Kelli Smith's three minor children were enrolled in an Amerigroup Kansas, Inc. and Amerigroup Corporation health plan. The Anthem Defendants further admit that they maintained information about Plaintiff Smith's three minor children in Anthem's information systems. In response to the allegations in the fourth sentence of Paragraph 57, the Anthem Defendants admit that they produced a notice letter addressed to the "Parent(s) or Guardian(s) of Jordan Smith," but are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations and, on that basis, deny them. In response to all other allegations in Paragraph 57, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1

**Kentucky**

2          58.    In response to Paragraph 58, the Anthem Defendants admit that their records

3  indicate that Plaintiff Dianne Reistroffer was enrolled in an Anthem Health Plans of Kentucky,

4  Inc. d/b/a Anthem Blue Cross and Blue Shield Medicare Select health plan and that premiums

5  were paid.  The Anthem Defendants further admit that they maintained information about this

6  individual in Anthem's information systems; that the Anthem Defendants mailed a notification

7  letter to Plaintiff Reistroffer regarding the Anthem Cyberattack; and that Plaintiff Reistroffer

8  produced a notification letter addressed to her in the course of discovery in this action.  In

9  response to all other allegations in Paragraph 58, the Anthem Defendants are without sufficient

10 knowledge or information to form a belief as to the truth of those allegations and, on that basis,

11 deny them.

12         59.    In response to Paragraph 59, the Anthem Defendants admit that their records

13 indicate that Plaintiff Christopher Ruberg was enrolled in an Anthem Health Plans of Kentucky,

14 Inc. d/b/ a Anthem Blue Cross and Blue Shield Access PPO health plan and that premiums were

15 paid.  The Anthem Defendants further admit that they maintained information about this

16 individual in Anthem's information systems; that the Anthem Defendants mailed a notification

17 letter to Plaintiff Ruberg regarding the Anthem Cyberattack; and that Plaintiff Ruberg produced a

18 notification letter addressed to him in the course of discovery in this action.  In response to all

19 other allegations in Paragraph 59, the Anthem Defendants are without sufficient knowledge or

20 information to form a belief as to the truth of those allegations and, on that basis, deny them.

21         60.    In response to Paragraph 60, the Anthem Defendants admit that they maintained

22 information about Plaintiff Frank Bailey in Anthem's information systems and that they mailed a

23 notification letter to Plaintiff Bailey regarding the Anthem Cyberattack.  In response to all other

24 allegations in Paragraph 60, the Anthem Defendants are without sufficient knowledge or

25 information to form a belief regarding the truth of the allegations and, on that basis, deny them.

26         61.    In response to Paragraph 61, the Anthem Defendants admit that their records

27 indicate that Plaintiff Jason Baker obtained health coverage under the Federal BCBSA Plan.  The

28 Anthem Defendants further admit that they maintained information about this individual in

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

Anthem's information systems; that the Anthem Defendants mailed a notification letter to

Plaintiff Baker regarding the Anthem Cyberattack; and that Plaintiff Baker produced a

notification letter addressed to him in the course of discovery in this action.  In response to all

other allegations in Paragraph 61, the Anthem Defendants are without sufficient knowledge or

information to form a belief as to the truth of those allegations and, on that basis, deny them.

**<u>Louisiana</u>**

62.    In response to Paragraph 62, the Anthem Defendants are without sufficient

knowledge or information to form a belief as to the truth of those allegations and, on that basis,

deny them.

**<u>Maine</u>**

63.    In response to Paragraph 63, the Anthem Defendants admit that their records

indicate that Plaintiff Robin Wilkey was enrolled in an Anthem Health Plains of Maine, Inc. d/b/

a Anthem Blue Cross and Blue Shield, Maine Education Trust (MEA Benefits Trust) health plan.

The Anthem Defendants further admit that they maintained information about this individual in

Anthem's information systems.  In response to all other allegations in Paragraph 63, the Anthem

Defendants are without sufficient knowledge or information to form a belief as to the truth of

those allegations and, on that basis, deny them.

64.    In response to Paragraph 64, the Anthem Defendants admit that their records

indicate that Plaintiff Gary Bellegarde was enrolled in an Anthem Health Plans of Maine, Inc.

d/b/a Anthem Blue Cross and Blue Shield health plan.  The Anthem Defendants further admit that

they maintained information about this individual in Anthem's information systems and that they

mailed Plaintiff Bellegarde a notification letter regarding the Anthem Cyberattack.  In response to

all other allegations in Paragraph 64, the Anthem Defendants are without sufficient knowledge or

information to form a belief as to the truth of those allegations and, on that basis, deny them.

65.    In response to Paragraph 65, the Anthem Defendants admit that their records

indicate that Plaintiff Mark Hatcher was enrolled in an Anthem Health Plans of Maine, Inc. d/b/a

Anthem Blue Cross and Blue Shield health plan until 2015.  The Anthem Defendants further

admit that they maintained information about this individual in Anthem's information systems;

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1  that the Anthem Defendants mailed a notification letter to Plaintiff Hatcher regarding the Anthem

2  Cyberattack; and that Plaintiff Hatcher produced a notification letter addressed to him in the

3  course of discovery in this action.  In response to all other allegations in Paragraph 65, the

4  Anthem Defendants are without sufficient knowledge or information to form a belief as to the

5  truth of those allegations and, on that basis, deny them.

### Maryland

66.    In response to Paragraph 66, the Anthem Defendants are without sufficient

knowledge or information to form a belief regarding the truth of the allegations in this Paragraph

and, on that basis, deny them.

67.    In response to Paragraph 67, the Anthem Defendants are without sufficient

knowledge or information to form a belief regarding the truth of the allegations in this Paragraph

and, on that basis, deny them.

### Massachusetts

68.    In response to Paragraph 68, the Anthem Defendants admit that their records

indicate that Plaintiff Fazi Zand was enrolled in an Anthem Blue Cross Life and Health Insurance

Company health plan.  The Anthem Defendants further admit that they maintained information

about this individual in Anthem's information systems.  In response to the allegations in the

fourth sentence of Paragraph 68, the Anthem Defendants admit that Plaintiff Zand produced a

form email regarding the Anthem Cyberattack, but deny all other allegations in this sentence.  In

response to all other allegations in Paragraph 68, the Anthem Defendants are without sufficient

knowledge or information to form a belief as to the truth of those allegations and, on that basis,

deny them.

69.    In response to Paragraph 69, the Anthem Defendants admit that their records

indicate that Plaintiff Claudia Cass was enrolled in a New York State Health Insurance Program

(NYSHIP) for Government Employees.  The Anthem Defendants also admit that Empire

HealthChoice Assurance, Inc. d/b/a Empire BlueCross currently provides third party claims

administration services for the program. The Anthem Defendants further admit that they

maintained information about this individual in Anthem's information systems; that the Anthem

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1  Defendants mailed a notification letter to Plaintiff Cass regarding the Anthem Cyberattack; and

2  that Plaintiff Cass produced a notification letter addressed to her in the course of discovery in this

3  action.  In response to all other allegations in Paragraph 69, the Anthem Defendants are without

4  sufficient knowledge or information to form a belief as to the truth of those allegations and, on

5  that basis, deny them.

6        70.    In response to Paragraph 70, the Anthem Defendants admit that their records

7  indicate that Plaintiff Robert Roy was enrolled in a UniCare Life & Health Insurance Company

8  health plan through the Commonwealth of Massachusetts.  The Anthem Defendants further admit

9  that they maintained information about this individual in Anthem's information systems.  The

10  Anthem Defendants deny all allegations in the fourth sentence of Paragraph 70.  In response to all

11  other allegations in Paragraph 70, the Anthem Defendants are without sufficient knowledge or

12  information to form a belief as to the truth of those allegations and, on that basis, deny them.

13        71.    In response to Paragraph 71, the Anthem Defendants admit that they maintained

14  information about Plaintiff Carrie Ramos in Anthem's information systems and that they mailed a

15  notification letter to Plaintiff Ramos regarding the Anthem Cyberattack.  In response to all other

16  allegations in Paragraph 71, the Anthem Defendants are without sufficient knowledge or

17  information to form a belief regarding the truth of the allegations and, on that basis, deny them.

18        72.    In response to Paragraph 72, the Anthem Defendants admit that their records

19  indicate that Plaintiff Lisa Daniels was enrolled in a group-sponsored health plan for which

20  Healthy Alliance Life Insurance Company d/b/a Anthem Blue Cross and Blue Shield provided

21  third party claims administration services.  The Anthem Defendants further admit that they

22  maintained information about this individual in Anthem's information systems and that the

23  Anthem Defendants mailed a notification letter to Plaintiff Daniels regarding the Anthem

24  Cyberattack.  In response to all other allegations in Paragraph 70, the Anthem Defendants are

25  without sufficient knowledge or information to form a belief as to the truth of those allegations

26  and, on that basis, deny them.

27

28

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

- 21 -

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

## **Michigan**

73.    In response to Paragraph 73, the Anthem Defendants deny that they maintained information about Plaintiff Michelle Kaseta-Collins in Anthem's information systems and that they mailed a notification letter to her regarding the Anthem Cyberattack.   In response to all other allegations in Paragraph 73, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

74.    In response to Paragraph 74, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

## **Minnesota**

75.    In response to Paragraph 75, the Anthem Defendants admit that their records indicate that Plaintiff Hank Maurer was enrolled in a group-sponsored health plan for which Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield provided third party claims administration services.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems.  The Anthem Defendants deny all allegations in the fourth sentence of Paragraph 75.  In response to all other allegations in Paragraph 75, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

76.    In response to Paragraph 76, the Anthem Defendants admit that their records indicate that Plaintiff Jack Wenglewick was enrolled in multiple health plans, including a group-sponsored health plan for which Anthem Blue Cross Life and Health Insurance Company provided third party claims administration services.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems.  In response to the allegations in the fourth sentence of Paragraph 76, the Anthem Defendants admit that Plaintiff Wenglewick produced a notification email in the course of discovery in this action, but are without sufficient knowledge or information to form a belief as to the truth of all other allegations in this sentence and, on that basis, deny them.  In response to all other allegations in

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1  Paragraph 76, the Anthem Defendants are without sufficient knowledge or information to form a
2  belief as to the truth of those allegations and, on that basis, deny them.

3                                    **Mississippi**

4        77.    In response to Paragraph 77, the Anthem Defendants admit that their records
5  indicate that Plaintiff Charles McCullough was enrolled in a group-sponsored health plan through
6  Yokohoma Tire Corporation for which Anthem Health Plans of Virginia, Inc. provided third party
7  claims administration services.  The Anthem Defendants further admit that they maintained
8  information about this individual in Anthem's information systems and that the Anthem
9  Defendants mailed a notification letter to Plaintiff McCullough regarding the Anthem
10 Cyberattack.  In response to all other allegations in Paragraph 77, the Anthem Defendants are
11 without sufficient knowledge or information to form a belief as to the truth of those allegations
12 and, on that basis, deny them.

13                                    **Missouri**

14       78.    In response to Paragraph 78, the Anthem Defendants admit that their records
15 indicate that Plaintiff Debbie Stein was enrolled in a group-sponsored health plan for which
16 RightCHOICE Managed Care, Inc. d/b/a Anthem Blue Cross and Blue Shield of Missouri
17 provided third party claims administration services.  The Anthem Defendants further admit that
18 they maintained information about this individual in Anthem's information systems and that they
19 mailed a notification letter to Plaintiff Stein regarding the Anthem Cyberattack.  In response to all
20 other allegations in Paragraph 78, the Anthem Defendants are without sufficient knowledge or
21 information to form a belief as to the truth of those allegations and, on that basis, deny them.

22       79.    In response to Paragraph79, the Anthem Defendants admit that their records indicate
23 that Plaintiff Melody Eads was enrolled in a RightCHOICE Managed Care, Inc. d/b/a Anthem
24 Blue Cross and Blue Shield of Missouri Blue Access PPO health plan.  The Anthem Defendants
25 further admit that they maintained information about this individual in Anthem's information
26 systems; that the Anthem Defendants mailed a notification letter to Plaintiff Eads regarding the
27 Anthem Cyberattack; and that Plaintiff Eads produced a notification letter addressed to her in the
28 course of discovery in this action.  In response to all other allegations in Paragraph 79, the

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1    Anthem Defendants are without sufficient knowledge or information to form a belief as to the

2    truth of those allegations and, on that basis, deny them.

3        80.   In response to Paragraph 80, the Anthem Defendants admit that their records

4    indicate that Plaintiff Christopher Allen was enrolled in an Anthem Blue Cross and Blue Shield /

5    RightCHOICE Managed Care, Inc. health plan and that premiums were paid.  The Anthem

6    Defendants further admit that they maintained information about this individual in Anthem's

7    information systems and that they mailed a notification letter to Plaintiff Allen regarding the

8    Anthem Cyberattack.  In response to all other allegations in Paragraph 80, the Anthem

9    Defendants are without sufficient knowledge or information to form a belief as to the truth of

10   those allegations and, on that basis, deny them.

11       81.   In response to Paragraph 81, the Anthem Defendants are without sufficient

12   knowledge or information to form a belief regarding the truth of the allegations in this Paragraph

13   and, on that basis, deny them.

14       82.   In response to Paragraph 82, the Anthem Defendants are without sufficient

15   knowledge or information to form a belief as to the truth of those allegations and, on that basis,

16   deny them.

17       83.   In response to Paragraph 83, the Anthem Defendants are without sufficient

18   knowledge or information to form a belief as to the truth of those allegations and, on that basis,

19   deny them.

20   Montana

21       84.   In response to Paragraph 84, the Anthem Defendants are without sufficient

22   knowledge or information to form a belief regarding the truth of the allegations in this Paragraph

23   and, on that basis, deny them.

24                              **<u>Nebraska</u>**

25       85.   In response to Paragraph 85, the Anthem Defendants admit that their records

26   indicate that Plaintiff Troy Hobbs was enrolled in a group-sponsored health plan for which Blue

27   Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield provided third party

28   claims administration services.  The Anthem Defendants further admit that they maintained

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

information about this individual in Anthem's information systems; that the Anthem Defendants mailed a notification letter to Plaintiff Hobbs regarding the Anthem Cyberattack; and that Plaintiff Hobbs produced a notification letter addressed to him in the course of discovery in this action. In response to all other allegations in Paragraph 85, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

## Nevada

86.    In response to Paragraph 86, the Anthem Defendants admit that their records indicate that Plaintiff David Ifversen obtained health coverage under the Federal BCBSA Plan. The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems; that the Anthem Defendants mailed Plaintiff Ifversen a notification letter regarding the Anthem Cyberattack; and that Plaintiff Ifversen produced a notification letter in the course of discovery in this action. In response to all other allegations in Paragraph 86, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

87.    In response to Paragraph 87, the Anthem Defendants admit that their records indicate that Plaintiff Angelin Gonzalez was enrolled in an Anthem Blue Cross Blue Shield health plan. The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems. In response to the allegations in the third sentence of Paragraph 87, the Anthem Defendants admit that Plaintiff Gonzalez produced a notification letter in the course of discovery in this action addressed to "Angelia Gonzalez," and are without sufficient knowledge or information to form a belief as to the truth of any remaining allegations and, on that basis, deny them. In response to all other allegations in Paragraph 87, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

## New Hampshire

88.    In response to Paragraph 88, the Anthem Defendants admit that their records indicate that Plaintiff Joseph LeBrun was enrolled in a group-sponsored health plan for which

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield provided third party claims administration services. The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems; that the Anthem Defendants mailed a notification letter to Plaintiff LeBrun regarding the Anthem Cyberattack; and that Plaintiff LeBrun produced a notification letter addressed to him in the course of discovery in this action. In response to all other allegations in Paragraph 88, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

89.    In response to Paragraph 89, the Anthem Defendants admit that their records indicate that Plaintiff Brenda Harrington was enrolled in an Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield health plan from 2013 until 2014. The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems; that the Anthem Defendants mailed a notification letter to Plaintiff Harrington about the Anthem Cyberattack; and that Plaintiff Harrington produced a notification letter in the course of discovery in this action. In response to all other allegations in Paragraph 89, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

## New Jersey

90.    In response to Paragraph 90, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

## New Mexico

91.    In response to Paragraph 91, the Anthem Defendants admit that their records indicate that Plaintiff Ronald Percy was enrolled in a UniCare Life & Health Insurance Company health plan from 2007 until 2011. The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems; that the Anthem Defendants mailed Plaintiff Percy a notification letter regarding the Anthem Cyberattack; and that Plaintiff Percy produced a notification letter addressed to him in the course of discovery in this action. In

Hogan Lovells US LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1  response to all other allegations in Paragraph 91, the Anthem Defendants are without sufficient

2  knowledge or information to form a belief as to the truth of those allegations and, on that basis,

3  deny them.

4  ### New York

5      92.   In response to Paragraph 92, the Anthem Defendants admit that their records

6  indicate that Plaintiff Barbara Gold was enrolled in a New York State Health Insurance Program

7  (NYSHIP) for Government Employees. The Anthem Defendants also admit that Empire

8  HealthChoice Assurance, Inc. d/b/a Empire BlueCross currently provides third party claims

9  administration services for the program.  The Anthem Defendants further admit that they

10  maintained information about this individual in Anthem's information systems; that the Anthem

11  Defendants mailed a notification letter to Plaintiff Gold regarding the Anthem Cyberattack; and

12  that Plaintiff Gold produced a notification letter addressed to her in the course of discovery in this

13  action.  In response to all other allegations in Paragraph 92, the Anthem Defendants are without

14  sufficient knowledge or information to form a belief as to the truth of those allegations and, on

15  that basis, deny them.

16      93.   In response to Paragraph 93, the Anthem Defendants admit that their records

17  indicate that Plaintiff Matthew Gates was enrolled in a health plan sponsored by Verizon and for

18  which Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield provided

19  third party claims administration services.  The Anthem Defendants further admit that they

20  maintained information about this individual in it Anthem's s information systems; that the

21  Anthem Defendants mailed a notification letter to Plaintiff Gates regarding the Anthem

22  Cyberattack; and that Plaintiff Gates produced a notification letter addressed to him in the course

23  of discovery in this action.  In response to all other allegations in Paragraph 93, the Anthem

24  Defendants are without sufficient knowledge or information to form a belief as to the truth of

25  those allegations and, on that basis, deny them.

26      94.   In response to Paragraph 94, the Anthem Defendants admit that their records

27  indicate that Plaintiff Juan Carlos Cerro was enrolled in a New York State Health Insurance

28  Program (NYSHIP) for Government Employees. The Anthem Defendants also admit that Empire

Hogan Lovells US
LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

HealthChoice Assurance, Inc. d/b/a Empire BlueCross currently provides third party claims administration services for the program.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems and that the Anthem Defendants mailed a notification letter to Plaintiff Cerro regarding the Anthem Cyberattack.  In response to all other allegations in Paragraph 94, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

95.   In response to Paragraph 95, the Anthem Defendants admit that their records indicate that Plaintiff Marne Onderdonk was enrolled in a New York State Health Insurance Program (NYSHIP) for Government Employees. The Anthem Defendants also admit that Empire HealthChoice Assurance, Inc. d/b/a Empire BlueCross currently provides third party claims administration services for the program.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems.  In response to all other allegations in Paragraph 95, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

96.   In response to Paragraph 96, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

97.   In response to Paragraph 97, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

**North Carolina**

98.   In response to Paragraph 98, the Anthem Defendants admit that they mailed a notification letter to Plaintiff Randy Polacsek regarding the Anthem Cyberattack.  In response to all other allegations in Paragraph 98, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations and, on that basis, deny them.

99.   In response to the Paragraph 99, the Anthem Defendants admit that their records indicate that Plaintiff Francis Nicosia was enrolled in a Blue Cross of California, d/b/a Anthem

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

Blue Cross health plan, but are without sufficient knowledge or information to form a belief regarding the truth of the allegations in the second, third, and fourth sentences of Paragraph 99. The Anthem Defendants admit that they maintained information about this individual in Anthem's information systems. In response to all other allegations in Paragraph 99, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

### Ohio

100. In response to Paragraph 100, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

101. In response to Paragraph 101, the Anthem Defendants admit that their records indicate that Plaintiff Rachel Calo was enrolled in a group-sponsored health plan for which Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield provided third party claims administration services. The Anthem Defendants admit that they maintained information about this individual in Anthem's information systems; that the Anthem Defendants mailed a notification letter to Plaintiff Calo regarding the Anthem Cyberattack; and that Plaintiff Calo produced a notification letter addressed to her in the course of discovery in this action. In response to all other allegations in Paragraph 101, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

102. In response to Paragraph 102, the Anthem Defendants admit that their records indicate that Plaintiff Nicholas Bowes was enrolled in a group-sponsored health plan for which Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield provided third party claims administration services. The Anthem Defendants admit that they maintained information about this individual in Anthem's information systems and that they mailed a notification letter to Plaintiff Bowes regarding the Anthem Cyberattack. In response to all other allegations in Paragraph 102, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

Hogan Lovells US LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

103.    In response to Paragraph 103, the Anthem Defendants admit that their records indicate that Plaintiff Martin Williams was enrolled in a Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield and that premiums were paid. The Anthem Defendants admit that they maintained information about this individual in Anthem's information systems and that they mailed a notification letter to Plaintiff Williams regarding the Anthem Cyberattack.  In response to all other allegations in Paragraph 103, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

### Oklahoma

104.    In response to Paragraph 104, the Anthem Defendants admit that their records indicate that Plaintiff Rosanne M. Stanley was enrolled in a group-sponsored health plan for which Anthem Insurance Companies, Inc. d/b/a Blue Cross and Blue Shield provided third party claims administration services.  The Anthem Defendants admit that they maintained information about this individual in Anthem's information systems; that they mailed a notification letter to Plaintiff Stanley regarding the Anthem Cyberattack; and that Plaintiff Stanley produced a notification letter addressed to her in the course of discovery in this action.  In response to all other allegations in Paragraph 104, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

Pennsylvania

105.    In response to Paragraph 105, the Anthem Defendants admit that their records indicate that Plaintiff Gregory Kremer was enrolled in a Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield health plan from 2009 until 2013.  The Anthem Defendants admit that they maintained information about this individual in Anthem's information systems and that they mailed a notification letter to Plaintiff Kremer regarding the Anthem Cyberattack. In response to all other allegations in Paragraph 105, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

Hogan Lovells US LLP
Attorneys At Law

1    106.  In response to Paragraph 106, the Anthem Defendants are without sufficient
2    knowledge or information to form a belief regarding the truth of the allegations in this Paragraph
3    and, on that basis, deny them.

**Rhode Island**

5    107.  In response to Paragraph 107, the Anthem Defendants admit that their records
6    indicate that Plaintiff Alan Voll was enrolled in a group-sponsored health plan for which Anthem
7    Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield provide third party claims
8    administration services.  The Anthem Defendants admit that they maintained information about
9    this individual in Anthem's information systems.  In response to all other allegations in Paragraph
10   107, the Anthem Defendants are without sufficient knowledge or information to form a belief as
11   to the truth of those allegations and, on that basis, deny them.

**South Carolina**

13   108.  In response to Paragraph 108, the Anthem Defendants admit that their records
14   indicate that Plaintiff Lakeysha Gant was enrolled in an Anthem Health Plans of Virginia, Inc.
15   d/b/a Anthem Blue Cross and Blue Shield of Virginia Bronze Plus Choice health plan.  The
16   Anthem Defendants admit that they maintained information about this individual in Anthem's
17   information systems and that they mailed a notification letter to Plaintiff Gant regarding the
18   Anthem Cyberattack.  In response to all other allegations in Paragraph 108, the Anthem
19   Defendants are without sufficient knowledge or information to form a belief as to the truth of
20   those allegations and, on that basis, deny them.

**Tennessee**

22   109.  In response to Paragraph 109, the Anthem Defendants admit that their records
23   indicate that Plaintiff Jonathan B. Pulcini was enrolled in a group-sponsored health plan for which
24   Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield provided third
25   party claims administration services.  The Anthem Defendants admit that they maintained
26   information about this individual in Anthem's information systems and that they mailed a
27   notification letter to Plaintiff Pulcini regarding the Anthem Cyberattack.  In response to all other

- 31 -

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

allegations in Paragraph 109, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

110.  In response to Paragraph 110, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

## Texas

111.  In response to Paragraph 111, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

112.  In response to Paragraph 112, the Anthem Defendants admit that their records indicate that Plaintiff Joseph Beckerman was enrolled in a Blue Cross of California, Inc. d/b/a Anthem Blue Cross of California PPO health plan and an Anthem Blue Cross Life and Health Insurance Company Blue View Plus Insurance Vision health plan d.  In response to the allegations in the fourth sentence of Paragraph 112, the Anthem Defendants admit that they maintained information about this individual in Anthem's information systems.  The Anthem Defendants deny the allegations in the fifth sentence of Paragraph 112.  In response to all other allegations in Paragraph 112, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

## Utah

113.  In response to Paragraph 113, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

114.  In response to Paragraph 114, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

## Virginia

115.  In response to Paragraph 115, the Anthem Defendants admit that their records indicate that Plaintiff Amanda Davis was enrolled in a state-sponsored HMO HealthKeepers, Inc.

- 32 -

1   d/b/a Anthem Blue Cross and Blue Shield of Virginia health plan and an Anthem Health Plans of

2   Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia health plan.  The Anthem

3   Defendants further admit that they maintained information about this individual in Anthem's

4   information systems and that they mailed a notification letter to Plaintiff Davis regarding the

5   Anthem Cyberattack.  In response to all other allegations in Paragraph 115, the Anthem

6   Defendants are without sufficient knowledge or information to form a belief as to the truth of

7   those allegations and, on that basis, deny them.

8        116.  In response to Paragraph 116, the Anthem Defendants admit that their records

9   indicate that Plaintiff Michael S. Weinberger was enrolled in group-sponsored health plan for

10  which Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana

11  provided third party claims administration services. The Anthem Defendants further admit that

12  they maintained information about this individual in Anthem's information systems and that they

13  mailed a notification letter to Plaintiff Weinberger regarding the Anthem Cyberattack.  In

14  response to all other allegations in Paragraph 116, the Anthem Defendants are without sufficient

15  knowledge or information to form a belief as to the truth of those allegations and, on that basis,

16  deny them.

17                                **Washington**

18        117.  In response to Paragraph 117, the Anthem Defendants admit that their records

19  indicate that Plaintiff Vernon Davitte was enrolled in a group-sponsored health plan for which

20  Anthem Blue Cross Life and Health Insurance Services provided third party claims

21  administration services, but deny that Plaintiff Davitte was enrolled in a Healthy Alliance Life

22  Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Missouri plan.  The Anthem

23  Defendants further admit that they maintained information about this individual in Anthem's

24  information systems and that they mailed a notification letter to Plaintiff Davitte regarding the

25  Anthem Cyberattack.  In response to all other allegations in Paragraph 117, the Anthem

26  Defendants are without sufficient knowledge or information to form a belief as to the truth of

27  those allegations and, on that basis, deny them.

28

Hogan Lovells US
LLP
Attorneys At Law

- 33 -

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

118. In response to Paragraph 118, the Anthem Defendants admit that their records indicate that Plaintiff Jennifer Mertlich was enrolled in group-sponsored health plan for which Anthem Blue Cross Life and Health Insurance Company provided third party claims administration services. The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems. In response to all other allegations in Paragraph 118, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

119. In response to Paragraph 119, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

### West Virginia

120. In response to Paragraph 120, the Anthem Defendants admit that their records indicate that Plaintiff Lisa Shiltz was enrolled in a group-sponsored health plan for which Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield provided third party claims administration services. The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems; that the Anthem Defendants mailed a notification letter to Plaintiff Shiltz regarding the Anthem Cyberattack; and that Plaintiff Shiltz produced a notification letter addressed to her in the course of discovery in this action. In response to all other allegations in Paragraph 120, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

Wisconsin

121. In response to Paragraph 121, the Anthem Defendants admit that their records indicate that Plaintiff Susan H. Jones was enrolled in a Compcare Health Services Insurance Corporation d/b/a Anthem Blue Cross and Blue Shield of Wisconsin health plan. The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems. The Anthem Defendants deny the allegations in the fourth sentence of Paragraph 121. In response to all other allegations in Paragraph 121, the Anthem Defendants are

- 34 -

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

122.  In response to Paragraph 122, the Anthem Defendants admit that their records indicate that Plaintiff Jennifer Rud was enrolled in a group-sponsored health plan for which Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana provided third party claims administration services.  The Anthem Defendants further admit that they maintained information about this individual in Anthem's information systems and that they mailed a notification letter to Plaintiff Rud regarding the Anthem Cyberattack.  In response to all other allegations in Paragraph 122, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of those allegations and, on that basis, deny them.

**B.    Defendants**

123.  In response to the allegations in the fourth sentence of Paragraph 123, the Anthem Defendants admit that Anthem is incorporated and headquartered in Indiana, and is one of the largest health benefits and health insurance companies in the United States.  The Anthem Defendants also admit that Anthem offers health benefit services through its subsidiaries. The Anthem Defendants further admit that they participate in the BlueCard Program, which is a national program that enables Anthem members traveling away from home or living in another Blue Cross and Blue Shield (BCBS) Plan area to receive health care services through claims processing networks of BlueCard-participating, independent Blue Plans.  The Anthem Defendants deny the remaining allegations of Paragraph 123.

124.  The Anthem Defendants admit the allegations in Paragraph 124.

125.  The Anthem Defendants admit the allegations in Paragraph 125.

126.  The Anthem Defendants admit the allegations in Paragraph 126.

127.  The Anthem Defendants admit the allegations in Paragraph 127.

128.  The Anthem Defendants admit the allegations in Paragraph 128.

129.  The Anthem Defendants admit the allegations in Paragraph 129.

130.  The Anthem Defendants admit the allegations in Paragraph 130.

131.  The Anthem Defendants admit the allegations in Paragraph 131.

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

132. The Anthem Defendants admit the allegations in Paragraph 132.

133. The Anthem Defendants admit the allegations in Paragraph 133.

134. The Anthem Defendants admit that Defendant RightChoice Managed Care Inc., d/b/a Anthem Blue Cross and Blue Shield of Missouri is an Anthem affiliate headquartered in Missouri, but deny the remaining allegations in Paragraph 134.

135. The Anthem Defendants admit the allegations in Paragraph 135.

136. The Anthem Defendants admit the allegations in Paragraph 136.

137. The Anthem Defendants admit the allegations in Paragraph 137.

138. The Anthem Defendants admit the allegations in Paragraph 138.

139. The Anthem Defendants admit the allegations in Paragraph 139.

140. The Anthem Defendants admit the allegations in Paragraph 140.

141. The Anthem Defendants admit the allegations in Paragraph 141.

142. The Anthem Defendants admit the allegations in Paragraph 142.

143. The Anthem Defendants admit the allegations in Paragraph 143.

144. The Anthem Defendants admit the allegations in Paragraph 144.

145. The Anthem Defendants admit the allegations in Paragraph 145.

146. The Anthem Defendants admit the allegations in Paragraph 146.

147. The Anthem Defendants admit the allegations in Paragraph 147.

148. The Anthem Defendants admit the allegations in Paragraph 148.

149. The Anthem Defendants admit the allegations in Paragraph 149.

150. The Anthem Defendants admit the allegations in Paragraph 150.

151. The Anthem Defendants admit the allegations in Paragraph 151.

152. The Anthem Defendants deny the allegations in Paragraph 152.

153. In response to Paragraph 153, the Anthem Defendants admit that Defendant Blue Cross and Blue Shield of Alabama is a Blue Cross Blue Shield Association Licensee, but is not an Anthem Affiliate or Subsidiary.  The Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations and, on that basis, deny them.

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

154.  In response to Paragraph 154, the Anthem Defendants admit that Defendant USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield is a Blue Cross Blue Shield Association Licensee, but is not an Anthem Affiliate or Subsidiary. The Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations and, on that basis, deny them.

155.  In response to Paragraph 155, the Anthem Defendants admit that Defendant California Physicians' Service, Inc. d/b/a Blue Shield of California is a Blue Cross Blue Shield Association Licensee, but is not an Anthem Affiliate or Subsidiary.  The Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations and, on that basis, deny them.

156.  In response to Paragraph 156, the Anthem Defendants admit that Defendant Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Illinois and Blue Cross and Blue Shield of Texas is a Blue Cross Blue Shield Association Licensee, but is not an Anthem Affiliate or Subsidiary.  The Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations and, on that basis, deny them.

157.  In response to Paragraph 157, the Anthem Defendants admit that Defendant Blue Cross and Blue Shield of Florida, Inc. is a Blue Cross Blue Shield Association Licensee, but is not an Anthem Affiliate or Subsidiary.  The Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations and, on that basis, deny them.

158.  In response to Paragraph 158, the Anthem Defendants admit that Defendant CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield is a Blue Cross Blue Shield Association Licensee, but is not an Anthem Affiliate or Subsidiary.  The Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations and, on that basis, deny them.

159.  In response to Paragraph 159, the Anthem Defendants admit that Defendant Blue Cross and Blue Shield of Massachusetts, Inc. is a Blue Cross Blue Shield Association Licensee, but is not an Anthem Affiliate or Subsidiary.  The Anthem Defendants are without sufficient

- 37 -

knowledge or information to form a belief as to the truth of the remaining allegations and, on that basis, deny them.

160.   In response to Paragraph 160, the Anthem Defendants admit that Defendant Blue Cross and Blue Shield of Michigan is a Blue Cross Blue Shield Association Licensee, but is not an Anthem Affiliate or Subsidiary.  The Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations and, on that basis, deny them.

161.   In response to Paragraph 161, the Anthem Defendants admit that Defendant BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota a Blue Cross Blue Shield Association Licensee, but is not an Anthem Affiliate or Subsidiary.  The Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations and, on that basis, deny them.

162.   In response to Paragraph 162, the Anthem Defendants admit that Defendant Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross and Blue Shield of New Jersey a Blue Cross Blue Shield Association Licensee, but is not an Anthem Affiliate or Subsidiary.  The Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations and, on that basis, deny them.

163.   In response to Paragraph 163, the Anthem Defendants admit that Defendant Blue Cross and Blue Shield of North Carolina, Inc. is a Blue Cross Blue Shield Association Licensee, but is not an Anthem Affiliate or Subsidiary.  The Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations and, on that basis, deny them.

164.   In response to Paragraph 164, the Anthem Defendants admit that Defendant Highmark Inc. d/b/a Highmark Blue Shield and d/b/a Highmark Blue Cross Blue Shield is a Blue Cross Blue Shield Association Licensee, but is not an Anthem Affiliate or Subsidiary.  The Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations and, on that basis, deny them.

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

- 38 -

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

165. In response to Paragraph 165, the Anthem Defendants admit that Defendant Blue Cross and Blue Shield of Vermont is a Blue Cross Blue Shield Association Licensee, but is not an Anthem Affiliate or Subsidiary. The Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations and, on that basis, deny them.

166. In response to Paragraph 166, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations and, on that basis, deny them.

167. The Anthem Defendants deny the allegations in Paragraph 167.

## STATEMENT OF FACTS

**A.      The Anthem Database**

168. The Anthem Defendants admit that Anthem is one of the largest health benefits and health insurance companies in the United States. The Anthem Defendants further admit that Anthem, Inc., through its affiliates, operates as a Blue Cross Blue Shield licensee in fourteen states. The Anthem Defendants further admit that Anthem operates through other affiliates and subsidiaries outside of those fourteen states. Plaintiffs' allegation in the second sentence of Paragraph 168 about how they intend to refer to licensees and affiliates requires no response. The Anthem Defendants deny the remaining allegations the allegations in Paragraph 168.

169. In response to Paragraph 169, the Anthem Defendants admit that they participate in the BlueCard Program, which is a national program that enables Anthem members traveling away from home or living in another Blue Cross and Blue Shield (BCBS) Plan area to receive health care services through claims processing networks of BlueCard-participating, independent Blue Plans. The Anthem Defendants deny the remaining allegations in Paragraph 169.

170. In response to Paragraph 170, the Anthem Defendants admit that they maintain member information, including some personal information, in its information systems. The Anthem Defendants deny the remaining allegations in Paragraph 171.

171. In response to Paragraph 171, the Anthem Defendants admit that Anthem, Inc. maintains an Enterprise Data Warehouse that contains certain personal information relating to

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

certain individuals who are Anthem members, Anthem employees, and members of Non-Anthem

BCBS Plans that are not affiliates or subsidiaries of Anthem ("Non-Anthem BSCBA Plans").

The Anthem Defendants deny the remaining allegations in Paragraph 171.

172. The Anthem Defendants deny the allegations in Paragraph 172.

173. The Anthem Defendants deny the allegations in Paragraph 173.

**B.** **Defendants' Privacy Policies, Representations, Omissions, and Contract Terms Pertaining to Data Security and Confidentiality**

    **1.** **Anthem and Anthem Affiliates**

        **a.** **Anthem's Privacy Policies, Representations and Omissions**

174. In response to Paragraph 174, the Anthem Defendants admit that at all times relevant to this litigation it had policies related to privacy. The Anthem Defendants deny the remaining allegations in Paragraph 174 on the grounds that those policies speak for themselves.

175. In response to Paragraph 175, the Anthem Defendants admit that at all times relevant to this litigation it had a "Personal Information (Including Social Security Number) Privacy Protection Policy." The Anthem Defendants deny the allegations regarding the Privacy Protection Policy (including the allegations set forth in footnote 1) on the grounds that the document speaks for itself. The Anthem Defendants deny all other allegations in Paragraph 175.

176. In response to Paragraph 176, the Anthem Defendants admit that the Privacy Protection Policy is currently found on its websites. The Anthem Defendants deny the remaining allegations in Paragraph 176.

177. In response to Paragraph 177, the Anthem Defendants admit that the Privacy Protection Policy is currently found on its websites. The Anthem Defendants deny the remaining allegations in Paragraph 177.

178. In response to Paragraph 178, the Anthem Defendants admit that they maintain sections of their websites related to privacy. The Anthem Defendants deny the allegations regarding the websites on the grounds that the contents of those websites speak for themselves. The Anthem Defendants deny the remaining allegations in Paragraph 178.

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

179. The Anthem Defendants admit that Anthem's Notice of Privacy Policy is available to customers on its website and that Anthem complies with its legal obligations. No response is required to the remaining allegations in Paragraph 179 because are legal conclusions.

180. In response to Paragraph 180, the Anthem Defendants deny the allegations regarding the sections of the Anthem Defendants' websites related to privacy on the grounds that these websites and the contents thereof speak for themselves. The Anthem Defendants deny the remaining allegations in Paragraph 180.

181. In response to Paragraph 181, the Anthem Defendants admit that they maintain a Notice of Privacy Policy, but deny the allegations regarding such policy on the grounds that the document speaks for itself. The Anthem Defendants deny the remaining allegations in Paragraph 181.

182. In response to Paragraph 182, the Anthem Defendants deny all allegations on the grounds that the Notice of Privacy Policy speaks for itself.

183. In response to Paragraph 183, the Anthem Defendants deny all allegations on the grounds that the Notice of Privacy Policy speaks for itself.

184. In response to Paragraph 184, the Anthem Defendants deny all allegations on the grounds that the Notice of Privacy Policy speaks for itself.

185. In response to Paragraph 185, the Anthem Defendants admit that Anthem's Notice of Privacy Policy is available to customers on its website, as well as the websites of the other non-BCBS Affiliates. The Anthem Defendants deny the remaining allegations in Paragraph 185.

186. The Anthem Defendants deny the allegations in Paragraph 186.

187. In response to Paragraph 187, the Anthem Defendants deny all allegations on the grounds that documents provided by the Anthem Defendants to its customers speak for themselves.

188. In response to Paragraph 188, the Anthem Defendants admit that potential members can review information regarding Anthem health insurance services online. That information speaks for itself. The Anthem Defendants deny the remaining allegations in Paragraph 188.

Hogan Lovells US LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

189.  In response to Paragraph 189, the Anthem Defendants deny all allegations in this paragraph regarding the contents of the Anthem Defendants' websites on the grounds that they speak for themselves.  The Anthem Defendants deny the remaining allegations in Paragraph 189.

190.  In response to Paragraph 190, the Anthem Defendants deny all allegations regarding the contents of the Anthem Defendants' websites on the grounds that they speak for themselves. The Anthem Defendants deny the remaining allegations in Paragraph 190.

191.  The Anthem Defendants deny the allegations in Paragraph 191.

192.  In response to Paragraph 192, the Anthem Defendants admit that their Notice of Privacy Policy are maintained on their websites.  The Anthem Defendants deny the remaining allegations in Paragraph 192.

193.  In response to Paragraph 193, Anthem states that it complies with its privacy policies.  On that basis, the Anthem Defendants deny the allegations in Paragraph 193.

194.  In response to Paragraph 194, Anthem states that it complies with its privacy policies and applicable law and meets or exceeds industry standards. On that basis, the Anthem Defendants deny the allegations in Paragraph 194.

195.  In response to Paragraph 195, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and, on that basis, deny them.

        **b.**     **Anthem's Insurance and Health Benefits Contracts Include Anthem's Privacy Policies**

196.  In response to Paragraph 196, the Anthem Defendants deny all allegations (including the allegations set forth in footnote 2), on the grounds that the referenced contracts speak for themselves.

197.  In response to Paragraph 197, the Anthem Defendants deny all allegations in this paragraph on the grounds that Anthem's website speaks for itself.

198.  In response to Paragraph 198, the Anthem Defendants deny all allegations in this paragraph on the grounds that Anthem's website speaks for itself.

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

199. In response to Paragraph 199, the Anthem Defendants deny all allegations in this paragraph on the grounds that Anthem's website speaks for itself.

200. In response to Paragraph 200, the Anthem Defendants admit that individuals who receive insurance or health benefits services from the Anthem Defendants do so as a result of being covered under individual or group insurance policies or contracts. The Anthem Defendants deny the remaining allegations in Paragraph 200.

### (i) Individual Contracts

201. In response to Paragraph 201, the Anthem Defendants admit that an individual who purchases individual insurance or health benefits policies enters into a contract with the Anthem Affiliate that issued that policy. The Anthem Defendants deny all remaining allegations in Paragraph 201.

202. In response to Paragraph 202, the Anthem Defendants admit that when an individual purchases an individual insurance policy, the Anthem entity that issued that policy provides a copy of the relevant contract document(s), which may be referred to in a variety of ways including, "policy," Evidence of Coverage," or "benefit booklet." The Anthem Defendants deny the remaining allegations in Paragraph 202.

203. Because Plaintiff Michael Bronzo purports to have dismissed his claim, no response to Paragraph 203 is required. To the extent a response is required, the Anthem Defendants admit that Exhibit 6 are excerpts from the Evidence of Coverage applicable to Plaintiff Michael Bronzo. The Anthem Defendants deny the remaining allegations in Paragraph 203 on the grounds that Exhibit 6 speaks for itself. No response is required to footnote 3 of Paragraph 203 because it is Plaintiffs' characterization of Exhibit 6. To the extent a response is required, the Anthem Defendants deny such allegations.

204. In response to Paragraph 204, the Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of allegations regarding the practices of "all insurers" and, on that basis, deny them. The Anthem Defendants deny the remaining allegations of Paragraph 204.

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

205. In response to Paragraph 205, the Anthem Defendants admit that they receive premiums relating to individuals who receive health insurance benefits through individual policies. The Anthem Defendants deny the remaining allegations of Paragraph 205.

206. Because Plaintiff Michael Bronzo purports to have dismissed his claim, no response to Paragraph 206 is required. To the extent a response is required, the Anthem Defendants deny the allegations regarding the Evidence of Coverage document relating to Plaintiff Michael Bronzo on the grounds that the document speaks for itself. The Anthem Defendants are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and, on that basis, deny them.

207. The Anthem Defendants deny the allegations in Paragraph 207.

208. The Anthem Defendants deny the allegations in Paragraph 208.

209. The Anthem Defendants deny the allegations in Paragraph 209.

210. The Anthem Defendants deny the allegations in Paragraph 210.

211. Because Plaintiff Michael Bronzo purports to have dismissed his claim, no response to Paragraph 211 is required. To the extent a response is required, the Anthem Defendants deny the allegations on the grounds that the Evidence of Coverage document relating to Plaintiff Michael Bronzo speaks for itself.

212. The Anthem Defendants deny the allegations in Paragraph 212.

213. The Anthem Defendants deny the allegations in Paragraph 213.

214. In response to Paragraph 214, the Anthem Defendants admit that individuals who obtain individuals health insurance coverage from the Anthem Defendants typically must submit an application for such coverage. The Anthem Defendants deny allegations regarding "Anthem California's individual application" on the grounds that the application speaks for itself. The Anthem Defendants deny the remaining allegations in Paragraph 214.

215. The Anthem Defendants deny the allegations in Paragraph 215.

216. The Anthem Defendants deny the allegations in Paragraph 216 regarding individual policy documents on the grounds that such documents speak for themselves. The Anthem Defendants deny the remaining allegations in Paragraph 216.

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

217.  The Anthem Defendants deny the allegations in Paragraph 217 on the grounds that any document the Anthem Defendants provided to its customers speaks for itself.  The Anthem Defendants deny all remaining allegations in Paragraph 217.

### (ii)     Group Contracts

218.  No response is required to Paragraph 218 because it alleges only legal conclusions and arguments.  To the extent a response is required, the Anthem Defendants deny the allegations in Paragraph 218.  The Anthem Defendants specifically deny allegations regarding any documents referenced in Paragraph 218 on the grounds that such documents speak for themselves.

219.  In response to Paragraph 219, the Anthem Defendants deny the allegations on the grounds that Anthem's website speaks for itself.

220.  In response to Paragraph 220, the Anthem Defendants deny the allegations on the grounds that Anthem's website speaks for itself.

221.  In response to Paragraph 221 the Anthem Defendants deny the allegations on the grounds that Anthem's website speaks for itself.

222.  In response to Paragraph 222, the Anthem Defendants deny the allegations on the grounds that Anthem's website speaks for itself.

223.  In response to Paragraph 223, the Anthem Defendants deny allegations regarding any documents referenced in Paragraph 223 on the grounds that such documents speak for themselves.  No response is required to the remaining allegations because they are legal conclusions and arguments.  To the extent a response is required, the Anthem Defendants deny the remaining allegations in Paragraph 223.

224.  In response to Paragraph 224, the Anthem Defendants admit that they enter into contracts providing health insurance benefits to fully insured plans and administrative services with regard to self-insured group policies.  The Anthem Defendants deny the allegations regarding these policy and contract documents on the grounds that such documents speak for themselves.  Plaintiffs' allegation in the second sentence of Paragraph 224 about how they intend

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

to refer to contract documents for self-funded plans does not require a response. To the extent a response is required, the Anthem Defendants deny such allegation.

225. In response to Paragraph 225, the Anthem Defendants admit that they enter into contracts providing health insurance benefits to fully insured plans and administrative services with regard to self-insured group policies. The Anthem Defendants deny the allegations regarding these policy and contract documents on the grounds that such documents speak for themselves.

226. No response is required to the first sentence of Paragraph 226 because it alleges only legal conclusions and arguments. To the extent a response is required, the Anthem Defendants deny these allegations. The Anthem Defendants deny the remaining allegations in Paragraph 226.

227. In response to Paragraph 227, the Anthem Defendants admit that Plaintiff Kenneth Coonce was enrolled in a group plan with Blue Cross of California, Inc. d/b/a Anthem Blue Cross, an Anthem Blue Cross Small Group PPO plan, offered by Swanson Fahrney Ford. The Anthem Defendants deny the allegations in the fourth and fifth sentences of Paragraph 227 on the grounds that the Evidence of Coverage booklet attached to the TAC as Exhibit 8-1 and the Group Agreements attached to the TAC as Exhibits 8-2 and 8-3 speak for themselves. In response to all other allegations in Paragraph 227, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of those allegations and, on that basis, deny them.

228. The Anthem Defendants deny the allegations in Paragraph 228.

229. The Anthem Defendants deny the allegations in the second sentence of Paragraph 229 on the grounds that the documents referenced therein speak for themselves. The Anthem Defendants deny the remaining allegations in Paragraph 229.

230. The Anthem Defendants deny the allegations in Paragraph 230.

231. The Anthem Defendants deny the allegations in Paragraph 231.

232. In response to Paragraph 232, the Anthem Defendants deny the allegations regarding plan documents as these documents speak for themselves. The Anthem Defendants deny the remaining allegations in Paragraph 232.

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

233. In response to Paragraph 233, the Anthem Defendants deny the allegations on the grounds that Exhibit 8-1 speaks for itself.

234. The Anthem Defendants deny the allegations in Paragraph 234.

235. The Anthem Defendants deny the allegations in Paragraph 235.

236. No response is required to Paragraph 236 because it alleges only legal conclusions and arguments. To the extent a response is required, the Anthem Defendants deny the allegations in Paragraph 236 on the grounds that the documents referenced therein speak for themselves.

237. In response to Paragraph 237, the Anthem Defendants deny the allegations regarding Exhibits 8-1, 8-2, and 8-3 on the grounds that these documents speak for themselves. The Anthem Defendants deny the remaining allegations in Paragraph 237.

238. The Anthem Defendants deny the allegations in Paragraph 238.

239. In response to Paragraph 239, the Anthem Defendants admit that they enter into contracts that are for Administrative Services. The Anthem Defendants further admit that they may provide an Evidence of Coverage or benefit booklet to members enrolled in a self-funded group plan and that members may be provided a Summary Plan Description. No response is required to footnote 4 because it calls for a legal conclusion. The Anthem Defendants deny the remaining allegations in Paragraph 239.

240. In response to Paragraph 240, the Anthem Defendants admit that they entered into contracts only for Administrative Services relating to self-funded plans. Those contracts speak for themselves. The Anthem Defendants deny the remaining allegations in Paragraph 240.

241. The Anthem Defendants deny the allegations in Paragraph 241.

242. Because Plaintiffs Daniel and Kelly Tharp purport to have dismissed their claims, no response to Paragraph 242 is required. To the extent a response is required, the Anthem Defendants admit that California Plaintiffs Daniel and Kelly Tharp enrolled in a group-sponsored health plan for which Anthem Blue Cross Life and Health Insurance Company and Blue Cross of California, Inc., d/b/a Anthem Blue Cross provided health benefits services pursuant to an Administrative Services Agreement between Anthem and the Ironworkers' Employees Benefit Corporation (IBEC). In response to allegations regarding the Administrative Services Agreement

- 47 -

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

between Anthem and IBEC, the Anthem Defendants deny such allegations on the grounds that the agreement speaks for itself.  The Anthem Defendants deny the remaining allegations in Paragraph 242.

243.  The Anthem Defendants deny the allegations in Paragraph 243 on the grounds that the agreements referenced in this Paragraph speak for themselves.

244.  The Anthem Defendants deny the allegations in Paragraph 244 on the grounds that Exhibit 12-1 speaks for itself.  The Anthem Defendants deny the remaining allegations in Paragraph 244.  The Anthem Defendants admit the allegations in footnote 5 of this Paragraph.

245.  The Anthem Defendants deny the allegations in Paragraph 245 on the grounds that Exhibits 9-1, 10-1, and 13 speak for themselves.  The Anthem Defendants deny the remaining allegations in Paragraph 245.

246.  The Anthem Defendants deny the allegations in Paragraph 246.

247.  The Anthem Defendants deny the allegations in Paragraph 247 on the grounds that the contract documents speak for themselves.

248.  The Anthem Defendants deny the allegations in Paragraph 248 on the grounds that the referenced documents speak for themselves.

249.  In response to Paragraph 249, the Anthem Defendants admit that some individuals are covered by plans or insurance policies that are purchased or established by a group and are subject to ERISA.  The Anthem Defendants deny the allegations relating to the terms of these plans and any contract documents related thereto on the grounds that they speak for themselves.  No response is required to the fifth and sixth sentences in Paragraph 249 because they allege only legal conclusions and arguments.  To the extent a response is required, the Anthem Defendants deny the allegations.

**2.     Non-Anthem BCBS Defendants**

**a.     The BlueCard Program**

250.  In response to Paragraph 250, the Anthem Defendants admit that the BlueCard Program is a national program that enables Anthem members traveling away from home or living in another Blue Cross and Blue Shield (BCBS) Plan area to receive health care services through

claims processing networks of BlueCard-participating, independent Blue Plans. The Anthem Defendants deny all other allegations in Paragraph 250.

251. In response to Paragraph 251, the Anthem Defendants admit that they may receive information relating to individuals enrolled in plans issued by Non-Anthem Defendants or for which Non-Anthem Defendants provide administrative service in connection with the BlueCard Program. The Anthem Defendants deny all other allegations in Paragraph 251.

252. The Anthem Defendants admit that the allegations contained in Paragraph 252 are consistent with information in a document in the Anthem Defendants' possession.

253. The Anthem Defendants admit that the allegations contained in Paragraph 253 are consistent with information in a document in the Anthem Defendants' possession.

254. In response to Paragraph 254, the Anthem Defendants admit that the allegations regarding the number of residents of Alabama, Alaska, Arizona, Delaware, D.C., Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Montana, North Carolina, North Dakota, Nebraska, New Hampshire, New Mexico, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, Virgin Island, Virginia, West Virginia, and Wyoming who were Affected Individuals enrolled with California Physicians' Service, Inc. d/b/a Blue Shield of California, are consistent with information in a document in the Anthem Defendants' possession. The Anthem Defendants deny the remaining allegations in Paragraph 254.

255. In response to Paragraph 255, the Anthem Defendants deny the allegations regarding the number of residents of Nevada and New Mexico who were Affected Individuals enrolled with Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Illinois. The Anthem Defendants admit that the remaining allegations in Paragraph 255 are consistent with information in a document in the Anthem Defendants' possession.

256. In response to Paragraph 256, the Anthem Defendants deny the allegations regarding the number of residents of Hawaii who were Affected Individuals of Blue Cross and Blue Shield of Florida, Inc. The Anthem Defendants admit that the remaining allegations in Paragraph 256 are consistent with information in a document in the Anthem Defendants' possession.

Hogan Lovells US LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

257.  In response to Paragraph 257, the Anthem Defendants deny the allegations regarding the number of residents of Alabama, Arizona, Arkansas, Connecticut, D.C., Florida, Georgia, Illinois, Maine, Maryland, Massachusetts, New Jersey, New York, Ohio, Pennsylvania, Texas, and Virginia who were Affected Individuals enrolled with CareFirst of Maryland, Inc.  The Anthem Defendants admit that the remaining allegations in Paragraph 257 are consistent with information in a document in the Anthem Defendants' possession.

258.  In response to Paragraph 258, the Anthem Defendants admit that the allegations regarding the number of residents of Alabama, Alaska, Arizona, Arkansas, D.C., Hawaii, Idaho, Iowa, Louisiana, Mississippi, Montana, North Dakota, Nebraska, New Mexico, Oklahoma, Oregon, Puerto Rico, South Dakota, Utah, Virgin Islands, Virginia, and West Virginia who were Affected Individuals enrolled with Blue Cross Blue Shield of Massachusetts, Inc. are consistent with information in a document in the Anthem Defendants' possession.  The Anthem Defendants deny the remaining allegations in Paragraph 258.

259.  In response to Paragraph 259, the Anthem Defendants admit that the allegations regarding the number of residents of Idaho, North Dakota, New Mexico, Virgin Islands, and Wyoming who were Affected Individuals enrolled with Blue Cross Blue Shield of Michigan are consistent with information in a document in the Anthem Defendants' possession.  The Anthem Defendants deny the remaining allegations in Paragraph 259.

260.  In response to Paragraph 260, the Anthem Defendants admit that the allegations regarding the number of residents of the Virgin Islands who were Affected Individuals enrolled with Blue Cross Blue Shield of Minnesota are consistent with information in a document in the Anthem Defendants' possession.  The Anthem Defendants deny the remaining allegations in Paragraph 260.

261.  In response to Paragraph 261, the Anthem Defendants admit that the allegations regarding the number of residents of the Virgin Islands and Wyoming who were Affected Individuals enrolled with Horizon Healthcare Services d/b/a/ Blue Cross Blue Shield of New Jersey are consistent with information in a document in the Anthem Defendants' possession.  The Anthem Defendants deny the remaining allegations in Paragraph 261.

Hogan Lovells US LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

262. In response to Paragraph 262, the Anthem Defendants admit that the allegations regarding the number of residents of Alaska, Hawaii, Idaho, Kansas, Louisiana, Mississippi, North Dakota, Nebraska, New Mexico, Puerto Rico, Utah, Virgin Islands, and Wyoming who were Affected Individuals enrolled with Blue Cross and Blue Shield of North Carolina are consistent with information in a document in the Anthem Defendants' possession. The Anthem Defendants deny the remaining allegations in Paragraph 262.

263. The Anthem Defendants deny the allegations in Paragraph 263.

264. In response to Paragraph 264, the Anthem Defendants admit that the allegations regarding the number of residents of Idaho, North Dakota, and the Virgin Island who were Affected Individuals enrolled with Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Texas are consistent with information in a document in the Anthem Defendants' possession. The Anthem Defendants deny the remaining allegations in Paragraph 264.

265. In response to Paragraph 265, the Anthem Defendants deny the allegations regarding the number of residents of Arizona, California, Connecticut, D.C., Florida, Georgia, Idaho, Illinois, Maine, Maryland, Massachusetts, Michigan, North Carolina, New Hampshire, New Jersey, New Mexico, New York, Pennsylvania, Tennessee, Vermont, and Virginia who were Affected Individuals enrolled with Blue Cross and Blue Shield of Vermont. The Anthem Defendants admit that the remaining allegations in Paragraph 265 are consistent with information in a document in the Anthem Defendants' possession.

### a. The Fourteen Non-Anthem Defendants' Privacy Policies, Representations, and Omissions

266. In response to Paragraph 266, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

267. In response to Paragraph 267, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

268. In response to Paragraph 268, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

269. In response to Paragraph 269, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

270. In response to Paragraph 270, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

271. In response to Paragraph 271, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

272. In response to Paragraph 272, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

273. In response to Paragraph 273, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

274. In response to Paragraph 274, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

275. In response to Paragraph 275, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

**b.    Each of the Fourteen Non-Anthem Defendants' Insurance and Health Benefits Contracts Include Specific Privacy Promises**

276. In response to Paragraph 276, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

and, on that basis, deny them.

277.  In response to Paragraph 277, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

278.  In response to Paragraph 278, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

279.  In response to Paragraph 279, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

280.  In response to Paragraph 280, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

281.  In response to Paragraph 281, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

282.  In response to Paragraph 282, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

283.  In response to Paragraph 283, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

284.  In response to Paragraph 284, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

285.  In response to Paragraph 285, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

286. In response to Paragraph 286, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

287. In response to Paragraph 287, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

288. In response to Paragraph 288, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

289. In response to Paragraph 289, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

290. In response to Paragraph 290, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

291. In response to Paragraph 291, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

292. In response to Paragraph 292, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

**Non-Anthem Defendant BCBS of Alabama**

293. In response to Paragraph 293, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

**Non-Anthem Defendant USAable Mutual Insurance (d/b/a Arkansas BCBS)**

294. In response to Paragraph 294, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph

Hogan Lovells US LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

and, on that basis, deny them.

### Non-Anthem Defendant California Physicians Service (d/b/a Blue Shield of California)

295. In response to Paragraph 295, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

### Non-Anthem Defendant BCBS of Florida

296. In response to Paragraph 296, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

### Non-Anthem Defendant Health Care Service Corporation d/b/a BCBS of Illinois and d/b/a BCBS of Texas

297. In response to Paragraph 297, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

298. In response to Paragraph 298, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

### Non-Anthem Defendant CareFirst of Maryland (d/b/a Carefirst BCBS)

299. In response to Paragraph 299, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

### Non-Anthem Defendant BCBS of Massachusetts

300. In response to Paragraph 300, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

### Non-Anthem Defendant BCBS of Michigan

301. In response to Paragraph 301, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1  and, on that basis, deny them.  The Anthem Defendants admit the allegations in footnote 6 of this
2  Paragraph.

3  <center>**Non-Anthem Defendant BCBS of Minnesota**</center>

4  302.  In response to Paragraph 302, the Anthem Defendants are without sufficient
5  knowledge or information to form a belief regarding the truth of the allegations in this Paragraph
6  and, on that basis, deny them.

7  <center>**Non-Anthem Defendant Horizon BCBSNJ**</center>

8  303.  In response to Paragraph 303, the Anthem Defendants are without sufficient
9  knowledge or information to form a belief regarding the truth of the allegations in this Paragraph
10  and, on that basis, deny them.

11  <center>**Non-Anthem Defendant BCBS of North Carolina**</center>

12  304.  In response to Paragraph 304, the Anthem Defendants are without sufficient
13  knowledge or information to form a belief regarding the truth of the allegations in this Paragraph
14  and, on that basis, deny them.

15  <center>**Non-Anthem Defendant Highmark Inc. (d/b/a Highmark Blue Shield**
16  **and d/b/a Highmark Blue Cross Blue Shield)**</center>

17  305.  In response to Paragraph 305, the Anthem Defendants are without sufficient
18  knowledge or information to form a belief regarding the truth of the allegations in this Paragraph
19  and, on that basis, deny them.  The Anthem Defendants deny the allegations in footnote 7 of this
20  Paragraph.

21  <center>**Non-Anthem Defendant BCBS of Vermont**</center>

22  306.  In response to Paragraph 306, the Anthem Defendants are without sufficient
23  knowledge or information to form a belief regarding the truth of the allegations in this Paragraph
24  and, on that basis, deny them.

25  **3.     Blue Cross Blue Shield Association and the Federal Contract**

26  307.  The Anthem Defendants deny the allegations in Paragraph 307.

27  308.  No response is required to Paragraph 308 because it alleges only legal conclusions.
28  To the extent a response is required, the Anthem Defendants deny the allegations on the grounds

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

- 56 -

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

that the Federal Employees Health Benefits Act of 1959 speaks for itself.

309. In response to Paragraph 309, the Anthem Defendants admit that federal employees are offered the opportunity to obtain health care benefits via the Blue Cross Blue Shield Service Benefit Plan ("Federal BCBSA Plan").

310. In response to Paragraph 310, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

311. In response to Paragraph 311, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

312. In response to Paragraph 312, the Anthem Defendants admit that their records show that Plaintiffs Alvin Lawson, Ralph Staffieri, David Ifversen, and Jason Baker had health coverage under the Federal BCBSA Plan. The Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the remaining allegations in Paragraph 312.

313. No response is required to Paragraph 313 because it alleges only legal conclusions. To the extent a response is required, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

314. In response to Paragraph 314, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

315. The Anthem Defendants deny the allegations in Paragraph 315 regarding the Federal BCBSA Contract on the grounds that the Contract speaks for itself. No response is required to the remaining allegations in Paragraph 315 because they allege only legal conclusions. To the extent a response is required, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of those allegations and, on that basis, deny them.

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

316.  The Anthem Defendants deny the allegations in Paragraph 316 regarding the Federal BCBSA Contract on the grounds that the Contract speaks for itself.  No response is required to the remaining allegations Paragraph 316 because they allege only legal conclusions.  To the extent a response is required, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of those allegations and, on that basis, deny them.

317.  The Anthem Defendants deny the allegations in Paragraph 317 regarding the FEHB Brochures on the grounds that the Brochures speak for themselves.

318.  The Anthem Defendants deny the allegations in Paragraph 318 regarding the FEHB Brochures on the grounds that the Brochures speak for themselves.

319.  The Anthem Defendants deny the allegations in Paragraph 319 on the grounds that the www.fepblue.org website speaks for itself.

320.  The Anthem Defendants deny the allegations in Paragraph 320 on the grounds that the www.fepblue.org website and the FEHB Brochure speak for themselves. In response to Paragraph 320, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

C.    **Defendants Had an Obligation to Protect Personal Information under Federal and State Law and the Applicable Standard of Care**

321.  No response is required to Paragraph 321 because it alleges only legal conclusions. To the extent a response is required, the Anthem Defendants deny the allegations in Paragraph 321.

322.  No response is required to the first sentence in Paragraph 322, including footnote 8, because it alleges only legal conclusions.  To the extent a response is required, the Anthem Defendants deny the allegations in the first sentence on the grounds that the statute speaks for itself.  In response to all other allegations in Paragraph 322, including those in footnote 9, the Anthem Defendants are without knowledge or information to form a belief regarding the truth of the allegations in this Paragraph and, on that basis, deny them.

323.  No response is required to Paragraph 323, including footnote 10, because it alleges only legal conclusions.  To the extent a response is required, the Anthem Defendants deny the

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

allegations on the grounds that the statute speaks for itself.

324.  No response is required to Paragraph 324, including footnote 11, because it alleges only legal conclusions.  To the extent a response is required, the Anthem Defendants deny the allegations on the grounds that the statute speaks for itself.

325.  No response is required to Paragraph 325 because it alleges only legal conclusions.  To the extent a response is required, the Anthem Defendants deny the allegations on the grounds that the statute speaks for itself.

326.  No response is required to Paragraph 326 because it alleges only legal conclusions.  To the extent a response is required, the Anthem Defendants deny the allegations on the grounds that the statute speaks for itself.

327.  No response is required to Paragraph 327, including footnote 12, because it alleges only legal conclusions.  To the extent a response is required, the Anthem Defendants deny the allegations on the grounds that the statute speaks for itself.

328.  No response is required to Paragraph 328 because it alleges only legal conclusions.  To the extent a response is required, the Anthem Defendants deny the allegations in Paragraph 328 on the grounds that the state laws and regulations referenced speak for themselves.

329.  to 336.   No response is required to Paragraphs 329 to 336 because they allege only legal conclusions and arguments.  To the extent a response is required, the Anthem Defendants deny the allegations in these Paragraphs.

**D.      Defendants Were On Notice of Cyber Attack Threats, and the Inadequacy of Their Data Security**

337.  No response is required to Paragraph 337 because it alleges only legal conclusions and arguments.  To the extent a response is required to the allegations in Paragraph 337, the Anthem Defendants deny them.

338.  In response to Paragraph 338, the Anthem Defendants admit that Anthem, Inc.'s former trade name is WellPoint, Inc.  The Anthem Defendants further admit that in early 2010, following a software upgrade to a non-public WellPoint website, certain security software was not properly re-installed and created a vulnerability that required a number of deliberate steps to

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

access list applications belonging to other individuals.   A plaintiff's law firm initiated those steps and downloaded roughly 600,000 customer files.  The Anthem Defendants admit that within 24-hours of notice of the issue, WellPoint Application Development and Information Security Teams repaired the affected computer applications and secured the sensitive information.  The Anthem Defendants deny the remaining allegations in Paragraph 338, including any allegations in footnotes 13 and 14.

339.  In response to Paragraph 339, the Anthem Defendants admit that on July 8, 2013, WellPoint entered into a Resolution Agreement with the Department of Health and Human Services.  The Anthem Defendants deny the allegations regarding the Resolution Agreement on the grounds that the Agreement speaks for itself.   The Anthem Defendants deny the remaining allegations in Paragraph 339, including any allegations in footnote 15.

340.  In response to Paragraph 340, the Anthem Defendants admit that in 2013, OIG conducted a review of WellPoint's information system.  To the extent OIG issued any report, the Anthem Defendants deny allegations regarding such report on the grounds that it speaks for itself. The Anthem Defendants deny the remaining allegations in Paragraph 340.

341.  In response to Paragraph 341, the Anthem Defendants deny allegations regarding an OIG report, if any, on the grounds that it speaks for itself.  The Anthem Defendants deny the remaining allegations in Paragraph 341.

342.  The Anthem Defendants deny the allegations in Paragraph 342.

343.  In response to Paragraph 343, the Anthem Defendants admit that Anthem and its subsidiaries are the targets of tens of thousands of threats per month.  The Anthem Defendants deny the remaining allegations in Paragraph 343.

344.  In response to Paragraph 344, the Anthem Defendants deny allegations regarding an FBI statement, if any, on the grounds that it speaks for itself.  The Anthem Defendants deny the remaining allegations in Paragraph 344, including the allegations in footnote 16.

345.  In response to Paragraph 345, The Anthem Defendants deny allegations regarding a statement by DHHS, if any, on the grounds that it speaks for itself. The Anthem Defendants deny the remaining allegations in Paragraph 345.

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

346.  In response to Paragraph 346, the Anthem Defendants admit that Anthem and its subsidiaries are  the targets of tens of thousands of threats per month.  The Anthem Defendants deny the remaining allegations in Paragraph 346.

**E.**     **Anthem Allowed a Massive Data Breach**

347.  In response to Paragraph 347, the Anthem Defendants admit that on February 4, 2015, Anthem announced that it had been the victim of a criminal cyberattack.  The Anthem Defendants further admit that Anthem provided information on www.anthemfacts.com, which is referenced in footnote 17 of this Paragraph.  The Anthem Defendants deny any allegations regarding the content of  www.anthemfacts.com on the grounds that the website and its contents speak for itself.  The remaining allegation in the first sentence of Paragraph 347 constitutes Plaintiffs' characterization of Anthem's announcement, which requires no response.  To the extent this allegation requires a response, the Anthem Defendants deny it.  The Anthem Defendants deny the remaining allegations in Paragraph 347.

348.  In response to Paragraph 348, the Anthem Defendants admit that the criminal cyberattack Anthem suffered involved some information for approximately 78.8 million people.  The Anthem Defendants deny the remaining allegations in Paragraph 348, including the allegations in footnote 18.

349.  In response to Paragraph 349, the Anthem Defendants admit that Anthem created www.anthemfacts.com which addresses information impacted by the criminal cyberattack Anthem suffered.  The contents of www.anthemfacts.com speak for themselves. The Anthem Defendants deny the remaining allegations in Paragraph 349.

350.  The Anthem Defendants deny the allegations in Paragraph 350.

351.  In response to Paragraph 351, the Anthem Defendants admit that they engaged Mandiant to assist in responding to the criminal cyberattack Anthem suffered.  The Anthem Defendants further admit that Mandiant created an Intrusion Investigation Report.  The Anthem Defendants deny the remaining allegations in Paragraph 351.

352.  In response to Paragraph 352, the Anthem Defendants deny the allegations regarding the Mandiant Report on the grounds that the Mandiant Report speaks for itself.   No response is

- 61 -

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

required to the second sentence of Paragraph 352 as it alleges only legal conclusions and arguments; to the extent a response is required to these allegations, the Anthem Defendants deny them.

353. to 357. With regard to the allegations in Paragraphs 353 to 357, no response is required as these Paragraphs allege only legal conclusions and arguments. To the extent a response is required to the allegations contained in these Paragraphs, the Anthem Defendants deny them.

358. In response to Paragraph 358, the Anthem Defendants deny these allegations on the grounds that the Mandiant Report speaks for itself. The Anthem Defendant deny the remaining allegations.

359. In response to Paragraph 359, the Anthem Defendants deny these allegations on the grounds that the Mandiant Report speaks for itself.

360. No response is required to Paragraph 360 because it alleges only legal conclusions and arguments. To the extent a response is required, the Anthem Defendants deny all allegations in Paragraph 360.

361. In response to Paragraph 361, the Anthem Defendants deny the allegations.

362. The Anthem Defendants deny the allegations in the first sentence of Paragraph 362 on the grounds that the Mandiant Report speaks for itself. In response to the second and third sentences of Paragraph 362, the Anthem Defendants deny the allegations.

363. The Anthem Defendants deny the allegations in the first and second sentences of Paragraph 363 on the grounds that the Mandiant Report speaks for itself. In response to the third and fourth sentences of Paragraph 363, the Anthem Defendants deny the allegations.

364. The Anthem Defendants deny the allegations in the first and second sentences of Paragraph 364 on the grounds that the Mandiant Report speaks for itself. The Anthem Defendants deny the remaining allegations in Paragraph 364.

365. In response to Paragraph 365, the Anthem Defendants deny these allegations on the grounds that the Mandiant Report speaks for itself.

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

366.  The Anthem Defendants deny the allegations in the first sentence of Paragraph 366 on the grounds that the Mandiant Report speaks for itself.   The Anthem Defendants deny the remaining allegations in Paragraph 366.

367.  The Anthem Defendants deny the allegations in Paragraph 367.

368.  The Anthem Defendants deny the allegations in the first, second, and third sentences of Paragraph 368 on the grounds that the Mandiant Report speaks for itself.  The Anthem Defendants deny the remaining allegations in Paragraph 368.

369.  The Anthem Defendants deny the allegations in Paragraph 369.

370.  The Anthem Defendants deny the allegations in the first sentence of Paragraph 370 on the grounds that the Mandiant Report speaks for itself.  The Anthem Defendants deny the remaining allegations in Paragraph 370.

371.  The Anthem Defendants deny the allegations in Paragraph 371.

372.  The Anthem Defendants deny the allegations in the first, second, and third sentences of Paragraph 372 on the grounds that the Mandiant Report speaks for itself.  The Anthem Defendants deny the remaining allegations in Paragraph 372.

373.  The Anthem Defendants deny the allegations in Paragraph 373.

374.  The Anthem Defendants deny the allegations in the first, second, and third sentences of Paragraph 374 on the grounds that the Mandiant Report speaks for itself.  The Anthem Defendants deny the remaining allegations in Paragraph 374.

375.  In response to Paragraph 375, the Anthem Defendants deny these allegations on the grounds that the Mandiant Report speaks for itself.

376.  In response to Paragraph 376, the Anthem Defendants deny these allegations on the grounds that the Mandiant Report speaks for itself.

377.  In response to Paragraph 377, the Anthem Defendants deny these allegations on the grounds that the Mandiant Report speaks for itself.

378.  The Anthem Defendants deny the allegations in Paragraph 378.

379.  The Anthem Defendants deny the allegations in the third and fourth sentences of Paragraph 379 on the grounds that the Mandiant Report speaks for itself.  The Anthem

- 63 -

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

Defendants deny the remaining allegations in Paragraph 379.

380. In response to Paragraph 380, the Anthem Defendants deny these allegations on the grounds that the Mandiant Report speaks for itself. The Anthem Defendants deny the remaining allegations in Paragraph 380.

381. The Anthem Defendants deny the allegations in Paragraph 381.

382. The Anthem Defendants deny the allegations in Paragraph 382.

383. In response to Paragraph 383, the Anthem Defendants admit that the criminal cyberattack Anthem suffered involved some information for approximately 78.8 million people. The Anthem Defendants deny the remaining allegations in Paragraph 383.

**F.    Anthem's Data Breach Was a Direct Result of Anthem's Inadequate Data Security.**

384. No response is required to Paragraph 384 because it alleges only legal conclusions and arguments. To the extent a response is required to these allegations, the Anthem Defendants deny them.

385. No response is required to Paragraph 385 because it alleges only legal conclusions and arguments. To the extent a response is required to these allegations, the Anthem Defendants deny them.

386. No response is required to Paragraph 386 because it alleges only legal conclusions and arguments. To the extent a response is required to these allegations, the Anthem Defendants deny them.

387. No response is required to Paragraph 387 because it alleges only legal conclusions and arguments. To the extent a response is required to these allegations, the Anthem Defendants deny them.

388. to 395. With regard to the allegations in Paragraphs 388 to 395, including footnotes 20-22, no response is required because these Paragraphs allege only legal conclusions and arguments. To the extent a response is required to the allegations contained in these Paragraphs, the Anthem Defendants deny them.

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

**G.    Defendants Breached Their Contracts To Protect Personal Information**

**1.    Anthem's Breach of Specific Contract Promises**

396. to 402.  With regard to the allegations in Paragraphs 396 to 402, no response is required to because these Paragraphs allege only legal conclusions and arguments.  To the extent a response is required to these allegations, the Anthem Defendants deny them.

403.  The Anthem Defendants deny the allegations in the first sentence of Paragraph 403 on the grounds that their Notice(s) of Privacy Policy speak for themselves.  The Anthem Defendants deny the remaining allegations of Paragraph 403.

404. to 411.  With regard to the allegations in Paragraph 404 to 411, no response is required because these Paragraphs allege only legal conclusions and arguments.  To the extent a response is required to these allegations, the Anthem Defendants deny them.

**2.    The Non-Anthem BCBS Defendants' Breach of Their Specific Contract Promises**

412.  In response to Paragraph 412, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in these Paragraphs and, on that basis, deny them.

413.  In response to Paragraph 413, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in these Paragraphs and, on that basis, deny them.

414.  In response to Paragraph 414, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in these Paragraphs and, on that basis, deny them.

415.  In response to Paragraph 415, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in these Paragraphs and, on that basis, deny them.

**3.    BCBSA and Anthem and Non-Anthem Defendants' Breach of the Federal Contract**

416.  The Anthem Defendants deny the allegations in Paragraph 416 on the grounds that that the Federal BCBSA Contract speaks for itself.

417.  The Anthem Defendants deny the allegations in Paragraph 417.

418.  No response is required to Paragraph 418 because it alleges only legal conclusions and arguments.  To the extent a response is required, the Anthem Defendants deny the allegations in Paragraph 418.

**H.      Affected Individuals Were Grievously Harmed By the Anthem Data Breach**

419.  The Anthem Defendants deny the allegations in Paragraph 419, including footnotes 23 and 24, on the grounds that the FTC's definitions of the referenced terms speak for themselves.

420.  The Anthem Defendants deny the allegations in Paragraph 420, including footnote 25.

421.  In response to Paragraph 421, the Anthem Defendants deny that the criminal cyberattack on Anthem caused any Plaintiff or Affected Individual injury.  The Anthem Defendants deny the remaining allegations in Paragraph 421.

422.  The Anthem Defendants deny the allegations in Paragraph 422.

423.  In response to Paragraph 423, including footnotes 26 and 27, the Anthem Defendants deny the allegations on the grounds that the Experian study, if any, speaks for itself.

424.  In response to Paragraph 424, the Anthem Defendants deny that the criminal cyberattack on Anthem caused any Plaintiff or Affected Individual injury.  The Anthem Defendants deny the remaining allegations in Paragraph 424.

425.  No response is required to Paragraph 425 because it alleges only legal conclusions and arguments.   To the extent that a response is required, the Anthem Defendants deny the allegations in Paragraph 425.

426.  In response to Paragraph 426, the Anthem Defendants admit that they offered twenty-four (24) months of AllClear services, including, but not limited to, identity repair and credit monitoring services to individuals whose information was impacted in the Anthem Cyberattack.  The Anthem Defendants deny the remaining allegations in Paragraph 426.

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

427.  The Anthem Defendants deny the allegations in Paragraph 427, including the allegations in footnote 28 relating to www.anthemfacts.com, on the grounds that this website and its contents speak for itself.

**CLASS ALLEGATIONS**

A.     **Statewide Classes**

428.  to 437.  No response is required to Paragraphs 428-437 because they only contain legal conclusions and arguments.  To the extent a response is required to the allegations contained in these Paragraphs, the Anthem Defendants deny them. In addition, in accordance with the Court's Order(s) Granting in Part and Denying in Part Anthem Defendants' Motion(s) to Dismiss [*see* Dkt. No. 468 (February 14, 2016,) and Dkt. No. 524 (May 27, 2016)], the Anthem Defendants are not required to respond to the allegations in these Paragraphs regarding claims, theories, or facts that have been dismissed, mooted, or otherwise rendered immaterial by the Court's Orders.  To the extent Paragraphs 427-437 contain allegations requiring a response, the Anthem Defendants deny them, and specifically deny that the TAC alleges any class or subclass properly certifiable under Federal Rule of Civil Procedure 23.

438.  The Anthem Defendants deny the allegations in Paragraph 438.

439.  to 444.  No response is required to Paragraphs 439-444 because they only contain legal conclusions and arguments. To the extent a response is required to the allegations contained in these Paragraphs, the Anthem Defendants deny them.  In addition, in accordance with the Court's Order(s) Granting in Part and Denying in Part Anthem Defendants' Motion(s) to Dismiss [*see* Dkt. No. 468 (February 14, 2016,) and Dkt. No. 524 (May 27, 2016)], the Anthem Defendants are not required to respond to the allegations in these Paragraphs regarding claims, theories, or facts that have been dismissed, mooted, or otherwise rendered immaterial by the Court's Orders.  To the extent Paragraphs 439-444 contain allegations requiring a response, the Anthem Defendants deny them, and specifically deny that the TAC alleges any class or subclass properly certifiable under Federal Rule of Civil Procedure 23.

1

2

3

## CAUSES OF ACTION

## COUNT I – NEGLIGENCE
**BROUGHT BY THE 53 STATEWIDE CLASSES AGAINST ALL DEFENDANTS EXCEPT FOR BCBSA**

4

5

6

7

8

445. In response to Paragraph 445, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim, with the exception of the allegations asserted on behalf of the Indiana statewide class. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

9

10

11

12

13

14

15

446. to 454. In response to Paragraphs 446 to 454, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim, with the exception of the allegations asserted on behalf of the Indiana statewide class. The Anthem Defendants also state that no response is required to Paragraphs 446 to 454 because they allege only legal conclusions and arguments. To the extent a response is required to the allegations in these Paragraphs, the Anthem Defendants deny them.

16

17

## COUNT II – NEGLIGENCE PER SE
**BROUGHT BY THE 53 STATEWIDE CLASSES AGAINST ALL DEFENDANTS EXCEPT FOR BCBSA**

18

19

20

21

22

455. In response to Paragraph 455, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

23

24

25

26

27

28

456. to 464. In response to Paragraphs 456 to 464, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 456 to 464 because they allege only legal conclusions and arguments. To the extent a response is required to the allegations in these Paragraphs, the Anthem Defendants deny them.

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

## COUNT III – BREACH OF CONTRACT (ANTHEM DEFENDANTS)

465.  In response to Paragraph 465, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim, with the exception of the allegations asserted on behalf of the California statewide class and the New Jersey statewide class.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

466.  to 480.  In response to Paragraphs 466 to 480, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim, with the exception of the allegations asserted on behalf of the California statewide class and the New Jersey statewide class.   The Anthem Defendants also state that no response is required to Paragraphs 466 to 480 because they contain only legal conclusions and arguments and, pursuant to the Court's Order (D.E. 524), the California Breach of Contract claim as to Plaintiffs Daniel Randrup, Kelly Tharp, and Daniel Tharp has been dismissed.  To the extent a response is required to the allegations contained in these Paragraphs, the Anthem Defendants deny them.

## COUNT IV – BREACH OF CONTRACT (NON-ANTHEM DEFENDANTS)

481.  In response to Paragraph 481, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim, with the exception of the allegations asserted on behalf of the California statewide class and the New Jersey statewide class.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

482.  to 496.  In response to Paragraphs 482 to 496, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim, with the exception of the allegations asserted on behalf of the California statewide class and the New Jersey statewide class.  To the extent a response is required, the Anthem Defendants are without sufficient knowledge or information to

form a belief regarding the truth of the allegations in Paragraphs 482 to 496 and, on that basis, deny them.

## COUNT V – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

**A.    Anthem Defendants**

497.  In response to Paragraph 497, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

498.  to 506.  In response to Paragraphs 498 to 506, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 498 to 506 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations contained in these Paragraphs, the Anthem Defendants deny them.

**B.    Non-Anthem Defendants**

507.  In response to Paragraph 507, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

508.  to 516.  In response to Paragraphs 508 to 518, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required,  the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in Paragraphs 508 to 516 and, on that basis, deny them.

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

**COUNT VI – THIRD PARTY BENEFICIARY CLAIM FOR BREACH OF CONTRACT UNDER FEDERAL LAW**

517. In response to Paragraph 517, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

518. to 519. The Anthem Defendants also state that no response is required to Paragraphs 518 to 519 because they contain only legal conclusions and arguments, and the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the allegations in these Paragraphs. To the extent a response is required to the allegations contained in these Paragraphs, the Anthem Defendants deny them.

520. The Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in Paragraph 520 and, on that basis, deny them.

521. No response is required to Paragraph 521 because it contains only legal conclusions and arguments. To the extent a response is required to the allegations contained in this Paragraph, the Anthem Defendants deny them.

522. The Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in Paragraph 522 and, on that basis, deny them.

523. to 524. No response is required to Paragraphs 523 to 524 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations contained in these Paragraphs, the Anthem Defendants deny them.

525. The Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in Paragraph 525 and, on that basis, deny them.

526. to 533. No response is required to Paragraphs 526 to 533 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations contained in these Paragraphs, the Anthem Defendants deny them.

**COUNT VII – NEGLIGENT MISREPRESENTATION**

534. In response to Paragraph 534, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully

Hogan Lovells US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1  set forth herein.

2      535. to 540.  In response to Paragraphs 535 to 540, the Anthem Defendants state that

3  pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these

4  Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that

5  no response is required to Paragraphs 535 to 540 because they contain only legal conclusions and

6  arguments.  To the extent a response is required to the allegations contained in these Paragraphs,

7  the Anthem Defendants deny them.

8                    **COUNT VIII – UNJUST ENRICHMENT**

9      541.  In response to Paragraph 541, the Anthem Defendants state that pursuant to Dkt.

10  Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim

11  that is not a Selected Claim, with the exception of the allegations asserted on behalf of the New

12  York statewide class.  To the extent a response is required, the Anthem Defendants incorporate

13  and reassert their responses to each of the preceding numbered paragraphs as if fully set forth

14  herein.

15      542.  In response to Paragraph 542, the Anthem Defendants state that pursuant to Dkt.

16  Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim

17  that is not a Selected Claim, with the exception of the allegations asserted on behalf of the New

18  York statewide class.  The Anthem Defendants also state that no response is required to

19  Paragraph 542 because it contains only argument.  To the extent a response is required to the

20  allegation in this paragraph, the Anthem Defendants deny it.

21      543.  In response to Paragraph 543, the Anthem Defendants state that pursuant to Dkt.

22  Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim

23  that is not a Selected Claim, with the exception of the allegations asserted on behalf of the New

24  York statewide class.  To the extent a response is required, the Anthem Defendants admit that

25  they generally receive monetary benefits in connection with contracts pursuant to which they

26  provide insurance or administrative services.  The Anthem Defendants also admit that they

27  retained information about certain individuals in their information systems.  No response is

28  required to the remaining allegations in Paragraph 543 because they contain only legal

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

conclusions and arguments, and to the extent a response is required, the Anthem Defendants deny them.

544. In response to Paragraph 544, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim, with the exception of the allegations asserted on behalf of the New York statewide class. To the extent a response is required, the Anthem Defendants admit that they generally receive monetary benefits in connection with contracts pursuant to which they provide insurance or administrative services and that they are aware of such benefits. No response is required to the remaining allegations in Paragraph 544 because they contain only legal conclusions, and to the extent a response is required, the Anthem Defendants deny them.

545. to 549. In response to Paragraphs 545 to 549, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim, with the exception of the allegations asserted on behalf of the New York statewide class. The Anthem Defendants also state that no response is required to Paragraphs 545 to 549 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

## COUNT IX – STATE CONSUMER PROTECTION LAWS

### Arizona
### ARIZONA CONSUMER FRAUD ACT
### A.R.S. § 44-1521, *et seq.*

550. In response to Paragraph 550, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

551. to 555. In response to Paragraphs 551 to 555, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that

- 73 -

no response is required to Paragraphs 551 to 555 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

### California
**CALIFORNIA UNFAIR COMPETITION LAW,
CAL. BUS. & PROF. CODE § 17200,** *et seq.*

556.  In response to Paragraph 556, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

557.  to 560.  No response is required to Paragraphs 557 to 560, including footnotes 32 and 33, because they contain only legal conclusions and arguments and, pursuant to the Court's Order (D.E. 524), Plaintiffs' California Unfair Competition Law claim has been dismissed as it relates to fraudulent misrepresentation and the California Insurance Information and Privacy Protection Act, the California Confidentiality of Medical Information Act, and Cal. Civ. Code § 1798.82.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

### Colorado
**COLORADO CONSUMER PROTECTION ACT,
COLO. REV.  STAT.§ 6-1-101,** *et seq.*

561.  In response to Paragraph 561, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

562.  to 568.  In response to Paragraphs 562 to 568, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 562 to 568 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

Case 5:15-md-02617-LHK Document 531 Filed 10/25/16 Page 706 of 827

**Connecticut**
**CONNECTICUT UNFAIR TRADE PRACTICES ACT,**
**C.G.S. § 42-110a** *et seq.*

570.  In response to Paragraph 570, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

571.  to 575.  In response to Paragraphs 571 to 575, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 571 to 575 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

**District of Columbia**
**DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT,**
**D.C. CODE § 28-3904,** *et seq.*

576.  In response to Paragraph 576, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

577.  to 583.  In response to Paragraphs 577 to 585, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 577 to 583 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

1

2

**Hawaii**
**HAWAII UNFAIR PRACTICES AND UNFAIR COMPETITION STATUTE,**
**HAW. REV. STAT. § 480-1, *et seq*.**

3    584.  In response to Paragraph 584, the Anthem Defendants state that pursuant to Dkt.

4    Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim

5    that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants

6    incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully

7    set forth herein.

8    585.  to 593.  In response to Paragraphs 585 to 593, the Anthem Defendants state that

9    pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these

10   Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that

11   no response is required to Paragraphs 585 to 593 because they contain only legal conclusions and

12   arguments.  To the extent a response is required to the allegations in these paragraphs, the

13   Anthem Defendants deny them.

14

15

**Illinois**
**ILLINOIS CONSUMER FRAUD ACT,**
**815 Ill. COMP. STAT. 505/1, *et seq*.**

16   594.  In response to Paragraph 594, the Anthem Defendants state that pursuant to Dkt.

17   Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim

18   that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants

19   incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully

20   set forth herein.

21   595.  to 599.  In response to Paragraphs 595 to 599, the Anthem Defendants state that

22   pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these

23   Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that

24   no response is required to Paragraphs 595 to 599 because they contain only legal conclusions and

25   arguments.  To the extent a response is required to the allegations in these paragraphs, the

26   Anthem Defendants deny them.

27

28

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

**ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT,**
**815 Ill. COMP. STAT. § 510/2(a), *et seq.***

600.  In response to Paragraph 600, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

601.  to 604.  In response to Paragraphs 601 to 604, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 601 to 604 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

**<u>Indiana</u>**
**INDIANA DECEPTIVE CONSUMER SALES ACT,**
**IND. CODE § 24-5-0.5.5-3**

605.  In response to Paragraph 605, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

606.  to 614.  In response to Paragraphs 606 to 614, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 606 to 614 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

**Kentucky**
## KENTUCKY CONSUMER PROTECTION ACT,
### KY REV. STAT. § 367.110, *et seq.*

615. to 622.  No response is required to Paragraphs 615 to 622 because, pursuant to the Court's Order (D.E. 468), Plaintiffs' claim for relief under the Kentucky Consumer Protection Act has been dismissed; the Anthem Defendants deny the allegations on that basis.

**Maine**
## MAINE UNFAIR TRADE PRACTICES ACT,
### 5 ME. REV. STAT. §205

623.  In response to Paragraph 623, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

624. to 625.  In response to Paragraphs 624 to 625, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants admit they received letters regarding Plaintiffs Gary Bellegarde, Mark Hatcher, and Robin Wilkey's alleged claims under the Maine Unfair Trade Practices Act.  No response is required to the remaining allegations in Paragraphs 624 to 625 because they contain only legal conclusions and argument, and to the extent a response is required, the Anthem Defendants deny them.

626. to 631.  In response to Paragraphs 626 to 631, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 626 to 631 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

**Maine**
## MAINE UNIFORM DECEPTIVE TRADE PRACTICES ACT, 10 ME. REV. STAT. § 1212, *et seq.*

632. In response to Paragraph 632, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

633. to 636. In response to Paragraphs 633 to 636, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 633 to 636 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

**Maryland**
## MARYLAND CONSUMER PROTECTION ACT, MD CODE COMMERCIAL LAW, § 13-301, *et seq.*

637. In response to Paragraph 637, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

638. to 646. In response to Paragraphs 638 to 646, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 638 to 646 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

**Massachusetts**
**MASSACHUSETTS CONSUMER PROTECTION ACT,**
**MASS. GEN. LAWS ANN. CH. 93A, § 1, *et seq.***

647.  In response to Paragraph 647, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

648.  In response to Paragraph 648, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraph 648 because it contains only argument.  To the extent a response is required to the allegation in this paragraph, the Anthem Defendants deny it.

649.  to 652.  In response to Paragraphs 649 to 652, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants admit they received letters regarding Plaintiffs Lisa Daniels, Darrell Hunter, Carrie Ramos, Fazi Zand, Claudia Cass, and Robert Roy's alleged claims under the Massachusetts Consumer Protection Act.  No response is required to the remaining allegations in Paragraphs 649 to 652 because they contain only legal conclusions and argument, and to the extent a response is required, the Anthem Defendants deny them.

653.  to 658.  In response to Paragraphs 653 to 658, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 653 to 658 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

## Minnesota
### MINNESOTA CONSUMER FRAUD ACT,
### MINN. STAT. § 325F.68, *et seq.* AND MINN. STAT. §8.31, *et seq.*

659. In response to Paragraph 659, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

660. to 666. In response to Paragraphs 660 to 666, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 660 to 666 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

### MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT,
### MINN. STAT. § 325D.43, *et seq.*

667. In response to Paragraph 667, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

668. to 674. In response to Paragraphs 669 to 674, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 668 to 674 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

Hogan Lovells US LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1

2

<div align="center">

**Missouri**
**MISSOURI MERCHANDISING PRACTICES ACT,**
**MO. STAT. § 407.010,** *et seq.*

</div>

3    675.  In response to Paragraph 675, the Anthem Defendants state that pursuant to Dkt.

4   Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim

5   that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants

6   incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully

7   set forth herein.

8    676.  to 682.  In response to Paragraphs 676 to 682, the Anthem Defendants state that

9   pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these

10   Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that

11   no response is required to Paragraphs 676 to 682 because they contain only legal conclusions and

12   arguments.  To the extent a response is required to the allegations in these paragraphs, the

13   Anthem Defendants deny them.

14

15

<div align="center">

**Montana**
**MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT,**
**MCA § 30-14-101,** *et seq.*

</div>

16    683.  In response to Paragraph 683, the Anthem Defendants state that pursuant to Dkt.

17   Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim

18   that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants

19   incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully

20   set forth herein.

21    684.  to 691.  In response to Paragraphs 684 to 691, the Anthem Defendants state that

22   pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these

23   Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that

24   no response is required to Paragraphs 684 to 691 because they contain only legal conclusions and

25   arguments.  To the extent a response is required to the allegations in these paragraphs, the

26   Anthem Defendants deny them.

27

28

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

<div align="center">

**Nebraska**
**NEBRASKA CONSUMER PROTECTION ACT,**
**NEB. REV. STAT. § 59-1601, *et seq.***

</div>

692.  In response to Paragraph 692, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

693.  to 699.  In response to Paragraphs 693 to 699, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 693 to 699 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

<div align="center">

**NEBRASKA UNIFORM DECEPTIVE TRADE PRACTICES ACT,**
**NEB. REV. STAT. § 87-301, *et seq.***

</div>

700.  In response to Paragraph 700, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

701.  to 706.  In response to Paragraphs 701 to 706, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 701 to 706 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

**Nevada**
# NEVADA DECEPTIVE TRADE PRACTICES ACT,
## NEV. REV. STAT. § 598.0915, *et seq*.; NEV. REV. STAT. § 41.600, *et seq*.

707.  In response to Paragraph 707, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

708.  to 713.  In response to Paragraphs 708 to 713, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 708 to 713 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

**New Jersey**
# NEW JERSEY CONSUMER FRAUD ACT,
## N.J. STAT. ANN. § 56:8-1, *et seq*.

714.  In response to Paragraph 714, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

715.  to 721.  In response to Paragraphs 715 to 721, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.   The Anthem Defendants also state that no response is required to Paragraphs 715 to 721 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

Hogan Lovells US
LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

Case 5:15-md-02210-LHK Document 531 Filed 10/25/16 Page 716 of 827

1

2

### New Mexico
### NEW MEXICO UNFAIR PRACTICES ACT,
### N.M. STAT. ANN.§ 57-12-1, *et seq.*

3    722.  In response to Paragraph 722, the Anthem Defendants state that pursuant to Dkt.

4    Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim

5    that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants

6    incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully

7    set forth herein.

8    723.  to 728.  In response to Paragraphs 723 to 728, the Anthem Defendants state that

9    pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these

10   Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that

11   no response is required to Paragraphs 723 to 728 because they contain only legal conclusions and

12   arguments.  To the extent a response is required to the allegations in these paragraphs, the

13   Anthem Defendants deny them.

14

15

### New York
### NEW YORK GENERAL BUSINESS LAW,
### N.Y. GEN. BUS. LAW § 349, *et seq.*

16   729.  In response to Paragraph 729, the Anthem Defendants incorporate and reassert their

17   responses to each of the preceding numbered paragraphs as if fully set forth herein.

18   730.  to 734.  No response is required to Paragraphs 730 to 734 because they contain only

19   legal conclusions and arguments.  To the extent a response is required to the allegations in these

20   paragraphs, the Anthem Defendants deny them.

21

22

### North Carolina
### NORTH CAROLINA UNFAIR TRADE PRACTICES ACT,
### N.C. GEN. STAT. ANN. § 75-1.1, *et seq.*

23   735.  In response to Paragraph 735, the Anthem Defendants state that pursuant to Dkt.

24   Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim

25   that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants

26   incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully

27   set forth herein.

28

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

736.  to 742.  In response to Paragraphs 736 to 742, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 736 to 742 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

<div align="center">

**North Dakota**
**NORTH DAKOTA UNLAWFUL SALES OR ADVERTISING ACT,**
**N.D. CENT. CODE §§ 51-10-01, *et seq.***

</div>

743.  In response to Paragraph 743, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

744.  to 750.  In response to Paragraphs 744 to 750, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 744 to 750 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

<div align="center">

**Oklahoma**
**OKLAHOMA CONSUMER PROTECTION ACT,**
**15 OKL. STAT. ANN. § 751, *et seq.***

</div>

751.  In response to Paragraph 751, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

752.  to 759.  In response to Paragraphs 752 to 759, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 752 to 759 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

### Pennsylvania
### PENNSYLVANIA UNFAIR TRADE PRACTICES,
### 73 PA STAT. ANN. § 201-1, *et seq.*

760.  In response to Paragraph 760, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

761.  to 767.  In response to Paragraphs 761 to 767, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 761 to 767 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

### Rhode Island
### RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT,
### R.I. GEN. LAWS§ 6-13.1, *et seq.*

768.  In response to Paragraph 768, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, theAnthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

769.  to 775.  In response to Paragraphs 769 to 775, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 769 to 775 because they contain only legal conclusions and

- 87 -

arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

**South Dakota**
**SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT, S.D. CODIFIED LAWS§ 37-24-1, *et seq.***

776.  In response to Paragraph 776, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

777.  to 783.  In response to Paragraphs 777 to 783, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 777 to 783 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

**Tennessee**
**TENNESSEE CONSUMER PROTECTION ACT, TENN. CODE ANN. §§ 47-18-101, *et seq.***

784.  In response to Paragraph 784, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

785.  to 791.  In response to Paragraphs 785 to 791, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.   The Anthem Defendants also state that no response is required to Paragraphs 785 to 791 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

Case 5:15-md-02617-LHK   Document 531   Filed 10/25/16   Page 720 of 827

**Texas**
**TEXAS DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT,**
**TEX. BUS. & COM. CODE § 17.41, *et seq*.**

792.  In response to Paragraph 792, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

793.  In response to Paragraph 793, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants admit they received a letter regarding Plaintiff Lane Wagner's alleged claim under the Texas Deceptive Trade Practices and Consumer Protection Act.   No response is required to the remaining allegations in Paragraph 793 because it contains only legal conclusions and argument, and to the extent a response is required, the Anthem Defendants deny them.

794.  In response to Paragraph 794, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in Paragraph 794 and, on that basis, deny them.

795.  to 800.  In response to Paragraphs 795 to 800, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.   The Anthem Defendants also state that no response is required to Paragraphs 795 to 800 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

**Vermont**
**VERMONT FRAUD ACT,**
**9 VT. STAT. ANN. §§ 2451, *et seq*.**

801.  In response to Paragraph 801, the Anthem Defendants state that pursuant to Dkt.

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

802. to 809. In response to Paragraphs 802 to 809, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 802 to 809 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

### Washington
### WASHINGTON CONSUMER PROTECTION ACT,
### WASH. REV. CODE § 19.86.020, *et seq.*

810. In response to Paragraph 810, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

811. to 816. In response to Paragraphs 811 to 816, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 811 to 816 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

### West Virginia
### WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT,
### W. VA. CODE § 46A-6-101, *et seq.*

817. In response to Paragraph 817, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants

incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

818.   In response to Paragraph 818, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraph 818 because it contains only legal conclusions and arguments.  To the extent a response is required to the allegations in this paragraph, the Anthem Defendants deny them

819.   In response to Paragraph 819, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants admit they received a letter regarding Plaintiff Lisa Shiltz's alleged claim under the West Virginia Consumer Credit and Protection Act.  No response is required to the remaining allegations in Paragraph 819 because they contain only legal conclusions and argument, and to the extent a response is required, the Anthem Defendants deny them.

820.   In response to Paragraph 820, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants are without sufficient knowledge or information to form a belief regarding the truth of the allegations in Paragraph 820 and, on that basis, deny them.

821.  to 826.  In response to Paragraphs 821 to 826, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 821 to 826 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

Hogan Lovells US LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

## COUNT X – DATA BREACH STATUTES

### California
### CALIFORNIA CUSTOMER RECORDS ACT,
### CAL. CIV. CODE § 1798.80, *et seq.*

827.  In response to Paragraph 827, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

828.  to 837.   In response to Paragraphs 828 to 837, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 828 to 837 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

### Colorado
### COLO. REV. STAT. ANN. § 6-1-716(2), *et seq.*

838.  In response to Paragraph 838, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

839.  to 845.  In response to Paragraphs 839 to 845, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 839 to 845 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

Hogan Lovells US LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

## Delaware
### DEL. CODE ANN. TIT. 6 § 12B-102(a), *et seq.*

846.   In response to Paragraph 846, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

847.   to 853.  In response to Paragraphs 847 to 853, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 847 to 853 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

## District of Columbia
### D.C. CODE § 28-3852(a), *et seq.*

854.   In response to Paragraph 854, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.   To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

855.   to 861.  In response to Paragraphs 855 to 861, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 855 to 861 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

## Georgia
### GA. CODE ANN. § 10-1-912(a), *et seq.*

862.   In response to Paragraph 862, the Anthem Defendants state that pursuant to Dkt.

Hogan Lovells US LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

863. to 869. In response to Paragraphs 863 to 869, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 863 to 869 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

## Hawaii
## HAW. REV. STAT. § 487N-2(a), *et seq.*

870. In response to Paragraph 870, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

871. to 877. In response to Paragraphs 871 to 877, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 871 to 877 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

## Iowa
## IOWA CODE ANN. § 715C.2(1), *et seq.*

878. In response to Paragraph 878, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants

Hogan Lovells US LLP
Attorneys At Law

incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

879. to 885.  In response to Paragraphs 879 to 885, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 879 to 885 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

<div align="center">

**Kansas**
**KAN. STAT. ANN. § 50-7a02(a),** *et seq.*

</div>

886.  In response to Paragraph 886, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

887. to 893.  In response to Paragraphs 887 to 893, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 887 to 893 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

<div align="center">

**Louisiana**
**LA. REV. STAT. ANN. § 51:3074(A),** *et seq.*

</div>

894.  In response to Paragraph 894, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

895. to 900. In response to Paragraphs 895 to 900, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 895 to 900 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

## Michigan
### MICH. COMP. LAWS ANN. § 445.72(1), *et seq.*

901. In response to Paragraph 901, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

902. to 907. In response to Paragraphs 902 to 907, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 902 to 907 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

## New Hampshire
### N.H. REV. STAT. ANN. § 359-C:20(I)(a), *et seq.*

908. In response to Paragraph 908, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

909. to 914. In response to Paragraphs 909 to 914, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

Paragraphs relate to a claim that is not a Selected Claim.   The Anthem Defendants also state that no response is required to Paragraphs 909 to 914 because they contain only legal conclusions and arguments.   To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

### Oregon
### OR REV. STAT. ANN. § 646A.604(1), *et seq.*

915.  In response to Paragraph 915, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a reponse is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

916.  to 924.  In response to Paragraphs 916 to 924, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 916 to 924 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

### South Carolina
### S.C. CODE ANN. § 39-1-90(A), *et seq.*

925.  In response to Paragraph 925, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

926.  to 931.  In response to Paragraphs 926 to 931, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 926 to 931 because they contain only legal conclusions and

Hogan Lovells US LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

### Tennessee
### TENN. CODE ANN. § 47-18-2107(b), *et seq.*

932.  In response to Paragraph 932, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

933.  to 938.  In response to Paragraphs 933 to 938, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 933 to 938 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

### Virginia
### VA. CODE ANN. § 18.2-186.6(B), *et seq.*

939.  In response to Paragraph 939, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

940.  to 945.  In response to Paragraphs 940 to 945, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 940 to 945 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

Hogan Lovells US
LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1

2

**Washington**
**WASH. REV. CODE ANN. § 19.255.010(1), *et seq*.**

3

4

5

6

7

946.  In response to Paragraph 946, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

8

9

10

11

12

13

947.  to 952.  In response to Paragraphs 947 to 952, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.   The Anthem Defendants also state that no response is required to Paragraphs 947 to 952 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

14

**Wisconsin**
**WIS. STAT. ANN. § 134.98(2), *et seq*.**

15

16

17

18

19

953.  In response to Paragraph 953, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

20

21

22

23

24

25

954.  to 959.  In response to Paragraphs 954 to 959, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 954 to 959 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

26

**Wyoming**
**WYO. STAT. ANN. § 40-12-502(a), *et seq*.**

27

28

960.  In response to Paragraph 960, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

961. to 966. In response to Paragraphs 961 to 996, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 961 to 966 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

## COUNT XI – STATE UNFAIR INSURANCE PRACTICE STATUTES

### Arizona
### ARIZONA UNFAIR INSURANCE PRACTICES STATUTE,
### (A.R.S. § 20-442, 443, 444)

967. In response to Paragraph 967, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

968. to 971. In response to Paragraphs 968 to 971, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 968 to 971 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

### Massachusetts
### UNFAIR METHODS OF COMPETITION AND UNFAIR AND DECEPTIVE ACTS AND PRACTICES IN THE BUSINESS OF INSURANCE,
### (MASS. GEN. LAWS ANN. CH. 176D, § 1, *et seq.*)

972. In response to Paragraph 972, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim

Hogan Lovells US LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1  that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants

2  incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully

3  set forth herein.

4      973.  to 976.  In response to Paragraphs 973 to 976, the Anthem Defendants state that

5  pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these

6  Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that

7  no response is required to Paragraphs 973 to 976 because they contain only legal conclusions and

8  arguments.  To the extent a response is required to the allegations in these paragraphs, the

9  Anthem Defendants deny them.

10                          **New Mexico**
                **TRADE PRACTICES AND FRAUDS IN INSURANCE BUSINESS,**
11              **(N.M. STAT. ANN. § 59A-16-1,** *et seq.***)**

12      977.  In response to Paragraph 977, the Anthem Defendants state that pursuant to Dkt.

13  Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim

14  that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants

15  incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully

16  set forth herein.

17      978.  to 981.  In response to Paragraphs 978 to 981, the Anthem Defendants state that

18  pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph

19  relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response

20  is required to Paragraphs 978 to 981 because they contain only legal conclusions and arguments.

21  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants

22  deny them.

23                          **North Dakota**
                **PROHIBITED PRACTICES IN INSURANCE BUSINESS,**
24              **(N.D. CENT. CODE§ 26.1-04-01,** *et seq.***)**

25      982.  In response to Paragraph 982, the Anthem Defendants state that pursuant to Dkt.

26  Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim

27  that is not a Selected Claim. To the extent a response is required, the Anthem Defendants

28  incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

- 101 -

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

set forth herein.

983. to 986. In response to Paragraphs 983 to 986, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 983 to 986 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

<div align="center">

**Texas**
**TEXAS UNFAIR AND DECEPTIVE INSURANCE PRACTICE LAWS,**
**(TEX. INS. CODE §§ 541.003, 541.051, 541.052, 541.061, 541.151)**

</div>

987. In response to Paragraph 987, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

988. to 991. In response to Paragraphs 988 to 991, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 988 to 991 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

<div align="center">

**West Virginia**
**UNFAIR TRADE PRACTICES IN THE BUSINESS OF INSURANCE,**
**(W. VA. CODE § 33-11-1, *et seq.*)**

</div>

992. In response to Paragraph 992, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

993. to 996. In response to Paragraphs 993 to 996, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 993 to 996 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

## COUNT XII – STATE INSURANCE PERSONAL INFORMATION PRIVACY STATUTES

### Arizona
### ARIZONA INSURANCE INFORMATION AND PRIVACY PROTECTION ACT, (A.R.S. §20-2113, § 20-2118(b))

997. In response to Paragraph 997, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

998. to 999. In response to Paragraphs 998 to 999, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 998 to 999 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

1000. In response to Paragraph 1000, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants admit that they retained information about certain individuals in their information systems. No response is required to the remaining allegations in Paragraph 1000 because they contain only legal conclusions and argument, and to the extent a response is required, the Anthem Defendants deny them.

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1001. to 1004.  In response to Paragraphs 1001 to 1004, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 1001 to 1004 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

**Connecticut**
**CONNECTICUT  INSURANCE INFORMATION  AND PRIVACY PROTECTION ACT, (CONN. GEN. STAT. §38a-988, 995, 999)**

1005. In response to Paragraph 1005, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

1006. to 1007.  In response to Paragraphs 1006 to 1007, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response is required to Paragraphs 1006 to 1007 because they contain only legal conclusions and arguments.  To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

1008. In response to Paragraph 1008, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants admit that they retained information about certain individuals in their information systems.  No response is required to the remaining allegations in Paragraph 1008 because they contain only legal conclusions and argument, and to the extent a response is required, the Anthem Defendants deny them.

1009. to 1013.  In response to Paragraphs 1009 to 1013, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these

Hogan Lovells US LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1  Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that

2  no response is required to Paragraphs 1009 to 1013 because they contain only legal conclusions

3  and arguments.  To the extent a response is required to the allegations in these paragraphs, the

4  Anthem Defendants deny them.

### Georgia
### GEORGIA INSURANCE INFORMATION AND PRIVACY PROTECTION ACT,
### (GA. CODE §33-39-14, 21(b))

7  1014. to 1020.  No response is required to Paragraphs 1014 to 1020 because, pursuant to

8  the Court's Order (D.E. 524), Plaintiffs' claim for relief under the Georgia Insurance Information

9  and Privacy Protection Act has been dismissed; the Anthem Defendants deny the allegations on

10 that basis.

### Illinois
### ILLINOIS INSURANCE INFORMATION  AND PRIVACY PROTECTION ACT,
### (215 ILCS 5/1014, 1021)

13 1021. In response to Paragraph 1021, the Anthem Defendants state that pursuant to Dkt.

14 Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim

15 that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants

16 incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully

17 set forth herein.

18 1022. to 1023.  In response to Paragraphs 1022 to 1023, the Anthem Defendants state that

19 pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these

20 Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that

21 no response is required to Paragraphs 1022 to 1023 because they contain only legal conclusions

22 and arguments.  To the extent a response is required to the allegations in these paragraphs, the

23 Anthem Defendants deny them.

24 1024. In response to Paragraph 1024, the Anthem Defendants state that pursuant to Dkt.

25 Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim

26 that is not a Selected Claim.  To the extent a response is required, theAnthem Defendants admit

27 that they retained information about certain individuals in their information systems.  No response

28 is required to the remaining allegations in Paragraph 1024 because they contain only legal

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

conclusions and argument, and to the extent a response is required, the Anthem Defendants deny them.

1025. to 1028. In response to Paragraphs 1025 to 1028, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 1025 to 1028 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

## Maine
## MAINE INSURANCE INFORMATION AND PRIVACY PROTECTION ACT, (ME. REV. STAT. 24-A, § 2215(1), 24-A, § 2217(2))

1029. In response to Paragraph 1029, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

1030. to 1031. In response to Paragraphs 1030 to 1031, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 1030 to 1031 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

1032. In response to Paragraph 1032, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants admit that they retained information about certain individuals in their information systems. No response is required to the remaining allegations in Paragraph 1031 because they contain only legal conclusions and argument, and to the extent a response is required, the Anthem Defendants deny them.

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1033. to 1035. In response to Paragraphs 1033 to 1035, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 1033 to 1035 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

## **Massachusetts**
## MASSACHUSETTS INSURANCE INFORMATION AND PRIVACY PROTECTION ACT, (MASS. GEN. LAWS CH. 175!, § 1, *et seq.*)

1036. In response to Paragraph 1036, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

1037. to 1043. In response to Paragraphs 1037 to 1043, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 1037 to 1043 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

## **Minnesota**
## MINNESOTA INSURANCE FAIR INFORMATION REPORTING ACT, (MINN. STAT. § 72A.49, *et seq.*)

1044. In response to Paragraph 1044, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

1045. to 1051. In response to Paragraphs 1045 to 1051, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these

Hogan Lovells US LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 1045 to 1051 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

### Montana
## MONTANA INSURANCE INFORMATION AND PRIVACY PROTECTION ACT,
### (MONT. CODE§ 33-19-101, *et seq.*)

1052. In response to Paragraph 1052, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

1053. to 1059. In response to Paragraphs 1053 to 1059, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 1053 to 1059 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

### New Jersey
## NEW JERSEY INSURANCE INFORMATION PRACTICES ACT,
### (N.J. STAT.§ 17:23A-1, *et seq.*)

1060. In response to Paragraph 1060, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

1061. to 1067. In response to Paragraphs 1061 to 1067, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 1061 to 1067 because they contain only legal conclusions

Hogan Lovells US
LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

and arguments.  To the extent a response is required to the allegations in these paragraphs, the
Anthem Defendants deny them.

### North Carolina
### NORTH CAROLINA CONSUMER AND CUSTOMER INFORMATION PRIVACY ACT, (N.C. GEN. STAT. § 58-39-1, *et seq.*)

1068. In response to Paragraph 1068, the Anthem Defendants state that pursuant to Dkt.
Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim
that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants
incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully
set forth herein.

1069. to 1075.  In response to Paragraphs 1069 to 1075, the Anthem Defendants state that
pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these
Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that
no response is required to Paragraphs 1069 to 1075 because they contain only legal conclusions
and arguments.  To the extent a response is required to the allegations in these paragraphs, the
Anthem Defendants deny them.

### Ohio
### OHIO INSURANCE TRANSACTION  INFORMATION STANDARDS LAW, (OHIO REV. CODE§ 3904.13, §3904.21(b)

1076. In response to Paragraph 1076, the Anthem Defendants state that pursuant to Dkt.
Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim
that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants
incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully
set forth herein.

1077. to 1078.  In response to Paragraphs 1077 to 1078, the Anthem Defendants state that
pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these
Paragraphs relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that
no response is required to Paragraphs 1077 to 1078 because they contain only legal conclusions
and arguments.  To the extent a response is required to the allegations in these paragraphs, the
Anthem Defendants deny them.

Hogan Lovells US LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1079. In response to Paragraph 1079, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants admit that they retained information about certain individuals in their information systems. No response is required to the remaining allegations in Paragraph 1079 because they contain only legal conclusions and argument, and to the extent a response is required, the Anthem Defendants deny them.

1080. to 1083. In response to Paragraphs 1080 to 1083, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 1080 to 1083 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

### Oregon
### OREGON USE AND DISCLOSURE OF INSURANCE INFORMATION, (OR  REV. STAT. § 746.600, *et seq.*)

1084. In response to Paragraph 1084, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

1085. to 1093. In response to Paragraphs 1085 to 1093, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 1085 to 1093 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

<u>**COUNT XIII – STATE MEDICAL AND HEALTH INFORMATION PRIVACY STATUTES**</u>

<u>**California**</u>

**CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT,
(CIVIL CODE §56 *et seq.*)**

1094. In response to Paragraph 1094, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

1095. to 1103. In response to Paragraphs 1095 to 1103, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 1095 to 1103 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

<u>**Maryland**</u>

**MARYLAND DISCLOSURE REQUIREMENTS FOR INSURERS,
(MD. CODE, INS. § 4-403)**

1104. In response to Paragraph 1104, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

1105. to 1110. In response to Paragraphs 1105 to 1110, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 1105 to 1110 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

Hogan Lovells US LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

## MARYLAND DISCLOSURE REQUIREMENTS FOR NONPROFIT HEALTH SERVICE PLANS, (MD. CODE, INS. § 14-138)

1111. In response to Paragraph 1104, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

1112. to 1117.   In response to Paragraphs 1112 to 1117, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 1112 to 1117 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

## MARYLAND  CONFIDENTIALITY OF MEDICAL RECORDS ACT, (MD. CODE, HEALTH-GEN. § 4-301,.t seq.)

1118. In response to Paragraph 1118, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

1119. to 1124.  In response to 1119 to 1124, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim.   The Anthem Defendants also state that no response is required to Paragraphs 1119 to 1124 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

Hogan Lovells US LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

Case 5:15-md-02617-LHK Document 531 Filed 10/24/16 Page 744 of 822

## Minnesota
## MINNESOTA HEALTH RECORDS ACT,
### (MINN. STAT. § 144.291, *et seq*.)
### AGAINST ANTHEM AND ANTHEM AFFILATES OPERATING IN MINNESOTA

1125. In response to Paragraph 1125, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

1126. to 1130. In response to Paragraphs 1126 to 1130, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 1126 to 1130 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

## Rhode Island
## RHODE ISLAND CONFIDENTIALITY OF HEALTH CARE INFORMATION ACT, (R.I. GEN. LAWS § 5-37.3-1, *et seq*.) AGAINST ANTHEM AND ANTHEM AFFILATES OPERATING IN RHODE ISLAND

1131. In response to Paragraph 1131, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

1132. to 1137. In response to Paragraphs 1132 to 1137, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 1132 to 1137 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1

2

3

**<u>Virginia</u>**
**VIRGINIA INSURANCE INFORMATION AND PRIVACY PROTECTION ACT, (VA. CODE § 38.2-600, *et seq.*) AGAINST ANTHEM AND ANTHEM AFFILATES OPERATING IN VIRGINIA**

4

5

6

7

8

1138. In response to Paragraph 1138, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

9

10

11

12

13

14

1139. to 1145. In response to Paragraphs 1139 to 1145, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 1139 to 1145 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

15

16

**<u>VIRGINIA HEALTH RECORDS PRIVACY STATUTE, (VA. CODE § 32.1-127.1:03) AGAINST ANTHEM AND ANTHEM AFFILATES OPERATING IN VIRGINIA</u>**

17

18

19

20

21

1146. In response to Paragraph 1146, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

22

23

24

25

26

27

1147. to 1153. In response to Paragraphs 1147 to 1153, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 1147 to 1153 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

28

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

## Washington
### WASHINGTON UNIFORM HEALTH CARE INFORMATION ACT, (WASH. REV. CODE. §70.02.045, §70.02.170) AGAINST ANTHEM AND ANTHEM AFFILIATES OPERATING IN WASHINGTON

1154. In response to Paragraph 1154, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

1155. to 1159. In response to Paragraphs 1155 to 1159, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in these Paragraphs relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 1155 to 1159 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

## Wisconsin
### WISCONSIN INSURANCE MEDICAL INFORMATION PRIVACY STATUTE, (WIS. STAT. § 610.70) AGAINST ANTHEM AND ANTHEM AFFILIATES OPERATING IN WISCONSIN

1160. In response to Paragraph 1160, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. To the extent a response is required, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

1161.to 1162. In response to Paragraphs 1161 to 1162, the Anthem Defendants state that pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim that is not a Selected Claim. The Anthem Defendants also state that no response is required to Paragraphs 1161 to 1162 because they contain only legal conclusions and arguments. To the extent a response is required to the allegations in these paragraphs, the Anthem Defendants deny them.

1163. In response to Paragraph 1163, the Anthem Defendants state that pursuant to Dkt.

Hogan Lovells US LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1   Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim

2   that is not a Selected Claim.  To the extent a response is required, the Anthem Defendants admit

3   that they retained information about certain individuals in their information systems.  No response

4   is required to the remaining allegations in Paragraph 1163 because they contain only legal

5   conclusions and argument, and to the extent a response is required, the Anthem Defendants deny

6   them.

7       1164. to 1167.  In response to Paragraphs 1164 to 1167, the Anthem Defendants state that

8   pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph

9   relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response

10  is required to Paragraphs 1164 to 1167 because they contain only legal conclusions and

11  arguments.  To the extent a response is required to the allegations in these paragraphs, the

12  Anthem Defendants deny them.

13  **WISCONSIN CONFIDENTIALITY OF HEATH RECORDS LAW, (WIS. STAT.**
**§ 146.82(5), §142.84) AGAINST ANTHEM AND ANTHEM AFFILIATES OPERATING**
14  **IN WISCONSIN**

15      1168. In response to Paragraph 1168, the Anthem Defendants state that pursuant to Dkt.

16  Nos. 326, 366, no response is required because the allegations in this Paragraph relate to a claim

17  that is not a Selected Claim. To the extent a response is required, the Anthem Defendants

18  incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully

19  set forth herein.

20      1169. to 1175.  In response to Paragraphs 1169 to 1175, the Anthem Defendants state that

21  pursuant to Dkt. Nos. 326, 366, no response is required because the allegations in this Paragraph

22  relate to a claim that is not a Selected Claim.  The Anthem Defendants also state that no response

23  is required to Paragraphs 1169 to 1175 because they contain only legal conclusions and

24  arguments.  To the extent a response is required to the allegations in these paragraphs, the

25  Anthem Defendants deny them.

26  **OTHER ALLEGATIONS**

27      1176. Except as expressly admitted above, the Anthem Defendants deny all of the

28  allegations in the Complaint.

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

- 116 -

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1177. The "Wherefore" clause and other sentences and clauses under the heading "PRAYER FOR RELIEF" on pages 277 to 279 of the Complaint set forth legal conclusions and Plaintiffs' characterization of the relief sought in this action, which requires no response.  To the extent a response is required, the Anthem Defendants deny any liability, in any form or amount, to Plaintiffs and/or any classes or subclasses as may be certified by the Court.   In response to Paragraph 1177, the Anthem Defendants incorporate and reassert their responses to each of the preceding numbered paragraphs as if fully set forth herein.

## AFFIRMATIVE DEFENSES

The Anthem Defendants, based on the facts and information known to date and subject to amendment following further investigation of the facts and proceedings in this action, and without waiver of any rights, privileges, or defenses, state its affirmative defenses as follows:

### FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

1.      Plaintiffs have failed to allege facts on which relief can be granted against the Anthem Defendants.

### SECOND AFFIRMATIVE DEFENSE
### (Lack of Standing)

2.      Plaintiffs' claims fail to the extent they lack standing to assert their claims.

### THIRD AFFIRMATIVE DEFENSE
### (No Injury and No Damage)

3.      Plaintiffs' claims fail, in whole or in part, to the extent they have not suffered any actual injury or damage, or in the alternative, any damages that Plaintiffs may have suffered were caused by their own conduct.

### FOURTH AFFIRMATIVE DEFENSE
### (Failure to Satisfy Fed. R. Civ. P. 23)

4.      The TAC does not allege a class properly certifiable under Fed. R. Civ. P. 23 because the requirements of Fed. R. Civ. P. 23 have not been met.  The deficiencies include, without limitation that Plaintiffs are not adequate class representatives, their claims are not typical

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

- 117 -

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

of those of the class, any common issues do not predominate, and a class action is not a superior

means of adjudication.

**FIFTH AFFIRMATIVE DEFENSE**
**(Failure to Mitigate Damages)**

5.      Plaintiffs' claims fail, in whole or in part, to the extent Plaintiffs failed to mitigate

damages, if any.

**SIXTH AFFIRMATIVE DEFENSE**
**(Failure to Exhaust)**

6.      Plaintiffs' claims are barred, in whole or in part, by their failure to exhaust

mandatory administrative and/or contractual remedies.

**SEVENTH AFFIRMATIVE DEFENSE**
**(Alter Ego)**

7.      The Anthem Defendants are not the alter ego of any subsidiaries or affiliates or

purported "health plans" named or referred to in the TAC.

**EIGHTH AFFIRMATIVE DEFENSE**
**(Lack of Agency)**

8.      The Anthem Defendants' subsidiaries, affiliates, or purported "health plans"

named or referred to in the TAC are not agents of Defendants or of each other.

**NINTH AFFIRMATIVE DEFENSE**
**(Lack of Causation)**

9.      Plaintiffs' claims fail, in whole or in part, to the extent Plaintiffs' alleged injuries

and/or damages, if any, were not caused in fact or were not proximately caused by acts and/or

omissions of the Anthem Defendants.

**TENTH AFFIRMATIVE DEFENSE**
**(Lack of Duty)**

10.     Plaintiffs' claims fail, in whole or in part, to the extent they are based on the

Anthem Defendants' failure to disclose information that the Anthem Defendants had no duty to

disclose.

Hogan Lovells US LLP
Attorneys At Law

- 118 -

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

## ELEVENTH AFFIRMATIVE DEFENSE
### (Waiver, Estoppel, Laches, Unclean Hands)

11.    Plaintiffs' claims are barred, in whole or in party, by the equitable doctrines of

waiver, estoppel, laches, and/or unclean hands.

## TWELFTH AFFIRMATIVE DEFENSE
### (Conditions Precedent/Subsequent)

12.    Plaintiffs' claims fail, in whole or in part, to the extent Plaintiffs or Plaintiffs'

assignees failed to satisfy any conditions or obligations which Plaintiffs' agreements with the

Anthem Defendants or their subsidiaries or affiliates require in order to enforce rights and

benefits under the terms of the agreements.

## THIRTEENTH AFFIRMATIVE DEFENSE
### (Foreseeability)

13.    Plaintiffs' claims fail, in whole or in part, to the extent any actions by the Anthem

Defendants' agents or employees which purportedly injured Plaintiffs were unforeseeable and/or

outside the scope of that person's or entity's agency or employment.

## FOURTEENTH AFFIRMATIVE DEFENSE
### (Limitations)

14.    Plaintiffs' claims are barred, in whole or in part, to the extent that any applicable

statute of limitations and/or contractual limitations period has lapsed.

## FIFTEENTH AFFIRMATIVE DEFENSE
### (Proper Parties)

15.    Plaintiffs' claims fail, in whole or in part, to the extent Plaintiffs failed to sue the

appropriate entity.

## SIXTEENTH AFFIRMATIVE DEFENSE
### (Accord and Satisfaction/Release)

16.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of accord and

satisfaction and/or release.

## SEVENTEENTH AFFIRMATIVE DEFENSE
### (Failure to Joint Parties Under Fed. R. Civ. P. 19)

17.    Plaintiffs' claims fail, in whole or in part, to the extent necessary and indispensable

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

parties to this action have not been joined under Fed. R. Civ. P. 19, prohibiting this action from proceeding in equity and good conscience among the parties presently before the Court. The Anthem Defendants specifically reserve the right to implead such parties.

### EIGHTEENTH AFFIRMATIVE DEFENSE
#### (Failure to Plead with Particularity)

18.    Plaintiffs' claims fail to the extent they are not pled with sufficient particularity under the Federal Rules of Civil Procedure.

### NINETEENTH AFFIRMATIVE DEFENSE
#### (Election of Remedies)

19.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of election of remedies.

### TWENTIETH AFFIRMATIVE DEFENSE
#### (Good Faith)

20.    Plaintiffs' claims fail because the Anthem Defendants at all times acted in good faith and in compliance with applicable state laws and regulations.

### TWENTY-FIRST AFFIRMATIVE DEFENSE
#### (Res Judicata and Collateral Estoppel)

21.    Plaintiffs' claims are barred, in whole or in part, by the doctrines of res judicata and/or collateral estoppel.

### TWENTY-SECOND AFFIRMATIVE DEFENSE
#### (Prospective Relief)

22.    Plaintiffs' claims fail, in whole or in part, to the extent that they seek prospective relief. The representative Plaintiffs are the members of the putative classes are not entitled to any equitable relief because they have an adequate remedy at law.

### TWENTY-THIRD AFFIRMATIVE DEFENSE
#### (Lack of Consideration)

23.    Plaintiffs' claims fail, in whole or in part, due to a lack of consideration.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE
#### (Fraud)

24.    Plaintiffs' claims fail, in whole or in part, to the extent fraud was committed by Plaintiffs.

Hogan Lovells US
LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

**TWENTY-FIFTH AFFIRMATIVE DEFENSE**
**(Lack of Privity)**

25.     Plaintiffs' claims fail, in whole or in part, due to lack of privity with the Anthem Defendants.

**TWENTY-SIXTH AFFIRMATIVE DEFENSE**
**(Vicarious Liability)**

26.     Plaintiffs' recovery is barred, in whole or in part, to the extent any damages suffered by Plaintiffs were proximately caused, in whole or in part, by persons and/or entities that are neither agents nor employees of the Anthem Defendants, and no legal or factual basis exists for imposing liability upon the Anthem Defendants for the acts or omissions of any such other persons and/or entities.

**TWENTY-SEVENTH AFFIRMATIVE DEFENSE**
**(ERISA)**

27.     The claims of certain members of the purposed classes are completely preempted by ERISA.  Certain members of the proposed classes are precluded from recovering punitive damages or attorneys' fees, pursuant to ERISA.  Plaintiffs' ERISA claims are barred because the Anthem Defendants complied with the terms of the relevant ERISA plans.  Plaintiffs' claims are barred because the Anthem Defendants' are not the plan "administrator" as defined by ERISA.

**TWENTY-EIGHTH AFFIRMATIVE DEFENSE**
**(Culpable Conduct)**

28.     Plaintiffs and members of the putative classes are barred, or any recovery should be reduced, to the extent of their own culpable conduct, including their own contributory negligence or individual acts of fraud or negligent misrepresentation.

**TWENTY-NINTH AFFIRMATIVE DEFENSE**
**(Ratification)**

29.     Plaintiffs were fully informed of and agreed to all material terms in any agreements between the parties, and ratified their agreements to these terms through repeated contract renewals.

**THIRTIETH AFFIRMATIVE DEFENSE**
**(Freedom of Contract)**

30.     Plaintiffs were free to accept the agreements between the parties and were not

- 121 -

forced or coerced into executing said agreements.

### THIRTY-FIRST AFFIRMATIVE DEFENSE
#### (No Violation of Law)

31.     Plaintiffs are not entitled to any relief because the Anthem Defendants have not engaged in any conduct that is a violation of any law or regulation.

### THIRTY-SECOND AFFIRMATIVE DEFENSE
#### (Contractual Period)

32.     Certain injuries allegedly sustained by Plaintiffs are outside the relevant contractual period or scope.

### THIRTY-THIRD AFFIRMATIVE DEFENSE
#### (Punitive Damages)

33.     To the extent Plaintiffs claim exemplary or punitive damages, such awards are prohibited under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. Alternatively, to the extent Plaintiffs claim exemplary or punitive damages, they fail to allege claims sufficient to entity them to such an award.

### THIRTY-FOURTH AFFIRMATIVE DEFENSE
#### (Reliance)

34.     Plaintiffs' claims are barred because Plaintiffs did not rely upon any alleged misrepresentations or omissions of the Anthem Defendants or, alternatively, such reliance was not reasonable or justified.

### THIRTY-FIFTH AFFIRMATIVE DEFENSE
#### (Statute of Frauds)

35.     Plaintiffs' claims are barred by the Statue of Frauds to the extent that Plaintiffs' claims are based on oral representations,.

### THIRTY-SIXTH AFFIRMATIVE DEFENSE
#### (Private Right of Action)

36.     Plaintiffs' claims fail to the extent the statutes and regulations upon which Plaintiffs rely do not provide individuals such as Plaintiffs with a private right of action.

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

- 122 -

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

### THIRTY-SEVENTH AFFIRMATIVE DEFENSE
### (Actions Contemplated by Contract)

37.     Plaintiffs' claims fail to the extent the practices of the Anthem Defendants complained of are expressly recognized, contemplated and permitted by the relevant agreements.

### THIRTY-EIGHTH AFFIRMATIVE DEFENSE
### (Acquiescence)

38.     Plaintiffs' claims are barred, in whole or in party, by the doctrines of actual or presumed knowledge, and/or the doctrine of acquiescence.

### THIRTY-NINTH AFFIRMATIVE DEFENSE
### (Lack of Misrepresentation)

39.     Plaintiffs' claims fail, in whole or in part, due to the absence of any material misrepresentations, misleading disclosures, and/or omissions made by the Anthem Defendants to Plaintiffs upon which Plaintiffs could have reasonably or justifiably relief.

### FORTIETH AFFIRMATIVE DEFENSE
### (Lack of Scienter)

40.     Plaintiffs' claims based on allegations of fraud, non-disclosure and/or misrepresentation fail, in whole or in part, because the Anthem Defendants lack the requisite scienter, including specific intent and/or willfulness, necessary to establish "fraud," nondisclosure and/or misrepresentation.

### FORTY-FIRST AFFIRMATIVE DEFENSE
### (Primary Jurisdiction)

41.     Plaintiffs' fraud and/or misrepresentation claims, or claims based on allegations of fraud and/or misrepresentation, are barred, in whole or in part, under the doctrine of primary jurisdiction to the extent they raise issues within the jurisdiction and special expertise of relevant State or federal administrative agencies.

### FORTY-SECOND AFFIRMATIVE DEFENSE
### (Administrative Law)

42.     Plaintiffs' claims are barred, in whole or in part, to the extent they seek remedies that duplicate and will disrupt, conflict, and/or interfere with complex governmental administrative schemes or that will require resolution of complex and unsettled questions of State

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

administrative law.

### FOURTY-THIRD AFFIRMATIVE DEFENSE
#### (Filed Rate Doctrine)

43.     Plaintiffs' claims are barred, in whole or in party, by the filed rate doctrine.

### FORTY-FOURTH AFFIRMATIVE DEFENSE
#### (Reservation of Rights)

44.     The Anthem Defendants expressly and specifically reserve the right to amend this Answer to add, delete, and/or modify defenses based on legal theories, facts and circumstances that may or will be divulged through further discovery and/or further legal analysis of Plaintiffs' position in this litigation.

### FORTY-FIFTH AFFIRMATIVE DEFENSE
#### (Received Benefits Due)

45.     Plaintiffs have received all benefits due them under the terms of their health plans.

### FORTY-SIXTH AFFIRMATIVE DEFENSE
#### (Set Off)

46.     To the extent that Plaintiffs have suffered any damages from conduct attributable to the Anthem Defendants, such damages must be reduced in whole or in part by an appropriate set off where Plaintiffs also received payment for damages from third parties.

WHEREFORE, the Anthem Defendants pray for relief as follows:

1.  That Plaintiffs' Complaint be dismissed with prejudice and Plaintiffs take nothing thereby;

2.  For the Anthem Defendants' costs of suit and reasonable attorneys' fees incurred in this action to the extent recoverable by law; and

3.  For such other and further relief as this Court may deem just and proper.

///

///

///

///

///

ANTHEM DEFENDANTS' ANSWER TO THIRD CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

| | |
|---|---|
| 1 | Dated:  August 4, 2016 |
| 2 | |

Respectfully submitted,

**HOGAN LOVELLS US LLP**
CRAIG A. HOOVER
E. DESMOND HOGAN
PETER R. BISIO
ALLISON M. HOLT

By: /s/ Craig A. Hoover

Craig A. Hoover (SBN 113965)
craig.hoover@hoganlovells.com
E. Desmond Hogan (admitted *pro hac vice*)
desmond.hogan@hoganlovells.com
Peter R. Bisio (admitted *pro hac vice*)
peter.bisio@hoganlovells.com
Allison M. Holt (admitted *pro hac vice*)
allison.holt@hoganlovells.com
555 Thirteenth Street, NW
Washington, DC 20004-1109
Telephone:    (202) 637-5600
Facsimile:    (202) 637-5910

*Attorneys for Defendants Anthem, Inc., Blue Cross and Blue Shield of Georgia, Inc., Blue Cross Blue Shield Healthcare Plan of Georgia, Inc., Anthem Insurance Companies, Inc., Blue Cross of California, Anthem Blue Cross Life and Health Insurance Company, Rocky Mountain Hospital and Medical Service, Inc., Anthem Health Plans, Inc., Anthem Health Plans of Kentucky, Inc., Anthem Health Plans of Maine, Inc., HMO Missouri, Inc., RightCHOICE Managed Care, Inc., Healthy Alliance Life Insurance Company, Anthem Health Plans of New Hampshire, Inc., Empire HealthChoice Assurance, Inc., Community Insurance Company, Anthem Health Plans of Virginia, Inc., HealthKeepers, Inc., Blue Cross Blue Shield of Wisconsin, Compcare Health Services Insurance Corporation, Amerigroup Corporation, Amerigroup Services, Inc., Amerigroup Kansas, Inc., HealthLink, Inc., UniCare Life & Health Insurance Company, Caremore Health Plan, The Anthem Companies, Inc., and The Anthem Companies of California, Inc. (collectively "The Anthem Defendants")*

Michael Maddigan (SBN 163450)
michael.maddigan@hoganlovells.com
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone:    (310) 785-4600
Facsimile:    (310) 785-4601

- 125 -

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1

2                                          *Attorneys for The Anthem Defendants*

3                                          **TROUTMAN SANDERS LLP**
                                           CHAD R. FULLER
4
                                           By: /s/ Chad R. Fuller
5

6                                          Chad R. Fuller (SBN 190830)
                                           chad.fuller@troutmansanders.com
7                                          11682 El Camino Real, Suite 400
                                           San Diego, CA 92130
8                                          Telephone:    (858) 509-6056
                                           Facsimile:    (858) 509-6040
9
                                           *Attorney for The Anthem Defendants*
10

11                                         **NELSON MULLINS RILEY &**
                                           **SCARBOROUGH LLP**
12                                         JOHN D. MARTIN
                                           LUCILE H. COHEN
13
                                           By: /s/ John D. Martin
14
                                           John D. Martin (admitted *pro hac vice*)
15                                         john.martin@nelsonmullins.com
                                           Lucile H. Cohen (admitted *pro hac vice*)
16                                         lucie.cohen@nelsonmullins.com
                                           1320 Main Street, 17th Floor
17                                         Columbia, SC 29201
                                           Telephone:    (803) 255-9241
18                                         Facsimile:    (858) 256-7500

19                                         *Attorneys for The Anthem Defendants*

20

21

22

23

24

25

26

27

28

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW

- 126 -

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

1

## DEMAND FOR JURY TRIAL

2

The Anthem Defendants demand a trial by jury on all issues so triable.

3

4

Dated:  August 4, 2016

By: /s/ Craig A. Hoover

5

Craig A. Hoover
*Attorney for Anthem Defendants*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Hogan Lovells US
LLP
Attorneys At Law

ANTHEM DEFENDANTS' ANSWER TO THIRD
CONSOLIDATED AMENDED COMPLAINT T
Case No. 15-MD-02617-LHK

# Exhibit K

1
2
3
4
5
6
7

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE ANTHEM, INC. DATA BREACH LITIGATION | Case No. 15-MD-02617-LHK |
| | **CASE MANAGEMENT ORDER** |

**Counsel on Behalf of Lead Plaintiffs and Lead Plaintiffs' Steering Committee:** Eve Cervantez, Danielle Leonard, Meredith Johnson, David Berger, Andrew Friedman
**Counsel on Behalf of Plaintiff Weinberger:** Karen Marcussem
**Counsel on Behalf of Defendants Anthem, Inc.; Anthem affiliates; and various non-Anthem affiliates:** Craig Hoover, Desmond Hogan, Chad Fuller, Allison Holt, John Martin, Lucile Cohen
**Counsel on Behalf of Defendants Blue Cross Blue Shield Association and Healthcare Services Corporation:** Brian Kavanaugh

A case management conference was held on July 22, 2016. A further case management conference is set for October 26, 2016, at 2:00 p.m. The parties shall file their joint case management statement by October 19, 2016.

At the case management conference, the Court made the following rulings:
**PLEADINGS**
Defendants shall file an answer to the third consolidated amended complaint by August 4, 2016.

**CLASS CERTIFICATION**

1

In order to help streamline the motion for class certification, the parties will identify by September 1, 2016 the total number of California residents enrolled in individual plans, group plans, and Administrative Services Only ("ASO") agreements.  The parties shall also provide enrollment numbers as to the ten ASO agreements with the largest number of California residents.

In addition, in the parties' October 19, 2016 joint case management statement, the parties shall propose specific approaches to class certification of the California breach of contract claim that will allow the Court to provide the parties a class certification ruling in an efficient and manageable manner.

**DISCOVERY**

For the reasons stated on the record, the parties' proposal to modify the discovery limits set forth in the Federal Rules of Procedure.  Specifically:

- Defendants may depose all named Plaintiffs
- Plaintiffs may take 25 fact depositions of employees of Anthem Defendants
- Plaintiffs may take 25 fact depositions of employees of Non-Anthem Defendants
- Plaintiffs and Defendants may both take up to 5 third party depositions
- Plaintiffs may serve one 30(b)(6) deposition notice on the Anthem Defendants, instead of having to serve separate 30(b)(6) notices for each Anthem Defendant
- Plaintiffs may depose two Anthem 30(b)(6) witnesses for up to 12 hours

**CASE SCHEDULE**

The Court made changes to the case schedule, in light of the parties' need for additional time to complete fact discovery.  Any further changes to the case schedule will be disfavored.  The amended case schedule is as follows:

| Scheduled Event | Date |
|---|---|
| Close of Fact Discovery | December 1, 2016 |
| Identification of Plaintiffs' Experts for Class Certification and Report | December 2, 2016 |
| Identification of Defendants' Experts for Class Certification and Report | December 21, 2016 |
| Identification of Plaintiffs' Rebuttal Witnesses for Class Certification and Report | January 16, 2017 |
| Last Day to Depose Experts (i.e., Close of Expert Discovery) | February 13, 2017 |
| Last Day to Amend Pleadings | February 24, 2017 |
| Deadline to File Motion for Class Certification | **Motion:** March 10, 2017 **Opp'n:** April 7, 2017 **Reply:** May 5, 2017 |
| Deadline for Defendants to File *Daubert* Motions | **Motion:** April 7, 2017 **Opp'n:** May 5, 2017 **Reply:** May 19, 2017 |

2

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Deadline for Plaintiffs to File *Daubert* Motions | **Motion:** May 5, 2017<br>**Opp'n:** May 19, 2017<br>**Reply:** June 2, 2017 |
|---|---|
| Hearing on Motion for Class Certification and *Daubert* Motions | June 29, 2017, at 1:30 p.m. |

**IT IS SO ORDERED.**

Dated:  July 22, 2016

*Lucy H. Koh*
_____
LUCY H. KOH
United States District Judge

United States District Court
Northern District of California

Case No. 15-MD-02617-LHK
CASE MANAGEMENT ORDER

3

# Exhibit L



# COHEN MILSTEIN

Andrew N. Friedman
(202) 408-4607
afriedman@cohenmilstein.com

May 12, 2016

Robin Jacobsohn, Esq.
General Counsel
U.S. Office of Personnel Management
1900 E Street, NW
Washington, DC 20415-1100

Re:   *In Re Anthem, Inc. Data Breach Litigation*, Case No. 15-Md-02617-LHK (NC)

Dear Ms. Jacobsohn:

As Lead Counsel for plaintiffs[1] in the referenced action[2] ("Action"), we write to request records, pursuant to 5 C.F.R. §295.204, from the U.S. Office of Personnel Management ("OPM") related to its Office of Inspector General ("OIG") audit of the information systems[3] ("Audit") of WellPoint Inc. ("WellPoint"), the auditing, testing or monitoring of the security of Federal Employees Health Benefits ("FEHB") Program Plan enrollees' Personally Identifiable Information ("PII") or Protected Health Information ("PHI") on Anthem Inc.'s ("Anthem")[4] computer networks, and the Anthem data breach publicly announced in February 2015 (the "Data Breach").

---

[1]   A list containing the name, address and telephone number of Lead Plaintiffs' Counsel and counsel for the Anthem Defendant is attached hereto as Exhibit A.

[2]   An as-filed redacted copy of the Second Consolidated Amended Class Action Complaint ("Complaint") is attached hereto as Exhibit B.

[3]   A copy of the OIG Final Audit Report of the Audit of Information Systems General and Application Controls at WellPoint Inc. dated September 10, 2013 (the "Audit Report") is attached hereto as Exhibit C.

[4]   "Anthem" means the Anthem Defendants and Anthem, Inc.'s past and present parents, subsidiaries, affiliates, predecessors, including but not limited to WellPoint Inc., successors, employees, independent contractors, officers, agents, vendors, accountants, and all other persons or entities acting on its behalf or under its direct or indirect control. The Anthem Defendants include Anthem, Inc. and the Anthem Affiliates.

---



May 12, 2016
Page 3

(c)   "we attempted to obtain additional information from WellPoint, but the Plan was unable to provide satisfactory evidence that it has ever had a program in place to routinely monitor the configuration of its servers";

(d)   "WellPoint has configured its servers to record the activity of privileged users (i.e., system administrators).  However, the event logs generated by these servers are only reviewed retroactively if a problem has been reported or detected . . . Failure to routinely review elevated user activity increases the risk that malicious activity could go undetected and sensitive information could be compromised";

(e)   "WellPoint has not implemented technical controls to prevent rogue devices (laptops, workstations, or routers not issued by or approved by the company) from connecting to its network";

(e)   "during our review we discovered that several specific servers containing Federal data are not subject to routine vulnerability scanning, and we could not obtain evidence indicating that these servers have ever been subject to a vulnerability scan . . . Failure to perform full scope vulnerability scanning increases the risk that WellPoint's systems are compromised and sensitive data stolen or destroyed.";

(g)   "In order to evaluate an FEHBP carrier's configuration compliance auditing program, we typically use automated tools to document the actual configuration of a sample of servers.  We then compare the results to the company's approved baseline configuration . . . When we requested to conduct this test at WellPoint, we were informed that a corporate policy prohibited external entities from connecting to the WellPoint network.";

(h)   "In an effort to meet our audit objective, we attempted to obtain additional information about WellPoint's configuration compliance auditing program.  We were initially provided a description of what appeared to be a thorough configuration compliance auditing program at WellPoint.  However, when we requested documentation to support this description, WellPoint was unable to provide any evidence that a configuration compliance auditing program had ever been in place at the company . . . Failure to implement a thorough configuration compliance auditing program increases the risk that insecurely configured servers remain undetected, creating a potential gateway for malicious virus and hacking activity that could lead to data breaches.";



May 12, 2016
Page 4

     (i)     "During the fieldwork phase of the audit, WellPoint provided us with conflicting statements regarding its plans to transition to Tivoli Endpoint Manager.  These conflicting statements along with WellPoint's inability to provide evidence that it performs configuration compliance scans ultimately led to us documenting a formal scope limitation."; and

     (j)     "WellPoint has created Technical Configuration Standards (TCS) that outline approved configuration settings for server and mainframe security software . . . However, we found several mainframe security settings that were not in compliance with the TCS."

6.     Documents that reflect or discuss the value or importance FEHB Plan enrollees place on participating plans maintaining the security and confidentiality of their PII or PHI.

7.     Documents that reflect or discuss the value or importance OPM places on FEHB Program participating plans maintaining the security and confidentiality of enrollee's PII or PHI.

8.     All documents that concern or describe any "external interference" related to the Audit, including but not limited to documents that identify persons or entities that engaged in any external interference.

9.     All documents regarding OPM's response or follow-up to the Audit, including consideration of whether to conduct further audit procedures or to obtain additional information related to the security of Anthem's networks or security of PII or PHI on Anthem's networks.

10.     All documents that reflect any resistance, refusal or interference by Anthem with any request or attempt by OPM to conduct audit or other procedures, subsequent to the Audit, related to the security of Anthem's networks, or the security of PII or PHI on Anthem's networks.

11.     Documents that set forth the right of OPM to conduct audits of the security of Anthem's networks, including, but not limited to, the right to conduct vulnerability scans on Anthem's networks or to use automated tools to evaluate the configuration of a sample of Anthem's computer servers.

12.     All documents memorializing or recording any meeting (or circulated in connection with any meeting) concerning the Audit (including Anthem's compliance with any request for access to Anthem's networks or for information related to the Audit) or the security of PII or PHI on Anthem's networks.



May 12, 2016
Page 5

    13.    All documents regarding requests by OPM to conduct vulnerability scans on Anthem's networks, including discussions related to any response by Anthem.

    14.    Documents that set forth the current status of OPM's requests or attempts to conduct vulnerability scans or any other audit or other procedures related to the security of Anthem's networks or the security of PII or PHI on Anthem's networks.

    15.    All documents that reflect OPM's communications with Anthem regarding the Data Breach.

    16.    All documents memorializing or recording any meeting (or circulated in connection with any meeting) OPM had with Anthem concerning the Data Breach.

    17.    Documents concerning any complaints and/or concerns received by the OPM from or on behalf any FEHB Plan enrollee regarding the Data Breach.

## Synopsis of the Action

In 2014 and 2015, Anthem experienced one of the largest data security breaches in history by exploiting security vulnerabilities, including some that OPM warned Anthem about. Cyberattackers stole the personal information of approximately 80 million Americans. Cplt. ¶ 1. In sum, the Complaint alleges that despite Anthem knowing that its computer systems stored sensitive personal information of millions of Americans, that it knew was valuable to, and vulnerable to, cyberattackers, Anthem used grossly inadequate data security practices, which allowed cyberattackers to easily make off with their personal data. Cplt. ¶¶ 327-385.

In particular, Count VI of the Complaint alleges a third-party beneficiary claim for breach of contract under federal law against Anthem and others on behalf of a Federal Employee Class for failure to take reasonable and contractually-required measures to keep the Federal Employee Class Members' PII and PHI secure and confidential and for failure to comply with the applicable federal and state laws, regulations and industry standards for data security. Cplt. ¶¶502-518.

The OIG Office of Audits conducts comprehensive and independent audits of OPM programs, operations, and contractors, including information systems audits at health insurance carriers participating in the FEHB Program. Anthem and its affiliates contracted with OPM to offer federal employees and other qualified persons health benefit plans through the FEHB Program. Cplt. ¶¶ 297-300. In 2013, the OIG conducted an information systems audit of Anthem's predecessor, WellPoint and thereafter at least attempted to perform additional procedures on Anthem's information systems but was denied access by Anthem. Cplt. ¶¶ 330-332.



May 12, 2016
Page 6

## Relevance of Evidence Sought

The information sought from OPM is relevant to the claims asserted in the Complaint. It is believed that this information will bear directly on, or will tend to show, among other things:(a) vulnerabilities of the security of computers systems at Anthem and the PII and PHI stored on those computer systems; (b) that management at Anthem was on notice of the vulnerabilities of the security of computers systems and the personal data stored thereon; (c) that Anthem, in violation of its obligations to permit such audit, interfered with OPM/OIG's efforts to conduct an information systems audit at Anthem; and (d) that Anthem continued to restrict or prohibit OPM/OIG's attempts to conduct audit or other procedures related to the security of Anthem's computer systems.

The information sought from OPM is not available from another source. OPM is the source providing the basis for the statements made in the Audit Report. While the Audit Report provides summary information about its findings, underlying information that is important to plaintiffs' claims is not revealed. For example, the Audit Report states, "we were informed that a corporate policy prohibited external entities from connecting to the WellPoint network", but does not disclose information about the "corporate policy", who at WellPoint/Anthem informed OPM of the policy, or who prohibited OPM from connecting to the WellPoint/Anthem network. The Audit Report states "we typically use automated tools to document the actual configuration of a sample of servers" but does not disclose what the automated tools were or the tests that would be conducted with those automated tools. The Audit Report states "we discovered that several specific servers containing Federal data are not subject to routine vulnerability scanning" but does not disclose which specific servers were not routinely scanned. Without knowing the specific servers referenced in Audit Report, we cannot know if the specific servers OPM flagged in 2013 were implicated in the Anthem Data Breach, These and other similar underlying facts will bear directly on plaintiffs' claims, including the breach of contract claim asserted in Count VI.

The importance of such evidence in prosecuting plaintiffs' claims clearly outweighs the burden of production. Indeed, most of the requested documents would likely be found in working papers that document the Audit, a discrete and readily identifiable set of materials. Further, requested documents are likely limited to circulation amongst high level OPM managers and therefore readily identifiable. Any confidential information produced by OPM would be covered by the Protective Order entered by the Court attached as Exhibit D.

The decisions and orders in the Action that bear upon the information requested are the Protective Order, Exhibit D, and the Court's decision on defendants' motion to dismiss attached hereto as Exhibit E.

Please contact me if you have any questions or if I can be of any assistance. I thank you in advance for your cooperation in this matter.



May 12, 2016
Page 7

Sincerely,

/s/ Andrew N. Friedman

Andrew N. Friedman

# Exhibit M



**U.S. Department of Justice**
Civil Division
Federal Programs Branch

| **Mailing Address** | **Overnight Delivery Address** |
|---|---|
| P.O. Box 883 | 20 Massachusetts Ave., N.W. |
| Washington, D.C. 20044 | Washington, D.C. 20001 |

---

Joseph E. Borson                                        Tel: (202) 514-1944
Trial Attorney                                          Fax: (202) 616-8460
                                                        Joseph.Borson@usdoj.gov

May 27, 2016

<u>Via Electronic Mail</u>

Andrew N. Friedman
Cohen, Milstein, Sellers & Toll, PLLC
1100 New York Avenue, NW
Suite 500 E
Washington, D.C. 20005
afriedman@cohenmilstein.com

> **Re:  *In re Anthem, Inc. Data Breach Litigation*, No. 15-MD-02617-LHK (NC)**
> **Office of Personnel Management Subpoena**

Dear Mr. Friedman:

I write to you on behalf of the Office of Personnel Management ("OPM") in response to the subpoena issued by you in the above-referenced action arising from a data security breach of Anthem, Inc.'s database that allegedly included information about Federal Employee Health Benefits ("FEHB") plan enrollees.  OPM is not a party to this litigation.

The subpoena and its accompanying cover letter request that OPM produce 17 separate categories of documents on or before June 3, 2016.  Several of these categories involve materials related to an audit of Anthem's systems that was conducted by OPM's Office of the Inspector General ("OIG") in 2013.  Other categories are much broader, requesting for example documents reflecting how OPM values the security and confidentiality of FEHB participants' personally identifying information ("PII") or protected health information ("PHI"), and any complaints and concerns received by OPM from any FEHB plan enrollees about the Anthem data breach.

OPM was served with the subpoena on May 13, 2016.  Pursuant to Federal Rule of Civil Procedure 45(d)(2)(B), OPM objects to the subpoena for the following reasons.

1.      <u>The Subpoena Does Not Comply with OPM's *Touhy* Regulations.</u>

Requests for production of information from OPM are governed by the regulations set out in 5 C.F.R. Part 295 (OPM's "*Touhy* regulations").  When, as here, the United States is not a party to the subject litigation, OPM's regulations prohibit its employees from producing material, including in response to a subpoena, without the prior, written approval of OPM's General

Counsel. *See* 5 C.F.R. § 295.201. Moreover, when submitting a request for materials, the requestor must comply with the requirements set out in OPM's *Touhy* regulations. *Id.* § 295.203. Plaintiffs' subpoena and cover letter do not comply with these regulations.

First, the subpoena is untimely. All requests for documents "should be submitted at least 45 days before the date that records . . . [are] required." *Id.* § 295.203(d). Your subpoena requests production only 21 days after service. Requests such as yours "submitted in less than 45 days before records . . . [are] required must be accompanied by a written explanation stating the reasons for the late request and the reasons for expedited processing." *Id.* You included no such explanation in your cover letter or the subpoena itself.

Second, your cover letter does not contain all of the information required by 5 C.F.R. § 295.203(b). For example, these regulations require the requestor to set out "a detailed description of how the information sought is relevant to the issues in the legal proceeding." *Id.* § 295.203(b)(3). You also must explain "how the need for the information outweighs the need to maintain any confidentiality of the information and outweighs the burden on OPM to produce the records," *id.* § 295.203(b)(4), and include "[a]statement indicating that the information sought is not available from another source," § 295.203(b)(5). In your cover letter, you briefly discuss how information related to the 2013 WellPoint Audit (the "Audit") is not available from another source, and then the letter asserts without the required "detailed description" that the requested information is relevant. *See* Letter, at 6. Such statements do not satisfy the requirements of OPM's *Touhy* regulations.

The subpoena also requests other categories of information that are not even addressed in your letter, for example, information about OPM's risk assessment of Anthem's information systems environment and applications generally, documents that "reflect or discuss the value or importance" that FEHB Plan enrollees and OPM place on participating plans maintaining the security and confidentiality of enrollee PII or PHI, OPM's current investigations, and OPM's reaction to the Anthem Data Breach itself. *See* Requests 2, 6-7, 13-14, 15-17. Without any explanation whatsoever about the relevance of such information to the lawsuit (not to mention, a showing of need), OPM cannot properly evaluate your request under its *Touhy* regulations.

    2.    <u>The Subpoena Seeks Information Protected by the Law Enforcement and Deliberative Process Privileges.</u>

The subpoena is also objectionable to the extent that it seeks privileged materials. *See* Fed. R. Civ. P. 45(d)(4)(A)(iii). First, the subpoena improperly seeks information protected by the law enforcement privilege, whose purpose "is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witnesses and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise prevent interference in an investigation." *In re Polypropylene Antitrust Litig.*, 181 F.R.D. 680, 687 (N.D. Ga. 1998) (quoting *In re Dep't of Investigation*, 865 F.2d 481, 484 (2d Cir. 1988)); *see also Black v. Sheraton Corp. of Am.*, 564 F.2d 531, 541-42 (D.C. Cir. 1977). This privilege applies to material collected and produced during Inspector General investigations. *See, e.g., Ohio Bureau of Workers' Compensation v. MDL Active Duration Fund*,

*Ltd.*, No. 05-cv-673, 2006 WL 3311514, at *2-3 (S.D. Ohio Nov. 13, 2006)). Most of the requested categories of information concern materials produced in the context of OPM OIG's law enforcement audit of Anthem's security systems, and also implicate the confidential investigatory techniques used in such audits. *See* Requests 1-5, 8, 10, 13-14. Other requests implicate the *current* status of any OPM OIG audits of Anthem's potential security vulnerabilities. *See* Requests 13-14. All of this information is within the privilege and therefore is protected from disclosure in response to the subpoena.

Second, because certain requests seek information about the conduct of the OPM OIG Audit and related materials, the subpoena undoubtedly implicates the deliberative process privilege, which applies to "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 76 (2d Cir. 2002), *cert. denied*, 538 U.S. 1056 (2003) (quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001)). Such documents include audit work papers and internal memoranda used by OPM OIG in the process of preparing the final audit, and these materials are requested in Requests 1-5, 8, 10, and 12-13. *See, e.g., Moye, O'Brien, O'Rourke, Hogan & Pickert v. Nat. R.R. Passenger Corp.*, 376 F.3d 1270, 1280 (11th Cir. 2004); *Hamilton Sec. Grp. Inc. v. Dep't of Housing & Urban Dev.*, 106 F. Supp. 2d 23, 29-32 (D.D.C. 2000); *see also* Fed. R. Civ. P. 45(d)(3)(A)(iii). Finally, the subpoena also seeks information that also may be protected by other privileges, including the attorney-client privilege and the work product doctrine. *See, e.g.*, Requests 1, 4, 14.

3.     <u>The Subpoena Seeks Information that Could Threaten Personal Privacy and Reveal Confidential Business Information.</u>

The subpoena also implicates the privacy interests of third-parties, either the enrollees themselves, or employees or other agents of Anthem. *See* Requests 2, 5, 6, 7, 10, 12, 15-17. The release of this information could violate their privacy, or potentially other applicable laws, including the Privacy Act. 5 U.S.C. § 552a(b).

The subpoena also seeks confidential business information, potentially in violation of the Trade Secrets Act, 18 U.S.C. § 1905. Pursuant to OPM OIG's 2013 Audit, the OIG sought and received sensitive information on the system architecture, structure, design and vulnerabilities of the Anthem system. This information is, at a minimum, commercially sensitive, and if released, could provide insight into the details of the underlying structure of the Anthem data infrastructure and systems architecture, thereby making those sensitive health care systems vulnerable to future attack. *See, e.g.*, Requests 2-5, 9, 12-14. Such information constitutes "a trade secret or other confidential research, development, or commercial information" that Rule 45 protects from disclosure. *See* Fed. R. Civ. P. 45(d)(3)(B)(i).

4.     <u>The Subpoena is Unduly Burdensome and Overbroad.</u>

In addition to seeking information protected by law from disclosure, the subpoena is unreasonably broad and constitutes an undue burden for OPM. *See* Fed. R. Civ. P.

45(d)(3)(A)(iv); 5 C.F.R. § 295.203(b)(4).

First, the subpoena exceeds the scope of Plaintiffs' breach of contract claim against Anthem, which is the only claim identified by Plaintiff as relevant to the subpoena.[1]  *See* Letter, at 5.  Request 2, for example, seeks "[a]ll documents that reflect the OPM's risk assessment of Anthem's information systems environment and applications," without ever attempting to define the specific information systems relevant to the breach of contract claim.  Requests 6 and 7, moreover, ask for documents that "reflect or discuss" the value that FEHB Plan enrollees and OPM itself places on "maintaining the security and confidentiality" of enrollee PII or PHI.  It is unclear how documents reflecting how PII or PHI is valued are relevant to a breach of contract claim against Anthem.  And Request 17 seeks "[d]ocuments concerning any complaints and/or concerns received by the OPM from or on behalf [of] any FEHB Plan enrollee regarding the Data Breach."  That information has no bearing on Anthem's conduct.  Additionally, to the extent that the requests implicate the *current* state of Anthem's systems – *i.e.*, its post-Breach, post-litigation status, such information has no bearing on a breach of contract claim that apparently ripened in 2014 or 2015, when the Data Breach occurred.  *See* Requests 2-3, 9, 13-16.  Because such information is not relevant to the lawsuit, it is not properly sought through your subpoena.  *See Callwave Commc'ns, LLC v. Wavemarket, Inc.*, No. 14-cv-80112, 2014 WL 2918218, at *2 (N.D. Cal. June 26, 2014) ("[T]he party issuing the subpoena must demonstrate that the discovery sought is relevant.") (quoting *Chevron Corp. v. Donzinger*, 12-MC-80237, 2013 WL 4536808, at *4 (N.D. Cal. Aug. 22, 2013)).

Second, the subpoena is unduly burdensome because it purports to require a search throughout all of OPM, and fails to specify any particular component or subdivision of OPM whose information is sought.  Such a search would require OPM to search many different records systems.  (As an example, OIG is an independent law enforcement office that does not share common architecture with other components within OPM.)  Such multiplicity of searches would constitute an undue burden.  *See, e.g., James Madison Project v. C.I.A.*, No. 08-cv-1323, 2009 WL 2777961, at *5 (E.D. Va. Aug. 31, 2009) (concluding that it would be an "unreasonable burden" for an agency to have to "contact every component within its directorate and tailor a search specific to that component's record system configuration").[2]

Third, certain requests are facially overbroad.  *See, e.g.*, Requests 1, 6-7, and 15.  These requests potentially "encompass[] a large number of documents that have no relevance to the claims and defenses . . . and  [thus] would impose an undue burden on" on OPM.  *Great Am. Ins.*

---

[1] While the letter generally avers that the information sought "is relevant to the claims asserted in the Complaint," Letter, at 6, with the exception of the breach of contract claim described above, it does not identify what those claims are.

[2] OPM also objects to the attempt to incorporate and impose electronically stored information ("ESI") requirements, as contained in the Stipulated Order regarding the Discovery of Electronically Stored Information.  *See* Fed. R. Civ. P. 34(b)(2)(D).  As an example, OIG's documents are maintained in a separate confidential law enforcement-based computer system, which may require more specialized treatment.

Page 4

*Co. v. Veteran's Support Org.*, No. 15-cv-80020, 2015 WL 10634342, at *5 (S.D. Fla. June 12, 2015). For example, Request 17 seeks documents "concerning *any* complaints and/or concerns received by the OPM from or on behalf [of] *any* FEHB Plan enrollee regarding the Data Breach." (emphasis added). But given the millions of FEHB Plan enrollees and the prominence of the Data Breach, that request easily could involve tens or hundreds of thousands of pages of materials without any seeming relevance to the breach of contract claim. *See, e.g., J & A Freight Sys. Inc. v. Travelers Property Cas. Co. of Am.*, No. 14-cv-1581, 2015 WL 360560, at *2 (N.D. Ill. Jan. 27, 2015) (concluding that a request for "any and all documents" related to a subject was over broad, as it "request[ed] information that is not relevant").

Finally, the requests cover an overly broad time frame, from January 1, 2011 to the present. Indeed, most of requests are not even implicitly linked to the time frame of the 2013 Audit, the nominal subject of this subpoena, nor are they constrained by the commencement of the litigation itself. *See* Requests 1, 3-4, 6-7, 10-11, 13-17. As a result, OPM is being asked to produce a potentially significant volume of information outside the time period relevant to the litigation. In that respect, the subpoena also exceeds the bounds of Rule 45. *See, e.g.,In re Accutane Prods. Liability Litig.*, No. 04-md-2523, 2006 WL 128159, at *1 (M.D. Fla. May 9, 2006) (holding that subpoena was "overly broad" when the sought materials were "not limited in temporal scope"); *Wellin v. Wellin*, No. 13-cv-1831, 2015 WL 5785709, at *29 (D.S.C. July 31, 2015) (concluding that a subpoena was overly broad and failed to impose a "proper limitation on the temporal scope of . . . discovery").

5.   The Subpoena Improperly Seeks Information Also Available From Defendants.

The subpoena also constitutes an undue burden because it seeks information available from defendants themselves. Here, many of the requests explicitly seek information about contacts between OPM and the defendants. *See* Requests 3, 10, 11, 13-16. Moreover, other requests implicitly ask about materials communicated between the defendants and OPM. For example, many of the sub-parts of Request 5 ask for information regarding requests that OPM made of Anthem. *See, e.g.*, Request 5(i) (seeking documents related to the claim that "Wellpoint provided [OPM] with conflicting statements regarding its plans to transition to Tivoli Endpoint Manager."). Because such information is available from parties to the litigation, that information should not be sought from OPM. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (prohibiting discovery if the request is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive."); 5 C.F.R. § 295.203(b)(5) (requiring requestor to include "[a] statement indicating that the information sought is not available from another source").

### 

The foregoing objections are not exclusive and we reserve the right to assert further objections in response to the subpoena as appropriate.

For all these reasons, OPM objects to the subpoena and will not produce the requested documents at the date, time, and place specified on the subpoena. We will let you know once

OPM has made a final decision on your request pursuant to its *Touhy* regulations.  We invite you to narrow and supplement your *Touhy* request with additional information to remedy the deficiencies identified above.  Otherwise, OPM will evaluate the request in its current form and provide a final response letter.

Please feel free to give me a call at your earliest convenience to discuss this matter.


Sincerely,


_____
Joseph E. Borson

# Exhibit N



**COHEN MILSTEIN**

Andrew N. Friedman
afriedman@cohenmilstein.com

June 6, 2016

***VIA ELECTRONIC MAIL***
Joseph.Borson@usdoj.gov

Joseph E. Borson, Esq.
U.S. Department of Justice
20 Massachusetts Ave., N.W.
Washington, D.C. 20001

Re:   *In re Anthem, Inc. Data Breach Litigation*, No. 15-MD-02617-LHK (NC)
      Office of Personnel Management Subpoena

Dear Joey:

Thanks again for speaking with us Friday about the subpoena and Touhy letter to OPM. We're confident that, based upon today's discussions, we can soon reach a compromise on the scope of what documents OPM will produce in the above-referenced litigation. At your request, this letter will serve to supplement our May 12, 2016 Touhy letter (the "Touhy Letter") with regard to certain issues raised on today's call.

While we explained the relevance of the evidence sought in the Touhy Letter, we discussed today the importance of noting that the documents sought – including documents related to the OPM Audit Report of Wellpoint – do not merely relate to the Anthem insurance made available to FEHB enrollees. OPM was in a unique position to observe and document facts and conditions bearing on the security of Personal Information held by WellPoint/Anthem during the relevant time period because of the OPM contract on behalf FEHB enrollees. But those facts, including information obtained during the Audit, are just as relevant to the tens of millions of class members who were enrolled in non-FEHB Anthem/BCBS insurance through group plans, individually or via administrative service contracts. As described in the Second Consolidated Amended Complaint (the "Complaint" (previously provided to you)), Anthem and its fellow defendants placed the personal information of approximately 80 million Americans in one centralized database (the "Anthem Database"). The Anthem Database includes Personal Information that was provided by current and former customers or members of Anthem, Anthem Affiliates as well as Non-Anthem BCBS plan members who obtained health care services in

Cohen Milstein Sellers & Toll PLLC   1100 New York Ave. NW   Suite 500, East Tower   Washington, DC 20005
t 202.408.4600   f 202.408.4699   www.cohenmilstein.com

2144610.1



Joseph E. Borson, Esq.
June 6, 2016
Page 2

areas where Anthem Affiliates serve as the BCBS licensees. Anthem's grossly inadequate data security related to the Anthem Database caused injury to all class members. Evidence of inadequate data security documented by OPM, including related to the OPM audit is, therefore, directly relevant to all members of the Class and to all claims in the Second Consolidated Amended Complaint.

We also discussed the relevance of our requests for documents related to the importance that OPM and FEHB enrollees placed on proper data security. As noted in Judge Koh's February 14, 2016 and May 27, 2016 Orders on Defendants' Motions to Dismiss (attached hereto as Exhibits A and B, respectively), the Court recognized that at least in regard to the California breach of contract claim, the California UCL claim, the New York GBL § 349 claim and the Federal Law Third Party Beneficiary claim brought on behalf of FEHB enrollees,[1] at least one form of damage properly pled is "benefit of the bargain" or "expectation" damages – *i.e.* damages sufficient to place the plaintiff in the same position he or she would have been in had the promisor performed the contract. And, according to the Court, it does not matter, as defendants have argued, that Defendants did not precisely earmark the portion of plaintiffs' payments that went towards data security. Here, as the Court recognized, it was the Anthem Defendants inability to fulfill their privacy obligations and their inability to set out the expected cost and value of these privacy obligation which form the basis of Plaintiffs' request for Benefit of the Bargain Losses. Exhibit A at pp. 31-34; 48-49; Exhibit B at pp. 23-25; 68-69; 75-77. Thus, the "expectations" of the FEHB enrollees and OPM regarding the data security abilities of Anthem are directly relevant to the damages alleged in the Complaint.

While your written response to the subpoena and the Touhy letter asserts that the relevant time period precedes the Audit, we noted that documents related to OPM's analysis of Anthem's data security (or enrollees' reaction thereto) are relevant for the reasons noted above, even those created prior to the Audit. Moreover, inquiries or observations that precipitated the 2013 Audit would be equally relevant.[2]

---

[1] As you may know, while the Complaint contains seven common law claims under virtually every state's common law and over 80 state statutory claims, the Court has purposely implemented a bellwether approach whereby only 10 claims would be heard on dispositive motions and subject to class certification. Those 10 claims are: Indiana negligence; California breach of Contract; New Jersey Breach of Contract; New York Unjust Enrichment; California Unfair Competition Law; New GBL § 349; Kentucky Consumer Protection Act; Kentucky Data Breach Act; Georgia Insurance Information and Privacy Protection Act; and the Federal Law Third Party Beneficiary Claims. Of these claims, the Indiana and Kentucky claims were dismissed.

[2] In addition, Defendants have generally agreed that the relevant time period for discovery begins on January 1, 2011.

2144610.1



Joseph E. Borson, Esq.
June 6, 2016
Page 3

In terms of OPM's assertion about the burdensome nature (or not) of the discovery we've requested, we agree with your assessment that it would be helpful to the process for OPM to first ascertain what documents it has and what would be entailed in collecting those documents before we can jointly meaningfully discuss narrowing any of the requests. To that end, we respectfully request that you undertake that analysis and report back to us within the next ten days. As we discussed, there is a fact discovery cut-off in this case of October 17, 2016. See Case Management Order at p. 2 (attached as Exhibit C).[3]

We are hopeful that we can continue to productively discuss the scope of the requested documents and reach an agreement for OPM's production. We agree that we will continue this discussion in the context of our Touhy letter, but as we know you understand, we will not withdraw our subpoena pending the resolution of our discussions.

Thank you again for your cooperation. We look forward to hearing from you shortly.

Sincerely,

Andrew Friedman

Andrew N. Friedman

cc:     Howard Longman
        Patrick Slyne
        Andrei Rado
        Eve Cervantez

---

[3] As we also noted, Defendants have been producing thousands of documents on a rolling basis and we anticipate hundreds of thousands, if not millions of pages of documents to be produced in the next month or so. Thus, while Defendants *might* produce correspondence between them and OPM, most of the documents we have requested of OPM are unlikely to be in any such production. For example, while there was undoubtedly correspondence exchanged during the Audit, documents that describe the Audit and what OPM ultimately concluded from that Audit are likely to be found only in OPM's files.

2144610.1

# Exhibit O



**U.S. Department of Justice**
Civil Division
Federal Programs Branch

| | |
|---|---|
| **Mailing Address** | **Overnight Delivery Address** |
| P.O. Box 883 | 20 Massachusetts Ave., N.W. |
| Washington, D.C. 20044 | Washington, D.C. 20001 |

---

Joseph E. Borson
Trial Attorney

Tel:  (202) 514-1944
Fax:  (202) 616-8460
Joseph.Borson@usdoj.gov

June 16, 2016

<u>Via Electronic Mail</u>

Andrew N. Friedman
Cohen, Milstein, Sellers & Toll, PLLC
1100 New York Avenue, NW
Suite 500 E
Washington, D.C. 20005
afriedman@cohenmilstein.com

> Re:  ***In re Anthem, Inc. Data Breach Litigation***, No. 15-MD-02617-LHK (NC)
> **Office of Personnel Management Subpoena**

Dear Andy:

In follow up to our conversation on June 3, 2016 and in response to your request for additional information about the materials OPM has that are responsive to your requests, I identify request-by-request what responsive information OPM has identified so far in its ongoing search for responsive documents.

Many of your requests overlap with one another, and we have tried to note that overlap when possible.  In addition, many of the documents identified below are privileged, and OPM reserves its right to assert any applicable privileges over such document.  Accordingly OPM provides this information subject to and without waiver of any privileges and/or protections for confidential business information, as  stated in its May 27, 2016 letter.  Furthermore, documents that appear potentially responsive ultimately may be determined to be non-responsive and therefore nothing in this letter should be deemed a final determination on any particular request.

**1.      All documents that reflect the circumstances that led to OPM's decision in or prior to 2013 to conduct an information systems environment and application audit at Anthem.**

OPM's Office of the Inspector General ("OIG") has identified its FY 2013 Audit Plan and the pre-decisional underlying information used to help develop this Audit Plan, which consists of the Information Systems Audit Group ("ISAG"), Office of Audits audit agenda for FY 2013 as potentially responsive to this request.

2.    **All documents that reflect the OPM's risk assessment of Anthem's information systems environment and applications.**

The meaning of "risk assessment" is not clear.  However, OPM OIG reports that no "risk assessments" were in use for the 2013 audit.  In subsequent years,OPM OIG's ISAG conducted "risk assessment type" surveys of approximately 100 plans.  These surveys were voluntary and are used as pre-decisional factors in developing audit agendas.

3.    **All documents regarding OPM's auditing, testing, or monitoring of the security of Anthem's networks and/or the security of FEHB Plan enrollees' PII or PHI on Anthem's networks, including all communications between and among OPM, Anthem, and any third-party vendors involved in the Audit, and OPM's internal communications regarding the Audit.**

OPM OIG reports that this request would cover (a) all pre-decisional and internal audit work papers for the 2013 Anthem audit, including, but not limited to: (1) planning documents; (2) Requests for Documentation ("RFD") sent to Anthem; (3) Responses to RFDs; and (4) auditor interview summaries; (b) Draft Audit Report, which was released to Anthem and OPM components; (c) Final Audit Report, which was released publically as redacted; and (d) other internal and external communications.

4.    **All documents regarding Anthem's compliance or noncompliance with the terms of Contract No. 1039 (including any amendments or modifications thereto) related to security and/or the confidentiality of enrollees' PII or PHI on Anthem's networks.**

OPM has identified documents related to the audit resolution process that would be covered by this request.  Such materials have generally been prepared by OPM's Audit Resolution Branch.  These materials, some of which may be pre-decisional and deliberative and/or otherwise privileged,include (a ) transmittal and resolution/status letters; (b) work plans containing corrective actions or other responses and updates to recommendations and findings; and (c) supporting documentation and evidence that findings have been remediated.

OPM has also identified emails from external individuals asking for information about the Data Breach (along with internal, pre-decisional emails regarding how to respond to these emails) as well as internal OPM emails discussing carrier contractual obligations to report identified or suspected breaches to OPM.

5.    **All documents regarding [10 separate] statements in the Audit Report**

Any responsive documents would be a subset of Response 3.  Each sentence may be mapped to a particular work paper; this is a "Yellow Book" requirement. The "Yellow Book" refers to the "Generally Accepted Government Auditing Standards" and it "provide[s] a framework for conducting high quality audits with competence, integrity, objectivity, and independence. The Yellow Book is for use by auditors of government entities, entities that receive government awards, and other audit organizations performing Yellow Book audits."

http://gao.gov/yellowbook/overview

**6.      Documents that reflect or discuss the value or importance FEHB Plan enrollees place on participating plans maintaining the security and confidentiality of their PII or PHI.**

OPM is continuing to review its materials to determine if any would be responsive to this request.  While it conducts surveys of enrollees, these surveys do not include questions related to enrollee views on maintaining the security and confidentiality of their PII or PHI.  OPM has received public comments about protecting PHI in the context of an APA rulemaking on the System of Records Notices ("SORNs").

**7.      Documents that reflect or discuss the value or importance OPM places on FEHB Program plans maintaining the security and confidentiality of enrollee's PII or PHI.**

Materials responsive to this request include carrier contract provisions and carrier letters & guidance.  Carrier letters & guidance are public documents available on OPM's website.

**8.      All documents that concern or describe any "external interference" relating to the Audit, including but not limited to documents that identify persons or entities that are engaged in any external interference.**

Any responsive documents would be a subset of Response 5.

**9.      All documents regarding OPM's response or follow-up to the Audit, including consideration of whether to conduct further audit procedures or to obtain additional information relating to the security of Anthem's networks or security of PII or PHI on Anthem's network.**

The audit resolution documents identified in Response 4 are potentially responsive to this request. OPM has also identified internal emails from the 2015 period concerning responses and materials related to the breach, as well as materials received from other federal agencies.  OPM OIG reports that it has pre-decisional and internal work papers pertaining to the follow-up audit of Anthem that is currently in process, as well as the Draft Audit Report for the follow-up audit of Anthem.

**10.      All documents that reflect any resistance, refusal or interference by Anthem with any request or attempt by OPM to conduct audit or other procedures, subsequent to the Audit, related to the security of Anthem's networks, or the security of PII or PHI on Anthem's networks.**

Although the reference to "other procedures" is not clear, OPM OIG reports that any potentially responsive documents would include correspondence between OPM OIG and Anthem related to the follow-up audit of Anthem that is currently in process.  Additional responsive documents would also potentially overlap with those identified in Response 9.

**11.     Documents that set forth the right of OPM to conduct audits of the security of Anthem's networks, including, but not limited to, the right to conduct vulnerability scans on Anthem's networks or to use automated tools to evaluate the configuration of a sample of Anthem's computer servers.**

The OPM-BCBSA contract sets out OPM's right to conduct audits.

OPM OIG's right to conduct audits is set out in the Inspector General Act of 1978, as amended; 5 U.S.C. Chapter 89; 5 C.F.R. Chapter 1, Part 890; and Contract 1039 for 2011, 2012, 2013, 2014, and 2015.

OPM has also identified documents related to the development of technical changes in OPM hardware to enable safe access to Plan IT systems.

**12.     All documents memorializing or recording any meeting (or circulated in connection with any meeting) concerning the Audit (including Anthem's compliance with any request for access to Anthem's networks or for information related to the Audit) or the security of PII or PHI on Anthem's networks.**

OPM has identified documents relevant to meetings conducted by OPM officials (e.g., meeting planners), mostly in the spring 2015 time frame.

**13.     All documents regarding requests by OPM to conduct vulnerability scans on Anthem's networks, including discussions related to any response by Anthem.**

Audit resolution or contract oversight related documents that have previously been mentioned are potentially relevant to this request. *See* Response 4.  Other materials would be covered as part of the audit work plan. *See* Response 3.

**14.     Documents that set forth the current status of OPM's requests or attempts to conduct vulnerability scans or any other audit or other procedures related to the security of Anthem's networks or the security of PII or PHI on Anthem's networks.**

OPM OIG has identified pre-decisional and internal audit documents pertaining to the follow-up audit of Anthem that is currently in progress. Other materials related to audit follow-up would be covered by Response 4.

**15.     All documents that reflect OPM's communications with Anthem regarding the Data Breach.**

OPM has identified email communications received from Anthem regarding the status of the breach, as well as emails from Anthem that provided information to Anthem members about potential enrollee responses to the breach.  Other materials related to audit follow-up would be covered by Response 9.

Page 4

**16.     All documents memorializing or recording any meeting (or circulated in connection with any meeting) OPM had with Anthem concerning the Data Breach.**
    *See* Responses 9, 12.

**17.     Documents concerning any complaints and/or concerns received by the OPM from or on behalf [of] any FEHB Plan enrollee regarding the Data Breach.**

OPM OIG reports that it has located three complaints received through the OIG Hotline complaint records system that may be potentially responsive.

<div align="center">###</div>

As we discussed during our phone call, OPM is continuing to review your *Touhy* request, as supplemented by your June 6, 2016, letter, as provided under its *Touhy* regulations, 5 C.F.R. Part 295. It expects to provide a final response within the period set out in the deadlines. The information provided in this letter is without prejudice to OPM's authority to make determinations regarding non-party requests for information in accordance with its *Touhy* regulations. Please feel free to give me a call at your earliest convenience to discuss this matter.

Sincerely,

_____

Joseph E. Borson

Exhibit P



**U.S. Department of Justice**
Civil Division
Federal Programs Branch

| Mailing Address | Overnight Delivery Address |
|---|---|
| P.O. Box 883 | 20 Massachusetts Ave., N.W. |
| Washington, D.C. 20044 | Washington, D.C. 20001 |

Joseph E. Borson
Trial Attorney

Tel: (202) 514-1944
Fax: (202) 616-8460
Joseph.Borson@usdoj.gov

July 15, 2016

<u>Via Electronic Mail</u>

Andrew N. Friedman
Cohen, Milstein, Sellers & Toll, PLLC
1100 New York Avenue, NW
Suite 500 E
Washington, D.C. 20005
afriedman@cohenmilstein.com

      **Re:** ***In re Anthem, Inc. Data Breach Litigation***, No. 15-MD-02617-LHK (NC)
         **Office of Personnel Management Touhy Request**

Dear Andy:

    On behalf of the General Counsel of the U.S. Office of Personnel Management ("OPM"), I am conveying OPM's response to your May 12, 2016, request for records and information in the above-referenced action to which the OPM is not a party. This response is based on information gathered to date from OPM's program offices and the OPM Office of the Inspector General ("OIG"), and will be supplemented or amended as needed.

    This request (your "Touhy request") was made pursuant to 5 C.F.R. §295.203. Specifically, you requested that OPM produce seventeen separate categories of records related to OPM OIG's audit of Wellpoint Inc.'s information systems (the "2013 Audit"); the auditing, testing, or monitoring of the security of Personally Identifiable Information ("PII") and protected health information ("PHI") of Federal Employee Health Benefit ("FEHB") Program Plan enrollees on Anthem's computer networks; and the Anthem data breach publicly announced in February 2015. A subpoena requesting the same seventeen categories of information accompanied your letter.

    On May 27, 2016, OPM filed a number of objections to the subpoena pursuant to Federal Rule of Civil Procedure 45(d)(2)(B) and notified you of various deficiencies in the Touhy request. In response, you sent a letter dated June 6, 2016, supplementing your original request with an explanation of the alleged relevance of certain information requested, as well as the suggestion that the scope of the information requested might be narrowed after OPM identifies

responsive documents for each category.  In furtherance of this effort, on June 16, 2016, OPM sent a letter detailing potentially responsive records it has identified.

Subsequently, on July 5, 2016, you agreed to narrow the requested information in several ways:  First, the requests are interpreted to exclude in the first instance correspondence between OPM and Anthem as well as other materials that are in Anthem's possession.  If, however, Plaintiffs are unable to obtain these documents directly from Anthem (and/or BCBSA), the parties will reopen discussions about including these materials in the Touhy request.  Second, OPM's responses to requests 3, 5, and 9 may be combined into a single response.  Third, for requests 7 and 11, as well as for other requests where OPM would otherwise produce contracts or contract provisions that Plaintiffs are already in possession of, you are willing to hold in abeyance your requests to the extent that OPM identifies the contract provisions it deems responsive.  Fourth, for any responses to which carrier letters and guidance materials are deemed responsive and are publically available, you agree to hold the request in abeyance provided that OPM sends links to the materials in question.  Finally, for request 17, OPM will search only officially established complaint database, repositories, or any officially established custodian for the receipt of such complaints and/or concerns.

In the interests of time and of providing you with relevant non-privileged materials as soon as possible, we have enclosed some of the responsive documents already gathered and determined appropriate for release, as indicated in more detail below.  We are completing our search and review for responsive information, and we will provide additional documents on a rolling basis, subject to any objections OPM may assert.  Therefore, and in accordance with 5 CFR part 295, OPM provides the following responses to the May 12, 2016 Touhy request:

**1.     All documents that reflect the circumstances that led to OPM's decision in or prior to 2013 to conduct an information systems environment and application audit at Anthem.**

OPM agrees to produce OPM's Office of the Inspector General ("OIG")'s FY 2013 Audit Plan.  OPM OIG also possesses pre-decisional documents used to help develop this Audit Plan. These documents consist of the OIG Office of Audits Information Systems Audit Group ("ISAG") draft audit agenda for FY 2013 and related materials submitted to OIG management for discussion and refinement while developing the Audit Plan.  These documents reflect ISAG's deliberative process, as it ranked and identifying potential audit targets, and are pre-decisional in nature and/or are law enforcement sensitive.  OPM has determined that disclosure of such records and information would not be appropriate under 5 CFR § 295.202(e) and (i), because disclosure would reveal confidential, sensitive or privileged information, including information protected by the law enforcement privilege and/or the deliberative process privilege, and disclosure is not in the best interest of OPM or the United States.

**2.     All documents that reflect the OPM's risk assessment of Anthem's information systems environment and applications.**

You have explained that the term "risk assessment" refers to "pre-audit" factors; *i.e.*, materials used to determine whether to audit Anthem. As applied to the 2013 audit, these materials are discussed in the response to Request 1.

In subsequent years, OPM OIG's ISAG conducted "risk assessment-type" surveys of approximately 100 plans that were voluntary and are used as pre-decisional factors in developing audit agendas. The responses to the surveys contain confidential and/or proprietary information provided by plans. OPM OIG also possesses pre-decisional and deliberative internal communications and documents based on this information that were used to develop subsequent years' proposed audit agendas and audit plans.

OPM has determined that disclosure of such records and information would not be appropriate under 5 CFR §§ 295.202(g) and (i) because the request would reveal confidential, sensitive or privileged information, including information protected by the law enforcement privilege, and the deliberative process privilege, and is not in the best interest of OPM or the United States. Finally, both the surveys and any responses provided by Anthem may be obtained directly from Anthem; therefore, disclosure would not be appropriate under 5 CFR § 295.202(f).

**3.     All documents regarding OPM's auditing, testing, or monitoring of the security of Anthem's networks and/or the security of FEHB Plan enrollees' PII or PHI on Anthem's networks, including all communications between and among OPM, Anthem, and any third-party vendors involved in the Audit, and OPM's internal communications regarding the Audit;**

**5.     All documents regarding [10 separate] statements in the Audit Report;**

**9.     All documents regarding OPM's response or follow-up to the Audit, including consideration of whether to conduct further audit procedures or to obtain additional information relating to the security of Anthem's networks or security of PII or PHI on Anthem's network.**

To the extent the requests relate to the 2013 Audit, the following documents would appear to be responsive to this request: (a) audit work papers for the 2013 Audit, including, but not limited to: (1) planning documents; (2) Requests for Documentation ("RFD") sent to Anthem; (3) Responses to RFDs; and (4) auditor interview summaries; (b) Draft Audit Report, which was released to Anthem and OPM components; (c) Final Audit Report, which was released publicly with redactions to protect sensitive and confidential commercial information; and (d) other internal and external communications.

With the exception of the Final Audit Report, a copy of which was attached to your request, disclosure of such records and information would not be appropriate under 5 CFR §§ 295.202(g) and (i) because such documents would reveal confidential, sensitive, or privileged

information, including information subject to the law enforcement privilege and/or the deliberative process privilege, as well as trade secret and/or propriety information of Anthem.  In addition, some of these documents are protected by the attorney client privilege.  Furthermore, because the RFDs, Responses to RFDs, Draft Audit Report, unredacted Final Audit Report, and external communications with Anthem can be obtained from Anthem, disclosure of this material would not be appropriate under 5 CFR § 295.202(f).

Regarding OPM's response and follow-up to the 2013 Audit, the vast majority of responsive documents identified by OPM consists of internal emails and inter-agency memoranda, as well as documents prepared by OPM's Audit Resolution Branch including, but not limited to: (a) transmittal and resolution/status letters; (b) work plans containing corrective actions or other responses and updates to recommendations and findings; and (c) supporting documentation and evidence that findings have been remediated.  OPM has determined that disclosure of internal OPM records and information would not be appropriate under 5 CFR §§ 295.202(g) and (i) because such disclosure would reveal confidential, sensitive, or privileged information, including information subject to the deliberative process privilege, trade secret and/or propriety information of Anthem, and/or information that may be protected by the attorney client privilege. Accordingly production of such documents is not in the best interest of OPM or the United States. External communications with Anthem in connection with the audit resolution process can be obtained from Anthem, and therefore disclosure would not be appropriate under 5 CFR § 295.202(f).

Finally, OPM possesses internal work papers pertaining to the follow-up audit of Anthem that is currently in process, as well as the Draft Audit Report for the follow-up audit of Anthem. OPM has determined that disclosure of such records and information would not be appropriate under 5 CFR §§ 295.202(g) and (i) because such disclosure would reveal confidential, sensitive, or privileged information, including information subject to the law enforcement privilege and/or the deliberative process privilege, as well as trade secret and/or propriety information of Anthem. With respect to any external communications between OPM and Anthem relative to the follow-up audit, including a copy of the Draft Audit Report, those documents can be obtained from Anthem, and therefore disclosure would not be appropriate under 5 CFR § 295.202(f).

Notwithstanding the determination that most of OPM's responsive records to the follow up or response to the 2013 Audit or the current audit are privileged, OPM will continue to conduct a search and review of responsive materials and release any materials or portions thereof deemed to be non-privileged.

**4.      All documents regarding Anthem's compliance or noncompliance with the terms of Contract No. 1039 (including any amendments or modifications thereto) related to security and/or the confidentiality of enrollees' PII or PHI on Anthem's networks.**

OPM possesses responsive documents that have generally been prepared by OPM's Audit Resolution Branch including, but not limited to: (a) transmittal and resolution/status letters; (b) work plans containing corrective actions or other responses and updates to recommendations and findings; and (c) supporting documentation and evidence that findings

have been remediated. OPM has determined that disclosure of such records and information would not be appropriate under 5 CFR §§ 295.202(g) and (i) because such disclosure would reveal confidential, sensitive, or privileged information, including information subject to the deliberative process privilege and/or the attorney client privilege, as well as trade secret and/or propriety information of Anthem. In addition, as for external communications between OPM and Anthem relative to the audit resolution process, those documents can be obtained from Anthem, and therefore disclosure would not be appropriate under 5 CFR § 295.202(f).

OPM has also identified internal emails concerning Anthem's compliance or noncompliance with the terms of Contract No. 1039 (including any amendments or modifications thereto) ("CS 1039") related to security and/or the confidentiality of enrollees' PII or PHI on Anthem's networks. OPM has determined that disclosure of such records and information would not be appropriate under 5 CFR § 295.202(g) and (i) because such disclosure would reveal confidential, sensitive, or privileged information, including information subject to the deliberative process privilege and/or attorney client privilege, and is not in the best interest of OPM or the United States.

**6.     Documents that reflect or discuss the value or importance FEHB Plan enrollees place on participating plans maintaining the security and confidentiality of their PII or PHI.**

OPM will provide copies of potentially responsive public comments it received in the course of an Administrative Procedure Act public rulemaking procedure in connection with establishment of the OPM Health Claims Data Warehouse.

**7.     Documents that reflect or discuss the value or importance OPM places on FEHB Program plans maintaining the security and confidentiality of enrollee's PII or PHI.**

OPM responds that provisions of CS 1039 for the 2011 through the 2016 contract years are responsive to this request. You have agreed that rather than providing copies of the contract, identification of the responsive contractual provisions would be sufficient in the first instance. These provisions will be provided under separate cover.

In addition, the following publicly available OPM guidance documents are responsive:

https://www.opm.gov/healthcare-insurance/healthcare/carriers/2015/2015-04.pdf
https://www.opm.gov/healthcare-insurance/healthcare/carriers/2010/2010-14.pdf
https://www.opm.gov/healthcare-insurance/healthcare/carriers/2007/2007-21.pdf

OPM has determined that it possesses no other records responsive to this category of information.

8.     All documents that concern or describe any "external interference" relating to the Audit, including but not limited to documents that identify persons or entities that are engaged in any external interference.

All documents potentially responsive to this request would be a subset of documents referenced in the response to requests 3, 5, and 9 above.

10.     All documents that reflect any resistance, refusal or interference by Anthem with any request or attempt by OPM to conduct audit or other procedures, subsequent to the Audit, related to the security of Anthem's networks, or the security of PII or PHI on Anthem's networks.

The term "other procedures" is vague and therefore this portion of the request is objectionable under 5 CFR 295.202(g). Subject to that objection, all documents potentially responsive to this request would be a subset of documents referenced in the response to requests 3, 5, and 9 above.

11.     Documents that set forth the right of OPM to conduct audits of the security of Anthem's networks, including, but not limited to, the right to conduct vulnerability scans on Anthem's networks or to use automated tools to evaluate the configuration of a sample of Anthem's computer servers.

OPM responds that provisions of CS 1039 for the 2011 through the 2016 contract years are responsive to this request.  You have agreed that rather than providing copies of the contract, identification of the responsive contractual provisions would be sufficient in the first instance. These provisions are provided in an appendix to this letter.

In addition, OPM OIG's authority to conduct audits is set out in the Inspector General Act of 1978, as amended, 5 U.S.C. app (IG Act); Contract 1039 for 2011, 2012, 2013, 2014, and 2015; 5 U.S.C. Chapter 89; and 5 C.F.R. Chapter 1, Part 890.

Finally, to the extent that this request may be construed as seeking any other documents exchanged between OPM OIG and Anthem during the course of OIG audits, those documents are discussed in the combined response to requests 3, 5, and 9.

12.     All documents memorializing or recording any meeting (or circulated in connection with any meeting) concerning the Audit (including Anthem's compliance with any request for access to Anthem's networks or for information related to the Audit) or the security of PII or PHI on Anthem's networks.

OPM has identified potentially responsive emails and memoranda regarding the development of tools to enable safe access to Wellpoint's IT system.  OPM has determined that disclosure of a subset of such records and information would not be appropriate under 5 CFR §§ 295.202(g) and (i) because such disclosure would reveal confidential, sensitive, or privileged information, including information subject to the deliberative process privilege.  OPM has

identified documents relative to meetings conducted by OPM officials that are not privileged and will provide copies of such documents.

In addition, as for any external communications between OPM and Anthem relative to the Audit or the security of PII or PHI on Anthem's networks, those documents can be obtained from Anthem, and therefore disclosure would not be appropriate under 5 CFR § 295.202(f).

**13.** **All documents regarding requests by OPM to conduct vulnerability scans on Anthem's networks, including discussions related to any response by Anthem.**

To the extent the request relates to the 2013 Audit that is the subject of the Final Audit Report, documents potentially responsive to this request would be a subset of documents referenced in the responses to requests 3, 4, 5, and 9 above. In addition, OPM has identified potentially responsive internal emails and memoranda regarding the development of tools to enable safe access to Wellpoint's IT system. OPM has determined that disclosure of these documents would not be appropriate under 5 CFR §§ 295.202(g) and (i) because such disclosure would reveal confidential, sensitive, or privileged information, including pre-decisional documents subject to the deliberative process privilege.

In addition, as for any external communications between OPM and Anthem regarding requests to conduct vulnerability scans or discussions related thereto, those documents can be obtained from Anthem, and therefore disclosure would not be appropriate under 5 CFR § 295.202(f).

**14.** **Documents that set forth the current status of OPM's requests or attempts to conduct vulnerability scans or any other audit or other procedures related to the security of Anthem's networks or the security of PII or PHI on Anthem's networks.**

All documents potentially responsive to this request would be a subset of documents referenced in the response to request 4 above.

**15.** **All documents that reflect OPM's communications with Anthem regarding the Data Breach.**

OPM has identified potentially responsive email communications received from Anthem regarding the status of the Data Breach, including documents that discuss information being provided by Anthem to Anthem members. OPM will provide copies for your convenience.

**16.** **All documents memorializing or recording any meeting (or circulated in connection with any meeting) OPM had with Anthem concerning the Data Breach.**

All documents potentially responsive to this request would be a subset of documents referenced in the response to request 12 above.

**17.     Documents concerning any complaints and/or concerns received by the OPM from or on behalf [of] any FEHB Plan enrollee regarding the Data Breach.**

You have agreed to narrow this request to seek complaints and/or concerns received by OPM by way of formally established channels, such as searchable databases, officially established custodians for the receipt of such complaints and/or concerns, or specifically designated mailboxes established for receipt of such complaints and/or concerns. OPM OIG received three complaints through the OIG Hotline complaint records system that may be potentially responsive.  These records are enclosed, with redactions to protect personally identifiable information as required by the Privacy Act, 5 U.S.C. § 552a(b), and §§ 7(b) and 8M(b)(2)(B) of the IG Act.

OPM continues to search other repositories for potentially responsive records and will supplement this response as needed.

### 

OPM will supplement these requests to the extent that it discovers additional responsive, non-privileged documents.  Notwithstanding our agreement to reopen discussions as referenced above, this letter does not waive any of OPM's objections to any materials covered by this request.

Please feel free to give me a call at your earliest convenience to discuss this matter.

Sincerely,

Joseph E. Borson

<u>Appendix</u>:

The following contract provisions are provided as detailed in response 11:

SECTION 1.11
FEHB INSPECTION (JUL 2005) (FEHBAR 1652.246-70)
(a)  The Contracting Officer, or an authorized representative of the Contracting
Officer, has the right to inspect or evaluate the work performed or being performed under
the contract, and the premises where the work is being performed, at all reasonable times
and in a manner that will not unreasonably delay the work.
(b)  The Contractor shall maintain and the Contracting Officer, or an authorized
representative of the Contracting Officer, shall have the right to examine and audit all
books and records relating to the contract for purposes of the Contracting Officer's
determination of the Carrier's subcontractor or Large Provider's compliance with the
terms of the contract, including its payment (including rebate and other financial
arrangements) and performance provisions.  The Contractor shall make available at its
office at all reasonable times those books and records for examination and audit for the
record retention period specified in the Federal Employees Health Benefits Acquisition
Regulation (FEHBAR), 48 CFR 1652.204-70.  This subsection is applicable to
subcontract and Large Provider Agreements with the exception of those that are subject
to the "Audits and Records – Negotiation" clause, 48 CFR 52.215-2.
(c) If the Contracting Officer, or an authorized representative of the Contracting
Officer, performs inspection, audit or evaluation on the premises of the Carrier, the
subcontractor, or the Large Provider, the Carrier shall furnish or require the subcontractor
or Large Provider to furnish all reasonable facilities for the safe and convenient
performance of these duties.
(d) The Carrier shall insert this clause, including this subsection (d), in all
subcontracts for underwriting and claim payments and administrative services and in all
Large Provider Agreements and shall substitute "contractor", "Large Provider," or other
appropriate reference for the term "carrier."

<u>The following provision is contained in the 2014, 2015, and 2016 Contracts:</u>

SECTION 1.30
HEALTH INFORMATION TECHNOLOGY PRIVACY AND SECURITY (JAN 2014)

(a)  Any Carrier subcontractor, large provider, or vendor, that administers a
personal health record or quality and cost or price transparency software applications for
Members that collect, create, receive, store or transmit individually identifiable protected
health information of Members that does not qualify as a covered entity or business
associate under the Health Insurance Portability and Accountability Act of 1996
(HIPAA) or regulations will be required by the Carrier to, at a minimum, comply with
equivalent privacy and security policies as are required of a "covered entity" under the
HIPAA Privacy and Security regulations.
(b)  The Carrier will provide for consumer transparency including, but not limited

to, the posting of the subcontractor's, large provider's, or vendor's notice of privacy practices prominently at the point where the Member enters the subcontractor's, large provider's, vendor's or other entity's website or web portal.

(c)  Notices of privacy practices disclosures must describe the uses of individually identifiable protected health information and any potential disclosure to other entities as described in the HIPAA Privacy Rule.

(d) (1) The Contracting Officer or an authorized representative of the Contracting Officer may use NIST SP 800-53 (or its current equivalent) requirements as a benchmark for conducting audits of Carrier information systems and may recommend that the Carrier adopt a best practice drawn from NIST SP 800-53 (or its current equivalent) to the following Carrier information systems:
(i) Information systems that directly process FEHBP data for contract purposes; and
(ii) All other information systems operating in the same general information technology control environment as the information systems in (i) above.

(2) In a written response to such a recommendation, the Carrier shall (i) agree to adopt the recommendation, (ii) explain that it is already in compliance with the recommendation, or(iii) explain why maintaining its current practice is compliant with Section 1.22, captioned Administrative Simplification -- HIPAA and is equally, if not more, appropriate for its business purposes than the recommended best practice from (1) above.

(3) Upon request of the Contracting Officer or an authorized representative of the Contracting Officer, the Carrier agrees to demonstrate to the requestor its compliance with either a recommended best practice from (1) or an alternative current practice from (2)(iii) that the Carrier has adopted. Evidence submitted pursuant to (2) that the Carrier and Contracting Officer agree is extremely sensitive may, at the Carrier's request and the Contracting Officer's concurrence, be reviewed on the Carrier's premises.

(4) If the Carrier agrees to adopt a best practice recommendation made pursuant to (1) above, the Contracting Officer will allow reasonable time for the Carrier to implement the best practice before making any request under (3) above.

The following provision is contained in 2013 Contract:

SECTION 1.30
HEALTH INFORMATION TECHNOLOGY PRIVACY AND SECURITY (JAN 2012)

(a)  Any Carrier subcontractor, large provider, or vendor, that administers a personal health record or quality and cost or price transparency software applications for Members that collect, create, receive, store or transmit individually identifiable protected health information of Members that does not qualify as a covered entity or business associate under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) or regulations will be required by the Carrier to, at a minimum, comply with equivalent privacy and security policies as are required of a "covered entity" under the HIPAA Privacy and Security regulations.

(b)  The Carrier will provide for consumer transparency including, but not limited to, the posting of the subcontractor's, large provider's, or vendor's notice of privacy

practices prominently at the point where the Member enters the subcontractor's, large provider's, vendor's or other entity's website or web portal.

(c)  Notices of privacy practices disclosures must describe the uses of individually identifiable protected health information and any potential disclosure to other entities as described in the HIPAA Privacy Rule.

The following provision is contained in the 2011 and 2012 Contracts:

SECTION 1.30
HEALTH INFORMATION TECHNOLOGY PRIVACY AND SECURITY (JAN 2009)
(a)  Any Carrier subcontractor, large provider, or vendor, that administers a personal health record or quality and cost or price transparency software applications for Federal members that collect, create, receive, store or transmit individually identifiable protected health information of Federal members that does not qualify as a covered entity or business associate under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) or regulations will be required by the Carrier to, at a minimum, comply with equivalent privacy and security policies as are required of a "covered entity" under the HIPAA Privacy and Security regulations.

(b)  The Carrier will provide for consumer transparency including, but not limited to, the posting of the subcontractor's, large provider's, or vendor's notice of privacy practices prominently at the point where the Federal member enters the subcontractor's, large provider's, vendor's or other entity's website or web portal.

(c)  Notices of privacy practices disclosures must describe the uses of individually identifiable protected health information and any potential disclosure to other entities as described in the HIPAA Privacy Rule.

# Exhibit Q



**U.S. Department of Justice**
Civil Division
Federal Programs Branch

| Mailing Address | Overnight Delivery Address |
|---|---|
| P.O. Box 883 | 20 Massachusetts Ave., N.W. |
| Washington, D.C. 20044 | Washington, D.C. 20001 |

Joseph E. Borson                               Tel: (202) 514-1944
Trial Attorney                                 Fax: (202) 616-8460
                                               Joseph.Borson@usdoj.gov

August 9, 2016

Via Electronic Mail

Andrew N. Friedman
Cohen, Milstein, Sellers & Toll, PLLC
1100 New York Avenue, NW
Suite 500 E
Washington, D.C. 20005
afriedman@cohenmilstein.com

     **Re:** *In re Anthem, Inc. Data Breach Litigation*, No. 15-MD-02617-LHK (NC)
           **Office of Personnel Management Touhy Request**

Dear Andy:

     This letter follows up on the questions you raised during our July 20, 2016, call concerning the Office of Personnel Management's ("OPM") final Touhy response letter dated July 15, 2016 ("Touhy Response").

     First, you inquired about the status of the production and whether OPM had placed any restrictions on the materials it has already produced. With respect to the production itself, at this time, OPM has completed its search and turned over to you all of the non-privileged, responsive documents identified in its Touhy Response. OPM is not claiming the protections of the protective order entered in this case for the materials it has already produced.[1]

     Second, you asked whether any of the materials that OPM identified in its Touhy Response as being "privileged and/or confidential" were confidential only and not privileged. OPM is continuing to review these materials, but presently it considers these materials to be both confidential and privileged.

     Third, you asked whether OPM could segregate purely factual material from privileged material in (1) the ISAG Draft Audit Agenda referenced in OPM's response to Item 1 of your Touhy request, and (2) the work papers and interview summaries referenced in OPM's

---

[1] This protective order was attached as Exhibit D to your Touhy request, and was entered by the Court on September 21, 2015. *See* ECF No. 293.

consolidated response to Items 3, 5, and 9 of your Touhy request.  OPM does not believe there is a way to segregate such material.  There is not, for example, a separate factual summary section within the ISAG Draft Audit Agenda.  Instead, factual information is embedded within materials that are otherwise privileged.[2]

Finally, you requested clarification about certain materials referenced in OPM's Touhy Response.  Specifically, you asked whether the "transmittal and resolution/status letters" and "work plans containing corrective actions" referenced in OPM's consolidated response to Items 3, 5, and 9 of your Touhy request were exchanged with Anthem.  OPM reports that they were. The former set of documents was sent from OPM; the latter was sent to OPM.  You also asked whether the "potentially responsive emails and memoranda regarding the development of tools to enable safe access to Wellpoint's IT systems" referenced in in OPM's response to Item 12 of your Touhy request would be responsive to other items in your Touhy request that asked more generally about OPM requests for access to Anthem's networks.  OPM reports that these materials would be responsive to other items in your Touhy request.

<p style="text-align:center">###</p>

Please feel free to give me a call if you have any questions about this response.

<p style="text-align:center">Sincerely,</p>

Joseph E. Borson

---

[2] As a point of clarification, this response refers to the ISAG Draft Audit Agenda.  As OPM reported in its July 15, 2016, letter, the OIG Audit plan has already been produced.

# Exhibit R

# STULL, STULL & BRODY
## ATTORNEYS AT LAW
6 EAST 45th STREET
NEW YORK, N.Y. 10017

TELEPHONE
212-687-7230

TELECOPIER
212-490-2022

August 15, 2016

VIA EMAIL
JOSEPH.BORSON@USDOJ.GOV

Joseph H. Borson
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20001

Re: *In re Anthem, Inc. Data Breach Litigation*, No. 15-MD-02617-LHK (NC)

Dear Joey:

As discussed during our August 12, 2016 conference call, on behalf of the plaintiffs in the above-referenced action, I write to provide the U.S. Office of Personnel Management ("OPM") with a list of categories of documents for which plaintiffs request that the OPM produce a privilege log.

As stated in the OPM's July 15, 2016 response to plaintiffs' May 12, 2016 Touhy letter ("OPM Letter"), the OPM declined to produce certain categories of documents the OPM identified as being in its possession and responsive to one or more of plaintiffs' seventeen requests asserting, among other things, privilege.[1]

Plaintiffs also served the OPM with a subpoena requesting production of the same seventeen categories of information requested in the Touhy letter.  On May 27, 2016, the OPM asserted objections claiming, among other things, that plaintiffs' subpoena requested production of privileged information.

Thus, plaintiffs request that the OPM produce a privilege log, in accordance with Federal Rule of Civil Procedure 45(e)(2)(A)(i) and (ii), for the following categories of documents:

(a)     OIG Office of Audits Information Systems Audit Group ("ISAG") draft audit agenda for FY 2013.  And to the extent related to Wellpoint/Anthem, materials submitted to OIG management for discussion and refinement while developing the 2013 Audit Plan including ISAG's identifying and ranking of potential audit targets.  See OPM Letter at 2;

(b)     Audit workpapers regarding 10 separate statements in the 2013 Audit Report.  See OPM Letter at 3;

---

[1] For convenience, a copy of the OPM Letter is attached.

Joseph H. Borson
U.S. Department of Justice
August 12, 2016
Page 2 of 2

(c)     Auditor interview summaries.  OPM Letter at 3;

(d)     Internal emails and inter-agency memoranda that relate to security and/or the confidentiality of enrollees' PII or PHI on Anthem's networks.  OPM Letter at 4;

(e)     Follow-up audit workpapers that provide the factual basis of assertions set forth in the 2016 draft audit report provided by OPM/OIG to Anthem.  OPM Letter at 4;

(f)     Internal emails concerning Anthem's compliance or noncompliance with the terms of Contract No. 1039 (including any amendments or modifications thereto) related to security and/or the confidentiality of enrollees' PII or PHI on Anthem's networks.  OPM Letter at 5;

(g)     Internal emails and memoranda regarding the development of tools to enable safe access to Wellpoint's IT system.  OPM Letter at 6; and

(h)     Internal emails, memoranda or documents regarding meetings OPM had with Anthem regarding the breach.  OPM letter at 7.

If you have any questions, please do not hesitate to call.

Sincerely,

Patrick Slyne

cc: Andrew Friedman

# Attachment



**U.S. Department of Justice**
Civil Division
Federal Programs Branch

| **Mailing Address** | **Overnight Delivery Address** |
|---|---|
| P.O. Box 883 | 20 Massachusetts Ave., N.W. |
| Washington, D.C. 20044 | Washington, D.C. 20001 |

---

Joseph E. Borson
Trial Attorney

Tel: (202) 514-1944
Fax: (202) 616-8460
Joseph.Borson@usdoj.gov

July 15, 2016

<u>Via Electronic Mail</u>

Andrew N. Friedman
Cohen, Milstein, Sellers & Toll, PLLC
1100 New York Avenue, NW
Suite 500 E
Washington, D.C. 20005
afriedman@cohenmilstein.com

> **Re:** *In re Anthem, Inc. Data Breach Litigation*, No. 15-MD-02617-LHK (NC)
> Office of Personnel Management Touhy Request

Dear Andy:

On behalf of the General Counsel of the U.S. Office of Personnel Management ("OPM"), I am conveying OPM's response to your May 12, 2016, request for records and information in the above-referenced action to which the OPM is not a party. This response is based on information gathered to date from OPM's program offices and the OPM Office of the Inspector General ("OIG"), and will be supplemented or amended as needed.

This request (your "Touhy request") was made pursuant to 5 C.F.R. §295.203. Specifically, you requested that OPM produce seventeen separate categories of records related to OPM OIG's audit of Wellpoint Inc.'s information systems (the "2013 Audit"); the auditing, testing, or monitoring of the security of Personally Identifiable Information ("PII") and protected health information ("PHI") of Federal Employee Health Benefit ("FEHB") Program Plan enrollees on Anthem's computer networks; and the Anthem data breach publicly announced in February 2015. A subpoena requesting the same seventeen categories of information accompanied your letter.

On May 27, 2016, OPM filed a number of objections to the subpoena pursuant to Federal Rule of Civil Procedure 45(d)(2)(B) and notified you of various deficiencies in the Touhy request. In response, you sent a letter dated June 6, 2016, supplementing your original request with an explanation of the alleged relevance of certain information requested, as well as the suggestion that the scope of the information requested might be narrowed after OPM identifies

responsive documents for each category. In furtherance of this effort, on June 16, 2016, OPM sent a letter detailing potentially responsive records it has identified.

Subsequently, on July 5, 2016, you agreed to narrow the requested information in several ways: First, the requests are interpreted to exclude in the first instance correspondence between OPM and Anthem as well as other materials that are in Anthem's possession. If, however, Plaintiffs are unable to obtain these documents directly from Anthem (and/or BCBSA), the parties will reopen discussions about including these materials in the Touhy request. Second, OPM's responses to requests 3, 5, and 9 may be combined into a single response. Third, for requests 7 and 11, as well as for other requests where OPM would otherwise produce contracts or contract provisions that Plaintiffs are already in possession of, you are willing to hold in abeyance your requests to the extent that OPM identifies the contract provisions it deems responsive. Fourth, for any responses to which carrier letters and guidance materials are deemed responsive and are publically available, you agree to hold the request in abeyance provided that OPM sends links to the materials in question. Finally, for request 17, OPM will search only officially established complaint database, repositories, or any officially established custodian for the receipt of such complaints and/or concerns.

In the interests of time and of providing you with relevant non-privileged materials as soon as possible, we have enclosed some of the responsive documents already gathered and determined appropriate for release, as indicated in more detail below. We are completing our search and review for responsive information, and we will provide additional documents on a rolling basis, subject to any objections OPM may assert. Therefore, and in accordance with 5 CFR part 295, OPM provides the following responses to the May 12, 2016 Touhy request:

**1.     All documents that reflect the circumstances that led to OPM's decision in or prior to 2013 to conduct an information systems environment and application audit at Anthem.**

OPM agrees to produce OPM's Office of the Inspector General ("OIG")'s FY 2013 Audit Plan. OPM OIG also possesses pre-decisional documents used to help develop this Audit Plan. These documents consist of the OIG Office of Audits Information Systems Audit Group ("ISAG") draft audit agenda for FY 2013 and related materials submitted to OIG management for discussion and refinement while developing the Audit Plan. These documents reflect ISAG's deliberative process, as it ranked and identifying potential audit targets, and are pre-decisional in nature and/or are law enforcement sensitive. OPM has determined that disclosure of such records and information would not be appropriate under 5 CFR § 295.202(e) and (i), because disclosure would reveal confidential, sensitive or privileged information, including information protected by the law enforcement privilege and/or the deliberative process privilege, and disclosure is not in the best interest of OPM or the United States.

2.     **All documents that reflect the OPM's risk assessment of Anthem's information systems environment and applications.**

You have explained that the term "risk assessment" refers to "pre-audit" factors; *i.e.*, materials used to determine whether to audit Anthem. As applied to the 2013 audit, these materials are discussed in the response to Request 1.

In subsequent years, OPM OIG's ISAG conducted "risk assessment-type" surveys of approximately 100 plans that were voluntary and are used as pre-decisional factors in developing audit agendas. The responses to the surveys contain confidential and/or proprietary information provided by plans. OPM OIG also possesses pre-decisional and deliberative internal communications and documents based on this information that were used to develop subsequent years' proposed audit agendas and audit plans.

OPM has determined that disclosure of such records and information would not be appropriate under 5 CFR §§ 295.202(g) and (i) because the request would reveal confidential, sensitive or privileged information, including information protected by the law enforcement privilege, and the deliberative process privilege, and is not in the best interest of OPM or the United States. Finally, both the surveys and any responses provided by Anthem may be obtained directly from Anthem; therefore, disclosure would not be appropriate under 5 CFR § 295.202(f).

3.     **All documents regarding OPM's auditing, testing, or monitoring of the security of Anthem's networks and/or the security of FEHB Plan enrollees' PII or PHI on Anthem's networks, including all communications between and among OPM, Anthem, and any third-party vendors involved in the Audit, and OPM's internal communications regarding the Audit;**

5.     **All documents regarding [10 separate] statements in the Audit Report;**

9.     **All documents regarding OPM's response or follow-up to the Audit, including consideration of whether to conduct further audit procedures or to obtain additional information relating to the security of Anthem's networks or security of PII or PHI on Anthem's network.**

To the extent the requests relate to the 2013 Audit, the following documents would appear to be responsive to this request: (a) audit work papers for the 2013 Audit, including, but not limited to: (1) planning documents; (2) Requests for Documentation ("RFD") sent to Anthem; (3) Responses to RFDs; and (4) auditor interview summaries; (b) Draft Audit Report, which was released to Anthem and OPM components; (c) Final Audit Report, which was released publicly with redactions to protect sensitive and confidential commercial information; and (d) other internal and external communications.

With the exception of the Final Audit Report, a copy of which was attached to your request, disclosure of such records and information would not be appropriate under 5 CFR §§ 295.202(g) and (i) because such documents would reveal confidential, sensitive, or privileged

information, including information subject to the law enforcement privilege and/or the deliberative process privilege, as well as trade secret and/or propriety information of Anthem. In addition, some of these documents are protected by the attorney client privilege. Furthermore, because the RFDs, Responses to RFDs, Draft Audit Report, unredacted Final Audit Report, and external communications with Anthem can be obtained from Anthem, disclosure of this material would not be appropriate under 5 CFR § 295.202(f).

Regarding OPM's response and follow-up to the 2013 Audit, the vast majority of responsive documents identified by OPM consists of internal emails and inter-agency memoranda, as well as documents prepared by OPM's Audit Resolution Branch including, but not limited to: (a) transmittal and resolution/status letters; (b) work plans containing corrective actions or other responses and updates to recommendations and findings; and (c) supporting documentation and evidence that findings have been remediated. OPM has determined that disclosure of internal OPM records and information would not be appropriate under 5 CFR §§ 295.202(g) and (i) because such disclosure would reveal confidential, sensitive, or privileged information, including information subject to the deliberative process privilege, trade secret and/or propriety information of Anthem, and/or information that may be protected by the attorney client privilege. Accordingly production of such documents is not in the best interest of OPM or the United States. External communications with Anthem in connection with the audit resolution process can be obtained from Anthem, and therefore disclosure would not be appropriate under 5 CFR § 295.202(f).

Finally, OPM possesses internal work papers pertaining to the follow-up audit of Anthem that is currently in process, as well as the Draft Audit Report for the follow-up audit of Anthem. OPM has determined that disclosure of such records and information would not be appropriate under 5 CFR §§ 295.202(g) and (i) because such disclosure would reveal confidential, sensitive, or privileged information, including information subject to the law enforcement privilege and/or the deliberative process privilege, as well as trade secret and/or propriety information of Anthem. With respect to any external communications between OPM and Anthem relative to the follow-up audit, including a copy of the Draft Audit Report, those documents can be obtained from Anthem, and therefore disclosure would not be appropriate under 5 CFR § 295.202(f).

Notwithstanding the determination that most of OPM's responsive records to the follow up or response to the 2013 Audit or the current audit are privileged, OPM will continue to conduct a search and review of responsive materials and release any materials or portions thereof deemed to be non-privileged.

4.    **All documents regarding Anthem's compliance or noncompliance with the terms of Contract No. 1039 (including any amendments or modifications thereto) related to security and/or the confidentiality of enrollees' PII or PHI on Anthem's networks.**

OPM possesses responsive documents that have generally been prepared by OPM's Audit Resolution Branch including, but not limited to: (a) transmittal and resolution/status letters; (b) work plans containing corrective actions or other responses and updates to recommendations and findings; and (c) supporting documentation and evidence that findings

have been remediated. OPM has determined that disclosure of such records and information would not be appropriate under 5 CFR §§ 295.202(g) and (i) because such disclosure would reveal confidential, sensitive, or privileged information, including information subject to the deliberative process privilege and/or the attorney client privilege, as well as trade secret and/or propriety information of Anthem. In addition, as for external communications between OPM and Anthem relative to the audit resolution process, those documents can be obtained from Anthem, and therefore disclosure would not be appropriate under 5 CFR § 295.202(f).

OPM has also identified internal emails concerning Anthem's compliance or noncompliance with the terms of Contract No. 1039 (including any amendments or modifications thereto) ("CS 1039") related to security and/or the confidentiality of enrollees' PII or PHI on Anthem's networks. OPM has determined that disclosure of such records and information would not be appropriate under 5 CFR § 295.202(g) and (i) because such disclosure would reveal confidential, sensitive, or privileged information, including information subject to the deliberative process privilege and/or attorney client privilege, and is not in the best interest of OPM or the United States.

   6.      **Documents that reflect or discuss the value or importance FEHB Plan enrollees place on participating plans maintaining the security and confidentiality of their PII or PHI.**

OPM will provide copies of potentially responsive public comments it received in the course of an Administrative Procedure Act public rulemaking procedure in connection with establishment of the OPM Health Claims Data Warehouse.

   7.      **Documents that reflect or discuss the value or importance OPM places on FEHB Program plans maintaining the security and confidentiality of enrollee's PII or PHI.**

OPM responds that provisions of CS 1039 for the 2011 through the 2016 contract years are responsive to this request. You have agreed that rather than providing copies of the contract, identification of the responsive contractual provisions would be sufficient in the first instance. These provisions will be provided under separate cover.

In addition, the following publicly available OPM guidance documents are responsive:

   https://www.opm.gov/healthcare-insurance/healthcare/carriers/2015/2015-04.pdf
   https://www.opm.gov/healthcare-insurance/healthcare/carriers/2010/2010-14.pdf
   https://www.opm.gov/healthcare-insurance/healthcare/carriers/2007/2007-21.pdf

OPM has determined that it possesses no other records responsive to this category of information.

8.    All documents that concern or describe any "external interference" relating to the Audit, including but not limited to documents that identify persons or entities that are engaged in any external interference.

All documents potentially responsive to this request would be a subset of documents referenced in the response to requests 3, 5, and 9 above.

10.    All documents that reflect any resistance, refusal or interference by Anthem with any request or attempt by OPM to conduct audit or other procedures, subsequent to the Audit, related to the security of Anthem's networks, or the security of PII or PHI on Anthem's networks.

The term "other procedures" is vague and therefore this portion of the request is objectionable under 5 CFR 295.202(g). Subject to that objection, all documents potentially responsive to this request would be a subset of documents referenced in the response to requests 3, 5, and 9 above.

11.    Documents that set forth the right of OPM to conduct audits of the security of Anthem's networks, including, but not limited to, the right to conduct vulnerability scans on Anthem's networks or to use automated tools to evaluate the configuration of a sample of Anthem's computer servers.

OPM responds that provisions of CS 1039 for the 2011 through the 2016 contract years are responsive to this request. You have agreed that rather than providing copies of the contract, identification of the responsive contractual provisions would be sufficient in the first instance. These provisions are provided in an appendix to this letter.

In addition, OPM OIG's authority to conduct audits is set out in the Inspector General Act of 1978, as amended, 5 U.S.C. app (IG Act); Contract 1039 for 2011, 2012, 2013, 2014, and 2015; 5 U.S.C. Chapter 89; and 5 C.F.R. Chapter 1, Part 890.

Finally, to the extent that this request may be construed as seeking any other documents exchanged between OPM OIG and Anthem during the course of OIG audits, those documents are discussed in the combined response to requests 3, 5, and 9.

12.    All documents memorializing or recording any meeting (or circulated in connection with any meeting) concerning the Audit (including Anthem's compliance with any request for access to Anthem's networks or for information related to the Audit) or the security of PII or PHI on Anthem's networks.

OPM has identified potentially responsive emails and memoranda regarding the development of tools to enable safe access to Wellpoint's IT system. OPM has determined that disclosure of a subset of such records and information would not be appropriate under 5 CFR §§ 295.202(g) and (i) because such disclosure would reveal confidential, sensitive, or privileged information, including information subject to the deliberative process privilege. OPM has

identified documents relative to meetings conducted by OPM officials that are not privileged and will provide copies of such documents.

In addition, as for any external communications between OPM and Anthem relative to the Audit or the security of PII or PHI on Anthem's networks, those documents can be obtained from Anthem, and therefore disclosure would not be appropriate under 5 CFR § 295.202(f).

**13.     All documents regarding requests by OPM to conduct vulnerability scans on Anthem's networks, including discussions related to any response by Anthem.**

To the extent the request relates to the 2013 Audit that is the subject of the Final Audit Report, documents potentially responsive to this request would be a subset of documents referenced in the responses to requests 3, 4, 5, and 9 above. In addition, OPM has identified potentially responsive internal emails and memoranda regarding the development of tools to enable safe access to Wellpoint's IT system.  OPM has determined that disclosure of these documents would not be appropriate under 5 CFR §§ 295.202(g) and (i) because such disclosure would reveal confidential, sensitive, or privileged information, including pre-decisional documents subject to the deliberative process privilege.

In addition, as for any external communications between OPM and Anthem regarding requests to conduct vulnerability scans or discussions related thereto, those documents can be obtained from Anthem, and therefore disclosure would not be appropriate under 5 CFR § 295.202(f).

**14.     Documents that set forth the current status of OPM's requests or attempts to conduct vulnerability scans or any other audit or other procedures related to the security of Anthem's networks or the security of PII or PHI on Anthem's networks.**

All documents potentially responsive to this request would be a subset of documents referenced in the response to request 4 above.

**15.     All documents that reflect OPM's communications with Anthem regarding the Data Breach.**

OPM has identified potentially responsive email communications received from Anthem regarding the status of the Data Breach, including documents that discuss information being provided by Anthem to Anthem members.  OPM will provide copies for your convenience.

**16.     All documents memorializing or recording any meeting (or circulated in connection with any meeting) OPM had with Anthem concerning the Data Breach.**

All documents potentially responsive to this request would be a subset of documents referenced in the response to request 12 above.

**17.     Documents concerning any complaints and/or concerns received by the OPM from or on behalf [of] any FEHB Plan enrollee regarding the Data Breach.**

You have agreed to narrow this request to seek complaints and/or concerns received by OPM by way of formally established channels, such as searchable databases, officially established custodians for the receipt of such complaints and/or concerns, or s pecifically designated mailboxes established for receipt of such complaints and/or concerns. OPM OIG received three complaints through the OIG Hotline complaint records system that may be potentially responsive.  These records are enclosed, with redactions to protect personally identifiable information as required by the Privacy Act, 5 U.S.C. § 552a(b), and §§ 7(b) and 8M(b)(2)(B) of the IG Act.

OPM continues to search other repositories for potentially responsive records and will supplement this response as needed.

### 

OPM will supplement these requests to the extent that it discovers additional responsive, non-privileged documents.  Notwithstanding our agreement to reopen discussions as referenced above, this letter does not waive any of OPM's objections to any materials covered by this request.

Please feel free to give me a call at your earliest convenience to discuss this matter.

Sincerely,

Joseph E. Borson

<u>Appendix</u>:

The following contract provisions are provided as detailed in response 11:

SECTION 1.11
FEHB INSPECTION (JUL 2005) (FEHBAR 1652.246-70)
     (a)  The Contracting Officer, or an authorized representative of the Contracting Officer, has the right to inspect or evaluate the work performed or being performed under the contract, and the premises where the work is being performed, at all reasonable times and in a manner that will not unreasonably delay the work.
     (b)  The Contractor shall maintain and the Contracting Officer, or an authorized representative of the Contracting Officer, shall have the right to examine and audit all books and records relating to the contract for purposes of the Contracting Officer's determination of the Carrier's subcontractor or Large Provider's compliance with the terms of the contract, including its payment (including rebate and other financial arrangements) and performance provisions. The Contractor shall make available at its office at all reasonable times those books and records for examination and audit for the record retention period specified in the Federal Employees Health Benefits Acquisition Regulation (FEHBAR), 48 CFR 1652.204-70. This subsection is applicable to subcontract and Large Provider Agreements with the exception of those that are subject to the "Audits and Records – Negotiation" clause, 48 CFR 52.215-2.
     (c) If the Contracting Officer, or an authorized representative of the Contracting Officer, performs inspection, audit or evaluation on the premises of the Carrier, the subcontractor, or the Large Provider, the Carrier shall furnish or require the subcontractor or Large Provider to furnish all reasonable facilities for the safe and convenient performance of these duties.
     (d) The Carrier shall insert this clause, including this subsection (d), in all subcontracts for underwriting and claim payments and administrative services and in all Large Provider Agreements and shall substitute "contractor", "Large Provider," or other appropriate reference for the term "carrier."

<u>The following provision is contained in the 2014, 2015, and 2016 Contracts</u>:

SECTION 1.30
HEALTH INFORMATION TECHNOLOGY PRIVACY AND SECURITY (JAN 2014)

     (a)  Any Carrier subcontractor, large provider, or vendor, that administers a personal health record or quality and cost or price transparency software applications for Members that collect, create, receive, store or transmit individually identifiable protected health information of Members that does not qualify as a covered entity or business associate under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) or regulations will be required by the Carrier to, at a minimum, comply with equivalent privacy and security policies as are required of a "covered entity" under the HIPAA Privacy and Security regulations.
     (b)  The Carrier will provide for consumer transparency including, but not limited

to, the posting of the subcontractor's, large provider's, or vendor's notice of privacy practices prominently at the point where the Member enters the subcontractor's, large provider's, vendor's or other entity's website or web portal.

(c) Notices of privacy practices disclosures must describe the uses of individually identifiable protected health information and any potential disclosure to other entities as described in the HIPAA Privacy Rule.

(d) (1) The Contracting Officer or an authorized representative of the Contracting Officer may use NIST SP 800-53 (or its current equivalent) requirements as a benchmark for conducting audits of Carrier information systems and may recommend that the Carrier adopt a best practice drawn from NIST SP 800-53 (or its current equivalent) to the following Carrier information systems:
(i) Information systems that directly process FEHBP data for contract purposes; and
(ii) All other information systems operating in the same general information technology control environment as the information systems in (i) above.

(2) In a written response to such a recommendation, the Carrier shall (i) agree to adopt the recommendation, (ii) explain that it is already in compliance with the recommendation, or(iii) explain why maintaining its current practice is compliant with Section 1.22, captioned Administrative Simplification -- HIPAA and is equally, if not more, appropriate for its business purposes than the recommended best practice from (1) above.

(3) Upon request of the Contracting Officer or an authorized representative of the Contracting Officer, the Carrier agrees to demonstrate to the requestor its compliance with either a recommended best practice from (1) or an alternative current practice from (2)(iii) that the Carrier has adopted. Evidence submitted pursuant to (2) that the Carrier and Contracting Officer agree is extremely sensitive may, at the Carrier's request and the Contracting Officer's concurrence, be reviewed on the Carrier's premises.

(4) If the Carrier agrees to adopt a best practice recommendation made pursuant to (1) above, the Contracting Officer will allow reasonable time for the Carrier to implement the best practice before making any request under (3) above.

The following provision is contained in 2013 Contract:

SECTION 1.30
HEALTH INFORMATION TECHNOLOGY PRIVACY AND SECURITY (JAN 2012)

(a) Any Carrier subcontractor, large provider, or vendor, that administers a personal health record or quality and cost or price transparency software applications for Members that collect, create, receive, store or transmit individually identifiable protected health information of Members that does not qualify as a covered entity or business associate under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) or regulations will be required by the Carrier to, at a minimum, comply with equivalent privacy and security policies as are required of a "covered entity" under the HIPAA Privacy and Security regulations.

(b) The Carrier will provide for consumer transparency including, but not limited to, the posting of the subcontractor's, large provider's, or vendor's notice of privacy

practices prominently at the point where the Member enters the subcontractor's, large provider's, vendor's or other entity's website or web portal.

(c) Notices of privacy practices disclosures must describe the uses of individually identifiable protected health information and any potential disclosure to other entities as described in the HIPAA Privacy Rule.

The following provision is contained in the 2011 and 2012 Contracts:

SECTION 1.30
HEALTH INFORMATION TECHNOLOGY PRIVACY AND SECURITY (JAN 2009)

(a) Any Carrier subcontractor, large provider, or vendor, that administers a personal health record or quality and cost or price transparency software applications for Federal members that collect, create, receive, store or transmit individually identifiable protected health information of Federal members that does not qualify as a covered entity or business associate under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) or regulations will be required by the Carrier to, at a minimum, comply with equivalent privacy and security policies as are required of a "covered entity" under the HIPAA Privacy and Security regulations.

(b) The Carrier will provide for consumer transparency including, but not limited to, the posting of the subcontractor's, large provider's, or vendor's notice of privacy practices prominently at the point where the Federal member enters the subcontractor's, large provider's, vendor's or other entity's website or web portal.

(c) Notices of privacy practices disclosures must describe the uses of individually identifiable protected health information and any potential disclosure to other entities as described in the HIPAA Privacy Rule.

# Exhibit S



**U.S. Department of Justice**

Civil Division
Federal Programs Branch

| Mailing Address | Overnight Delivery Address |
|---|---|
| P.O. Box 883 | 20 Massachusetts Ave., N.W. |
| Washington, D.C. 20044 | Washington, D.C. 20001 |

Joseph E. Borson
Trial Attorney

Tel:  (202) 514-1944
Fax:  (202) 616-8460
Joseph.Borson@usdoj.gov

September 9, 2016

<u>Via Electronic Mail</u>

Patrick Slyne
Stull, Stull & Brody
6 East 45th Street
New York, N.Y. 10017
pkslyne@ssbny.com

   Re:  *In re Anthem, Inc. Data Breach Litigation*, No. 15-MD-02617-LHK (NC)
        **Office of Personnel Management Touhy Request**

Dear Patrick:

   This letter follows up on our telephone conversation on August 25, 2016, and your letter dated August 15, 2016, concerning the Office of Personnel Management's ("OPM") final Touhy response.  In response to your letter, this letter provides additional information about the material for which OPM has identified an applicable privilege, as well the basis for such an assertion.

   In the attached table, OPM has provided additional information about the materials for which OPM identified an applicable privilege in its *Touhy* response. [1]  As I explained in our call last month, neither the enclosed information nor the final *Touhy* response constitutes a formal invocation of any privilege by OPM.  *See In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997) (a litigant is not required "to formally invoke its privileges in advance of the motion to compel.").  OPM reserves the right to supplement this information as appropriate.

---

[1] In request (h) of your August 15, 2016, letter, you asked for "[i]nternal emails, memoranda or documents regarding meetings OPM had with Anthem regarding the breach. [Touhy Response] letter at 7."  In its *Touhy* response, OPM did not identify any such materials for which it was claiming a privilege. *See Touhy* response at 6-7.

Please feel free to give me a call if you have any questions about this response.

Sincerely,

Joseph E. Borson

CC: Andrew N. Friedman
Attachment

| Document Category | Plaintiff's Category Description | Document Types / Subcategories within Category | Number of Documents | Applicable Privileges | Withholding Description |
|---|---|---|---|---|---|
| (a) | OIG Office of Audits Information Systems Audit Group ("ISAG") draft audit agenda for FY 2013. And to the extent related to Wellpoint/ Anthem, materials submitted to OIG management for discussion and refinement while developing the 2013 Audit Plan including ISAG's identifying and ranking of potential audit targets. See OPM Letter at 2 | 1) "FY13 Audit Universe" – a pre-decisional spreadsheet combining and organizing data about FEHB plans according to confidential OIG methodology; 2) "ISAG FY 2013 Audit Agenda" – a pre-decisional document prepared by ISAG for Audits senior management, containing recommended audit priorities and projected resource allocation for each proposed audit | 2 | Deliberative Process; Law Enforcement | These documents represent the synthesis of information, selected and organized according to confidential OIG methodology, reflecting proposals and recommendations by ISAG staff in order to advise senior OIG management in the creation and adoption of the final OIG Audit Plan for FY 2013. Exposure of the audit planning and prioritization process would enable audited entities to circumvent the OIG's oversight and enforcement efforts. |
| (b) | Audit workpapers regarding 10 separate statements in the 2013 Audit Report. See OPM Letter at 3 | (1) Auditor Statement: "There is no supporting documentation for this statement, it was the auditors' conclusion/professional opinion based on work performed during the audit. The "interference" was the whole issue about them not allowing us to perform scans." | 0 | N/A | No documents |
| (b) | Audit workpapers regarding 10 separate statements in the 2013 Audit Report. See OPM Letter at 3 | (2) Documents: "Configuration Management Meeting Write Up" and three related scheduling and attendance documents. | 4 | Deliberative Process; Law Enforcement | The OIG conducts audits as part of its unique oversight and enforcement role. The purpose of the IT audit is to ensure the audited entity's compliance with applicable laws, rules, regulations, standards, contract provisions, and other requirements. Factual information gathered during the audit is inextricably intertwined within documents that expose the audit process and reveal the deliberations of auditors as they reach the conclusions ultimately published in the Final Audit Report. Exposure of the audit process would have a chilling effect on the OIG's ability to obtain critical information for its oversight activities and enable audited entities to circumvent OIG's enforcement efforts. Revelation of the pre-decisional thoughts and impressions contained in the workpapers would cloud the Final Audit Report in confusion and contravene the Generally Accepted Government Auditing Standards. Any factual information contained in the workpapers would be available from the audited entity itself and could be obtained without the myriad harmful effects of compelling the government to waive its privileges. Audit workpapers are pre-decisional, deliberative documents, prepared during the course of an audit by individual auditors. Findings and Recommendations in the Final Audit Report are derived from the synthesis of deliberative information in the audit workpapers. Workpapers are designed to inform the conclusions and recommendations contained in the Final Audit Report and reflect the thoughts and impressions of each auditor as they gather information for consideration during the report drafting process. "Meeting Write-Ups" are a form of workpaper documenting conversations or interviews between auditors and representatives of the audited entity, and reveal the mental process of the auditor on possible conclusions to draw from information that is shared during the meeting. The auditor's questions during the meeting reflect not only the auditor's judgment in response to the direction of the audit, but also protected investigative techniques, the revelation of which would undermine the OIG's ability to obtain complete and accurate information from other audited entities. |

| Document Category | Plaintiff Category Description | Document Type / Subcategory within Category | Number of Documents | Applicable Privileges | Withholding Description |
|---|---|---|---|---|---|
| (b) | Audit workpapers regarding 10 separate statements in the 2013 Audit Report. See OPM Letter at 3. | (3) Documents: "Configuration Management Meeting Write Up" and three related scheduling and attendance documents. | 4 | Deliberative Process, Law Enforcement | The OIG conducts audits as part of its unique oversight and enforcement role. The purpose of the IT audit is to ensure the audited entity's compliance with applicable laws, rules, regulations, standards, contract provisions, and other requirements. Factual information gathered during the audit is inextricably intertwined within documents that expose the audit process and reveal the deliberations of auditors as they reach the conclusions ultimately published in the Final Audit Report. Exposure of the audit process would have a chilling effect on the OIG's ability to obtain critical information for its oversight activities and enable audited entities to circumvent OIG's enforcement efforts. Revelation of the pre-decisional thoughts and impressions contained in the workpapers would cloud the Final Audit Report in confusion and contravene the Generally Accepted Government Auditing Standards. Any factual information contained in the workpapers would be indistinguishable from the audited entity itself and could be obtained without the myriad harmful effects of compelling the government to waive its privilege. Audit workpapers are pre-decisional, deliberative documents, prepared during the course of an audit by individual auditors. Findings and recommendations in the Final Audit Report are derived from the synthesis of deliberative information in the audit workpapers. Workpapers are designed to inform the conclusions and recommendations contained in the Final Audit Report and reflect the thoughts and impressions of each auditor as they gather information for consideration during the report drafting process. "Meeting Write-Ups" are a form of workpaper documenting conversations or interviews between auditors and representatives of the audited entity, and reveal the mental process of the auditor on possible conclusions to draw from information that is shared during the meeting. The auditor's questions during the meeting reflect not only the auditor's judgment in response to the direction of the audit, but also protected investigative techniques, the revelation of which would undermine the OIG's ability to obtain complete and accurate information from other audited entities. |
| (c) | Audit workpapers regarding 10 separate statements in the 2013 Audit Report. See OPM Letter at 3. | (4) Auditor Statement: "The portion of the statement that begins 'Failure to routinely review...' does not have supporting documentation. It is based on the auditor's professional opinion of the effect of not having specific controls in place." Documentation. "Meeting Write-Up" are a form of "Network Security Meeting Write Up" and one related attendance document. | 2 | Deliberative Process, Law Enforcement | The OIG conducts audits as part of its unique oversight and enforcement role. The purpose of the IT audit is to ensure the audited entity's compliance with applicable laws, rules, regulations, standards, contract provisions, and other requirements. Factual information gathered during the audit is inextricably intertwined within documents that expose the audit process and reveal the deliberations of auditors as they reach the conclusions ultimately published in the Final Audit Report. Exposure of the audit process would have a chilling effect on the OIG's ability to obtain critical information for its oversight activities and enable audited entities to circumvent OIG's enforcement efforts. Revelation of the pre-decisional thoughts and impressions contained in the workpapers would cloud the Final Audit Report in confusion and contravene the Generally Accepted Government Auditing Standards. Any factual information contained in the workpapers would be indistinguishable from the audited entity itself and could be obtained without the myriad harmful effects of compelling the government to waive its privilege. Audit workpapers are pre-decisional, deliberative documents, prepared during the course of an audit by individual auditors. Findings and recommendations in the Final Audit Report are derived from the synthesis of deliberative information in the audit workpapers. Workpapers are designed to inform the conclusions and recommendations contained in the Final Audit Report and reflect the thoughts and impressions of each auditor as they gather information for consideration during the report drafting process. "Meeting Write-Ups" are a form of workpaper documenting conversations or interviews between auditors and representatives of the audited entity, and reveal the mental process of the auditor on possible conclusions to draw from information that is shared during the meeting. The auditor's questions during the meeting reflect not only the auditor's judgment in response to the direction of the audit, but also protected investigative techniques, the revelation of which would undermine the OIG's ability to obtain complete and accurate information from other audited entities. |

| Document Category | Plaintiff's Category Description | Document Threat / Subcategories within Category | Number of Documents | Applicable Privileges | Withholding Description |
|---|---|---|---|---|---|
| (b) | Audit workpapers regarding 10 separate statements in the 2013 Audit Report. See OPM Letter at 3 | (5) "Network Security Meeting Write Up" and one related attendance document. | 2 | Deliberative Process; Law Enforcement | The OIG conducts audits as part of its unique oversight and enforcement role. The purpose of the IT audit is to ensure the audited entity's compliance with applicable laws, rules, regulations, standards, contract provisions, and other requirements. Factual information gathered during the audit is inextricably intertwined within documents that expose the audit process and reveal the deliberations of auditors as they reach the conclusions ultimately published in the Final Audit Report. Exposure of the audit process would have a chilling effect on the OIG's ability to obtain critical information for its oversight activities and enable audited entities to circumvent OIG's enforcement efforts. Revelation of the pre-decisional thoughts and impressions contained in the workpapers would chill the Final Audit Report in confusion and contravene the Generally Accepted Government Auditing Standards. Any factual information contained in the workpapers would be severable from the audited entity itself and could be obtained without the myriad harmful effects of compelling the government to waive its privileges. Audit workpapers are pre-decisional, deliberative documents, prepared during the course of an audit by individual auditors. Findings and recommendations in the Final Audit Report are derived from the synthesis of deliberative information in the audit workpapers. Workpapers are designed to inform the conclusions and recommendations contained in the Final Audit Report and reflect the thoughts and impressions of each auditor as they gather information for consideration during the report drafting process. "Meeting Write-Up" are a form of workpaper documenting conversations or interviews between auditors and representatives of the audited entity, and reveal the mental process of the auditor on possible conclusion to draw from information that is shared during the meeting. The auditor's questions during the meeting reflect not only the auditor's judgment in response to the direction of the audit, but also potential investigative techniques, the revelation of which would undermine the OIG's ability to obtain complete and accurate information from other audited entities. |
| (b) | Audit workpapers regarding 10 separate statements in the 2013 Audit Report. See OPM Letter at 3 | (6) Auditor Statement: "The statement that begins 'Failure to perform…' does not have supporting documentation. It is based on the auditor's professional opinion of the effect of not having specific controls in place." Document: email from Anthem representative to OIG auditor stating that Anthem policy would not allow vulnerability scans. Vulnerability scanning workpaper describing Anthem's vulnerability scan practices. | 2 | Deliberative Process; Law Enforcement | The OIG conducts audits as part of its unique oversight and enforcement role. The purpose of the IT audit is to ensure the audited entity's compliance with applicable laws, rules, regulations, standards, contract provisions, and other requirements. Factual information gathered during the audit is inextricably intertwined within documents that expose the audit process and reveal the deliberations of auditors as they reach the conclusions ultimately published in the Final Audit Report. Exposure of the audit process would have a chilling effect on the OIG's ability to obtain critical information for its oversight activities and enable audited entities to circumvent OIG's enforcement efforts. Revelation of the pre-decisional thoughts and impressions contained in the workpapers would chill the Final Audit Report in confusion and contravene the Generally Accepted Government Auditing Standards. Any factual information contained in the workpapers would be severable from the audited entity itself and could be obtained without the myriad harmful effects of compelling the government to waive its privileges. Audit workpapers are pre-decisional, deliberative documents, prepared during the course of an audit by individual auditors. Findings and Recommendations in the Final Audit Report are derived from the synthesis of deliberative information in the audit workpapers. Workpapers are designed to inform the conclusions and recommendations contained in the Final Audit Report and reflect the thoughts and impressions of each auditor as they gather information for consideration during the report drafting process. |

| Document Category | Plaintiff's Category Description | Document Type / Subcategory within Category | Number of Documents | Applicable Privilege | Withholding Description |
|---|---|---|---|---|---|
| (b) | Audit workpapers regarding 10 separate statements in the 2013 Audit Report. See OPM Letter at 3 | (7) Auditor Statement: "The portion of the statement that begins "In order to ." at the auditor's summarization of the testing performed to accomplish the audit step. There is no supporting documentation." Documents: email from Anthem representative to OIG auditor stating that Anthem policy would not allow vulnerability scans. | 1 | Deliberative Process, Law Enforcement | The OIG conducts audits as part of its unique oversight and enforcement role. The purpose of the IT audit is to ensure the audited entity's compliance with applicable laws, rules, regulations, standards, contract provisions, and other requirements. Factual information gathered during the audit is inextricably intertwined within documents that expose the audit process and reveal the deliberations of auditors as they reach the conclusions ultimately published in the Final Audit Report. Exposure of the audit process would have a chilling effect on the OIG's ability to obtain critical information for its oversight activities and enable audited entities to circumvent OIG's enforcement efforts. Revelation of the pre-decisional thoughts and impressions contained in the workpapers would cloud the Final Audit Report in confusion and undermine the Generally Accepted Government Auditing Standards. Any factual information contained in the workpapers would be available from the audited entity itself and could be obtained without the myriad harmful effects of compelling the government to waive its privileges. Audit workpapers are pre-decisional, deliberative documents, prepared during the course of an audit to individual auditors. Findings and Recommendations in the Final Audit Report are derived from the synthesis of deliberative information as the audit workpapers. Workpapers are designed to inform the conclusions and recommendations contained in the Final Audit Report and reflect the thoughts and impressions of each auditor as they gather information for consideration during the report drafting process. |
| (b) | Audit workpapers regarding 10 separate statements in the 2013 Audit Report. See OPM Letter at 3 | (8) Auditor Statement: "The portion of the statement that begins "Failure to implement." does not have supporting documentation. It is based on the auditor's professional opinion of the effect of not having specific controls in place." Documents: "Configuration Management Meeting Write-Up" and three related scheduling and attendance documents. | 4 | Deliberative Process, Law Enforcement | The OIG conducts audits as part of its unique oversight and enforcement role. The purpose of the IT audit is to ensure the audited entity's compliance with applicable laws, rules, regulations, standards, contract provisions, and other requirements. Factual information gathered during the audit is inextricably intertwined within documents that expose the audit process and reveal the deliberations of auditors as they reach the conclusions ultimately published in the Final Audit Report. Exposure of the audit process would have a chilling effect on the OIG's ability to obtain critical information for its oversight activities and enable audited entities to circumvent OIG's enforcement efforts. Revelation of the pre-decisional thoughts and impressions contained in the workpapers would cloud the Final Audit Report in confusion and undermine the Generally Accepted Government Auditing Standards. Any factual information contained in the workpapers would be available from the audited entity itself and could be obtained without the myriad harmful effects of compelling the government to waive its privileges. Audit workpapers are pre-decisional, deliberative documents, prepared during the course of an audit to individual auditors. Findings and Recommendations in the Final Audit Report are derived from the synthesis of deliberative information in the audit workpapers. Workpapers are designed to inform the conclusions and recommendations contained in the Final Audit Report and reflect the thoughts and impressions of each auditor as they gather information for consideration during the report drafting process. "Meeting Write-Ups" are a form of workpaper documenting conversations or interviews between auditors and representatives of the audited entity, and reveal the mental process of the auditor as possible conclusions to draw from information that is shared during the meeting. The auditor's questions during the meeting reflect not only the auditor's judgment in response to the direction of the audit, but also protected investigative techniques, the revelation of which would undermine the OIG's ability to obtain complete and accurate information from other audited entities. |

| Document Category | Plaintiff's Category Description | Document Title / Subcategories within the Category | Number of Documents | Applicable Privileges | Withholding Description |
|---|---|---|---|---|---|
| (b) | Audit workpapers regarding 10 separate statements in the 2013 Audit Report. See OPM Letter at 3. | (9) Documents: "Configuration Management Meeting Write Up" and one related attendance document | 2 | Deliberative Process, Law Enforcement | The OIG conducts audits as part of its unique oversight and enforcement role. The purpose of the IT audit is to ensure the audited entity's compliance with applicable laws, rules, regulations, standards, contract provisions, and other requirements. Factual information gathered during the audit is inextricably intertwined within documents that expose the audit process and reveal the deliberations of auditors as they reach the conclusions ultimately published in the Final Audit Report. Exposure of the audit process would have a chilling effect on the OIG's ability to obtain critical information for its oversight activities and enable audited entities to circumvent OIG's enforcement efforts. Revelation of the pre-decisional thoughts and impressions contained in the workpapers would cloud the Final Audit Report in confusion and contravene the Generally Accepted Government Auditing Standards. Any factual information contained in the workpapers would be available from the audited entity itself and could be obtained without the myriad harmful effects of compelling the government to waive its privilege. Audit workpapers are pre-decisional, deliberative documents, prepared during the course of an audit by individual auditors. Findings and Recommendations in the Final Audit Report are derived from the synthesis of deliberative information in the audit workpapers. Workpapers are designed to inform the conclusions and recommendations contained in the Final Audit Report and reflect the thoughts and impressions of each auditor as they gather information for consideration during the report drafting process. "Meeting Write-Ups" are a form of workpaper documenting conversations or interviews between auditors and representatives of the audited entity, and reveal the mental process of the auditor on possible conclusions to draw from information that is shared during the meeting. The auditor's questions during the meeting reflect not only the auditor's judgment in response to the direction of the audit, but also protected investigative techniques, the revelation of which would undermine the OIG's ability to obtain complete and accurate information from other audited entities. |
| (e) | Audit workpapers regarding 10 separate statements in the 2013 Audit Report. See OPM Letter at 3. | (10) Documents: Workpaper describing auditor review of and nonchalance about TCS settings for mainframe. | 1 | Deliberative Process, Law Enforcement | The OIG conducts audits as part of its unique oversight and enforcement role. The purpose of the IT audit is to ensure the audited entity's compliance with applicable laws, rules, regulations, standards, contract provisions, and other requirements. Factual information gathered during the audit is inextricably intertwined within documents that expose the audit process and reveal the deliberations of auditors as they reach the conclusions ultimately published in the Final Audit Report. Exposure of the audit process would have a chilling effect on the OIG's ability to obtain critical information for its oversight activities and enable audited entities to circumvent OIG's enforcement efforts. Revelation of the pre-decisional thoughts and impressions contained in the workpapers would cloud the Final Audit Report in confusion and contravene the Generally Accepted Government Auditing Standards. Any factual information contained in the workpapers would be available from the audited entity itself and could be obtained without the myriad harmful effects of compelling the government to waive its privilege. Audit workpapers are pre-decisional, deliberative documents, prepared during the course of an audit by individual auditors. Findings and Recommendations in the Final Audit Report are derived from the synthesis of deliberative information in the audit workpapers. Workpapers are designed to inform the conclusions and recommendations contained in the Final Audit Report and reflect the thoughts and impressions of each auditor as they gather information for consideration during the report drafting process. |

| Document Category | Plaintiff Category Description | Document Types / Subcategories within Category | Number of Documents | Applicable Privilege | Withholding Description |
|---|---|---|---|---|---|
| (c) | Auditor interview summaries, OPM Letter at 3 | (1) Application Change Control Write-Up; (2) Business Continuity Write-Up; (3) Claims Processing Walkthrough Write-Up; (4) Configuration Management Meeting Write-Up; (5) Debutment meeting write-up; (6) Enterprise security meeting write-up; (7) HR meeting write-up; (8) Logical Access meeting write-up; (9) Network Security Meeting Write-Up; (10) Physical access meeting write-up; (11) Risk Assessment meeting write-up; (12) Special Investigations and Fraud | 12 | Deliberative Process, Law Enforcement | The OIG conducts audits as part of its unique oversight and enforcement role. The purpose of the IT audit is to ensure the audited entity's compliance with applicable laws, rules, regulations, standards, contract provisions, and other requirements. Factual information gathered during the audit is inextricably intertwined within documents that expose the audit process and reveal the deliberations of auditors as they reach the conclusions ultimately published in the Final Audit Report. Exposure of the audit process would leave a chilling effect on the OIG's ability to obtain critical information for its oversight activities and enable audited entities to circumvent OIG enforcement efforts. Revelation of the pre-decisional thoughts and impressions contained in the workpapers would reveal the Final Audit Report is confusion and contravene the Generally Accepted Government Auditing Standards. Any factual information contained in the workpapers would be available from the audited entity itself and could be obtained without the myriad harmful effects of compelling the government to waive its privileges. Audit workpapers are pre-decisional, deliberative documents, prepared during the course of an audit by individual auditors. Findings and Recommendations in the Final Audit Report are derived from the synthesis of deliberative information in the audit workpapers. Workpapers are designed to inform the conclusions and recommendations contained in the Final Audit Report and reflect the thoughts and impressions of each auditor as they gather information for consideration during the report drafting process. "Meeting Write-Ups" are a form of workpaper documenting conversations or interviews between auditors and representatives of the audited entity, and reveal the mental process of the auditor on possible conclusions to draw from information that is shared during the meeting. The auditor's experience during the meeting reflect not only the auditor's judgment in response to the direction of the audit, but also protected investigative techniques, the revelation of which would undermine the OIG's ability to obtain complete and accurate information from other audited entities. |
| (d) | Internal emails and inter-agency memoranda that relate to security and/or the confidentiality of enrollee PII or PHI on Anthem's networks. OPM Letter at 4 | (1) Emails between ISAG and Audit Resolution Branch re closing | 3 | Deliberative Process | Internal emails between ISAG and Audit Resolution Branch discerning how to close out recommendation stemming from the 2015 Audit. Exposure of the deliberative process would chill the frank exchange of ideas among OPM employees regarding programmatic decisions. |
| (d) | Internal emails and inter-agency memoranda that relate to security and/or the confidentiality of enrollee PII or PHI on Anthem's networks. OPM Letter at 4 | (2) Post-breach emails within OIG discerning Anthem IT security | 8 | Deliberative Process, Law Enforcement, Attorney-Client | These emails contain the deliberations of OIG staff, in consultation with OIG counsel, in the process of determining what was known about the Anthem breach. The primary purpose of the emails is to determine a course of action in response to the breach, and includes proposals and drafts. Exposure of the deliberative process in that situation would chill the frank exchange of ideas among OIG employees and create public confidence about the distinction between official findings and statements, and individual employees' theories and proposals. It would also violate the attorney-client privilege. |
| (e) | Internal emails and inter-agency memoranda that relate to security and/or the confidentiality of enrollee PII or PHI on Anthem's networks. OPM Letter at 4 | (3) Post-breach emails within OIG discerning Anthem strategy for 2015 au | 3 | Deliberative Process, Law Enforcement, Attorney-Client | These emails contain the deliberations of OIG staff, in consultation with OIG counsel, in the process of determining what was known about the Anthem breach. The primary purpose of the emails is to determine a course of action in response to the breach, and includes proposals and drafts. Exposure of the deliberative process in that situation would chill the frank exchange of ideas among OIG employees and create public confidence about the distinction between official findings and statements, and individual employees' theories and proposals. It would also violate the attorney-client privilege. |
| (e) | Follow-up audit workpapers that provide the factual basis of assertions set forth in the 2016 draft audit report provided by OPM/OIG to Anthem. OPM Letter at 4 | N/A | ... | Deliberative Process, Law Enforcement | Not possible to identify specific documents because reference to "assertions" is overly broad and vague. However, any workpaper providing the factual basis for the 2016 draft audit report are protected by the deliberative process privilege. |
| (f) | Internal emails concerning Anthem's compliance or noncompliance with the terms of Contract No. 1039 (including any amendments or modifications thereto) related to security and/or the confidentiality of enrollee PII or PHI on Anthem's networks. OPM Letter at 5 | Emails within OIG analyzing whether Anthem complied with breach notification requirement of 2015 contract | 4 | Deliberative Process, Law Enforcement, Attorney-Client | These emails contain the deliberations of OIG staff, in the process of determining what was known about the Anthem breach in relation to Anthem's compliance with the notification requirements in the 2015 carrier contract. The primary purpose of the emails is to determine a course of action in response to the breach, and includes proposals and drafts. Exposure of the deliberative process in that situation would chill the frank exchange of ideas among employees and create public confidence about the distinction between official findings and statements, and individual employees' theories and proposals. It would also violate the attorney-client privilege. |

| Document Category | Plaintiff Category Description | Document Type(s)/Subcategories within Category | Number of Documents | Applicable Privileges | Withholding Description |
|---|---|---|---|---|---|
| (g) | Internal emails and memoranda regarding the development of tools to enable safe access to Webports/IT system. OPM Letter at 6 | 1) Emails between OIG and FEHB discussing carrier comments on 2014 FEHB Contract Amendment | 13 | Deliberative Process | These emails pertain to OPM's effort, following the difficulties with the 2015 Anthem audit, to modify the 2014 FEHB carrier contracts in a way that provided better OIG IT audit access. In these emails, OPM employees discuss issues raised during the contracting process. Exposure of the deliberative process in this situation would chill the frank exchange of ideas among OPM employees and create public confusion about the distinction between the opinions of individual OPM employee and final OPM action in the contract modification process. |
| (g) | Internal emails and memoranda regarding the development of tools to enable safe access to Webports/IT system. OPM Letter at 6 | 2) Emails between OIG and FEHB re 2014 FEHB Contract Amendment language for OIG IT Audit Access | 26 | Deliberative Process | These emails pertain to OPM's effort, following the difficulties with the 2015 Anthem audit, to modify the 2014 FEHB carrier contracts in a way that provided better OIG IT audit access. In these emails, OPM employees discuss issues raised during the contracting process. Exposure of the deliberative process in this situation would chill the frank exchange of ideas among OPM employees and final OPM action in the contract modification process. |
| (g) | Internal emails and memoranda regarding the development of tools to enable safe access to Webports/IT system. OPM Letter at 6 | 3) Emails between OIG and OPM regarding 2015 contract modifications (post Anthem breach) | 4 | Deliberative Process | These emails pertain to OPM discussions about potential contractual modifications potentially necessitated after the Anthem breach. In these emails, OPM employees discuss issues raised during the contracting process. Exposure of the deliberative process in this situation would chill the frank exchange of ideas among OPM employees and final OPM action in the contract modification process. |
| (g) | Internal emails and memoranda regarding the development of tools to enable safe access to Webports/IT system. OPM Letter at 6 | 4) Emails between OIG, OPM, and Carrier representatives re 2014 FEHB Contract Amendment for IT Audit Access | 3 | Deliberative Process | These emails discuss potential contractual modifications. Exposure of the deliberative process in this situation would chill the frank exchange of ideas among OPM employees and create public confusion about the distinction between the opinions of individual OPM employee and final OPM action in the contract modification process. |
| (g) | Internal emails and memoranda regarding the development of tools to enable safe access to Webports/IT system. OPM Letter at 6 | 5) Emails within OIG discussing carrier comments on 2014 FEHB Contract Amendment | 4 | Deliberative Process, Attorney-Client | These emails pertain to OPM's effort, following the difficulties with the 2015 Anthem audit, to modify the 2014 FEHB carrier contracts in a way that provided better OIG IT audit access. In these emails, OPM employees discuss the consequences of various proposals. The emails also reflect internal deliberations prior to the OIG's adoption of a position with regard to the proposed modifications. Exposure of the deliberative process in this situation would chill the frank exchange of ideas among OIG employees and create public confusion about the distinction between the opinions of individual OIG employee and final OPM action in the contract modification process. It would also violate the attorney-client privilege. |
| (g) | Internal emails and memoranda regarding the development of tools to enable safe access to Webports/IT system. OPM Letter at 6 | 6) Emails within OIG re 2014 FEHB Contract Amendment language for OIG IT Audit Access | 12 | Deliberative Process, Attorney-Client | These emails pertain to OPM's effort, following the difficulties with the 2015 Anthem audit, to modify the 2014 FEHB carrier contracts in a way that provided better OIG IT audit access. In these emails, OIG employees seek OIG counsel's advice on the consequences of various proposals. The emails also reflect internal deliberations prior to the OIG's adoption of a position with regard to the proposed modifications. Exposure of the deliberative process in this situation would chill the frank exchange of ideas among OIG employees and create public confusion about the distinction between the opinions of individual OIG employee and final OPM action in the contract modification process. It would also violate the attorney-client privilege. |
| (g) | Internal emails and memoranda regarding the development of tools to enable safe access to Webports/IT system. OPM Letter at 6 | 7) Emails within OIG regarding 2015 contract modifications (post Anthem breach) | 8 | Deliberative Process, Attorney-Client | Following the Anthem breach, OIG proposed to OPM that it engage in a new effort to strengthen the contract language or issue a carrier letter to improve OIG IT audit access. These emails include deliberations within OIG reflecting the adoption of positions on the modifications effort and include the exchange of ideas, proposed language, and suggested responses to events during the process. The emails reflect advice from OIG staff members for senior OIG management, including the Inspector General, on potential courses of action. The emails also include consultation with OIG counsel on the consequences of certain positions. Exposure of the deliberative process in this situation would chill the frank exchange of ideas among OIG employees and create public confusion about the distinction between the opinions of individual OIG employee and final OPM action in the contract modification process. It would also violate the attorney-client privilege. |